**ADDENDUM**

## TABLE OF CONTENTS

Motion for Preliminary Injunction (February 11, 2025) (Dkt. 14)…………………1

    Exhibits (February 11, 2025) (Dkt. 15)………………….……………..…..33

Opposition to Motion for Preliminary Injunction
    (February 19, 2025) (Dkt. 31)……………………………………...……….260

    Exhibits (February 19, 2025) (Dkt. 31)……………………………....296

Reply in Support of Motion for Preliminary Injunction
    (February 22, 2025) (Dkt. 36)……………….…..………………………315

District Court Order (February 28, 2025) (Dkt. 45)…………………….……334

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DOROTHY A. FINK, in her official capacity as Acting Secretary of Health and Human Services, <br><br> *Defendants.* | Case No. C25-255 JNW <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> NOTE ON MOTION CALENDAR: FEBRUARY 24, 2025[*] <br><br> ORAL ARGUMENT REQUESTED |

_____

[*] This noting date reflects the expedited briefing schedule for this motion agreed to by Plaintiffs and Defendants. A stipulated notice outlining this schedule will be filed concurrently.

PLS.' MOT. FOR PRELIM. INJ. – i
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

I.    The Trump Administration has issued a systemwide ban of refugees in an attempt to dismantle the USRAP. ................................................................. 2

II.    USRAP is a congressionally created lifeline for refugees around the world to seek safety in the United States. ......................................................... 5

III.    The Trump Administration previously and unlawfully attempted to ban refugees, with lingering effects. ........................................................... 8

ARGUMENT ............................................................................................................. 8

I.    Plaintiffs are irreparably harmed by the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and have standing to challenge them. .......................................................................... 9

    A.    The individual Plaintiffs are irreparably harmed and have standing. ......... 9

    B.    The organizational Plaintiffs are irreparably harmed and have standing. ........................................................................... 11

II.    Plaintiffs are likely to succeed on the merits of their claims. ................. 13

    A.    The Refugee Ban EO is *ultra vires*. ............................................. 14

        1.    The President lacks authority to override the Refugee Act. ......... 14

        2.    Section 212(f) does not justify the Refugee Ban EO. .................. 17

    B.    The Agency Suspension violates the INA and APA. ........................ 19

        1.    Defendants cannot rewrite the Refugee Act. ............................ 19

        2.    The Agency Suspension and Refugee Funding Suspension should have been subject to notice-and-comment rulemaking. ..... 22

    C.    The Agency Suspension and Refugee Funding Suspension are arbitrary and capricious. .......................................................... 23

    D.    The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension violate the due process rights of follow-to-join petitioners. ......................................................................... 26

III.    The balance of equities and public interest support a preliminary injunction. ..... 26

CONCLUSION ......................................................................................................... 28

PLS.' MOT. FOR PRELIM. INJ. – ii
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 002

## **INTRODUCTION**

A Congolese refugee stranded awaiting travel to the United States with his wife and infant child; a mother and daughter awaiting reunification for seven years; a Yazidi refugee persecuted for his religious beliefs in Iraq; resettlement agencies facing catastrophic cuts to services, staffing, and funding overnight: These are among the Plaintiffs facing irreparable and, indeed, immeasurable harm because of the Trump Administration's ongoing actions to end the resettlement of refugees to the United States and dismantle the congressionally created U.S. Refugee Admissions Program ("USRAP") in its entirety. The Administration has suspended—indefinitely—the processing and admission of all refugees, is denying recently resettled refugees the transitional assistance they depend on to begin their lives in the United States, and has stopped funding the organizations that carry out these critical refugee resettlement services. It has done so through an executive order titled "Realigning the United States Refugee Admissions Program" (the "Refugee Ban EO" or "Order"), Defendants' implementation of that order, and the agencies' suspension of funding to USRAP resettlement partners. These actions by the President and the Department of State ("DOS"), Department of Homeland Security ("DHS"), and Department of Health and Human Services ("DHHS") violate the Refugee Act of 1980 ("Refugee Act"), the Administrative Procedure Act ("APA"), and the U.S. Constitution. Plaintiffs are thus likely to succeed on the merits of their claims.

The Trump Administration's refugee ban and related funding suspension are already inflicting—and, absent expedited relief, will continue to inflict—catastrophic and irreparable harm on refugees, their family members, and organizations that are the backbone of the USRAP. Because of the funding cuts, Plaintiffs Church World Service, Inc. ("CWS") and HIAS, Inc. ("HIAS") have already had to furlough hundreds of staff worldwide and must decide whether they can outlast this assault on refugee resettlement long enough to again welcome refugees when, if ever, the program resumes. The individual Plaintiff refugees (and others like them) have seen the doors to this country suddenly slammed shut, dashing their hopes of ever reaching safety and

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1 reuniting with family members. The harm of this lost time and infrastructure cannot be remedied
2 and compounds each day that the Administration's policies are permitted to stand.

3 A preliminary injunction is imperative to protect Plaintiffs and the future of refugee
4 resettlement in the United States from the Trump Administration's executive order, Defendants'
5 suspension of refugee processing and admissions, and the suspension of USRAP-related funding
6 to resettlement partners.

7 **BACKGROUND**

8 **I.  The Trump Administration has issued a systemwide ban of refugees in an attempt to dismantle the USRAP.**

9 Declaring that "it is the historic policy of the United States to respond to the urgent needs
10 of persons subject to persecution in their homelands," Congress passed the Refugee Act as an
11 amendment to the Immigration and Nationality Act ("INA") to provide a "permanent and
12 systematic procedure" for refugee admissions. Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980). The
13 Refugee Act created the modern-day USRAP, through which refugees are interviewed, thoroughly
14 vetted by multiple government agencies, and matched to resettlement agencies or private sponsor
15 groups that help them resettle in the United States. *See* Ex. 1.[1] For decades, the USRAP has served
16 as a lifeline for millions of refugees from around the world, with 100,034 refugees admitted in
17 fiscal year 2024. *See* Ex. 2.

18 The Administration threw that carefully crafted system into crisis and disarray on January
19 20, 2025, after President Donald J. Trump vowed on the campaign trail to "suspend refugee
20 resettlement" as part of a broader effort to "immediately end the migrant invasion of America."
21 Ex. 11. President Trump took the first step to fulfill that promise just hours into his second term.
22 The Refugee Ban EO directed that the entry of refugees under the USRAP be suspended
23 indefinitely until President Trump determines that resumption is in the interests of the United
24 States—as he has defined those interests in the Order. *See* Exec. Order No. 14163, 90 Fed. Reg.

25 _____

26 [1] Exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with this motion.

PLS.' MOT. FOR PRELIM. INJ. – 2
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

8,459 (Jan. 20, 2025). The Refugee Ban EO cites as justifications "record levels of migration," influxes of migrants that have caused major cities to seek federal aid to manage the "burden of new arrivals," and emergency declarations by New York and Massachusetts "because of increased migration." *Id.* § 1.

Section 4 of the Order outlines the process for making the finding of whether USRAP can resume: The Secretaries of State and Homeland Security must submit a report within ninety days to the President—through his Homeland Security Advisor, Stephen Miller—as to whether resumption of refugee admissions "would be in the interests of the United States"; reports will continue every ninety days thereafter until President Trump makes the determination required to resume the USRAP. *Id.* § 4. The Order provides that this determination be made in light of President Trump's stated refugee policies: (1) to "ensure that public safety and national security are paramount considerations in the administration of the USRAP"; (2) "to admit only those refugees who can fully and appropriately assimilate into the United States"; (3) "to ensure that the United States preserves taxpayer resources for its citizens"; and (4) that state and local jurisdictions be granted a role in the process of determining the resettlement of refugees in their jurisdictions. *Id.* § 2.

The immense impact of the Refugee Ban EO is clear from its face. Unlike the first Trump Administration's refugee ban of October 2017, *see infra* p. 8, it suspends *all* refugee admissions across all nationalities and subprograms. It suspended decisions on applications for refugee status immediately and admissions as of 12:01 a.m. EST on January 27, 2025. *Id.* § 3(a). And it provides no deadline by which the President will make a decision as to whether the program can resume. Although the Order suggests that exceptions to the suspension can be made on a case-by-case basis should the Secretaries of State and Homeland Security find that the "entry of such [refugees] is in the national interest and does not pose a threat to the security or welfare of the United States," *id.* § 3(c), it does not provide any process for seeking or making such exceptions. The Refugee Ban EO also directs the Secretary of Homeland Security, in consultation with the Attorney General, to

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   propose a way for state and local jurisdictions to have greater involvement in the process of

2   determining the placement of refugees in their jurisdictions, consistent with applicable law. *Id.*

3   § 3(d).

4          The agencies overseen by Defendants immediately moved to implement the Order's

5   suspension on refugee decisions and admissions and, in fact, *expanded* its scope (the "Agency

6   Suspension"). The day after the Order was signed, DOS's Bureau of Population, Refugees, and

7   Migration ("PRM") sent an email to refugee resettlement partners stating that *all* refugee case

8   processing, including referrals of new cases to the program and all processing of existing cases,

9   was suspended. Ex. 23 ¶¶ 29–30; Ex. 24 ¶¶ 35–36. PRM further advised that all previously

10  scheduled travel for refugees was being canceled, including travel scheduled to take place before

11  the effective date set out in the Order, and that no new travel would be booked. Ex. 23 ¶¶ 29–30;

12  Ex. 24 ¶¶ 35–36. Thousands of refugees, including many with imminent travel scheduled, found

13  themselves trapped mid-process. DOS has provided no information to resettlement partners

14  regarding the case-by-case waiver contemplated by the Order. Ex. 23 ¶ 28; Ex. 24 ¶ 40.

15         The agencies overseen by Defendants then took the unprecedented step of suspending all

16  funding to resettlement partners, including Plaintiff resettlement agencies, for their work

17  processing USRAP applications overseas and their provision of post-arrival services to refugees

18  in the United States. On January 24, 2025, PRM sent notices of suspension to the resettlement

19  agencies, ordering that they immediately "stop all work" under their cooperative agreements to

20  provide Reception and Placement services and refugee case processing through Resettlement

21  Support Centers ("RSCs") and other consortia, and that they not incur any new costs after the date

22  of the letter (the "Suspension Notices"). Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45. The Suspension Notices

23  further ordered that the resettlement agencies "cancel as many outstanding obligations as

24  possible." Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45.

25         DOS claims that the Suspension Notices—issued without notice and effective

26  immediately—are necessary because foreign assistance programs "may no longer effectuate

PLS.' MOT. FOR PRELIM. INJ. – 4
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   agency priorities" such that the government must review the programs and decide whether to

2   "continue, modify, or terminate" them. Ex. 23 ¶ 43; Ex. 24 ¶¶ 44–45. But the notices threaten to

3   imminently eviscerate the refugee resettlement infrastructure and destabilize recently arrived

4   refugees: They halt all funding for resettlement agencies' work and the provision of statutorily

5   mandated benefits and services to individuals in the United States. Ex. 23 ¶¶ 43–45; Ex. 24 ¶¶ 28,

6   44–45. And, in any event, these extraordinary, devastating agency actions have no obvious

7   connection to the sole authority cited—President Trump's executive order titled "Reevaluating

8   and Realigning United States Foreign Aid" (the "Foreign Aid EO"), which required a ninety-day

9   pause of all funding for "foreign development assistance" pending a review to ensure alignment

10  with President Trump's foreign policy. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025).

11  The government has not explained how processing cases for a U.S. immigration program and

12  support for resettled refugees in the United States plausibly relate to "foreign development

13  assistance."

14          Also beginning on January 20, 2025, DOS and the Office of Refugee Resettlement

15  ("ORR") a subagency of DHHS, began withholding reimbursements to resettlement agencies for

16  work performed pursuant to cooperative agreements to provide support for recently arrived

17  refugees and Special Immigrant Visa ("SIV") recipients, without any announcement or

18  explanation for this action (the "*Sub Silentio* Suspension," and together with the Suspension

19  Notices, the "Refugee Funding Suspension"). Ex. 23 ¶¶ 46–47, 53; Ex. 24 ¶ 59. Since receiving

20  the Suspension Notices, CWS and HIAS have not received reimbursements for millions of dollars

21  they are owed from DOS for work performed in November and December 2024, well before the

22  Suspension Notices and the Foreign Aid EO issued. Ex. 23 ¶¶ 46–47, 53; Ex. 24 ¶ 59.

23  **II.    USRAP is a congressionally created lifeline for refugees around the world to seek
         safety in the United States.**

24          As Congress has authorized, only certain refugees "of special humanitarian concern" to the

25  United States are considered for resettlement via the USRAP. 8 U.S.C. § 1157(c)(1). The

26

PLS.' MOT. FOR PRELIM. INJ. – 5
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

categories of refugees determined to be of special humanitarian concern to the United States are set out annually in a report to Congress from DOS, DHS, and DHHS. *See, e.g.*, Ex. 3, at 15–16. Generally, a refugee must either be referred by a designated entity (such as the United Nations High Commissioner for Refugees or a group of private individual sponsors) or be eligible to apply directly to the program because they belong to a group with shared characteristics (designated by statute or DOS in the annual report to Congress). *See id.* at 15–21. Congress also authorizes refugees already resettled to the United States to apply for their spouse and unmarried minor children to join them—the "follow-to-join" program. *See* 8 U.S.C. § 1157(c)(2)(A). Those family members are entitled to admission as refugees so long as they are not inadmissible under specific statutory grounds—that is, the U.S. government lacks discretion to deny their applications for any other reason. *See id.* Refugees and follow-to-join family members are subject to the ceiling on refugee admissions set by the President through the annual "presidential determination" as "justified by humanitarian concerns or . . . otherwise in the national interest." 8 U.S.C. § 1157(a)(3). President Joe Biden provided for 125,000 refugees to be resettled to the United States in fiscal year 2025. *See* Ex. 4. As of December 31, 2024, 27,308 of them had been admitted. Ex. 2.

Once a refugee or follow-to-join family member's case is in the USRAP pipeline, the processing of their application is generally the same: They are interviewed; subject to rigorous background, security, and medical checks; and, in the case of refugee applicants, required to attend cultural orientation to prepare for their arrival in the United States. *See* Ex. 5. Some of these processing steps are handled by resettlement partners, such as third-party-operated RSCs located overseas and the International Organization for Migration. Pursuant to cooperative agreements with DOS, the RSCs conduct intake interviews, collect information to facilitate security screening and adjudication by the U.S. government, schedule interviews and medical exams, and offer cultural orientation. Ex. 6.

After an applicant has been conditionally approved by the DHS, DOS requests a "sponsorship assurance" from one of ten national resettlement agencies—including Plaintiffs

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    CWS and HIAS. Exs. 1, 5–6; *see also* Ex. 7 (listing refugee resettlement partners, including U.S.

2    resettlement agencies). When a resettlement agency provides an assurance, it assumes

3    responsibility through one of its local affiliates—such as Plaintiff Lutheran Community Services

4    Northwest ("LCSNW")—to provide basic necessities and integration services during the refugee's

5    initial period of resettlement. *See* Exs. 1, 8. These services help refugees and their families

6    integrate and achieve self-sufficiency in coordination with efforts from state and local actors,

7    community groups, and others. For example, resettlement agencies have developed relationships

8    with local landlords such that they are able to secure housing before refugees arrive, even though

9    the refugees have no credit history or bank accounts. *See* Ex. 23 ¶¶ 12–13; Ex. 24 ¶¶ 16, 25; Ex. 25

10    ¶¶ 17–19. Through decades of work, the Plaintiff resettlement agencies, like other resettlement

11    agencies, have built the necessary infrastructure and local relationships to provide these services.

12    Ex. 23 ¶¶ 11–14; Ex. 24 ¶¶ 10–12, 35; Ex. 25 ¶¶ 17–20.

13        Part of the funding for the resettlement agencies' provision of life-changing post-arrival

14    support comes from cooperative agreements with DOS. Ex. 9. This funding covers up to the first

15    ninety days a refugee is in the United States and is used to provide housing, furnishings, food,

16    clothing, orientation, and assistance with access to social, medical, educational, and employment

17    services. *Id.*[2] Under their cooperative agreements, resettlement agencies are reimbursed a set

18    amount per refugee or SIV recipient they sponsor, which is split between direct assistance to the

19    family and the local affiliate's services and overhead supporting the family. Ex. 23 ¶ 49; Ex. 24

20    ¶ 54; Ex. 25 ¶¶ 14, 38–39.

21        Resettlement agencies also receive funding through ORR for longer-term assistance to

22    refugees and SIV recipients. *See* 8 U.S.C. §§ 1521, 1522(b). ORR enters into cooperative

23    agreements with the resettlement agencies to reimburse them for their work supporting the

24

25    ──────────────
     [2] These benefits are also authorized for Afghan and Iraqi SIV holders. *See* Refugee Crisis
26    in Iraq Act of 2008, Pub. L. 110-181, § 1244(g), 122 Stat. 3; Afghan Allies Protection Act of 2009,
     Pub. L. 111-8, § 602(b)(8), 123 Stat. 807.

PLS.' MOT. FOR PRELIM. INJ. – 7
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

integration of recently arrived refugees and SIV recipients after their first ninety days in the United States. Ex. 8; Ex. 24 ¶ 17; Ex. 25 ¶¶ 15, 21–25.

### III.   The Trump Administration previously and unlawfully attempted to ban refugees, with lingering effects.

In 2017, after campaigning on a promise to ban Muslims, refugees, and especially Muslim refugees from the United States, President Trump repeatedly attempted to suspend the USRAP and block refugees from the United States; each attempt was enjoined. *See* Dkt. # 1 ¶¶ 78–86 (outlining executive orders and court challenges); *HIAS, Inc. v. Trump*, 415 F.Supp.3d 669, 686 (D. Md. 2020) (preliminarily enjoining executive order giving state and local governments power to veto where refugees are resettled), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The first Trump Administration's third attempt was challenged in this district by several directly affected resettlement agencies and individuals, and the court quickly blocked the administration from enforcing it. *See Doe v. Trump*, 288 F.Supp.3d 1045, 1086 (W.D. Wash. 2017). That case ultimately settled, with the government prioritizing the processing of refugee cases that were close to complete at the time the ban went into effect. *See* Stipulated Dismissal, *Doe v. Trump*, C17-0178JLR (W.D. Wash. Feb. 20, 2020), Dkt. # 205. Five years later, many of the cases covered by that settlement are still pending. *See* Ex. 10. After having had their cases delayed for over eight years due to the refugee bans of the first Trump Administration, these refugees are now stuck once again due to President Trump's latest refugee ban—which seeks to impose even more widescale damage by dismantling refugee resettlement to the United States *in its entirety*.

### <u>ARGUMENT</u>

Together, the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension have placed the lives of hundreds of thousands of refugees on hold, left families separated without hope of reuniting, threatened the survival of those who recently arrived in the United States, created an existential crisis for the nonprofit organizations that serve them, and left the future of the USRAP hanging in the balance. Plaintiffs respectfully request that the Court preliminarily

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  enjoin these challenged actions to stop the irreparable harm currently being imposed on Plaintiffs
2  and countless other individuals and organizations.

3        A preliminary injunction is warranted where plaintiffs establish that (1) they are likely to
4  succeed on the merits, (2) irreparable harm is likely in the absence of preliminary relief, (3) the
5  balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat.*
6  *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach to
7  preliminary relief, "serious questions going to the merits and a balance of hardships that tips
8  sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the
9  plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the
10 public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (cleaned
11 up).

12 **I.   Plaintiffs are irreparably harmed by the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and have standing to challenge them.**
13

14      **A.   The individual Plaintiffs are irreparably harmed and have standing.**

       Each individual Plaintiff in this case has standing to challenge the Refugee Ban EO, the
15 Agency Suspension, and/or the Refugee Funding Suspension, and each is irreparably harmed by
16 one or more of the challenged actions. These Plaintiffs[3] are:
17

18      •   **Pacito**, a refugee from the Democratic Republic of the Congo, who, after learning
           his travel scheduled for January 22, 2025, had been abruptly canceled, slept in a
19         parking lot outside the travel office with his wife and infant child, hoping that it
           was just a mistake. Ex. 14 ¶¶ 9, 29–30.

20      •   **Esther**, a U.S. citizen and former refugee living in Idaho, and **Josephine**, her
           daughter stranded in South Africa, who have been waiting for seven years to
21         reunite. Ex. 15 ¶¶ 4–5, 10, 17; Ex. 16 ¶¶ 2, 30–31.

22      •   **Sara**, an Iraqi refugee stranded in dangerous conditions in Jordan, who longs to
           reunite with her eldest son in the United States and fears she might miss the birth
23         of her first grandchild. Ex. 17 ¶¶ 2–7, 19, 21.

24

       [3] The individual Plaintiffs are each proceeding under pseudonym out of fear that, if their
25 names are publicized in connection with this lawsuit, they or their family members will be
26 vulnerable to harassment in the United States or to reprisals from the government or other actors
   abroad. *See* Ex. 14 ¶ 47; Ex. 16 ¶ 34; Ex. 17 ¶ 23; Ex. 18 ¶ 34; Ex. 20 ¶ 29; Ex. 21 ¶ 18.

PLS.' MOT. FOR PRELIM. INJ. – 9
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

- **Alyas**, a Yazidi refugee from Iraq, who is desperate to find a safe home where his family can practice their religion freely and without fear. Ex. 18 ¶¶ 10–11, 25.

- **Marcos**, whose stepdaughter in El Salvador was on the verge of travel after her case had stalled due to program suspensions during the first Trump Administration, only to have the hope of reuniting dashed again. Ex. 19 ¶¶ 2–3, 11–13, 18–21.

- **Ali**, a newly arrived refugee living on his own, who worries that he will be unable to gain work and security without the critical support he received through the Refugee Cash Assistance program. Ex. 20 ¶¶ 2, 19, 22–25.

- **Ahmed**, an Afghan refugee and peace activist who longs to pursue his studies and begin his life anew instead of being stuck in limbo in Germany. Ex. 21 ¶¶ 4, 7, 13–15.

- **Rachel**, a Washington-based sponsor whose Jewish faith motivated her to spend many hours preparing and fundraising over $15,000 to welcome an Afghan refugee family through the Welcome Corps program. Ex. 22 ¶¶ 3, 5, 8–18.

The individual Plaintiffs have standing because their injuries described above are traceable to the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension and will be redressed by vacating or enjoining those unlawful actions. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As a result of the challenged actions, the Plaintiffs stranded abroad are injured by their inability to pursue their cases and travel to the safety of the United States. And, as demonstrated by the ongoing effects of President Trump's first refugee ban, even a short delay results in "cascading effects that prolong a refugee's processing and ultimate admission." *Doe*, 288 F.Supp.3d at 1070 (explaining how refugees' security and medical checks expire and must be reinitiated in order to travel (citing *Hawai'i v. Trump*, 871 F.3d 646, 664 (9th Cir. 2017))). Many of the individual Plaintiffs are injured by prolonged separation from their family members, Ex. 14 ¶ 42; Ex. 15 ¶¶ 22–23; Ex. 16 ¶¶ 27–28; Ex. 17 ¶¶ 18, 20–21; Ex. 18 ¶¶ 26–30; Ex. 19 ¶¶ 15, 19–21, 23–24; Ex. 21 ¶ 15, and are at risk of physical harm because they are unable to travel to the United States, Ex. 14 ¶ 37; Ex. 16 ¶ 31; Ex. 17 ¶ 19; Ex. 18 ¶¶ 10, 20. The petitioner and sponsor Plaintiffs are harmed by loss of funds spent on planning to welcome family members and the family they prepared to sponsor. Ex. 15 ¶ 22; Ex. 19 ¶¶ 16–17; Ex. 22 ¶¶ 14–15, 25. And the Plaintiffs who sold belongings and gave up jobs in anticipation of their imminent travel to the

PLS.' MOT. FOR PRELIM. INJ. – 10
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   United States are harmed by loss of funds and threats to their livelihood. Ex. 14 ¶¶ 17–20, 34–36,

2   39; Ex. 16 ¶¶ 21, 30; Ex. 17 ¶¶ 14, 21; Ex. 18 ¶ 22. Plaintiff Ali, who recently arrived in the United

3   States, is injured by the loss of benefits and case management support he relies on to help him

4   achieve self-sufficiency, including through finding a job and securing financial assistance. Ex. 20

5   ¶¶ 17–24.

6        These harms represent paradigmatic irreparable injury. Prolonged separation from one's

7   family is irreparable harm. *See Hawai'i v. Trump*, 859 F.3d 741, 782–83 (9th Cir.) (per curiam),

8   *vacated on mootness grounds*, 583 U.S. 941 (2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70

9   (9th Cir. 2011) (per curiam) (recognizing that "important [irreparable harm] factors include

10  separation from family members" (cleaned up)). So too is the risk of physical harm to those abroad

11  resulting from their inability to seek safety in the United States. *Cf. Leiva-Perez*, 640 F.3d at 969

12  (likelihood of physical danger if asylum-seeker is returned to his or her home country is part of

13  irreparable harm inquiry). Likewise irreparable is the economic harm suffered by individual

14  plaintiffs who sold belongings and gave up jobs in reliance on anticipated travel. *See E. Bay*

15  *Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (economic harm is irreparable

16  "where parties cannot typically recover monetary damages flowing from their injury—as is often

17  the case in APA cases"). The need for preliminary relief here is apparent and acute.

18       **B.    The organizational Plaintiffs are irreparably harmed and have standing.**

19       The challenged actions also inflict devastating and irreparable harm on Plaintiffs CWS,

20  HIAS, and LCSNW, which gives them standing to seek preliminary relief. The organizational

21  Plaintiffs resettle, reunite, and serve refugees to fulfill their longstanding political, moral, and, in

22  some cases, religious commitments to welcome the stranger. Ex. 23 ¶¶ 4–6, 14; Ex. 24 ¶¶ 5–6; Ex.

23  25 ¶¶ 4–5. Plaintiffs CWS and HIAS, both national resettlement agencies, have resettled over

24  *5 million* refugees since their founding and have offices across the nation and the world. Ex. 23

25  ¶¶ 7, 9–10 (CWS has offices in sixteen countries and provides services across twenty-four states,

26  either directly or through affiliates); Ex. 24 ¶¶ 10–12 (HIAS has offices in twenty-one countries

PLS.' MOT. FOR PRELIM. INJ. – 11
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   and thirty affiliate locations throughout seventeen states). In addition, CWS and HIAS operate

2   RSCs pursuant to cooperative agreements with DOS, through which they provide regional refugee

3   processing services for USRAP. Ex. 23 ¶¶ 17, 23–24; Ex. 24 ¶¶ 19, 21. Over one hundred million

4   dollars in anticipated revenue under those agreements has now been suspended indefinitely due to

5   the Refugee Funding Suspension. Ex. 23 ¶¶ 19, 43–45, 49–52; Ex. 24 ¶¶ 28, 44–45; Ex. 25 ¶¶ 11–

6   12, 21, 26. The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension thus

7   directly threaten and interfere with the organizational Plaintiffs' "core business activities." Ex. 23

8   ¶¶ 6, 8, 28, 40–41, 47, 49–56; Ex. 24 ¶¶ 10, 30–31, 38, 42, 55–56; Ex. 25 ¶¶ 3, 26–30, 34, 37–41;

9   *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (organization has standing

10   where it can show that its core business activities are directly affected by defendant's conduct).

11   The Refugee Funding Suspension has left the organizational Plaintiffs in cash-flow crises with no

12   option but to furlough or lay off hundreds of staff—which has already started, Ex. 23 ¶¶ 3, 41, 54,

13   56; Ex. 24 ¶¶ 3, 42, 61–62, and the accompanying directive to "cancel as many outstanding

14   obligations as possible" has led them to indefinitely stop core work, including provision of

15   essential services for refugees and their families, Ex. 23 ¶¶ 43, 52–56; Ex. 24 ¶¶ 55–56, 64.

16       These losses pose an existential threat to the organizational Plaintiffs, Ex. 23 ¶¶ 2, 54–56;

17   Ex. 24 ¶¶ 2, 65; Ex. 25 ¶¶ 44–45, and constitute irreparable business harms, *see HiQ Labs, Inc. v.*

18   *LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business

19   is sufficient to establish irreparable harm[.]" (cleaned up)); *Doran v. Salem Inn, Inc.*, 422 U.S. 922,

20   932 (1975) ("a substantial loss of business" and prospect of "bankruptcy" constitute irreparable

21   harm). Similarly, the organizational Plaintiffs face reductions in their staffs, the loss of institutional

22   knowledge and goodwill with community partners, and a corresponding decline in the quality of

23   services provided. Ex. 23 ¶¶ 3, 40–41, 54–56; Ex. 24 ¶¶ 61–62, 65; Ex. 25 ¶¶ 44–45; *see also*

24   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence

25   of threatened loss of . . . goodwill certainly supports a finding of the possibility of irreparable

26   harm.").

PLS.' MOT. FOR PRELIM. INJ. – 12
(No. C25-255 JNW)

The organizational Plaintiffs have standing not only because of the direct harms they face, but also to vindicate the rights of their clients—people with whom they have close relationships who are unable to protect their interests on their own. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension impose a significant, if not insurmountable, barrier to the reunification of their clients with family members who are seeking resettlement through the USRAP. Ex. 23 ¶¶ 3, 31, 33–34, 36–38; Ex. 24 ¶¶ 47–58, 65; Ex. 25 ¶¶ 3, 30, 35–41. This too is a cognizable injury. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471 (D.C. Cir. 1995) (U.S. residents petitioning for family members abroad to enter country demonstrated irreparable harm based on prolonged separation), *vacated on other grounds*, 519 U.S. 1 (1996). Accordingly, the organizational Plaintiffs have standing to assert their clients' rights in this case and, in balancing the equities, the Court may consider the irreparable injury that would befall them. *See, e.g.*, *Exodus Refugee Immigr., Inc. v. Pence*, 165 F.Supp.3d 718, 738–39 (S.D. Ind.) (considering irreparable harm to refugee clients for whom resettlement organization had third-party standing), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

## II.     Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs are likely to succeed on the merits of their claims because the challenged actions—the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension—unlawfully disrupt Congress's carefully crafted statutory framework for refugee resettlement in the United States, defy the guardrails for agency decision-making set out in the APA, and violate the U.S. Constitution.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

A. **The Refugee Ban EO is *ultra vires*.**

1. **The President lacks authority to override the Refugee Act.**

The Refugee Ban EO must be enjoined because the President does not have the power to totally suspend the USRAP under section 212(f) of the INA, *see* 8 U.S.C. § 1182(f), or any other power provided for by Congress.[4]

As the U.S. Supreme Court acknowledged when considering a narrower entry suspension imposed by President Trump in his first term, the President cannot invoke his power under section 212(f) to "override particular provisions of the INA." *Trump v. Hawai'i*, 585 U.S. 667, 689 (2018); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018) (President "may not rewrite clear statutory terms" (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014))). This is especially true where, as here, an executive order purports to eviscerate a statutorily created immigration program. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. U.S. DHS*, 491 F.Supp.3d 549, 564–65 (N.D. Cal. 2020) ("*NAM*") (President Trump's attempt in his first term to indefinitely ban entire work visa categories "indefinitely nullif[ied] Congress' considered judgments").

The Refugee Ban EO conflicts with specific provisions of the INA in several ways.

*First*, the Order bars entry and suspends decisions on applications for follow-to-join refugees, directly conflicting with Congress's considered judgment to prioritize family reunification and its resulting mandate that follow-to-join refugees "shall" be entitled to the same refugee status as the principal applicant as long as they are not barred by specific inadmissibility grounds. *Doe*, 288 F.Supp.3d at 1078–79; *see also* 8 U.S.C. § 1157(c)(2)(A); *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (Congress's use of word "shall" imposes mandatory duty). Another court in this district has already held that indefinite suspension of

---

[4] He certainly does not under 8 U.S.C. § 1185(a)(1), also cited by the Refugee Ban EO, which makes it unlawful for a noncitizen to enter the United States except under such "reasonable rules, regulations and orders" as the President prescribes. At minimum, the Order would need to align with the President's authority under section 212(f), *see Hawai'i*, 859 F.3d at 770 n.10, which, as explained below, it does not.

PLS.' MOT. FOR PRELIM. INJ. – 14
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    follow-to-join refugee processing violates the INA. *See Doe*, 288 F.Supp.3d at 1077–78. By

2    ordering agencies to indefinitely stop performing their mandatory duty to admit spouses and

3    children of refugees whom Congress singled out for entitlement to admission, the Order unlawfully

4    overrides 8 U.S.C. § 1157(c)(2)(A).

5         *Second*, the Order's suspension of the USRAP (and underlying policy objectives) conflicts

6    with Congress's purpose in establishing the program, and where an executive order conflicts with

7    the purpose of a statute, it is *ultra vires. See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318

8    F.Supp.3d 370, 417 (D.D.C. 2018) (citing *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339

9    (D.C. Cir. 1996)), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019); *Murphy*

10   *Co. v. Biden*, 65 F.4th 1122, 1133 (9th Cir. 2023) (considering whether executive action was

11   consistent with statute's purpose when conducting *ultra vires* review). The Order indefinitely

12   suspends the USRAP in pursuit of a series of stated policy interests, some of which unlawfully

13   supplant the congressional plan underlying the Refugee Act (replacing them with President

14   Trump's own policy interests) and others of which are interests that "the pre-existing law already

15   guarantees." *NAM*, 491 F.Supp.3d at 565 (executive order unlawful where pre-existing law

16   guaranteed order's policy objectives).

17        Specifically, the Order's four identified policy goals related to the USRAP (upon which

18   resumption is dependent), *see supra* pp. 2–5, each would supplant Congress's own policy

19   judgments or are already provided for by the relevant law—or both. By seeking to end refugee

20   admissions in order to prioritize resources for Americans and impose "assimilation" requirements

21   on refugees, the Order subverts the Refugee Act's historic purpose to respond to "the urgent needs

22   of [refugees]" as a matter of "humanitarian concern." Pub. L. 96-212, § 101, 94 Stat. 102. With

23   respect to public resources, Congress has specifically opted to provide public benefits, including

24   cash assistance, to refugees and has outlined detailed procedures for doing so. *See* 8 U.S.C.

25   § 1522(a)(1)(A), (e). And it has created a detailed statutory structure to support recently arrived

26   refugees' "effective[] resettle[ment]," which Congress has defined as promoting their economic

PLS.' MOT. FOR PRELIM. INJ. – 15
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 017

1  self-sufficiency and English language learning—*not* full assimilation. *See id.* § 1522(a)(1)(A); *see*

2  *also infra* pp. 19–22 (discussing conflict between Refugee Funding Suspension and section 1522).

3  Congress has provided a detailed scheme for the involvement and input of states and localities, as

4  the Order acknowledges. *See* Refugee Ban EO § 3(d) (citing 8 U.S.C. § 1522(a)(2)); *see also HIAS*,

5  415 F.Supp.3d at 680–81 (observing that executive order granting state and local governments

6  ability to veto refugee resettlement in their jurisdictions would "undermine [section 1522(a)(2)'s]

7  arrangement" and "flies in the face of clear Congressional intent"). And, as described above,

8  Congress already requires refugees to undergo rigorous security vetting and provides for exclusion

9  of refugees on the basis of national security and public safety. *See* 8 U.S.C. § 1182(a) (listing

10  inadmissibility categories). In short, Congress already carefully weighed the policy interests that

11  President Trump claims necessitate shutting down the USRAP when it enacted the Refugee Act

12  and created "comprehensive and uniform provisions" for refugee admission and authorizing

13  programs for domestic resettlement and assistance to refugees. The President lacks the authority

14  to ignore Congress's considered judgments.

15       In any event, the Refugee Ban EO conflicts with Congress's detailed statutory scheme for

16  refugee admissions. It provides that a case-by-case exception to its ban will be made only upon a

17  separate determination that an individual's entry is "in the national interest and does not pose a

18  threat to the security or welfare of the United States." Refugee Ban EO § 3(c). But Congress has

19  already defined the circumstances under which a refugee may be admitted, *see* 8 U.S.C.

20  § 1157(c)(1), including the detailed, specific inadmissibility bars for refugees, which are narrower

21  than those that apply generally to noncitizens seeking admission, *see id.* § 1157(c)(3).[5] Under these

22  standards, Congress granted the Secretary of Homeland Security discretionary authority to "admit

23  any particular refugee who is not firmly resettled in any foreign country and is determined to be

24  _____

25      [5] In particular, the public charge, labor certification, and travel document grounds of inadmissibility do not apply to refugees, and other grounds of inadmissibility (other than controlled

26  substance trafficking and certain security-related grounds) may be waived for humanitarian purposes, to assure family unity, or when in the public interest. 8 U.S.C. § 1157(c)(3).

PLS.' MOT. FOR PRELIM. INJ. – 16
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

of special humanitarian concern to the United States," as long as they are admissible.[6] And the definition of "refugee" itself was carefully defined by Congress to achieve its purposes and tailored to ensure compliance with the United States' international treaty obligations. *See* Pub. L. No. 96-212, § 201, 94 Stat. 102 (enacting universal, nondiscriminatory definition of "refugee" closely paralleling that of 1951 United Nations Convention Relating to Status of Refugees).

Because the Order conflicts with Congress's comprehensive plan for refugee resettlement, Plaintiffs are likely to succeed on their claim that the executive order is *ultra vires*. *See Doe v. Trump*, 957 F.3d 1050, 1064 (9th Cir. 2020) (proclamation issued during President Trump's first term mandating acquisition of healthcare to establish eligibility for family visa eviscerated public charge statutory scheme).

### 2.    Section 212(f) does not justify the Refugee Ban EO.

Even if the ban could somehow be read as consonant with the Refugee Act—which it cannot—the Refugee Ban EO fails to meet the requirements to invoke the President's section 212(f) power. That statute requires that any suspension thereunder be supported by a finding that entry of the suspended class "would be detrimental to the interest of the United States," 8 U.S.C. § 1182(f), but the Refugee Ban EO's only "findings" are irrelevant to the entry ban ordered, *see Hawai'i*, 859 F.3d at 788 (requiring justification beyond statement that detriment existed). For example, the Order cites the example of certain states and localities that sought federal aid and work authorization to assist migrants, but those migrants were *not* refugees for whom Congress has systematically provided federal funding for integration and who are authorized to work upon arrival.[7] These unrelated and misleading citations bear no relation to the Refugee Ban EO's

---

[6] All applicants in the USRAP pipeline have already been determined to be of special humanitarian concern to the United States. *See supra* pp. 5–8.

[7] In particular, section 1 of the Refugee Ban EO states that U.S. cities have experienced "influxes of migrants" and sought federal aid or declared states of emergency in response to "increased migration" to conclude, in a deceptive non-sequitur, that the United States lacks the ability to absorb "in particular, refugees" into its communities. Refugee Ban EO § 1. On the contrary, the New York state of emergency referenced related to Texas Governor Greg Abbott's bussing of approximately 17,000 asylum seekers to New York City without warning, *see* Ex. 13,

PLS.' MOT. FOR PRELIM. INJ. – 17
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    suspension of refugee admissions and thus cannot satisfy the preconditions of section 212(f). *See*

2    *NAM*, 491 F.Supp.3d at 569 (finding that did "not comport with actual facts" was insufficient to

3    satisfy section 212(f)).

4            The Refugee Ban EO also completely disregards the existing statutory framework for

5    refugee admissions, which already addresses the policy concerns that the Order raises. *See supra*

6    pp. 14–17; *NAM*, 491 F.Supp.3d at 568 (where findings "completely disregard[] . . . the preexisting

7    statutory framework," they are insufficient to justify invocation of section 212(f) powers). And, in

8    any event, the Order does not attempt to explain why its inapposite findings would require

9    indefinite suspension of all refugee admissions, contrary to congressional intent and the statutory

10   scheme. Notably, the Order makes no findings that public safety and national security are not

11   already paramount concerns or that current processes are inadequate. As courts have cautioned,

12   national security is not a "talismanic incantation" that can be invoked to support unbridled

13   presidential powers under section 212(f). *Hawai'i*, 859 F.3d at 788. Similarly, the self-evident

14   need for compliance with the state and local consultation requirements under section 1522(a)(2),

15   *see* Refugee Ban EO § 3(d), without any finding of *non*-compliance, cannot support the Refugee

16   Ban EO's suspension. And "domestic" concerns, such as the availability of resources for

17   Americans, are outside "the traditional spheres" of section 212(f) and do not support the broad

18   invocation of the President's power attempted here. *See Doe*, 957 F.3d at 1065, 1067

19   (unsubstantiated findings of perceived problem of burdened healthcare system related to long-term

20   economic concern and was insufficient to show detriment); *NAM*, 491 F.Supp.3d at 566

21   (underlying purpose of "eliminat[ing] the threat of taking jobs from American citizens" not basis

22   for finding detriment).

23

24

25   and the Massachusetts state of emergency emphasized the need for work authorization for asylum
     seekers, *see* Ex. 12, whereas individuals admitted as refugees automatically receive work
26   authorization upon admission.

PLS.' MOT. FOR PRELIM. INJ. – 18
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1                         \*     \*     \*

2 In short, Plaintiffs are likely to succeed on the merits of their claim that the Refugee Ban

3 EO is unlawful because it conflicts with the INA and fails to make any finding necessary to justify

4 a wholesale suspension of the USRAP.

5 **B.**      **The Agency Suspension violates the INA and APA.**

6 Defendants' and their agencies' implementation of the Refugee Ban EO to immediately

7 halt the processing, adjudication, and admission of refugee cases is unlawful for many of the same

8 reasons as the Refugee Ban EO itself. This action too should be enjoined.

9           **1.**      **Defendants cannot rewrite the Refugee Act.**

10 The Court should block enforcement of the Agency Suspension and the Refugee Funding

11 Suspension because they violate the well-established principle that agencies can exercise their

12 statutorily delegated authority only pursuant to the scheme that Congress enacted. *See La. Pub.*

13 *Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (administrative agencies "literally ha[ve] no

14 power to act . . . unless and until Congress confers power[s]" to do so); 5 U.S.C. § 706(2)(C)

15 (reviewing court shall "hold unlawful and set aside agency action . . . in excess of statutory

16 jurisdiction, authority, or limitations, or short of statutory right"). Together or independently, the

17 Agency Suspension and Refugee Funding Suspension suspend the USRAP in its entirety by

18 prohibiting processing of refugees' applications (the Agency Suspension) and by cutting off

19 funding for that processing (the Refugee Funding Suspension).

20 Defendants' agencies have not identified any statutory authority to suspend the USRAP in

21 its entirety; their communications announcing the Agency Suspension and Refugee Funding

22 Suspension cite only the Refugee Ban EO and the Foreign Aid EO, respectively. To the extent the

23 agencies implicitly rely on 8 U.S.C. §§ 1182(f) and 1185(a), they cannot: These laws expressly

24 delegate authority to the President alone. And, although the Refugee Act authorizes DHS to admit

25 refugees "pursuant to such regulations as [the Department] may prescribe," 8 U.S.C. § 1157(c), as

26 explained further below, Defendants' agencies have failed to issue any such regulations here.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Finally, whatever authority Defendants enjoy under the Refugee Act is limited by its stated

2    purpose: to design a "systematic procedure" for refugee admissions embodying the American

3    commitment to refugee admissions as a matter of humanitarian (as opposed to ideological,

4    political, or other) concern. Defendants' complete suspension of all refugee processing is wholly

5    at odds with this purpose.

6        Even if the Agency Suspension and Refugee Funding Suspension were somehow

7    considered to fall within the agencies' authority to act, they must still be set aside as contrary to

8    law and violative of the APA because they fundamentally conflict with the Refugee Act. *See*

9    *Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (agency rule that contradicted statute violated both

10   statute and APA (citing *E. Bay Sanctuary Covenant*, 932 F.3d at 773)); *see also supra* pp. 14–17.

11   First, similar to the Order, these suspensions each and collectively take a wrecking ball to

12   Congress's carefully crafted statutory scheme—elevating an applicant's refugee status to an

13   inadmissibility bar of its own. Under the Refugee Act, any individual refugee may enter the United

14   States only if they are not subject to one of the inadmissibility bars set out in 8 U.S.C. § 1182(a).

15   Agencies cannot "nullif[y]" the contours of existing inadmissibility grounds or "evade the

16   limitations [of] Congress," *Abourezk v. Reagan*, 785 F.2d 1043, 1057 (D.C. Cir. 1986), *aff'd*, 484

17   U.S. 1 (1987), by creating a new and separate inadmissibility grounds that do not exist in the INA.

18   But this is exactly what the Agency Suspension and Refugee Funding Suspension purport to do by

19   banning the entry of all refugees.

20       The Refugee Funding Suspension is in excess of the agencies' statutory authority for the

21   additional reason that it is contrary to Congress's detailed statutory scheme for providing federal

22   support to recently arrived refugees. *See* 8 U.S.C. § 1522 *et seq.* In section 1522, Congress

23   expressly sought to ensure the economic self-sufficiency and effective resettlement of refugees as

24   quickly as possible and to foster close collaboration between resettlement agencies and state and

25   local governments receiving refugees. *See id.* § 1522(a)(1). In furtherance of those purposes,

26   Congress directed that the resettlement agencies contracted to provide initial resettlement services

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

to refugees "*shall . . .* fulfill [their] responsibility to provide for the basic needs (including food, clothing, shelter, and transportation for job interviews and training) of each refugee resettled" as well as develop, implement, and monitor "a resettlement plan" for each resettled refugee. *Id.* § 1522(b)(7) (emphasis added). By withholding funds Congress appropriated to support refugee self-sufficiency and integration under the statute, Defendants are acting directly contrary to Congress's stated intent and statutory scheme—and thereby making it impossible for CWS, HIAS, and LCSNW to comply with Congress's mandatory directives that they provide for the basic needs of each resettled refugee.[8]

Similarly, Congress created a statutory scheme and appropriated funds to ensure that Afghan and Iraqi nationals in danger because of their work on behalf of the U.S. missions in their countries be provided with resettlement benefits to the same extent as refugees. *See* Refugee Crisis in Iraq Act of 2008, Pub. L. 110-181, § 1244(g), 122 Stat. 3; Afghan Allies Protection Act of 2009, Pub. L. 111-8, § 602(b)(8), 123 Stat. 807. By withholding funds appropriated to assist resettled Afghan and Iraqi SIV holders, Defendants once again directly contravene a congressional mandate.

Finally, the Agency Suspension and Refugee Funding Suspension violate the Refugee Act's guarantee of admission to a refugee's spouse and minor children who have met the eligibility requirements and who are not subject to any applicable inadmissibility grounds. *See* 8 U.S.C. § 1157(c)(2)(A) ("A spouse or child . . . of any refugee who qualifies for admission . . . *shall . . .* be entitled to the same admission status as such refugee if . . . following to join[] such refugee and if the spouse or child is admissible[.]" (emphasis added)). As another court in this district previously observed, "[n]othing in the statute authorizes the Secretary to stop, terminate, or

---

[8] To the extent President Trump's Foreign Assistance EO directed this result, an executive order that conflicts with the purpose of a federal statute is *ultra vires*, and the President cannot supplant Congress's carefully crafted purpose with his own policy interests. *See supra* pp. 14–17.

PLS.' MOT. FOR PRELIM. INJ. – 21
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

suspend the ability of otherwise qualified [follow-to-join] applicants from seeking and obtaining that entitlement." *Doe*, 288 F.Supp.3d at 1079.

### 2. The Agency Suspension and Refugee Funding Suspension should have been subject to notice-and-comment rulemaking.

The Agency Suspension and Refugee Funding Suspension should be enjoined for the separate reason that they fail to satisfy the procedural standards for agency action set by the APA. Each amounts to a "legislative rule" for which notice and comment rulemaking under the APA is required. *See Doe*, 288 F.Supp.3d at 1075 (plaintiffs were likely to succeed on their claim that refugee ban violated APA's rulemaking requirements). There can be no question that the two suspensions substantively alter the rights of hundreds of thousands of refugees worldwide, their U.S.-based family members and sponsors, and the resettlement partners that serve them. *See Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087–88 (9th Cir. 2003) (legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress"). The Refugee Funding Suspension also substantively alters the rights of thousands of recently arrived refugees and SIV holders in the United States. Without these policies, there is no basis in law or regulation for the agencies to suspend refugee processing and admissions. *See id.* at 1087. And, without the Refugee Funding Suspension, there is no basis in law or regulation for the agencies to suspend statutorily mandated benefits to recently arrived refugees and SIV holders. The Agency Suspension and Refugee Funding Suspension thus should have been promulgated through notice-and-comment rulemaking.[9]

---

[9] Of note, 8 C.F.R. part 207, the regulations implementing the Refugee Act, and subsequent amendments outlining procedures for the follow-to-join program, were subject to notice and comment before they were codified. Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. pt. 207); Procedures for Filing a Derivative Petition (Form I-730) for a Spouse and Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3,792 (Jan. 27, 1998) (to be codified at 8 C.F.R. § 207.7).

PLS.' MOT. FOR PRELIM. INJ. – 22
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2

**C.  The Agency Suspension and Refugee Funding Suspension are arbitrary and capricious.**

The Agency Suspension and Refugee Funding Suspension must also be set aside under the APA for the separate reason that they are "arbitrary, capricious, [or] an abuse of discretion." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting 5 U.S.C. § 706(2)(A)). When taking final agency action, agencies are required to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (cleaned up). An agency "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Where the agency rescinds prior policy, it must consider important aspects of the problem, including serious reliance interests, *id.*, and the agency "must consider" reasonable "alternatives that are within the ambit of the existing policy," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

Here, the agencies offer no rational connection between the suspension of the refugee program in its entirety—which harms hundreds of thousands of vulnerable refugees and the organizations who serve them—and the facts and justifications that could conceivably underlie it. In fact, they offer no explanation at all. This is fatal under the APA. *See Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (courts should not "infer an agency's reasoning from mere silence" (cleaned up)). With respect to the Agency Suspension, the only rationale that the agencies appear to provide is a reference to the Refugee Ban EO. But where an agency rule incorporates a presidential action, the combined operative rule must comply with the APA. *E. Bay Sanctuary Covenant*, 932 F.3d at 770 (reviewing validity of DHS rule incorporating proclamation under APA). Here, of course, it does not, because the Refugee Ban EO itself is contrary to law and *ultra vires*. *See supra* pp. 14–19.

The Agency Suspension would violate the APA in any event because it goes beyond what the Refugee Ban EO requires without explanation and in violation of the Refugee Act. *See e.g.*,

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   *Zafarmand v. Pompeo*, No. 20-CV-00803-MMC, 2020 WL 4702322, at *3–4 (N.D. Cal. Aug. 13,

2   2020) (reviewing whether agency implementation exceeded presidential proclamation). The

3   suspension stopped refugee travel *immediately*—a week *before* the Refugee Ban EO's express

4   deadline. And the Agency Suspension stopped all refugee case processing, whereas the Refugee

5   Ban EO directed suspensions of admissions and decisions only. Again, no justification was

6   offered, nor any indication that the agencies had considered any justifications in light of the

7   reliance interests of the refugees, U.S.-based family members, and resettlement agencies in the

8   continuation of processing and travel, or even the purpose of the Refugee Act pursuant to which

9   they operate the program. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins.*

10  *Co.*, 463 U.S. 29, 57 (1983).

11          As for the Refugee Funding Suspension, the agencies do not come close to satisfying the

12  APA's minimum standards for reasoned decision-making. DOS failed to provide any reason why

13  it must immediately suspend all USRAP funding while it merely *considers* whether such work is

14  consistent with President Trump's Foreign Aid EO—thereby threatening the ability of refugees

15  and SIV holders to obtain food, shelter, and medical care during their first days in the United States

16  and threatening the survival of the resettlement agencies that are the backbone of refugee

17  resettlement (and thereby ensuring that the USRAP would be suspended, even without the Agency

18  Suspension). The Notices of Suspension do not even attempt to explain why the Foreign Aid EO

19  is relevant: That order does not bear on *domestic* funding for refugees and SIVs or on support

20  provided by resettlement partners for processing of refugees for admission to the United States.

21  This is fatal under the APA.

22          With respect to both the Agency Suspension and the Refugee Funding Suspension, the

23  agencies failed to consider important aspects of the problem, including Congress's purpose in

24  adopting the Refugee Act and in creating a detailed statutory scheme providing resettlement

25  benefits for recently arrived refugees and SIV holders. DOS also failed to consider its own

26  regulations governing the limited circumstances in which its contracts can be suspended or

PLS.' MOT. FOR PRELIM. INJ. – 24
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    terminated and accompanying procedural requirements, *see* 2 C.F.R. § 200 *et seq.*; 2 C.F.R. § 600

2    *et seq.*—which DOS explicitly incorporated into the cooperative agreements, *see* Ex. 23 ¶ 25; Ex.

3    24 ¶ 27.

4         Most importantly, the agencies entirely failed to consider the serious reliance interests

5    created by the decades-long federal policy of resettling refugees to safety through the USRAP and

6    by the congressionally appropriated funding of the resettlement agencies' work, which in turn is

7    relied upon by recently arrived refugees and SIV holders to meet their basic needs. *See* Ex. 20

8    ¶¶ 19, 24; Ex. 23 ¶ 51. As described above, the resettlement agencies are highly dependent on

9    government funding to do their core work and cannot exist without it. *See* Ex. 23 ¶¶ 3, 19–24, 41,

10   54–56; Ex. 24 ¶¶ 2–3, 55–56, 61–65. Inexcusably, even as DOS claims to be merely *considering*

11   whether to change its policy going forward, it failed to contemplate any alternative to the drastic,

12   far-reaching suspension of all funding to the resettlement agencies that will inevitably cause such

13   harm as to prevent a return to the status quo in the future. *See* Ex. 23 ¶¶ 52–56; Ex. 24 ¶¶ 2–3, 38,

14   42, 61–64; Ex. 25 ¶¶ 29–32, 44–45. Either DOS is ignorant of the fundamental facts or it seeks to

15   eliminate refugee resettlement infrastructure under the guise of a "temporary" suspension—

16   regardless, its action is arbitrary and capricious and must be set aside. *See FCC*, 556 U.S. at 515

17   (agency must display awareness of relevant facts). Moreover, by silently withholding

18   reimbursements from resettlement agencies for millions of dollars incurred to provide services to

19   refugees and SIV holders, Defendants' agencies have engaged in the *Sub Silentio* Suspension—

20   which is, by definition, arbitrary and capricious. *Id.* Finally, DOS failed to consider any alternative

21   to stopping *all* refugee application processing immediately, including travel scheduled before the

22   Refugee Ban EO's travel suspension went into effect—thereby preventing even those refugees like

23   Plaintiffs Pacito and Josephine, who were on the cusp of travel, from coming to safety and

24   reuniting with their families.

25

26

PLS.' MOT. FOR PRELIM. INJ. – 25
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

#### D. The Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension violate the due process rights of follow-to-join petitioners.

Finally, Plaintiff Esther is likely to succeed on her procedural due process claim that the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension deprive her of her statutorily created entitlement to the admission of her daughter. To have a property interest in a statutorily created benefit, an individual must "have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The mandatory language in the statute provides Esther with a "legitimate claim of entitlement" to her daughter's admission that Defendants cannot take away without due process. *See id.*

### III. The balance of equities and public interest support a preliminary injunction.

The Court should preliminarily enjoin the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension in their entirety, as other courts did with the prior refugee bans, to stem the devastation they cause to refugees and resettlement agencies and prevent even further irreparable harm. *See, e.g.*, *Doe*, 288 F.Supp.3d at 1086 (preliminarily enjoining first Trump Administration refugee ban); *HIAS*, 415 F.Supp.3d at 686 (preliminarily enjoining executive order giving state and local governments power to veto refugee resettlement). Plaintiffs are entitled to preliminary relief because both the balance of equities and the public interest "tip[] sharply" in their favor such that they satisfy the standard for preliminary relief. *Cottrell*, 632 F.3d at 1134–35; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of harms and public interest factors "merge when the Government is the opposing party").

The individual Plaintiffs suffer irreparable harm every day they are deprived of the ability to seek safety, reunite with family members, and receive critical benefits to which they are entitled. *See supra* pp. 9–11. The organizational Plaintiffs suffer irreparable harm every day they are unable to perform the core work at the heart of their missions, and each passing day of Defendants' unlawful actions threatens their very ability to survive. *See supra* pp. 11–13. Finally, the relief Plaintiffs seek is consistent with the public interest and indeed is necessary to enforce Congress's

PLS.' MOT. FOR PRELIM. INJ. – 26
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 028

1  detailed statutory scheme for resettling refugees through the USRAP and supporting their effective

2  resettlement after they arrive in the United States. There can be no legitimate government interest

3  in violating federal law, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013), or the

4  U.S. Constitution, *see United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971).

5      Defendants' unlawful conduct results in overlapping and irreparable injuries to Plaintiffs

6  that cannot be otherwise remedied. Individual Plaintiffs abroad are harmed every day that the

7  USRAP does not process their refugee applications—whether because the Refugee Ban EO or

8  Agency Suspension prohibits such processing or because the Refugee Funding Suspension

9  prevents resettlement partners, including the organizational Plaintiffs, from doing this work.

10  Individual Plaintiffs in the United States are harmed every day they are unable to receive their

11  statutorily mandated resettlement benefits because the Refugee Funding Suspension prevents

12  resettlement agencies from providing them. And Individual Plaintiffs who are family members and

13  sponsors in the United States are harmed every day the Refugee Ban EO, Agency Suspension, and

14  Refugee Funding Suspension prolong their separation from their family and friends abroad.[10]

15      As for the organizational Plaintiffs, every fewer refugee assured to them as a result of the

16  Refugee Ban EO, Agency Suspension, or Refugee Funding Suspension results in reduced federal

17  funding pursuant to their cooperative agreements and thereby threatens their ability to maintain

18  the local resettlement support infrastructure and relationships they have built up over years. Their

19  missions suffer as a result. Meanwhile, the Refugee Funding Suspension strikes at their ability to

20  survive in the immediate term, as evidenced by their layoffs and furloughs of hundreds of

21  employees to date.

22

23      _____

    [10] Restriction of any remedy based on connection to the United States is unnecessary here;
24  because refugees must be assured by a resettlement agency or sponsored by a welcome group to
    be admitted, they necessarily have a relationship to the United States by virtue of their pending
25  applications for resettlement. *See Hawai'i*, 871 F.3d at 661. In addition, many refugees resettled
    to the United States are reuniting with family. *See, e.g.*, Ex. 24 ¶ 15 (75% of refugees HIAS assures
26  are placed based on U.S. tie).

PLS.' MOT. FOR PRELIM. INJ. – 27
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    The only way to prevent continuing irreparable harms to Plaintiffs is to enjoin in their

2    entirety the Refugee Ban EO, Agency Suspension, and Refugee Funding Suspension; a broad

3    preliminary injunction is therefore necessary and appropriate. *See E. Bay Sanctuary Covenant*, 993

4    F.3d at 658 (affirming nationwide preliminary injunction of rule limiting asylum eligibility where

5    broad relief was necessary to prevent harm to plaintiffs). Vacatur of agency action is the standard

6    remedy for violations of the APA, *Regents of Univ. of Cal. v. U.S. DHS*, 908 F.3d 476, 511 (9th

7    Cir. 2018), *rev'd in part and vacated in part*, 591 U.S. 1 (2020), and it is appropriate here where

8    uniform application of immigration laws is particularly important, *E. Bay Sanctuary Covenant*,

9    993 F.3d at 681.

10    ## CONCLUSION

11    Preliminary relief is necessary to stop irreparable harm to Plaintiffs and safeguard the

12    American commitment to providing refuge for those facing persecution—before it is too late.

13    Plaintiffs respectfully request that this Court issue a preliminary injunction blocking the

14    enforcement of the Refugee Ban EO, the Agency Suspension, and the Refugee Funding

15    Suspension in their entirety.

16    \*    \*    \*

17    The undersigned certifies that this motion contains 10,000 words, in compliance with the

18    Local Civil Rules and pursuant to Plaintiffs' concurrently filed unopposed motion to file an over-

19    length motion.

20

21

22

23

24

25

26

PLS.' MOT. FOR PRELIM. INJ. – 28
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   Dated: February 11, 2025

2        Deepa Alagesan*
         Mevlüde Akay Alp*
3        Linda Evarts*
         Ghita Schwarz*
4        **INTERNATIONAL REFUGEE**
5        **ASSISTANCE PROJECT**
         One Battery Park Plaza, 33rd Floor
6        New York, New York 10004
         Telephone: (646) 939-9169
7        Facsimile: (516) 324-2267
         dalagesan@refugeerights.org
8        makayalp@refugeerights.org
         levarts@refugeerights.org
9        gschwarz@refugeerights.org

10       Melissa Keaney*
11       **INTERNATIONAL REFUGEE**
         **ASSISTANCE PROJECT**
12       P.O. Box 2291
         Fair Oaks, California 95628
13       Telephone: (646) 939-9169
         mkeaney@refugeerights.org
14

By: s/ *Harry H. Schneider, Jr.*

Harry H. Schneider, Jr., WSBA No. 9404
Jonathan P. Hawley, WSBA No. 56297
Shireen Lankarani, WSBA No. 61792
Esmé L. Aston, WSBA No. 62545
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com
EAston@perkinscoie.com

John M. Devaney[†]
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
JDevaney@perkinscoie.com

Joel W. Nomkin*
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
JNomkin@perkinscoie.com

Nicholas J. Surprise[†]
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
NSurprise@perkinscoie.com

*Counsel for Plaintiffs*

* *Admitted pro hac vice*
[†] *Pro hac vice forthcoming*

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

## CERTIFICATE OF SERVICE

2    I certify under penalty of perjury that on February 11, 2025, I caused to be electronically

3 filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will

4 send a notification of the filing to the email addresses indicated on the Court's Electronic Mail

5 Notice List.

6    Dated: February 11, 2025

7

*s/ Harry H. Schneider, Jr.*

8            Harry H. Schneider, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# EXHIBIT 1



The U.S. Refugee Admissions Program (USRAP) is managed by the Department of State (State) in cooperation with the **Department of Homeland Security (DHS)** and the **Department of Health and Human Services (HHS)**.  Individuals admitted as refugees are eligible for U.S. government-funded resettlement assistance.

The first step for most individuals seeking refugee status is to register with the United Nations High Commissioner for Refugees (UNHCR) in the country to which they have fled. UNHCR can provide services to those seeking assistance in their current location.  In coordination with host country governments and national asylum systems, UNHCR may identify refugees for whom permanent resettlement in a third country is the best or only solution.  Given the large numbers of people displaced around the world, only around one percent are generally referred for third country resettlement.  U.S. embassies, certain senior U.S. government officials, certified non-governmental organizations (NGOs), and **Welcome Corps** private sponsors (groups of five or more U.S. citizens or lawful permanent residents) may also provide referrals to the USRAP for individuals of particular concern to the United States.

Refugee claims from persons of any nationality can be considered for resettlement in the United States through the USRAP.  Refugee processing includes several appointments for data collection, a refugee adjudication interview, and a medical exam. The Departments of Homeland Security and State work to screen and vet all refugee applicants, without exception, in close coordination with law enforcement and intelligence partners.   Specially trained officers from U.S. Citizenship and Immigration Services (USCIS) interview each refugee applicant, and only those applicants who have completed all required checks, are found to quality for refugee status under U.S. law, have no inadmissibilities, and have no unresolved national security concerns are approved for resettlement.   Applicants who are approved for admission to the United States are assigned to a resettlement agency or private sponsor group in the United States, and travel is arranged.  Upon arrival in the United States, domestic resettlement agencies or private sponsor groups welcome newcomers, provide initial housing assistance, help enroll children in school, and connect resettled refugees with job opportunities as well as other community resources.  The Department of Health and Human Services' Office of Refugee Resettlement provides longer-term benefits for resettled refugees to assist with their integration into their new communities.

Each year, after consultation with Congress, the President determines whether and how many refugees to admit to the United States.  This determination is formalized in the Presidential Determination on Refugee Admissions. There is no minimum or fixed maximum number of refugees that can be admitted under U.S. law. More information about the USRAP can be found in the FY2024 Report to

**URL**

https://2021-2025.state.gov/refugee-admissions/

**Timestamp**

Tue Feb 11 2025 07:58:40 GMT-0800 (Pacific Standard Time)

(USCIS) interview each refugee applicant, and only those applicants who have completed all required checks, are found to qualify for refugee status under U.S. law, have no inadmissibilities, and have no unresolved national security concerns are approved for resettlement.   Applicants who are approved for admission to the United States are assigned to a resettlement agency or private sponsor group in the United States, and travel is arranged.  Upon arrival in the United States, domestic resettlement agencies or private sponsor groups welcome newcomers, provide initial housing assistance, help enroll children in school, and connect resettled refugees with job opportunities as well as other community resources.  The Department of Health and Human Services' Office of Refugee Resettlement provides longer-term benefits for resettled refugees to assist with their integration into their new communities.

Each year, after consultation with Congress, the President determines whether and how many refugees to admit to the United States.  This determination is formalized in the Presidential Determination on Refugee Admissions. There is no minimum or fixed maximum number of refugees that can be admitted under U.S. law. More information about the USRAP can be found in the FY2024 Report to Congress in the Remarks and Releases Tab.



White House     USA.gov     Office of the Inspector General     Archives     Contact Us

FOLLOW US     Privacy Policy     Accessibility Statement     Copyright Information     FOIA     No FEAR Act

**URL**
https://2021-2025.state.gov/refugee-admissions/

**Timestamp**
Tue Feb 11 2025 07:58:40 GMT-0800 (Pacific Standard Time)

# EXHIBIT 2

**Department of State**
**Bureau of Population, Refugees, and Migration**
**Office of Admissions - Refugee Processing Center**
Summary of Refugee Admissions
**as of 31-December-2024**

### Cumulative Summary of Refugee Admissions

**Regions (Based on the Nationality of the Principal Applicant)**

| Fiscal Year | Africa | Asia | Europe Central Asia | Former Soviet Union | Kosovo | Latin America Caribbean | Near East South Asia | PSI | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1975 | 0 | 135,000 | 1,947 | 6,211 | 0 | 3,000 | 0 | 0 | 146,158 |
| 1976 | 0 | 15,000 | 1,756 | 7,450 | 0 | 3,000 | 0 | 0 | 27,206 |
| 1977 | 0 | 7,000 | 1,755 | 8,191 | 0 | 3,000 | 0 | 0 | 19,946 |
| 1978 | 0 | 20,574 | 2,245 | 10,688 | 0 | 3,000 | 0 | 0 | 36,507 |
| 1979 | 0 | 76,521 | 3,393 | 24,449 | 0 | 7,000 | 0 | 0 | 111,363 |
| 1980 | 955 | 163,799 | 5,025 | 28,444 | 0 | 6,662 | 2,231 | 0 | 207,116 |
| 1981 | 2,119 | 131,139 | 6,704 | 13,444 | 0 | 2,017 | 3,829 | 0 | 159,252 |
| 1982 | 3,412 | 73,755 | 11,109 | 2,760 | 0 | 580 | 6,480 | 0 | 98,096 |
| 1983 | 2,645 | 39,245 | 11,867 | 1,342 | 0 | 691 | 5,428 | 0 | 61,218 |
| 1984 | 2,749 | 51,978 | 10,096 | 721 | 0 | 150 | 4,699 | 0 | 70,393 |
| 1985 | 1,951 | 49,962 | 9,233 | 623 | 0 | 151 | 5,784 | 0 | 67,704 |
| 1986 | 1,322 | 45,482 | 8,503 | 799 | 0 | 131 | 5,909 | 0 | 62,146 |
| 1987 | 1,990 | 40,099 | 8,396 | 3,699 | 0 | 323 | 10,021 | 0 | 64,528 |
| 1988 | 1,593 | 35,371 | 7,510 | 20,411 | 0 | 2,497 | 8,368 | 733 | 76,483 |
| 1989 | 1,902 | 45,722 * | 8,752 | 39,602 | 0 | 2,604 | 6,938 | 1,550 | 107,070 |
| 1990 | 3,453 | 51,598 * | 6,094 | 50,628 | 0 | 2,305 | 4,979 | 3,009 | 122,066 |
| 1991 | 4,420 | 53,522 * | 6,837 | 39,226 | 0 | 2,253 | 5,342 | 1,789 | 113,389 |
| 1992 | 5,470 | 51,899 * | 2,915 | 61,397 | 0 | 3,065 | 6,903 | 882 | 132,531 |
| 1993 | 6,967 | 49,817 * | 2,582 | 48,773 | 0 | 4,071 | 6,987 | 251 | 119,448 |
| 1994 | 5,860 | 43,564 * | 7,707 | 43,854 | 0 | 6,156 | 5,840 | 0 | 112,981 |
| 1995 | 4,827 | 36,987 * | 10,070 | 35,951 | 0 | 7,629 | 4,510 | 0 | 99,974 |
| 1996 | 7,604 | 19,321 * | 12,145 | 29,816 | 0 | 3,550 | 3,967 | 0 | 76,403 |
| 1997 | 6,065 | 8,594 * | 21,401 | 27,331 | 0 | 2,996 | 4,101 | 0 | 70,488 |
| 1998 | 6,887 | 10,854 * | 30,842 | 23,557 | 0 | 1,627 | 3,313 | 0 | 77,080 |
| 1999 | 13,043 | 10,206 * | 24,497 | 17,410 | 14,161 | 2,110 | 4,098 | 0 | 85,525 |
| 2000 | 17,561 | 4,561 * | 22,561 | 15,103 | 0 | 3,232 | 10,129 | 0 | 73,147 |

**Department of State**
**Bureau of Population, Refugees, and Migration**
**Office of Admissions - Refugee Processing Center**
Summary of Refugee Admissions
**as of 31-December-2024**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | 19,020 | 4,163 * | 15,794 | 15,978 | 0 | 2,975 | 11,956 | 0 | 69,886 |
| 2002 | 2,551 | 3,512 * | 5,459 | 9,969 | 0 | 1,934 | 3,706 | 0 | 27,131 |
| 2003 | 10,714 | 1,724 * | 2,506 | 8,744 | 0 | 455 | 4,260 | 0 | 28,403 |
| 2004 | 29,104 | 8,084 * | 9,254 | 0 | 0 | 3,577 | 2,854 | 0 | 52,873 |
| 2005 | 20,745 | 12,076 * | 11,316 | 0 | 0 | 6,699 | 2,977 | 0 | 53,813 |
| 2006 | 18,126 | 5,659 * | 10,456 | 0 | 0 | 3,264 | 3,718 | 0 | 41,223 |
| 2007 | 17,483 | 15,643 * | 4,560 | 0 | 0 | 2,976 | 7,620 | 0 | 48,282 |
| 2008 | 8,935 | 19,489 * | 2,343 | 0 | 0 | 4,277 | 25,147 | 0 | 60,191 |
| 2009 | 9,670 | 19,850 * | 1,997 | 0 | 0 | 4,857 | 38,280 | 0 | 74,654 |
| 2010 | 13,305 | 17,716 * | 1,526 | 0 | 0 | 4,982 | 35,782 | 0 | 73,311 |
| 2011 | 7,685 | 17,367 * | 1,228 | 0 | 0 | 2,976 | 27,168 | 0 | 56,424 |
| 2012 | 10,608 | 14,366 * | 1,129 | 0 | 0 | 2,078 | 30,057 | 0 | 58,238 |
| 2013 | 15,980 | 16,537 * | 580 | 0 | 0 | 4,439 | 32,390 | 0 | 69,926 |
| 2014 | 17,476 | 14,784 * | 959 | 0 | 0 | 4,318 | 32,450 | 0 | 69,987 |
| 2015 | 22,472 | 18,469 * | 2,363 | 0 | 0 | 2,050 | 24,579 | 0 | 69,933 |
| 2016 | 31,624 | 12,518 * | 3,957 | 0 | 0 | 1,340 | 35,555 | 0 | 84,994 |
| 2017 | 20,232 | 5,173 * | 5,205 | 0 | 0 | 1,688 | 21,418 | 0 | 53,716 |
| 2018 | 10,582 | 3,671 * | 3,612 | 0 | 0 | 959 | 3,848 | 0 | 22,672 |
| 2019 | 16,366 | 5,030 * | 4,994 | 0 | 0 | 809 | 2,801 | 0 | 30,000 |
| 2020 | 4,160 | 2,129 | 2,578 | 0 | 0 | 948 | 1,999 | 0 | 11,814 |
| 2021 | 6,219 | 776 | 983 | 0 | 0 | 400 | 3,033 | 0 | 11,411 |
| 2022 | 11,358 | 2,215 | 2,351 | 0 | 0 | 2,485 | 7,056 | 0 | 25,465 |
| 2023 | 24,481 | 6,262 | 2,765 | 0 | 0 | 6,312 | 20,194 | 0 | 60,014 |
| 2024 | 34,017 | 7,540 | 3,180 | 0 | 0 | 25,358 | 29,939 | 0 | 100,034 |
| 2025 | 8,662 | 2,971 | 566 | 0 | 0 | 5,106 | 10,003 | 0 | 27,308 |
| Total | 494,370 | 1,509,294 | 347,603 | 596,571 | 14,161 | 171,062 | 538,646 | 8,214 | 3,679,921 |

* Includes Amerasian Immigrants

Based on the terms of a settlement in *Doe et a. v. Trump et al.*, No. 17-0178 (W.D. Wash), certain refugee applicants that arrive in FY 2020 and any future fiscal years are counted toward the FY 2018 refugee admissions ceiling.

# EXHIBIT 3

PROPOSED REFUGEE ADMISSIONS
FOR FISCAL YEAR 2025

REPORT TO THE CONGRESS

SUBMITTED ON BEHALF OF
## THE PRESIDENT OF THE UNITED STATES
TO THE
## COMMITTEES ON THE JUDICIARY
## UNITED STATES SENATE
AND
## UNITED STATES HOUSE OF REPRESENTATIVES

IN FULFILLMENT OF THE REQUIREMENTS OF
SECTIONS 207(d)(1) AND (e)
OF THE
IMMIGRATION AND NATIONALITY ACT

### UNITED STATES DEPARTMENT OF STATE
### UNITED STATES DEPARTMENT OF HOMELAND SECURITY
### UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

# Table of Contents

INTRODUCTION ............................................................................................................................ 4

FOREWORD ................................................................................................................................. 5

OVERVIEW OF U.S. REFUGEE POLICY ......................................................................................... 13

PROPOSED CEILINGS FOR FY 2025 ............................................................................................ 14

ADMISSIONS PROCEDURES ........................................................................................................ 15

DHS/USCIS REFUGEE ADJUDICATIONS ..................................................................................... 27

PROCESSING ACTIVITIES OF THE DEPARTMENT OF STATE ......................................................... 29

OFFICE OF REFUGEE RESETTLEMENT ......................................................................................... 33

REGIONAL REFUGEE ADMISSIONS ............................................................................................. 40

    **Africa** ..................................................................................................................................... 40

    **East Asia** ............................................................................................................................... 42

    **Europe and Central Asia** ..................................................................................................... 43

    **Latin America and the Caribbean** ....................................................................................... 45

    **Near East and South Asia** .................................................................................................... 47

    **International Religious Freedom Act Reporting** ................................................................. 48

    **North Korean Human Rights Act Reporting** ...................................................................... 53

REFUGEE ADMISSIONS TO THE UNITED STATES ........................................................................ 53

## LIST OF TABLES

|  |  | Page |
|---|---|---|
| I. | Projected Refugee Admissions for FY 2024 and Proposed Refugee Admissions for FY 2025 by Region | 14 |
| II. | USRAP Projected Arrivals by Region, FY 2024 | 55 |
| III. | USRAP Admissions, FY 2023 | 56 |
| IV. | USRAP Admissions by Country of Origin, FY 2023 | 57-59 |
| V. | Sex and Median Age of Refugee Arrivals, FY 2023 | 60 |
| VI. | Select Age Categories of Refugee Arrivals, FY 2023 | 61 |
| VII. | Refugee Arrivals by State of Initial Resettlement, FY 2023 | 62-63 |
| VIII. | Funding for Refugee Processing and Resettlement, FY 2024 and FY 2025 | 64-65 |
| IX. | UNHCR Resettlement Referrals Submitted by Resettlement Country – 2023 | 66 |

## INTRODUCTION

This Proposed Refugee Admissions for Fiscal Year (FY) 2025 Report to the Congress is submitted in compliance with Sections 207(d)(1) and (e) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1157(d)(1) and (e).  This report provides the information required by those sections, including:

1) *A description of the nature of the refugee situation;*
2) *A description of the number and allocation of the refugees to be admitted, and an analysis of conditions within the countries from which they came;*
3) *A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement;*
4) *An analysis of the anticipated social, economic, and demographic impact of their admission to the United States;*
5) *A description of the extent to which other countries will admit and assist in the resettlement of such refugees;*
6) *An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States; and*
7) *Such additional information as may be appropriate or requested by such members.*

This report contains information as required by Section 602(d) of the International Religious Freedom Act of 1998 (P.L. 105-292) (IRFA), as amended, 22 U.S.C. § 6472(d), about religious persecution of refugee populations eligible for consideration for admission to the United States.

This report meets the reporting requirements of Section 305(b) of the North Korean Human Rights Act of 2004 (P.L. 108-333), as amended, 22 U.S.C. § 7845(b), by providing information about specific measures taken to facilitate access to the United States refugee admissions program for individuals who have fled "countries of particular concern" for particularly severe violations

of religious freedom, identified pursuant to Section 402(b) of the IRFA, 22 U.S.C. § 6442(b).

## FOREWORD

The U.S. Refugee Admissions Program (USRAP) is a critical demonstration of the United States' efforts to extend hope and relieve suffering globally through refugee resettlement, as record numbers of people around the world have been forced to flee war, persecution, and instability. Nearly 118 million people are now forcibly displaced worldwide, more than at any other time in history. According to the United Nations High Commissioner for Refugees (UNHCR), nearly three million refugees are now in need of protection through third-country resettlement. Through resettlement, the United States provides an opportunity for some refugees to pursue a life of safety and dignity without fear of persecution. In doing so, the United States reaffirms its role as a global leader, upholds our nation's core values, and builds on the long, enduring history of American communities providing a warm welcome to those fleeing persecution.

Over the past three years, the Biden-Harris Administration has restored, strengthened, and modernized the USRAP. This included a whole-of-government effort to streamline and improve overseas refugee processing, enhance the security and integrity of the program, digitize case management for efficiency, work through the backlog of the oldest cases, increase staffing to support operations, and reestablish and expand the domestic infrastructure for welcoming refugees.

These efforts have resulted in steady annual increases in refugee admissions, with admissions doubling in FY 2022 and again in FY 2023. In FY 2024, the United States expects to reach a historic milestone by resettling 100,000 refugees from around the world – the most in three decades. USRAP is on its strongest footing in modern history.

The Administration has launched and continues to implement groundbreaking initiatives. The Welcome Corps, a program that allows

everyday Americans to privately sponsor refugees and Afghan SIVs to come to the United States, responds to the widespread interest of the American people to play a greater role in welcoming refugees. Through the Safe Mobility initiative, migrants in Guatemala, Colombia, Costa Rica, and Ecuador can access information and apply for lawful pathways (including refugee resettlement) to the United States, Canada, and Spain and learn more about local integration options in the countries where they are. Screening individuals for lawful pathways closer to home helps encourage them to avoid dangerous irregular journeys to the U.S. border.

The Administration also continues to lead on resettlement and complementary protection pathways across the international community, working to expand the number of countries where refugees can find safety. All these efforts advance the United States' broader foreign policy and humanitarian efforts to expand safe, orderly, and lawful pathways to the United States and other countries around the world, and to invest in improving conditions in countries of origin and asylum so that vulnerable individuals can access the support they need and are not compelled to undertake dangerous journeys in search of safety.

Welcoming refugees helps demonstrate the United States' global human rights and humanitarian commitments, shows solidarity, and shares responsibility with countries that host the majority of the world's refugees. Collaboration with other countries, including through resettlement, helps provide stability in regions around the world experiencing conflict, advancing vital U.S. interests and national security objectives.

In FY 2025, the United States will continue the momentum of the last three years and reaffirm refugee resettlement as a core component of our global leadership. For FY 2025, the President again proposes to set an ambitious and achievable goal of resettling 125,000 refugees in the United States.

This renewed goal reflects the highest American values. The USRAP is an essential part of our proud history as a nation that has welcomed and been enriched by refugees since our founding. As refugees build new lives in the

communities where they are resettled, the United States benefits from their significant economic, social, and cultural contributions.  As the Department of Health and Human Services (HHS) concluded in a recent landmark study, refugees and other newcomer populations contributed almost $124 billion to the growth of the U.S. economy over a 15-year period.[1]

## USRAP in FY 2025:  Strengthening the Program for the Future

Effective refugee resettlement through the USRAP requires close cooperation among U.S. government agencies, U.S. state and local governments, non-profit and private resettlement partners, foreign governments, UNHCR, the International Organization for Migration (IOM), and refugees themselves.  Crucially, the success and sustainability of the USRAP is shaped by the strong partnership and investment of the American public and the U.S. Congress in this life-saving program.

Innovations and efficiencies made over the last three years have provided new hope and opportunities to refugee applicants in the USRAP, including longstanding refugee populations from Ethiopia, the Democratic Republic of the Congo, and Syria, as well as Rohingya refugees who are facing increased threats and dwindling assistance, among many others.  In FY 2025, the United States will remain focused on these populations while continuing to expand the resettlement of other key populations of concern, including vulnerable people from Latin America and the Caribbean; Afghan allies; lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) individuals; and individuals persecuted for their religious beliefs.

This section highlights priority objectives and innovations in FY 2025 to further strengthen the USRAP, building on the progress made over the past three years.

## Strengthening and Continuing Innovations in Domestic Resettlement

---

[1] Refugees in U.S. Have Contributed Nearly $124B to U.S. Government Budget, New HHS Study Reveals | The Administration for Children and Families (last accessed Aug. 21, 2024).

**The Welcome Corps:**  In FY 2025, the Department of State will continue to expand opportunities for private sponsorship.  The Welcome Corps launched in January 2023 to empower everyday Americans to welcome refugees from around the world and directly support their resettlement and integration as they build new lives in the United States.  The Welcome Corps expands our country's ability to provide a warm welcome to refugees and Afghan SIVs by tapping into the generosity, capacity, and interest of American communities.

The Welcome Corps first enabled Americans to sponsor refugees they did not know.  Beginning in December 2023, Americans also can identify specific refugees they wish to support and directly refer them for consideration to the USRAP, a first for USRAP.  The first "sponsor someone you know" refugee arrived in June 2024.  In April 2024, the Department of State launched Welcome Corps at Work, a program to match refugees with U.S. employers for jobs in critical industries such as healthcare, education, and information technology.  In August 2024, 17 participating U.S. colleges and universities and their on-campus sponsor groups welcomed the first cohort of 31 refugee students through Welcome Corps on Campus.  Like all refugees, refugees arriving through the Welcome Corps are fully vetted overseas before arrival.

As of August 2024, Americans in all 50 states, Washington, D.C., and Puerto Rico have applied to sponsor refugees of more than 45 nationalities through the Welcome Corps.  Building on this interest, the Department of State intends to resettle at least 10,000 refugees through the Welcome Corps in FY 2025.

**Domestic Resettlement Capacity:**  In FY 2025, the Department of State and HHS will build on the efforts that restored the traditional domestic resettlement system following significant cuts and expand to welcome greater numbers of refugees.  There are now 355 local refugee resettlement sites operated by the ten national resettlement agencies throughout the United States, and resettlement agencies continue to explore opening additional local offices in consultation with community stakeholders.  In FY 2025, the Department of State will further expand partnerships with new

resettlement partners and grow its innovative new model of virtual reception and placement services for certain eligible refugees.

Recognizing that access to affordable housing remains a challenge, multiple U.S. government initiatives aim to strengthen access to housing for newly arrived refugees.  For example, some landlords and property managers have been reluctant to rent to refugees, due to a lack of understanding of this immigration status.  In response, in April 2024, the Department of State, Department of Housing and Urban Development, Department of Homeland Security (DHS), and HHS jointly released a fact sheet that provides information to landlords and property managers who may have questions on renting to refugees and other newcomer populations.  The Department of State and HHS also fund Refugee Housing Solutions, a project of Church World Service, to provide technical assistance to resettlement agencies to collectively address affordable housing challenges faced by newly arriving refugees.  Refugee Housing Solutions currently partners with the private sector, universities, and faith groups to increase refugees' access to affordable housing.  They also work to identify housing innovations and best practices for host and shared housing.

**Building on Progress on Global Resettlement Priorities**

**Latin America and the Caribbean:**  As forced displacement in the Western Hemisphere reaches historic highs, the United States remains committed to expanding access to resettlement to refugees from Latin America and the Caribbean to discourage dangerous journeys to the United States.  The Biden-Harris Administration has increased operations in the region from four countries to nearly two dozen and UNHCR has referred more than twice as many individuals from the Americas into USRAP since early 2021 as in the previous three decades combined.  FY 2024 refugee arrivals from Latin America and the Caribbean will be a more than fourfold increase over FY 2023 arrivals.  In FY 2025, the United States will continue to increase refugee resettlement from the region, including through the Safe Mobility initiative.  These historic increases are part of a broader effort the United States is leading, alongside regional partners, to provide lawful pathways to the

United States and other countries to those who qualify, a goal set forth in the Los Angeles Declaration on Migration and Protection endorsed by President Biden and 21 other regional leaders.

**Afghan Resettlement:**  The United States continues to fulfill its commitment to the brave Afghans who supported the U.S. mission in Afghanistan over two decades, serving alongside American diplomats, development professionals, and military service members.  U.S. communities have welcomed more than 160,000 Afghan newcomers since August 2021, most notably in Texas, California, Virginia, Washington, and Pennsylvania.  Through our Enduring Welcome effort, Afghan allies arrive to the United States using durable immigration pathways, such as refugee referrals, Afghan SIVs, and family reunification pathways.  Through the Welcome Corps, Americans may now sponsor and welcome Afghan refugees and SIVs to the United States, including those they know.

**Resettlement Diplomacy:**  As the country that resettles the most refugees in the world, the United States is uniquely positioned to galvanize global action on resettlement and encourage countries across the world to provide well-organized and legal pathways to protection for those in danger.

The United States chairs the Resettlement Diplomacy Network (RDN), a high-level forum launched in partnership with Australia, Canada, Italy, New Zealand, Spain, the United Kingdom, and the European Commission to strengthen the global resettlement system.  Through the RDN, the United States works with other resettlement countries to build on the lessons learned around global efforts to rapidly standup new protection pathways in response to the displacement of Afghans, Russia's war against Ukraine, and other emerging crises.  The RDN allows us to make better use of resettlement as a foreign policy tool and ensures the United States is just one of many safe havens for refugees.  The United States also co-chairs the Priority Situations Core Group alongside the Government of Canada.  In FY 2024, the United States, along with Canada, led a delegation comprising six governments to Rwanda and Ethiopia to demonstrate and expand resettlement countries' commitment to receiving referrals from the

Emergency Transit Mechanism in Rwanda, which hosts vulnerable individuals relocated by UNHCR from Libya.  The United States will continue to support and promote the life-saving protection offered by this mechanism and others like it.

In FY 2025, the United States will continue to advance collective diplomacy to address shared resettlement challenges across multiple regions, collaborate on refugee referral mechanisms, and deepen cooperation on emergency resettlement responses.

**Rohingya in Bangladesh:**  Around one million stateless Rohingya have been forced to seek refuge in Bangladesh and the surrounding region after the Burma military committed genocide and crimes against humanity against them, which further worsened following the February 2021 military *coup d'état*.  In August 2023, the United States co-led with Canada a delegation of resettlement countries to Bangladesh to encourage greater resettlement of Rohingya, leading to additional commitments from resettlement countries. In FY 2025, the United States and our partners will continue to resettle Rohingya refugees from the region so they can start new lives in the United States and elsewhere.  The United States continues to work with other countries and international partners to seek increased resettlement opportunities for Rohingya globally in the coming months and years.

**LGBTQI+ Persons:**  In FY 2025, the Department of State will build on significant progress in expanding resettlement access for vulnerable LGBTQI+ refugees in regions across the world.  The U.S. Special Envoy to Advance the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer and Intersex (LGBTQI+) Persons has continued their partnership with NGOs to identify LGBTQI+ individuals in need of resettlement.  Through the Equitable Resettlement Access Consortium (ERAC), other NGO partners are also now making direct referrals to the USRAP of historically marginalized refugee populations, including LGBTQI+ refugees.  In FY 2025, these partners will further facilitate access to resettlement.  Communities across the United States may now also sponsor and welcome LGBTQI+ refugees through the Welcome Corps.

**Recognition of the Impacts of Climate Change on Refugee Vulnerability:**  As the world tackles the climate crisis, it is vital to develop smart, humane policies to address the impacts of climate change on migration and displacement within countries and across borders.  The United States will use its global leadership role in refugee resettlement to reflect the crucial role that migration plays in adaptation to the climate crisis.  Many displaced populations, stateless persons, and vulnerable migrants are displaced many times by climate impacts and require expanded protection.  In FY 2025, the United States aims to strengthen this protection, including through consideration of the impact of climate change on refugees' vulnerability in the refugee resettlement process.

**Ensuring Security and Program Integrity**

**Security Vetting:**  The safety and security of the American people remain at the forefront of efforts to strengthen the USRAP.  In FY 2024, the Department of State and DHS, alongside U.S. intelligence, counterterrorism, and law enforcement partners, modernized an older refugee vetting process, the Security Advisory Opinion, through the National Vetting Center. This change enhanced the integrity and thoroughness of refugee vetting while enabling more efficient processes.  Additional improvements to further enhance the refugee vetting process are planned for FY 2025.

**Ensuring National Security, Public Safety, and Fraud Prevention:**  The Department of State and DHS, in cooperation with other U.S. federal government partners, continue to safeguard the integrity of the USRAP by leading efforts to ensure U.S. national security and public safety are prioritized while mitigating fraud, waste, and abuse; identifying potential vulnerabilities; investigating allegations received through public and private reporting mechanisms; and ensuring fraudulent cases do not gain access to the USRAP.  In FY 2024, strong relationships across the U.S. federal government bolstered the program's ability to proactively address fraud risks and learn from best practices.  In FY 2025, these partnerships will

support the implementation of additional integrity measures and robust monitoring to ensure the effectiveness of existing integrity mechanisms.

## OVERVIEW OF U.S. REFUGEE POLICY

### Who is a Refugee?

Under Section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42), a refugee is a person who is outside their country of nationality (or, if no nationality, country of last habitual residence) and who has experienced past persecution or has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  Individuals who meet the statutory definition may be considered for refugee status under Section 207 of the INA, 8 U.S.C. § 1157, if they are outside the United States.

Additionally, under Section 101(a)(42)(B) of the INA, 8 U.S.C. § 1101(a)(42)(B), the President may specify circumstances under which individuals who are within their countries of nationality (or, if no nationality, within their country of last habitual residence) may be considered a refugee for purposes of admission to the United States.  For FY 2025, the President proposes to specify that the following individuals may be considered refugees for the purpose of admission to the United States within their countries of nationality or habitual residence:  Persons in Cuba; Persons in Eurasia and the Baltics; Persons in Iraq; Persons in El Salvador, Guatemala, and Honduras; and, in certain circumstances, that is, for compelling humanitarian reasons, persons identified by a U.S. embassy or by an authorized State Department referral partner in any location.

Individuals outside the United States seeking admission as a refugee under Section 207 of the INA, 8 U.S.C. § 1157, are processed through the USRAP, which is managed by the Department of State in cooperation with DHS and HHS.  Those admitted as refugees are eligible for U.S. government-funded resettlement assistance, which is discussed below in the Office of Refugee

Resettlement section.

Since the enactment of the Refugee Act in 1980, which incorporated this definition of a refugee into the INA, the United States has welcomed more than 3.3 million refugees through the USRAP.

## PROPOSED CEILINGS FOR FY 2025

TABLE I
Projected Refugee Admissions for FY 2024 and
Proposed Refugee Admissions for FY 2025 by Region

| REGION | FY 2024 CEILING | FY 2024 PROJECTED ARRIVALS | PROPOSED FY 2025 ALLOCATION |
|---|---|---|---|
| Africa | 30,000-50,000 | 32,500-34,500 | 30,000-50,000 |
| East Asia | 10,000-20,000 | 6,500-8,500 | 10,000-20,000 |
| Europe and Central Asia | 2,000-3,000* | 3,000 | 2,000-3,000 |
| Latin America/Caribbean | 35,000-50,000 | 23,500 – 25,500 | 35,000-50,000 |
| Near East/South Asia | 30,000-45,000 | 27,500 – 29,500 | 30,000-45,000 |
|  |  |  |  |
| Total | 125,000 | 100,000 | 125,000 |

\* In July 2024, the Department of State transferred unused admissions allocated to other regions to the Europe and Central Asia region to increase that regional allocation to 2,000-3,500.

The proposed FY 2025 regional allocation ranges continue to reflect the Administration's ambition to expand refugee processing in priority regions, while providing flexibility as needs arise and as operational capacity grows. The total admissions among all the regions would not exceed 125,000. Furthermore, the President may, as in the past, authorize the Secretary of State, upon notification to the Judiciary Committees of the Congress, to transfer unused allocations from a particular region to one or more other

regions that have a need for greater allocations.  More detail about each region is provided below in the Regional Refugee Admissions section.

## ADMISSIONS PROCEDURES

**Eligibility for Access to the USRAP**

The Department of State's Bureau of Population, Refugees, and Migration (PRM) is responsible for coordinating and managing the USRAP.  A critical part of this responsibility is determining which individuals or groups from among the millions of refugees worldwide will have access to the USRAP. PRM coordinates within the Department of State, as well as with DHS, U.S. Citizenship and Immigration Services (USCIS), and other agencies, in carrying out this responsibility.

Section 207(a)(3) of the INA, 8 U.S.C. § 1157(a)(3), provides that "[a]dmissions … shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation."  Which individuals are "of special humanitarian concern" to the United States for the purpose of refugee resettlement consideration is determined through one of four categories:

*Priority 1:  Individual cases referred by designated entities to the program by virtue of their circumstances and apparent need for resettlement.*

*Priority 2:  Groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and apparent need for resettlement.*

*Priority 3:  Individual cases granted access for purposes of reunification with family members already in the United States.*

*Priority 4:  Individual cases from all nationalities who have been referred by private sponsors in the United States and who receive post-arrival support and services from those sponsors.*

(Note:  Refugees resettled in the United States may also seek the admission of their spouses and unmarried children younger than the age of 21 who are still abroad or are located domestically but who did not accompany the principal refugee by filing a Form I-730, Refugee/Asylee Relative Petition, known as a "following-to-join" petition, which does not require a separate refugee adjudication for these family members overseas.  This option is described in more detail in the discussion of following-to-join cases below.)

Access to the USRAP under one of the four categories does not necessarily mean an applicant meets the statutory definition of a "refugee" or is admissible to the United States under the INA.  Applicants granted access to the USRAP within the established categories present to USCIS officers for inquiry and adjudication.  The determination as to whether an applicant can be admitted as a refugee into the United States is made by DHS in accordance with criteria set forth in the INA and various security protocols.

Although the four access categories to the USRAP are referred to as "priorities," entering the program under a certain priority does not establish precedence in the order in which cases will be processed or the likelihood of success of being admitted to the United States as a refugee.  Once cases are established as eligible for access under one of the categories, they all undergo the same processing steps.

**Priority 1 (P-1) – Individual Referrals**

Priority 1 (P-1) allows the USRAP to consider refugee claims from persons of any or no nationality, usually with compelling protection needs, for whom resettlement appears to be the appropriate durable solution.  P-1 cases are identified and referred to the program by UNHCR, a U.S. embassy, a senior U.S. government official granted referral authority, or a designated NGO.

UNHCR, which has the international mandate to provide protection to refugees worldwide, has historically referred the vast majority of cases to the United States under this priority.  A U.S. ambassador or designated embassy representative may also make a P-1 referral for vulnerable individuals and are encouraged to do so.

To facilitate protection and access to the USRAP for our Afghan allies, U.S. government federal employees in the Senior Executive Service or Senior Foreign Service may make P-1 referrals for Afghan nationals who are known to U.S. government officials, have imminent and compelling protection concerns, and do not qualify for an SIV or P-2 referral based on their past employment.

Two other senior government officials were designated with authority in 2023 to make P-1 referrals.  The U.S. Special Envoy to Advance the Human Rights of LGBTQI+ Persons may refer both individuals who face persecution because of their work promoting respect for the human rights of LGBTQI+ persons and individuals who face persecution on the basis of their real or perceived sexual orientation, gender identity, gender expression, or sex characteristics.  The Special Envoy's office has also partnered with NGOs with expertise serving LGBTQI+ individuals to submit refugee referrals to the USRAP.  The Assistant Secretary of State for the Bureau of Democracy, Human Rights, and Labor may also make P-1 referrals for vulnerable individuals identified by the bureau.

The Department of State has also designated certain NGOs that assist refugees to make P-1 referrals through the ERAC led by HIAS, RefugePoint, and the International Refugee Assistance Project.  This effort seeks to reach highly vulnerable refugees in need of resettlement who lack access to the USRAP through traditional referral mechanisms and for whom resettlement may be the only durable solution.  ERAC is designed to grow the network of NGOs that refer individuals to the USRAP and to address the coordination gap among resettlement stakeholders to ensure a coherent and streamlined approach to NGO referrals.  This model for refugee referrals expands equitable access to resettlement while establishing global partnerships with

UNHCR, refugee-led organizations, organizations serving LGBTQI+ refugees, and other stakeholders in the field of refugee protection.

**Priority 2 (P-2) – Group Referrals**

P-2 includes specific groups whose members warrant resettlement as identified by the Department of State in consultation with USCIS, NGOs, UNHCR, and other experts.  P-2 designations reflect the determination that a group is of special humanitarian concern to the United States and that individual members of the group will likely qualify for admission as refugees under U.S. law.

There are two distinct models of P-2 access to the program:  predefined group access and direct access.  Under both models, P-2 designations are made based on shared characteristics that define the group.  In general, these characteristics are the reason that members of the group have been persecuted or have a well-founded fear of persecution in the future.

A predefined group designation is usually based on a UNHCR recommendation that lays out eligibility criteria for individuals in a specific location.

Once PRM, in consultation with USCIS, establishes the access eligibility criteria for the group, the referring entity provides the biographical data of eligible refugee applicants for processing.  This type of referral enables efficient processing because it identifies large groups of people with very similar persecution claims, avoids labor-intensive individual referrals, and prevents delays to applicants.

In special circumstances, the direct access model for P-2 group referrals enables individuals to apply for access to the program based on meeting designated criteria.  The direct access model has operated largely for in-country programs, historically including refugees from Bosnia and Herzegovina, Cuba, Eurasia and the Baltics, and Vietnam.  To establish a direct access P-2 group, PRM, in consultation with USCIS, defines the specific

criteria and procedures for access.  Applicants may then apply according to that process.  Applicants who clearly do not meet the access requirements do not proceed to USCIS interviews.

Once an individual gains access to processing via a P-2 designation, all other processing steps are the same as for those referred by P-1, including individual pre-screening and USCIS interviews, and all security and medical checks.

*Pre-defined Group Access P-2s:*

**Ethnic Minorities from Burma in Malaysia:**  Members of ethnic minorities from Burma who were recognized by UNHCR as refugees in Malaysia, registered by August 17, 2010, and identified as needing resettlement, are eligible for resettlement processing.

**Rohingya Refugees in Bangladesh:**  Rohingya who are (1) registered with UNHCR in Bangladesh, (2) defined by the Government of Bangladesh and UNHCR as part of the registered caseload of 1992 refugees, and (3) participated in the 2023 re-verification exercise are eligible for resettlement consideration.

**Registered Refugees Residing in the Nine Temporary Shelters in Thailand:** Refugees from Burma who (1) currently reside in one of the nine temporary shelters in Thailand and (2) were verified by UNHCR in its 2015 verification exercise or by the Thailand Ministry of the Interior in its 2019-2020 verification exercise are eligible for resettlement consideration.

**Congolese in the Great Lakes:**  Congolese refugees in Rwanda, Tanzania, and Burundi who arrived in the countries of asylum within certain designated years are eligible for resettlement processing in these countries.

**Refugees "Twice Displaced" in Ethiopia:**  Eritrean, Sudanese, and South Sudanese refugees in Ethiopia who were displaced from refugee camps in

Ethiopia as a result of the violence in Tigray, Afar, and Benishangul-Gumuz regions are eligible for resettlement processing.

**Certain Afghan Nationals:**  Certain Afghans who do not meet the minimum time-in-service for an SIV but who work/worked as employees of contractors*, locally employed staff, interpreters or translators for the U.S. government, including United States Forces Afghanistan, International Security Assistance Force, or Resolute Support; certain Afghans who work/worked for a U.S. government-funded program or project in Afghanistan supported through a U.S. government grant or cooperative agreement*; and certain Afghans who are/were employed in Afghanistan by a U.S.-based media organization or NGO are eligible for resettlement processing.  U.S.-based media organizations may also refer Afghan nationals who worked for them under stringer, freelance, and comparable arrangements.**  Afghan nationals eligible for a P-2 referral must be referred by an American citizen who works for a U.S. government agency or by the senior-most U.S. citizen employee of a U.S.-based NGO or media organization.  Afghan nationals may not submit self-referrals.

*Afghans who work/worked for sub-contractors and sub-grantees do not qualify for the P-2 designation, though they may qualify for P-1 referrals.*

**Under exceptional circumstances, PRM may accept P-2 referrals for third-party contractors, particularly from U.S.-based media organizations, and for staff of U.S. NGO wholly- or majority-owned subsidiaries in Afghanistan.*

*Direct Access Model P-2s:*

**Lautenberg Program for Certain Members of Religious Minority Groups in Eurasia, the Baltics, and Iran:**  Jews, Evangelical Christians, and Ukrainian Catholic and Orthodox religious adherents who are or were nationals and residents of the Soviet Union, as identified in the Lautenberg Amendment, Section 599D of Title V, of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990 (P.L. 101-167), as amended (the Lautenberg Amendment), with close family in the United States are

considered for refugee resettlement in their countries of origin under a reduced standard for establishing a well-founded fear of persecution.

Members of religious minorities in Iran who are or were nationals and residents of Iran with close family in the United States are also eligible for processing under the Lautenberg Amendment pursuant to the Specter Amendment, Section 213 of Title II, Division E, of the Consolidated Appropriations Act of 2004 (P.L. 108-199).

**Certain Iraqis Associated with the United States:**  Set forth in Section 1243(a) of the Refugee Crisis in Iraq Act of 2007 (Title XII, Div. A, P.L. 110-181), as amended, employees of the U.S. government, a U.S. government-funded contractor or grantee, U.S. media, or U.S. NGOs working in Iraq, and certain family members of such employees, as well as beneficiaries of approved Forms I-130, Petition for Alien Relative, are eligible for in-country refugee processing in Iraq as well as in several countries in the region, including Jordan, Egypt, and Lebanon.

**Syrian Beneficiaries of Approved Form I-130 petitions:**  Syrian beneficiaries of approved Form I-130 petitions for whom immigrant visas have not yet been issued are eligible for consideration for refugee processing.

**Certain Persons in El Salvador, Guatemala, and Honduras:**  Under the Central American Minors (CAM) P-2 designation, certain qualifying parents and legal guardians in the United States may request access to the USRAP for their unmarried child(ren) younger than the age of 21.  In some instances, other in-country relatives may be eligible when accompanying the qualifying child.

**Certain Persons in Cuba:**  Human rights activists, members of persecuted religious minorities, former political prisoners, and persons deprived of their professional credentials or subjected to other disproportionately harsh or discriminatory treatment resulting from their perceived or actual political or religious beliefs were eligible for resettlement processing.  As of September 2024, this program remains suspended.

**Priority 3 (P-3) – Family Reunification**

P-3 provides USRAP access to individuals of special humanitarian concern who have eligible family members in the United States (i.e., parents, spouses, or children younger than the age of 21 who were admitted in certain humanitarian immigrant statuses).  The eligible family members in the United States can initiate an application for their relatives even if they subsequently gained lawful permanent resident status or naturalized as U.S. citizens.

To qualify for access under the P-3 category, an applicant must generally be outside their country of origin, be registered or have legal status in the country of asylum, have had an Affidavit of Relationship (AOR) filed on their behalf by an eligible family member in the United States, and have been cleared for onward processing by USCIS.

PRM designates which U.S.-based relatives can initiate P-3 processing based on their admission status.  For FY 2025, AOR filers can include those admitted as asylees, refugees, or Afghan and Iraqi special immigrants (admitted under Section 1059 of the National Defense Authorization Act for Fiscal Year 2006 (Title X, Div. A, P.L. 109-163), Section 1244 of the Refugee Crisis in Iraq Act of 2007 (Title XII, Div. A, P.L. 110-181), as amended, and Section 602 of the Afghan Allies Protection Act of 2009 (Div. F, Title VI, P.L. 111-8), as amended).  This includes persons who are lawful permanent residents of the United States or U.S. citizens who initially were admitted to the United States in the designated status.  The U.S.-based filer must be at least 18 years of age at the time the AOR is filed.  The filer must file the AOR within five years of the date they were admitted as an asylee, refugee, or special immigrant, and the USRAP may reject any AOR for a relationship that is contrary to law or policy of the United States, such as underage or plural marriages.

The USRAP recognizes that many refugee families face legal and practical obstacles to legal marriage or marriage registration.  The United States will

allow a qualifying individual to file for P-3 access for a partner of any gender if the filer considers that person to be their spouse or life partner and can provide evidence of an ongoing relationship with the partner for at least one year overseas prior to the submission of the AOR and evidence that legal marriage could not be obtained due to social and/or legal prohibitions.

Because of the importance of reuniting immediate refugee families who have been separated while fleeing from persecution, the USRAP will continue to make P-3 processing available to individuals of all nationalities, including stateless individuals.

In FY 2024, the United States made progress in streamlining P-3 processing and will continue to do so in FY 2025.

### Priority 4 (P-4) – Privately sponsored refugees

The Welcome Corps private sponsorship program creates opportunities for Americans to directly sponsor refugees from around the world arriving through the USRAP.  The program is designed to strengthen and expand the country's capacity to resettle refugees by harnessing the energy of private sponsors across American society, including members of faith and civic groups, veterans, diaspora communities, businesses, colleges and universities, and other community organizations.  The program complements the reception and placement (R&P) program provided pursuant to Section 412(b) of the INA, 8 USC 1552(b), by creating new, additional opportunities for Americans and organizations nationwide to directly support refugee resettlement.

Like traditional resettlement agency partners, groups of private sponsors help refugees find housing and employment, enroll children in school, connect with other essential services, and raise funds to support refugees during the initial resettlement period.  These services are provided according to standards of care within a framework of outcomes and indicators developed jointly by the NGO community, state refugee coordinators, and U.S. government agencies.

Americans may sponsor refugees through the Welcome Corps in one of three ways: (1) they can be matched with approved refugees or Afghan SIVs they do not know yet, (2) they can sponsor someone they know who is already in USRAP or Afghan SIV processing, or (3) they can apply to sponsor refugees they know and refer them to the USRAP. The United States welcomed the first arrival through this "sponsor someone you know" P-4 referral process in June 2024.

The P-4 category provides access to the USRAP globally for refugees of any nationality who have U.S.-based private sponsors. However, the ability of the United States to accept and effectively process P-4 referrals is subject to the specific requirements imposed by host governments and the operational constraints of conducting refugee processing in certain country contexts. To qualify for access to the USRAP through the P-4 category, an applicant must generally be outside of their country of origin, be registered as a refugee as of an established cut-off date, and have a P-4 referral filed on their behalf by an eligible private sponsor group in the United States that is approved through the Welcome Corps. Additional eligibility criteria may apply for applicants in certain locations to comply with the specific requirements of host governments. Refugees must still be found eligible for refugee status, undergo security vetting, and be approved by USCIS, consistent with all other refugee cases.

**Family Members and Other Individuals Accompanying the Refugee Applicant**

In accordance with Section 207(c)(2)(A) of the INA, 8 U.S.C. § 1157(c)(2)(A), a refugee applicant's spouse or a child, as defined by Section 101(b)(1) of the INA, 8 U.S.C. § 1101(b)(1), accompanying that applicant is entitled to the same admission status as the refugee applicant.

On a case-by-case basis, an individual may be added to a qualifying refugee applicant's case if that individual:

- Lived in the same household as the qualifying family member in the country of nationality or, if stateless, last habitual residence;

- Was part of the same economic unit as the qualifying family member in the country of nationality or, if stateless, last habitual residence; and

- Demonstrates exceptional and compelling humanitarian circumstances that justify inclusion on the qualifying family member's case.

These individuals are not "spouse[s]" or "child[ren]," under Section 207(c)(2)(A) of the INA, 8 U.S.C. § 1157(c)(2)(A), and thus cannot derive their refugee status from the principal applicant. They must, therefore, independently establish that they qualify as a refugee.

**Following-to-Join Family Reunification Petitions**

Under Section 207(c)(2) of the INA, 8 U.S.C. § 1157(c)(2), a principal refugee admitted to the United States may request following-to-join benefits for their spouse and/or unmarried children younger than the age of 21 who were not previously granted refugee status. Once in the United States, and within two years of admission, the principal refugee may file a Form I-730 Refugee/Asylee Relative Petition[2] with USCIS for each eligible family member.[3] Following-to-join refugee petitions are initially processed domestically by USCIS' Refugee, Asylum, and International Operations Directorate (RAIO).

Once USCIS has completed initial processing of the Form I-730 petition, if the beneficiary appears eligible, the case is sent to the appropriate office depending on the beneficiary's location to interview the qualifying spouse

---

[2] This petition is used to file for the relatives of both refugees and asylees, also known as Visa 93 and Visa 92 cases, respectively. The USRAP handles only Visa 93 cases, which are counted within the annual refugee admissions ceiling. Visa 92 cases are not considered to be refugee admissions cases and are not counted in the number of refugees admitted annually.
[3] USCIS may grant a waiver of the two-year filing deadline for humanitarian reasons.

and/or child(ren) and to complete processing.  If the beneficiary is located within the United States, the petition is forwarded to the USCIS domestic field office with jurisdiction over the beneficiary's residence.  If the beneficiary is located outside of the United States, the petition is forwarded through the Department of State's National Visa Center to either the USCIS international field office or one of the Department of State's consular posts with jurisdiction over the beneficiary's location.  By regulation, all Form I-730 petitions must be filed with and adjudicated by USCIS.  However, in locations where USCIS does not have a presence, USCIS partners with the Department of State to have consular officers conduct interviews and determine the beneficiary's eligibility to travel to the United States.

The U.S. government continues to streamline and improve following-to-join refugee processing, including by centralizing processing within the USCIS International and Refugee Affairs Division, increasing staffing to support that workload, and making significant technological improvements.

USCIS or consular officers interview individuals who gain access to the USRAP through the Form I-730 petition to verify the relationship claimed in the petition, as well as to examine any applicable bars to asylee or refugee status and/or admissibility to the United States.  Beneficiaries are not required to establish past persecution or a well-founded fear of persecution, as they derive their status from the refugee relative in the United States who filed the petition.  Beneficiaries of Form I-730 petitions may be processed within their country of origin or in other locations.

Certain eligible principal refugees in the United States may file a Form I-730 petition and separately seek P-3 access for their qualifying family members simultaneously.  In some cases, the Form I-730 petition will be the only option, as the family members are still in their country of origin.  It is also important to note that unlike the P-3 process, the Form I-730 following-to-join process does not allow the relative in the United States to petition for parents.

## DHS/USCIS REFUGEE ADJUDICATIONS

Pursuant to Section 207(c)(1) of the INA, 8 U.S.C. § 1157(c)(1), as amended, the Secretary of Homeland Security may admit, at the Secretary's discretion, any refugee who is not firmly resettled in a third country, who is determined to be of special humanitarian concern, and who is admissible to the United States as an immigrant. USCIS has authority to adjudicate refugee applications. (*See* 6 U.S.C. § 271(b)(3)). USCIS also devotes substantial resources to security vetting, fraud prevention and detection, and training related to refugee processing, and it has strong partnerships with the law enforcement, national security, and intelligence communities to maintain and promote the integrity of the USRAP.

**Eligibility for Classification as a Refugee**

To be approved for classification as a refugee, an applicant must meet the refugee definition in Section 101(a)(42) of the INA, 8 U.S.C. § 1101(a)(42). That section provides that a refugee is a person who is outside his or her country of nationality or, if stateless, last habitual residence, and is unable or unwilling to return to that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. As mentioned above, the President may specify special circumstances under which a person can meet the refugee definition when still within their country of origin or, if stateless, within their country of habitual residence.

The refugee definition excludes a person who has ordered, incited, assisted, or otherwise participated in persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Further, an applicant who has been "firmly resettled" in a third country may not be admitted as a refugee under Section 207 of the INA, 8 U.S.C. § 1157. Applicants are also subject to various statutory grounds of inadmissibility, including criminal, security, and public health grounds, some of which may be waived or from which applicants may be exempted. Finally, an applicant must establish that a positive exercise of discretion is merited.

A USCIS officer conducts an inquiry of each principal refugee applicant designed to elicit information about the applicant's claim for refugee status, any grounds of inadmissibility, and factors related to the exercise of discretion.  The officer asks questions about the applicant's experiences in the country of origin, including problems and fears about returning (or remaining), as well as questions concerning the applicant's activities, background, and criminal history.  The officer also considers evidence about conditions in the country of origin and assesses the applicant's credibility and claim.  For derivative applicants, the officer also asks questions to inform the decision of eligibility based on family relationships.

**Background Security Checks**

The safety and security of the American people remains the first and foremost consideration in refugee admissions processing.  Refugees are the most thoroughly screened and vetted group to enter the United States.  Refugee applicants of all nationalities are required to undergo rigorous background security checks.  Security checks include biographic checks for all refugee applicants and biometric (fingerprint) checks for refugee applicants within certain age limits.  Biographic and biometric information is vetted against a broad array of law enforcement, intelligence community, and other relevant databases to help confirm identity, to check for any national security, criminal, or other derogatory information (including watchlist information), and to identify information that could inform lines of questioning during the inquiry.  Refugee applicants must have all required security checks completed and fully addressed prior to an applicant's admission to the United States as a refugee.

In addition, PRM and USCIS work continually with interagency partners to identify opportunities to enhance and refine security screening for refugee applicants.  This includes increasing the efficacy, efficiency, and fairness of security screening to further enhance the rigorous security measures that ensure the safety and security of the American people.

## PROCESSING ACTIVITIES OF THE DEPARTMENT OF STATE

**Overseas Processing Services**

In most processing locations, PRM funds an NGO or an international organization to manage a Resettlement Support Center (RSC) that assists in the processing of refugee applicants for admission to the United States.  RSC staff pre-screen applicants for eligibility for one of the applicable processing priorities and prepare cases for USCIS.  The RSCs assist applicants in completing documentary requirements and schedule USCIS refugee eligibility interviews.  USCIS then conducts security vetting checks on applicants.  If an applicant is conditionally approved for resettlement by USCIS, RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs.  The RSC obtains domestic sponsorship assurances, and once all required steps are completed, the RSC refers the case to IOM for transportation to the United States.

In FY 2024, four NGOs worked under cooperative agreements with PRM to operate RSCs based in Austria covering Austria and Israel (HIAS), Kenya covering sub-Saharan Africa (Church World Service), Türkiye covering Türkiye and Lebanon (International Catholic Migration Commission), and Thailand covering Asia (International Rescue Committee).  The Department of State also funded IOM to operate RSCs based in El Salvador covering Latin America and the Caribbean, Jordan covering the Near East and North Africa, and Ukraine (temporarily in Poland) covering Europe and Central Asia.

**Cultural Orientation**

PRM strives to ensure refugees who are approved for admission to the United States are prepared for the profound life changes they will experience as part of the resettlement process.  Pre-departure and post-arrival cultural orientation aim to provide refugees with the vital knowledge, skills, and insights they need to adapt to their new lives and be well-positioned to achieve self-sufficiency.

PRM supports a robust technical assistance program, the Cultural Orientation Resource Exchange (CORE), which works to ensure refugees receive consistent messages in pre-departure and post-arrival cultural orientation and trains resettlement staff to deliver effective cultural orientation.  In addition, CORE helps providers respond to unforeseen events that impact resettlement and require rapid adaptation and critical communication to resettling refugees, such as during the COVID-19 pandemic.  CORE also develops and manages refugee-facing resources and digital channels to augment instructor-led classes, support refugee self-learning, and build the digital skills that will help them achieve self-sufficiency.

RSCs offer pre-departure cultural orientation, usually one week to three months before departure.  The orientation is generally one to five days and is provided by trained educators using appropriate teaching methodologies.

Cultural orientation programming is guided by objectives and indicators that cover 14 topics.  Each RSC over many years has established its own curriculum that is customized as needed to the populations receiving it, based on these objectives and indicators.  RSCs regularly review and update their curriculum and incorporate new materials and activities from CORE as needed.  The RSCs have specific cultural orientation trainers who deliver the sessions.  Resettlement agencies have access to a comprehensive curriculum via the CORE website. "The Road Ahead" supports local providers in delivering effective cultural orientation.  The curriculum serves as a foundation and can be adapted to align with local needs.

Staff at local resettlement agencies provide the post-arrival cultural orientation, beginning right after arrival in the United States.  As part of the resettlement cultural orientation continuum, post-arrival cultural orientation reviews and builds upon pre-departure cultural orientation by grounding lessons in the local context.  For example, state health care coverage is explained as refugees learn how to access and pay for health services; refugees are introduced to the local public school system and learn

about customary student behavior and expectations of parental involvement; and refugees learn about the amenities and services available in their new communities.

Cultural adjustment is also addressed including gender dynamics, child rearing, and changing family roles.  Laws and responsibilities are also a focus.  In many locations, local partners, such as representatives from health care facilities, banks, and local police stations, are invited to attend cultural orientation to break down barriers and build trust.  Volunteers in many communities also help with cultural orientation by, for example, accompanying refugees to neighborhood grocery stores or the library or by showing them how public transportation works in their cities.

**Transportation**

The cost of transportation to the United States is provided to refugees in the form of an interest-free loan from IOM.  Refugees are responsible for repaying these loans over time, beginning six months after their arrival, although it is possible to request a deferral based on inability to begin paying at that time.  The underlying principle of the IOM travel loan program is that refugees' financial participation in making repayments against their debt will not only defray U.S. resettlement costs but also strengthen the refugees' determination to make a success of their migration and help establish their credit rating in the United States.  IOM billing and credit reporting policies are designed to encourage repayment of these interest-free loans without placing undue hardship on refugees as they adjust to their new lives in the United States.

**Reception and Placement (R&P)**

In FY 2024, PRM funded cooperative agreements with ten non-profit resettlement agencies to provide initial resettlement services to refugees and Afghan SIVs arriving in the United States pursuant to the authority in Section 412(b) of the INA, 8 U.S.C. § 1522(b), as amended.  The resettlement agencies are responsible for providing initial reception and core services to

arriving refugees.  These services are provided according to standards of care within a framework of outcomes and indicators developed jointly by the NGO community, state refugee coordinators, and U.S. government agencies.  These national resettlement organizations maintain a nationwide network of approximately 355 affiliated offices in 226 communities to provide services.  Two of the organizations also maintain a network of 28 affiliated offices through which they place unaccompanied refugee minors into foster care, a program administered and funded by HHS.

Using R&P funds from PRM, supplemented by funds and in-kind contributions from private and other sources, the participating resettlement agencies provide the following services, consistent with the terms of the R&P cooperative agreements:

- Agreement to accept cases for management by local resettlement affiliates (a process known as "assurance");
- Pre-arrival resettlement planning, including placement;
- Reception on arrival;
- Basic needs support (including housing, furnishings, food, and clothing) for at least 30 days;
- Cultural orientation;
- Assistance with access to health, employment, education, and other services, as needed; and
- Development and implementation of an initial service plan for each refugee.

In FY 2024, PRM approved six of the national resettlement organizations to offer virtual R&P services (VR&P) to select beneficiaries, including Afghan SIV holders, Afghan refugees, and refugees from Latin America.  VR&P services are provided through remote case managers instead of relying on local affiliate offices.  Modeled after the successful Virtual Afghan Placement and Assistance program, VR&P empowers refugees who have opted into this R&P model (and after an assessment) to make their own decisions on housing, material needs, and other items by receiving per capita direct assistance once assured to VR&P.

## OFFICE OF REFUGEE RESETTLEMENT

Through the Refugee Act, Congress directed the Office of Refugee Resettlement (ORR) in HHS to provide refugees with resettlement assistance that includes employment training, English language training, cash assistance (in a manner that promotes early self-sufficiency), and job placement – including providing women with equal opportunities to employment as men.  ORR's mission is to promote the health, well-being, and stability of refugees and other eligible individuals and families, through culturally responsive, trauma-informed, and strengths-based services.  ORR can only provide these benefits to the extent possible based on the availability of Congressional appropriations.

ORR refugee benefits are also authorized by Congress for asylees, Cuban and Haitian entrants, certain Amerasians from Vietnam, victims of a severe form of trafficking, Iraqi and Afghan SIV holders, and certain Afghan and Ukrainian humanitarian parolees.  In addition to refugee arrivals through the USRAP, ORR is projecting to serve 531,500 other arrivals in FY 2025, the majority of whom are expected to arrive as Cuban and Haitian Entrants through lawful pathways.  ORR funds and administers several critical programs for eligible populations, some of which are highlighted below.

**Refugee Cash and Medical Assistance**

Refugees who are not eligible for Temporary Assistance for Needy Families (TANF) or Supplemental Security Income are eligible to receive Refugee Cash Assistance (RCA) upon arrival.  Refugees who are not eligible for Medicaid are eligible to receive Refugee Medical Assistance (RMA) upon arrival. While refugees are statutorily authorized to receive RCA and RMA for up to 36 months from arrival, funding limitations have historically limited RCA and RMA availability.  In FY 2022, ORR expanded RCA and RMA from eight months to up to 12 months of assistance.  RCA and RMA are administered by states and replacement designees, which are private entities designated by ORR to administer the domestic resettlement program in a state that has

withdrawn from administration of the program.  In state-administered programs that operate a publicly administered RCA program, RCA benefits are based on cash-benefit levels established by state TANF programs.  In states that operate their RCA program through a public-private program, the RCA benefit is based on the higher of the RCA rates developed by ORR or the state TANF rates.  RMA benefits are generally designed to mirror those provided through the state's Medicaid program.

**Refugee Support Services**

ORR provides states and replacement designees with Refugee Support Services program (RSS) funds.  ORR distributes this funding by a formula based on the arrived and served ORR-eligible populations for up to the previous three years.  Funding is time limited, and refugees can only access RSS services up to five years after arrival.  These services include employment services, on-the-job training, English language instruction, vocational training, case management, translation/interpreter services, social adjustment services, health-related services, home management, childcare, and transportation.

Additionally, to assist specific groups of refugees or to target specific needs, ORR administers specialized RSS "set-aside" programs, which includes the following:  Services to Older Refugees (SOR) to support integration and wellness for refugees aged 60 and older; Refugee School Impact (RSI), which also includes "Early RSI," to support effective integration and education for children from birth to age 18 and their families; Youth Mentoring to foster mentorships in support of positive civic and social engagement and educational and vocational advancement; and Refugee Health Promotion, including the Refugee Mental Health Initiative, to support physical and emotional wellness and to build capacity within communities to address the mental health needs of refugee populations, including helping to overcome stigmas associated with mental health care and creating opportunities for social engagement to reduce isolation.

**ORR Matching Grant Program**

The ORR Matching Grant program (MG) is an alternative to traditional cash assistance provided through the ten national resettlement agencies.  The objective of MG is to guide newly arrived refugee households toward economic self-sufficiency through employment within eight months of program eligibility (which usually begins on the date of arrival in the United States).  In MG, self-sufficiency is defined as total household income from employment that (1) would exceed the established state income threshold for TANF eligibility and (2) enables a family unit to support itself without relying on cash assistance.  For each MG participant, ORR awards a per-capita grant to participating national resettlement agencies, which then allocate funds to their networks of local affiliates for direct services and administrative expenses.  Resettlement agencies provide a 50 percent match to every federal dollar awarded.  While enrolled in MG, refugees may not access ORR-funded RCA but can still access RMA.

Through MG, local service providers ensure core support services for a minimum of 240 days, which include housing, transportation, food, and a cash allowance.  Refugees also receive intensive case management and employment services throughout the 240-day service period, with more than 78 percent of refugees attaining self-sufficiency during that time.  Refugees who are unable to attain self-sufficiency by day 240 may access RCA for the remainder of the eligibility period, up to 12 months.

**Preferred Communities Program**

ORR's Preferred Communities program (PC) provides intensive case management to particularly vulnerable refugees.  PC supports a network of sites nationwide specializing in a variety of programs supporting particularly vulnerable populations.  The program builds resettlement agencies' capacity for placement of the most vulnerable refugees and provides long-term intensive case management to those with acute vulnerabilities, such as health or mental health needs, family strengthening needs, and single-

headed households.  It also helps meet the unmet needs of unexpected arrivals.

## Specialty Programs

ORR administers several specialty programs that promote economic mobility and pathways to self-sufficiency.  Funded through grants to community-based organizations, these programs help refugees advance their careers and obtain certifications, open small businesses, build community gardens, engage with employers in career development, and save to purchase homes or cars or to pay for tuition.  ORR also funds ethnic community organizations to help build the capacity of local providers to offer ongoing support and services in a culturally competent manner.

## ORR Refugee Health and Behavioral Health

ORR services focus on providing technical assistance on domestic medical screening guidelines and refugee medical assistance, assessment, and follow-up for contagious or communicable diseases, mental health awareness and linkages, suicide prevention, emergency preparedness, and other health and mental health initiatives.  Specifically, ORR funds RMA, medical screening, and refugee health promotion to support refugee populations.  Additionally, in FY 2025, ORR plans to increase behavioral health services through a new grant program, Support for Trauma-Affected Refugees (STAR).  The goals of the STAR program are the integration and successful achievement of sustained physical, social, emotional, and economic well-being of refugees whose experience of trauma is impeding their ability to function effectively at home, school, work, or in social settings.  STAR will provide access to appropriate and effective trauma assistance services at both the individual and family level and include a network of culturally responsive providers who can deliver holistic services to address the psychosocial needs of trauma-affected newcomers.

ORR also funds the Survivors of Torture program to provide culturally competent and strengths-based services, as well as individual-centered

treatment plans to restore dignity, enhance resilience, and rebuild the lives of all survivors of torture, regardless of immigration status. ORR also conducts mental-health first aid trainings to refugee-serving program staff and refugee community leaders to help them identify and assist refugees in emotional distress. Additionally, ORR provides direct services to those identified as survivors of torture, including physical and psychological treatment and rehabilitation, social and legal services to enable survivors to rebuild their lives.

**ORR Unaccompanied Refugee Minors Program**

ORR provides funding to 15 states and the District of Columbia and replacement designees to administer 26 Unaccompanied Refugee Minors programs (URM). The URM program is separate and distinct from ORR's Unaccompanied Children program, although children who become eligible for the URM program while in the care and custody of ORR may be referred for placement into the URM program. States and replacement designees contract with local licensed foster care agencies that provide specialized placements and services to unaccompanied refugee minors.

Unaccompanied minors with refugee status identified overseas are eligible for the URM program, and over time, Congress has expanded eligibility to other unaccompanied minor populations. Unaccompanied refugee minors live in various placements including traditional and therapeutic foster homes, group homes, semi-independent and independent living, and residential treatment centers. The youth receive various services including English language training, educational and vocational training, cultural preservation, social integration, family tracing, permanency planning, independent living, medical care, and mental health care. ORR requires states to provide services to unaccompanied refugee minors in parity with the state's Title IV-B and Title IV-E foster care plans.

**ORR Refugee Technical Assistance**

ORR's Refugee Technical Assistance program provides technical assistance to resettlement stakeholders to enhance services, strengthen organizational capacity, and increase community engagement.  Switchboard, a project of the International Rescue Committee, is funded by ORR and makes its resources, trainings, and expertise available to all ORR grantees and sub-grantees.

ORR also funds a technical assistance provider to support grantees in its Survivors of Torture program.  The Center for Victims of Torture's National Capacity Building project supports ORR Survivor of Torture grantees by building capacity to provide holistic, sustainable, and integrated services and evaluating and strengthening the quality and sustainability of these programs and organizations.  Refugees are determined to be eligible for the Services for Survivors of Torture program based on the definition of torture in 18 U.S.C. § 2340(1).

In FY 2025, ORR will launch the new National Refugee Children and Youth Resilience program, which aims to expand the child welfare and protection capacity of refugee-serving agencies through training and technical assistance, partnership and outreach, crisis intervention and case consultation, and assessment and evaluation activities.

**Lived Experience**

In recognition of the value of lived experience, ORR has prioritized creating opportunities to listen and respond to the voices of new arrivals and former refugees to adapt policy and program services to best support their unique needs.

The ORR Youth Leadership Council for Refugees and Newcomers, a component of the Youth Mentoring program, allows refugees and newcomer youths to build their leadership skills and share their experiences directly with ORR.  As part of this council, ORR has hosted guided listening

sessions and roundtable discussions on topics such as community support and resilience, civic engagement, leadership, professional development, mental health, addressing systemic racism, prejudice, and discrimination.

ORR is working to more proactively engage Ethnic Community Self-Help grantees on the topic of integration.  These are community-based grantees that comprise leadership from refugee and immigrant groups and are closely connected to their communities' challenges and strengths.

Ethnic community-based organizations play an important role in refugee resettlement, including improving linguistic and cultural understanding and filling the gaps in service provision.  Through expanded engagement and regular listening sessions, ORR hopes to build additional capacity to support more refugees.

**Research Initiatives**

ORR also works to support enhanced research initiatives to demonstrate the positive impact refugees have on communities.  The HHS Office of the Assistant Secretary for Planning and Evaluation (ASPE), in collaboration with ORR, conducted a study, which estimated the net fiscal impact of refugees and asylees on government budgets.  The net fiscal impact of refugees and asylees over a 15-year period equaled $123.8 billion.  The net fiscal benefit to the federal government was estimated at $31.5 billion, and the net fiscal benefit to state and local governments was estimated at $92.3 billion.

ORR's Annual Survey of Refugees (ASR) is the only national survey on refugee self-sufficiency and integration.  ASR findings are included in ORR's Annual Report to Congress, as required by Section 413 of the INA, 8 U.S.C. § 1523, as amended.  The 2022 ASR results provide insight into arrival demographics, resettlement trends, and refugee employment and integration.  As a longer-term gauge of employment and integration. ORR's recent 2022 Annual Survey of Refugees reflected:

- Among refugees in the labor force, more than 85 percent are employed, earning an average of $16.50 per hour.
- More than 25 percent own homes within 5 years of arrival.
- 70 percent took English as a second language classes since arriving in the United States, with more than 50 percent improving their English language proficiency.

## REGIONAL REFUGEE ADMISSIONS

### Africa

The proposed FY 2025 allocation for African refugees is 30,000-50,000 individuals.

There are currently more than 8.1 million refugees on the African continent, approximately 25 percent of refugees under UNHCR's mandate globally.  New or escalating conflicts across the continent have forced unprecedented numbers of people to cross borders in search of safety, intensifying the pressure on the humanitarian infrastructure.  New refugees are increasingly susceptible to food insecurity, conflicts, gender-based violence, asylum restrictions, and overcrowded camps – all compounded by climate shocks.

In 2024, UNHCR estimates that more than 735,000 refugees in Africa need resettlement.  While voluntary repatriation and local integration may be possible in small numbers, resettlement remains an important durable solution for refugees across the continent.  To address these needs, the United States plans to maintain robust resettlement activities in Africa.  The United States will continue processing Congolese, Eritrean, Sudanese, South Sudanese, and Somali refugees, as well as reaching populations the USRAP has historically only processed in small numbers in countries such as Cameroon, Ivory Coast, South Sudan, Mauritania, and Djibouti.  Remote interviews are also planned in locations that are difficult to access due to security or operational constraints.

According to UNHCR, Uganda hosts the largest number of refugees and asylum-seekers on the African continent (more than 1.6 million) and continues to receive new arrivals from eastern Democratic Republic of the Congo (DRC), Sudan, and South Sudan, as well as from other countries in the region.  The East, Horn of Africa, and Great Lakes Region have the highest concentration of refugees with populations from Sudan, the DRC, South Sudan, and Somalia.  In Ethiopia, immense humanitarian needs persist, including for refugees who experienced secondary displacement within Ethiopia during the 2020-2022 northern conflict.

Since the outbreak of the conflict in Sudan in April 2023, nearly 1.9 million individuals have fled to neighboring countries, placing an additional strain on already limited resources and assistance.  Chad alone has taken more than 604,000 refugees and asylum-seekers and is struggling to manage the humanitarian crisis.  An average of 1,000 people leave Sudan for South Sudan on a daily basis, with more than 700,000 arrivals since 2023.  Among the recent influx from Sudan, 86 percent are women and children, many of whom report experiencing gender-based violence during the conflict and while fleeing to safety.  Resettlement will remain an important protection and responsibility-sharing tool to support the efforts of refugee-hosting nations in the face of the Sudan crisis.

The complex emergency in the DRC has contributed to the continent's ever expanding refugee population.  Longstanding conflict in eastern DRC that has recently intensified, along with political instability and armed clashes in the Sahel region, is expected to drive up the number of forcibly displaced and stateless persons.

Given the protracted conflict in the DRC, a sizable number of Congolese refugees remain pending USRAP processing.  Congolese refugees will continue to constitute one of the largest populations arriving in the United States.  In addition, the United States will accept a high volume of referrals from Ethiopia through the 2023 P-2 designation for certain refugees "twice displaced" by violence in the Tigray, Afar, and Benishangul-Gumuz regions.

In addition, resettlement processing out of Chad will continue to increase in response to the influx from the Sudan conflict.

The United States is a key partner in the resettlement of unaccompanied refugee minors from Africa.  As one of the few countries with a specialized foster care system for unaccompanied minors, the United States plans to increase the number of emergency unaccompanied refugee minor cases processed throughout the continent.  PRM will continue to focus on unaccompanied refugee minors who have been evacuated from Libya by UNHCR through the Emergency Transit Mechanisms in Rwanda and Niger.

PRM has made steady progress safely identifying, referring, processing, and departing LGBTQI+ individuals from Africa for resettlement in the United States.  These individuals face specific legal and protection risks in Africa, where same-sex relationships are often criminalized and integration prospects are limited or non-existent.  LGBTQI+ refugees often face significant insecurity, discrimination, and difficulty accessing asylum systems in the country of asylum.

The United States has also made a concerted effort to advance stalled backlog cases that were referred to the USRAP prior to FY 2018.  Cases processed in Africa represent the largest number of backlog cases within the program that are now resolved, including more than 12,000 backlogged individuals across the African continent that have arrived stateside since FY 2023.  Processing efficiencies, remote interviews, and close partner coordination will help resolve more longstanding cases.

### East Asia

The proposed FY 2025 allocation for refugees from East Asia is 10,000-20,000 individuals.

According to UNHCR, there are 14.3 million people of concern across Asia and the Pacific, including 7.2 million refugees, 245,000 asylum-seekers, 5.3

million internally displaced persons, and 2.5 million stateless persons. Thailand, Bangladesh, and Malaysia continue to host large numbers of refugees and asylum-seekers from Burma, as well as Afghan, Iraqi, Pakistani, Somali, Sri Lankan, Sudanese, and Syrian refugees. Tens of thousands of refugees from more than fifty nationalities are residing in and around the capital cities of Bangkok, Kuala Lumpur, and Jakarta. Malaysia and Bangladesh currently host 90 percent of all Rohingya refugees in the region.

The United States considers Rohingya a priority refugee population whose resettlement is an essential component of an international, comprehensive humanitarian response. More than 16,000 Rohingya have resettled to the United States since 2009, primarily from Malaysia. The United States will continue to focus on Rohingya resettlement in USRAP as well as in resettlement diplomacy efforts.

The four primary countries for UNHCR referrals from East Asia are Bangladesh, Indonesia, Malaysia, and Thailand, with a smaller number of referrals from other countries in the region. Three P-2 designations for certain ethnic Burmese, including Rohingya, residing in Bangladesh, Malaysia, and Thailand support large-scale resettlement of refugees from Burma. While refugees from Burma comprise the majority of individuals departing from the East Asia region, refugees from other countries including from Afghanistan, Cambodia, Iran, Pakistan, Sri Lanka, Sudan, and Vietnam depart from some 14 other countries in the region.

### Europe and Central Asia

The proposed FY 2025 allocation for refugees from Europe and Central Asia is 2,000-3,000 individuals. By July 2024, almost 3,500 refugees, of which 75 percent qualified as persecuted religious minorities from the former Soviet Union under the Lautenberg program, arrived from this region to the United States.

Europe hosts large refugee populations, particularly as a result of Russia's war of aggression against Ukraine, as well as significant numbers of asylum-seekers, internally displaced persons, and stateless persons. According to UNHCR, European countries are hosting approximately six million refugees from Ukraine as of June 2024. Many other refugees have sought refuge in Europe by fleeing conflicts outside the region, particularly in Syria, Afghanistan, and Iraq. The estimate also includes persons claiming persecution within Eurasia, including hundreds of thousands of refugees and internally displaced persons in the Balkans and South Caucasus. There are also Belarusians and Russians seeking protection who have been fleeing the increased crackdown on dissent inside Belarus and Russia since February 2022.

Much of the refugee caseload within Eurasia falls under the direct access P-2 Lautenberg program, a family reunification program dating from 1990 whereby individuals who were nationals and residents of the former Soviet Union are eligible for the USRAP if they belong to certain religious minorities and can show a qualifying relationship with individuals legally residing in the United States. P-2 applicants may include Ukrainians who fled Russia's full-scale invasion.

In 2004, Congress expanded the Lautenberg program with the Specter Amendment to include persecuted religious minorities from Iran. Refugees resettled through the Iranian Lautenberg program have included Jews, Christians, Baha'is, Sabaean-Mandaeans, and Zoroastrians. These refugees are counted against the Near East/South Asia regional allocation. The demand for this refugee program in Iran continues to grow and the Department of State reached arrangements with new partners in Europe that aim to increase annual refugee processing of Iranian minorities to more than 1,250 in FY 2025.

The United States' commitment to helping refugees, including Ukrainians, from the former Soviet Union is unwavering. While some Ukrainians have been resettled through the USRAP, the majority of Ukrainians that arrived in the United States since the start of the war have come on temporary status

because most do not want to resettle permanently. Martial law restricts
most male Ukrainian applicants from leaving Ukraine, and many Ukrainian
refugees families choose to remain in Europe. Russian and Belarusian
applicants often need to travel to the South Caucasus or Central Asia to be
processed and interviewed.

Türkiye continues to host the largest refugee population in the world.
According to UNHCR, there are more than 3.3 million refugees in Türkiye
since the start of 2024, the vast majority of whom are Syrians (3.1 million),
with smaller numbers of Afghans, Iraqis, Iranians, and other nationalities.
Refugees in Türkiye from a wide array of nationalities are resettled through
USRAP Türkiye and are counted against the corresponding regional
allocation of their country of origin.

## Latin America and the Caribbean

The proposed FY 2025 allocation for refugees from Latin America and the
Caribbean is 35,000-50,000 individuals. This allocation reflects the
unprecedented levels of displacement in the region. It further helps
advance foreign policy priorities with partners in the region to also provide
for a safe refuge for those individuals fleeing persecution in their homeland,
and reaffirms the U.S. commitment to working with regional partners to
advance the principles of safe, orderly, humane, and regular migration
under the Los Angeles Declaration on Migration and Protection.

According to UNHCR, countries in Latin America and the Caribbean host
more than 21 million asylum-seekers, refugees, stateless persons, and
internally displaced persons. The crisis in Venezuela has displaced more
than 7.7 million Venezuelans, with 85 percent of them residing within other
countries in Latin America and the Caribbean. Government repression in
Nicaragua and Cuba have also forced hundreds of thousands to flee those
countries. Protracted violence by organized criminal gangs in Guatemala,
Honduras, and El Salvador has uprooted more than a million people from
those three countries since 2015. Additionally, a combination of economic
insecurity, political instability, and gang violence in Haiti has forced the

internal displacement of 578,000 people in 2024 and has prompted increased outmigration.

In FY 2023, UNHCR submitted an all-time high number of referrals from the region to the USRAP and will more than quadruple that number by the end of FY 2024. Refugee resettlement from Latin America between 2016 and 2021 focused primarily on Colombians in Ecuador and Salvadorans, Guatemalans, and Hondurans within northern Central America; since then, efforts have expanded to more than 20 countries. Venezuelans, which accounted for relatively few cases two years ago, have become the most-referred nationality to USRAP operations in the region, surpassing Guatemalans, Salvadorans, and Hondurans.

The United States has surpassed its commitment made in connection with the Los Angeles Declaration on Migration and Protection to resettle 20,000 refugees from the Americas during FY 2023 to FY 2024. This reflects the Biden-Harris Administration's strong commitment to welcoming refugees through established lawful pathways. Haitian and Nicaraguan refugee arrivals to the United States have steadily trended upward in FY 2024, as referrals to the USRAP from these nationalities increased, enabling the United States to interview and screen people with legitimate protection concerns in the regions where they are.

The Safe Mobility initiative (known by the Spanish name *Movilidad Segura)* facilitates access to protection and other lawful pathways to the United States and other countries via the MovilidadSegura.org website and Safe Mobility Offices (SMOs). The Safe Mobility initiative is one of the ways the United States is facilitating access to integration and lawful migration pathways. SMOs in Colombia, Costa Rica, Ecuador, and Guatemala provide information about the wide range of existing services and support available for refugees and migrants to integrate in host countries and, when needed, facilitate expedited refugee processing via the USRAP as well as provide information and referrals to other humanitarian and labor pathways. SMOs also provide information and referrals to lawful pathways to third countries, including Canada and Spain.

Since the launch of the SMO initiative in June 2023, more than 230,000 individuals have registered via MovilidadSegura.org.  More than 50,000 individuals have been referred to the USRAP across the four SMO countries, and more than 24,000 individuals have been referred for other lawful pathways.

## Near East and South Asia

The proposed FY 2025 allocation for refugees from the Near East and South Asia is 30,000-45,000 individuals.

The Near East and South Asia region continues to host more than 8 million refugees, primarily Afghans, Iranians, Iraqis, Palestinians, Sri Lankans, Syrians, and Tibetans.  The humanitarian situation in Syria remains dire.  Over the past 13 years, nearly 14 million Syrians have been displaced from their homes, including more than 6.7 million who are now refugees hosted in Türkiye, Lebanon, Jordan, and Egypt.  Within Syria, human rights violations and abuses and armed conflict – as well as economic decline, food and water scarcity, and the degradation of social services – are expected to continue contributing to vulnerabilities in 2025.  Humanitarian needs in the country, as measured by the UN, are at their highest level since the conflict began.  Across the region, Syrian refugees remain highly vulnerable.  UNHCR reports that Syrian nationals have the highest resettlement needs globally and estimates that more than 753,000 Syrians will need resettlement as part of an ongoing multi-year targeted program.  In Iraq, the political and security environment is likely to remain challenging, while the Sudan crisis and the resulting displacement of millions of Sudanese across North Africa will continue to have a wider impact, particularly on Libya and Egypt.  More than four million people have been displaced by the civil conflict in Yemen, and the humanitarian situation continues to deteriorate as the conflict endures.  In Iran, people continue to seek to escape repression as the Government of Iran continues its long history of human rights violations against its citizens, including using transnational repression to intimidate,

Add. 086

silence, and exact reprisal against dissidents, journalists, and former insiders.

More than 774,400 Afghan nationals have been displaced since 2021.  Inside Afghanistan, more than 3 million Afghans are internally displaced by conflict, and 1 million internally displaced persons have returned to their places of origin.  Following the announcement of the Government of Pakistan's Illegal Foreigners Repatriation Plan in October 2023, more than 595,000 Afghans have returned to Afghanistan from Pakistan – including deportations, assisted voluntary repatriations, and other returns of Afghans of varying statuses (including UNHCR proof of registration cardholders, Afghan citizen cardholders, and undocumented Afghans).  As of March 2024, there are more than seven million Afghans in neighboring countries, including 5.5 million Afghan refugees and Afghans in refugee-like situations in Iran and Pakistan alone.

Since August 2021, the U.S. government and its partners have resettled more than 160,000 Afghan newcomers.  As of early July 2024, PRM has accepted 28,000 P-1 and P-2 referrals for Afghan principal applicants and continues to process refugee cases for Afghan nationals in third countries around the globe.  The United States remains committed to providing refuge, through a range of legal pathways, for those Afghans who supported the U.S. mission in Afghanistan.  In July 2023, PRM and USCIS began processing applications of Afghan refugees in Pakistan, and since January 2024 have significantly increased processing capacity.

## International Religious Freedom Act Reporting

The USRAP continues to be available through P-1 referrals to persons of any or no nationality who have been persecuted or fear persecution on account of religion.  The Lautenberg P-2 program provides direct access for members of religious minority groups in Eurasia, the Baltics, and Iran.  In addition, P-3 provides USRAP access to individuals of special humanitarian concern, including those persecuted on account of religion, who have immediate family members in the United States who were admitted in certain

humanitarian immigrant statuses.  Lastly, P-4 allows groups of Americans to refer and sponsor refugees, including those persecuted on account of religion, in the United States.

## Countries of Particular Concern

As of December 29, 2023, the Secretary of State designated the following countries as Countries of Particular Concern pursuant to Section 402(b) of the IRFA, 22 U.S.C. § 6442(b), as amended.

### Africa:  Eritrea

In Eritrea, the government is engaging in or tolerating systematic and ongoing violations of religious freedom.  The Eritrean government only recognizes four officially registered religious groups:  the Eritrean Orthodox Tewahedo Church, Sunni Islam, the Catholic Church, and the Evangelical Lutheran Church of Eritrea.  The Eritrean government continues to imprison individuals on the basis of their religion.  NGOs estimate between 130 to 1,000 people are detained for their faith.  At least 20 Jehovah's Witnesses continue to be imprisoned for their refusal to participate in military service or renounce their faith.  The Government of Eritrea also continues to deny citizenship to Jehovah's Witnesses after stripping them of citizenship in 1994 for refusing to participate in the referendum that created the independent state of Eritrea.

### East Asia:  Democratic People's Republic of Korea (DPRK), People's Republic of China (PRC), and Burma

The Democratic People's Republic of Korea (DPRK) severely restricts religious freedom, including all government-organized religious activity, and reportedly continues to execute, torture, arrest, and physically abuse individuals for religious activities.  While the constitutions of the DPRK, the People's Republic of China (PRC), and Burma provide for freedom of religion or religious belief, in practice and in law, these governments heavily restrict or repress religious activities and freedom.  Furthermore, a military coup in Burma in February 2021 has further undermined those human rights

enshrined in Burma's constitution and laws and resulted in further repression of religious freedom and related human rights.  In March 2022, the Secretary of State determined the military of Burma committed genocide and crimes against humanity against Muslim Rohingya.  In January 2021, the Secretary of State determined that, since at least March 2017, the PRC has committed genocide and crimes against humanity against predominantly Muslim Uyghurs and members of other ethnic and religious minority groups in Xinjiang.

**Europe and Central Asia:  Russia, Tajikistan, and Turkmenistan**

The Russian government misuses the law on extremism to restrict the peaceful activities of members of religious minority groups, including Muslim and Christian groups.  In both Russia and Russia-occupied areas of Ukraine, the Russian government has harassed, tortured, or imprisoned hundreds for their faith.

Tajikistan law prohibits persons younger than the age of 18 from participating in public religious activities, and the government-supported highest Islamic religious body bans Hanafi Sunni women from attending mosques.  The Government of Turkmenistan has imprisoned an unknown number of Muslims for their religious beliefs.  Turkmenistan law prohibits all activity by unregistered religious groups, and the grounds for approval of registration remains arbitrary.

**Near East and South Asia:  Iran, Pakistan, and Saudi Arabia**

In Iran and Pakistan, the governments use blasphemy and defamation of religion laws to restrict religious freedom, constrain the rights of religious minorities, limit freedom of expression, and imprison those accused.  The Government of Iran convicts and executes dissidents, political reformers, and peaceful protesters on charges of "enmity against God" and spreading anti-Islamic propaganda.  In Saudi Arabia, freedom of religion is not provided for under the law.  The Saudi government constrains the rights of religious

minorities, and incarcerates individuals accused of apostasy and blasphemy against Islam.

**Western Hemisphere:  Cuba and Nicaragua**

In Cuba and Nicaragua, the governments used forced exile, unjust arrests, violence and intimidation, and prolonged detention without charges of religious actors, who were expressing their religious beliefs, to stamp out any perceived dissent.  The Government of Nicaragua also denationalized hundreds of individuals in conjunction with forced exile and other forms of persecution, including Catholic clergy and affiliates of the Catholic Church.

**Special Watch List**

As of December 29, 2023, the Secretary of State also designated the following countries to the Special Watch List pursuant to Section 402(b) of the IRFA, 22 U.S.C. § 6442(b), as amended.

**Africa:  Central African Republic and Comoros**

In Central African Republic, security actors, including the Forces Armées Centrafricaines (FACA), police, and gendarmes, used violence, discrimination, and threats to target individuals and communities based on their actual or perceived religious affiliation.

In Comoros, the constitution defines national identity based on one official state religion, Sunni Islam, but proclaims equality of rights and obligations for all, regardless of religious belief.  However, this is understood to be freedom of belief for foreigners.  The constitution also specifies that Shafi'i Sunni Islam regulates worship and social life.  Proselytizing any religion other than Sunni Islam is illegal, and the law prohibits performance of non-Sunni rituals based on the principle of "affronting society's cohesion and endangering national unity."  Individuals who convert from Sunni Islam to Christianity or Shia Islam are often shunned.

## Europe:  Azerbaijan

In Azerbaijan, the government maintains control over religious practices and arrests, imprisons, and harasses religious actors.  The Azerbaijani government granted the State Committee for Work with Religious Associations (SCRWA) sole responsibility for the hiring and firing of all imams and the authority to approve the appointment of religious leaders in non-Islamic religious communities.  The SCRWA required religious groups to cease religious activity in the absence of an appointed cleric, approves the content of religious literature read during meetings and sermons at mosques, establishes registration requirements for all religious groups, and bans activities by unregistered religious groups.  Any offense committed against the SCRWA regulations is punishable by fines or imprisonment.  The government arrests religious activists and Shia Muslims whom they consider "nonconforming," specifically, the unregistered Shia group Muslim Unity Movement (MUM), which the government considers an illegal organization.  MUM members report authorities physically abused them and sexually assaulted them while in custody.

## Near East:  Algeria

The Algerian government has increasingly restricted religious freedom, often punitively or violently, for religious minority communities through numerous government agencies.  The government most often uses the 2006 and 2012 laws governing practices of religion and association to target the Protestant Church of Algeria, other Protestant churches, and the Ahmadi Muslim community.  Because these churches and religious communities are not allowed to register as religious groups, their gatherings, worship services, and other religious and administrative activities are deemed illegal by the government.

## East Asia:  Vietnam

In Vietnam, the government maintains significant control over religious practices in the stated interest of national security, including mandating

registration of groups under government-sponsored religious organizations.  Authorities in certain provinces frequently force individuals not registered under state-sponsored organizations to renounce their faith, and the authorities harass, intimidate, threaten, arrest, and detain those who peacefully advocate for freedom of religion or belief.

### North Korean Human Rights Act Reporting

As reflected in the North Korean Human Rights Act, 22 U.S.C. § 7845(b), as amended, the United States remains deeply concerned about the human rights situation of North Koreans, both inside the DPRK and in other countries around the world.  The United States began resettling interested, eligible North Korean refugees and their family members in 2006 and remains committed to continuing this program.

### REFUGEE ADMISSIONS TO THE UNITED STATES

In FY 2023, the USRAP admitted 60,014 refugees from 75 countries.  The Democratic Republic of the Congo, Syria, Afghanistan, and Burma collectively comprised more than two-thirds of total admissions. (See Table IV.)

The demographic characteristics of refugee arrivals from the 20 largest source countries (representing 96 percent of total arrivals) in FY 2023 illustrate the variation among refugee groups.  The median age of all FY 2023 arrivals was 20 years, ranging from a median age of 16 years for arrivals from Syria to 37 years of age for arrivals from Iran.  In FY 2023, 49.95 percent of all arriving refugees were female, and 50.38 percent of all arriving refugees were male. (See Table V.)

Of the total arrivals in FY 2023, roughly 11.24 percent were younger than the age of five, 34.08 percent were of school age (5-17 years old), 52.90 percent were of working age (18-64 years old), and 1.78 percent were of retirement age (65 years and older).  (See Table VI.)  Considerable variation among refugee groups can be seen among specific age categories.

During FY 2023, 50.77 percent of all arriving refugees resettled in 10 states: Texas (8.42 percent), New York (6.42 percent), California (6.11 percent), Pennsylvania (4.59 percent), North Carolina (4.37 percent), Arizona (4.34 percent), Ohio (4.21 percent), Kentucky (4.19 percent), Michigan (4.08 percent), and Washington (4.04 percent).  (See Table VII.)

# ADMISSIONS TABLES AND STATISTICS

**TABLE II**
**USRAP Projected Arrivals by Region, FY 2024**

| REGION | FY 2024 CEILING | FY 2024 PROJECTED ARRIVALS |
|---|---|---|
| Africa | 30,000 - 50,000 | 32,5000-34,500 |
| East Asia | 10,000 - 20,000 | 6,500-8,500 |
| Europe and Central Asia | 2,000 - 3,000* | 3,000 |
| Latin America/Caribbean | 35,000 - 50,000 | 23,500-25,500 |
| Near East/South Asia | 30,000 - 45,000 | 27,500-29,500 |
| | | |
| Total | 125,000 | 100,000 |

\* In July 2024, the Department of State transferred unused admissions allocated to other regions to the Europe and Central Asia region to increase that regional allocation to 2,000-3,500.

**TABLE III**
**USRAP Admissions, FY 2023**

| REGION | FY 2023 CEILING | FY 2023 ACTUAL ARRIVALS |
|---|---|---|
| Africa | 40,000 | 24,481 |
| East Asia | 15,000 | 6,262 |
| Europe and Central Asia | 15,000 | 2,765 |
| Latin America/Caribbean | 15,000 | 6,312 |
| Near East/South Asia | 35,000 | 20,194 |
| Regional Subtotal | 120,000 | 60,014 |
| Unallocated Reserve | 5,000 | |
| Total | 125,000 | 60,014 |

**TABLE IV**

**USRAP Admissions by Country of Origin, FY 2023**

| Country of Origin | Individual Arrivals | Percentage of Total Arrivals |
|---|---|---|
| **Grand Total** | **60,014** | 100% |
| Dem. Rep. Congo | 18,145 | 30.24% |
| Syria | 10,781 | 17.96% |
| Afghanistan | 6,594 | 10.99% |
| Burma | 6,185 | 10.31% |
| Guatemala | 1,748 | 2.91% |
| Sudan | 1,635 | 2.72% |
| Venezuela | 1,442 | 2.40% |
| Somalia | 1,385 | 2.31% |
| Ukraine | 1,337 | 2.23% |
| Iraq | 1,235 | 2.06% |
| Colombia | 1,165 | 1.94% |
| El Salvador | 1,056 | 1.76% |
| Eritrea | 973 | 1.62% |
| Iran | 743 | 1.24% |
| Central African Republic | 634 | 1.06% |
| Honduras | 598 | 1.00% |
| Republic of South Sudan | 592 | 0.99% |
| Pakistan | 492 | 0.82% |
| Moldova | 489 | 0.82% |
| Ethiopia | 441 | 0.74% |
| Burundi | 335 | 0.56% |
| Russia | 297 | 0.50% |
| Nicaragua | 217 | 0.36% |
| Yemen | 204 | 0.34% |
| Armenia | 190 | 0.32% |
| Kyrgyzstan | 146 | 0.24% |
| Belarus | 126 | 0.21% |
| Uzbekistan | 90 | 0.15% |
| Senegal | 86 | 0.14% |
| Rwanda | 85 | 0.14% |
| Kazakhstan | 70 | 0.12% |
| Palestinian Territories | 56 | 0.09% |
| Cuba | 45 | 0.08% |

| Vietnam | 45 | 0.08% |
|---|---|---|
| Uganda | 39 | 0.07% |
| Haiti | 34 | 0.06% |
| Cameroon | 29 | 0.048% |
| Mali | 26 | 0.043% |
| Guinea | 25 | 0.042% |
| Sri Lanka | 22 | 0.037% |
| Ivory Coast | 22 | 0.037% |
| Nepal | 18 | 0.030% |
| Bhutan | 17 | 0.028% |
| China | 15 | 0.025% |
| Tajikistan | 11 | 0.018% |
| Cambodia | 10 | 0.017% |
| Liberia | 9 | 0.015% |
| Türkiye | 8 | 0.013% |
| Indonesia | 7 | 0.012% |
| Libya | 6 | 0.010% |
| Kenya | 6 | 0.010% |
| Turkmenistan | 5 | 0.008% |
| Egypt | 5 | 0.008% |
| Lithuania | 4 | 0.007% |
| Jordan | 4 | 0.007% |
| Namibia | 3 | 0.005% |
| Jamaica | 3 | 0.005% |
| Algeria | 3 | 0.005% |
| Zimbabwe | 2 | 0.003% |
| Tunisia | 2 | 0.003% |
| Peru | 2 | 0.003% |
| Chad | 2 | 0.003% |
| Zambia | 1 | 0.002% |
| Togo | 1 | 0.002% |
| Tanzania | 1 | 0.002% |
| Nigeria | 1 | 0.002% |
| Niger | 1 | 0.002% |
| Morocco | 1 | 0.002% |
| Lebanon | 1 | 0.002% |
| India | 1 | 0.002% |
| Guyana | 1 | 0.002% |
| Costa Rica | 1 | 0.002% |
| Burkina Faso | 1 | 0.002% |

| Benin | 1 | 0.002% |
| Bangladesh | 1 | 0.002% |

*Source:  Department of State, Bureau of Population, Refugees, and Migration, Refugee Processing Center*

**TABLE V**
**Sex and Median Age of Refugee Arrivals, FY 2023**

| Rank | Country of Origin | Refugees Admitted | Median Age | % Female | % Male |
|------|-------------------|-------------------|------------|----------|--------|
| 1 | Dem. Rep. Congo | 18,145 | 18 | 49.95% | 50.05% |
| 2 | Syria | 10,781 | 16 | 47.92% | 52.08% |
| 3 | Afghanistan | 6,594 | 22 | 50.77% | 49.23% |
| 4 | Burma | 6,185 | 21 | 48.78% | 51.22% |
| 5 | Guatemala | 1,748 | 21 | 54.69% | 45.31% |
| 6 | Sudan | 1,635 | 21 | 45.87% | 54.13% |
| 7 | Venezuela | 1,442 | 27 | 51.11% | 48.89% |
| 8 | Somalia | 1,385 | 23 | 50.40% | 49.60% |
| 9 | Ukraine | 1,337 | 23 | 50.49% | 49.51% |
| 10 | Iraq | 1,235 | 28 | 47.45% | 52.55% |
| 11 | Colombia | 1,165 | 22 | 51.16% | 48.84% |
| 12 | El Salvador | 1,056 | 23 | 58.43% | 41.57% |
| 13 | Eritrea | 973 | 21 | 47.79% | 52.21% |
| 14 | Iran | 743 | 37 | 44.68% | 55.32% |
| 15 | Central African Republic | 634 | 18 | 49.53% | 50.47% |
| 16 | Honduras | 598 | 23 | 52.84% | 47.16% |
| 17 | Republic of South Sudan | 592 | 18 | 50.00% | 50.00% |
| 18 | Pakistan | 492 | 23 | 47.76% | 52.24% |
| 18 | Moldova | 489 | 26 | 54.19% | 45.81% |
| 20 | Ethiopia | 441 | 22 | 50.79% | 49.21% |
| 21 | All other countries | 2,344 | 27 | 47.74% | 52.26% |
| **TOTAL** | | 60,014 | 20 | 49.62% | 50.38% |

*Source:  Department of State, Bureau of Population, Refugees, and Migration, Refugee Processing Center*

TABLE VI

SELECT AGE CATEGORIES OF REFUGEE ARRIVALS, FY 2023

| RANK | COUNTRY OF ORIGIN | YOUNGER THAN 5 YEARS | SCHOOL AGE (5-17) | WORKING AGE (18-64) | RETIREMENT AGE (65 AND OVER) |
|---|---|---|---|---|---|
| 1 | Dem. Rep. Congo | 14.89% | 34.24% | 49.05% | 1.82% |
| 2 | Syria | 9.38% | 44.49% | 45.37% | 0.77% |
| 3 | Afghanistan | 9.63% | 30.83% | 57.39% | 2.15% |
| 4 | Burma | 13.40% | 32.64% | 52.77% | 1.18% |
| 5 | Guatemala | 9.38% | 31.98% | 57.21% | 1.43% |
| 6 | Sudan | 11.80% | 31.07% | 55.90% | 1.22% |
| 7 | Venezuela | 6.45% | 28.92% | 63.04% | 1.60% |
| 8 | Somalia | 5.92% | 28.88% | 63.03% | 2.17% |
| 9 | Ukraine | 13.09% | 31.41% | 49.21% | 6.28% |
| 10 | Iraq | 4.94% | 24.70% | 66.15% | 4.21% |
| 11 | Colombia | 10.64% | 31.59% | 57.17% | 0.60% |
| 12 | El Salvador | 8.14% | 31.16% | 58.81% | 1.89% |
| 13 | Eritrea | 7.71% | 32.89% | 59.10% | 0.31% |
| 14 | Iran | 2.42% | 9.96% | 81.70% | 5.92% |
| 15 | Central African Republic | 8.83% | 40.85% | 49.37% | 0.95% |
| 16 | Honduras | 9.87% | 28.93% | 59.87% | 1.34% |
| 17 | Republic of South Sudan | 7.77% | 39.53% | 52.03% | 0.68% |
| 18 | Pakistan | 5.28% | 32.93% | 60.57% | 1.22% |
| 19 | Moldova | 12.47% | 25.15% | 55.21% | 7.16% |
| 20 | Ethiopia | 12.24% | 32.43% | 53.97% | 1.36% |
| 21 | All other countries | 8.32% | 25.51% | 63.27% | 2.90% |
| Total | | 11.24% | 34.08% | 52.90% | 1.78% |

*Source:  Department of State, Bureau of Population Refugee and Migration, Refugee Processing Center*

(103 of 397), Page 103 of 397
Case: 25-1313, 03/08/2025, DktEntry: 5.1, Page 103 of 397
Case 2:25-cv-00255-JNW    Document 15-3    Filed 02/11/25    Page 63 of 67

TABLE VII

REFUGEE ARRIVALS BY STATE OF INITIAL RESETTLEMENT FY 2023

| STATE | TOTAL REFUGEE ARRIVALS | PERCENTAGE OF TOTAL ARRIVALS |
|---|---|---|
| Texas | 5,053 | 8.42% |
| New York | 3,851 | 6.42% |
| California | 3,667 | 6.11% |
| Pennsylvania | 2,756 | 4.59% |
| North Carolina | 2,621 | 4.37% |
| Arizona | 2,605 | 4.34% |
| Ohio | 2,524 | 4.21% |
| Kentucky | 2,514 | 4.19% |
| Michigan | 2,447 | 4.08% |
| Washington | 2,423 | 4.04% |
| Illinois | 2,331 | 3.88% |
| Georgia | 2,228 | 3.71% |
| Florida | 1,899 | 3.16% |
| Minnesota | 1,531 | 2.55% |
| Iowa | 1,515 | 2.52% |
| Indiana | 1,444 | 2.41% |
| Colorado | 1,424 | 2.37% |
| Wisconsin | 1,408 | 2.35% |
| Missouri | 1,402 | 2.34% |
| Virginia | 1,381 | 2.30% |
| Maryland | 1,331 | 2.22% |
| Massachusetts | 1,247 | 2.08% |
| Tennessee | 1,132 | 1.89% |
| Utah | 893 | 1.49% |
| Nebraska | 849 | 1.41% |
| Oregon | 844 | 1.41% |
| Idaho | 796 | 1.33% |
| Kansas | 784 | 1.31% |
| South Carolina | 683 | 1.14% |
| Connecticut | 672 | 1.12% |
| New Jersey | 550 | 0.92% |
| Nevada | 415 | 0.69% |
| Maine | 402 | 0.67% |
| Oklahoma | 330 | 0.55% |
| Vermont | 318 | 0.53% |
| New Mexico | 286 | 0.48% |

Add. 101

| | | |
|---|---|---|
| South Dakota | 202 | 0.34% |
| Rhode Island | 191 | 0.32% |
| North Dakota | 184 | 0.31% |
| New Hampshire | 171 | 0.28% |
| Arkansas | 148 | 0.25% |
| Delaware | 130 | 0.22% |
| Montana | 130 | 0.22% |
| Alabama | 106 | 0.18% |
| Louisiana | 105 | 0.17% |
| Alaska | 79 | 0.13% |
| Mississippi | 9 | 0.15% |
| District of Columbia | 3 | 0.005% |
| **TOTAL** | **60,014** | **100%** |

TABLE VIII
**Funding for Refugee Processing and Resettlement**
**FY 2024 and FY 2025**

| AGENCY | FY 2024 AVAILABILITY (IN MILLIONS) | ESTIMATED FY 2025 AVAILABILITY (IN MILLIONS) |
|---|---|---|
| **DEPARTMENT OF HOMELAND SECURITY** *U.S. Citizenship and Immigration Services* | | |
| **Refugee Processing** [1] | $126.5 | $139.6 |
| **DEPARTMENT OF STATE** *Bureau of Population, Refugees, and Migration* | | |
| **Refugee Admissions** [2] [3] [4] | $1,321.8 | $1,215.2 |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES** *Administration for Children and Families, Office of Refugee Resettlement* | | |
| **Refugee Resettlement** [5] | $1,352.2 | $3,785.5 |
| **TOTALS** | $2,800.5 | $5,140.3 |

[1]  FY 2024 projected costs are based on payroll and general expenses that support USCIS refugee processing activities, reimbursement for following-to-join refugee processing conducted by Department of State on behalf of USCIS, and certain International Cooperative Administrative Support Services (ICASS) and Capital Security Cost Sharing (CSCS) costs and other international operations costs related to USCIS international offices that support refugee processing.   FY 2025 projections assume that funding levels match the President's FY 2025 budget request submitted to Congress, which is subject to Congressional budget action.  All figures are estimates.

[2] FY 2024:  Equals the sum of FY 2024 Migration and Refugee Assistance (MRA) allocation of $1,243.3 million, $68.5 million in MRA carryover from FY 2023, and an estimate of $10 million in prior year MRA recoveries.  Some FY 2024 funds will be carried forward into FY 2025.

[3] FY 2025:  Equals the FY 2025 MRA budget request of $1,215.2 million.

[4] Funding in FY 2024 and FY 20254 does not include funding from the ERMA or Enduring Welcome Administrative Expenses accounts, which covers costs associated with Enduring Welcome.

[5] FY 2024 and FY 2025:  In addition to refugees, ORR refugee program benefits and services are also provided to asylees, Cuban and Haitian entrants, certain Amerasians from Vietnam, victims of a severe form of trafficking who have received certification or eligibility letters from ORR,

Iraqi and Afghan SIV holders, and certain Afghan and Ukrainian parolees.  However, only refugees are included in the refugee admissions ceiling; there is no admissions ceiling or target for the other ORR-eligible populations.  The estimated funding to provide cash and medical assistance, domestic medical screenings, and refugee social services for all ORR eligible populations, are included here.  ORR received $871 million in regular FY 2024 appropriations, as well as $481 million in emergency appropriations.  These amounts are reflected in the above funding chart.  ORR estimates do not include any prior year carryover funding or reprogramming.  Funding estimates to support all ORR-eligible populations in mainstream services such as TANF, Medicaid, and Supplemental Security Income are also not included, as they are not appropriated to ORR.  In addition to base funding requested to support the Transitional and Medical Services and Refugee Support Services line items, the President's FY 2025 Budget request includes a $2.9 billion emergency supplemental appropriation.

**TABLE IX**
**UNHCR Resettlement Referrals Submitted by Resettlement Country – 2023[1]**
(January-December 2023)

| RESETTLEMENT COUNTRY | NUMBER OF UNHCR REFUGEES REFERRED TO EACH COUNTRY | PERCENT OF TOTAL NUMBER OF UNHCR REFUGEES REFERRED GLOBALLY |
|---|---|---|
| United States | 105,490 | 67.86% |
| Australia | 14,377 | 9.25% |
| Canada | 13,194 | 8.49% |
| Germany | 6,931 | 4.46% |
| France | 3,804 | 2.45% |
| New Zealand | 2,386 | 1.53% |
| Norway | 2,358 | 1.52% |
| Finland | 1,263 | 0.81% |
| Spain | 1,198 | 0.77% |
| Sweden | 803 | 0.52% |
| Italy | 770 | 0.50% |
| The Netherlands | 635 | 0.41% |
| The United Kingdom | 559 | 0.36% |
| Switzerland | 427 | 0.27% |
| Portugal | 424 | 0.27% |
| Romania | 246 | 0.16% |
| Denmark | 201 | 0.13% |
| Belgium | 184 | 0.12% |
| Slovenia | 131 | 0.08% |
| Japan | 64 | 0.04% |
| **TOTAL** | **155,445** | |

*Source:  UNHCR, actual data current as of June 2024*

[1] The figures provided are primarily limited to UNHCR country operations with allocated quotas and specific commitments to meet; additional submissions may have been made by other operations.  The table reflects only the number of refugee referrals UNHCR submitted to resettlement countries and does not reflect actual number of refugees resettled in each country.

# EXHIBIT 4



| ⌂ Sections ▼ | ◎ Browse ▼ | 🔍 Search ▼ | ♿ Reader Aids ▼ | 👥 My FR ▼ | Search Documents | 🔍 |

# FEDERAL REGISTER
The Daily Journal of the United States Government

PO **Presidential Document**

## Presidential Determination on Refugee Admissions for Fiscal Year 2025

A Presidential Document by the Executive Office of the President on 10/18/2024 🚩▾



PUBLISHED DOCUMENT: 2024-24321 (89 FR 83767)

- 📄 PDF
- 📑 Document Details
- ≡ Table of Contents
- 💬 Public Comments
- ⚡ Regulations.gov Data
- ⇗ Sharing
- 🖨 Print
- 📊 Document Statistics
- ⟩ Other Formats
- 🔍 Public Inspection

🖨 print page 83767) Presidential Determination No. 2024-13 of September 30, 2024

### Presidential Determination on Refugee Admissions for Fiscal Year 2025

### Memorandum for the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States, in accordance with section 207 of the Immigration and Nationality Act (the "Act") (8 U.S.C. 1157), and after appropriate consultations with the Congress, I hereby make the following determinations and authorize the following actions:

The admission of up to 125,000 refugees to the United States during Fiscal Year (FY) 2025 is justified by humanitarian concerns or is otherwise in the national interest.

The admissions numbers shall be allocated among refugees of special humanitarian concern to the United States in accordance with the following regional allocations:

| | |
|---|---|
| Africa | 30,000-50,000 |
| East Asia | 10,000-20,000 |
| Europe and Central Asia | 2,000-3,000 |
| Latin America/Caribbean | 35,000-50,000 |
| Near East/South Asia | 30,000-45,000 |

The above allocation ranges are intended to provide flexibility as needs arise, but the total admissions among all of the regions may not exceed 125,000. Upon providing notification to the Judiciary Committees of the Congress, you are hereby authorized to transfer unused admissions allocated to a particular region to one or more other regions, if there is a need for greater admissions for the region or regions to which the admissions are being transferred.

Consistent with section 2(b)(2) of the Migration and Refugee Assistance Act of 1962 (22 U.S.C. 2601(b)(2)), I hereby determine that assistance to or on behalf of persons applying for admission to the United States as part of the overseas refugee admissions program will contribute to the foreign policy interests of the United States and designate such persons for this purpose.

Consistent with section 101(a)(42) of the Act (8 U.S.C. 1101(a)(42)), and after appropriate consultation with the Congress, I also specify that, for FY 2025, the following persons may, if otherwise qualified, be considered refugees for the purpose of admission to the United States within their countries of nationality or habitual residence:

a. Persons in Cuba;

b. Persons in Eurasia and the Baltics;

c. Persons in Iraq;

---

- 📑 Document Details
- ≡ Table of Contents
- 💬 Public Comments
- ⚡ Regulations.gov

**URL**

https://www.federalregister.gov/documents/2024/10/18/2024-24321/presidential-determination-on-refugee-admissions-for-fiscal-year-2025

**Timestamp**

Tue Feb 11 2025 07:59:43 GMT-0800 (Pacific Standard Time)



States as part of the overseas refugee admissions program will contribute to the foreign policy interests of the United States and designate such persons for this purpose.

Consistent with section 101(a)(42) of the Act (8 U.S.C. 1101(a)(42)), and after appropriate consultation with the Congress, I also specify that, for FY 2025, the following persons may, if otherwise qualified, be considered refugees for the purpose of admission to the United States within their countries of nationality or habitual residence:

a. Persons in Cuba;

b. Persons in Eurasia and the Baltics;

c. Persons in Iraq;

d. Persons in El Salvador, Guatemala, and Honduras; and

e. In certain circumstances, persons identified by a United States Embassy or by an authorized State Department referral partner in any location.

(🖨 print page 83768)

You are authorized and directed to publish this determination in the *Federal Register*.

THE WHITE HOUSE, Washington, September 30, 2024 Filed 10-17-24; 8:45 am]
[FR Doc. 2024-24321

Billing code 4710-10-P

PUBLISHED DOCUMENT: 2024-24321 (89 FR 83767)

**HOME**
- Home

**SECTIONS**
- Money
- Environment
- World
- Science & Technology
- Business & Industry
- Health & Public Welfare

**BROWSE**
- Agencies
- Topics (CFR Indexing Terms)
- Dates
- Public Inspection
- Executive Orders

**SEARCH**
- Document Search
- Advanced Document Search
- Public Inspection Search

**READER AIDS**
- Office of the Federal Register Announcements
- Using FederalRegister.Gov
- Understanding the Federal Register
- Recent Site Updates
- Federal Register & CFR Statistics
- Videos & Tutorials
- Developer Resources
- Government Policy and OFR Procedures
- Congressional Review

**MY FR**
- My Clipboard
- My Subscriptions
- My Comments
- Sign In

**INFORMATION**
- About This Site
- Legal Status
- Contact Us
- Privacy

**URL**

https://www.federalregister.gov/documents/2024/10/18/2024-24321/presidential-determination-on-refugee-admissions-for-fiscal-year-2025

**Timestamp**

Tue Feb 11 2025 07:59:43 GMT-0800 (Pacific Standard Time)

Add. 108



**URL**

https://www.federalregister.gov/documents/2024/10/18/2024-24321/presidential-determination-on-refugee-admissions-for-fiscal-year-2025

**Timestamp**

Tue Feb 11 2025 07:59:43 GMT-0800 (Pacific Standard Time)

# EXHIBIT 5

# UNITED STATES REFUGEE ADMISSIONS PROGRAM (USRAP)



## REFUGEE IS OVERSEAS AND MUST BE IN ONE OF 4 CATEGORIES:

**PRIORITY 1 (P-1) REFERRAL**
Referral for resettlement consideration from U.N. High Commissioner for Refugees (UNHCR), U.S. embassy, or specially designated nongovernmental organization (NGO)

**P-2 GROUPS OF SPECIAL CONCERN**
Groups of special humanitarian concern identified by the USRAP

**P-3 FAMILY REUNIFICATION**
Qualified individual in the U.S. submits Affidavit of Relationship (AOR) on behalf of qualified family member through a domestic resettlement agency

**P-4 PRIVATE SPONSORSHIP**
Individuals/households referred by qualified private sponsors in the U.S., who provide them post-arrival support and services.

**DEPARTMENT OF STATE (DOS) REFUGEE COORDINATOR**
Reviews referrals and confirms acceptance into the USRAP

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS)**
Refugee Access Verification Unit (RAVU) verifies anchor status and relationship to the applicant

**REFUGEE PROCESSING CENTER (DOS/RPC)**
Receives AOR from domestic resettlement agency, reviews AOR, and forwards to USCIS RAVU

Receives results from RAVU verification

Relationship(s) Verified

Relationship(s) not verified

**RPC returns AOR to domestic resettlement agency**

**RESETTLEMENT SUPPORT CENTER**
· Pre-screens applicants before the USCIS interview
· Educates the applicant about the process
· Prepares the case file and applicant's Form I-590 application
· Initiates certain biographic security checks as appropriate, including the interagency check via the National Vetting Center

**USCIS**
· Captures photographs and fingerprints and initiates biometric security checks against DOD, FBI and DHS holdings
· Reviews biographic and biometric security check results to assess any impact on eligibility or discretion
· Interviews refugee applicant
· Confirms that applicant has been properly granted access to USRAP
· Confirms that applicant has not previously participated in acts of persecution against others
· Determines whether applicant is a refugee
· Determines whether applicant is admissible to the U.S.
· Determines whether applicant is firmly resettled in a third country
· Determines whether discretion should be exercised favorably to approve the application
· Initiates electronic record of proceeding for paperless processing and electronic travel packet creation

**DENIAL**

**USCIS**
· Adjudicates waiver of inadmissibility if filed
· Adjudicates Request for Review if requested

**APPROVAL**

**PANEL PHYSICAN OR INTERNATIONAL ORGANIZATION FOR MIGRATION HEALTH DIVISION**
Provides medical screening

**RESETTLEMENT SUPPORT CENTER**
Offers cultural orientation

**REFUGEE PROCESSING CENTER**
Assigns the case to a resettlement agency or the Welcome Corps program for placement in an initial resettlement site in the U.S.

**IOM**
· Arranges travel to the U.S.
· Issues promissory notes for travel loan

**U.S. CUSTOMS AND BORDER PROTECTION**
Conducts additional background checks at port of entry and admits refugee if eligible

**REFUGEE ARRIVES IN THE U.S.**

**DOMESTIC RESETTLEMENT AGENCY OR PRIVATE SPONSOR GROUP**
· Provides transitional social and economic assistance for 30-90 days, which may include arranging housing and essential furnishings, food, necessary seasonal clothing, orientation, assistance with access to social, medical and employment services and other benefits



U.S. Citizenship and Immigration Services



Last Updated 9/18/2024



Bureau of Population, Refugees, and Migration

Add. 111

# EXHIBIT 6



For Refugees    News & Media

Donate 

About Us    Members    Impact Areas    Resources    Get Involved    Policy Center

RESOURCES

# Resettlement Process

Steps of the US Refugee Admissions Program

There are three pathways for refugees once they flee their country of origin: repatriation, or moving back to their country of origin once it's safe; local integration to the country that they fled to; or resettlement into a third country. The US Refugee Admissions Program helps refugees resettle in the United States.

Since the passage of the Refugee Act in 1980, the United States has admitted more than 3.1 million refugees through the US Refugee Admissions Program. Refugees go through an extensive process before they finally arrive at their final destination.

## Pre Arrival Processing

**1** ## UNHCR Identification and Referral

UNHCR is mandated to ensure that refugees most in need of protection have access to resettlement. This happens with both internal UNHCR referrals and external referrals made by NGOs and other external partners like governmental agencies. Once UNHCR receives referrals, they assess the resettlement needs of the referred cases in line with UNHCR resettlement criteria, guidelines, priorities, and policy considerations. Once UNHCR makes a final decision based on the criteria, guidelines, priorities, and policy considerations, UNHCR submits the case to the resettlement country.

**2** ## Resettlement Support Center Interview

The US has Resettlement Support Centers (RSCs) abroad to process refugee cases and to coordinate administrative aspects of the program.

RSCs serve to pre-screen refugees once they've been referred by the UNHCR to ensure they fall within US-designated nationalities and processing priorities. They create files for each case considered by the US, and prepare refugees for their interviews with Refugee Officers from the Department of Homeland Security's US Citizenship and Immigration Services (DHS/USCIS).

**3** ## Department of Homeland Security/US Citizenship and Immigration Services Interview

1 | UNHCR Identification and Referral

2 | Resettlement Support Center Interview

3 | Department of Homeland Security/US Citizenship and Immigration Services Interview

4 | Additional Screenings

5 | Cultural Orientation

6 | Assurances and Travel Arrangements

7 | Arrival



For Refugees    News & Media

Donate

About Us    Members    Impact Areas    Resources    Get Involved    Policy Center

Spouses and unmarried children under 21 derive their status based on that of the primary

1 | UNHCR Identification and

**URL**

https://rcusa.org/resources/resettlement-process/

**Timestamp**

Tue Feb 11 2025 08:00:15 GMT-0800 (Pacific Standard Time)

considered by the US, and prepare refugees for their interviews with Refugee Officers from the Department of Homeland Security's US Citizenship and Immigration Services (DHS/USCIS).

7 | Arrival

**3** Department of Homeland Security/US Citizenship and Immigration Services Interview



For Refugees    News & Media    **Donate**

About Us    Members    Impact Areas    Resources    Get Involved    Policy Center

Spouses and unmarried children under 21 derive their status based on that of the primary applicant. Other types of family members – like parents, aunts, uncles, nieces, and nephews – must meet the criteria for refugee consideration on their own.

If during the interview process it's learned that the person seeking resettlement is already firmly resettled in the country they sought asylum or elsewhere, they'll no longer be eligible for resettlement in the US.

If an applicant has been rejected by DHS/USCIS during the interview process, they cannot appeal the decision. They can only request their case be reconsidered if new or previously unavailable information arises. The DHS/USCIS official who conducted the original screening uses their own discretion in deciding whether or not to grant a new interview. To assist with this process DHS/USCIS has produced a Request for Review Tip Sheet.

Persons formally determined as refugees by DHS/USCIS receive conditional approval for resettlement until they pass a medical examination and multiple, extensive security checks.

1 | UNHCR Identification and Referral

2 | Resettlement Support Center Interview

3 | Department of Homeland Security/US Citizenship and Immigration Services Interview

4 | Additional Screenings

5 | Cultural Orientation

6 | Assurances and Travel Arrangements

7 | Arrival

**4** Additional Screenings

Even after screenings from the UNHCR, and a successful interview with DHS/USCIS, applicants must go through additional medical and security checks.

The US screens for tuberculosis and certain venereal diseases. Persons testing positive for any of these conditions will have their admission to the US delayed while they receive medical treatment.

Numerous security checks through multiple federal and international databases are required and processed for all refugees.

For more information about the extensive screenings refugees and asylum seekers undergo, see these fact sheets by:

• Human Rights First

• The US Committee for Refugees and Immigrants

• World Relief

• US Citizenship and Immigration Services

• RCUSA

**5** Cultural Orientation

IOM provides cultural orientation to all refugees before they depart for the United States. The goal is to provide factual information about what to expect in the US, teach important skills like how to call 911, and explore attitudes about adjustments once in the US.

**6** Assurances and Travel Arrangements

Upon approval, travel arrangements are facilitated through the coordination of US resettlement agencies and the International Organization of Migration.

After a refugee has been conditionally accepted by DHS/USCIS, the RSC sends a request for sponsorship assurance to the US. The assurance process is managed by the Refugee

**URL**

https://rcusa.org/resources/resettlement-process/

**Timestamp**

Tue Feb 11 2025 08:00:15 GMT-0800 (Pacific Standard Time)

**6** **Assurances and Travel Arrangements**

Upon approval, travel arrangements are facilitated through the coordination of US resettlement agencies and the International Organization of Migration.

After a refugee has been conditionally accepted by DHS/USCIS, the RSC sends a request for sponsorship assurance to the US. The assurance process is managed by the Refugee

 **RCUSA**
Refugee Council USA

For Refugees    News & Media    **Donate**    🔍

About Us    Members    Impact Areas    Resources    Get Involved    Policy Center

Travel arrangements and medical screenings are generally coordinated by the International Organization of Migration (IOM) in cooperation with RSCs. In some countries where IOM is not present, travel may be coordinated by a US embassy or by UNHCR. Refugees receive an interest free travel loan to pay for the cost of their transportation to the US.

---

**7** **Arrival**

Where a refugee is ultimately resettled within the US is determined by one of the nine US resettlement agencies and their vast networks of community partners. Upon arrival, refugees are welcomed and provided assistance as they become established in their new communities.

Newly arrived refugees are assigned to one of the 10 National Resettlement Agencies:

1. Global Refuge

2. US Conference of Catholic Bishops

3. Episcopal Migration Ministries

4. Ethiopian Community Development Council

5. Church World Service

6. International Rescue Committee

7. Bethany Christian Services

8. HIAS

9. US Committee for Refugees and Immigrants

10. World Relief

The National Resettlement Agencies determine where in the United States refugees are placed. If the refugee has a US Tie, or a family member who already lives in the United States, they will most likely be placed in the same location.

**1** UNHCR Identification and Referral

**2** Resettlement Support Center Interview

**3** Department of Homeland Security/US Citizenship and Immigration Services Interview

**4** Additional Screenings

**5** Cultural Orientation

**6** Assurances and Travel Arrangements

**7** Arrival

## Post Arrival Resettlement Services

**Reception and Placement** (up to 90 days after arrival in the United States)

All 10 Resettlement Agencies have the Reception and Placement grant. This grant provides core services to newly arrived refugees to ensure they have baseline support established in the United States. These services include access to initial housing and healthcare, cultural orientation, referral to employment services, English language classes, and public benefits, and applications for social security cards.

**URL**

https://rcusa.org/resources/resettlement-process/

**Timestamp**

Tue Feb 11 2025 08:00:15 GMT-0800 (Pacific Standard Time)

All 10 Resettlement Agencies have the Reception and Placement grant. This grant provides core services to newly arrived refugees to ensure they have baseline support established in the United States. These services include access to initial housing and healthcare, cultural orientation, referral to employment services, English language classes, and public benefits, and applications for social security cards.



About Us    Members    Impact Areas    Resources    Get Involved    Policy Center

The Matching Grant program is an employment program that helps eligible refugees become employed as quickly as possible so that they can be economically self-sufficient within 240 days of arrival without accessing public cash assistance programs. Services of this program include case management, employment skills training, and financial assistance.

<u>Preferred Communities</u> (up to 5 years after arrival in the United States)

The Preferred Communities (PC) program supports refugee and ORR-eligible populations facing special challenges including serious medical conditions, women at risk, and elderly refugees.

<u>State-Funded Programs</u> (generally up to 5 years after arrival in the United States)

Each state and each resettlement agency has programs specifically designed to help refugees with integration into the US. These programs focus on topics such as employment, health, refugee youth, elderly refugees, and microenterprise projects.

## What is Asylum?

Whereas refugees seek to secure their safety by being resettled in a third country, asylum seekers ask for protection directly from within the country, or border of the country, where they hope to remain. Learn the steps individuals must navigate to be resettled as an asylee in the United States

[ View the Process ]

**Stay Informed**    First Name    Last Name    Email    [ Subscribe Now ]



About Us    Members    Impact Areas    Resources    Get Involved

For Refugees    News & Media    Contact Us

    𝕏  Facebook  Instagram

©2024 Refugee Council USA. All Rights Reserved. / Privacy policy

RCUSA is a 501(c)3 tax-exempt organization | EIN 87-1437940

**URL**
https://rcusa.org/resources/resettlement-process/
**Timestamp**
Tue Feb 11 2025 08:00:15 GMT-0800 (Pacific Standard Time)

# EXHIBIT 7

UNHCR US website: **Change site** ⌄



Home / What we do / Resettlement in the United States

## U.S. Resettlement Partners

A refugee from Myanmar now helps resettle other new arrivals in the U.S. state of Oklahoma
© UNHCR/Nick Oxford

**Español**

Resettlement is a coordinated activity undertaken in partnership with UNHCR, U.S. government agencies, NGOs and other actors. It includes a variety of specific actions, from the identification of refugees in need of resettlement in the field to screening, processing and reception and integration of the refugees in the United States. Below is a list of partner agencies and organizations.

**National and State Government Partners**

**Bureau of Population, Refugees and Migration (PRM)**
**Department of State**

The Bureau of Population, Refugees, and Migration provides aid and sustainable solutions for refugees, victims of conflict and stateless people around the world through repatriation, local integration and resettlement in the United States. PRM also promotes the United States' population and migration policies.

**Office of Refugee Resettlement (ORR),**
**Department of Health and Human Services**

The Office of Refugee Resettlement (ORR) provides new populations with the opportunity to maximize their potential in the United States. Its programs provide people in need with critical resources to assist them in becoming integrated members of American

**URL**
https://www.unhcr.org/us/what-we-do/resettlement-united-states/u-s-resettlement-partners

**Timestamp**
Tue Feb 11 2025 08:00:45 GMT-0800 (Pacific Standard Time)

Add. 118

**National and State Government Partners**

**Bureau of Population, Refugees and Migration (PRM)**
**Department of State**

The Bureau of Population, Refugees, and Migration provides aid and sustainable solutions for refugees, victims of conflict and stateless people around the world through repatriation, local integration and resettlement in the United States. PRM also promotes the United States' population and migration policies.

**Office of Refugee Resettlement (ORR),**
**Department of Health and Human Services**

The Office of Refugee Resettlement (ORR) provides new populations with the opportunity to maximize their potential in the United States. Its programs provide people in need with critical resources to assist them in becoming integrated members of American society.

**State Refugee Coordinators**

**State Health Coordinators**

**United States Citizen and Immigration Services**
**Department of Homeland Security**

U.S. Citizenship and Immigration Services (USCIS) is the government agency that oversees lawful immigration to the United States.

**Non-Governmental Partners and Refugee Advocacy Organizations**

**Refugee Council USA (RCUSA)**
Refugee Council USA is a coalition of organizations committed to welcoming and protecting refugees.

**InterAction**
InterAction is the largest alliance of U.S.-based international nongovernmental organizations.

**Cultural Orientation Resource Exchange**
The Cultural Orientation Resource Exchange (CORE) is a technical assistance program designed to support and strengthen the linkages between pre-departure and post-arrival cultural orientation programs for refugees on their journey to resettle in the United States.

**Resettlement Agencies**

Church World Service (CWS)

Ethiopian Community Development Council (ECDC)

Episcopal Migration Ministries (EMM)

Hebrew Immigrant Aid Society (HIAS)

International Rescue Committee (IRC)

US Committee for Refugees and Immigrants (USCRI)

Lutheran Immigration and Refugee Services (LIRS)

United States Conference of Catholic Bishops (USCCB)

World Relief Corporation (WR)

Bethany Christian Services

**Intergovernmental Partners**

**URL**
https://www.unhcr.org/us/what-we-do/resettlement-united-states/u-s-resettlement-partners

**Timestamp**
Tue Feb 11 2025 08:00:45 GMT-0800 (Pacific Standard Time)

United States Conference of Catholic Bishops (USCCB)

World Relief Corporation (WR)

Bethany Christian Services

**Intergovernmental Partners**

**International Organization for Migration (IOM)**

IOM works to help ensure the orderly and humane management of migration, to promote international cooperation on migration issues, to assist in the search for practical solutions to migration problems and to provide humanitarian assistance to migrants in need, including refugees and internally displaced people.



**Support our work**

Please help refugees in need.

Donate now

**Stay connected**

Follow us on

**Stay informed**

Sign up to our newsletter to learn more about people forced to flee and how you can support them.

Subscribe

**Contact us**

Frequently asked questions

Contact UNHCR

Media centre

Report misconduct or abuse

Report a fraudulent site or email

Become a supplier

We use cookies and other identifiers to help improve your online experience. By using our website you are agreeing to this. Read our privacy policy to find out what cookies are used for and how to change your settings.

Accept

**URL**

https://www.unhcr.org/us/what-we-do/resettlement-united-states/u-s-resettlement-partners

**Timestamp**

Tue Feb 11 2025 08:00:45 GMT-0800 (Pacific Standard Time)

# EXHIBIT 8



Refugees selected for resettlement through the U.S. Refugee Admissions Program are eligible to receive post-arrival services through the **Reception and Placement (R&P) program** ⧉, or via private sponsorship through the Welcome Corps. Each refugee approved for admission to the United States is sponsored by one of 10 non-profit resettlement agencies participating in the R&P Program under a cooperative agreement with the Department of State, or through Welcome Corps private sponsor groups. For more information about the Welcome Corps, please visit the **Welcome Corps website** ⧉.

Upon arrival in the United States, refugees are met by a staff or volunteer from the local resettlement affiliate, private sponsors, or a family member or friend. They are taken to their initial **housing**, which has essential furnishings, appropriate food, and other necessities.

The resettlement agencies, family and friends, or private sponsors assist refugees during their initial resettlement in the United States, including enrolling in employment services, registering youth for school, accessing medical care, applying for benefits as eligible, and connecting them with necessary social or language services. In coordination with publicly supported refugee service and assistance programs, resettlement agencies and private sponsors focus on assisting refugees to achieve economic self-sufficiency through employment as soon as possible after their arrival in the United States.

The Reception and Placement Program and sponsorship through the Welcome Corps are both limited to the first three months after arrival. The **Department of Health and Human Services' Office of Refugee Resettlement** ⧉ works through U.S. states as well as resettlement agencies, and other community-based organizations, to provide longer-term assistance, as well as English language training, employment, and social services. Refugees may also be eligible for federal benefits.

| TAGS | | | |
| --- | --- | --- | --- |
| Refugee Admissions | Resettlement | United Nations High Commissioner for Refugees | |

**URL**

https://2021-2025.state.gov/refugee-admissions/domestic-resettlement/

**Timestamp**

Tue Feb 11 2025 08:01:12 GMT-0800 (Pacific Standard Time)

to the first three months after arrival. The
**Department of Health and Human Services' Office of Refugee Resettlement** works through U.S. states as well as resettlement agencies, and other community-based organizations, to provide longer-term assistance, as well as English language training, employment, and social services. Refugees may also be eligible for federal benefits.



TAGS    Refugee Admissions    Resettlement    United Nations High Commissioner for Refugees

**U.S. DEPARTMENT** *of* **STATE**

White House    USA.gov    Office of the Inspector General    Archives    Contact Us

FOLLOW US    Privacy Policy    Accessibility Statement    Copyright Information    FOIA    No FEAR Act

**URL**
https://2021-2025.state.gov/refugee-admissions/domestic-resettlement/
**Timestamp**
Tue Feb 11 2025 08:01:12 GMT-0800 (Pacific Standard Time)

# EXHIBIT 9



# Population, Refugees, and Migration

U.S. DEPARTMENT *of* STATE

## The Reception and Placement (R&P) Program

Refugees selected for resettlement through U.S. Refugee Admissions Program are eligible for Reception and Placement (R&P) assistance. Each refugee approved for admission to the United States is sponsored by one of ten resettlement agencies, seven of which are faith-based, participating in the R&P Program under a cooperative agreement with the Department of State.

> ### R&P Resettlement Agencies
>
> **BCS:** Bethany Christian Services
> **CWS:** Church World Service
> **ECDC:** Ethiopian Community Development Council
> **EMM:** Episcopal Migration Ministries
> **HIAS**
> **IRC:** International Rescue Committee
> **LIRS:** Lutheran Immigration and Refugee Service
> **USCCB:** United States Conference of Catholic Bishops
> **USCRI:** U.S. Committee for Refugees and Immigrants
> **WR:** World Relief

Managed by the Bureau of Population, Refugees, and Migration (PRM), the R&P Program provides initial support over a period of 30 to 90 days to help refugees begin their new lives in the United States. The Department of Health and Human Services' Office of Refugee Resettlement works through the states and other non-governmental organizations to provide longer-term cash and medical assistance, as well as English language, employment, and social services.

## *Where are Refugees Resettled?*

Representatives from the resettlement agencies meet frequently to review the biographic information and other case records sent by the Department of State's overseas Resettlement Support Centers (RSC), seeking to match the particular needs of each incoming refugee with the specific resources available in U.S. communities. Through this process, they determine which resettlement agency will sponsor and where each refugee will be initially resettled in the United States.

Many refugees have family or close friends already in the United States, and resettlement agencies make every effort to reunite them. Others are placed where they have the best opportunity for success through employment with the assistance of strong community services. Agencies place refugees throughout the United States. Through its local affiliates, each agency monitors the resources that each community offers (e.g., interpreters who speak various languages, the size and special features of available housing, the availability of schools with special services, medical care, English classes, employment services, etc.).

### FY 2022 Top Ten States
**(number of refugees and SIVs)**

| | |
|---|---|
| California | 4,366 |
| Texas | 3,794 |
| Washington | 2,304 |
| Virginia | 1,872 |
| New York | 1,779 |
| North Carolina | 1,346 |
| Ohio | 1,340 |
| Kentucky | 1,325 |
| Pennsylvania | 1,253 |
| Michigan | 1,221 |

### *The Role of the Resettlement Agency*

The sponsoring resettlement agency is responsible for placing refugees with one of its local affiliates and for providing initial services. The Department of State's cooperative agreement with each of the resettlement agencies specifies the services the agency must provide. The R&P Program provides resettlement agencies a one-time payment per refugee to assist with expenses during a refugee's first three months in the United States, but the program anticipates that sponsoring agencies will contribute significant cash or in-kind resources to supplement U.S. government funding.

### *What Happens When Refugees Arrive?*

Upon arrival in the United States, all refugees are met by someone from the local resettlement affiliate or a family member or friend. They are taken to their initial housing, which has basic furnishings, appliances, climate-appropriate clothing, and some food typical of the refugee's culture. Shortly after arrival, refugees are helped to start their lives in the United States. This includes applying for a Social Security card, registering children in school, arranging medical appointments, and connecting refugees with necessary social or language services.



Refugees are eligible for public assistance when they first arrive. Nevertheless, the U.S. government seeks to promote early economic self-sufficiency through employment to speed integration into American society. Refugees receive employment authorization upon arrival and are assisted in becoming employed as soon as possible.

For more information related to the Reception and Placement Program, please visit https://www.state.gov/refugee-admissions/reception-and-placement/.

# EXHIBIT 10

**90-Day Report in Compliance with Settlement Agreement for Executive Order 13815,** *Doe (JFS) v. Trump*

**Date of Settlement: February 7, 2020**

The number of cases/individuals listed in Appendix A to the settlement agreement was 167 cases/315 individuals. Between the dates the data was pulled for Appendix A to the settlement agreement and the signing of the agreement, one baby was added to a case. In addition, one case within the scope of the settlement was inadvertently not included. The Government has provided information on that case to Plaintiffs' counsel in a Confidential Appendix A to the May 7, 2020 Report that lists the case number and the part of the settlement it falls within. Since the signing of the settlement agreement, seven derivatives have been added to cases, and one case has been split. Therefore, the cases/individuals the Government is actively tracking that are in the scope of the settlement are 169 cases/323 individuals.

**90 Day Update: January 17, 2024[1]**

Report on the Number of Cases and Individuals[2] for each Part of Exhibit A which are Admitted, Denied, Administratively Closed, and Remaining to be Processed.

| Part 1 (I-730): FTJ designated Ready for Departure in WRAPS on October 23, 2017 | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 7 | 7 |
| Denied | 0 | 0 |
| Administrative Closure | 0 | 0 |
| **Total** | **7** | **7** |

| Part 1 (I-590): I-590 designated Ready for Departure in WRAPS on October 23, 2017 | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 17[3] | 49 |

---

[1] As reported in Appendix A to the Settlement Agreement, some cases appear in multiple parts. As a result, the report numbers for each part, when added, exceed the total number of cases in the settlement.

[2] For further clarity, the case count for Forms I-730 is based on the case numbers that WRAPS assigns to Forms I-730. A separate Form I-730 must be filed for each qualifying family member. In WRAPS, a single case number is sometimes assigned to a family, i.e., multiple Forms I-730 filed by the same petitioner. In CAMINO, however, each Form I-730 is counted as a separate case. Thus, in CAMINO the case count for Forms I-730s is equivalent to the number of individual beneficiaries. We confirm that the information regarding the status of each Form I-730 petition comes from CAMINO and is reflected in the "individuals" column count.

[3] One case/one individual listed in Appendix A to the settlement agreement arrived prior to the date the settlement was signed and was therefore counted toward FY 2020 arrival number.

1

| | | |
|---|---|---|
| Denied | 21 | 52 |
| Administrative Closure | 3 | 5 |
| **Total** | **41** | **106** |

| **Part 2 (I-730): FTJ cases which were designated "pending completion granted" in CAMINO as of December 23, 2017** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 12 | 15 |
| Admitted to U.S. | 23 | 24 |
| Denied | 18 | 18 |
| Administrative Closure | 5 | 5 |
| **Total** | **58** | **62** |

KE-00552428:  Pending assurance
KE-00560002:  Pending admin processing
KE-00560004:  Pending admin processing
KE-00560686:  Medicals expired, pending TB test results
KE-00560690:  Pending admin processing
KE-00560691:  Medicals expired, pending TB test results
KE-00567233:  Beneficiary requested travel delay
KE-00567234:  Beneficiary requested travel delay
KE-00568612:  Petitioner requested travel delay
KE-00568613:  Petitioner requested travel delay
KE-00569239:  Pending travel booking
SF-00940198:  Pending travel booking

| **Part 3 (I-730): FTJ cases which according to CAMINO, had a medical clearance expire between October 23, 2017 and February 1, 2018** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 1 | 4 |
| Admitted to U.S. | 0 | 0 |
| Denied | 0 | 0 |
| Administrative Closure | 1 | 1 |
| **Total** | **2** | **5** |

SF-00940198: Pending travel booking

| **Part 4 (I-730): FTJ cases according to CAMINO, had a security clearance expire between October 23, 2017 and February 1, 2018** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 7 | 7 |
| Admitted to U.S. | 14 | 16 |
| Denied | 7 | 9 |

2

| | | |
|---|---|---|
| Administrative Closure | 1 | 1 |
| **Total** | **29** | **33** |

KE-00560004:  Pending admin processing
KE-00560686:  Medicals expired, pending TB test results
KE-00560690:  Pending admin processing
KE-00560691:  Medicals expired, pending TB test results
KE-00567231:  Beneficiary requested travel delay
KE-00569239:  Pending travel booking
TH-00153903:  Completed interview, pending security vetting

| **Part 5 (I-590): Cases previously selected by Plaintiffs from among those in the digital stamping queue in WRAPS between October 23, 2017 and February 1, 2018** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 11 | 32 |
| Denied | 2 | 6 |
| Administrative Closure | 1 | 4 |
| **Total** | **14** | **42** |

| **Part 6 (I-730): Cases of the Doe Case plaintiffs** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 5 | 5 |
| Denied | 0 | 0 |
| Administrative Closure | 0 | 0 |
| **Total** | **5** | **5** |

| **Part 6 (I-590): Cases of the Doe Case plaintiffs** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 0 | 0 |
| Denied | 1 | 13 |
| Administrative Closure | 0 | 0 |
| **Total** | **1** | **13** |

| **Part 7 (I-730): Cases of JFS Case plaintiffs Doe** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 3 | 3 |
| Denied | 0 | 0 |

3

| Administrative Closure | 0 | 0 |
|---|---|---|
| **Total** | **3** | **3** |

| **Part 7 (I-590): Cases of JFS Case plaintiffs Doe** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 3 | 3 |
| Denied | 1 | 1 |
| Administrative Closure | 0 | 0 |
| **Total** | **4** | **4** |

| **Part 8 (I-730): Cases assured to 3 organizational plaintiffs - Plaintiffs Jewish Family Service of Seattle, Jewish Family Services of Silicon Valley, and the Episcopal Diocese of Olympia on October 23, 2017 or January 31, 2018** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 2 | 2 |
| Admitted to U.S. | 1 | 1 |
| Denied | 0 | 0 |
| Administrative Closure | 0 | 0 |
| **Total** | **3** | **3** |

ET-00944193:  Pending beneficiary submission of travel document
IZ-00303623:   Beneficiary chose not to travel

| **Part 8 (I-590): Cases assured to 3 organizational plaintiffs - Plaintiffs Jewish Family Service of Seattle, Jewish Family Services of Silicon Valley, and the Episcopal Diocese of Olympia on October 23, 2017 or January 31, 2018** | | |
|---|---|---|
| | **Cases** | **Individuals** |
| In Process | 0 | 0 |
| Admitted to U.S. | 10 | 38 |
| Denied | 5 | 29 |
| Administrative Closure | 4 | 5 |
| **Total** | **19** | **72** |

**Decisions on Requests For Review (RFR) on cases covered by this settlement**

**Reported for all Parts of Appendix A:**

| | **Cases** | **Individuals** |
|---|---|---|
| RFR Decisions | 13 | 8 |

4

Add. 131

| Pending RFRs | 1 | 4 |
|---|---|---|

# EXHIBIT 11



ADVERTISEMENT

Earn 3X points on travel and 2X points on everything else

NAVY FEDERAL Credit Union

LEARN MORE

**AP**

WORLD   U.S.   POLITICS   SPORTS   ENTERTAINMENT   BUSINESS   SCIENCE   FACT CHECK   ODDITIES   BE WELL   NEWSLETTERS   PHO

Gaza ceasefire   Live: Trump and Jordan's king   Scottsdale plane   AP SETS THE STANDARD FOR POLITICAL REPORTING. SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.   DONATE

U.S. NEWS

# Resettlement agencies race to help refugees ahead of Trump's second term

2 of 8 | In this Jan. 3, 2025 photo, Rogers Lopez, sits with his wife Karina Canizarez, right, and son Jesus David outside their apartment in New Milford, Conn. (AP Photo/Jessica Hill)

BY SUSAN HAIGH
Updated 10:05 AM PST, January 18, 2025

Share

NEW MILFORD, Conn. (AP) — Rogers Lopez knows just how lucky his family is as they settle into their furnished two-bedroom apartment in suburban Connecticut, just before President-elect Donald Trump takes office.

Lopez, his wife Karina Cañizarez and their 5-year-old son Jesus are refugees from Venezuela and Colombia who were embraced by a team of supportive volunteers when they arrived in December. Similar encounters happened nationwide as resettlement

ADVERTISE

Assisted & Memor

Vola OF HILL

SCHEDULE (971) 44

SEE PR & AVAILA
VolanteofHill

MOST READ

**URL**
https://apnews.com/article/refugees-trump-resettlement-connecticut-6ad8a0504c6094cdf4c33e491fa25bc6

**Timestamp**
Tue Feb 11 2025 08:13:14 GMT-0800 (Pacific Standard Time)

NEW MILFORD, Conn. (AP) — Rogers Lopez knows just how lucky his family is as they settle into their furnished two-bedroom apartment in suburban Connecticut, just before President-elect Donald Trump takes office.

Lopez, his wife Karina Cañizarez and their 5-year-old son Jesus are refugees from Venezuela and Colombia who were embraced by a team of supportive volunteers when they arrived in December. Similar encounters happened nationwide as resettlement groups scrambled in the final days of President Joe Biden's administration to find homes for refugees before Trump sharply limits, if not closes, this path to safety and citizenship.

"Always, the refugee process is very difficult," said Lopez, 29, who said "political problems" forced him from Venezuela. "But it will be more difficult in the future."

The U.S. Refugee Admissions Program has brought in more than 3 million people since Congress created it in 1980 for refugees fearing persecution because of their race, religion, nationality, membership in a social group or political opinion.

ADVERTISEMENT



Trump, who put tight limits on refugees in his first term, has vowed to "suspend refugee resettlement" as part of a broader effort to "immediately end the migrant invasion of America."

**RELATED STORIES**

  

Afghan refugees urge Pakistan to ease visa regime after Trump pauses US resettlement programs

Refugee resettlement agencies scramble after Trump orders them to halt their federally funded work

Aid groups sue over Trump's order suspending federal refugee program and funding

Presidents set targets and Biden ramped them up, citing "the generosity that has always been at the core of the American spirit," and the billions of dollars refugees have contributed to the U.S. economy.

Nearly 30,000 refugees arrived during the final three months of 2024, coming close to meeting Biden's annual cap of 125,000. Trump admitted about 11,000 during the final year of his first term, the fewest since the U.S. began resettlements.

"People are desperate to do the work right now because we have a pretty good idea that all immigration is going to cease, at least for a while, when he takes office," said Michele Shackelford, president of the New Milford Refugee Resettlement group that's helping Lopez and his family.

ADVERTISEMENT





**MOST READ**



1  Review: Kendrick Lamar Like Us' into history-ma show

2  Trump says he is seriou 51st state in Super Bowl

3  FEMA says it's halting pa housing in New York afte hotels

4  Why was Taylor Swift bo

5  Trump says he has direc minting new pennies, cit

**Suggested For You**

See The Value Of Anyo Searching Address (Ta
Advertisement · Home Value Lookup

What Does Atopic Derr (Take A Look)
Advertisement · Atopic Dermatitis Ras





Next-Gen Wrinkle Smo Hottest New Find - Fin

**URL**

https://apnews.com/article/refugees-trump-resettlement-connecticut-6ad8a0504c6094cdf4c33e491fa25bc6

**Timestamp**

Tue Feb 11 2025 08:10:39 GMT-0800 (Pacific Standard Time)

that all immigration is going to cease, at least for a while, when he takes office," said Michele Shackelford, president of the New Milford Refugee Resettlement group that's helping Lopez and his family.

ADVERTISEMENT



Often conflated with asylum-seekers who come directly to the U.S.-Mexico border, these refugees face a much more rigorous process. If the U.N. refugee agency determines they qualify, they are interviewed by U.S. immigration officials and must pass criminal background checks and medical screening. It can take years.

Aware that Trump can close the doors almost immediately, Maria Mostajo, a former Manhattan prosecutor, and Carolyn Setlow, a retired business executive, have been working furiously to settle families in Connecticut through a project they founded in their small town of Washington.

"If Trump comes in and either puts the kibosh on these entries or, as he's done in the past, reduces the number of people that can enter per year, then that basically means all these people that are in the pipeline, fewer and fewer of them are actually going to get in," Mostajo said.

During the fall of the U.S.-supported government in Afghanistan, Mostajo and Setlow held a community meeting, appealing for volunteers and funds to help settle one Afghan family of six. Through various fundraising efforts, including a GoFundMe campaign and a party donated by a local distillery, they raised $80,000, as well as donations of furniture and clothing, free legal help, English tutoring and other assistance.

ADVERTISEMENT



Ad
Easiest Chicken Noodle
The New York Times          Read More.

She and Setlow realized that their Washington Resettlement Project could leverage support for more refugees by providing grants of up to $10,000 to other volunteers. Since the election, they have awarded grants to the New Milford group and three others, with two more in the pipeline, Mostajo said.

After Trump's victory, global charities such as Church World Service urged volunteers across the U.S. to quickly create more private sponsorship groups as part of Welcome Corps, a U.S. State Department initiative launched in 2023 to encourage teams of citizens to take responsibility for incoming refugees. Groups need to raise a minimum of $2,425 per refugee to cover their initial 90 days of living expenses.

Larger resettlement organizations make the matches. For Connecticut, federal officials told Integrated Refugee & Immigrant Services in New Haven to expect about 130 arrivals between late November and January. IRIS, which receives $3,000 per refugee from the State Department, reached out to around 50 community groups to resettle as


Next-Gen Wrinkle Smo...
Hottest New Find - Fin...
Advertisement  The Skincare Magazine


Study Shows Surprisin...
Aging & your Pillowcas...
Advertisement  Blissy

ADVERTISEMENT


Get Xf...
Inter...
for j...
$14...
when yo...
Apply t...
inter...
essen...

**URL**
https://apnews.com/article/refugees-trump-resettlement-connecticut-6ad8a0504c6094cdf4c33e491fa25bc6

**Timestamp**
Tue Feb 11 2025 08:10:39 GMT-0800 (Pacific Standard Time)

citizens to take responsibility for incoming refugees. Groups need to raise a minimum of $2,425 per refugee to cover their initial 90 days of living expenses.

Larger resettlement organizations make the matches. For Connecticut, federal officials told Integrated Refugee & Immigrant Services in New Haven to expect about 130 arrivals between late November and January. IRIS, which receives $3,000 per refugee from the State Department, reached out to around 50 community groups to resettle as many as possible before Inauguration Day, according to Mohammad Daad Serweri, who manages the sponsorships at IRIS.

ADVERTISEMENT



In just two weeks, the New Milford volunteers managed to find an apartment and fill it with food, toys and thrift store furniture. They hope the Lopez-Cañizarez family will be integrated into the community, find jobs and be ready to fully take over their living expenses within a year.

The couple didn't realize they'd receive such help, and never dreamed they could live in a place where they would feel so safe.

"We had no idea," Cañizarez said in Spanish. "This has been marvelous for us because these are excellent people … they took us in like we are family."

ADVERTISEMENT



—

This story corrects the amount of federal funding Integrated Refugee & Immigrant Services receives per immigrant from $2,425 per refugee to $3,000 per refugee for fiscal year 2025.



**SUSAN HAIGH**

Haigh covers the Connecticut General Assembly, state government, politics, public policy matters and more for The Associated Press. She has worked for The AP since 2002.



**URL**

https://apnews.com/article/refugees-trump-resettlement-connecticut-6ad8a0504c6094cdf4c33e491fa25bc6

**Timestamp**

Tue Feb 11 2025 08:10:39 GMT-0800 (Pacific Standard Time)





**Track's proposed eligibility, transgender rules would completely ban Semenya a...**

Track and field moved toward adopting rules that would place athletes assigned female at birth but ha...

AP News

**Marco Odermatt shows off an unusual haircut at the skiing world...**

Marco Odermatt and other Swiss skiers showed up for the medal ceremony for the men's downhill at the ...

AP News



**URL**

https://apnews.com/article/refugees-trump-resettlement-connecticut-6ad8a0504c6094cdf4c33e491fa25bc6

**Timestamp**

Tue Feb 11 2025 08:10:39 GMT-0800 (Pacific Standard Time)

# EXHIBIT 12





§ OFFERED BY   Governor Maura Healey and Lt. Governor Kim Driscoll   Executive Office of Housing and Livable Communities
Executive Office of Health and Human Services

PRESS RELEASE

# Governor Healey Declares State of Emergency, Calls for Support for Newly Arriving Migrant Families

**Administration calls on federal government to expedite funding and work authorizations Migrant Families Relief Fund established by United Way of Massachusetts Bay and Boston Foundation to support new arrivals Additional ways to help available at mass.**

|  |  |
|---|---|
| FOR IMMEDIATE RELEASE: | |
| 8/08/2023 | Governor Maura Healey and Lt. Governor Kim Driscoll |
| | Executive Office of Health and Human Services |
| | Executive Office of Housing and Livable Communities |

MEDIA CONTACT

**Karissa Hand, Press Secretary**

📞 **Phone**

617-725-4025

**BOSTON** — Governor Maura T. Healey today declared that a state of emergency exists in Massachusetts due to rapidly rising numbers of migrant families arriving in Massachusetts in need of shelter and services and a severe lack of shelter availability in the state. The declaration serves as a notice to the federal government and the Commonwealth that the state's shelter system is rapidly expanding capacity in an unsustainable manner, and that further assistance is urgently needed. There are currently nearly 5,600 families or more than 20,000 individuals in state shelter, including children and pregnant women.

In a letter to Secretary of Homeland Security Alejandro Mayorkas, Governor Healey pointed to work authorizations as a primary driver of the crisis. She called on the federal government to take urgent action to streamline and expedite work authorizations and increase funding to states to assist in providing shelter and services to families. She called on bipartisan leaders in Congress to address outdated and punitive immigration laws. She also called on the cities and towns, charities, advocates, faith organizations and providers to continue to partner with the administration to meet the need for shelter and work. Information about how the public can help is available at mass.gov/sheltercrisis. Anyone who can offer assistance should contact the state at shelterhelp@mass.gov or by dialing 211, which will be monitored by MEMA.

The administration recently launched the Immigrant Assistance

**URL**
https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families

**Timestamp**
Tue Feb 11 2025 14:51:03 GMT-0800 (Pacific Standard Time)

Add. 140

Governor Healey pointed to work authorizations as a primary driver of the crisis. She called on the federal government to take urgent action to streamline and expedite work authorizations and increase funding to states to assist in providing shelter and services to families. She called on bipartisan leaders in Congress to address outdated and punitive immigration laws. She also called on the cities and towns, charities, advocates, faith organizations and providers to continue to partner with the administration to meet the need for shelter and work. Information about how the public can help is available at mass.gov/sheltercrisis. Anyone who can offer assistance should contact the state at shelterhelp@mass.gov or by dialing 211, which will be monitored by MEMA.

The administration recently launched the **Immigrant Assistance Services (IAS) program**, which provides case management, legal services and other support for families in state shelters. This program, not yet replicated in any other state, is providing an unprecedented level of legal support toward asylum, work authorization, and other legal steps to help new arrivals integrate into Massachusetts. The state is also working to establish new and innovative pathways for new arrivals to secure work. The Massachusetts federal delegation also recently **wrote to** Secretary of Homeland Security Alejandro Mayorkas and U.S. Citizenship and Immigration Services Director Ur M. Jaddou urging them to expedite and streamline the work authorization process.

"State employees and our partners have been miracle workers throughout this crisis – going above and beyond to support families and using every tool at their disposal to expand shelter capacity by nearly 80 percent in the last year. But in recent months, demand has increased to levels that our emergency shelter system cannot keep up with, especially as the number of families leaving shelter has dwindled due to a lack of affordable housing options and barriers to securing work," said **Governor Maura Healey**. "I am declaring a state of emergency in Massachusetts and urging my partners in the federal government to take the action we need to address this crisis by streamlining the work authorization process and passing comprehensive immigration reform. Many of the new arrivals to our state desperately want to work, and we have historic workforce demands across all industries. I am also calling on all of our partners – from cities and towns to the faith community, philanthropic organizations, and human service providers – to rise to this challenge and do whatever you can to help us meet this moment."

"Our Emergency Assistance system is designed to be a temporary, emergency safety-net program. It is not equipped to handle the demand that we have seen in recent months. While we have made herculean efforts to expand capacity as much as possible, we've reached a point where the expansion is unsustainable," said **Lieutenant Governor Kim Driscoll.** "We know what it will take to truly address the root causes of this emergency – rapidly increasing housing production across the state and implementing comprehensive immigration reform at the federal level, including work authorizations. We invite our partners in the federal government and across the Commonwealth to join us in advancing these solutions and supporting all families in Massachusetts."

In her letter, the Governor pointed to several primary drivers of this emergency, including federal policies on immigration and work authorizations, inadequate production of affordable housing over the

**URL**

https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families

**Timestamp**

Tue Feb 11 2025 14:51:03 GMT-0800 (Pacific Standard Time)

work authorizations. We invite our partners in the federal government and across the Commonwealth to join us in advancing these solutions and supporting all families in Massachusetts."

In her letter, the Governor pointed to several primary drivers of this emergency, including federal policies on immigration and work authorizations, inadequate production of affordable housing over the last decade, and the end of COVID-era food and housing security programs. As a result, the demand for emergency shelter in Massachusetts has skyrocketed over the past year. Today, nearly 5,600 families, including very young children and pregnant women, are living in emergency shelter, many of whom are migrants who recently arrived in Massachusetts. That's up from around 3,100 families a year ago. Meanwhile, the number of families leaving emergency shelter for safe, permanent housing has dwindled, in large part due to a lack of affordable housing options.

"Teams of people from EOHHS have worked with our colleagues across state government relentlessly pursuing creative ways to provide essential resources for families in need, many of whom are new arrivals to Massachusetts," said **Health and Human Services Secretary Kate Walsh**. "We are committed to supporting these resilient families as they find new opportunities in our state."

"Over the past year, the teams at EOHLC have been able to expand emergency shelter capacity and support more families than ever before. But now we confront significant challenges. Our service provider partners are stretched beyond their means, and it has become increasingly difficult to add new shelter units to our EA portfolio," said **Housing and Livable Communities Secretary Ed Augustus**. "The health and well-being of the families in emergency shelter are our first responsibility and we will continue to place eligible families when units become available. I thank the Governor and the Lieutenant Governor for leading an empathetic and collaborative approach to addressing this crisis, and I thank the communities and shelter service providers who have partnered with us in this incredible, ongoing effort."

The administration also announced that the United Way of Massachusetts Bay and The Boston Foundation have launched the Massachusetts Migrant Families Relief Fund to help ensure that new arrivals in Massachusetts have their essential needs met. More information can be found at unitedwaymassbay.org/migrantrelief. The Fund will:

- Rapidly deploy emergency financial assistance through our trusted network of human services and shelter organizations in the Commonwealth to ensure individuals, children, and families have access to essential needs (temporary accommodations food, clothing, diapers, hygiene items, transportation).

- Fund livelihood opportunities and assistance such as health screenings, translation services, legal assistance, work authorizations, ESOL classes, and other socio-economic and cultural integration supports.

- Support the local community-based organizations providing direct services on already-stretched budgets and staff resources.

"As we face this unprecedented stress on our shelter system, we must

**URL**

https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families

**Timestamp**

Tue Feb 11 2025 14:51:03 GMT-0800 (Pacific Standard Time)

authorizations, ESOL classes, and other socio-economic and cultural integration supports.

- Support the local community-based organizations providing direct services on already-stretched budgets and staff resources.

"As we face this unprecedented stress on our shelter system, we must embrace our collective responsibility to care for those individuals and families in need of housing and support, and to work in partnership with cities, towns and civic and community organizations leading this work," said **M. Lee Pelton, President and CEO of The Boston Foundation**. "We are honored to join the Healey Administration, the United Way and the roster of community leaders who are tirelessly working to ensure the dignity, safety, and health and wellbeing of these new arrivals."

"We are committed to demonstrating we are a welcoming place for our newest arrivals and to connecting them to the resources and support needed to work and thrive," said **Bob Giannino, President and CEO at United Way of Massachusetts Bay**. "By working together, we can ensure every person in Massachusetts has their essential needs met and is treated with the dignity and respect we would all want for our own families.  We are proud to stand with the Healey-Driscoll Administration and The Boston Foundation to mobilize and distribute resources with urgency and compassion to address this humanitarian crisis."

Since taking office in January, the Healey-Driscoll Administration has taken a whole-of-government approach and utilized every resource at its disposal to expand shelter capacity and support families. The administration created a standalone housing secretariat and dramatically expanded staff and resources dedicated to address this crisis. The Emergency Assistance system spread to more than 80 communities, added thousands of new units of emergency assistance housing, launched new shelter sites, including activating 50 National Guard Members at Joint Base Cape Cod, and created Family Welcome Centers to serve as central intake centers to connect families with shelter and services. Despite these efforts, demand has continued to rise at a pace that the Emergency Assistance system cannot sustain.

###

## Media Contact

| Karissa Hand, Press Secretary | + |
| --- | --- |



**Governor Maura Healey and Lt. Governor Kim Driscoll ➔**

**URL**

https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families

**Timestamp**

Tue Feb 11 2025 14:51:03 GMT-0800 (Pacific Standard Time)



### Governor Maura Healey and Lt. Governor Kim Driscoll →

Governor Healey and Lieutenant Governor Driscoll are committed to bringing people together and making Massachusetts a place where every worker, business and family can succeed.



### Executive Office of Health and Human Services →

The Executive Office of Health and Human Services is comprised of 11 agencies and the MassHealth program. EOHHS seeks to promote the health, resilience, and independence of the nearly one in every three residents of the Commonwealth we serve. Our public health programs touch every community in the Commonwealth.

### Executive Office of Housing and Livable Communities →

The Executive Office of Housing and Livable Communities (EOHLC) was established in 2023 to create more homes and lower housing costs in every region. EOHLC also distributes funding to municipalities, oversees the state-aided public housing portfolio, and operates the state's EA family shelter.

---

### Help Us Improve Mass.gov

**Did you find what you were looking for on this webpage?**

◯ Yes    ◯ No

Feedback

---

All Topics    Site Policies    Public Records Requests

© 2025 Commonwealth of Massachusetts.

Mass.gov® is a registered service mark of the Commonwealth of Massachusetts.    **Mass.gov Privacy Policy**

**URL**

https://www.mass.gov/news/governor-healey-declares-state-of-emergency-calls-for-support-for-newly-arriving-migrant-families

**Timestamp**

Tue Feb 11 2025 14:51:03 GMT-0800 (Pacific Standard Time)

# EXHIBIT 13



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

### EMERGENCY EXECUTIVE ORDER NO. 224

October 7, 2022

**WHEREAS,** over the past several months, thousands of asylum seekers have been arriving in New York City, from the Southern border, without having any immediate plans for shelter; and

**WHEREAS,** as of October 5, 2022, the asylum seekers who have entered the City's shelter system operated by the Department of Homeless Services (DHS Shelter System") include approximately 17,429 individuals, comprised of 2,896 families with children; 6,014 adults; and 734 adult families; and

**WHEREAS,** to date, the City has opened 42 DHS shelters in response to this influx of asylum seekers;

**WHEREAS,** the state of Texas, and the city of El Paso, have pledged to continue sending asylum seekers on buses to New York City, and

**WHEREAS,** Texas has not provided notice to New York City, and has indicated that it will continue not providing notice to New York City, regarding how many busloads of people will be arriving, or the dates and times of their arrival; and

**WHEREAS,** many of the buses arrive at the Port Authority Bus Terminal unannounced and unscheduled, in the early morning or late night hours; and

**WHEREAS**, many of the asylum seekers are coping with the effects of trauma and exhaustion, as well as other physical and mental health concerns; and

**WHEREAS,** the stress on the asylum seekers has been compounded by the additional days of travel to New York City, during which time it has been reported that many have been afforded limited food and water, and limited opportunities to leave the bus; and

**WHEREAS**, the DHS Shelter System is nearing its highest ever recorded population of over 61,000 individuals and is not designed to serve the influx of asylum seekers arriving to New York City from the Southern border;

Add. 146

**WHEREAS,** if asylum seekers continue to enter the City at the current rate, the total population within the DHS Shelter System will exceed 100,000 individuals next year;

**NOW, THEREFORE,** pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. <u>State of Emergency</u>. A state of emergency is hereby declared to exist within the City of New York based on the arrival of thousands of individuals and families seeking asylum.

§2.  <u>Humanitarian Emergency Response and Relief Centers.</u>

a. I hereby direct New York City Emergency Management (NYCEM) to coordinate with the New York City Health and Hospitals Corporation (H+H), the Department of Information Technology and Telecommunications, also known as the Office of Technology and Innovation (OTI), the Department of Design and Construction (DDC), the Mayor's Office of Immigrant Affairs, and other agencies as appropriate, to establish and operate temporary humanitarian relief centers to be known as "Humanitarian Emergency Response and Relief Centers" ("HERRCs") that will provide assistance for arriving asylum seekers, helping them by immediately offering respite, food, medical care, case work services, and assistance in accessing a range of settlement options, including through connections to family and friends inside and outside of New York City, in addition to, if needed, direct referrals to alternative emergency supports.

b.  I hereby authorize the Deputy Mayor of Health and Human Services to enter into a memorandum of understanding with H+H concerning the establishment and operation of the HERRCs, which shall, among other things, provide for the establishment of policies and procedures for the operation of the HERRCs, provide for the confidentiality of information collected from the persons served in the HERRCs, and provide restrictions on disclosure of information about an individual's immigration status consistent with the policies set forth in Executive Order 34 (dated May 13, 2003) and Executive Order 41 (dated September 17, 2003).

§ 3. <u>Cooperation of all agencies.</u>

I hereby direct all agency heads, including but not limited to the Mayor's Office of Immigrant Affairs, the New York City Emergency Management, the Department of Health and Mental Hygiene, the Mayor's Community Affairs Unit, the Fire Department, the Police Department, the Sheriff's Office, the Chief Privacy Officer, and the Departments of Buildings, Housing Preservation and Development, Sanitation, Social Services, Homeless Services, Environmental Protection, and Parks and Recreation, to take all appropriate and necessary steps to preserve health and public safety during this humanitarian crisis.

I hereby direct all agency heads, including but not limited to the Mayor's Office of Immigrant Affairs, the New York City Emergency Management, the Department of Health and Mental Hygiene, the Mayor's Community Affairs Unit, the Fire Department, the Police Department, the Sheriff's Office, the Chief Privacy Officer, and the Departments of Buildings, Housing Preservation and Development, Sanitation, Social Services, Homeless Services, Environmental Protection, and Parks and Recreation, to take all appropriate and necessary steps to preserve health and public safety during this humanitarian crisis.

§ 4. Suspension of laws and rules.

a. I hereby direct that the following laws and rules related to the Uniform Land Use Review Procedure, and other procedures applicable to the City planning and land use review processes, to the extent they would apply to the siting, construction and operations of the HERRCs, impose limitations on the amount of time permitted for the holding of public hearings, the certification of applications, the submission of recommendations, any required or necessary voting, the taking of final actions, and the issuance of determinations, are suspended, and that any such time limitations are tolled for the duration of the State of Emergency: sections 195, 197-d, 203 , and 3020 and subdivisions (b) through (h) of section 197-c of the Charter, sections 25-303, 25-306, 25-308, 25-309, 25-310 and 25-313 of the Administrative Code, and sections 1-05.5 and 1-07.5 of Title 2 and sections 2-02 through 2-07 of Title 62 of the Rules of the City of New York.

b. I hereby direct that section 14-140 of the Administrative Code and section 12-10 of Title 38 of the Rules of the City of New York are suspended, to the extent they impact the disposition of personal property at the HERRCs.

§ 5. Effective date. The State of Emergency declared in section 1 of this Order shall remain in effect for 30 days and may be extended. The remaining provisions of this Order shall take effect immediately and shall remain in effect for five (5) days unless they are terminated or modified at an earlier date.

Eric Adams
Mayor

3

Add. 148

# EXHIBIT 14

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8   PLAINTIFF PACITO; PLAINTIFF ESTHER;
    PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9   PLAINTIFF ALYAS; PLAINTIFF MARCOS;
    PLAINTIFF AHMED; PLAINTIFF RACHEL;
10  PLAINTIFF ALI; HIAS, INC.; CHURCH
    WORLD SERVICE, INC.; and LUTHERAN
11  COMMUNITY SERVICES NORTHWEST,

12              *Plaintiffs*,

13          v.

14

15  DONALD J. TRUMP, in his official capacity as
    President of the United States; MARCO RUBIO,
16  in his official capacity as Secretary of State;
    KRISTI NOEM, in her official capacity as
17  Secretary of Homeland Security; DOROTHY A.
    FINK, in her official capacity as Acting Secretary
18  of Health and Human Services,

19              *Defendants*.

20

Case No. C25-255 JNW

**DECLARATION OF PLAINTIFF PACITO**

21

22

23

24

25

26  DECLARATION OF PLAINTIFF PACITO – 1
    (No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

## DECLARATION OF PACITO

I, Pacito, declare as follows:

1. I am 22 years old, and I am of sound mind.

2. I am waiting to travel to the United States as a refugee.

3. My wife, my baby son, and I were on the verge of travel to the United States on January 22, 2025 when I learned that we could not travel because of President Trump's refugee suspension.

4. I live in Nairobi, Kenya.

5. I am a citizen of the Democratic Republic of the Congo.

6. I have extended family members living in the United States in Tennessee and Iowa.

7. My wife and I met in Kenya, where we are both refugees, and we married in June of 2023.

8. On or around May 5, 2024, my wife gave birth to our son.

9. I fled the Democratic Republic of the Congo (DRC) with my family in 2016, when I was about thirteen years old. I remember it took us about four days to get from DRC to Kenya.

10. It was a traumatizing time for me. I remember that there were guns everywhere I looked and so many people I knew were moving away from the DRC There was no peace in DRC when my family and I left the country.

11. My family and I arrived in Kenya in or around 2016.

12. I understand from my wife that she and her family were forced out of their home during the conflict in DRC. Some of her family members were killed, including her father's brothers.

13. My wife began her refugee resettlement process earlier than I did.

14. After we married in June 2023, I was added to her refugee application.

15. After our son was born in 2024, he was added to her application as well.

16. Our refugee application process has had many steps. My family and I did biometrics, interviews, and multiple rounds of medical exams. Because it took time to add my son to

our case, my wife and I both had to redo medical exams in September and October of last year.

17. We were scheduled to travel to the United States on January 22, 2025. We had packed our belongings, and we gave up our home and sold some of our furniture and electronics because we could not bring them with us.

18. I work as a music producer, and I sold all of my music production equipment.

19. My wife and I were excited to be traveling so soon to the United States. This would be the first time that either of us would travel on a plane.

20. We had packed the few belongings we would take to the United States. We had new clothes and new shoes for our new life in the United States. We had already said goodbye to our community.

21. When we did our pre-departure medicals, on or about January 17, 2025, IOM told us to report to the transit center on January 21, the day before our travel on January 22 at 1:35am.

22. I understood from IOM that at the transit center, we would do our final medical checkups and be transported to the airport to travel to the United States.

23. But then on January 21, before we left for the transit center, I received a phone call from IOM telling me there was a problem and we would not be able to travel to the United States after all.

24. I was in a state of confusion and disbelief. Days earlier, I had already confirmed with IOM that everything was in order for our travel. My family and I went to the transit center hoping that we could clear up the mistake.

25. At the travel center, I learned that our travel had been cancelled because of President Trump's refugee suspension order.

26. The IOM staff told us that we could get more information on the White House website.

27. I went to the White House website, and I read that President Trump said that his suspension of the U.S. Refugee Admissions Program would take effect on January 27, 2025. But it was January 21, 2025. I felt shocked and confused. I could not understand why the executive order was affecting us when it was not yet January 27, 2025.

28. I asked IOM staff why the executive order was affecting us, but they could not explain. They told me that a representative from Washington, D.C. told them to cancel our flights.

29. We slept outside the transit center office on the night of January 21, 2025. I continued to hope that we would be able to resolve the mistake and board our flights to the United States.

30. My wife, my baby, and I slept outside the center in the parking lot, along with eight or nine other families waiting to travel to the United States. I believe there were about 20 people there with us.

31. One family had traveled seven hours from where they lived to come to the travel center. That family told me they had been staying near the travel center for the past two weeks so they could complete all of their pre-departure processes. They had packed up all of their possessions weeks before the refugee suspension.

32. The next morning on January 22, the IOM staff continued to tell me that our flights had been cancelled by President Trump.

33. Then, I saw CNN reporting that refugees' flights had been cancelled. Ultimately, my wife and I returned with our baby to where we live in Nairobi.

34. Returning to Nairobi was extremely difficult. We had given up our lease on the house we were renting and we had sold or given away all of our belongings that we could not take with us on the plane. We were very lucky that our landlord allowed us to stay in our empty house for one week.  After that, we had to move in with a friend who is letting us stay with him for some days while I search for a job.

35. I do not know how we will survive.  Life was already difficult before we sold our belongings and gave up our home in preparation for resettlement to the United States.

36. It took me three years to save up enough money to buy the music production equipment that I just sold in anticipation of our travel. Now that I don't have my music production equipment, I will have to find a different source of income to support my family. I do not think that I can buy my equipment back anytime soon because I have to make money so that my family can eat and have a place to live and we can buy the things we need for the baby.  My wife cannot work now because our son is just nine months old and she stays home to take care of him.

37. Here in Kenya, it is not safe for me and my family because we are targeted for being foreigners. In about 2020, I was beaten by a group of men while I was walking home from work. When I went to the police to report the incident, they said there was nothing they could do.

38. It is not safe for me or my family to return to DRC because of the conflict there; there is no peace in the DRC. My wife's family members have been killed during the conflict, and I believe that if we were to return, we would be killed as well.

39. When I learned that President Trump was suspending refugee admissions, I felt devastated. This suspension has affected me and my family in so many ways. We gave up our house and we sold or gave away our cooking utensils, our furniture, and even some of our clothes. I sold my instruments for music production – they were my livelihood and my most treasured belongings. Now, we have nothing.

40. When I think about going to America, I think about my baby boy and the better life he would have there. In the United States, my son will be able to go school and study and I will be able to support him so that he can make a better life for himself.

41. In the United States, I hoped to finish my education and continue my work in the music industry. My wife has told me that she also hoped to finish her education in the United States.

42. I was also looking forward to being reuniting with my family who live in the United States and who I have not seen in many years. My mother's sister and her family went to the United States as refugees in or around 2016. They live in Iowa. My cousin and his family went the United States as refugees in or around 2021. They live in Tennessee.

43. Before the refugee suspension, my cousin from Tennessee told me that he would greet us at the airport when we arrived and introduce us to life in the United States.

44. When I was approved to travel to America with my family, it felt like I was given a second chance at life. I thought that my family and I would finally have security and peace of mind in America, and I would no longer have to live in fear.

45. I fear that if my real name becomes public in this lawsuit, my family and I could be at risk of our personal information including our refugee history being broadcast or publicized.

46. I have heard about conservative organizations in the U.S. publishing names and personal information of people who criticize the Trump Administration. I am very afraid this could happen to me and I could be harassed.

47. I also fear that if my real name becomes public in this lawsuit, my and my family's pending refugee application could be jeopardized. Our application remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to adversely impact our application or delay or prevent us from coming to the United States.

48. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

49. I am willing to serve as a class representative on behalf of those who are similarly situated to me and my family who are trying to come to the United States through the refugee program.

50. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugee applicants and their family members. I understand what being a class representative means.

51. I want to help everyone in my and my family's situation because I know other families are going through the same things that we are going through, and I am happy to do something to help them. Also, I speak English, Ican use computers, and I feel comfortable interacting with lawyers, so I think I am well placed to stand up for others. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.



# EXHIBIT 15

THE HONORABLE JAMAL N. WHITEHEAD

1
2
3
4
5
6                UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
7                        AT SEATTLE

8  PLAINTIFF PACITO; PLAINTIFF ESTHER;          Case No. C25-255 JNW
   PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9  PLAINTIFF ALYAS; PLAINTIFF MARCOS;           **DECLARATION OF PLAINTIFF**
   PLAINTIFF AHMED; PLAINTIFF RACHEL;           **E T ER**
10 PLAINTIFF ALI; HIAS, INC.; CHURCH
   WORLD SERVICE, INC.; and LUTHERAN
11 COMMUNITY SERVICES NORTHWEST,
12
               *Plaintiffs*,
13
                   v.
14
15 DONALD J. TRUMP, in his official capacity as
   President of the United States; MARCO RUBIO,
16 in his official capacity as Secretary of State;
   KRISTI NOEM, in her official capacity as
17 Secretary of Homeland Security; DOROTHY A.
   FINK, in her official capacity as Acting Secretary
18 of Health and Human Services,
19
               *Defendants*.
20
21
22
23
24
25
26
   DECLARATION OF PLAINTIFF ESTHER – 1         **Perkins Coie LLP**
   (No. C25-255 JNW)                           1201 Third Avenue, Suite 4900
                                               Seattle, Washington 98101-3099
                                               Phone: +1.206.359.8000
                                               Fax: +1.206.359.9000

Add. 158

### DECLARATION OF E  T  ER

I, Esther, declare as follows:

1.  I am 62 years old, and I am of sound mind.

2.  My daughter is waiting to travel to the United States as a refugee.  I petitioned for her through the  follow-to-join  process in 2017.

3.  She was on the verge of travel to the United States when we learned that she could not travel because of the refugee suspension.

4.  I live in Boise, Idaho.

5.  I am a citizen of the United States.

6.  I work full-time as a cleaner at a local hospital.

7.  I am involved with my church and the local Congolese community.

8.  My daughter lives in Durban, South Africa.

9.  I am married and live with my husband and two of my children, all of whom came to the United States with me in 2016 as refugees.  Another of my children lives nearby in Boise.

10. My family is from the Democratic Republic of the Congo (  DRC  ). We fled the DRC many years ago because of the war.  My daughter was very young at the time.

11. We fled to Tanzania where we lived in a refugee camp.

12. We had a very difficult life in Tanzania. As refugees, we could not control what we ate, where we slept, what we did. The refugee camp felt like a prison.

13. Life in the camp was especially difficult and dangerous for young women like my daughter.  And my daughter wanted to go to school, but there were no options for her to continue her studies.  When my daughter wanted to try to leave the camp, I supported her. Eventually, she went to South Africa.

14. The rest of my family stayed behind in the camp.  I had filed for refugee resettlement in the United States.  I waited for the application to be processed.

15. I came to the United States as a refugee in 2016 with my husband and my three sons.

16. I understood from non-governmental organization workers that my daughter would be able to join us in the United States a short time later.

17. I filed a follow-to-join petition for my daughter in 2017.

18. My daughter's case moved very slowly because of government delays. For example, the government requested DNA evidence to confirm my relationship with my daughter.  I provided proof that I had completed the government's DNA test, but the government delayed more than three years in arranging DNA testing for my daughter.

19. Finally, I filed a case in federal court asking the judge to order the government to make a decision on my petition.

20. After that, my daughter's refugee case moved through multiple processing steps.  My petition was approved, my daughter completed her medical exams, and a resettlement agency in Idaho assured her.

21. She was on the verge of travel when Donald Trump announced the refugee suspension.

22. I felt so happy at the thought that we would finally be together. She was going to live in my house with me. I bought a new bed, blankets, and sheets for her.

23. When I learned that President Trump was suspending refugee admissions, I felt extremely sad. It was particularly painful for me to hear this news because two weeks ago, I had received the news that my son who lives in a refugee camp in Tanzania had died. I was hoping my daughter would be here soon to accompany me in my grieving.

24. I fear that if my real name becomes public in this lawsuit, my daughter will not be safe because of the discrimination and violence against refugees in South Africa where she lives. If people find out my daughter is a refugee and that she was about to travel to the United States, I worry they may harm her.  I live in fear for my daughter.  Two of my sons have already died in refugee camps.

25. I understand that some people in the United States have been publishing the names and personal details online of people who criticize the Trump Administration, and I am very fearful that if my name is disclosed in this lawsuit, that the case could end up on social media and people will see my name, and this could put me and my family at risk of harassment and violence.

26.  I fear that if my real name becomes public in this lawsuit, my daughter's pending refugee application could be jeopardized.  My follow-to-join application for my daughter remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to delay or prevent my daughter from coming to safety in the United States.

27. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

28. I am willing to serve as a class representative on behalf of those who are similarly situated to me who are trying to help their families come to safety in the United States through the refugee program, including through the follow-to-join process.

29. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugee family members.  I understand what being a class representative means.

30. I want to help everyone in my situation because I know how hard it is to be separated from your family by the refugee process.  I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

. This declaration has been read to me aloud in Swahili, a language I understand, and I have understood it and verified its contents.



# EXHIBIT 16

(167 of 397), Page 167 of 397

Case 2:25-cv-00255-JNW    Document 15-16    Filed 02/11/25    Page 2 of 8
Case: 25-1313, 03/08/2025, DktEntry: 5.1, Page 167 of 397

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
7                            AT SEATTLE

8    PLAINTIFF PACITO; PLAINTIFF ESTHER;        Case No. C25-255 JNW
     PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9    PLAINTIFF ALYAS; PLAINTIFF MARCOS;         **DECLARATION OF PLAINTIFF**
     PLAINTIFF AHMED; PLAINTIFF RACHEL;          **O  EP   INE**
10   PLAINTIFF ALI; HIAS, INC.; CHURCH
     WORLD SERVICE, INC.; and LUTHERAN
11   COMMUNITY SERVICES NORTHWEST,

12                        *Plaintiffs*,

13
                  v.
14
     DONALD J. TRUMP, in his official capacity as
15   President of the United States; MARCO RUBIO,
     in his official capacity as Secretary of State;
16   KRISTI NOEM, in her official capacity as
     Secretary of Homeland Security; DOROTHY A.
17   FINK, in her official capacity as Acting Secretary
     of Health and Human Services,
18
                        *Defendants*.
19

20

21

22

23

24

25

26
     DECLARATION OF PLAINTIFF JOSEPHINE – 1           **Perkins Coie LLP**
     (No. C25-255 JNW)                              1201 Third Avenue, Suite 4900
                                                   Seattle, Washington 98101-3099
                                                    Phone: +1.206.359.8000
                                                     Fax: +1.206.359.9000

                          Add. 165

## DECLARATION OF O EP INE

I, Josephine, declare as follows:

1. I am 28 years old, and I am of sound mind.

2. I am waiting to travel to the United States as a refugee and to reunite with my family who live in Idaho. My mother filed a follow-to-join" petition for me in 2017.

3. I was on the verge of travel to the United States when I learned that I could not travel because of President Trump's refugee suspension.

4. I live in Durban, South Africa.

5. I was born in Democratic Republic of the Congo ( DRC ).

6. My mother, my mother's husband, and three of my siblings live in the United States in Boise, Idaho.

7. My family entered the United States as refugees in or around 2016.

8. When I was very young, my family and I fled Congo because of the danger we faced during the civil war.

9. We eventually came to a refugee camp in Tanzania, and I spent most of my childhood there.

10. Life was difficult and dangerous for everyone, especially for young women like me. The camp was not a safe place for young women. I was afraid.

11. I also wanted to go to school, but the educational opportunities were very limited. Many girls became pregnant at a young age. Most girls stopped going to school early.

12. My mother told me she was worried about my safety and she supported my desire to find a safer place where I could live and study. In or around 2012, when I was around 15, I left the camp and went to South Africa.

13. My mother, her husband, and my siblings stayed behind in the refugee camp.  My mother had applied to the U.S. Refugee Admissions Program and she was waiting for her application to be processed.

14. Eventually, my mother, her husband, and my three brothers were resettled to the United States as refugees.

15. In 2017, my mother applied for me to join her as a refugee in the United States through the  follow-to-join  process.

16. The process took many years.

17. Eventually, I was conditionally approved for refugee resettlement, I completed medical exams and security checks, and I received an assurance from a resettlement agency in the United States.  I provided my passport to the consulate for more processing.

18. After President Trump's inauguration, he ordered a suspension in refugee admissions that he said would begin on January 27.  I understood that refugees like me were still allowed to travel to the United States before that date.

19. My understanding is that the International Organization for Migration (IOM) generally organizes travel for refugees.  I asked whether I could organize my travel on my own because I was desperate to go to the United States before the ban took effect.  But I did not get a clear answer.

20. I learned my travel documents were ready at the consulate.  I decided to make travel arrangements without IOM, and I was able to get a ticket leaving South Africa for the United States in the evening of January 24, three days before the refugee ban was scheduled to begin.

21. Then I packed my bags and gave away many of my belongings. I terminated my rental agreement with my landlord.

22. Early in the morning on January 24, I went to the consulate and asked to pick up my travel documents.  I spoke with a consulate official who said they could not give me my travel documents unless they got permission. They told me to wait outside the consulate to see if they heard back.

23. I waited the whole day, but I never heard from the official again.  I could not get on my flight without the travel documents.

24. I stayed overnight in Johannesburg and went back to the consulate the next day Saturday, January 25   to see if I could speak with the consular official.  The security guards told me there was no one available to see me.

25. Later that day, I spoke with IOM and asked if they could help me.  The official I spoke to said there was nothing IOM could do because State Department guidance directed a stop to all refugee processing.

26. When I learned that I would not be allowed to travel because of the refugee suspension, I was so upset. My refugee process had been so prolonged and full of uncertainty. Just when I thought a door had finally opened for me, it slammed in my face.

27. It is so hard for me to continue to be separated from my family.  I was planning to live with my mother, her husband, and two of my siblings in Idaho.

28. My mother needs me badly now.  One of my brothers recently died unexpectedly, and my mother tells me she is feeling heartbroken.  She has had a very hard life as a refugee, and I want to help her and support her during this difficult time. I have no words I can say to her now, but if I could at least be with her, I think I could bring her some peace.

29. I had hoped to find work in the United States. I would like to do some kind of work related to helping children. But my plan was to work anywhere I could to support myself and my family in the United States.

30. But I am still in South Africa.  I have given up my lease and given away my possessions. I am struggling to survive.

31. Life in South Africa as a refugee is very difficult. Police arbitrarily arrest and detain refugees.  Private citizens discriminate against and harass refugees, and police refuse to protect us.

32. I fear that if my real name becomes public in this lawsuit, I will be in danger because people in my community will learn that I am a refugee trying to resettle to the United States, and they may harass and even hurt me, and the police will not protect me.  I do not talk about my history as a refugee or my plans to travel to the United States with people in my community for this reason.

33. I understand that some people in the United States have been publishing the names and personal details online of people who criticize the Trump Administration, and I am very fearful that if my name is shared in this lawsuit, that this could put me in danger and put my family at risk of harassment and threats.

34. I fear that if my real name becomes public in this lawsuit, my pending refugee application could be jeopardized.  My application remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to delay or prevent me from coming to safety in the United States.

35. For these reasons, I believe that my personal security and well-being and that of my family necessitates that I be allowed to use a pseudonym in this case.

36. I am willing to serve as a class representative on behalf of those who are similarly situated to me who are trying to seek safety in the United States through the refugee program, including through the follow-to-join process.

37. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugees.  I understand what being a class representative means.

38. I want to help everyone in my situation because I always have the heart to help, wherever I have the opportunity to help someone I am willing. I know that refugees like me are struggling, I have lived many years as a refugee, so I know how desperate people are for a change. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

I declare under penalty of perjury
under the laws of the united states
that the forgoing is true and correct

Executed in Durban, South Africa on
february 9, 2025

Signature    REDACTED

# EXHIBIT 17

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8    PLAINTIFF PACITO; PLAINTIFF ESTHER;        Case No. C25-255 JNW
     PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9    PLAINTIFF ALYAS; PLAINTIFF MARCOS;         **DECLARATION OF PLAINTIFF**
     PLAINTIFF AHMED; PLAINTIFF RACHEL;          **ARA**
10   PLAINTIFF ALI; HIAS, INC.; CHURCH
     WORLD SERVICE, INC.; and LUTHERAN
11   COMMUNITY SERVICES NORTHWEST,

12
                                          ,
13
              v.
14
     DONALD J. TRUMP, in his official capacity as
15   President of the United States; MARCO RUBIO,
     in his official capacity as Secretary of State;
16   KRISTI NOEM, in her official capacity as
     Secretary of Homeland Security; DOROTHY A.
17   FINK, in her official capacity as Acting Secretary
     of Health and Human Services,
18
19                                        .
20

21

22

23

24

25

26
     DECLARATION OF PLAINTIFF SARA – 1                    **Perkins Coie LLP**
     (No. C25-255 JNW)                              1201 Third Avenue, Suite 4900
                                                    Seattle, Washington 98101-3099
                                                    Phone: +1.206.359.8000
                                                    Fax: +1.206.359.9000

## DECLARATION OF ARA

I, Sara, declare as follows:

1. I am 59 years old, and I am of sound mind.

2. I am waiting to travel to the United States as a refugee together with my son who is 18 years old.

3. I applied to the U.S. Refugee Admissions Program in 2014, and I was about to travel to the United States when President Trump suspended refugee admissions.

4. I live in Amman, Jordan.

5. I am a citizen of Iraq.

6. My older son lives in Idaho. He came to the United States as a refugee in approximately 2012, and he is now a U.S. citizen. He is married, and his wife is pregnant with their first child.

7. I was forced to leave Iraq because I was in extreme danger there. I lived with my family in Basra during the U.S.-Iraq war. When the shelling got very bad, my husband brought me and my older son to stay with my parents where we thought it was safer. My husband's car was bombed after he dropped us off, and my husband was killed.

8. After my husband s death, my husband s brother demanded that I give him my house and custody of my baby son. My brother-in-law is a member of an influential militia network, and he threatened me and shot a gun at my home. The police told me they could not help me, and ultimately my brother-in-law took my house and I fled to Jordan with my son.

9. After the move to Jordan, I gave birth to my second son, who suffers from a birth defect in his brain that affects his nerves and vision.

10. I applied for refugee status for myself and my younger son in 2014, and we went through many processing steps, including interviews.

11. Finally, in January 2024, my younger son and I were conditionally approved for refugee resettlement.

12. We completed multiple rounds of medical exams because our first medical exams expired before we could travel.

13. Around January 13, 2025, I began my cultural orientation. I found this be very useful because it explained a lot about our travel to the United States and it gave me insight into the school systems in the country for those older than 18 years old. It made me think about my goals for myself and my youngest son. I thought that maybe I could go to school and get a driver's license. I asked the staff during my cultural orientation if I could achieve this and they told me,   you can do anything as long as you follow the rules.

14. IOM told me that once we were scheduled for travel, that the process would happen quickly. To prepare myself, I purchased two pieces of luggage and sold some items for our travel to the United States. I wanted to make sure to be ready for the day that I received the call from the U.S. government that we would travel to the United States.

15. In the days before I found out about the refugee suspension, my son in the United States called me multiple times a day to ask about cultural orientation and what I had learned. I could tell that he was excited for me to be learning about American culture and his excitement made me so happy.

16. My son told me that he had already prepared a room for us in his home, and that he would look for a bigger house so that we could all have our own rooms.  I told him that I didn't need anything else because I was just so happy that we would be together soon.

17. On January 25, 2025, IOM called me and told me that the refugee program was suspended because the President had paused refugee admissions for at least 90 days.

18. I could not believe the news. I had been waiting for so long and I thought the wait was finally over and we would be able to come to safety and reunite with my son and his family.

19. Conditions in Jordan are difficult. We face discrimination and extortion as refugees. In or around July of 2023, my son was beaten and robbed by a gang in our neighborhood.  I live in fear.

20. Whenever I close my eyes, I imagine myself at the airport and I see my oldest son waiting for me. My son told me that he would be waiting for me at the airport.

21. It is extremely difficult to be apart from my older son. I talk to him daily.  He is married now, and I was looking forward to meeting his wife. She is pregnant, and I hoped to be in the United States in time for my first grandchild's birth. I was hoping to be there to support him and his wife. My son told me that I did not need to buy anything for them, but I still bought my grandchild some clothes. I hope to be able to gift the clothes while the baby is still young enough to wear them.

22.  I fear that if my real name becomes public in this lawsuit, my brother-in-law and the militia he is affiliated with may target my mother and my siblings who are still living in Iraq in retaliation for me speaking publicly about my brother-in-law s crimes.

23.  I also fear that if my real name becomes public in this lawsuit, my pending refugee application could be jeopardized.  My application remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to adversely impact my application and delay or prevent me and my son from coming to the United States.

24. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

25. I am willing to serve as a class representative on behalf of those who are similarly situated to me and my family who are trying to come to the United States through the refugee program.

26. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugee applicants and their family members. I understand what being a class representative means.

27. I want to help everyone in my and my family's situation because I know that there are many other refugees prevented from traveling who are suffering through things that are even more difficult than my situation. For instance, there are many refugees who I have met in Jordan with serious health issues or who are caring for disabled family members, and they need medical treatment and to be reunited with family in the United States. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

28. This declaration has been read to me aloud in Arabic, a language I understand, and I have understood it and verified its contents.



I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed in Amman, Jordan on February 9, 2024

REDACTED

# EXHIBIT 18

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
7                             AT SEATTLE

8   PLAINTIFF PACITO; PLAINTIFF ESTHER;        Case No. C25-255 JNW
    PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9   PLAINTIFF ALYAS; PLAINTIFF MARCOS;         **DECLARATION OF PLAINTIFF**
    PLAINTIFF AHMED; PLAINTIFF RACHEL;         **AL   A**
10  PLAINTIFF ALI; HIAS, INC.; CHURCH
    WORLD SERVICE, INC.; and LUTHERAN
11  COMMUNITY SERVICES NORTHWEST,

12
                                    ,
13
         v.
14
    DONALD J. TRUMP, in his official capacity as
15  President of the United States; MARCO RUBIO,
    in his official capacity as Secretary of State;
16  KRISTI NOEM, in her official capacity as
    Secretary of Homeland Security; DOROTHY A.
17  FINK, in her official capacity as Acting Secretary
    of Health and Human Services,
18
19                                 .
20

21

22

23

24

25

26
    DECLARATION OF PLAINTIFF ALYAS – 1              **Perkins Coie LLP**
    (No. C25-255 JNW)                          1201 Third Avenue, Suite 4900
                                               Seattle, Washington 98101-3099
                                                 Phone: +1.206.359.8000
                                                  Fax: +1.206.359.9000

### DECLARATION OF AL   A

I, Alyas, declare as follows:

1. I am 35 years old, and I am of sound mind.

2. I was scheduled to travel as a refugee to the United States on February 3, 2025 through the Direct Access Program for U.S.-Affiliated Iraqis (DAP). I first applied to the program more than a decade ago.

3. I learned on January 21, 2025 from IOM my travel to the United States has been cancelled because of the Trump Administration's refugee suspension.

4. I live in Sinjar City, Iraq.

5. I am a citizen of Iraq.

6. I am married, and my wife and I have one son who is three years old.

7. Most of my immediate family lives in the United States in Nebraska. My wife, my child, and I were planning to reunite with them.

8. I had planned for my family to live with one of my brothers in Nebraska.  My brother is a United States Citizen, and he has been living in the United States since about 2015.  He supported the U.S. mission in Iraq, and he came to the U.S. through the Special Immigrant Visa program.  My brother lives with his wife and his two children.

9. My parents and my other brother also live in the same city in Nebraska. They arrived in the United States as refugees in about 2023. They have applied for lawful permanent resident status.

10. In Iraq my life is in danger because I am Yazidi. Yazidis have been persecuted in Iraq for many years based on our status as a religious minority group. Many people in Iraq

Add. 181

call us devil-worshippers. For many years, Yazidis have been targeted by ISIS, Al

   aeda, and other groups. In about 2008, I attended university in Mosul, Iraq. At the

time, Al    aeda was active in the area and frequently attacked Yazidis. To get to the

university, my friends and I would take buses from Yazidi-majority villages to Mosul.

One day, one of these buses was attacked and Yazidi students on it were killed. One

of my friends was kidnapped, killed, and his body was thrown in the streets. After

that, I left the university and didn't return for years. Many other Yazidi students left

as well. It was a very scary time for me. I was worried I would be captured and killed

if I continued to study.

11. Because my life was in danger, I applied for refugee status around 2011.

12. Later, I got married, and I added my wife to my case.  After my wife and I had our

son, I added him to the case as well.

13. I had an interview on or about July 30, 2024.

14. I had medical exams in about August or September of 2024.

15. I received conditional approval of my refugee status on or about December 22, 2024.

16. In January 2025, I had a cultural orientation.

17. I was scheduled to travel on February 3, 2025. IOM told me they bought our tickets

and they provided me with the flight numbers and information about what to expect

when we traveled.

18. On January 21, 2025, IOM called me to say that my family and I could not travel

anymore. They apologized and told me that our flights were cancelled because of the

U.S. suspension of refugee admissions. They told me that I may have to repeat

security checks and other checks because of the suspension. Before I got the phone

call from IOM, my family and I had already packed our bags and we were ready to leave.

19. This is a very difficult situation to go through. I thought we had finally reached the end of the process after all these years, and we would be able to come to safety in the United States. I thought I would see my parents and brothers again.

20. I am in a bad psychological state now. I had anxiety before, and now it is much worse. Sleeping and eating are both very difficult for me right now. I started smoking again.

21. My wife tells me she is also suffering psychologically. I noticed that she also has trouble sleeping now. But we avoid discussing the fact that our travel was cancelled because it is really hard on us, and we cannot change it.

22. I had to quit my job last year in order to finish refugee processing. For my job, I had to travel a lot, and I could not continue to work and attend all the refugee appointments required before travel to the U.S. My family and I have been surviving off our savings in anticipation of traveling to the U.S. soon.

23. In the United States, one of my brothers owns a small construction renovation company, and my other brother also works for the company. I'm skilled in this work, and I was planning to  work with them when I arrived in the United States.

24. I also hoped to study again in the United States. I used to be an electrician and HVAC technician, and I had hoped to attend community college and become a licensed electrician and HVAC technician.

25. I was looking forward to having the freedom to practice my religion in the United States without fear for my life.

26. And I looked forward to being reunited with my family and ensuring that my son could grow up near my family. My son has two cousins in Nebraska who are close in age to him, and I was looking forward to seeing them grow up together.

27. I am very close to my parents. We have now been apart for many months since they went to the United States. I talk to my parents daily and they try to console me as my family and I try to get through this difficult time.

28. My parents are very close to my son. Before they moved to the United States, my parents lived with me and my family. My parents took care of him. My son tells me that he misses his grandparents and asks when we'll see them. I don't know what to say.

29. My mother told me that she was preparing for our arrival. She bought toys for my son, and she talked to him about them – a new turtle and mouse.

30. I feel so upset that my family is being kept apart by the refugee suspension. I don't know how much longer I'll have to wait to see my family, and I'm losing hope.

31. I fear that if my real name becomes public in this lawsuit, my family and I will be in greater danger in Iraq. I am aware that Yazidis in Iraq are regularly kidnapped, killed, disappeared, and otherwise harmed, as are their supporters. I fear that I will be targeted for speaking publicly about the repression of Yazidis in Iraq.

32. I also fear disclosing my name because Iranian-backed militias and armed groups in the government target people who have affiliations with the United States. I fear that my family and I will be targeted and harmed if people in Iraq find out that we are trying to go to the United States.

33. It is for these reasons that I have not told anyone outside of my family that I applied for refugee status and that I am trying to bring my wife and son with me to the United States. Even when we used to go to the U.S. embassy for refugee appointments, we took precautions to avoid people seeing us entering and exiting a U.S. government building.

34. I fear that if my real name becomes public in this lawsuit, my pending refugee application could be jeopardized. My application remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to delay or prevent me and my family from coming to safety in the United States.

35. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

36. I am willing to serve as a class representative on behalf of those who are similarly situated to me who are trying to seek safety in the United States through the refugee program.

37. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugees.  I understand what being a class representative means.

38. I want to help everyone in my situation because my family and I have suffered greatly, and there are so many others who are suffering under similar circumstances. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed in Sinjar City, Iraq on February 8, 2025

REDACTED

# EXHIBIT 19

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8    PLAINTIFF PACITO; PLAINTIFF ESTHER;          Case No. C25-255 JNW
     PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9    PLAINTIFF ALYAS; PLAINTIFF MARCOS;           **DECLARATION OF PLAINTIFF**
     PLAINTIFF AHMED; PLAINTIFF RACHEL;           **MARCO**
10   PLAINTIFF ALI; HIAS, INC.; CHURCH
     WORLD SERVICE, INC.; and LUTHERAN
11   COMMUNITY SERVICES NORTHWEST,

12
                              ,
13
                 v.
14
     DONALD J. TRUMP, in his official capacity as
15   President of the United States; MARCO RUBIO,
     in his official capacity as Secretary of State;
16   KRISTI NOEM, in her official capacity as
     Secretary of Homeland Security; DOROTHY A.
17   FINK, in her official capacity as Acting Secretary
     of Health and Human Services,
18
19                             .
20

21

22

23

24

25

26   DECLARATION OF PLAINTIFF MARCOS – 1
     (No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

## DECLARATION OF MARCO

I, Marcos, declare as follows:

1. I am 59 years old, and I am of sound mind.

2. My stepdaughter is waiting to travel to the United States through the refugee program for Central American minors (CAM).

3. My wife and I have been trying to reunite with her daughter (my stepdaughter) for nearly nine years. She was supposed to travel to the United States by the middle of February, but soon after President Trump took office, I learned that she could no longer travel because of the refugee suspension.

4. I live in Los Angeles, California, United States.

5. I am a citizen of El Salvador.

6. I have lived in the United States for about 25 years, and I have Temporary Protected Status.

7. I work five days a week in private security.

8. I met my wife in or around 2010. She has told me that she experienced domestic violence at the hands of her daughter's biological father. I understand that this is the reason why my wife came to the United States and had to leave her daughter behind.

9. My wife and stepdaughter have shared with me details about my stepdaughter's difficult life in El Salvador. As a young child, my stepdaughter witnessed her father hit and physically abuse her mother. She was physically and emotionally abused by her biological father and other family in El Salvador.

10. My stepdaughter was also subject to threats of violence from gangs in El Salvador. When she was around 12 or 13 years old, gang members began to threaten her aunt who owned a store. The gang members came to the aunt's store and told the aunt that they knew her sister   my wife   was in the United States, and that my wife would have to pay them   renta  (a protection fee) or they would hurt her daughter. My stepdaughter stopped going to school for several years because she was afraid the gangs would harm her.

11. I began the CAM program process for my stepdaughter in 2016, when I filed the affidavit of relationship for her. However, because of President Trump's actions to end the CAM program during his first administration, the process was stopped. In or around June of 2022, I was able to restart the CAM process for her.

12. My stepdaughter has had two interviews already. She received a conditional approval of eligibility for resettlement in August 2024. Then she did a medical exam on or around December 11, 2024.

13. On or around January 6, 2025, I learned from the International Organization for Migration (IOM) that my stepdaughter was going to travel to the United States in the first or second week of February.

14. I confirmed with IOM on January 6 that I would be personally responsible for my stepdaughter's housing, food, clothes, and transportation in the United States. I even told IOM that I would pay for the plane ticket if needed, but they told me the way it works for refugees is that they pay for the ticket and I pay them back after she is in the United States.

15. My wife and I have been eagerly awaiting to be reunited with our daughter in the United States. I was so excited that she would be joining us in the United States after so many years of waiting.

16. My wife and I started preparing for her arrival. I started preparing her room in our home. I painted her room a dark pink color. When I bought the paint, I called her from the store and asked her to select from a variety of paint color samples the one she wanted for her room.

17. My wife also bought our daughter new clothes to wear. We also bought her a new computer so that she could be prepared for her studies here in the United States.

18. I learned about the suspension of all refugee programs on January 31. I still have not heard anything from IOM about my stepdaughter's expected travel in February.

19. When I called my stepdaughter to tell her that her travel was cancelled, she was devastated and cried on the phone. She was so close to travel and so ready to be reunited with her mother, who she hasn't seen since she was a small child.

20. It was particularly devastating for us to hear that my stepdaughter's travel in February was cancelled as this is the second time her refugee process has been halted by the U.S. government.

21. My stepdaughter has been waiting to come to the United States since I first applied for her through CAM in 2016. We have tried to do everything right and follow all the required steps of the program, only to have travel cancelled at the very last moment. I am scared that this pause means my stepdaughter will never be able to travel to the United States to live with her mother and me.

22. My stepdaughter has put her life in El Salvador on pause because she believed she would be traveling to the United States soon. She was scheduled to enroll in university in El Salvador, to start in January of 2025 but decided not to because she had already been

Add. 190

conditionally approved to go to the United States. Now she is stuck in El Salvador and unable to enroll in university for this semester to keep her life moving forward.

23. In El Salvador, my stepdaughter lives with a relative with serious heart issues who cannot provide economically for her. I am afraid that if something happens to the family member, my stepdaughter will be left with no home and no one to support her in El Salvador. My stepdaughter has also expressed to me and my wife that she is afraid of continuing violence in El Salvador. In particular, the police have been increasingly violent and violate the human rights of innocent people.

24. Although I have never met my stepdaughter in person, I have been speaking to her on a regular basis ever since her mother and I got together, many years before we got married. I provide her support, both financially and emotionally. I send her money every other week, sometimes every week, so that she has money for food, medical care and other necessities. I provide her emotional support when I can, especially since I know that her father was abusive and has abandoned her. I consider her like my own daughter.

2 . I fear that if my real name becomes public in this lawsuit, I could be targeted because of my criticism of President Trump's policies.

2 . I also have heard in the news about conservative organizations in the U.S. publishing names and personal information of people who criticize the Trump Administration. I am very afraid this could happen to me and I could be harassed and even attacked.

2 . For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

28. I am willing to serve as a class representative on behalf of those who are similarly situated to me and my stepdaughter who are trying to come to the United States through the refugee program.

29. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugee applicants and their family members. I understand what being a class representative means.

30. I want to help everyone in my and my stepdaughter's situation because of what my wife and I have suffered waiting for our daughter to be allowed to come to the United States and having that process be stopped. I know how painful it is to be separated from your loved ones for so many years. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

31. This declaration has been read to me aloud in Spanish, a language I understand, and I have understood it and verified its contents.



I declare under penalty of perjury that the forgoing is true and correct.

Executed in Los Angeles, California on February 6, 2025

REDACTED

# EXHIBIT 20

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF WASHINGTON
7                                  AT SEATTLE

8    PLAINTIFF PACITO; PLAINTIFF ESTHER;          Case No. C25-255 JNW
     PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9    PLAINTIFF ALYAS; PLAINTIFF MARCOS;           **DECLARATION OF PLAINTIFF
     PLAINTIFF AHMED; PLAINTIFF RACHEL;           ALI**
10   PLAINTIFF ALI; HIAS, INC.; CHURCH
     WORLD SERVICE, INC.; and LUTHERAN
11   COMMUNITY SERVICES NORTHWEST,

12
                                        ,
13
                   v.
14
     DONALD J. TRUMP, in his official capacity as
15   President of the United States; MARCO RUBIO,
     in his official capacity as Secretary of State;
16   KRISTI NOEM, in her official capacity as
     Secretary of Homeland Security; DOROTHY A.
17   FINK, in her official capacity as Acting Secretary
     of Health and Human Services,
18

19                                      .

20

21

22

23

24

25

26
     DECLARATION OF PLAINTIFF ALI – 1                  **Perkins Coie LLP**
     (No. C25-255 JNW)                            1201 Third Avenue, Suite 4900
                                                  Seattle, Washington 98101-3099
                                                    Phone: +1.206.359.8000
                                                     Fax: +1.206.359.9000

**DECLARATION OF ALI**

I, Ali, declare as follows:

1. I am 22 years old, and I am of sound mind.

2. I arrived in the United States on or about January 9, 2025 as a refugee through the U.S. Refugee Admissions Program (USRAP).

3. I live in Dallas, Texas.

4. I am a citizen of Iraq.

5. My life was in danger in Iraq because I am a gay man. In Iraq, it is illegal to have same-sex relationships, and you can be punished with many years in prison.

6. Throughout my childhood and teenage years, I was repeatedly sexually assaulted by men. I could not report the assaults to the police because I worried that I would be arrested for being gay.

7. My life in Iraq was extremely difficult. My mother, brother, other relatives, teachers, and peers at school, and coworkers physically and emotionally abused me.

8. Around November 2023, police arrested me and another man because they believed we were romantically involved with each other. Police officers kicked and hit us in the street and at the police station. Later, one officer tried to coerce me into performing oral sex.

9. I was ultimately released, but I was terrified for my safety because the police had my home address and personal information and had accused me of being gay. I believed I could be imprisoned at any time because of my sexual orientation.

10. After my arrest, I knew I had to leave the country to survive. I did not feel that I could trust anyone.

11. I requested and was granted access to USRAP.

12. I went through processing and was conditionally approved for resettlement.

13. I later learned I was being processed for resettlement in Dallas, Texas.

14. When I learned I would be resettled in Dallas, I was so excited that I began screaming with happiness and jumping and dancing.

15. For the first time in my life, I thought I would be able to live my life free of fear.

16. I travelled to the United States on or about January 9, 2025.

17. Since my arrival in the United States, Catholic Charites has been assisting me. They provided me with a case manager and financial assistance for my first three months in the United States.

18. Catholic Charities is also helping me to identify longer-term assistance programs for recent refugees that can help me with basic necessities and finding a job.

19. It is very important for me to find an organization that can help me with rent, food, and job placement.  I am alone in the United States.  I do not have family here.  And I came to the United States with only   120 that I have already spent on basic necessities.

20. One of the programs Catholic Charities recommended to me is called the Matching Grant program.  I applied to the program, which would cover one year of rent and utilities, provide a monthly allowance, assign me a case manager for one year, and include job placement services.

21. My case manager later told me that she had learned the program is no longer accepting clients.  I am looking into other options now.

22. My case manager told me about an alternative program I could qualify for called Refugee Cash Assistance that provides a monthly stipend to refugees for six months and potentially longer.

23. But on February 5, 2025, I received an email from the Texas Office for Refugees that said there is an  indefinite delay in Refugee Cash Assistance (RCA) benefit payments because of  technical issues at the federal level.   The email I received is attached to my declaration.

24. I learned from my case manager that the government has stopped funding some of the programs assisting recently-arrived refugees like me.  I feel very scared that I may not be able to get the help I need to establish myself here and find a job.  I have trouble sleeping when I think about this.

25. In the United States, I hope to get a good job and feel safe and secure. I am thinking about studying to become a nurse.

26. I hope to continue receiving the support that will help me remain here safely and reach my goals.

27. I fear that if my real name becomes public in this lawsuit, my family back in Iraq could be targeted because of my sexual identity.

28. As I mentioned, Iraq is a very unsafe place for LGBT  + people.  When I speak to people back in Iraq, I hide the fact that I'm gay and that the police arrested and abused me for being gay.  I do this to protect my mother, siblings, and other family who are still in Iraq. I am very concerned that if people back in Iraq learned about my sexual orientation and my interactions with the police, my family would be in danger.

29. I also have heard in the news about conservative organizations in the U.S. publishing names and personal information of people who criticize the Trump Administration, and I am very afraid this could happen to me and I could be harassed and even attacked. I am also worried that if my name is made public in this case, it would make it even more difficult to find employment or lead to me being discriminated against in other ways.

30. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

31. I am willing to serve as a class representative on behalf of those who are similarly situated to me who have recently arrived as refugees in the United States and are in need of resettlement benefits.

32. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugees. I understand what being a class representative means.

33. I want to help everyone in my situation because it is difficult for me now, and I know there are other refugees who recently arrived and are struggling even more than me.

34. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.



# __Attachment  A__

## (to Declaration of Plaintiff Ali)



To all current Refugee Cash Assistance (RCA) clients

Dear REDACTED

Due to technical issues at the federal level, we are sorry to inform you that there is an indefinite delay in Refugee Cash Assistance (RCA) benefit payments.

We understand the critical importance of these payments to your well-being and daily living expenses. We appreciate your patience and resilience during this challenging time, and we will keep you updated with any significant developments regarding the status of your payments.

In the meantime, we encourage you to reach out to local support services and community organizations that may offer temporary assistance. It's important to stay connected with these resources to help navigate this period of uncertainty. We are committed to providing you with this vital support as soon as possible and we remain hopeful that a resolution will be achieved soon. Thank you for your understanding and cooperation.

Texas Office for Refugees

# EXHIBIT 21

(205 of 397), Page 205 of 397
Case 2:25-cv-00255-JNW   Document 15-21   Filed 02/11/25   Page 2 of 6
Case: 25-1313, 03/08/2025, DktEntry: 5.1, Page 205 of 397

THE HONORABLE JAMAL N. WHITEHEAD

1

2

3

4

5

6                        UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8    PLAINTIFF PACITO; PLAINTIFF ESTHER;        Case No. C25-255 JNW
     PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
9    PLAINTIFF ALYAS; PLAINTIFF MARCOS;         **DECLARATION OF PLAINTIFF**
     PLAINTIFF AHMED; PLAINTIFF RACHEL;         **A   MED**
10   PLAINTIFF ALI; HIAS, INC.; CHURCH
     WORLD SERVICE, INC.; and LUTHERAN
11   COMMUNITY SERVICES NORTHWEST,

12
                                        ,
13
                    v.
14
     DONALD J. TRUMP, in his official capacity as
15   President of the United States; MARCO RUBIO,
     in his official capacity as Secretary of State;
16   KRISTI NOEM, in her official capacity as
     Secretary of Homeland Security; DOROTHY A.
17   FINK, in her official capacity as Acting Secretary
     of Health and Human Services,
18
19
                                        .
20

21

22

23

24

25

26

DECLARATION OF PLAINTIFF AHMED – 1        **Perkins Coie LLP**
(No. C25-255 JNW)                         1201 Third Avenue, Suite 4900
                                          Seattle, Washington 98101-3099
                                          Phone: +1.206.359.8000
                                          Fax: +1.206.359.9000

**DECLARATION OF A   MED**

I, Ahmed, declare as follows:

1. I am 28 years old, and I am of sound mind.

2. I am waiting to travel to the United States as a refugee. I was conditionally approved for resettlement and was close to travel when I learned that the Trump Administration had suspended refugee admissions.

3. I applied to the U.S. Refugee Admissions Program in 2022.

4. I currently live in Germany.

5. My parents are from Afghanistan, and I have an Afghan passport. I was born in Pakistan after my family fled Afghanistan because of the Soviet invasion and subsequent civil war. I lived in Afghanistan with my family beginning around 2015.

6. I have a sister who lives in the United States in Maryland, and she is a lawful permanent resident. She came to the U.S. through the Afghan Special Immigrant Visa program. She and her husband have five children, one of whom is a U.S. citizen.

7. In Afghanistan, I actively supported the peace process as a university student at the American University of Afghanistan (AUAF), and I participated in various related activities sponsored by or affiliated with the U.S. government. Outside of the university, I was involved with other groups advocating for human rights, women's empowerment, and peace-related activities.

8. In October or November of 2021, I was evacuated along with more than 100 other Afghan students whose lives were at serious risk because of our affiliation with the American University.

9. My life is in danger for several reasons, including my affiliation with the American University of Afghanistan, my association with the U.S. Embassy in Kabul during the peace process, my liberal political views regarding women's rights, and my views on human rights in Afghanistan. For all of these reasons, I know that my life is in danger if I am in Afghanistan. I have not returned to Afghanistan since I was evacuated.

10. After my classmates and I were evacuated from Afghanistan, in or around June 2022, I was referred to USRAP and I applied to be resettled as a refugee in the United States.

11. My refugee case was conditionally approved in January of this year.

12. Thereafter, I attended my required medical examination.

13. While traveling for my medical exam, I learned from the news that President Trump was suspending the U.S. Refugee Admissions Program.  I felt so bad. I have been waiting for refugee resettlement and had already been making plans for my life in the United States.

14. In the United States, I had hoped to continue my studies and to complete a graduate-level degree. I was planning to live with my sister in Maryland before hopefully beginning classes at either Mississippi Valley State University or Clark University in Massachusetts. In 2023, I received offers of admission from both schools, but I was waiting to complete my refugee process. Once I was resettled to the United States, I had planned to reapply to attend one of these schools in Fall 2025.

15. I am devastated that I will not be reunited with my sister and her family in the United States. I have not seen my sister since 2021 and I have never met my youngest niece, who is two years old. I was so excited to join them in the United States.

16. I fear that if my real name becomes public in this lawsuit, the Taliban could target my mother, siblings, and my other family who are living in Afghanistan in retaliation for me publicly criticizing the Taliban and publicly speaking about my associations with and desire to resettle to the United States.

17. I also have heard in the news about conservative organizations in the U.S. publishing on the internet names and personal information of people who criticize the Trump Administration. I am very afraid this could happen to me and this could put my family's lives in danger.

18. I also fear that if my real name becomes public in this lawsuit, my pending refugee application could be jeopardized.  My application remains pending and is in final stages of processing, and I do not want my participation in the lawsuit to adversely impact my application and delay or prevent me from coming to the United States.

19. For these reasons, I believe that my personal security and that of my family necessitates that I be allowed to use a pseudonym in this case.

20. I am willing to serve as a class representative on behalf of those who are similarly situated to me who are trying to come to the United States through the refugee program.

21. I know that if the class is certified, I will be representing more than just myself in this case. I will be representing the interests of other refugee applicants and their family members. I understand what being a class representative means.

22. I want to help everyone in my situation because I know how hard it is to have to flee your home country and then be prevented from building a stable life elsewhere. I am willing to be actively involved in this lawsuit as a class representative and to work with my attorneys to help all of the class members.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct.

Executed in Osnabrück, Germany on February 6, 2025

REDACTED

# EXHIBIT 22

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST, <br><br> , <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DOROTHY A. FINK, in her official capacity as Acting Secretary of Health and Human Services, <br><br> . | Case No. C25-255 JNW <br><br> **DECLARATION OF PLAINTIFF RAC EL** |

DECLARATION OF PLAINTIFF RACHEL – 1
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 209

## DECLARATION OF RACHEL

I, Rachel, declare as follows:

1. I am 61 years old, and I am of sound mind.

2. I have filed an application, along with four other people, to sponsor an Afghan family of refugees through a program known as Welcome Corps.

3. I live in Bellevue, Washington.

4. I am a citizen of the United States.

5. I decided to organize several of my friends, synagogue community members, and my book club members in support of sponsoring an Afghan family after I came to know an Afghan asylee here in the United States through my daughter.

6. When I met this young Afghan woman, she was about 26 years old, she was educated and single, and I believed that was special because of what I knew about conditions for women in Afghanistan. She was intelligent and kind, and she had drive and enthusiasm. This young woman worked for a private company for a while, and then she went on to work at a Jewish resettlement agency.

7. This young woman told me she was worried about the family members she had left behind, especially her mother, father, siblings, and her sister's four children. Her family members were in Pakistan and were already in the process of applying for resettlement as refugees in the United States. But the woman told me that nothing was happening with their refugee applications.

8. When I learned about the option to sponsor her family through Welcome Corps through my synagogue, I felt I had to say yes. I am a big believer in the promise of America and that as a nation of immigrants, our strength is in our diversity.

9.  My parents instilled these values in me from a young age.  When I was growing up, we often hosted people from other countries in our home.

10. Similarly, I try to learn from other people, and I try to instill the same values in my children – I was involved in cross-cultural activities all of my life, and I tried to make sure the same was true for my children.

11.  My Jewish faith was a key part of my decision to sponsor this family. Historically, Jews have been refugees and have had to move to strange and hostile places throughout their history as a people.

12. After I decided to sponsor this family, I began a long and involved process.

13. I had to find four other people to sponsor the family with me, which I did through my network at my synagogue.

14. Then we had to fundraise   15,520 since there were 8 people in the family we wanted to sponsor. I was able to fundraise through my synagogue, and through a network of friends and family, including my book club.

15. Each of the sponsors, including myself, had to get a background check.

16. We as sponsors also had to sign a guarantee that we would be responsible for the whole family we were sponsoring for the first three to six months after they arrived in the United States. That means we would help them get jobs, register for assistance, find housing and food, register the kids for school, and other similar things. I would have welcomed them to live in my own home, but the program would not allow the family to live with me, so we had already begun researching where they could live and what would be needed after they arrived.

17. Between the fundraising, sponsoring, and preparing for arrival, I would estimate that I spent more than 60 hours working actively on this effort – but that does not include a lot of time that I spent thinking about the family.

18. I also had to prepare a detailed application for the family, which was basically a refugee application explaining why each family member was afraid to return to Afghanistan.

19. Meanwhile, the family also faced significant danger in Pakistan. Pakistani police raided their apartment, stole from them, and threatened them with deportation.

20. The family remains very fearful of the threats they face from the Taliban in Afghanistan. The family is a target for a few reasons. Their father worked with an NGO removing land mines placed by the Taliban for many years. In addition, their children – including their daughters – were educated and worked. Their son attended the American University in Afghanistan, which made him a particular target of the Taliban.

21. As of July 2024, the family had completed all of their medical exams and their interviews.

22. Then inauguration day came, and I learned about President Trump's refugee suspension that same day.

23. It was so hard when I had to explain to the young woman that her family's refugee processing was suspended indefinitely.  And then about 48 hours later, her father – who would have been one of the sponsored refugees – died. It was heartbreaking.

24. I have a strong sense of dread and hopelessness.

25.  I hated having to give her the news of the refugee suspension. Now I need to refund the donations of my friends who joined the fundraising efforts. I am having a lot of trouble accepting that this family cannot come to safety now.

26. I have seen media coverage of people who have been doxxed, meaning their names and personal details have been published online, following criticism of the Trump Administration. I am very fearful that if my name is disclosed in this lawsuit, that this could happen to me and put me and my family at risk of harassment, threats, and other harm.

27. I fear that if my real name becomes public in this lawsuit, the pending refugee application for the family I am sponsoring could be jeopardized.  Their application remains pending, and I do not want my participation in the lawsuit to delay or prevent them from coming to safety in the United States.

28. For these reasons, I believe that my personal security and that of the family that I am sponsoring necessitates that I be allowed to use a pseudonym in this case.

I declare under penalty of perjury that the forgoing is true and correct.

Executed in Bellevue, WA on February 8, 2025

REDACTED

# EXHIBIT 23

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER;
PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
PLAINTIFF ALYAS; PLAINTIFF MARCOS;
PLAINTIFF AHMED; PLAINTIFF RACHEL;
PLAINTIFF ALI; HIAS, INC.; CHURCH
WORLD SERVICE, INC.; and LUTHERAN
COMMUNITY SERVICES NORTHWEST,

        *Plaintiffs,*

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States; MARCO RUBIO,
in his official capacity as Secretary of State;
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; DOROTHY A.
FINK, in her official capacity as Acting Secretary
of Health and Human Services,

        *Defendants.*

Case No. C25-255 JNW

**DECLARATION OF RICHARD L. SANTOS**

I, Richard L. Santos, hereby declare:

    1.    I am President and Chief Executive Officer of Church World Service (CWS), one of ten national resettlement agencies. The facts set forth in this declaration are based on my personal knowledge, on my conversations with my staff, and on the information kept in the ordinary course of business at CWS.

DECL. OF RICHARD L. SANTOS
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

2.    I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction, because the suspension of the U.S. Refugee Assistance Program (USRAP) and the suspension of government funding for USRAP and to support recently-arrived refugees and Special Immigrant Visa holders represent an existential threat to CWS's mission and funding.

3.    The government's suspensions have already caused immense and irreparable harm to CWS's work with refugees, which has been paused indefinitely; to our clients and their families, whose hopes for safety, resettlement and family reunification have been thwarted; and to our staff, hundreds of whom have already been furloughed or laid off.

## I.    Church World Service

4.    Church World Service (CWS) is a 501(c)(3) non-profit, faith-based global humanitarian organization founded in 1946 by 17 religious denominations seeking to respond to the humanitarian and displacement crisis created by World War II, with the mission to "Feed the hungry, clothe the naked, heal the sick, comfort the aged, shelter the homeless."

5.    Today, CWS continues to be a faith-based organization transforming communities around the globe through just and sustainable responses to hunger, poverty, displacement, and disaster.

6.    Since its founding, CWS has helped refugee families rebuild their lives through resettlement to the United States, beginning with CWS representatives meeting refugees arriving on ships from war-torn Europe and providing for their passage to local communities and churches ready to welcome them throughout the United States.

7.    CWS has offices in sixteen countries, including the United States. Our headquarters and principal place of business is in New York City, and we have offices in Elkhart, Indiana and Washington, D.C., and across the country. CWS works closely with its 14 Covenant Members who represent a new way for historical members of CWS to engage with each other and the organization. Our Covenant Members work together with CWS to find practical ways to engage their faith communities in carrying out our common mission of providing refuge to those fleeing

DECL. OF RICHARD L. SANTOS – 2
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

violence and persecution and they represent more than 9 million members across the United States and Canada.

8.    As CWS's work has expanded to include development, humanitarian assistance, and advocacy for refugees worldwide, U.S. refugee resettlement remains at the heart of our mission.

9.    Either directly or through its affiliates, CWS currently supports refugees resettled in 44 active locations in 24 states: California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Virginia. CWS additionally is currently serving recently arrived refugees in Anchorage, Honolulu, Providence, and Provo through Remote Placement partners, and maintains capacity to recruit and manage Remote Placement partners in areas outside of its resettlement office locations.

10.    CWS's offices in Dallas, TX, Durham, NC, Garden Grove, CA, Georgetown, DE, Grand Rapids, MI, Greensboro, NC, Harrisburg, PA, Harrisonburg, VA, Houston, TX, Islip, NY, Jacksonville, FL, Jersey City, NJ, Kalamazoo, MI, Lancaster, PA, Miami, FL, Orlando, FL, Rochester, NY, Tampa, FL, Walnut Creek, CA, Wilmington, NC, and Winchester, VA are part of CWS's 501(c)(3) structure and provide Reception and Placement (R&P) services. CWS operates the remaining offices through sub-grant agreements with affiliates.

11.    To carry out our work effectively, our local resettlement offices work hard to employ and retain staff with special skills, including language skills and ties to refugee communities. Many of our staff are themselves immigrants and former refugees. Combined, our local resettlement offices typically employ over 1000 individuals.

12.    Our local resettlement offices' ability to resettle refugees successfully in the United States requires that cultivation and maintenance of local community relationships and programs. For example, given that we are required to secure housing for refugees before they arrive in the United States, our local offices coordinate leases with landlords on behalf of people the landlord

DECL. OF RICHARD L. SANTOS – 3
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    has never met and who have no credit, employment, or renting history in the United States.

2    Landlords agree to sign these leases with our clients only because of our local resettlement offices'

3    reputations in the community and the strong relationships with landlords that our local offices have

4    developed and positive experiences renting to refugees in the past.

5        13.    Similarly, in order to assist refugees in obtaining employment, our local staff

6    engage in extensive outreach with local employers to persuade them to consider hiring refugees

7    who may not speak any English, come from a very different cultural background, and have never

8    worked in the United States. Staff also engage in substantial outreach with local school systems,

9    local health care providers, local law enforcement, and local benefit offices.

10        14.    CWS also depends heavily on the generosity and work of volunteers in the counties

11    where we resettle refugees (200 counties in federal fiscal year 2024). These volunteers come

12    through our church constituency and a variety of other constituencies, and the investments we have

13    made over time in relationships with a wide range of community members, including local

14    landlords, medical providers, and employers. CWS practices a co-sponsorship model of refugee

15    resettlement, serving as a conduit to local faith communities who believe—as CWS and our

16    covenant members do—that refugee resettlement is a fulfillment of their Biblical calling to

17    welcome the stranger and their churches' organizational missions.

18        15.    I have been the President and CEO of CWS since 2020 and have spent more than

19    three decades working in the relief, development and displacement sectors. I previously served as

20    the President and CEO of IMA World Health, a faith-based public health organization. Throughout

21    my career, I have focused on engaging and partnering with civil society in the development process

22    to build and prioritize robust local and regional partnerships with communities, organizations, and

23    networks throughout the United States and across the globe.

24    **II.**    **CWS's Participation in the U.S. Refugee Admissions Program**

25        16.    CWS operates programs related to the U.S. Refugee Admissions Program

26    (USRAP) both within the United States and in Africa. Within the United States, CWS works to

DECL. OF RICHARD L. SANTOS – 4
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 219

1    build welcoming communities that support refugees on a path toward self-sufficiency, full

2    integration into their communities, and securing a bright future for their families.

3         17.    CWS is one of ten resettlement agencies that for decades have been entrusted with

4    the responsibility to manage the reception and placement of refugees in the United States under

5    the Refugee Act.  CWS itself has participated in the U.S. State Department's Reception and

6    Placement program since it began in 1980 and has operated its Resettlement Support Center (RSC

7    Africa) since 1989.

8         18.    Since its founding, CWS has helped to resettle more than 910,000 refugees,

9    humanitarian parolees, and other entrants across the United States.

10        19.    CWS receives funding from the U.S. Department of State through seven

11   "cooperative agreements" with the Bureau of Population, Resettlement and Migration (PRM).  The

12   FY25 combined PRM cooperative agreements provide for $100,646,762. Of these, five relate to

13   the USRAP and total $98,128,461, approximately 35% of CWS's annual revenue. The five

14   cooperative agreements each have an end date of September 30, 2025.

15        20.    Two of the USRAP-related cooperative agreements with PRM are for services

16   provided through the Reception and Placement Program, and two are for services provided through

17   the Refugee Housing Solutions (RHS) and Refugee Welcome Collective (RWC) technical

18   assistance projects, which support the work of housing attainment and community sponsorship for

19   refugees resettled by all ten resettlement agencies.  These agreements are all for work performed

20   in the United States to assist refugees and SIVs who have recently resettled.

21        21.    Through the Reception & Placement (R&P) Program, CWS provides services to

22   resettled refugees during their first 30 to 90 days in the United States.  These services include

23   activities such as pre-arrival settlement planning, including arranging for the refugee to be met at

24   the airport; basic needs support, including housing, furnishings, food and clothing for at least 30

25   days; cultural orientation assistance; access to health, employment, education and other services

26   for which refugees are eligible, and development of a service plan for each adult refugee.

DECL. OF RICHARD L. SANTOS – 5
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

22.     Through the R&P program, in federal Fiscal Year 2024, which ran from October 1, 2023, to September 30, 2024, we resettled 15,061 refugees, and Special Immigrant Visa (SIV) holders in 200 different counties in the United States. We provided 9,637 individuals with these services in Fiscal Year 2023 and 12,471 individuals with these services in Fiscal Year 2022, including refugees, SIV holders, and Afghan Placement and Assistance Program (APA) beneficiaries.

23.     The remaining USRAP-related cooperative agreement with PRM is for CWS's work in administering the Resettlement Support Center (RSC Africa) program, located primarily in Nairobi, Kenya, with additional offices in South Africa, Tanzania, Uganda, and Rwanda.

24.     RSC staff pre-screen applicants for eligibility for applicable priorities and prepare cases for processing through U.S. Citizenship and Immigration Services, a component of the Department of Homeland Security. RSC staff assist applicants in completing documentary requirements and schedule refugee eligibility interviews. After USCIS conducts security vetting on applicants, RSC staff guide refugees through post-adjudication steps, including medical screening, cultural orientation, domestic sponsorship assurances, and referrals to the International Office of Migration for travel planning. In FY24, CWS' RSC Africa program departed 31,416 individuals to the United States from sub-Saharan Africa.

25.     Each of the five PRM cooperative agreements include a document entitled "U.S. Department of State Award Provisions," which states in part that "[d]uring the period of performance, the Recipient must comply with . . . [t]he applicable sections of 2 CFR §200 and 2 CFR §600[.]"

III.    **Executive Order 14163 and Immediate and Ongoing Impact on CWS and its Clients**

26.     On January 20, 2025, President Trump signed an Executive Order ("EO") suspending all refugee admissions and decisions effective January 27, 2025. EO 14163, titled "Realigning the United States Refugee Admissions Program," orders the suspension of all refugee admissions and decisions on refugee applications "until such time as the further entry into the

DECL. OF RICHARD L. SANTOS – 6
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    United States of refugees aligns with the interests of the United States interests," that is to say,

2    indefinitely.

3          27.    EO 14163 has caused immediate harm to CWS's mission and to its economic

4    stability, and that harm increases with every day that the EO remains in effect.

5          28.    Although EO provides for a "case-by-case" waiver for refugees whose entry is

6    deemed to be in the "national interest," there has been no information forthcoming from the State

7    Department about what such a process would entail.  Thus EO 14163 places almost insurmountable

8    obstacles for any refugee to enter the United States and thus makes it extremely difficult for CWS's

9    refugee assistance programs to fulfill their mission to help refugees enter the United States through

10   the statutory pathways authorized by the United States Congress.

11         29.    The day after the EO was issued, on January 21, 2025, CWS received an email from

12   PRM addressed to numerous USRAP partners stating that:

13         Following the issuance of the Executive Order (EO), "Realigning the United States
           Refugee Admissions Program," refugee arrivals to the United States have been
14         suspended until further notice. All previously scheduled travel of refugees to the
           United States is being cancelled, and no new travel bookings will be made. RSCs
15         should not request travel for any additional refugee cases at this time.

16         Additionally, all refugee case processing and pre-departure activities are also
           suspended. RSCs and IOM should not move refugees to transit centers in
17         anticipation of travel and should halt all pre-departure activities for refugee cases.
           No new referrals should be made into the USRAP. Intake of new applications for
18         the Welcome Corps is suspended, as well as processing of all active or previously
           submitted applications. We understand there will be questions related to the
19         implementation of suspending refugee case processing, and we will send additional
           guidance in the coming days.
20
           30.    In a follow-up email, PRM confirmed "that all planned refugee arrivals for this
21
     week have been cancelled and we do not anticipate any being scheduled," notwithstanding the
22
     EO's admissions suspension not being effective until January 27, 2027.
23
           31.    As a result of the EO, thousands of our clients in the refugee pipeline fear they will
24
     never be able to enter the United States, see long-separated family members, or achieve safety and
25
     stability from danger.
26

DECL. OF RICHARD L. SANTOS – 7
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

32. As of February 7, 2025, CWS has 5,277 clients overseas who have been extensively vetted and have valid assurances to enter the United States.

33. 42 of these clients are "Follow-to-Join" spouses and children of refugees currently resettled in the United States. These family members have been separated for months and even years from their petitioning relative.

34. Of these overseas clients, 127 had petitions filed on their behalf by an immediate relative in statutorily-created categories.

35. Another 766 of these clients are approved under the Special Immigrant Visa (SIV) program, 764 of whom are people who worked for the United States government or its contractors in Iraq and Afghanistan.

36. The plans of all of these clients have been completely reversed.

37. Some of our clients were so far along in the process that they had travel already scheduled when EO 14163 was signed. That travel has been cancelled. For example, CWS's affiliate in Buffalo, New York was expecting a "Follow-to-Join" Somali minor to reunite with her father on February 11, 2025. Shortly after the EO was signed, CWS was informed that her travel was cancelled. She has been waiting to reunite with her father since before April 2017.

38. Indeed, although EO 14163 purported to take effect on January 27, 2025, in fact several of the refugees assured to CWS were unable to enter the United States. For example, CWS's affiliate in Worcester, Massachusetts affiliate was supposed to receive four unaccompanied Afghan minors, ages 7, 14, 15 and 17, who were expecting to reunite with their parents on January 23, 2025. On January 22, CWS received a travel cancellation for the four minors with the cancellation reason listed as "due to executive order on realigning USRAP." These minor children had been separated from their parents on August 21, 2021, outside Kabul airport.

39. Further, although EO 14163 did not explicitly address the processing of refugee applications, in fact the State Department has ceased accepting applications from refugees through USRAP.

DECL. OF RICHARD L. SANTOS – 8
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 223

40. Because the suspension is indefinite, we are unable to predict when or if services will resume. It will be exceedingly difficult to maintain relationships with sponsors of refugees and our extensive local networks while the programs are indefinitely suspended. Our mission to serve refugees will be irreparably damaged.

41. The suspension of admission of refugees is also devastating economically to CWS's refugee programs, which depend on federal funding as part of the public-private partnership that is the foundation of the USRAP. We have already begun furloughing and laying off hundreds of staff, with the resulting loss of institutional knowledge and experience and personal relationships.

**IV.    EO 14169 and the U.S. State Department's January 24, 2025 Notice of Suspension to CWS to "Stop Work" on Seven Grants.**

42. In addition to EO 14163, on January 20, President Trump signed 44 other executive orders. Among these were EO 14169, "Reevaluating and Realigning Foreign Aid," which suspended all foreign aid programs, including those related to the USRAP, for ninety days.

43. On January 24, 2025, CWS received a Notice of Suspension letter from the U.S. State Department's Bureau of Population, Refugees, and Migration (PRM) stating that seven (7) different grants to CWS were immediately suspended "pending a Department-wide review of foreign assistance programs" pursuant to EO 14169. See January 24, 2025 Letter attached to this declaration (hereinafter "CWS Suspension Notice").

44. Also on January 24, CWS received a cable from Secretary of State Marco Rubio to all diplomatic and consular posts (ALDAC) informing them of the funding suspension pursuant to EO 14169.

45. On February 3, CWS received an email from PRM addressed to numerous USRAP partners stating that:

> PRM is complying with the Executive Order (EO) Reevaluating and Realigning United States Foreign Aid which directs a 90-day pause in assistance including new obligations and disbursements to both non-governmental organizations (NGOs) and international organizations. While final guidance on processing payments is

DECL. OF RICHARD L. SANTOS – 9
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

not yet available, PRM believes that payments will be allowed for requests meeting the following conditions:

- Payments are for expenses incurred prior to January 24, 2025
- Payments are for expenses associated with stop work orders
- Payments are for emergency food assistance
- Payments are for exempted activities

In order to move payments forward, PRM will need recipients to certify payment requests meet one of these conditions. For payments already in process, grants officers will reach out with a certification form. For any future payments, please use the attached form to certify that payments meet one (or more) of these criteria. Please submit the form as a .pdf and have it signed by the appropriate authorized official for your organization.

Please note, the guidance is not yet available and this process may change. PRM is working hard to adjudicate payments and disburse funding. We appreciate your patience and understanding as we ensure compliance with EOs. PRM will share additional information and/or requirements as they become available.

Please abide by the notice of suspension issued to your organization. Recipients are reminded that any changes to award terms and conditions, as well as costs, must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

46. After receiving the February 3 email, CWS on February 6 submitted the certification forms and documentation for reimbursements. CWS has yet to receive any reimbursements for this work.

47. Since the issuance of the Executive Orders, CWS has not received any reimbursement from PRM, including for program costs and expenses incurred prior to January 20, 2025. We have also received no guidance or direction regarding how to balance compliance with the CWS Suspension Notice and our Cooperative Agreement requirements to serve refugees in our care.

**V.    Immediate Impact on Refugees Served by CWS**

48. The financial impact on recently resettled refugees in the United States is severe.

49. Through the Reception and Placement Program, as specified in the annual cooperative agreement, the federal government provides CWS with funding for national management of the R&P program, as well as fixed per capita grants of $3,000 per refugee admitted

DECL. OF RICHARD L. SANTOS – 10
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

under Section 207 of the INA who is assigned to CWS pursuant to the agreement. No more than $1,350 of that grant may be used to partially cover affiliate capacity expenses of the local office to which refugees are assigned for providing resettlement services, while at least $1,650 must be used to cover direct assistance payments directly to or on behalf of the individual refugee or other refugees. Affiliate capacity funding is based on the number of refugees assigned to the affiliate during the grant period.  The government reimburses CWS for direct assistance costs based on the number of refugees for whom CWS provides Reception and Placement services.  If fewer refugees receive CWS' Reception and Placement services, federal reimbursements are reduced.

50.    A large portion of these funds for refugees CWS has resettled since October 1, 2024 have been effectively frozen.

51.    Since the beginning of federal Fiscal Year 2025 on October 1, 2024, the CWS network has served 9,534 refugees and SIV holders arrived through its R&P program.  As of February 7, 2025, 3,718 recently arrived refugees and SIV holders are still within their first 90-day service period following their resettlement in the United States.

52.    The impact of this CWS Suspension Notice was immediately destabilizing to CWS's operations. Our R&P, RSC, RHS, RWC, and two additional PRM Assistance grants in Egypt and Indonesia, totaling $100,646,762, stopped with no warning or chance for us to prepare.

53.    As of February 7, 2025, we have not been paid $15,085,770.80 that we have submitted for reimbursement for expenses incurred prior to the CWS Suspension Notice.

54.    The impact has been crushing at the national and international levels. Exclusive of our affiliates, CWS employed over 1,000 individuals in the United States as of January 31, 2025. We furloughed 852 of them as of February 6, 2025, and, pursuant to the requirements of the Worker Adjustment and Retraining Notification (WARN) Act, issued letters to many of the furloughed employees, putting them on notice that these furloughs may become layoffs. In addition, we have initiated layoffs of over 600 staff in Africa.

DECL. OF RICHARD L. SANTOS – 11
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    55.    This is likely just the start of a process of debilitating shrinking of our work in the

2    United States and around the world.

3    **VI.    Conclusion**

4    56.    EO 14163 and its implementation pose existential threats to CWS's decades-long

5    commitment to refugee resettlement and to the well-being of refugees and others needing

6    humanitarian protection in the United States.  Every day that a refugee has to wait longer for safety,

7    stability, and family connection causes an immeasurable and irreparable loss.  Every day of

8    furlough and layoff of our staff adds to the harm suffered by CWS, the communities we serve, and

9    the faith communities with whom we partner.  Without immediate relief, once we lose our staff and

10    partners, whose expertise, local knowledge, and networks are essential for the success of our

11    programs, it will be difficult and costly, if not impossible, to rebuild.

12

13    I declare under the penalty of perjury that the foregoing is true and correct.

14

15    Executed in Silver Springs, Maryland on February 11, 2025.

16    Signed by:

    *Richard Santos*
    328D1D2DC064462...

17    Richard L. Santos

18

19

20

21

22

23

24

25

26

DECL. OF RICHARD L. SANTOS – 12
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# Attachment  A

## (to Declaration of Richard L. Santos)



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C. 20520*

January 24, 2025

REDACTED

Church World Service
475 Riverside Dr., Suite 700
New York, NY 10115

REF:    SPRMCO24CA0095
         SPRMCO24CA0254
         SPRMCO24CA0329
         SPRMCO24CA0308
         SPRMCO24CA0337
         SPRMCO24CA0319
         SPRMCO24CA0322

Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI Programs and Preferencing and Initial Recissions of Harmful Executive Orders and Actions, Recipients are hereby notified that no U.S. Government funds may be used to promote "diversity, equity, and inclusion" (DEI) at any level or in any activity, regardless of partner or program location.  Any use of PRM funding to promote DEI must cease immediately, including activities that were previously authorized by PRM.  Your certification that all such activities funded by U.S. Government funds have ceased is required immediately by emailing the grants officer for your award and copy PRM-Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from various grantors requesting this certification. Recipients must reply to this letter by email.

UNCLASSIFIED

2

Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

If you have any other questions regarding the suspension, please contact me at REDACTED@state.gov.

Sincerely,



REDACTED

UNCLASSIFIED

# EXHIBIT 24

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER;
PLAINTIFF JOSEPHINE; PLAINTIFF SARA;
PLAINTIFF ALYAS; PLAINTIFF MARCOS;
PLAINTIFF AHMED; PLAINTIFF RACHEL;
PLAINTIFF ALI; HIAS, INC.; CHURCH
WORLD SERVICE, INC.; and LUTHERAN
COMMUNITY SERVICES NORTHWEST,

        *Plaintiffs,*

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States; MARCO RUBIO,
in his official capacity as Secretary of State;
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; DOROTHY A.
FINK, in her official capacity as Acting Secretary
of Health and Human Services,

        *Defendants.*

Case No. C25-255 JNW

**DECLARATION OF MARK
HETFIELD**

I, Mark Hetfield, hereby declare:

1.     I am the President of HIAS, Inc., one of ten national refugee resettlement

agencies. The facts set forth in this declaration are based on my personal knowledge, on my

conversations with my staff, and on the information kept in the ordinary course of business at

HIAS.

DECL. OF MARK HETFIELD
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

2.      I make this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, because the suspension of the U.S. Refugee Admissions Program (USRAP) and the suspension of government funding for USRAP and to support recently-arrived refugees and Special Immigrant Visa holders represent an existential threat to HIAS' mission and funding.

3.      The government's suspensions have already caused immense and irreparable harm to HIAS' work with refugees, to our clients and the communities they live in, and to our staff and the staff of our affiliates, who for over four decades, have relied on millions of dollars in funding from the federal government for our operations. Refugees we serve have had travel cancelled and reunions with family members postponed indefinitely; our staff are being laid off; and our organization's solvency is at risk.  If this suspension of funding is not urgently reversed, HIAS will likely lack the capacity to participate in refugee resettlement if and when refugee admissions resume.

**I.      HIAS**

4.      HIAS is a global and faith-based nonprofit organization which, working with the organized American Jewish community, is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom.

5.      Our mission is to rescue people whose lives are in danger for being who they are. To that end, we protect the most vulnerable refugees, helping them build new lives and reuniting them with their families in safety and freedom. We also advocate for the protection of refugees and assure that displaced people are treated with the dignity they deserve.

6.      HIAS was founded in New York City in 1903 as the Hebrew Immigrants Aid Society to assist Jews who had fled the pogroms of Russia and Eastern Europe. Today known as "HIAS," it is the international Jewish organization dedicated to assisting forcibly displaced persons, regardless of their faith or ethnicity, with their protection and resettlement needs.

DECL. OF MARK HETFIELD – 2
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

7.      I have held multiple roles at HIAS, and I assumed my current position in September 2024, after serving as President and CEO since 2013. Previously, I was HIAS' interim President and CEO, HIAS' Senior Vice President for Policy and Programs and Director of International Operations. I first joined the organization as a caseworker in 1989, and I have been at HIAS consistently since 2006. My duties as President include oversight of HIAS' participation in the U.S. Refugee Admissions Program.

8.      I have worked in positions requiring expertise in refugee and immigration law for the last 35 years. Before I returned to HIAS in 2006, I worked for three years as Immigration Counsel and Director for International Refugee Issues of the United States Commission on International Religious Freedom. Earlier in my career, I worked as an immigration attorney for the law firm Fulbright and Jaworski, LLP, and I worked as an Appeals Officer and Supervisory Appeals Officer for the United States Immigration and Naturalization Service.

9.      Through my past and current work, I am deeply familiar with HIAS's operations and with the process for resettling refugees in the United States.

10.      Refugee resettlement in partnership with the U.S. government has long been a core activity for HIAS. During its first hundred years in operation, HIAS had a role in helping millions of refugees resettle in the United States, long before the modern refugee resettlement program was codified by Congress in the Refugee Act of 1980. Since 1970, HIAS has helped to resettle over 500,000 refugees in the United States. For decades, HIAS has served refugees without regard to their ethnicity or religion.

11.      Today, HIAS operates offices in twenty-one countries, including the United States, supporting refugees with services to ensure legal protection, economic inclusion, protection from gender-based violence and access to mental health services.

12.      HIAS currently resettles refugees in cooperation with local Jewish family service agencies and other community-based organizations in thirty locations in seventeen states: California, Colorado, Connecticut, Florida, Illinois, Maine, Massachusetts, Michigan, New York,

DECL. OF MARK HETFIELD – 3
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 234

1   North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Texas, Washington, and

2   Wisconsin.

3       13.     HIAS is a 501(c)(3) nonprofit organization headquartered in Silver Spring,

4   Maryland.

5   **II.    Our Clients**

6       14.     The clients whom HIAS resettles in the United States in partnership with the U.S.

7   government are among the most vulnerable people in the world. These refugees fled persecution

8   from their own countries and have been unable to find safety or a long-term solution in the

9   places to which they fled. Notably, many of the refugees with whom we work have been referred

10  by the United Nations High Commissioner for Refugees, and those referrals are generally based

11  on the refugees' disability, need for medical treatment that is not available in the country where

12  they reside, status as women or children at risk, or membership in a particularly persecuted

13  group, such as LGBTQI individuals.

14      15.     Many of these refugees have family in the United States with whom they seek to

15  reunite. Indeed, approximately seventy-five percent of our refugee clients are placed based on a

16  U.S. tie—that is, a U.S.-based family member or friend with whom they will be reunited, and

17  who will provide them support as they resettle.

18      16.     HIAS is dedicated to providing refugees with a welcoming environment and the

19  support that will allow them to integrate successfully into the United States. When refugees first

20  arrive in the United States, HIAS and its affiliates provide them with initial housing, food, and

21  seasonally appropriate clothing. HIAS also helps them with cultural integration, assistance in

22  obtaining employment, and, where appropriate, specialized services for LGBTQI refugees,

23  disabled refugees, and those suffering from torture and trauma, among other vulnerable

24  communities.

25

26

DECL. OF MARK HETFIELD – 4
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

### III.    HIAS's Participation in the U.S. Refugee Admissions Program

17.    HIAS conducts its work in the U.S. Refugee Admissions Program (USRAP) under the terms of several agreements entered with federal agencies, including the Department of State, the Department of Homeland Security, and the Office of Refugee Resettlement, a component of the Department of Health and Human Services.

18.    HIAS receives funding from the U.S. Department of State through thirteen "cooperative agreements" with the Bureau of Population, Resettlement and Migration (PRM) (the "cooperative agreements" or "grants"). The PRM cooperative agreements for the USRAP program, which have end dates in September 2025, provided HIAS with $36,943,648 in revenue. The full amount has not been paid.

19.    Through one of the cooperative agreements with PRM, HIAS has administered the Resettlement Support Center (RSC) in Austria, with suboffices in Croatia and Israel, for over twenty-five years. HIAS's work administering the RSC includes assisting people seeing admission to USRAP in completing applications for consideration, assisting the U.S. government in the processing of such applications, conducting Cultural Orientation for approved applicants, and collecting information from applicants that will enable resettlement agencies to make decisions regarding appropriate placement.

20.    The offices in Austria and Croatia rely on special arrangements between the governments of those countries and the Department of State. Under those arrangements, Austria and Croatia issue a limited number of visas at the request of HIAS, vetted by the U.S. government, for Iranian followers of the Jewish, Christian, Baha'i, Zoroastrian and Mandaean faiths. There are currently over 14,000 religious minority members who registered with HIAS for the program and are waiting for visas in Iran. The program allows them to escape from living as persecuted religious minorities in the Islamic Republic of Iran, and travel to Europe for adjudication of their claims by United States Homeland Security officials. In Tel Aviv, the RSC

DECL. OF MARK HETFIELD – 5
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 236

1   operated by HIAS prepares resettlement applications for refugees from Eritrea, Sudan, and South

2   Sudan who are vulnerable in Israel.

3        21.    Through another cooperative agreement with the Department of State, HIAS

4   administers and leads the Equitable Resettlement Access Consortium (ERAC), as a means to

5   facilitate referrals from non-governmental service providers who identify highly vulnerable

6   refugees in need of resettlement due to protection concerns in the country of first asylum. Since

7   ERAC's launch in 2023, a total of 13 NGOs have been approved by PRM as ERAC partners and

8   764 NGO staff globally have been trained in refugee protection and resettlement. The ERAC

9   network has set up operations in Lebanon, Jordan, Egypt, Nigeria, Kenya, Greece, Romania,

10   Poland, Aruba, Guyana, Peru, Panama, and Colombia, which have in turn identified 2,614

11   individuals with resettlement needs and submitted 1,179 individuals to the U.S. Refugee

12   Admissions Program (USRAP) from countries including: Syria, Iraq, Afghanistan, the

13   Democratic Republic of the Congo, Somalia, Ethiopia, Central African Republic, Venezuela, and

14   Ecuador.  All ERAC Resettlement Registration Forms (RRFs) are reviewed by ERAC staff to

15   ensure the highest possible case quality, as well as global consistency in submissions. Seventy-

16   eight percent of refugee clients receiving resettlement services through ERAC reported that

17   assistance was delivered in a safe, accessible, accountable, and participatory manner.

18        22.    Through the cooperative agreements with PRM, HIAS receives funds through two

19   funding streams to conduct work under the Reception and Placement program.

20        23.    The first funding stream, known as Migration and Refugee Assistance (MRA),

21   provides for services through the Reception and Placement Program, which assists refugees and

22   Special Immigrant Visas (SIVs) who are not Afghan refugees or SIVs eligible under Operation

23   Enduring Welcome (OEW).

24        24.    The second funding stream, Emergency Refugee and Migration Assistance

25   (ERMA), offers the same Reception and Placement Program services but specifically for Afghan

26   refugees and SIVs eligible under OEW.  These programs operate with the assistance of HIAS's

DECL. OF MARK HETFIELD – 6
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   affiliates all over the United States. In addition, HIAS receives funds from PRM through a

2   separate grant for Virtual Reception and Placement (VRP), operated through its headquarters.

3       25.    Through the Reception and Placement Program, HIAS is responsible for

4   providing refugees with services upon their first day of arrival in the United States to 90 days

5   thereafter. These services include arranging for the refugee to be met at the airport; securing

6   permanent housing (usually entailing payment of one month's rent and a security deposit)

7   equipped with basic furnishings, household items, a welcome meal, and a stock of groceries;

8   ensuring that the refugee has weather-appropriate clothing; helping the refugee apply for a Social

9   Security card; registering any refugee children in school; helping the refugee access shopping

10  facilities; arranging for any medical appointments, particularly for individuals with significant

11  medical needs, which is common; otherwise connecting refugees with social or language

12  services; and assisting refugees in achieving economic self-sufficiency through employment. We

13  also provide specialized services for refugees with particular needs, such as LGBTQI refugees

14  and refugees living with disabilities, at various of our sites.

15      26.    Either on our own or through partnerships with affiliates, we maintain

16  resettlement services providing Reception and Placement services in thirty states. In fiscal year

17  2025 alone, HIAS has helped refugees find homes in 247 counties across the thirty states.

18      27.    The PRM cooperative agreements include a document entitled "U.S. Department

19  of State Award Provisions," which states in part that "[d]uring the period of performance, the

20  Recipient must comply with . . . [t]he applicable sections of 2 CFR §200 and 2 CFR §600[.]"

21      28.    As described below, refugee admissions and decision-making have been

22  suspended as of January 20, 2025, and all the funds PRM committed to HIAS to fund this work

23  have been halted as of January 24, 2025.

24

25

26

DECL. OF MARK HETFIELD – 7
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 238

## IV.    Executive Order 14163 and Immediate and Ongoing Impact on HIAS and its Clients

29.    On January 20, 2025, President Trump signed an Executive Order 14163 ("EO") suspending all refugee admissions and decisions effective January 27, 2025. EO 14163, titled "Realigning the United States Refugee Admissions Program," orders the suspension of all refugee admissions and decisions on refugee applications "until such time as the further entry into the United States of refugees aligns with the interests of the United States interests," that is to say, indefinitely.

30.    EO 14163 has caused immediate harm to HIAS' mission and to its financial stability, and that harm increases with every day that the EO remains in effect.

31.    EO 14163 strikes at the heart of HIAS' organizational mission to assist and welcome refugees to enter the United States through the statutory pathways authorized by the United States Congress. The EO indefinitely stops the entry of refugees we serve around the world, bars family members from reunifying with their loved ones inside the United States and freezes decision-making for applicants who in some cases have been waiting for years to learn whether they can enter the United States.

32.    As a result of the EO, thousands of our clients have been plunged into a state of devastating fear and uncertainty, and many with approved refugee applications have had their travel cancelled.

33.    EO 14163, by failing to respect or even take into account negotiated arrangements with the governments of Croatia and Austria to provide visas for Iranian religious minorities to transit to the HIAS-USRAP Resettlement Support Centers in Vienna and Zagreb, effectively ended these arrangements and puts them at risk of never being restarted. The suspension puts at risk the 14,069 applicants who are religious minorities in Iran registered for the program and waiting for an available visa, as they are now unable to leave their country of persecution through the safe and congressionally-created program for which they registered.

DECL. OF MARK HETFIELD – 8
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

34. Further, although EO 14163 did not explicitly address the processing of refugee applications, in fact the State Department has suspended all refugee processing, which includes all cases currently in the USRAP pipeline and any new referrals.

35. The day after the EO was issued, on January 21, 2025, HIAS received an email from PRM addressed to numerous USRAP partners stating that:

> Following the issuance of the Executive Order (EO), "Realigning the United States Refugee Admissions Program," refugee arrivals to the United States have been suspended until further notice. All previously scheduled travel of refugees to the United States is being cancelled, and no new travel bookings will be made. RSCs should not request travel for any additional refugee cases at this time.
>
> Additionally, all refugee case processing and pre-departure activities are also suspended. RSCs and IOM should not move refugees to transit centers in anticipation of travel and should halt all pre-departure activities for refugee cases. No new referrals should be made into the USRAP. Intake of new applications for the Welcome Corps is suspended, as well as processing of all active or previously submitted applications. We understand there will be questions related to the implementation of suspending refugee case processing, and we will send additional guidance in the coming days.

36. In a follow-up email on January 22, PRM confirmed "that all planned refugee arrivals for this week have been cancelled and we do not anticipate any being scheduled," notwithstanding the EO's admissions suspension not being effective until January 27, 2027.

37. In other words, refugees who were already referred to the United States for resettlement are now frozen in the process and will not see their applications move forward and no new referrals to USRAP can be made at this time.

38. Because the suspension is indefinite, we are unable to predict when or if services will resume. It will be exceedingly difficult to maintain relationships with sponsors of refugees in the United States and our extensive local networks while the programs are indefinitely suspended. Our mission to serve refugees will be irreparably damaged.

DECL. OF MARK HETFIELD – 9
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    39.    In addition, although the EO provides case-by-case waivers for certain refugees
2    whose entry is deemed to be in the "national interest," we have asked PRM about this process
3    and received no response.

4    40.    In the PRM email of January 21, the Director of Admissions for PRM emailed me
5    and other USRAP partners to inform us that all refugee arrivals to the United States had been
6    suspended until further notice, all previously scheduled refugee travel had been cancelled, no
7    new bookings would be made, and all refugee case processing and pre-departure activities were
8    suspended. In response, on the same day, I asked PRM to confirm that the suspension of refugee
9    admissions would not be effective until midnight on January 27, pursuant to the terms of EO
10   14163. PRM responded that the suspension was immediate, and all planned refugee arrivals had
11   been cancelled. I then specifically asked for guidance on how HIAS could request exceptions to
12   the refugee admission suspension but have yet to receive any response from PRM or any other
13   specific guidance on how to request case-by-case waivers under the EO. The subsequent
14   communications I received from PRM did not address how to apply for waivers and stated in
15   part, "Given the stop work orders, no action is being requested or required by the State
16   Department."

17   41.    EO 14163 is also financially catastrophic to HIAS, its affiliates, and the refugees
18   we serve.

19   42.    Without incoming refugees, HIAS will not be able to sustain its operations and
20   has had to lay off staff members while affiliates may permanently close their resettlement
21   operations, with the resulting loss of institutional knowledge, experience and personal
22   relationships.

23
24
25
26

DECL. OF MARK HETFIELD – 10
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**V.** **EO 14169 and the U.S. State Department's January 24, 2025, Order to HIAS to "Stop Work."**

43.     In addition to EO 14163, on January 20, President Trump signed 44 other executive orders. Among these were EO 14169, "Reevaluating and Realigning Foreign Aid," which suspended all foreign aid programs, including those serving refugees, for ninety days.

44.     On January 24, 2025, HIAS received a letter from the U.S. Department of State Bureau of Population, Refugees, and Migration (PRM) stating that thirteen (13) different grants to HIAS were immediately suspended "pending a Department-wide review of foreign assistance programs" pursuant to EO 14169. *See* January 24, 2025 PRM Letter, attached to this declaration (hereinafter "HIAS Suspension Notice").

45.     Also on January 24, HIAS received a cable from Secretary of State Marco Rubio to all diplomatic and consular posts (ALDAC) informing them of the funding suspension pursuant to EO 14169. HIAS' funding under its federal grants has been entirely cut off: HIAS had only one payment deposited from a federal grant since the HIAS Suspension Notice was issued and that was for an invoice processed *before* the HIAS Suspension Notice.

46.     Nor would we be able to receive funds to continue work under a waiver since all federal government payment portals are not functioning, making the purported waiver process useless.

**VI.** **The Devastating Impact of EO 14163 and the HIAS Suspension Notice on Refugees.**

47.     The refugees we work with in the United States and overseas have had their plans upended overnight. As of February 6, 2025, through its Reception and Placement, Virtual Reception and Placement and Welcome Corps programs, HIAS has 3,740 clients overseas who have been extensively vetted and are awaiting resettlement to the United States; at least 1,453 of these were "travel-ready" and just awaiting boarding documents and flight plans to enter the United States.

DECL. OF MARK HETFIELD – 11
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

48.     Thirty-one (31) clients are "Follow-to-Join" spouses and children of refugees currently resettled in the United States, including twelve who were travel-ready. These family members have been separated for months and even years from their petitioning relatives.

49.     Another 499 clients are approved under the Special Immigrant Visa (SIV) program for people who worked for the United States government or its contractors in Iraq and Afghanistan.

50.     All of these individuals have had their life plans upended, their separation from family members prolonged, and their chances for stability and safety suspended indefinitely.

51.     For example, the parents and brother of one HIAS client based in Orange County, California, had their refugee applications approved in November 2024. They sold their house in Guatemala and had tickets to enter the United States for early February. The HIAS client in the U.S. who is awaiting the arrival of her family took out an $800 loan to get furniture for their new home. Her family's travel has been cancelled.

52.     Family members of a refugee from Afghanistan who had worked for a company that supported the U.S. mission have been resettled in St. Louis since 2021. His sister and her family, who fled Afghanistan for Iraq, where they have only temporary status, had been vetted and approved for entry to the United States, thanks to the private sponsorship of a HIAS Welcome Corps group. The private sponsorship group has raised at minimum $7,275 to support the arrival of this client. Scheduled to arrive in St. Louis on February 12, the family's travel was cancelled as a result of EO 14163. The family lives in fear of being returned to Afghanistan.

53.     The financial impact on recently resettled refugees is likewise severe.

54.     HIAS obtains approval at the start of each fiscal year for a certain number of refugees that it has capacity to serve year. To partially reimburse HIAS for the costs of participation in the Reception and Placement program, the federal government provides each affiliate $1,350 for each approved refugee for the affiliate's administrative expenses in supporting the refugee's resettlement. In addition, the government provides HIAS with $1,650 to

DECL. OF MARK HETFIELD – 12
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   cover essential living expenses for each refugee who arrives.  The government reimburses HIAS

2   based on the number of refugees for whom we provide Reception and Placement services.  If

3   fewer refugees receive HIAS' Reception and Placement services, federal reimbursements are

4   reduced.

5       55.     In HIAS's Fiscal Year 2025, which began on October 1, 2024, 2,714 refugees and

6   SIV holders arrived through HIAS's Reception and Placement programs and an additional 406

7   refugees and SIV holders came through our VRP program. In addition, 159 individuals are

8   supported through our local Welcome Corps, groups of U.S.-based volunteers who provide

9   private sponsorship to refugees.  As of February 6, 2025, HIAS has 2,526 recently arrived

10  refugees and SIV holders who are in the first 90 days of resettlement in the United States and

11  working with our affiliates. An additional 320 individuals who are in their first 90 days of

12  resettlement are working with our VRP program, and 120 individuals in their first 90 days are

13  sponsored through our Welcome Corps. Reception and Placement funding for essential services

14  to those recently resettled individuals has been frozen through the HIAS Stop-Work Order.

15      56.     As a result of the HIAS Stop-Work order, all subawards under the Equitable

16  Resettlement Access Consortium (ERAC) project to vetted, approved and trained refugee

17  resettlement referral partners have ended, preventing partners from maintaining resettlement staff

18  and continuing operations. Resettlement case workers who have undergone extensive training on

19  resettlement have been laid off with no notice, resulting in challenges communicating with

20  clients in various stages of the resettlement process.

21      57.     HIAS clients in the resettlement process include a female Haitian journalist

22  residing in Romania whose foster family resides in New Jersey and a young Afghan man

23  residing in Greece whose biological mother and entire maternal family are U.S. citizens residing

24  in California. HIAS clients also include victims of the civil wars of eastern Democratic Republic

25  of Congo, including victims of aggravated sexual assault struggling to access resources in

26  Kenya, opponents of the government in Venezuela who were driven out of their homes by

DECL. OF MARK HETFIELD – 13
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    government persecution, and Syrian refugees displaced by the now-defunct Assad regime,

2    unable to return home.

3        58.    Many refugees identified by ERAC have suffered violence not only in their

4    countries of origin, but often also in transit and in their country of asylum, and face protection

5    needs beyond the capacity of the country of asylum to provide. The impact on these refugees is

6    dire.

7    **VII.    Consequences of EO 14163 and the HIAS Suspension Notice for HIAS's Operations.**

8        59.    Immediately after the HIAS Suspension Notice issued, we discovered that we

9    could not access the State Department portal through which we submitted our requests for

10   reimbursement for money expended under these grants. We have not been paid the

11   $3,527,171.22 we are owed on our USRAP grants for work done prior to the issuance of the

12   stop-work order, primarily in December of 2024.

13       60.    Along with fellow resettlement agencies, we immediately began to engage with

14   the State Department about the severe impact the HIAS Suspension Notice had and is having on

15   our operations. We also expressed our concern about the dismantling of the safe and legal escape

16   route for Iranian Jews, Christians, Baha'i, and other religious minorities, developed between

17   HIAS, the State Department, and the governments of Austria and Croatia; and that the impact of

18   the Stop-Work Order on the RSC leaves 14,000 persons duly registered for the program trapped

19   in the Islamic Republic of Iran. But there has been no response to our requests for clarity.

20       61.    The impact has been crushing at both national and local levels. We began laying

21   off employees at our national office on Friday, January 31. By close of business on Monday,

22   February 3, we had laid off 20 employees around the country, including in Virginia, New York,

23   Maryland, California, Texas, Arizona and Washington, D.C.

24       62.    Should the suspension of our grants continue, we will be forced to lay off many

25   more staff.

26

DECL. OF MARK HETFIELD – 14
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

63.     Our national office has also talked extensively with our affiliate partners around the country so that leaders and staff receive rapidly changing information as soon as we have it and receive the encouragement and support they need. But no amount of encouragement and support can make up for the devastating financial impact of the HIAS Suspension Notice and our affiliate partners and the ripple effect it is causing in the local community.

64.     Our dedicated staff is reeling with the knowledge that thousands of people who depend on us for safety have been left in precarious and dangerous situations. Every year, HIAS assists thousands of refugees, SIV recipients, and others to enter the United States, reunify with family members and establish safety and stability. The indefinite suspension of that work is devastating for the clients we serve and for the staff we have laid off who needed a steady stream of income to support basic living expenses for themselves and their families.

**VIII.   Conclusion**

65.     Without immediate relief, HIAS's clients both in the United States and overseas will suffer immeasurable harm. Our laid-off staff will lose income, and HIAS will, in the long term, face the prospect of insolvency and an inability to fulfill the mission we have been committed to for more than a century.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on February 11, 2025.

Mark Hetfield

DECL. OF MARK HETFIELD – 15
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# Attachment  A

## (to Declaration of Mark Hetfield)



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C. 20520*

January 24, 2025

REDACTED

HIAS Inc.
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF:   SPRMCO24CA0215; SPRMCO24CA0255; SPRMCO24CA0262; SPRMCO24CA0277;
        SPRMCO24CA0278; SPRMCO24CA0292; SPRMCO24CA0328; SPRMCO22CA0311;
        SPRMCO24CA0325; SPRMCO24CA0348; SPRMCO24CA0354; SPRMCO24CA0349

Consistent with the President's Executive Order on Reevaluating and Realigning United
States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and
Migration hereby notifies the recipient that, consistent with the terms of the award(s),
the referenced award(s) are immediately suspended as of January 24, 2025. Award(s)
may no longer effectuate agency priorities and are suspended pending a Department-
wide review of foreign assistance programs. Decisions whether to continue, modify, or
terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension the Recipient must stop
all work under the award(s) and not incur any new costs after the effective date cited
above. The Recipient must cancel as many outstanding obligations as possible.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI
Programs and Preferencing and Initial Recissions of Harmful Executive Orders and
Actions, Recipients are hereby notified that no U.S. Government funds may be used to
promote "diversity, equity, and inclusion" (DEI) at any level or in any activity, regardless
of partner or program location.  Any use of PRM funding to promote DEI must cease
immediately, including activities that were previously authorized by PRM.  Your
certification that all such activities funded by U.S. Government funds have ceased is
required immediately by emailing the grants officer for your award and copy PRM-
Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from
various grantors requesting this certification. Recipients must reply to this letter by
email.

Recipients may submit payment requests for legitimate expenses incurred prior to the
date of this Notice of Suspension or legitimate expenses associated with this Notice of
Suspension.

UNCLASSIFIED

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

If you have any other questions regarding the suspension, please contact me at REDACTED @state.gov.

Sincerely,


REDACTED
Grants Officer

# EXHIBIT 25

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST,

     *Plaintiffs,*

     v.

DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DOROTHY A. FINK, in her official capacity as Acting Secretary of Health and Human Services,

     *Defendants.*

Case No. C25-255 JNW

**DECLARATION OF DAVID DUEA**

I, David Duea, hereby declare:

    1.    I am the Chief Executive Officer of Lutheran Community Services Northwest ("LCSNW"), which I have led since July 1, 2014. The facts set forth in this declaration are based on my personal knowledge, my conversations with my staff, and documents kept in the ordinary course of business at LCSNW.

DECL. OF DAVID DUEA
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

2.      I make this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.  LCSNW seeks to enjoin the implementation of Executive Order 14163 ("EO 14163"), which suspends the U.S. Refugee Assistance Program (USRAP) indefinitely, and to reverse the government's sudden suspension of funding for refugee resettlement.

3.      The government's suspensions are having and will continue to have a devastating impact on refugee clients, funding, and operations that are vital to LCSNW's mission. Refugees we work with directly have had travel plans cancelled, family reunifications suspended, and crucial essential services cut.  LCSNW is scrambling to make up the difference so that our clients don't lose services, and we are pulling hard-won resources together to make sure that refugees and the staff who serve them can maintain stability.

I.      **Lutheran Community Services Northwest**

4.      LCSNW is a nonprofit, 501(c)(3) organization incorporated in the state of Oregon, with headquarters in Tacoma, Washington. LCSNW is a social service agency that formed in 2001 from the merger of several Lutheran outreach ministries and nonprofit organizations that had served communities in the Northwest since the 1920s. LCSNW's lines of service include refugee and immigrant services, mental health counseling, low-income housing, child and family welfare, and support for victims of crime. LCSNW has more than 40 locations across Washington, Oregon, and Idaho, with more than 700 employees and dozens of programs providing services to more than 40,000 clients per year.

5.      Refugee resettlement work is a core part of LCSNW's work and has been central to the mission of the organizations that formed LCSNW since at least the 1950s.  We estimate that LCSNW and its precursor organizations have served more than 40,000 refugees since 1975.

6.      As Chief Executive Officer for the last decade, I have had overall responsibility for the day-to-day operations of LCSNW, which is one of the regional and local agencies whose services are funded by subcontracts with one of ten national resettlement agencies.

DECL. OF DAVID DUEA – 2
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

7.     I was born in Minnesota and later moved to the Pacific Northwest, where I earned a bachelor's degree in social work from Pacific Lutheran University and an MBA. Since 2014, my team and I have led LCSNW through significant growth, expanding programs in behavioral health, refugee services, child welfare, and housing. Now living in Tacoma, I remain committed to strengthening community partnerships and ensuring LCSNW provides life-changing services across the region.

8.     Through my past and current work, I have become deeply familiar with the process for resettling refugees in the United States and LCSNW's particular role in that process.

9.     The resettlement support LCSNW provides to refugees includes welcoming refugees at the airport; securing housing, furnishings, and food; and referring refugees and their families for both temporary and long-term housing, school enrollment, job coaching, and cash assistance.

10.     The relationships and the goodwill we have built over decades in the communities we serve are essential to the success of our services.

11.     Federal funding for LCSNW's Refugee Reception and Placement Program (R&P Program) located primarily in Tacoma, WA, and Portland, OR, constitutes 95% of the funding for LCSNW's resettlement assistance programs, including approximately 50 jobs.

## II.     LCSNW's Participation in the U.S. Refugee Admissions Program

12.     LCSNW funds its refugee resettlement work primarily with funding from the federal government, sometimes in partnership with state agencies and other community partners. While our services to refugees date back to the 1950s, since the passage of the Refugee Act in 1980, LCSNW has provided initial resettlement services to refugees primarily through funding from federal agencies.

13.     LCSNW is an affiliate of a national resettlement agency (RA), one of ten that provide the infrastructure for the United States Refugee Admissions Program. Through this affiliate relationship, LCSNW receives funding from the Department of State's Bureau of

DECL. OF DAVID DUEA – 3
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Population, Migration, and Resettlement (PRM) to provide Resettlement and Placement (R&P)
services. This funding is provided through "cooperative agreements" between LCSNW and the
RA.

14.    LCSNW's 2024-2025 cooperative agreements with the RA provided for up to
$4,377,000 from PRM to support LCSNW's Reception and Placement (R&P) program, which
provides for services and assistance to refugees through their first 90 days in the United States.
LCSNW invoices the RA for reimbursement based on the number of refugees we serve.

15.    This same affiliate process applies to other grants we receive via the RA,
including $1,312,612 in funding from the Office of Refugee Resettlement (ORR) of the U.S.
Department of Health and Human Services to support programs and services for refugee clients
following their first 90 days in the United States.

16.    We help resettle hundreds of refugees in our catchment areas each year. In the
2024 federal fiscal year, we assisted 1391; in 2023, 1043; in 2022; 676.

17.    Our refugee resettlement work is a deeply local endeavor that depends on our
long-term partnerships in the communities we serve.  We work with local landlords to persuade
them to provide leases to incoming refugees whom the landlord has never met and who have no
employment or credit history. Securing these leases is possible only because of our strong
outreach and local relationships.

18.    We work in similar ways with private employers in local communities,
encouraging them to give new refugees, who often speak little or no English, a chance at stable
employment. We work with school systems, medical care providers, and local benefit offices to
ensure that arriving families are able to have the essential services they need to start new lives
with as much security and stability as possible.

19.    We partner with local governments and community groups to help welcome and
integrate refugee clients, allowing clients to build new social connections and social support
structures. We consult and coordinate with state and local officials, as well as other public and

DECL. OF DAVID DUEA – 4
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

private organizations, to maximize the impact to refugees the limited public funds made available to them for their first months in our communities. We are intentional in our work to ensure services are most impactful on behalf of our clients.

20.     Successful resettlement of newly arrived refugee clients relies on trust built up over decades of hard work between LCSNW and our community partners, including state and local governments, businesses, community groups, and private individuals. LCSNW helps ensure that new arrivals will be welcomed in their new homes by providing the support and connections they need to become independent and productive. The local communities, in turn, rely on LCSNW to support new arrivals in good faith. Communities know they can trust LCSNW not to abandon clients to their own devices, and as a result, those communities feel comfortable welcoming these new arrivals, confident that they will not be a burden to their neighbors.

## III.    Office of Refugee Resettlement Funded Programs

21.     LCSNW also receives funding from the Office of Refugee Resettlement ("ORR") of the Department of Health and Human Services for longer-term refugee resettlement work.

22.     ORR works through the states and other nongovernmental organizations such as LCSNW to provide longer-term cash and medical assistance, as well as language, employment, and social services. This is a key component in the refugee resettlement process.

23.     Through our cooperative agreements with the RA, LCSNW provides services to refugees funded by ORR's Preferred Communities, Safe Release and Family Strengthening programs. The Preferred Communities program includes a service to refugee clients called Matching Grant. Matching Grant is an alternative to public cash benefits, providing support with rent, utilities, transportation, and other basic needs until the family is able to become self-sufficient through employment.  Preferred Communities also supports families with case management, job readiness skills, job development, job placement, and follow up services.

24.     Clients of the Preferred Communities program may arrive with severe medical issues, mental health concerns, or other vulnerabilities that require more intensive support.  The

DECL. OF DAVID DUEA – 5
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1 Preferred Communities program supports the most vulnerable refugees resettled in the US by

2 providing intensive case management, including intake and assessment of needs and risk factors,

3 a service plan, and regular contact and support to reach goals.

4    25.    ORR has committed to $1,312,912 in funding for LCSNW for the 2024-2025

5 agreement period, via our RA partner.

6 **IV.   Executive Order 14163 and Immediate and Ongoing Impact on LCSNW**

7 **and its Clients**

8    26.    As described below, refugee admissions and decision-making have been

9 suspended as of January 20, 2025, and all the funds PRM committed to LCSNW to fund this

10 work has been halted as of January 24, 2025.  In addition, although LCSNW has received no

11 formal suspension of our ORR funding, the RA has been unable to access funding for work

12 LCSNW has contracted to do or even to obtain reimbursements for work done in November and

13 December of 2024.

14    27.    On January 20, 2025, President Trump signed an Executive Order ("EO")

15 suspending all refugee admissions and decisions effective January 27, 2025. EO 14163, titled

16 "Realigning the United States Refugee Admissions Program," orders the suspension of all

17 refugee admissions and decisions on refugee applications "until such time as the further entry

18 into the United States of refugees aligns with the interests of the United States interests," that is

19 to say, indefinitely.

20    28.    On January 22, 2025, LCSNW received an email from the RA stating that PRM

21 had informed the RA that "all refugee travel would be cancelled until further notice" and that no

22 refugee travel would be booked. The email stated that these cancellations were taking place

23 immediately, "earlier than what we expected" given that EO 14163 stated that it would not take

24 effect until January 27, 2025.

25    29.    EO 14163 has caused immediate harm to LCSNW's mission, to the refugees we

26 serve, and to economic stability. That harm increases every day that EO 14163 is in effect.

DECL. OF DAVID DUEA – 6
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

30.     EO 14163 does immense damage to LCSNW's organizational mission to assist and welcome refugees to enter the United States through the statutory pathways authorized by the United States Congress and to resettle here with safety and stability. The EO indefinitely stops the entry of refugees we have committed to serving, bars family members from reunifying with their loved ones inside the United States and has stopped decision-making for refugees who have gone through extensive vetting and have waited for months and in some cases years to enter the United States.

31.     Because the suspension is indefinite, we are unable to predict when or if the services we provide to incoming refugees will resume.  As described below, we receive federal government funding based on the number of refugees we serve. It will be exceedingly difficult to maintain relationships with sponsors of refugees and our extensive local networks while the programs are indefinitely suspended. The quality of the services we can provide will suffer.  Our mission to serve refugees will be irreparably damaged.

32.     Without incoming refugees, LCSNW will not be able to sustain its refugee resettlement programs that have been a core part of our mission for decades. The contraction of our work could lead to layoffs and will certainly lead to loss of relationships and essential networks that provide a vital supplement to federal funding, allowing us to welcome refugees in our communities.

**V.      EO 14169 and the U.S. State Department's January 24, 2025 Order to "Stop Work"**

33.     In addition to EO 14163, on January 20, President Trump signed 44 other executive orders. Among these was EO 14169, "Reevaluating and Realigning Foreign Aid," which suspended all foreign aid programs, including those serving refugees, for ninety days.

34.     On January 24, the RA received a Notice of Suspension of PRM-funded work, including grants that flowed to LCSNW. On January 30, 2025, LCSNW received an email instructing us not to file claims and expenses for any work performed after January 24, 2025, and that the RA would use its own resources to provide funding for "client emergency and basic

DECL. OF DAVID DUEA – 7
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    needs expenses" for recently-arrived refugees who had arrived between December 24, 2025 and

2    January 24, 2025.

3    **VI.    The Devastating Impact of EO 14163 and the Suspension of Funding on Refugees.**

4              35.    The refugees we work with in the United States and overseas have had their plans

5    upended overnight.  As of February 7, 2025, LCSNW has 610 clients overseas who have been

6    extensively vetted and are awaiting resettlement to the United States.

7              36.    All of these individuals have had their life plans upended, their separation from

8    family members prolonged, and their chances for stability and safety suspended indefinitely.

9              37.    The financial impact on recently resettled refugees is likewise severe.

10             38.    LCSNW obtains approval at the start of each fiscal year for a certain number of

11   refugees that it has capacity to serve year. PRM's Reception and Placement (R&P) Program,

12   through the RA, provides LCSNW with $3,000 per refugee whom LCSNW has assured.  These

13   funds assist with meeting expenses during a refugee's first few months in the United States.

14             39.    At least $1,650 of that grant must be used to cover payments directly to or on

15   behalf of the refugee.  The remaining $1,350 may be used towards the expenses of the local

16   office that provides R&P services to assist with meeting expenses during a refugee's first few

17   months in the United States. But this amount does not cover the true cost of our services.

18             40.    During the R&P period, case managers provide refugee families with a variety of

19   core services, including, but not limited to, airport reception with qualified interpretation, safety

20   orientation, cultural orientation, enrollment in English classes for adults and school for children,

21   access to eligible public benefits, including SNAP, WIC, and other public services, enrollment in

22   employment services, emotional and social well-being services, health care and vaccinations, and

23   a firm connection to ongoing services available at the organization and in the community.

24             41.    As of February 7, 2025, LCSNW has approximately 268 recently arrived refugees

25   and SIV holders who are in the first 90 days of resettlement in the United States. PRM funding

26

DECL. OF DAVID DUEA – 8
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    for essential services to those recently resettled individuals has been frozen as of January 24,

2    2025.

**VII.    Consequences of EO 14163 and the Notice of Suspension for LCSNW's Operations**

4    42.    The total amount immediately impacted by the Notice of Suspension is more than

5    $4,377,000.

6    43.    In addition, although we understand that the RA has not received a formal notice

7    of suspension of funding from ORR, it has not been able to access funding for ORR programs.

8    The total amount of ORR funding that LCSNW would receive from the RA under 2024-2025

9    contracts is $1,312,612.

10    44.    Approximately 50 staff are employed by LCSNW's R&P programs, and all of

11    those jobs are in jeopardy. LCSNW has continued to provide services without a guarantee of

12    funding out of a strong commitment to assist our clients, and we are working on reallocating

13    available funding to cover the immediate shortfall.

**VIII.    Conclusion**

15    45.    Without immediate relief, LCSNW's clients both in the United States and

16    overseas will suffer immense harm that will be impossible to repair. Should the suspension of

17    refugee entry and funding continue, our refugee resettlement programs will be severely curtailed,

18    and we run the very real risk of layoffs. Losing the experienced staff and the long-term

19    relationships they have built in our communities will be irreparable; it will not be easy to rebuild

20    these programs if they shrink or are shut down.

22    I declare under penalty of perjury under the laws of the United States that the foregoing is

23    true and correct.

24    EXECUTED this 11th day of February, 2025, at Tacoma, Washington.

_David Duea_
DocuSigned by:
David Duea

DECL. OF DAVID DUEA – 9
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

District Judge Jamal N. Whitehead

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PLAINTIFF PACITO; PLAINTIFF ESTHER;
PLAINTIFF JOSEPHINE; PLAINTIFF
SARA; PLAINTIFF ALYAS; PLAINTIFF
MARCOS; PLAINTIFF AHMED;
PLAINTIFF RACHEL; PLAINTIFF ALI;
HIAS, INC.; CHURCH WORLD SERVICE,
INC.; and LUTHERAN COMMUNITY
SERVICES NORTHWEST,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, MARCO
RUBIO, in his official capacity as Secretary of
State, KRISTI NOEM, in her official capacity
as Secretary of Homeland Security;
DOROTHY A. FINK, in her official capacity
as Acting Secretary of Health and Human
Services,

        *Defendants*.

CASE NO. 2:25-cv-00255

OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUCTION

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.      The Executive's Authority to Suspend Entry of Aliens and to Set Foreign Aid .......... 2

    II.     The Refugee Act .................................................................................. 4

    III.    The Executive Orders ........................................................................... 5

    IV.    Implementation of the Executive Orders ................................................. 6

    V.     This Litigation .................................................................................... 8

STANDARD OF REVIEW ................................................................................... 8

ARGUMENT ...................................................................................................... 8

    I.      Plaintiffs Are Not Likely to Prevail on the Merits of their Claims.................. 8

         A.    Plaintiffs Lack Standing to Seek Injunctive or Declaratory Relief Against the President ............................................................... 9

         B.    Plaintiffs' Separation of Powers Claim Fails Because the President's Power in the Realm of Refugee Admission and Foreign Affairs is Vast and Not Justiciable ............................................................. 9

         C.    Plaintiffs' Refugee Act Claim Also Fails as the President Validly Exercised His Constitutional and Statutory Power and the USRAP Order Does Not Conflict with the INA ........................................ 12

             1.    The INA grants the President authority to suspend refugee admissions ........................................................................... 12

             2.    Consistent with the Refugee Act, the INA grants the President, through the Secretary of Homeland Security, discretion over the admission of all refugees, including suspension of entry. ................. 13

             3.    The INA does not entitle derivative refugees to admission but simply affords them refugee status should they be admitted. ............. 14

         D.    Plaintiffs Have Failed to State a Cognizable Due Process Claim ................. 16

         E.    Plaintiffs are Not Likely to Prevail on their APA Claims ............................ 16

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 261
i

1.   Plaintiffs do not allege any agency action. ........................................ 17

2.   Plaintiffs do not allege any final action. ............................................ 18

3.   Defendants have not exceeded their statutory authority and have
     not acted contrary to law. .................................................................. 19

4.   Defendants have not acted arbitrary and capriciously. ....................... 20

II.   Plaintiffs Failed To Show Irreparable Harm And The Balance Of Public Interest
      Factors Weighs Strongly Against An Injunction ....................................... 24

CONCLUSION ................................................................................................. 27

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 262
ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abourezk v. Reagan,*
    785 F.2d 1043 (D.C. Cir. 1986) ................................................................... 2-3, 10

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) ................................................................... 12

*AIDS Vaccine v. United States,*
    Case No. 25-00400 (D.D.C.) ................................................................... 25

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127, 1131 (9th Cir. 2011) ......................................................... 25

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ................................................................... 11

*Am. Whitewater v. Tidwell,*
    770 F.3d 1108 (4th Cir. 2014) ................................................................... 16

*Arizona v. United States,*
    567 U.S. 387 (2012) ................................................................... 26

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................... 18

*California v. Azar,*
    911 F.3d 588 (9th Cir. 2018) ................................................................... 26

*Dalton v. Specter*
    511 U.S. 461 (1994) ................................................................... 9

*Dep't of State v. Muñoz,*
    602 U.S. 899 (2024) ................................................................... 16

*Detroit Int'l Bridge Co. v. Gov't of Canada,*
    189 F. Supp. 3d 85 (D.D.C. 2016) ......................................................... 17

*Doe #1 v. Trump,*
    957 F.3d 1050 (9th Cir. 2020) ................................................................... 26

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 263
iii

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ...................................................................... 9, 14

*Doe v. Trump*,
288 F. Supp. 3d 1045 (W.D. Wash. Dec. 23, 2017) ........................................... 14, 15

*E. Bay Sanctuary Covenant v. Trump*,
2019 WL 1048238 (N.D. Cal. Mar. 5, 2019) .......................................................... 25

*Elkins v. Moreno*,
435 U.S. (1978) ............................................................................................................ 2

*Fiallo v. Bell*,
430 U.S. 787 (1977) ................................................................................................. 2, 10

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................................... 17, 18

*Haitian Refugee Ctr., Inc. v. Gracey*,
600 F. Supp. 1396 (D.D.C. 1985) ............................................................................ 13

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ................................................................................................... 10

*Hawaii v. Trump*,
878 F.3d 662 (9th Cir. 2017) ................................................................................... 13

*I.N.S. v. Stevic*,
467 U.S. 407 (1984) ................................................................................................... 14

*INS v. Legalization Assistance Project*,
510 U.S. 1301 (1993) ................................................................................................. 26

*Johnson v. Whitehead*,
647 F.3d 120 (4th Cir. 2011) ..................................................................................... 2

*Kerry v. Din*,
576 U.S. 86 (2015) ..................................................................................................... 10

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) ................................................................................. 25

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................................................... 17

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

*Maryland v. King*,
    567 U.S. 1301 (2012)............................................................................ 26

*Matthews v. Diaz*,
    426 U.S. 67 (1976)............................................................................... 15

*Mississippi v. Johnson*,
    71 U.S. 475 (1866).............................................................................. 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................. 17

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010)........................................................... 9

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................ 24

*Norton v. S. Utah Wilderness*,
    *All.*, 542 U.S. 55 (2004)..................................................................... 16

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005)............................................................ 12

*Serv. Emp. Int'l Union Local 200 United v. Trump*,
    420 F. Supp. 3d 65 (W.D.N.Y. 2019).................................................. 20

*Sierra Club v. Peterson*,
    228 F.3d 559 (5th Cir. 2000)......................................................... 17, 18

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ............................................................. 8

*Trump v. Hawaii*,
    585 U.S. 667 (2018)..................................................................... *passim*

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................................ 3, 11

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936)................................................................... 3, 10, 12

*United States v. Texas*,
    599 U.S. 670 (2023)............................................................................ 26

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 265
v

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 1, 8, 24

*Wright v. Riveland*,
   219 F.3d 905 (9th Cir. 2000) ................................................................ 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................ 12

*Zivotofsky ex rel Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ................................................................................ 12

**Statutes**

5 U.S.C. § 704 ................................................................................ 19, 21

5 U.S.C. § 706(2)(A) ...................................................................... 19, 22

8 U.S.C. § 706(1) ................................................................................ 18

8 U.S.C. § 1101 ................................................................................... 2

8 U.S.C. § 1157(a)(2) ........................................................................... 4

8 U.S.C. § 1157(c) .............................................................................. 18

8 U.S.C. § 1157(c)(1) .......................................................................... 16

8 U.S.C. § 1157(c)(2)(A) ........................................................ 5, 16, 17, 18

8 U.S.C. § 1157(c)(3) ........................................................................ 4, 5

8 U.S.C. § 1157(e) ......................................................................... 15, 16

8 U.S.C. § 1182(a) ............................................................................... 4

8 U.S.C. § 1182(f) ........................................................................ *passim*

8 U.S.C. § 1201(h) ............................................................................. 16

8 U.S.C. § 1522 ................................................................................... 5

8 U.S.C. § 1522(a)(1) ......................................................................... 22

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 266
vi

8 U.S.C. § 1522(a)(1)(A) ................................................................................. 5

8 U.S.C § 1157 ........................................................................................ 16, 17, 18

8 U.S.C. § 1157(c)(2)(A) ............................................................................ 5, 17

22 U.S.C. § 2346(a) ........................................................................................ 3

22 U.S.C. § 2601(c)(1) .................................................................................... 3

28 U.S.C. § 1291 ........................................................................................... 22

**Regulations**

45 Fed. Reg. 25,789 (Apr. 15, 1980) ............................................................ 15

51 Fed. Reg. 30470 (Aug. 22, 1986) ............................................................... 3

61 Fed. Reg. 60007 (Nov. 22, 1996) ............................................................... 3

74 Fed. Reg. 4093 (Jan. 21, 2009) .................................................................. 3

76 Fed. Reg. 44751 (July 24, 2011) ................................................................ 3

82 Fed. Reg. 8977 (January 17, 2017) ............................................................ 7

90 Fed. Reg. 8,459 (Jan. 20, 2025) ................................................................ 1

8 C.F.R. § 207.7(a) ......................................................................................... 5

45 C.F.R. § 400 .............................................................................................. 5

45 C.F.R. §§ 400.11(a) ................................................................................... 5

**Other Authorities**

Exec. Order No. 12,172 .................................................................................. 15

Exec. Order No. 12,807 .................................................................................... 3

Exec. Order No 13769 ..................................................................................... 7

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

Add. 267
vii

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Exec. Order No. 14,169 ........................................................................................ 1

Pub. L. No. 87-510, 76 Stat. 121 ........................................................................ 3

Pub. L. No. 101-179, 103 Stat. 1298 .................................................................. 4

Pub. L. No. 96-212, 94 Stat. 102, § 101(b)........................................................ 4

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

Add. 268
viii

Pursuant to Local Civil Rule 7(e)(3), Defendants submit this opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 14)(Mot.).

**INTRODUCTION**

The President has broad statutory authority to "suspend the entry of … any class of aliens" "*[w]henever* [he] finds that [their] entry … would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f)(emphasis added). "By its terms, § 1182(f) exudes deference to the President in every clause" and provides a "comprehensive delegation" of authority. *Trump v. Hawaii*, 585 U.S. 667, 684–85 (2018). "*The sole prerequisite* set forth in § 1182(f) is that the President 'find[ ]" that the entry of the covered aliens "would be detrimental to the interests of the United States.'" *Id.* at 685 (emphasis added)(alteration in original).

Invoking that comprehensive statutory delegation and his inherent constitutional authority to control the entry of aliens into this country, on January 20, 2025, the President temporarily suspended the admission of refugees pending a determination that "further entry into the United States of refugees aligns with the interests of the United States." Exec. Order No. 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8,459 (Jan. 20, 2025)("USRAP Order") §§ 1, 4. The President also issued a 90-day pause in foreign development assistance to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with foreign policy. *See* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,610 (Jan. 20, 2025)("Foreign Aid Order") §§ 2, 3. As a result, foreign aid related to the United States Refugee Admissions Program ("USRAP") was paused.

Plaintiffs, three national and local resettlement agencies and nine individuals, have moved the Court to preliminarily enjoin the USRAP and Foreign Aid Orders. Such relief is an "extraordinary remedy," which Plaintiffs bear a heavy burden to justify. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Especially here, as the President is acting pursuant to his statutory and constitutional authority to make determinations regarding national security and the admission of aliens.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

1

Add. 269

Plaintiffs' motion fails as Plaintiffs have not demonstrated a clear likelihood of success on the merits: (1) Plaintiffs lack standing to seek injunctive or declaratory relief against the President, (2) the exercise of the President's powers in the realm of refugee admission and foreign affairs is not justiciable, (3) the President's issuance of the USRAP and Foreign Aid Orders is a valid exercise of his statutory and constitutional authority and is consistent with the Refugee Act of 1980, (4) Plaintiffs' due process claims are not cognizable, and (5) the agencies acted lawfully in implementing the USRAP Order and suspending funds, which fall within the definition of foreign aid, that support the refugee program. Moreover, Plaintiffs have not demonstrated irreparable harm, and the balance of equities and public interest further weigh against interfering with the President's exercise of statutory and constitutional power. The Court should deny a preliminary injunction.

## BACKGROUND

### I.    The Executive's Authority to Suspend Entry of Aliens and to Set Foreign Aid

The Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 et seq., as amended, established "a comprehensive and complete code covering all aspects of admission of aliens to this country," *Elkins v. Moreno*, 435 U.S. 664 (1978), and reflects "Congress's plenary power over immigration and naturalization," *Johnson v. Whitehead*, 647 F.3d 120, 126 (4th Cir. 2011)(citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Central to this case, Congress gave the President broad discretionary authority to suspend or restrict the entry of all aliens:

**(f) Suspension of entry or imposition of restrictions by President**
Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. . . .

8 U.S.C. § 1182(f). "The President's sweeping proclamation power" under § 1182(f) "provides[, among others,] a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the" INA's grounds for denying admission of aliens in § 1182(a). *Abourezk v.*

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

2

*Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986). Numerous Presidents have invoked § 1182(f) to suspend or impose restrictions on the entry of certain aliens or classes of aliens,[1] and the Supreme Court has repeatedly upheld the broad and virtually unreviewable sweep of this authority. *See, e.g., Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

This congressional delegation of authority to suspend entry to any aliens or to any class of aliens is at the heart of (and is bolstered by) the President's broad inherent constitutional authority under Article II relating to foreign affairs and national security. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)("The exclusion of aliens is a fundamental act of sovereignty . . . inherent in the executive power to control the foreign affairs of the nation."); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936)(discussing "the very delicate, plenary and exclusive power of the President…in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").

Similarly, the statutory framework governing foreign assistance grants the President broad discretion to set the conditions on which the United States provides such assistance. Indeed, the Foreign Assistance Act of 1961 (FAA), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine." *See, e.g.*, section 531 of the FAA (22 U.S.C. § 2346(a))(assistance to promote economic or political stability); section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)).

Ultimately, Congress has given the President broad discretion to determine "whether and when to suspend entry … [,] whose entry to suspend … [,] for how long … [,] and on what conditions ('any restrictions he may deem to be appropriate')." *Hawaii*, 585 U.S. at 684. Congress has similarly deemed

---

[1] *See, e.g.*, Presidential Proclamation No. 5517, 51 Fed. Reg. 30470 (Aug. 22, 1986)(President Reagan); Exec. Order No. 12,807, 57 Fed. Reg. 23133 (May 24, 1992)(President H.W. Bush); Presidential Proclamation No. 6958, 61 Fed. Reg. 60007 (Nov. 22, 1996)(President Clinton); Presidential Proclamation No. 8342, 74 Fed. Reg. 4093 (Jan. 21, 2009)(President W. Bush); Presidential Proclamation No. 8693, 76 Fed. Reg. 44751 (July 24, 2011)(President Obama).

| | |
|---|---|
| Opposition to Plaintiffs' Motion for a Preliminary Injunction | U.S. Department of Justice Civil Division, Office of Immigration Litigation P.O. Box 878, Ben Franklin Station |
| No. 2:24-cv-00255-JNW | Washington, DC 20044 (202) 305-7234 |

3

it unlawful for "any alien" to enter or attempt to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

## II. The Refugee Act

The Refugee Act of 1980 amended the INA to establish "a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for [their] effective resettlement." Pub. L. No. 96-212, 94 Stat. 102, § 101(b). The Refugee Act provides that the maximum number of refugees that may be admitted annually shall be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with Congress], is justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).

Subject to numerical limits set annually by the President, the Secretary of Homeland Security has discretion to admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant" under the INA. 8 U.S.C. § 1157(c)(1); *see also* 8 U.S.C. §§ 1101(a)(42)(defining "refugee"), 1182(a)(general inadmissibility grounds). Which refugees are determined to be "of special humanitarian concern" to the United States for the purpose of refugee resettlement is determined in the Report to Congress on Proposed Refugee Admissions prior to the beginning of the fiscal year. Declaration of Adam Zerbinopoulos (Ex. 1) ¶9. Refugees admitted in accordance with this provision are sometimes referred to as "principal" applicants or refugees.

In addition, certain individuals who do not meet the statutory definition of a refugee under 8 U.S.C. § 1101(a)(42) may nonetheless be entitled to refugee status if they are accompanying or "following-to-join" a principal refugee. *See* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a). To obtain "derivative refugee" status, an applicant must be the spouse or unmarried child under the age of 21 of

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

4
Add. 272

a principal refugee and must also be admissible (except as otherwise provided under 8 U.S.C. § 1157(c)(3)) as an immigrant under the INA. 8 U.S.C. § 1157(c)(2)(A). Derivative refugees who are either in the physical company of the principal refugee when admitted to the United States or admitted within four months of the principal refugee's admission are called "accompanying" refugees. 8 C.F.R. § 207.7(a). Derivative refugees who seek admission more than four months after the principal refugee are called "following-to-join" refugees. *Id.*

The INA provides only that such derivative refugees are entitled to refugee *status* if the appropriate application or petition is processed and their relationship as the spouse or child of a principal refugee and their admissibility is established.[2] *See* 8 U.S.C. § 1157(c)(2)(A). The INA does not, however, entitle derivative refugees to be *admitted* to the United States without qualification. The admission of a derivative who has obtained refugee status is contingent on there being room under the subsection allocation under which the principal refugee's admission is charged, as well as, by implication, the annual refugee limit, set by the President, and that individual establishing their eligibility for admission. *Id.* And, of course, such individuals, like everyone else seeking entry into the United States, may also be subject to the bar on entries under § 1182(f).

Following admission, the INA authorizes the funding of programs by public and private organizations to assist refugees in achieving self-sufficiency. 8 U.S.C. § 1522; 45 C.F.R. pt. 400. Government support for these programs, however, is only permitted "to the extent of available appropriations." 8 U.S.C. § 1522(a)(1)(A); *see* 45 C.F.R. §§ 400.11(a), 400.56.

## III.    The Executive Orders

On January 20, 2025, the President signed the USRAP Order, which suspended admission of refugees under the USRAP, pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and

---

[2] Accompanying derivatives are processed via Form I-590, Registration for Classification as Refugee, which is filed in conjunction with the Form I-590 by the principal refugee overseas. Following-to-join derivatives are processed via Form I-730, Refugee/Asylee Relative Petition, which the admitted principal refugee files on behalf of the derivative, who may be overseas or in the United States.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

5

Add. 273

1185(a) and based on the President's finding that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." USRAP Order § 1. The USRAP Order also suspended "decisions on applications for refugee status." *Id.* § 3(b). Notwithstanding the suspension, the USRAP Order allows for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and would not threaten national security or welfare, and sets a process for resuming refugee admissions in the future. *Id.* §§ 3(c), 4.

That same day, the President also signed the Foreign Aid Order, which required agency heads to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs … to be conducted within 90 days." Foreign Aid Order § 3(a). The Foreign Aid Order also required agency heads to review each foreign assistance program under guidelines provided by the Secretary of State to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* § 3(b)–(c). Notwithstanding the pause, the Foreign Aid Order allows the Secretary of State to waive the 90-day pause on incurring new development assistance funds and allows for the resumption of programs prior to the end of the 90-day period with the Secretary of State's approval. *Id.* § 3(d)–(e).

## IV.    Implementation of the Executive Orders

In the days before the administration change, senior officials in the State Department's Bureau of Population and Migration (PRM) were informed that President Trump intended to suspend refugee admissions under the USRAP through executive order. Ex. 1 ¶18. In 2017, when President Trump previously suspended the USRAP, the suspension took effect immediately, and following the

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

6

Add. 274

suspension, some refugees were stranded at U.S. ports of entry, unable to enter the United States.[3] Ex. 1 ¶19. Thus, in anticipation of the USRAP Order, the State Department, upon learning that the suspension would go into effect on January 27, 2025, cancelled all travel after 12:00 p.m. on January 20, 2025. Ex. 1 ¶20. The State Department did so out of an abundance of caution because most refugees travel to the United States from around the world, a trip that involves multiple layovers and can take multiple days. *Id.* Consequently, the State Department cancelled travel scheduled between January 20-27 to avoid the not insignificant risk that refugees would not arrive in the United States before the suspension went into effect at 12:01 a.m. on January 27, 2025, and to avoid the possibility that some refugees would be stranded at a U.S. port of entry or at an airport in a foreign country. *Id.*

In response to the USRAP Order's directive to suspend any decisions on refugee applications, the State Department also suspended USRAP processing activities. Ex. 1 ¶21. The suspension was intended to prevent inefficiencies, as it would be illogical for the Government and resettlement partners to move refugees to transit centers or conduct pre-departure activities when refugee admissions were suspended. Ex. 1 ¶¶21–22. And some processing activities, such as medical exams and security checks, expire after a certain amount of time. Ex. 1 ¶22. Further, the State Department could not be sure when and which classes of refugees the President would find to be in the United States' interest upon resumption of refugee admissions. Ex. 1 ¶22.

Following the Foreign Aid Order's directive to *immediately* cease foreign aid payments, the State Department, on January 24, 2025, issued 25 STATE 6828, an "All Diplomatic and Consular Posts" (ALDAC) cable "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Ex. 1 ¶26. This pause applied to assistance funded from accounts in title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act, to include the Migration and Refugee Assistance account, from

---

[3] *See* Exec. Order No 13769, *Protecting the Nation from Foreign Terrorist Entry into the United States*, 82 Fed. Reg. 8977 (Jan. 17, 2017).

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

7

which funding for initial reception and placement services is provided to resettlement agencies. Ex. 1 ¶¶23-26. Thus, the Order's halt on foreign aid necessarily included payments to resettlement agencies in the United States. Ex. 1 ¶¶24-26.

## V.    This Litigation

On February 10, 2025, three national and local refugee-serving agencies and nine individuals filed suit on their own behalf and on behalf of a putative class. *See generally* ECF 1, Complaint (Compl.). The individual Plaintiffs are a refugee resettled in the United States, refugee applicants hoping to be resettled in the United States, and principal refugees residing in the United States and their derivative-refugee-beneficiaries abroad hoping to be resettled in the United States. Compl. ¶¶13–21. The organizational Plaintiffs are three refugee resettlement agencies. Compl. ¶¶22–24.

Plaintiffs allege, among others, that the President and various agencies violated the Refugee Act, APA, Due Process Clause, and Separation of Powers doctrine in issuing and implementing the USRAP and Foreign Aid Orders. *See generally* Mot.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009)(citation omitted).

## ARGUMENT

## I.    Plaintiffs Are Not Likely to Prevail on the Merits of their Claims

Plaintiffs' motion should be denied because they are not likely to prevail on their claims. First, Plaintiffs lack standing to seek injunctive or declarative relief against the President. Plaintiffs' motion also fails because (1) the President's exercise of his extensive powers in the realm of refugee admission

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

8

and foreign affairs challenged here is justiciable, (2) the President's issuance of the USRAP and Foreign Aid Orders is a valid exercise of his statutory and constitutional authority and is consistent with the Refugee Act, (3) Plaintiffs' due process claims are not cognizable, and (4) the agencies acted lawfully in implementing the URSAP Order and suspending funds, that support the refugee program.

## A.   Plaintiffs Lack Standing to Seek Injunctive or Declaratory Relief Against the President

Plaintiffs' motion should be dismissed because Plaintiffs lack standing to seek any relief against the President. Plaintiffs ask this Court to enjoin the President from implementing the USRAP Order and to declare the Order unlawful in its entirety. Compl. at 45–46 (Prayer for Relief). Additionally, Plaintiffs ask this Court to declare unlawful and set aside the suspension of resettlement agency funding under the Foreign Aid Order. *Id*. But neither form of relief is available against the President: the President may not be enjoined in the performance of his official non-ministerial duties, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."), and declaratory relief likewise is not available for non-ministerial conduct, *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018)("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly.").

## B.   Plaintiffs' Separation of Powers Claim Fails Because the President's Power in the Realm of Refugee Admission and Foreign Affairs is Vast and Not Justiciable

As an initial matter, Defendants note that the President's actions are not cognizable as they are derivative of Plaintiffs' APA claims. *Dalton v. Specter*, 511 U.S. 461, 469 (1994). Plaintiffs argue that Defendants violated the principle of separation of powers because "[t]here is no provision in the Constitution that authorizes the President to enact, amend, or repeal statutes" and to "redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." Compl. ¶240. The

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

9
Add. 277

(280 of 397), Page 280 of 397
Case: 25-1313, 03/08/2025, DktEntry: 5.1, Page 280 of 397
Case 2:25-cv-00255-JNW    Document 31    Filed 02/19/25    Page 19 of 36

USRAP and Foreign Aid Orders, however, are well within the President's discretion to make, as it is the President whose authority reigns principally in the realm of admission of aliens and foreign affairs.

The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792; *see Harisiades v. Shaughnessy,* 342 U.S. 580, 589 (1952). In particular, "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo,* 430 U.S. at 796 (citation omitted).

"The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. "When Congress prescribes a procedure concerning the admissibility of aliens, … [i]t is implementing an inherent executive power…Thus, the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign []." *Id.*

In enacting §§ 1182(f) and 1185(a), Congress conferred a "sweeping proclamation power" to not only suspend entry of aliens but also impose restrictions wholly in the President's discretion. *See Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)(R.B. Ginsburg, J.), *aff'd by an equally divided Court*, 484 U.S. 1 (1987)(per curiam). The USRAP Order, issued pursuant to that expansive inherent authority, thus renders Plaintiffs' non-constitutional claims not justiciable. *See Knauff*, 338 U.S. at 542. Indeed, the restrictions the USRAP Order imposes are inextricably tied to the President's "broad power over the creation and administration of the immigration system," *Kerry v. Din*, 576 U.S. 86, 106 (2015)(Kennedy, J., concurring in judgment), which necessarily includes the regulation of such benefits as refugee status. In short, despite Plaintiffs' unsupported assertion that § 1185(a)(1)

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

10
Add. 278

does not give the President the authority to restrict refugee entry,[4] and Plaintiffs' cramped reading of the President's authority under § 1182(f), the USRAP Order is not justiciable as "a fundamental act of sovereignty ... implementing an inherent executive power." *Knauff*, 338 U.S. at 542.

As § 1182(f) plainly states, the President is authorized to suspend the entry of "any aliens" or "any class of aliens"—whenever he finds that their entry would be detrimental to the interests of the United States. Accordingly, in finding that the "United States lacks the ability to absorb large numbers of [refugees]" without compromising the availability of resources for Americans and the ability to protect the safety and security of Americans, and without being able to ensure the appropriate assimilation of refugees into the country, the President properly invoked his § 1182(f) power to enact the USRAP Order. USRAP Order § 1.

As with admission of aliens, the President also has broad authority to attend to the foreign affairs of the nation, including determining how foreign aid funds are used. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003)(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952)(Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*

Here, Plaintiffs challenge a general policy initiated by the President to *pause* foreign aid to confirm that those initiatives are within the national interest. This is well within the Executive Branch's unique expertise and constitutional role, is consistent with Article II of the Constitution, and is the sort

---

[4] Plaintiffs baldly assert that § 1185(a) "certainly" does not provide the President with the authority to suspend the USRAP. Mot. at 16 n. 4. But, the plain text of § 1185(a)(1) makes it unlawful for a noncitizen to enter the United States except under such "reasonable rules, regulations and orders, and subject to such limitations and exceptions as the President may prescribe."

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

11

of conduct that a federal court should hesitate to disrupt, absent a valid and binding direction to the contrary. Indeed, Plaintiffs' request that the Court override the President's judgment is the very separation of powers problem Plaintiffs' claim to challenge. That is because diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005)("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."). As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

Plaintiffs are not likely to prevail on their separation of powers claim as the relief they seek would in fact result in a serious overstep of the judiciary into the exclusive domain of the Executive.

**C.    Plaintiffs' Refugee Act Claim Also Fails as the President Validly Exercised His Constitutional and Statutory Power and the USRAP Order Does Not Conflict with the INA**

Even if Plaintiffs' claims were justiciable, Plaintiffs fail to demonstrate that the President violated the Refugee Act in issuing the USRAP Order.

**1.    The INA grants the President authority to suspend refugee admissions.**

"The sole prerequisite set forth in § 1182(f) is that the President 'find[]' that the entry of the covered aliens 'would be detrimental to the interests of the United States.'" *Hawaii*, 585 U.S. at 685. Plaintiffs' assertion that the USRAP Order fails to make a requisite finding to properly invoke the President's authority under § 1182(f) is unsupported by the plain language of the statute and Order. Mot. at 17. Plaintiffs assert that the President must make a "finding that entry of the suspended class 'would be detrimental to the interest of the United States,'" and complains that the only findings made in the USRAP Order are "irrelevant to the entry ban ordered." *Id.* But, that is exactly what the President

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

12
Add. 280

did—he found that entry of additional refugees would be impossible without "compromise[ing] the availability of resources for Americans, … protect[ing] their safety and security, and … ensur[ing] the appropriate assimilation of refugees." USRAP Order § 1 (citing "record levels of migration, including through the [USRAP]" and "significant influxes of migrants" over the last four years, requests by urban centers for "Federal aid to manage the burden of new arrivals," and declarations by some jurisdictions of "states of emergency because of increased migration"). This finding, based on an influx of aliens over the past four years, is impossible to ignore. Ex. 1 ¶16-17. In sum, the President "f[ound[] that the entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Because the USRAP Order on its face satisfies the INA, Plaintiffs' statutory challenge to it necessarily fails. [5] Mot. at 17.

### 2. Consistent with the Refugee Act, the INA grants the President, through the Secretary of State and Homeland Security, discretion over the admission of all refugees, including suspension of entry.

In addition to the President's wide discretion to suspend the "entry of *all aliens*," 8 U.S.C. § 1182(f)(emphasis added), the INA expressly permits the President, following consultation with the House of Representatives and Senate Judiciary Committees, to set numerical limits on refugee admission, which operates as a ceiling on such admissions. 8 U.S.C. § 1157(e) defines such consultations as in-person discussions between Cabinet-level representatives of the President and members of those Committees. The Secretary of State, as the President's delegate pursuant to E.O. 12208, 45 Fed. Reg. 25,789 (Apr. 15, 1980), attends these consultations, generally with officials from

---

[5] Because the President made the requisite finding under § 1182(f), Plaintiffs' § 1185(a)(1) argument fails. Section 1185(a), along with § 1182(f), "make it clear that Congress has allowed the Executive Branch to exercise its broad discretion regarding alien immigration." *Haitian Refugee Ctr., Inc. v. Gracey*, 600 F. Supp. 1396, 1399 (D.D.C. 1985). Indeed, President Carter invoked § 1185(a)(1) when delegating to the Attorney General authority to place restrictions on the entry of Iranians during the Hostage Crisis. *Hawaii*, 585 U.S. at 696. At bottom, §§ 1182(f) and 1185(a)(1) are separate provisions, and because these provisions are not closely positioned, § 1185(a)(1) is not modified by § 1182(f). As such, the court, in *Hawaii v. Trump*, 878 F.3d 662, 694 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. at 683, n.1, erred in concluding that §1185(a)(1) requires a finding of detriment as § 1182(f) provides the President with independent authority to place limitations on entry of aliens.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

the Homeland Security and Health and Human Services. Ex. 1 ¶7. Prior to these discussions, and consistent with 8 U.S.C. 1157(e), the Departments of State, Homeland Security, and Health and Human Services submit a Report to Congress on Proposed Refugee Admissions on behalf of the President. Ex. 1 ¶8. The Secretary of Homeland Security also has discretion to "admit any refugee" "pursuant to such regulations as the [Secretary] may prescribe," subject to the maximum number set by the President. 8 U.S.C. § 1157(c)(1).

Plaintiffs assert that the USRAP Order violates the Refugee Act, but nowhere does the Refugee Act *entitle* refugees to admission into the United States. *See I.N.S. v. Stevic*, 467 U.S. 407, 426 (1984); 8 U.S.C. § 1201(h)("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law."). Nor does the Refugee Act or rules regarding admissibility override § 1182(f), the source of authority for the USRAP Order. *See Hawaii* ("§1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA"). Prior case law relied upon by Plaintiffs did not involve § 1182(f) and predated the *Hawaii* decision. *See Doe v. Trump*, 288 F. Supp. 3d 1045, 1078–79 (W.D. Wash. 2017)(Robart, J.)(stating there is an "entitlement for spouses and children" under the Refugee Act).[6] The Refugee Act permits refugee admissions and imposes numerical limitations—a ceiling, not a floor, but the Act does not mandate a set number of refugees in any fiscal year nor override the President's authority under § 1182(f). *See* 8 U.S.C § 1157.

### 3.  The INA does not entitle derivative refugees to admission but simply affords them refugee status should they be admitted.

Derivative refugees are not entitled to *admission* to the United States as 8 U.S.C. § 1157(c)(2)(A) requires only that when admitted to the United States, derivatives are to be admitted

---

[6] In *Doe 2*, 288 F. Supp. 3d at 1078–79, the Court held that the Secretary lacked authority under § 1157(c)(2)(A) to suspend refugee processing, but the case did not involve a Presidential suspension under § 1182(f). *Id.* at 1057–58.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

14

in the "same admission *status*" (i.e. refugee status) as the principal refugee they are accompanying or following to join. To be admitted, a derivative refugee must still independently establish they are not subject to a ground of inadmissibility, and entry may be suspended under § 1182(f) just as for any other alien who seeks entry into the United States. 8 U.S.C. § 1201(h). A derivative's admission also hinges on there being room left under the total applicable regional refugee ceilings and total ceiling set by the President for the fiscal year. 8 U.S.C. § 1157(c)(2)(A). Thus, contrary to Plaintiffs' assertion that derivative refugee benefits "are nondiscretionary," Compl. ¶217, Plaintiffs seeking refugee status as a derivative are not entitled to be admitted to the United States simply because they may be eligible for the same refugee status as the relative they are following to join in the United States if and when they are admitted. *Contra* Mot. at 14-15 (misdescribing § 1157(c)(2)(A) as creating a "mandatory duty to admit spouses and children of refugees whom Congress singled out for entitlement to admission"). Instead, because Plaintiffs' entry into the U.S. is also subject to the limitations of § 1182(f), as well as whatever cap on refugees that the President sets, the USRAP Order suspending entry does not deprive individuals seeking admission to this country of any entitlement.

Separate from admission, the suspension of refugees also does not violate § 1157(c)(2)(A)'s requirement that, if admissible, derivatives be admitted in the same refugee *status* as the relative they are following to join in the United States. Nothing in that provision requires processing when the action that would allow them to obtain refugee status—entry into the United States—is suspended pursuant to § 1182(f). Moreover, because the USRAP Order temporarily suspends decisions on I-730 petitions, the petitions have not been denied. Rather, adjudication is delayed because of the suspension on entry. Plaintiffs do not allege unreasonable delay,[7] and, even if the USRAP Order is evaluated for unreasonable delay under 8 U.S.C. § 706(1), Plaintiffs cannot state a plausible claim because the INA

---

[7] Plaintiffs assert that the indefinite suspension of I-730 application processing is unlawful, Mot. at 14-15, (citing *Doe*, 288 F. Supp. 3d at 1078−79), but *Doe* assumed all I-730 beneficiaries would be found eligible for refugee status. *See* 288 F. Supp. 3d at 1078−79. Respectfully, like here, the *Doe* court should have asked whether the delayed decisions resulting from the suspension had become unreasonably prolonged.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

does not supply any duty to process refugee applications in general or within a certain timeframe. *See* 8 U.S.C. § 1157 (prescribing no such duty); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004)(court can compel unreasonably delayed agency action only if the agency has a legal duty to act). Further, there is a reasonable rationale for the halt in processing—the entry suspension would not allow individuals to enter, and adjudicating requests while that suspension is in place serves no purpose.

### D.   Plaintiffs Have Failed to State a Cognizable Due Process

To state a procedural due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000)(citation omitted). Here, Plaintiff Esther's procedural due process claim has no likelihood of success because she does not have a liberty interest in the admission of her daughter, Plaintiff Josephine, the I-730 beneficiary whose entitlement is supposedly being withheld. *See Dep't of State v. Muñoz*, 602 U.S. 899, 909 (2024)(holding "that a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country"). It is fundamental that a noncitizen outside the United States has no constitutional right to entry. *Muñoz*, 602 U.S at 909. Plaintiffs' contrary view—that § 1157(c)(2)(A) creates a property interest in entry—is contrary to *Muñoz* and fails to acknowledge the President's § 1182(f) authority.

### E.   Plaintiffs are Not Likely to Prevail on their APA Claims

Under the APA, the Court may set aside an agency action if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). The Court's review is "narrow and deferential" and focused on "ensur[ing] that the agency has 'examined the relevant data and articulated a satisfactory explanation for its action.'" *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014)(cleaned up)(citations omitted). The agency

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

16

Add. 284

need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made," *id.*, and a court "is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' APA claims are not likely to succeed here because (1) they do not allege any *agency* action, (2) they do not allege any *final* action, (3) Defendants have not exceeded their statutory authority and have not acted contrary to law, and (4) Defendants have not acted arbitrarily and capriciously.

### 1.     Plaintiffs do not allege any agency action.

Review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions are not agency actions reviewable under the APA and thus, the USRAP and Foreign Aid Orders are not reviewable. *Franklin*, 505 U.S. at 801.

Plaintiffs' challenges to agency implementation of the USRAP and Foreign Aid Orders likewise fail. First, where the Complaint effectively seeks review of the President's action by suing an agency acting on behalf of the President, the implementing agency actions are not reviewable under the APA. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018), *and aff'd*, 883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018).

Second, to the extent Plaintiffs challenge the agencies' general implementation of the USRAP and Foreign Aid Orders, that is not a discrete, identifiable "agency action" subject to challenge. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990)(a plaintiff cannot challenge "the continuing (and thus constantly changing) operations" of the agency in carrying out a program, but must instead "direct its attack against some particular 'agency action' that causes it harm"). As the Supreme Court has recognized, the APA precludes "programmatic challenges," or challenges that demand "wholesale improvement [of an agency's] program[s] by court decree." *Sierra Club v. Peterson*, 228 F.3d 559,

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

17
Add. 285

566 (5th Cir. 2000)(cleaned up). To sidestep this, Plaintiffs advert to an internal agency email announcing the USRAP Order's suspension of refugee case processing, as well as notices of suspension reflecting the directives contained in the Foreign Aid Order. Mot. at 3. But the heart of Plaintiffs' claims is the "impact" of the Orders themselves—which they argue "is clear from its face"—as opposed to any particular discrete agency determination or action. Mot. at 3. Ultimately, Plaintiffs seek the Court's intervention in lifting the Orders and halting the agencies' implementation of the Orders entirely. Mot. at 28 (requesting the entry of a "broad" preliminary injunction that would "enjoin in their entirety" the USRAP Order and its operation). That is the exact type of broad programmatic challenge that courts have repeatedly ruled are impermissible under the APA.

### 2.   Plaintiffs do not allege any final action.

Agency action must be "final" to be reviewable under the APA. 5 U.S.C. § 704. Agency action is final only if (1) the agency action marks "the consummation of the agency's decisionmaking process" and (2) the "action must be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)(citations omitted). In their motion, Plaintiffs fail to identify any final agency action. *See* Mot. at 19–26. That is because there is no final agency action where, as here, the USRAP and Foreign Aid Orders are temporary. Indeed, the USRAP Order calls for a report to be submitted "[w]ithin 90 days" for the President to determine "whether resumption of entry of refugees…is in the interests of the United States." USRAP Order § 4. And whatever determination the President ultimately reaches would not be subject to challenge, since that final action would be made by the President himself in view of "the interests of the United States." USRAP Order § 4; *see Franklin*, 505 U.S. at 796 ("no final agency action," where "the final action complained of is that of the President, and the President is not an agency within the meaning of the [APA]"). Similarly, the Foreign Aid Order calls for a determination to be made "within 90 days of this order on whether to continue, modify, or cease" foreign assistance. Foreign Aid Order ¶3(c). In other words, the agency's decisionmaking process is ongoing—not consummated—and there

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

1  is no final agency action here. There is also no provision in the law that requires the foreign aid funds

2  to be disbursed at a particular time in the fiscal year.

3        **3.**      **Defendants have not exceeded their statutory authority and have not acted**

4                **contrary to law.**

5       As explained above, the Court may set aside an agency action only if the Court finds that

6  challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

7  law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5

8  U.S.C. §§ 706(2)(A), (C). Plaintiffs argue that the agencies have no statutory authority to implement

   the President's USRAP and Foreign Aid Orders. Mot. at 19. These arguments are unfounded.

9       8 U.S.C. § 1182(f) vests the President with "ample power" to impose entry restrictions in

10  addition to those elsewhere enumerated in the INA, and agencies are obligated to carry out lawful

11  executive orders.  Plaintiffs assert that the USRAP and Foreign Aid Orders effectively "ban[] the entry

12  of all refugees" in violation of "Congress's detailed statutory scheme" providing for the admission of

   refugees and federal support to recently arrived refugees. *See* Mot. at 19-21. But, as discussed *supra*

13  I.C., Plaintiffs' Refugee Act claim fails as the President validly exercised his constitutional and

14  statutory power (which agencies are obligated to follow) and, in any event, the USRAP order does not

15  conflict with the INA.

16       Nor does the agency's temporary pause of funding violate the Refugee Act.  Plaintiffs assert

17  that funding for newly arrived refugees is congressionally mandated and that the agencies violated the

18  Refugee Act in "withholding funds Congress appropriated to support refugee self-sufficiency and

19  integration under the statute." Mot. at 20–21; 8 U.S.C. § 1522(a)(1). While it is true that

20  § 1522(b), in conjunction with the Presidential letter dated January 13, 1981, authorizes the Secretary

   of State "to make grants to, and contracts with, public or private nonprofit agencies for initial

21  resettlement (including initial reception and placement with sponsors) of refugees in the United

22  States," nothing *requires* the Secretary to exercise this authority at all or to any specific degree.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

19
Add. 287

8 U.S.C. § 1522(b)(1)(A)(ii). If Plaintiffs believe that the Secretary has taken action that in essence violates a contractual provision, the proper—and typically exclusive—place to raise such a claim is in the Court of Federal Claims. 28 U.S.C. § 1291 (Court of Federal Claims has exclusive jurisdiction over monetary claims against the United States in excess of $10,000). Further, Afghan and Iraqi special immigrant visa (SIV) holders are only eligible for benefits "available to refugees." Refugee Crisis in Iraq Act of 2007, sec. 1244(g), Title XII, Div. A, NDAA for FY 2008, P.L. 110–181; Afghan Allies Protection Act of 2009, sec. 602(b)(8), Div. F, Title VI, Omnibus Appropriations Act, P.L. 111–8. If no benefits are "available to refugees" due to the Secretary's decision to make no grants or contracts for such benefits or because such benefits are paused under existing grants or contracts, then there are no benefits for which Afghan and Iraqi SIV holders are eligible. Ex. 1 ¶15.

Plaintiffs also allege that the agencies failed to engage in required notice-and-comment rulemaking prior to implementing the USRAP and Foreign Aid Orders. Mot. at 22. The President was not required to engage in notice-and-comment rulemaking, however, as he has broad authority under the Constitution and the INA to suspend and impose restrictions on the entry of aliens, which were then delegated to the agencies to implement. *See Hawaii*, 585 U.S. at 683-84. And, any activity relating to the pause in funding necessarily involves "loans, grants, benefits, or contracts," 5 U.S.C. § 553(a)(1), which is exempt from rulemaking under the APA.  In any event, executive orders and the agencies' implementation of them "leave open the possibility for future notice-and-comment rulemaking, and expressly state that the executive orders should be implemented only "to the extent consistent with applicable law." *Serv. Emp. Int'l Union Local 200 United v. Trump*, 420 F. Supp. 3d 65, 77 (W.D.N.Y. 2019).

### 4.    Defendants have not acted arbitrary and capriciously.

Plaintiffs next argue that the agencies' temporary suspension of USRAP and its funding was arbitrary and capricious because they "offer no rational" explanation. Mot. at 23–25. Plaintiffs complain that the government offered no reasoning for suspending all USRAP processing activities

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

20
Add. 288

when the USRAP Order suspended only refugee admissions. Mot. at 25. Yet there is clearly a rational connection between the executive orders and the agencies' actions. While section 3(a) of USRAP Order only "direct[ed] that the entry into the United States of refugees under the USRAP be suspended," section 1 expressly states that the "order suspends the USRAP until such time as the further entry into the United States of refugees aligns with the interests of the United States." And, section 4 requires the Secretary of Homeland Security and State to submit reports every 90 days "until [the [President] determine[s] that resumption of the USRAP is in the interest of the United States." In other words, the USRAP Order does not limit suspensions to only admissions. Suspending operations, and not just admissions, therefore is consistent with the purpose of the USRAP Order. Suspending USRAP processing until admissions resume is also not arbitrary and capricious given the entry suspension on its own: doing so is appropriate as it would be an inefficient use of resources to move refugees to transit center or conduct pre-departure activities when refugee admissions are barred until the President lifts USRAP entry restrictions. Ex. 1 ¶¶21–22. This is particularly true as some processing activities, for example, medical exams and security checks, expire after a certain amount of time. *Id.*

Plaintiffs observe that the U.S. government stopped refugee travel immediately, a week before the admission suspension went into effect on January 27. Mot. at 6, 26–27. Senior officials in the State Department's PRM were informed on or about January 18 and 19 that the President intended to issue an executive order suspending refugee admissions and that cancelling refugee travel ahead of issuance would be prudent. Ex. 1 ¶18. Mindful of the risk of stranding travelers unless travel was stopped well before January 27, PRM officials cancelled all refugee travel scheduled for after January 20. Ex. 1 ¶¶19–20. Even though the refugee admissions suspension did not go into effect for seven days, PRM officials noted that because most refugees travel from across the world, their travel includes several layovers and often spans more than one day. PRM officials were concerned that refugees would not arrive by January 27 and would be stranded at a U.S. port of entry or mid transit. Ex. 1 ¶20.

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

21

Importantly, there is no right for a potential refugee to travel to a border or U.S. port of entry at any particular time, and many refugees are not resettled for a lengthy period. And for many refugees, once they leave their country of first refuge, they cannot return, which could potentially leave them stranded at an airport in a foreign country. These are rational and logical explanations for the agencies' decision to suspend the USRAP and its corresponding funds.

Plaintiffs also assert that the agencies' decision to suspend USRAP funding was arbitrary and capricious. Mot. at 25. However, PRM's suspension of all USRAP funding was consistent with the Foreign Aid Order. Ex. 1 ¶¶23–27. Funds for activities to meet refugee and migration needs, including funds for including initial reception and placement benefits, are appropriated under the "Migration and Refugee Assistance" (MRA) heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOAA). Ex. 1 ¶24. On January 20, 2025, President Trump issued the Foreign Aid Order stating that "[i]t is the policy of [the] United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." Section 3(a) directed that "[a]ll department and agency heads…shall immediately pause new obligations and disbursements of development assistance funds…pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order." To ensure foreign assistance is provided consistent with President Trump's foreign policy, Secretary Rubio issued the January 24 ALDAC cable, "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Ex. 1 ¶26. For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to "immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." *Id.* This pause applied to assistance funded from, among others, accounts in title III of the SFOAA, to include MRA funds—which includes the migrant funds at issue here. *Id.*

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

22
Add. 290

Consistent with the Foreign Aid Order and ALDAC, PRM issued a "Notice of Suspension" on January 24, 2025, to its implementing partners, to include HIAS Inc. (HIAS) and Church World Service (CWS). Ex. 1 ¶27. This Notice advised recipients that awards were "immediately suspended pending a department-wide review of foreign assistance programs" and that "[d]ecisions whether to continue, modify, or terminate" awards would be made following that review. *Id.* Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025. *Id.* Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice. *Id.*

Plaintiffs assert that the suspension of funds fails to consider the resettlement agencies high dependence on "government funding to do their core work," without which they cannot exist. Mot. at 25. But, as Plaintiffs concede, this suspension of foreign aid is temporary. The Foreign Aid Order provides for a 90-day suspension and the Secretary of State has issued implementing guidance directing a review to take place within the Department of State and relevant components of other agencies "to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository," following which "[d]ecisions whether to continue, modify, or terminate programs will be made following this review." Ex. 1, Attachment A. As such, Plaintiffs' assertion that the executive agencies unlawfully terminated their cooperative agreements is unlikely to succeed on the merits. *See* Mot. at 43–44. They also have no entitlement to receive the funds at any particular time.

The agencies also considered the reliance interests of the resettlement agencies by providing a means for reimbursement of costs incurred prior to the issuance of the Foreign Aid Order and by requiring "contracting officers and grant officers" to "immediately issue stop-work orders, consistent with the terms of the relevant award," for "existing foreign assistance awards." Exhibit 1, Attachment B. Additionally, the PRM stated that payments would be allowed for "expenses incurred prior to

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

23
Add. 291

January 24, 2025[,]" "expenses associated with stop work orders[,]" "emergency food assistance[,]" and "exempted activities[.]" ECF No. 15–23 at ¶45; 15–24 at ¶35. Thus, resettlement agencies have a means to recoup costs incurred and were directed to refrain from incurring additional costs. Thus, the agencies' decision to immediately suspend the funding of the USRAP program was rational and consistent with the Foreign Aid Order.

The temporary suspension of resettlement agency funding was thus lawful under the APA.

## II. Plaintiffs Failed To Show Irreparable Harm And The Balance Of Public Interest Factors Weighs Strongly Against An Injunction

Plaintiffs' motion should also be denied because Plaintiffs have not made a clear showing of irreparable harm absent a preliminary injunction. Individual plaintiffs have not demonstrated that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Plaintiffs allege that prolonged separation from family members is "paradigmatic" irreparable harm, Mot. at 11, but delay in entry alone does not amount to irreparable harm. Refugees often wait years for their applications to be processed, and the USRAP Order merely suspends temporarily their admission into the United States, while still allowing for admission on a case-by-case basis during the suspension period. In other words, while Plaintiffs may have waited many years to be reunited with their family members, the entirety of that separation cannot be attributable to a temporary suspension in refugee admissions. Indeed, even "the burden of removal alone cannot constitute the requisite irreparable injury." *Nken v. Holder*, 556 U.S. 418, 435 (2009). If *outright removal* from the U.S. does not satisfy the irreparable-harm requirement, then a temporary extension of non-entry into the U.S. cannot either *a fortiori*.

Plaintiffs abroad also allege fear for their physical safety, but these individuals have already been waiting months or years for possible admission to the United States in a third country—not their home country where they faced persecution—and critically have not demonstrated that an injunction from this Court would bring them to the United States any sooner *or* that they will be returned to their

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

24
Add. 292

home country in the absence of an injunction. Similarly, economic harm alone is not generally considered irreparable, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Because individual Plaintiffs have not shown that a temporary suspension in refugee admissions will irreparably harm them, they are not entitled to the "extraordinary remedy" of preliminary injunctive relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)(citation omitted).

Organization Plaintiffs similarly have failed to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Plaintiffs CWS, HIAS, and LCSNW assert that the temporary pause in funding has resulted in a "cash-flow" crisis. Mot. at 11–12. But, as explained above, a dispute over money is not irreparable. In any event, a preliminary injunction with respect to the Foreign Aid Order and the Department of State implementation has been issued by another Court. That Court has enjoined the government from "enforcing and giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of the [Foreign Aid Order]." *See AIDS Vaccine Advocacy Coalition v. United States,* Case No. 25-00400-AHA, ECF No. 21 (D.D.C. Feb. 13, 2025). Those are the exact same provisions from which Plaintiffs here seek relief. Mot. at 28; Compl. 45. That Court is also receiving notice concerning compliance with that injunction, *AIDS Vaccine*, ECF No. 22 ("Status Report *regarding* Compliance"), and a second overlapping injunction on complex issues such as those raised here would risk imposing inconsistent obligations on the Government. The existing injunction also greatly reduces or eliminates Plaintiffs' claim of present harm deriving from these challenged policies. *See E. Bay Sanctuary Covenant v. Trump*, No. 4:18-cv-06810, 2019 WL 1048238, at * 2 (N.D. Cal. Mar. 5, 2019)("noting that where there is a preliminary injunction in place, not merely a TRO, 'Plaintiffs are unlikely to suffer harm if the Court stays these proceedings because the preliminary injunction preventing Defendants from enforcing the Rule will remain in place'").

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

25
Add. 293

1    Conversely, an injunction would irreparably harm the Government and the public interest.

2    "[A]ny time a State is enjoined by a court from effectuating statues enacted by representatives of its

3    people, it suffers a form if irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012)(Roberts,

4    C.J., in chambers). The same principle applies to the judgments of the President at issue here: the

5    Court should not interfere with, or second-guess, the foreign policy and national security judgments

6    that the Constitution and INA commit unequivocally to the duly elected President.

7        Plaintiffs' asserted harms are greatly outweighed by the harm to the government and public

     interest that would result from an order taking the unprecedented step of enjoining the President from
8
     exercising his Constitutional and statutory power over the admission of refugees. *See Nken*, 556 U.S.
9
     at 435. As the Supreme Court has recognized, Executive officials must have "broad discretion" to
10
     manage the immigration system. *Arizona v. United States*, 567 U.S. 387, 395–96 (2012). It is the
11
     United States that has "broad, undoubted power over the subject of immigration and the status of
12
     aliens," *id*. at 394, and providing Plaintiffs with their requested relief would mark a severe intrusion
13
     into this core executive authority, *see INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06
14
     (1993)(O'Connor, J., in chambers)(warning against "intrusion by a federal court into the workings of

15   a coordinate branch of the Government"); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1084 (9th Cir.

16   2020)(Bress, J., dissenting)(an injunction that limits presidential authority is "itself an irreparable

17   injury").    Furthermore, while Plaintiffs seek a nationwide injunction, Mot. at 28, "universal

18   injunctions…intrude on powers reserved for the elected branches," *United States v. Texas*, 599 U.S.

19   670, 694 (2023)(Gorsuch, J., concurring), and any injunction should, at a minimum, be "narrowed to

     redress only the injury shown as to [Plaintiffs]," *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

20
     //
21

22   //

23
     Opposition to Plaintiffs' Motion for                    U.S. Department of Justice
24   a Preliminary Injunction                                 Civil Division, Office of Immigration Litigation
                                                              P.O. Box 878, Ben Franklin Station
     No. 2:24-cv-00255-JNW                                    Washington, DC 20044
                                                              (202) 305-7234

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

DATED this 19th day of February, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

AUGUST FLENTJE
Acting Director

*/s/ Nancy K. Canter*
NANCY K. CANTER
(CA Bar No. 263198)
Senior Litigation Counsel

LINDSAY ZIMLIKI
JOSEPH MCCARTER
ALEXANDRA YEATTS
Trial Attorneys
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
Washington, DC 20005
Phone: 202-305-7234
Email: nancy.k.canter@usdoj.gov

*Attorneys for Defendants*

I certify that this memorandum contains 9,988 words, in compliance with the Local Civil Rules as modified by this Court's February 12, 2025 Order (ECF No. 19).

Opposition to Plaintiffs' Motion for
a Preliminary Injunction

No. 2:24-cv-00255-JNW

U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-7234

27

## THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

PACITO, *et al.*,

        *Plaintiffs,*

    - against –

DONALD J. TRUMP, *et al.*,

        *Defendants.*

No. 2:25-cv-00255-JNW

Hon. Jamal N. Whitehead

## DECLARATION OF ADAM ZERBINOPOULOS
## SENIOR BUREAU OFFICIAL
## BUREAU OF POPULATION, REFUGEES, AND MIGRATION
## DEPARTMENT OF STATE

I, Adam Zerbinopoulos, for my declaration, hereby state as follows:

1.      I am the Senior Bureau Official of the Bureau of Population, Refugees, and Migration ("PRM") within the United States Department of State (Department of State or State Department).[1]  I have held this position since January 21, 2025.  Prior to becoming the PRM Senior Bureau Official, I was PRM's Regional Director for East Asia and the Pacific.  I have been employed at the Department of State since 2008.

2.      In my current position, I oversee PRM's operations, namely the promotion of U.S. interests by working to reduce illegal migration, to provide humanitarian assistance to those fleeing persecution, crisis, or violence, and to seek durable solutions for forcibly displaced people around the world.

3.      I submit this declaration in support of the U.S. government's Motion in opposition to Plaintiffs' Motion for preliminary injunction.  Specifically, I address herein (i) the framework

---

[1] The title "Senior Bureau Official" is used to refer to the senior-level official who oversees a bureau but does not necessarily hold the title of Assistant Secretary of State.

of the U.S. Refugee Admissions Program (USRAP) as set forth in the annual Report to Congress

on Proposed Refugee Admissions, (ii) the President's suspension of refugee entry into the United

States through Executive Order 14163, Realigning the United States Refugee Admissions

Program (E.O. 14163), (iii) the cancellation of refugee travel under the USRAP prior to the

effective date of the suspension of refugee admissions in E.O. 14163, (iv) the suspension of

USRAP processing activities following the issuance of E.O. 14163, and (v) the pause of funding

for USRAP functions following the issuance of Executive Order 14169, Reevaluating and

Realigning United States Foreign Aid (E.O. 14169).

4.      The statements made herein are based on my personal knowledge and information

made available to me in the course of carrying out my duties and responsibilities as the PRM

Senior Bureau Official.

### Structure of the U.S. Refugee Admissions Program

5.      The Refugee Act of 1980, as it amended the Immigration and Nationality Act

(INA), provides the general contours for how the Executive Branch admits refugees.  However, it

would be inaccurate to state that the Refugee Act of 1980 created or statutorily mandated the

USRAP.

6.      For example, pursuant to section 207(a)(2) of INA, the President has sole

authority to determine, after appropriate consultation with Congress, the number of refugees who

may be admitted in a given fiscal year that is justified by humanitarian concerns or is otherwise

in the national interest.  And section 207(a)(3) of the INA, requires refugee admissions to be

allocated among refugees of special humanitarian concern to the United States.  The President

specifies such number – commonly referred to as the "refugee ceiling" – and allocations before

the beginning of the fiscal year through a Presidential Determination on Refugee Admissions.

2

7.      Section 207(e) of the INA specifies that in-person discussions between designated Cabinet-level representatives of the President and members of the House of Representatives and Senate Judiciary Committees (Judiciary Committees) must be held before the President determines the number of refugees to be admitted within the next fiscal year.  The President has designated the Secretary of State and the Attorney General as his Cabinet-level representatives for such consultations.  Officials from the United States Departments of Homeland Security (DHS) and Health and Human Services (HHS) generally attend the consultations with the Secretary of State.

8.      Section 207(e) of the INA also requires the consultations to include discussions of the refugee situation and the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or is otherwise in the national interest.  Prior to these discussions, the State Department, DHS, and HHS submit a Report to Congress on Proposed Refugee Admissions to the Judiciary Committees.[2]

9.      The Report to Congress on Proposed Refugee Admissions, among other things, defines which individuals are "of special humanitarian concern" to the United States for the purpose of refugee resettlement through one or more processing categories.  These categories have traditionally included (i) individual cases referred by designated entities by virtue of their circumstances and apparent need for resettlement, (ii) groups of special concern designated by the Department of State as having access to the program by virtue of their circumstances and

---

[2] The Reports to Congress on Proposed Refugee Admissions for fiscal years 2004-2024 are publicly available at https://www.wrapsnet.org/resources/.

Add. 298

apparent need for resettlement, and (iii) individual cases from designated nationalities granted access for purposes of reunification with family members already in the United States.[3]

10.     It is the President's policies in this Report to Congress, rather than the Refugee Act of 1980, that sets forth the contours of refugee admissions for the next fiscal year. Congress's only role is one of consultation.

11.     Following consultations with Congress, the number of refugees determined to be admitted in the fiscal year as justified by humanitarian concerns or is otherwise in the national interest may be changed.  Section 207(b) of the INA provides that the President may increase the refugee ceiling, following consultation with the Judiciary Committees, if he determines that an unforeseen emergency refugee situation exists, the admission of refugees in response to this situation is justified by grave humanitarian concerns or is otherwise in the national interest, and the admission of these refugees cannot be accomplished under the previous determination.  And section 212(f) of the INA gives the President authority to suspend the entry of all aliens or any class of aliens, thereby potentially decreasing the refugee ceiling, including to zero.

12.     Relatedly, which refugees are considered "of special humanitarian concern to the United States" is not permanent.  Which individuals or groups qualify for access to the USRAP through one of the processing categories has frequently changed within the same administration, and processing categories have changed within the same fiscal year after the Report on Proposed Refugee Admissions is submitted to the Judiciary Committees.  For example, PRM created a Priority 1 direct referral process and Priority 2 group designation for Afghans in summer 2021

---

[3] Although these categories are called "priorit[ies]," entering the USRAP under a certain "priority" does not establish precedence in the order in which cases will be processed.  Once cases are established as eligible for access under one of the processing priorities, they all undergo the same processing steps.  Beginning with the report for fiscal year 2022, the Report to Congress on Proposed Refugee Admissions included as a processing category individual cases from all nationalities who have been referred by private sponsors in the United States and who receive post-arrival support and services from those sponsors.

Add. 299

and created Priority 1 processes for direct referrals from the U.S. Special Envoy to Advance the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer and Intersex (LGBTQI+) Persons and the Bureau of Democracy, Human Rights, and Labor Senior Bureau Official in spring and summer 2023, respectively. And there is no statutory provision that would prevent PRM from discontinuing certain processing categories, except those expressly created by statute.[4]

13.     Just as the USRAP is not congressionally mandated, the provision of initial reception and placement (R&P) benefits is not required by statute. Section 412 of the INA sets forth the contours of the provision of initial R&P benefits to refugees through resettlement agencies. The Department of State has traditionally provided these initial R&P benefits for the first 90 days of a refugee's resettlement in the United States, and HHS has provided benefits to refugees thereafter.

14.     While section 412(b) of the INA authorizes the Secretary of State "to make grants to, and contracts with" resettlement agencies for initial R&P benefits in the United States, nothing requires the Secretary to exercise this authority or to any specific extent.

15.     Relatedly, while Afghan and Iraqi special immigrant visa (SIV) holders are eligible by law for R&P benefits that are "available to refugees," if no R&P benefits are "available to refugees," then there are no benefits for which Afghan and Iraqi SIV holders are eligible.

### Suspension of Refugee Entry under the U.S. Refugee Admissions Program

16.     On January 20, 2025, through E.O. 14163, President Trump directed that the entry of refugees under the USRAP would be detrimental to the interests of the United States. In

---

[4] For example, the Refugee Crisis in Iraq Act of 2007 created the Iraqi direct access program, and through the Lautenberg and Specter Amendments, Congress required the establishment of categories for religious minorities from certain countries.

5

making such direction, President Trump referenced the record levels of migration, including refugees, over the past four years, which the United States has been unable to absorb in a manner that does not compromise the availability of U.S. resources.

17.    Between January 2021 and January 2025, over 210,000 refugees were admitted into the United States under the USRAP, the most admitted in a four-year period in nearly a decade.[5]  In fiscal year 2024 alone, over 100,000 refugees were admitted, the most in a single year in over 30 years.  In addition to hundreds of thousands of refugees, numerous other migrants entered the United States over the past four years in parole status or with immigrant visas.  And from January 2021 to January 2025, the Department of State obligated nearly $1.5 billion to resettlement agencies to support the refugees' initial R&P benefits.  The absorbing of hundreds of thousands of migrants, including hundreds of thousands of refugees, at the expense of more than one billion dollars in U.S. government resources over the past four years supports the President's concern that a record level of migrants and costs to support them compromises the availability of resources for U.S. citizens.

## Cancellation of Travel for Refugees in the U.S. Refugee Admissions Program

18.    Prior to the issuance of E.O. 14163, senior officials in PRM were informed on or about January 18-19, 2025, that President Trump intended to suspend refugee admissions under the USRAP through executive order.

19.    PRM anticipated that the executive order would be similar to the executive order issued during the first week of President Trump's first administration.  On January 27, 2017, President Trump issued Executive Order 13769, Protecting the Nation from Foreign Terrorist Entry into the United States, which, among other things, directed the Secretary of State to

---

[5] This data is publicly available at https://www.wrapsnet.org/admissions-and-arrivals/.

Add. 301

suspend the USRAP for 120 days. The 2017 suspension took effect immediately, and following the suspension, some refugees were stranded at U.S. ports of entry, unable to enter the United States.

20.     To avoid a similar situation, PRM officials canceled all refugee travel scheduled for after 12:00 p.m. on January 20, 2025. Most refugees travel to the United States from around the world. Their travel accordingly includes several layovers and often spans more than one day. Even one flight delay or cancellation at any layover could result in a multi-day delay to a refugee's travel to the United States. There was, accordingly, a not insignificant risk that refugees scheduled for travel between January 20-27, 2025, could experience such a delay or cancellation and, thus, not arrive in the United States before the entry suspension went into effect at 12:01 a.m. on January 27, 2025. In such circumstances, refugees would be stranded at a U.S. port of entry, or worse, at a layover location in a third country mid transit. And for many refugees, once they leave their country of first refuge, they cannot return, effectively leaving them indefinitely stranded at an airport in a foreign country.

### Suspension of U.S. Refugee Admissions Program Processing Activities

21.     Following the issuance of E.O. 14163, PRM suspended all USRAP processing activities. This suspension was consistent with the text of the executive order, in particular its purpose in section 1, which states: "This order *suspends the USRAP* until such time as the further entry into the United States of refugees aligns with the interests of the United States." (emphasis added). And section 4 of E.O. 14163 requires the Secretary of Homeland Security, in consultation with the Secretary of State, to submit reports every 90 days "until [the President] determine[s] that *resumption of the USRAP* is in the interest of the United States." (emphasis

7

added).  The most reasonable reading of these sections is that the USRAP generally, and not just

admissions specifically, was suspended by E.O. 14163.

22.     The suspension of USRAP processing activities was also logical.  It would be an

inefficient use of U.S. government – and resettlement partner – resources to move refugees to

transit centers or to conduct pre-departure activities when refugees will not be admitted until the

President resumes the USRAP.[6]  And the results of some processing activities expire after a

certain amount of time, for example, six months for medical examinations and certain security

checks.  Lastly, it is uncertain to what extent the President will resume USRAP admissions.  It is

possible that some applicants in the USRAP pipeline will not be admitted after the President

determines how, and to what extent, the resumption of the USRAP is in the U.S. interest.  It

would therefore be inefficient to continue processing applications for individuals who might not

be admitted to the United States even after entry under the USRAP resumes.

### Pause of Funding for U.S. Refugee Admissions Program Functions

23.     Section 412(b)(1)(A) of the INA authorizes the use of "grants to, and contracts

with, public or private nonprofit agencies for initial resettlement (including initial reception and

placement with sponsors) of refugees in the United States."  On January 13, 1981, President

Carter determined, in accordance with section 412(b)(1)(B) of the INA, that "the administration

of the Reception and Placement Grants, awarded to resettlement agencies for the performance of

certain initial services for refugees coming to the United States, should be retained by the

Department of State."

---

[6] Section 3(c) of E.O. 14163 provides a process for case-by-case exceptions to the refugee admissions suspension
if the Secretary of State and the Secretary of Homeland Security jointly determine that the entry of such aliens as
refugees is in the national interest and does not pose a threat to the security or welfare of the United States.  It is
possible for some refugees to be admitted before the President resumes the USRAP, but it is not clear – and was not
clear on January 21, when USRAP processing was suspended – which refugees those might be.

8

24.     Funds for activities to meet refugee and migration needs, to include funds for R&P assistance, are appropriated under the "Migration and Refugee Assistance" (MRA) heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOAA).

25.     On January 20, 2025, President Trump issued E.O. 14169, section 3(a) of which directed that "[a]ll department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-government organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order."

26.     Consistent with E.O. 14169, on January 24, 2025, Secretary Rubio issued 25 STATE 6828, an "All Diplomatic and Consular Posts" ("ALDAC") cable (25 STATE 6828), included as Attachment A, "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID."  For existing foreign assistance awards, the Secretary directed contracting officers and grant officers to "immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review."  This pause applied to assistance funded from, among others, accounts in title III of the SFOAA, to include MRA funds from which R&P assistance is funded.

27.     Following issuance of E.O. 14169 and 25 STATE 6828, PRM issued a "Notice of Suspension," included as Attachment B, on January 24, 2025, to its implementing partners, to include HIAS Inc. and Church World Service.  This Notice advised recipients that awards were

"immediately suspended pending a Department-wide review of foreign assistance programs" and that "[d]ecisions whether to continue, modify, or terminate" awards would be made following that review. Recipients were directed to stop all work under the awards and not incur any new costs after January 24, 2025. Additionally, recipients were advised they could submit payment for legitimate expenses incurred prior to the date of the Notice or for legitimate expenses associated with the Notice.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of February 2025, Washington, D.C.

Adam Zerbinopoulos

UNCLASSIFIED



| | |
|---|---|
| **MRN:** | 25 STATE 6828 |
| **Date/DTG:** | Jan 24, 2025 / 241600Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | PREL, AID, EAID |
| **Subject:** | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new

obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review.  For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.  Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs:  no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts.  No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of

foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International

Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

---

---

**UNCLASSIFIED**



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C.  20520*

January 24, 2025

Mr. Guillermo Birmingham
HIAS Inc.
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF:   SPRMCO24CA0215; SPRMCO24CA0252; SPRMCO24CA0262; SPRMCO24CA0277;
       SPRMCO24CA0278; SPRMCO24CA0292; SPRMCO24CA0328; SPRMCO22CA0311;
       SPRMCO24CA0325; SPRMCO24CA0348; SPRMCO24CA0354; SPRMCO24CA0349

Consistent with the President's Executive Order on Reevaluating and Realigning United
States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and
Migration hereby notifies the recipient that, consistent with the terms of the award(s),
the referenced award(s) are immediately suspended as of January 24, 2025. Award(s)
may no longer effectuate agency priorities and are suspended pending a Department-
wide review of foreign assistance programs. Decisions whether to continue, modify, or
terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension the Recipient must stop
all work under the award(s) and not incur any new costs after the effective date cited
above. The Recipient must cancel as many outstanding obligations as possible.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI
Programs and Preferencing and Initial Recissions of Harmful Executive Orders and
Actions, Recipients are hereby notified that no U.S. Government funds may be used to
promote "diversity, equity, and inclusion" (DEI) at any level or in any activity, regardless
of partner or program location.  Any use of PRM funding to promote DEI must cease
immediately, including activities that were previously authorized by PRM.  Your
certification that all such activities funded by U.S. Government funds have ceased is
required immediately by emailing the grants officer for your award and copy PRM-
Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from
various grantors requesting this certification. Recipients must reply to this letter by
email.

Recipients may submit payment requests for legitimate expenses incurred prior to the
date of this Notice of Suspension or legitimate expenses associated with this Notice of
Suspension.

UNCLASSIFIED

2

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

If you have any other questions regarding the suspension, please contact me at DeninoPM@state.gov.

Sincerely,


Philip Denino
Grants Officer

UNCLASSIFIED



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C. 20520*

January 24, 2025

Lissette Diaz de Villegas
Church World Service
475 Riverside Dr., Suite 700
New York, NY 10115

REF:    SPRMCO24CA0095
        SPRMCO24CA0254
        SPRMCO24CA0329
        SPRMCO24CA0308
        SPRMCO24CA0337
        SPRMCO24CA0319
        SPRMCO24CA0322

Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI Programs and Preferencing and Initial Recissions of Harmful Executive Orders and Actions, Recipients are hereby notified that no U.S. Government funds may be used to promote "diversity, equity, and inclusion" (DEI) at any level or in any activity, regardless of partner or program location.  Any use of PRM funding to promote DEI must cease immediately, including activities that were previously authorized by PRM.  Your certification that all such activities funded by U.S. Government funds have ceased is required immediately by emailing the grants officer for your award and copy PRM-Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from various grantors requesting this certification. Recipients must reply to this letter by email.

UNCLASSIFIED

2

Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

If you have any other questions regarding the suspension, please contact me at SalikhovA@state.gov.

Sincerely,

Askar Salikhov

UNCLASSIFIED

1

2

3

4

5

6

7

8

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC.; and LUTHERAN COMMUNITY SERVICES NORTHWEST, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,* <br><br> *Defendants*. | Case No. C25-255 JNW <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> NOTE ON MOTION CALENDAR: FEBRUARY 24, 2025 <br><br> ORAL ARGUMENT REQUESTED |

25

26

---

\* Pursuant to Federal Rule of Civil Procedure 25(d), Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services, is automatically substituted for Dorothy A. Fink, in her official capacity as Acting Secretary of Health and Human Services.

PLS.' REPLY ISO PRELIM. INJ.
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 315

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    Defendants do not meaningfully dispute Plaintiffs' standing or irreparable harms. ...................................................................................................... 2

    II.    Plaintiffs are likely to succeed on the merits of their APA claims. ...................... 3

        A.    Agency implementation of the Executive Orders is not immune from review. .............................................................................................. 3

            1.    The agencies' decision-making is reviewable. .............................. 3

            2.    The challenged agency actions are discrete and identifiable. ......... 5

            3.    The challenged actions are sufficiently final. ................................ 6

        B.    Defendants' arguments and evidence do not undermine Plaintiffs' likelihood of success. .............................................................................. 7

            1.    Plaintiffs are likely to succeed on their arbitrary-and-capricious claims. ................................................................................. 7

            2.    Plaintiffs are likely to succeed on their notice-and-comment claims. .............................................................................................. 9

            3.    Plaintiffs are likely to succeed on their contrary-to-law claims. .............................................................................................. 10

    III.    Plaintiffs are likely to succeed on the merits of their *ultra vires* claims............... 11

        A.    Plaintiffs' claims are reviewable. .................................................. 11

        B.    Defendants ignore controlling caselaw and attack strawmen. .................. 11

    IV.    Plaintiffs are likely to succeed on the merits of their due-process claim............. 13

    V.    The *Winter* factors and the record support a comprehensive preliminary injunction. ......................................................................................... 14

CONCLUSION............................................................................................................. 15

PLS.' REPLY ISO PRELIM. INJ. – ii
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 316

**INTRODUCTION**

Reading Defendants' opposition is like entering an alternate reality—one in which President Trump's day-one orders to suspend all refugee admissions and all foreign-aid funding were run-of-the-mill uses of presidential authority; executive agencies were "just following orders" and exercised no discretion when they implemented those directives; and Plaintiffs and hundreds of thousands of refugees, families, and resettlement partners are suffering no immediate or irreparable harms as a result. This is not the world we live in, as the extensive, unrebutted evidence in this case makes clear.

Defendants almost entirely ignore that evidence, and they ignore or mischaracterize most of Plaintiffs' cases and arguments. Notably, they dismiss in just a sentence and two footnotes the considered judgment of another court in this district that issued a nationwide preliminary injunction of an earlier and *narrower* version of President Trump's refugee ban.

Instead, Defendants argue that the actions of the President and executive agencies are immune from judicial review, such that this Court is barred from even considering executive actions of breathtaking scope that are irreparably harming hundreds of thousands of people and threatening to decimate the U.S. refugee-resettlement apparatus. Binding precedent forecloses this argument.

On the merits, Defendants claim that the President has boundless power to invalidate entire statutory provisions enacted by Congress. No court has blessed such an expansive reading of presidential power under section 212(f) of the INA. Arguing that agencies implementing the Refugee Ban EO and the Foreign Aid EO can never violate the law, Defendants do not seriously engage with Plaintiffs' APA arguments—even though each APA violation is sufficient on its own to support a preliminary injunction under the *Winter* test. Defendants similarly fail to counter Plaintiffs' arguments that the President's actions are *ultra vires* and violate the Refugee Act, or that Defendants violated Plaintiff Esther's right to due process. Plaintiffs are likely to succeed on those claims as well.

PLS.' REPLY ISO PRELIM. INJ. – 1
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Given the substantial evidence of irreparable and compounding harms Plaintiffs face, and

2    based on the remaining *Winter* factors, a comprehensive preliminary injunction is necessary and

3    appropriate to stop Defendants' unlawful actions and redress Plaintiffs' injuries.

4                              **ARGUMENT**

5    **I.    Defendants do not meaningfully dispute Plaintiffs' standing or irreparable harms.**

6    Defendants do not dispute that both individual and organizational Plaintiffs have standing

7    to challenge the agencies' implementation of the Refugee Ban EO and the Foreign Aid EO

8    (together, the "Executive Orders"). Dkt. # 31 ("Opp'n") at 9. Nor could they, because Plaintiffs'

9    evidence and controlling precedent make clear that they are directly harmed and that enjoining

10   those challenged actions would redress those harms. Dkt. # 14 ("Mot.") at 9–13 (citing Plaintiffs'

11   declarations). Defendants assert only that Plaintiffs "lack standing to seek any relief against the

12   President." Opp'n 9. But this conflates questions of justiciability and appropriate relief with the

13   issue of Plaintiffs' undisputed personal stake in the outcome of this case. In any event, as discussed

14   below, Defendants' cases regarding executive discretion are inapposite where the President's

15   actions are contrary to statute and lack lawful authority. Mot. 14–17; *contra* Opp'n 9 (relying on

16   cases involving "official non-ministerial duties").

17   As for irreparable harm, Defendants' position, Opp'n 24–25, is in direct conflict with

18   incontrovertible evidence of the danger Plaintiffs face abroad, the cancellation of their imminent

19   travel to the United States, their prolonged family separation, the loss of goodwill and harm to

20   relationships, and the massive disruption of core business activities. *See generally* Exs. 14–25;[1]

21   *see also* Mot. 9–13. As Plaintiffs set out, ample precedent finds such harms definitionally

22   irreparable. *See Al Otro Lado, Inc. v. McAleenan*, 423 F.Supp.3d 848, 876–77 (S.D. Cal. 2019)

23   (threat of physical danger to refugees is irreparable harm); *Doe v. Trump*, 288 F.Supp.3d 1045,

24   1082 (W.D. Wash. 2017) (prolonged family separation, including in context of refugee suspension,

25   constitutes irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (same);

26

---

[1] Plaintiffs' exhibits are attached to the declaration of Jonathan P. Hawley. Dkt. # 15.

PLS.' REPLY ISO PRELIM. INJ. – 2
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven

2    out of business is sufficient to establish irreparable harm." (cleaned up)); *AIDS Vaccine Advoc.*

3    *Coal. v. U.S. Dep't of State*, Nos. CV 25-00400 (AHA), 25-00402 (AHA), 2025 WL 485324, at

4    *2, *4 (D.D.C. Feb. 13, 2025) ("scale of the disruption" and "loss of funding . . . that threatens the

5    very existence of [their] business" constitutes irreparable harm (cleaned up)). Defendants'

6    misapplication of the narrow finding in *Nken v. Holder*, 556 U.S. 418, 435 (2009) (finding only

7    that removal is not *categorically* irreparable harm), Opp'n 25, does not show otherwise.

8        Finally, Defendants assert—wrongly—that another court has already enjoined the Refugee

9    Funding Suspension, Opp'n 25 (citing *AIDS Vaccine* case), but they do not and cannot represent

10   that any Plaintiff in *this* case is now receiving funding. In any event, the *AIDS Vaccine* court issued

11   a TRO that did not address or even mention the Refugee Ban EO or grants from the State

12   Department's Bureau of Population, Resettlement, and Migration ("PRM"), and Defendants' own

13   caselaw demonstrates that a TRO is insufficient to stop irreparable harm. Opp'n 25 (citing *E. Bay*

14   *Sanctuary Covenant v. Trump*, No. 4:18-cv-6810-JST, 2019 WL 1048238, at *2 (N.D. Cal. Mar.

15   5, 2019)). And Defendants' assertion that Plaintiffs' harm is "greatly reduce[d] or eliminate[d],"

16   *id.*, is belied by a February 20 order in *AIDS Vaccine* granting the plaintiffs' motion to enforce the

17   TRO—seven days *after* the TRO went into effect, with funding yet to be resumed. *See AIDS*

18   *Vaccine Advoc. Coal. v. U.S. Dep't of State*, Nos. CV 25-00400 (AHA), 25-00402 (AHA) (D.D.C.

19   Feb. 20, 2025), Dkt. # 30.

20   **II.    Plaintiffs are likely to succeed on the merits of their APA claims.**

21       **A.    Agency implementation of the Executive Orders is not immune from review.**

22           **1.    The agencies' decision-making is reviewable.**

23       Defendants take the sweeping and unprecedented position that agency action is immune

24   from judicial review under the APA whenever the agency is implementing a president's executive

25   order. Opp'n 17. As the *AIDS Vaccine* court recognized, this position, if accepted, "would allow

26   the President and agencies to simply reframe agency action as orders or directives originating from

PLS.' REPLY ISO PRELIM. INJ. – 3
(No. C25-255 JNW)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   the President to avoid APA review." 2025 WL 485324, at *5. Defendants' support for this

2   untenable position rests on a single out-of-circuit, district-court case that addressed merely

3   "ministerial" agency action involving no exercise of discretion. *Detroit Int'l Bridge Co. v. Gov't*

4   *of Can.*, 189 F.Supp.3d 85, 104 (D.D.C. 2016), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir.

5   2017). That case does not support upending decades of APA precedent affirming judicial review

6   of agency action. As subsequent and factually analogous cases make clear, when agencies exercise

7   judgment in implementing presidential orders, their actions are *not* ministerial—and *are* subject to

8   APA review. *See, e.g.*, *Tate v. Pompeo*, 513 F.Supp.3d 132, 143 (D.D.C. 2021) (State Department

9   implementation of presidential proclamation forbidding admission to certain noncitizens was not

10  ministerial and was reviewable); *Milligan v. Pompeo*, 502 F.Supp.3d 302, 314 (D.D.C. 2020)

11  (same).

12        Here, the text of the Executive Orders and Defendants' own evidence, which demonstrates

13  multiple exercises of discretion, defeat any argument that agency implementation was ministerial

14  and thus immune from judicial review. The Foreign Aid EO left to the implementing agencies the

15  job of defining the contours of the "United States foreign development assistance" that it

16  suspended, *see* Foreign Aid EO § 3(a). The State Department used its judgment to construe that

17  term—without explanation—to be conterminous with programs funded by certain appropriations

18  to the agency. Dkt. # 31-1 ("Zerbinopoulos Decl.") ¶¶ 24, 26. But the agency's discretion did not

19  stop there: The Foreign Aid EO granted the agency discretion to, among other things, "waive" the

20  funding suspension for "specific programs." Foreign Aid EO § 3(e). Yet the State Department

21  stopped federal payment portals from even functioning, "making the purported waiver process

22  useless," Ex. 24 ¶ 46—even though the programming at issue operates on U.S. soil or involves the

23  domestic program of processing refugees for admission, and thus has no obvious connection to the

24  Foreign Aid EO's stated purpose and policy, *see* Foreign Aid EO §§ 1–2. Finally, while the agency

25  "advised" funding recipients that they could request reimbursements for work prior to the agency's

26  suspension notices, Zerbinopoulos Decl. ¶ 27, and Defendants claim they provided a "means" for

PLS.' REPLY ISO PRELIM. INJ. – 4
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 320

1   doing so, Opp'n 23, they do not rebut Plaintiffs' evidence that the agencies have also suspended

2   *sub silentio* these reimbursements that are outside the scope of the Foreign Aid EO, Ex. 24 ¶¶ 45,

3   59; Ex. 23 ¶¶ 46, 53; Mot. 5.

4          The agencies exercised similar discretion in implementing the Refugee Ban EO. That order

5   provides that the Secretaries of State and Homeland Security "may jointly determine . . . in their

6   discretion" to admit refugees on a case-by-case basis, "[n]otwithstanding" the President's

7   suspension of refugee entry. Refugee Ban EO § 3(a), (c). Although Defendants elsewhere highlight

8   the availability of these discretionary exceptions, Opp'n 24, the unrebutted evidence shows that

9   the agencies have not created a process for considering case-by-case exceptions, Ex. 24 ¶¶ 39–40;

10  Ex. 23 ¶ 28; *see also* Zerbinopoulos Decl. ¶ 22 n.6 (it is "not clear" which refugees "might" benefit

11  from case-by-case exception). Indeed, before the Refugee Ban EO issued, the State Department

12  *on its own* exercised discretion when it cancelled all refugee travel scheduled on or after noon on

13  January 20, 2025. Zerbinopoulos Decl. ¶¶ 18–20. It also exercised discretion when it determined

14  it was "reasonable" and "logical" to suspend *all* refugee processing, *id.* ¶¶ 21–22, even though the

15  plain language of the Refugee Ban EO requires only suspension of "entry into the United States"

16  and "decisions on applications for refugee status," *see* Refugee Ban EO § 3(a)–(b). Mr.

17  Zerbinopoulos's legal argument in his declaration that the order more generally "suspends the

18  USRAP" relies on selective quotations and omits the operative language "direct[ing]" only a

19  suspension of entry and decisions. *Compare* Zerbinopoulos Decl. ¶ 21, *and* Opp'n 21, *with*

20  Refugee Ban EO § 3(a)–(b).

21          **2.      The challenged agency actions are discrete and identifiable.**

22          Defendants next argue that the agencies' implementation of the Executive Orders is

23  immune from judicial review because Plaintiffs' challenge is not "discrete" and therefore amounts

24  to a demand for "wholesale improvement" of agency programs. Opp'n 17–18. But nothing about

25  Plaintiffs' challenge to the abrupt halt of all refugee processing and the blanket funding suspension

26  resembles the kind of "programmatic challenge" to agency operational management dismissed in

PLS.' REPLY ISO PRELIM. INJ. – 5
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (finding plaintiffs' challenge to "last

2    twenty years" of on-the-ground forest management too broad).

3        To the contrary, Plaintiffs' challenge narrowly targets discrete agency decisions, made over

4    the course of several days, that conflict with statute. The relief sought would simply block the

5    government from enforcing those discrete policy decisions. As Defendants' own declarant makes

6    plain, the State Department's decisions to suspend all refugee processing and all funding to

7    resettlement partners for USRAP-related work abroad and in the United States reflected specific,

8    identifiable agency decisions—albeit with massive ramifications felt around the world.

9    Zerbinopoulos Decl. ¶¶ 20–21 (cancelling all refugee travel and all USRAP processing); *id.* ¶¶ 26–

10   27 (suspending resettlement-related funding to all resettlement partners). It is clear even from

11   Defendants' citations that judicial review is available under exactly these circumstances. *See Lujan*

12   *v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 & n.2 (1990) (final agency action "applying some

13   particular measure across the board . . . can of course be challenged under the APA" where that

14   action causes plaintiff harm). To the extent Defendants imply that Plaintiffs are limited to

15   challenging only written agency policies, cases in this circuit have repeatedly rejected that

16   argument. *See, e.g.*, *Al Otro Lado, Inc. v. McAleenan*, 394 F.Supp.3d 1168, 1206–07 (S.D. Cal.

17   2019) (agency's unwritten practice of limiting access to asylum at border subject to APA review);

18   *Washington v. U.S. DHS*, 614 F.Supp.3d 863, 872–73 (W.D. Wash. 2020) (same as to U.S.

19   Customs and Border Protection's unwritten practice of courthouse arrests of noncitizens).

20                    **3.    The challenged actions are sufficiently final.**

21       Finally, Defendants contend that Plaintiffs cannot demonstrate final agency action under

22   *Bennett v. Spear*, which requires that challenged agency action (1) marks "the consummation of

23   the agency's decisionmaking process" and (2) is "one by which rights or obligations have been

24   determined, or from which legal consequences flow." 520 U.S. 154, 177–78 (1997) (cleaned up).

25   Defendants do not dispute that the challenged agency decisions are ones by which "legal

26   consequences flow" to Plaintiffs, all refugees in the USRAP, and all resettlement partners. They

PLS.' REPLY ISO PRELIM. INJ. – 6
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 322

1   argue only that the challenged actions are "temporary" and subject to change in the future. Opp'n

2   18. But *all* agency actions are subject to future change, and courts regularly reject agency attempts

3   to insulate themselves from review by using a "temporary" label. As another court recently

4   determined in enjoining a requirement to "pause" funding and disbursements, "[b]y any measure,

5   Defendants' action[s] led to legal consequences and constituted final agency action." *Nat'l Council*

6   *of Nonprofits v. OMB*, No. 25-239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025).

### B. Defendants' arguments and evidence do not undermine Plaintiffs' likelihood of success.

#### 1. Plaintiffs are likely to succeed on their arbitrary-and-capricious claims.

10   Plaintiffs have laid out why Defendants' USRAP and refugee-funding suspensions violate

11   many of the bare-minimum requirements for reasoned decision-making under the APA: The

12   agency failed to consider the reliance interests of refugees and SIV holders, failed to consider

13   reasonable alternatives, failed to consider "important aspect[s] of the problem," and engaged in

14   *sub silentio* policy change. Mot. 24–25; *see also Nat'l Council of Nonprofits*, 2025 WL 368852,

15   at *11–12 (finding arbitrary and capricious memorandum from OMB directing federal agencies to

16   freeze grant, loan, and assistance programs). Defendants fail to respond *at all* to each of these

17   arguments, and they are now forfeited. This alone is sufficient reason to find Plaintiffs likely to

18   succeed on the merits.

19   Indeed, Defendants' primary response to Plaintiffs' arbitrary-and-capricious arguments is

20   a declaration prepared in support of Defendants' opposition. Opp'n 21–23 (citing Mr.

21   Zerbinopoulos's declaration). But it is well established that judicial review of an agency's action

22   under the APA is limited to examination of the administrative record as it existed when the agency

23   made the relevant decision. *See, e.g.*, *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th

24   Cir. 2000). Agencies cannot rely on "post hoc rationalizations" to defend earlier decisions, *Bowen*

25   *v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988), and Defendants do not and cannot argue

26   that any exception to this general rule applies. In any event, the declaration, made by a PRM

PLS.' REPLY ISO PRELIM. INJ. – 7
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Add. 323

employee who does not purport to have any legal expertise, is largely comprised of misleading legal conclusions and interpretations. *See, e.g.*, Zerbinopoulos Decl. ¶¶ 7–8, 13–14 (omitting relevant definitions of "appropriate consultation" with Congress and ignoring mandatory statutory language in 8 U.S.C. § 1522). Setting aside that use of a witness declaration to interpret statutes and render legal opinions amounts to an impermissible circumvention of the word-count limitation, insofar as the declaration does not limit itself to documentation of agency action, it is irrelevant and should be disregarded in the APA merits inquiry.

In any event, Defendants fail to show that the agencies' decision-making satisfies the APA's minimum standards. *See* Mot. 23–25. Their myopic focus on promoting purportedly efficient use of government resources and preventing hypothetical refugee travel delays—at any cost—is arbitrary and capricious under the APA because they failed to consider important factors, such as statutory purpose and the serious reliance interests of refugees, their families and sponsors, and resettlement partners in the existing and well-established scheme. *See* Mot. 23–25; Ex. 24 ¶ 47 (number of impacted travelers); Ex. 23 ¶ 32 (same); Ex. 18 ¶ 10 (in danger). It is particularly notable that the agency did not consider the serious reliance interests of refugees on the verge of travel, even where Defendants recognize that medical exams and security checks expire, Opp'n 21, such that temporary travel delays can have "cascading effects that prolong a refugee's processing and ultimate admission," Mot. 10 (cleaned up); *see also AIDS Vaccine*, 2025 WL 485324, at *5 (failure to consider "immense reliance interests" rendered agency action likely arbitrary and capricious). It is similarly arbitrary and capricious that the agency failed to consider whether, for example, its concerns about hypothetical travel delays could not be addressed by a much-less-disruptive alternative, such as granting case-by-case exceptions to the entry suspension for the small number of refugees who might have been impacted. The experience of Plaintiff Pacito and his family—discovering, after years of waiting, that their scheduled January 22 travel was cancelled—highlights the serious reliance interests at stake and the disruptive nature of the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    agencies' failures. *See also* Dkt. # 25-1 at 2, 4–11, 14–18 (amicus brief specifying harms to states

2    and refugees and showing that agency acted contrary to stated purposes of Executive Orders).

3        As for the agencies' implementation of the funding suspension, Defendants do not explain

4    why the agencies interpreted the term "foreign development assistance" to apply to a broad swath

5    of appropriations that included funding for *domestic* work. Opp'n 22. Defendants' argument that

6    they considered resettlement partners' reliance interests when they "immediately issue[d] stop-

7    work orders," *id.* at 23, is irrational on its face—particularly where the State Department has

8    discretion under the Foreign Aid EO to waive the funding suspension. Defendants' contention that

9    the funding suspension is merely "temporary" ignores the relevant factors—including that the

10   Plaintiff organizations might not be able to survive the suspension and, at minimum, will suffer

11   lasting impacts. Mot. 11–12. And Defendants' suggestion that resettlement partners "have a means

12   to recoup costs," Opp'n 24, ignores the reality that no such funding has been provided and the

13   agency stopped payment portals from reimbursing resettlement agencies for work done prior to

14   January 20, Ex. 24 ¶¶ 44–46, 59; Ex. 23 ¶¶ 43–47, 53.

15       **2.    Plaintiffs are likely to succeed on their notice-and-comment claims.**

16       Defendants' notice-and-comment arguments are similarly unpersuasive. They focus on the

17   irrelevant contention that notice-and-comment claims cannot lie against the President, even though

18   Plaintiffs only asserted those claims against the agencies. Dkt. # 1 ¶¶ 222, 234. Any suggestion

19   that the agencies' implementation is merely ministerial remains unavailing. *See supra* pp. 4–5.

20   And the single out-of-circuit case they cite, Opp'n 20, does not support their position.

21       Defendants do not even attempt to distinguish a decision by a court in this district that

22   concluded that plaintiffs challenging a refugee suspension were likely to succeed on the merits of

23   their notice-and-comment claim. *See* Mot. 22 (citing *Doe*, 288 F.Supp.3d at 1075). The record

24   illustrates why public notice, an opportunity for comment, and agency consideration of relevant

25   comments are essential where, as here, an agency substantively alters the rights of hundreds of

26   thousands of vulnerable people. Mot. 22. For example, Plaintiffs Pacito and Josephine recount that

PLS.' REPLY ISO PRELIM. INJ. – 9
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  they could not understand why their travel was blocked before the effective date of the Refugee

2  Ban EO. Ex. 14 ¶¶ 25–28; Ex. 16 ¶¶ 18–24. Pacito described sleeping overnight in a parking lot

3  with his wife and infant along with other impacted families because they believed there had been

4  some mistake. Ex. 14 ¶¶ 28–31. The agencies appear not to have grasped the magnitude and lasting

5  impact of the harms resulting from their actions or considered obvious reasonable alternatives. *See*

6  *supra* pp. 7–9. Such omissions in agency decision-making are fatal under the APA, *see id.*, and

7  are precisely why Congress created the notice-and-comment guardrails in the first place.[2]

8  **3.**      **Plaintiffs are likely to succeed on their contrary-to-law claims.**

9  Defendants' arguments that the agencies did not act contrary to law rise and fall with their

10  claims about the scope of presidential authority under section 212(f). Opp'n 19. For the reasons

11  discussed below, *infra* pp. 12–13, Plaintiffs are likely to succeed on the merits of those claims.

12  But there is an independently sufficient reason why Plaintiffs' contrary-to-law claims are

13  likely to succeed: The agencies' actions fall outside their statutory authority and conflict with

14  federal statutes. Mot. 19–21. These are "infirmities of a constitutional magnitude." *Nat'l Council*

15  *of Nonprofits*, 2025 WL 368852, at *12. For example, as discussed above, the State Department

16  in its discretion construed the Foreign Aid EO to apply to domestic assistance for refugees and

17  SIV holders living in the United States. In so doing, the agency directly contravened Congress's

18  mandate that where, as here, the government has contracted with resettlement agencies to provide

19  initial resettlement services, the resettlement agencies "*shall* . . . fulfill [their] responsibility to

20  provide for [] basic needs." 8 U.S.C. § 1522(b)(7) (emphasis added). While it may be that the

21  agency is not required to enter into such contracts, Opp'n 19, this argument is unavailing where the

22  agency *has already done so* and the contract periods last until September 2025, Mot. 24–25

23  (agency violated its own contract regulations). And Defendants' passing reference to Tucker Act

24  challenges, which must be brought in the U.S. Court of Federal Claims, Opp'n 20, is a red herring

25

26        [2] Defendants have not asserted that any exceptions to the notice-and-comment rulemaking requirement apply, and those arguments are now forfeited.

PLS.' REPLY ISO PRELIM. INJ. – 10
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

given that Plaintiffs do not bring breach-of-contract claims for money damages. Instead, they challenge agency actions suspending all USRAP processing and funding for USRAP and resettlement assistance and seek an injunction and ultimately vacatur of those unlawful actions.

Similarly, the agencies' failure to ensure a process for exemptions from the USRAP suspension for follow-to-join refugees directly conflicts with Congress's statutory directive that eligible and admissible spouses and children of such refugees are entitled to admission. Mot. 21–22. And Defendants ignore that another court in this district has already held that a suspension of "the ability of otherwise qualified [follow-to-join] applicants from seeking and obtaining that entitlement" is contrary to law under the APA. *Doe*, 288 F.Supp.3d at 1079.

## III. Plaintiffs are likely to succeed on the merits of their *ultra vires* claims.

### A. Plaintiffs' claims are reviewable.

Defendants assert that Plaintiffs' *ultra vires* claims are not justiciable—but fail to explain why. Opp'n 12. Nor could they: A long line of U.S. Supreme Court cases has reviewed on-the-merits challenges to presidential actions as *ultra vires* of the President's constitutional or statutory authority. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 171–73 (1993); *Trump v. Hawai'i*, 585 U.S. 667, 682–83 (2018) (assuming without deciding that claim was reviewable and proceeding to merits).[3]

### B. Defendants ignore controlling caselaw and attack strawmen.

The core of Defendants' argument is that the President's powers under section 212(f) (and section 215(a)[4]) are so vast that the President has boundless authority to eliminate entire statutory provisions enacted by Congress that provide for refugee admissions and resettlement assistance. Opp'n 12–16. Defendants rely almost exclusively on *Trump v. Hawai'i*, but they ignore that the

---

[3] Defendants spill considerable ink on Plaintiffs' separation-of-powers claim, Opp'n 9–12, but Plaintiffs did not move on that claim.

[4] Plaintiffs analyze only section 212(f) as it "substantially overlap[s]" with section 215(a), *Hawai'i*, 585 U.S. at 683 n.1, and Defendants provide no analysis or caselaw specific to section 215(a).

PLS.' REPLY ISO PRELIM. INJ. – 11
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

case involved a narrower invocation of presidential power, supported by significant findings, that aligned with Congress's statutory scheme and purpose. *See* 585 U.S. at 677–80, 689. As the *Hawai'i* Court emphasized, the challenged presidential proclamation imposed entry restrictions on nationals of countries following a worldwide multi-agency review that determined certain countries had deficient information-sharing practices and presented national-security concerns, and only following diplomatic efforts to address those concerns. *Id.* at 677–79. The Court further emphasized that the President's proclamation "support[ed] Congress's individualized approach for determining admissibility" because it ensured consular officers had "sufficient (and sufficiently reliable) information" to make those determinations. *Id.* at 689.

Here, in stark contrast, the Refugee Ban EO's policy goals are domestic in nature, and there has been no review or findings that support suspending any refugee admissions, let alone USRAP in its entirety. Mot. 14–17. The Ninth Circuit requires a "sufficient finding" to support invocation of section 212(f) and has held that findings indistinguishable from those here could not support a prior refugee ban. *See Hawai'i v. Trump*, 859 F.3d 741, 771–74 (9th Cir.) (per curiam), *vacated on other grounds*, 583 U.S. 941 (2017). Lest there be any doubt, the Ninth Circuit's *Hawai'i* decision remains good law: It was vacated only because the ban at issue became moot after the Supreme Court granted certiorari and before the appeal could be adjudicated.[5] Conspicuously, Defendants ignore the Ninth Circuit's *Hawai'i* decision entirely.

The Refugee Ban EO fails to meet the requirements to invoke the President's section 212(f) power. Mot. 17–18. Rather than address this failing or Plaintiffs' arguments that the Refugee Ban EO unlawfully supplants Congress's priorities and directly conflicts with the Refugee Act, *see id.* at 15–17, Defendants tackle strawmen, *compare* Opp'n 14–15 (refugees are not entitled to admission), *with* Mot. 21 (statute mandates that follow-to-join refugees be granted refugee status if eligible and not otherwise inadmissible). Defendants' minimal legal analysis is relegated to

---

[5] The Supreme Court's *Hawai'i* decision concerned a subsequent iteration of the "Muslim ban" that was limited to certain visa holders and did not concern refugees.

PLS.' REPLY ISO PRELIM. INJ. – 12
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  footnotes and incorrectly suggests Plaintiffs should have claimed unreasonable delay under

2  section 706(1) of the APA. Opp'n 11–15 nn. 4–7. But section 1157(c)(2)(A) of the INA creates a

3  non-discretionary duty to admit, and indefinitely suspending admission is unlawful agency action

4  that must be analyzed under section 706(2) of the APA. Defendants' false suggestion that "refugee

5  status"—conferred upon admission as a legal matter—is somehow different than admission must

6  be rejected. Finally, Defendants fail to explain why the decision of a court in this district applying

7  circuit precedent to hold a narrower refugee ban unlawful is no longer good law after *Hawai'i*. *See*

8  Mot. 17 (citing *Doe*, 288 F.Supp.3d at 1078–79).

9  With respect to the Foreign Aid EO, Defendants do not assert that section 212(f) applies,

10  but they cite a string of cases involving "foreign affairs" for the proposition that the President has

11  authority to "determin[e] how foreign aid funds are used." Opp'n 11. Even if these cases supported

12  Defendants' claim (they do not), they fail to explain why the President's foreign-affairs authority

13  supports suspension of *domestic* assistance to noncitizens in the United States and processing for

14  *domestic* immigration programs. *See* Mot. 14–18.

15  **IV.  Plaintiffs are likely to succeed on the merits of their due-process claim.**

16  Finally, in response to Plaintiffs' due-process claim, *see* Mot. 26, Defendants argue only

17  that Plaintiffs lack a cognizable property or liberty interest under Supreme Court precedent, Opp'n

18  16. But *Department of State v. Muñoz* is inapposite: That case concerned whether judicial review

19  of an individual visa denial was available under an exception to the doctrine of consular

20  nonreviewability, and the Court held that no exception applied to a U.S.-citizen spouse challenging

21  her husband's visa denial because she lacked a fundamental liberty interest in her spouse's

22  admission—following an analysis of whether a right is "deeply rooted in this Nation's history

23  and tradition." 602 U.S. 899, 903, 907–12 (2024) (quoting *Washington v. Glucksberg*, 521 U.S.

24  702, 720–21 (1997)). Here, in contrast, Congress has created a *statutory entitlement* to admission

25  for family members of principal refugees in the United States as long as those family members are

26  otherwise eligible and not inadmissible. Mot. 14–15 (citing 8 U.S.C. § 1157).

PLS.' REPLY ISO PRELIM. INJ. – 13
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**V.      The *Winter* factors and the record support a comprehensive preliminary injunction.**

Plaintiffs are thus likely to succeed on the merits (or, at minimum, demonstrate serious questions going to the merits) and are suffering irreparable harm, and the other *Winter* factors further support injunctive relief. Mot. 26–28.

Defendants' invocation of the abstract harm purportedly suffered by the Executive Branch when its authority over immigration is questioned, Opp'n 26, cannot defeat Plaintiffs' far more concrete injuries or their invocation of the public interest, *see AIDS Vaccine*, 2025 WL 485324, at *6 (balance of equities favored party showing "concrete, real-world harm"); *see also* Dkt. # 25-1 at 6–11, 15–18 (detailing harms to states resettling nearly half of all refugees last year). Moreover, the Ninth Circuit has regularly concluded that there is no public interest in maintaining unlawful executive action. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679 (9th Cir. 2021) ("[T]he public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat." (cleaned up)); *Hawai'i*, 859 F.3d at 784 ("The public interest is served by curtailing unlawful executive action." (cleaned up)).

Finally, Defendants are wrong to assert that a nationwide injunction is broader than necessary to redress "the injury shown." Opp'n 26 (cleaned up). A comprehensive injunction is the only way to redress the proven irreparable harms Plaintiffs face, and binding precedent supports a comprehensive injunction. Mot. 27–28. Defendants also ignore the cascade of recent opinions temporarily restraining and preliminarily enjoining the Trump Administration's unlawful actions on a nationwide basis given evidence of irreparable harm. *See, e.g.*, *Washington v. Trump*, No. C25-0127-JCC, 2025 WL 415165, at *7 (W.D. Wash. Feb. 6, 2025) (granting nationwide preliminary injunction enjoining enforcement of birthright-citizenship executive order); *Nat'l Council of Nonprofits*, 2025 WL 368852, at *14 (granting nationwide TRO enjoining implementation of funding freeze of federal grant programs); *Ass'n of Am. Med. Colls. v. NIH*, No. 25-CV-10340-AK (D. Mass. Feb 10, 2025), Dkt. # 8 (same for notice changing reimbursement

PLS.' REPLY ISO PRELIM. INJ. – 14
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

policy for scientific research); *AIDS Vaccine*, 2025 WL 485324, at \*6–7 (same for foreign-assistance funding).

## <u>CONCLUSION</u>

The Court should preliminarily enjoin the Refugee Ban EO, the Refugee Suspension, and the Refugee Funding Suspension in their entirety.

*      *      *

The undersigned certifies that this brief contains 4,974 words, in compliance with the Local Civil Rules.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Dated: February 22, 2025

By: s/ *Harry H. Schneider, Jr.*

Linda Evarts*
Deepa Alagesan*
Mevlüde Akay Alp*
Ghita Schwarz*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
dalagesan@refugeerights.org
makayalp@refugeerights.org
levarts@refugeerights.org
gschwarz@refugeerights.org

Melissa Keaney*
**INTERNATIONAL REFUGEE
ASSISTANCE PROJECT**
P.O. Box 2291
Fair Oaks, California 95628
Telephone: (646) 939-9169
mkeaney@refugeerights.org

Harry H. Schneider, Jr., WSBA No. 9404
Jonathan P. Hawley, WSBA No. 56297
Shireen Lankarani, WSBA No. 61792
Esmé L. Aston, WSBA No. 62545
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com
EAston@perkinscoie.com

John M. Devaney*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
JDevaney@perkinscoie.com

Joel W. Nomkin*
**PERKINS COIE LLP**
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
JNomkin@perkinscoie.com

Nicholas J. Surprise*
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
NSurprise@perkinscoie.com

*Counsel for Plaintiffs*

* *Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on February 22, 2025, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of the filing to the email addresses indicated on the Court's Electronic Mail Notice List.

Dated: February 22, 2025

*s/ Harry H. Schneider, Jr.*
Harry H. Schneider, Jr.

CERTIFICATE OF SERVICE
(No. C25-255 JNW)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

2

3

4

5

6

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

| | |
|---|---|
| PLAINTIFF PACITO; PLAINTIFF ESTHER; PLAINTIFF JOSEPHINE; PLAINTIFF SARA; PLAINTIFF ALYAS; PLAINTIFF MARCOS; PLAINTIFF AHMED; PLAINTIFF RACHEL; PLAINTIFF ALI; HIAS, INC.; CHURCH WORLD SERVICE, INC., and LUTHERAN COMMUNITY SERVICES NORTHWEST, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARCO RUBIO, in his official capacity as Secretary of State; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br><br> Defendants. | CASE NO. 2:25-cv-255-JNW <br><br> FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION |

1

## 1. INTRODUCTION

This case presents a challenge to the President's authority to indefinitely suspend a statutory refugee program. Hours into his second term, President Trump issued Executive Order 14163, "direct[ing] that entry into the United States of refugees under the [United States Refugee Assistance Program (USRAP)] be suspended" indefinitely pending a determination by the President that "resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States." This action fulfilled the President's campaign promise to "suspend refugee resettlement" as part of efforts to "immediately end the migrant invasion of America." The order halts, without a defined end date, the carefully constructed framework Congress established through the Refugee Act of 1980. The Court must determine whether this executive action exceeds statutory bounds, and whether the federal agencies' implementation of the Order comports with administrative law.

After carefully reviewing the Parties' briefing and holding a hearing on the matter, the Court granted Plaintiffs' motion and issued a preliminary injunction on February 25, 2025. Dkt. No. 39. This Order is to elucidate the Court's reasoning and define the parameters of the injunction further. In sum, though the Executive enjoys considerable latitude to suspend refugee admissions, that discretion is not boundless. Where, as here, Presidential action effectively nullifies a congressionally established program, causing irreparable harm to vulnerable individuals and organizations, judicial intervention becomes necessary to preserve the separation of powers our Constitution demands.

## 2.  BACKGROUND

### 2.1    Refugee admission in the United States.

Congress amended the Immigration and Nationality Act (INA) through the Refugee Act of 1980 to provide a "permanent and systematic procedure" for refugee admissions.[1] Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980). In passing the Refugee Act, Congress found that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." *Id*. Under the Refugee Act, "[a]dmissions . . . shall be allocated among refugees of special humanitarian concern to the United States." 8 U.S.C. § 1157(a)(3).

The Refugee Act provides for the admission and resettlement of refugees in the United States. *See generally* 8 U.S.C. §§ 1157, 1521–24. The government fulfills this statutory mandate through USRAP, which is jointly administered by the Department of State (DOS), through its sub-agency the Bureau of Population, Refugees, and Migration (PRM); the Department of Homeland Security (DHS), through its sub-agency U.S. Citizenship and Immigration Services (USCIS); the Department of Health and Human Services (DHHS), through its sub-agency the

---

[1] A "refugee" is defined in relevant part as follows:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]

8 U.S.C. § 1101(a)(42).

Office of Refugee Resettlement (ORR); and through partnerships with the United

Nations—in particular, the International Organization for Migration (IOM) and

United Nations High Commissioner for Refugees (UNHCR); and nonprofit agencies

that provide case processing and refugee resettlement services.

The Refugee Act creates a deliberate framework for refugee admissions that

balances presidential authority with congressional oversight. While the President

sets annual refugee ceilings through "Presidential Determinations," this power

operates within statutory constraints. *See* 8 U.S.C. § 1157(a)(3), (b), (d). The law

requires "appropriate consultation" with Congress—specifically, in-person meetings

with Judiciary Committee members where the administration must justify proposed

admission levels and provide detailed information about anticipated impacts and

resettlement plans. *See* 8 U.S.C. § 1157(d) ("Oversight reporting and consultation

requirements."); 8 U.S.C. §1157(e) ("'Appropriate consultation' defined"). Even when

increasing admission limits for humanitarian emergencies, the President remains

bound by these consultation requirements. *See* 8 U.S.C. § 1157(d), (e). Further,

Congress directs the Executive to report on the admission of certain groups of

refugees that it has identified by statute, such as refugees fleeing North Korea. *See*

22 U.S.C. § 7845 (contained within the subchapter "Protecting North Korean

Refugees"). This structure reflects Congress's intent that refugee admission

decisions involve both political branches, not unilateral executive action. *See* 8

U.S.C. §§ 1157(e) (3), (4).

In accordance with the Refugee Act, President Biden determined that

125,000 refugees should be admitted in the 2025 fiscal year. Presidential

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Determination No. 2024-13, 89 Fed. Reg. 83,767 (Sept. 30, 2024). As of December 31, 2024, nearly 30,000 refugees had been admitted. Dkt. No. 15-2 at 3.

Applying for admission to the United States as a refugee is a highly regulated process. "The first step for most individuals seeking refugee status is to register with the [UNHCR] in the country to which they have fled." Dkt. No. 15-1 (DOS webpage). To be eligible to apply for admission under USRAP, "a refugee must either be referred to the program by an authorized entity or group (such as UNHCR) or belong to certain designated groups with common characteristics, defined either by statute or by the State Department in its joint reports to Congress." Dkt. Nos. 1 ¶ 47; 15-3 at 16–33 (USRAP report to Congress, submitted by DOS, DHS, and DHHS) (providing overview of procedures for refugee applications, vetting, processing, and admissions).

One such statutorily defined designated group is "Follow-to-Join" ("FTJ") petitioners. *See* 8 U.S.C. § 1157(c)(2)(A). Under the FTJ program, if a refugee resettles in the United States but their unmarried, minor child or spouse remains abroad, the resettled individual may apply for the admission of the abroad family member as a refugee under USRAP. *Id.* (stating that spouse or child, if not inadmissible, "shall" be entitled to refugee status).

DHS and DOS work cooperatively to process and adjudicate applications from eligible individuals. To facilitate the application process, DOS enters "cooperative agreements" with third-party, non-governmental Resettlement Support Centers (RSCs). *See* Dkt. No. 1 ¶¶ 52–54. "RSC staff pre-screen applicants for eligibility . . . and prepare cases for USCIS [by] . . . assist[ing] applicants in completing

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 5

documentary requirements and schedul[ing] USCIS refugee eligibility interviews."
Dkt. No. 15-3 at 30.

Once DOS (through a cooperative agreement with an RSC) has prepared an eligible individual to apply for refugee status, DHS (through USCIS) adjudicates the application. *See* 6 U.S.C. § 271(b)(3); 8 C.F.R. §§ 207.1–207.7 (DHS implementing regulations). "A USCIS officer conducts an inquiry of each principal refugee applicant designed to elicit information about the applicant's claim for refugee status, any grounds of inadmissibility, and factors related to the exercise of discretion." Dkt. No. 15-3 at 29. The USCIS officer investigates the applicant's activities, background, and criminal history, using extrinsic evidence to assess the applicant's credibility and claim. *Id.* "For derivative applicants, the officer also asks questions to inform the decision of eligibility based on family relationships." *Id.*

Throughout this process, DOS and DHS perform careful, individualized security vetting. According to the most recent Presidential report to Congress on USRAP, "Refugees are the most thoroughly screened and vetted group to enter the United States." *Id.* Refugee applicants undergo rigorous background checks, as well as biometric checks for those within certain age limits. *Id.* "Refugee applicants must have all required security checks completed and fully addressed prior to an applicant's admission to the United States as a refugee." *Id.*

"Approval of a refugee application by USCIS outside the United States authorizes [Customs and Border Patrol] to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved." 8 C.F.R. § 207.4. Once a refugee has been conditionally

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 6

approved by USCIS, "RSC staff guide the refugee through post-adjudication steps, including completing medical screening exams and attending cultural orientation programs." Dkt. No. 15-13 at 30; *see also* 8 C.F.R. § 207.2(b) ("medical examination as required by sections 221(d) and 232(b) of the [Refugee] Act"). The RSC also arranges the applicant's mandatory, pre-entry cultural orientation. *See* Dkt. No. 15-3 at 30–32.

Like the application and adjudication process, the transportation, admission, and resettlement processes are governed by a detailed statutory and regulatory scheme, jointly administered by PRM and ORR. *See generally* 8 U.S.C. §§ 1521–24. This scheme, like the application scheme, relies on "cooperative agreements" with nonprofit agencies, who receive federal funds from PRM to deliver statutorily mandated resettlement services. *See* 8 U.S.C. § 1522(b)(1)-(7). "In FY 2024, PRM funded cooperative agreements with ten non-profit resettlement agencies to provide initial resettlement services to refugees and Afghan SIVs arriving in the United States pursuant to [statutory] authority." Dkt. No. 15-3 at 32. "The resettlement agencies are responsible for providing initial reception and core services to arriving refugees." *Id.* at 32–33. "These national resettlement organizations maintain a nationwide network of approximately 355 affiliated offices in 226 communities to provide services." *Id.*

Even before a refugee travels to the United States, the RSC obtains a "sponsorship assurance" from an approved resettlement agency within the United States; that resettlement agency ensures that it, or its affiliates, will provide the refugee with initial services during the refugee's first 90 days in the United States.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 7

*Id.* at 30, 33 (listing services that resettlement agencies provide); *see also* 8 U.S.C. § 1522(b)(7) (resettlement agencies' statutory responsibilities); 8 C.F.R. § 207.2(c).

When it comes time for a refugee to move to the United States, the RSC refers the refugee's case to the International Organization for Migration (IOM) to book their travel. Dkt. No. 15-13 at 30. IOM funds this travel with an interest-free loan that the refugee is expected to pay back after they arrive in the United States. *Id.* at 32; *see e.g.*, Dkt. No. 15-14 ¶ 14 ("I confirmed with IOM on January 6 that I would . . . pay for the plane ticket if needed, but they told me the way it works for refugees is that they pay for the ticket and I pay them back after [the refugee] is in the United States.").

Once in the country, refugees receive statutorily authorized support services—including employment training and placements, direct cash support, and English-language training—from their sponsoring resettlement agency or its affiliates. *See generally* 8 U.S.C. § 1522. Those agencies use federal funding, private donations, and volunteer support to facilitate effective resettlement with the goal of placing "employable refugees . . . on jobs as soon as possible after their arrival" to cultivate "economic self-sufficiency." *See* 8 U.S.C. § 1522(a)(1). These agencies also assist refugees in adjusting their status to obtain permanent lawful residence within one year of entry. *See* 8 U.S.C. § 1159 ("Adjustment of status of refugees"); 8 C.F.R. § 209.1 (same).

## 2.2 The USRAP EO's terms.

On January 20, 2025, President Trump signed Executive Order 14163, "Realigning the United States Refugee Admissions Program." *See* Executive Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("USRAP EO"). As the name suggests, the EO purports to "realign" the entire statutory refugee admissions system with the President's political priorities. In two-and-a-half pages, the President indefinitely suspends all refugee admissions and directs the Secretary of DHS to "suspend decisions on applications for refugee status." *See* USRAP EO § 3(b).

The Order begins by asserting that "over the last 4 years, the United States has been inundated with record levels of migration, including through the U.S. Refugee Admissions Program (USRAP)." USRAP EO § 1. It notes that communities "from Charleroi, Pennsylvania, and Springfield, Ohio, to Whitewater, Wisconsin" have experienced "significant influxes of migrants," and that even major urban centers like "New York City, Chicago, and Denver have sought Federal aid to manage the burden of new arrivals." *Id.* The Order further observes that "some jurisdictions, like New York and Massachusetts, have even recently declared states of emergency because of increased migration." *Id.*

Based on these alleged circumstances, the USRAP EO concludes that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." *Id.*

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 9

The Executive Order establishes several key policies. First, "it is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens." *Id.* § 2. And the Order states that "[i]t is also the policy of the United States that to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions" of refugees. *Id.*

The central operational provisions of the USRAP EO include:

1. A suspension of "entry into the United States of refugees under the USRAP," effective on January 27, 2025. *Id.* § 3(a).

2. An immediate suspension of "decisions on applications for refugee status." *Id.* § 3(b).

3. A case-by-case exception mechanism allowing the Secretaries of State and Homeland Security to "jointly determine to admit aliens to the United States as refugees... only so long as they determine that the entry of such aliens as refugees is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* § 3(c).

4. A directive for the Secretary of Homeland Security to "examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions." *Id.* § 3(d).

The USRAP EO also establishes a review process requiring the Secretary of Homeland Security, in consultation with the Secretary of State, to submit a report to the President through his Homeland Security Advisor within 90 days "regarding whether resumption of entry of refugees into the United States under the USRAP

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 10

would be in the interests of the United States, in light of the policies outlined in section 2[.]" *Id.* §4. It requires further reports "every 90 days thereafter until [the President] determine[s] that resumption of the USRAP is in the interests of the United States." *Id.* Thus, the President's say-so is the only way USRAP can resume.

### 2.3    Agency implementation of the USRAP EO.[2]

Rather than waiting for the USRAP EO's suspension on entry to take effect on January 27, Defendants Marco Rubio (Secretary of State), Kristi Noem (Secretary of Homeland Security), and Robert F. Kennedy, Jr. (Secretary of Health and Human Services) (collectively, "Agency Defendants") implemented it immediately. The day after President Trump signed the USRAP EO, PRM sent an email to refugee resettlement partners stating that:

> Following the issuance of the Executive Order (EO), "Realigning the United States Refugee Admissions Program," refugee arrivals to the United States have been suspended until further notice. All previously scheduled travel of refugees to the United States is being cancelled, and no new travel bookings will be made. RSCs should not request travel for any additional refugee cases at this time.

> Additionally, all refugee case processing and pre-departure activities are also suspended. RSCs and IOM should not move refugees to transit centers in anticipation of travel and should halt all pre-departure activities for refugee cases. No new referrals should be made into the USRAP.

---

[2] On February 26, 2025—one day after the Court granted Plaintiffs' motion for preliminary injunction—Defendant Secretary Rubio's agents emailed termination notices to the organizational Plaintiffs, purporting to terminate their funding entirely and immediately. *See* Dkt. Nos. 44-1–44-5. As this written Order further explains the Court's February 25th oral ruling issuing a preliminary injunction, it does not address subsequent developments. The Court has set a separate hearing to address the termination notices.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 11

Dkt. Nos. 15-23 ¶ 29; 15-24 ¶ 35.

In a follow-up email the next day, PRM confirmed that "all planned refugee arrivals for this week have been cancelled and we do not anticipate any being scheduled[.]" Dkt. Nos. 15-23 ¶ 30; 15-24 ¶ 36. This action left stranded thousands of people in the process of fleeing their home countries under fear of persecution and harm. *See* Dkt. No. 1 at ¶ 207; *see, e.g.,* Dkt. No. 15-17 ("I live in fear."). Plaintiffs call these actions the "Agency Suspension."

The Agency Defendants also suspended all funding to RSCs and resettlement agencies, despite the cooperative agreements promising federal funding for work completed on behalf of DOS. On January 24, 2025, PRM sent notices of suspension ("Suspension Notices") to the resettlement agencies, stating in relevant part:

> Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) [referencing recipient-specific grants] are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

> Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

> [. . .]

> Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 12

Dkt. Nos. 31-3, 31-4; *see also* Dkt. No. 15-23 ¶ 43; Dkt. No. 15-24 ¶¶ 44–35. As noted

in the quoted text, the Agency Defendants cite to the President's Executive Order on

Reevaluating and Realigning United States Foreign Aid, Executive Order No.

14,169, 90 Fed. Reg. 8,610 (Foreign Aid EO) to justify the suspensions.

Additionally, on January 20, 2025, the Agency Defendants began withholding

reimbursements owed to resettlement agencies for work already performed under

cooperative agreements to support recently arrived refugees and Special Immigrant

Visa (SIV) recipients. Dkt. Nos. 15-23 ¶¶ 46–47, 53; 15-24 ¶ 59. This has resulted in

millions owed to the resettlement agencies for work performed in November and

December 2024.

Plaintiffs refer to the Suspension Notices and the *sub silentio* withholding of

reimbursements, together, as the "Refugee Funding Suspension."

## 2.4    Plaintiffs' experiences.

Plaintiffs challenge the USRAP EO, the Agency Suspension, and the Refugee

Funding Suspension. Each Plaintiff has suffered harm as a result of the USRAP

EO, the Agency Defendants' actions, or both.

Plaintiff Pacito[3] is a refugee from the Democratic Republic of the Congo. He

and his family were scheduled to travel to the United States on January 22, 2025.

---

[3] The individual Plaintiffs wish to proceed using pseudonyms for fear of the serious
harms and retaliation they may face should their participation in this lawsuit
become public. Dkt. No. 1 at 5 n.1; *see* Dkt. No. 15-14 ¶¶ 45–48; Dkt. No. 15-15 ¶¶
31–35; Dkt. No. 15-16 ¶¶ 32–35; Dkt. No. 15-17 ¶¶ 22–24; Dkt. No. 15-18 ¶¶ 31–35;
Dkt. No. 15-19 ¶¶ 25–27; Dkt. No. 15-20 ¶¶ 27–30; Dkt. No. 15-21 ¶¶ 16–19; Dkt.
No. 15-22 ¶¶ 26–28. Given the heated political climate surrounding immigration

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 13

Dkt. No. 15-4 ¶ 17. The family sold all their belongings that they could not bring with them, packed their bags, and gave up their home. *See id.* ¶¶ 17, 20. On January 18, 2025, IOM told Pacito and his family to report to the transit center on January 21—the day before their travel. *Id.* ¶ 21. Before they made it to the transit center on January 21, Pacito received a phone call "telling [him] there was a problem and [they] would not be able to travel to the United States after all." *Id.* ¶ 23.

Plaintiff Esther is a U.S. citizen and former refugee living in Idaho. Her daughter, Josephine, is now stranded in South Africa. They have been waiting years to reunite under the FTJ program. Dkt. No. 15-15. Indeed, Esther filed her FTJ application for Josephine in 2017, and after years of waiting for a decision, her daughter was finally approved for resettlement in Idaho. *Id.* ¶ 20. Esther explains that her daughter was on the verge of travel when the President issued the USRAP EO. Josephine's admission and reunification with her mother were suspended indefinitely.

Plaintiff Marcos faces a similar situation. He is a citizen of El Salvador with Temporary Protected Status; he has lived in the United States for 25 years and works in private security. Dkt. No. 15-19 ¶¶ 4–7. He first applied for his stepdaughter's entry into the United States from El Salvador under the Central

---

issues and the other plaintiff-specific harms alleged in their declarations, these fears are reasonable. Their privacy interests also outweigh any prejudice to Defendants or the public's interest in disclosure. *Cf. Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1069 (9th Cir. 2000) (reversing district court for denying plaintiffs permission to proceed anonymously). Accordingly, the individual Plaintiffs may proceed using pseudonyms.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 14

Add. 347

American Minors (CAM) refugee program in 2016. *Id*. ¶ 2, 11. "However, because of President Trump's actions to end the CAM program during his first administration, the process was stopped." *Id*. ¶ 11. He restarted the process in 2022, *id.*, and on January 6, 2025, IOM told him that his stepdaughter would travel to the United States in the first or second week of February. *Id*. ¶¶ 13–14. Eager to see his stepdaughter, he offered to buy her plane ticket, but IOM told him "the way it works for refugees is that [IOM] pay[s] for the ticket." *Id*. ¶ 14. Marcos was "particularly devastat[ed]" to hear that his stepdaughter's travel had been cancelled because this is the second time the refugee process has been halted by President Trump's executive orders. *Id*. ¶ 18.

Plaintiff Sara is an Iraqi refugee stranded in dangerous conditions in Jordan. She applied for refugee status for herself and her son in 2014. Dkt. No. 15-17 ¶ 10. In 2024, they were finally, conditionally approved for refugee resettlement and began the post-application resettlement process. *See id*. ¶¶ 11–14. She planned to join her son and his family—all U.S. citizens—living in Idaho. *Id*. ¶¶ 6, 15–16, 21. But now she cannot do so because of the USRAP EO.

Plaintiff Alyas is a Yazidi refugee from Iraq who applied for refugee admission to the United States in 2011 because his life was in danger. Dkt. No. 15-18 ¶ 11. After he married and had a son, he added his wife and child to the application. *Id*. ¶ 12. They received conditional approval and began the post-application process, including cultural orientation. *Id*. ¶¶ 13–16. IOM bought tickets and arranged for the family's travel. *Id*. ¶ 17. They were scheduled to travel on February 3, 2025, after years of waiting, but on January 21, 2025, IOM called

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 15

him "to say that [he and his] family . . . could not travel anymore," as "flights were cancelled because of the U.S. suspension of refugee admissions." *Id*. ¶ 18.

Plaintiff Ali is an Iraqi refugee, newly arrived and living on his own in the United States. He is 22-years old, and he arrived on January 9, 2025, through USRAP. *See* Dkt. No. 15-20 ¶¶ 1–10. As a gay man, he fled Iraq for his safety and to avoid persecution. *See id*. When his application was approved and he learned he would be resettled in the United States, "[he] was so excited that [he] began screaming with happiness and jumping and dancing," because "for the first time in [his] life, [he] thought [he] would be able to live . . . free of fear." *Id*. ¶¶ 14–15. Because Ali is alone in the United States and arrived with only $120, he depended on the resettlement agencies to help him get established. *See id*. ¶¶ 19–21. But because the USRAP EO has indefinitely suspended funding for resettlement agencies within the United States, many have stopped accepting applications for specific programs they have historically offered to assist refugees. He worries that "he may not be able to get the help [he] needs to establish [himself] here and find a job." *Id*. ¶ 24.

Plaintiff Ahmed is an Afghan refugee and peace activist who wishes to pursue his studies and begin a new life in the United States. Because of the USRAP EO, he is stuck "in limbo" in Germany. Dkt. No. 14 at 12 (citing Dkt. No. 15-21 ¶¶ 4, 7, 13–15).

And finally, Plaintiff Rachel is a Washington-based sponsor who has fundraised over $15,000 to welcome an Afghan refugee family through the Welcome Corps program. *Id*. (citing Dkt. No. 15-22 ¶¶ 3, 5, 8–18).

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 16

1    As for the organizational Plaintiffs, Church World Services, Inc. (CWS) is an

2    RSC that has cooperative agreements with DOS to assist with overseas USRAP

3    processing as well as domestic resettlement of refugees. Dkt. No. 15-23. "Either

4    directly or through its affiliates, CWS currently supports refugees resettled in 44

5    active locations in 24 states." *Id.* ¶ 9. HIAS, Inc., too, is an RSC that provides

6    resettlement services in the United States through 30 affiliates in 17 states. *Id.*

7    ¶ 22. Pacific Lutheran Community Services Northwest ("LCSNW") is an affiliate of

8    a national resettlement agency headquartered in Tacoma, Washington, with more

9    than 40 locations in the Pacific Northwest, more than 700 employees, and dozens of

10   programs providing services to more than 40,000 clients each year. *Id.* ¶ 24. As a

11   result of the Refugee Funding Suspension, these resettlement agencies suddenly,

12   and without advance notice, lost their funding indefinitely. The financial impact of

13   the EO is devastating for these organizations, threatening their core existence, as

14   they have already been forced to furlough or lay off hundreds of staff. Dkt. Nos. 14

15   at 14; 15-23 ¶¶ 3, 41, 54, 56; 15-24 ¶¶ 3, 42, 61–62.

## 3.  DISCUSSION

### 3.1  Plaintiffs have standing to sue.

16
17   "Article III of the Constitution limits the federal judicial power to the

18   adjudication of 'Cases' and 'Controversies.'" *City & Cnty. of San Francisco v. United*

19
20   *States Citizenship & Immigr. Servs.*, 944 F.3d 773, 786 (9th Cir. 2019) (quoting

21   U.S. Const. art. III, § 2, cl. 1.). An essential element of the case-or-controversy

22   requirement is that the plaintiff must have standing to sue. *Id.* To demonstrate

23   standing, the plaintiff must show "'concrete and particularized' injury that is 'fairly

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 17

1    traceable' to the defendant's conduct and 'that is likely to be redressed by a

2    favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338

3    (2016)). "At least one plaintiff must have standing to seek each form of relief

4    requested, and that party bears the burden of establishing the elements of standing

5    with the manner and degree of evidence required at the successive stages of the

6    litigation." *Id.* (cleaned up). On a preliminary injunction, "plaintiffs 'may rely on the

7    allegations in their Complaint and whatever other evidence they submitted in

8    support of their preliminary-injunction motion to meet their burden.'" *Id.* (quoting

9    *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017)).

10       The individual and organizational plaintiffs have standing here because their

11   injuries, as described above, are concrete and non-speculative; traceable to the

12   USRAP EO, the Refugee Funding Suspension, and the Agency Suspension; and

13   redressable by the relief sought.

14       Defendants challenge this finding only as far as they contend that "Plaintiffs

15   lack standing to seek any relief against the President" because "the President may

16   not be enjoined in the performance of his official non-ministerial duties." Dkt. No.

17   31 at 18. While it is unclear why Defendants discuss this issue in relation to

18   standing, "[t]his position of the Government is [nevertheless] well taken." *Hawaii v.*

19   *Trump*, 859 F.3d 741, 788 (9th Cir. 2017) (*Hawaii*), *vacated on other grounds*, 583

20   U.S. 941 (2017). In general, courts lack "jurisdiction of a bill to enjoin the President

21   in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788,

22   802–03 (1992) (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see Hawaii*,

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 18

859 F.3d at 802 ("[I]njunctive relief against the President . . . is extraordinary, and should . . . raise[ ] judicial eyebrows.").

And yet, the Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) ("[A] challenge to presidential action will be considered constitutional, and therefore justiciable . . . , so long as a plaintiff claims that the President has 'violated constitutional separation of powers principles' because the President's action lacked both 'statutory authority' and 'background constitutional authority.'" (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019)). When the President acts outside his constitutional power, federal courts—even if they cannot enjoin the President directly—can enjoin executive officials from carrying out Presidential directives. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952) (*Youngstown*) (holding that President Truman exceeded his constitutional power in seizing steel mills and affirming decision enjoining the Secretary of Commerce from carrying out Presidential order); *Hawaii*, 859 F.3d at 788 ("We conclude that Plaintiffs' injuries can be redressed fully by injunctive relief against the [Secretaries of State and Homeland Security], and that the extraordinary remedy of enjoining the President is not appropriate here.").

Thus, that the Court may lack jurisdiction to directly enjoin the President does not affect the justiciability of Plaintiffs' claims. The Court finds that the USRAP EO, Refugee Funding Suspension, and Agency Suspension are subject to

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 19

judicial review, that Plaintiffs have established standing to challenge those actions, and that "Plaintiffs' injuries can be redressed fully by injunctive relief against the remaining Defendants," without enjoining the President himself. *See Hawaii*, 859 F.3d at 788.

### 3.2   Plaintiffs are entitled to a preliminary injunction.

A preliminary injunction is an extraordinary remedy, never awarded as a matter of right. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Its purpose is to maintain the "'status quo ante litem'"—that is, "'the last uncontested status'" before the controversy erupted—pending a decision on the merits. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1191 (9th Cir. 2024) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). To obtain a preliminary injunction, the plaintiff must clearly show (1) likely success on the merits, (2) likely irreparable harm without preliminary relief, (3) a balance of equities in their favor, and (4) service of the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These four factors—the *Winter* factors—apply whenever a preliminary injunction is sought. *Winter*, 555 U.S. at 20; *see Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a showing on all four prongs" is required).

The Ninth Circuit takes a "sliding scale" approach to preliminary injunctions, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (cleaned up). This approach allows a stronger showing of one *Winter* factor to offset a weaker showing of another. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024).

As explained below, all four *Winter* factors are met here.

### 3.3    Plaintiffs are likely to succeed on the merits of their ultra vires claim.

Plaintiffs challenge the USRAP EO as ultra vires, asserting that it exceeds the statutory and constitutional limitations on the President's power. Plaintiffs' reply clarifies that they only request a preliminary injunction on the grounds that the USRAP EO exceeds the scope of the President's statutory power—specifically under the INA. *See* Dkt. No. 36 at 11 n.3. The Court finds that Plaintiffs are likely to succeed on the merits of that claim.

The President's authority to issue the USRAP EO must come from either Congress or the Constitution. *Youngstown*, 343 U.S. 579 (1952). Under the *Youngstown* framework, Presidential power is strongest when "act[ing] pursuant to an express or implied authorization of Congress," *id.* at 635, weakest when opposing Congress's will, *id.* at 637, and uncertain in the "zone of twilight" between these poles, *id.* at 636.

The parties dispute where on this spectrum the USRAP EO falls. While the Constitution gives Congress authority over immigration policy, *see* U.S. Const. art I, § 1; *id.* art. I, § 8, cl. 4, Congress delegated to the President the power to suspend

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 21

1    entry of foreign nationals deemed detrimental to U.S. interests, *see* 8 U.S.C. §

2    1182(f). Based on this delegation, the President claims maximum authority for the

3    USRAP EO. Section 1182(f) states:

4    **Suspension of entry or imposition of restrictions by President**

5    Whenever the President finds that the entry of any aliens or of any class
     of aliens into the United States would be detrimental to the interests of
6    the United States, he may by proclamation, and for such period as he
     shall deem necessary, suspend the entry of all aliens or any class of
7    aliens as immigrants or nonimmigrants, or impose on the entry of aliens
     any restrictions he may deem to be appropriate . . . .

8    8 U.S.C. § 1182(f).

9
     In *Trump v. Hawaii* (*Hawaii III*), the Supreme Court addressed the scope of

10   presidential authority under Section 1182(f), establishing both its breadth and its

11   boundaries. 585 U.S. 667 (2018). Section 1182(f) "exudes deference" to the President

12   and "vests [him] with 'ample power' to impose entry restrictions in addition to those

13   elsewhere enumerated in the INA." *Id*. at 684 (quoting *Sale v. Haitian Ctrs.*

14   *Council, Inc.*, 509 U.S. 155, 187 (1993)). The statutory text imposes a single,

15   straightforward condition: that the President "find[ ]" that the entry of certain

16   aliens "would be detrimental to the interests of the United States." *Id*. (quoting 8

17   U.S.C. § 1182(f)).[4]

18

19   [4] Congress expressly conditioned the President's suspension authority under Section
     1182(f) on a finding that entry would be "detrimental to the interests of the United
20   States." The statutory text employs the term "finding," which ordinarily denotes the
     conclusion of an inquiry or investigation—not merely a proclamation or
21   announcement, as is the case here. *Compare Finding* and *To find*, Webster's Third
     New International Dictionary of the English Language at 851, 852 (2021) *with To*
22   *proclaim* and *Proclamation*, *id*. at 1808. When comparing the USRAP EO with the
     proclamation reviewed in *Hawaii III*, notable differences emerge. The latter

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 22

1    This authority, while substantial, is not without limits. In *Hawaii III*, the

2 Supreme Court delineated the outer boundaries of this presidential power,

3 accepting the premise that Section 1182(f) "does not give the President authority to

4 countermand Congress's considered policy judgments." *Id.* at 689. The provision

5 "does not allow the President to expressly override particular provisions of the

6 INA." *Id.* at 689, 691.

7    Indeed, the Supreme Court's analysis in *Hawaii III* turned precisely on this

8 limitation. The Court upheld the presidential proclamation at issue because the

9 "plaintiffs [did] not point to any contradiction with another provision of the INA,"

10 and thus "the President [had] not exceeded his authority under § 1182(f)." *Id.* at

11 691. This reasoning establishes the principle that the President's invocation of

12 Section 1182(f) becomes unlawful and ultra vires when it overrides or conflicts with

13 the INA's statutory provisions.

14    The Ninth Circuit, applying this precedent, has further clarified this

15 framework, noting that while "§ 1182(f) grants the President broad discretion to

16 suspend the entry of aliens into the United States . . . the substantive scope of this

17

18

---

19 contained a thorough description of a multi-agency evaluation process and specific
20 recommendations supporting the restrictions, *see* 858 U.S. at 685, while the USRAP
EO simply "proclaim[s]" detriment without providing evidence of any investigative
21 process or factual determinations—i.e., findings—specifically related to refugee
admissions under USRAP, USRAP EO § 3(a). The textual divergence between
22 Section 1182(f)'s requirements and the USRAP EO's language raises questions
about its conformity with congressional authorization, but the Court need not
23 resolve this issue as it concludes for other reasons that the USRAP EO exceeds the
President's authority under Section 1182(f).

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 23

1    power is not limitless." *Doe #1 v. Trump*, 957 F.3d 1050, 1066 (9th Cir. 2020).[5] The

2    President may not invoke Section 1182(f) to "eviscerate" an entire "statutory

3    scheme," *id.* at 1064, or "revers[e] course on legislatively enacted policy in its

4    entirety," *Nat'l Ass'n of Mfrs.*, 491 F. Supp. 3d at 565.

5         Thus, the President may not employ Section 1182(f) to effect a wholesale

6    reversal of legislatively established policy, nor may he use the provision to nullify

7    an entire statutory framework through executive decree. The Constitution's

8    separation of powers demands this limitation.

### 3.3.1    The USRAP EO eviscerates an entire statutory scheme, replacing it with the President's unfettered discretion.

10        The USRAP EO is ultra vires because it unlawfully overrides USRAP in its

11   entirety. The order suspends USRAP indefinitely, with resumption contingent

12   solely on President Trump's determination that allowing refugee entries "is in the

13   interests of the United States." USRAP EO §§ 1, 4. The order provides neither

14   criteria for this determination nor a timeline for making it. Given these terms,

15   President Trump could effectively suspend USRAP permanently based solely on his

16   judgment about American interests.

17        This executive action unlawfully "countermand[s] Congress's considered

18   policy judgment[]," *see Hawaii III*, 585 U.S. at 688, that allowing refugees into the

---

[5] The Ninth Circuit "re-examined the merits" of *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), in a subsequent decision, but that decision was later vacated. *See Doe #1 v. Trump*, 948 F.3d 848 (9th Cir. 2020), vacated, *Doe #1 v. Biden*, 2 F.4th 1284, 1285 (9th Cir. 2021). At oral argument, the Parties expressed agreement that *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), is binding precedent.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 24

1    country is in the United States' interest, thereby "reversing course on legislatively

2    enacted policy in its entirety" and "'eviscerate[ing]'" it. *Nat'l Ass'n of Mfrs.*, 491 F.

3    Supp. 3d at 565 (quoting *Doe #1*, 957 F.3d at 1064). Congress clearly and expressly

4    stated its purpose and policy judgments in passing the Refugee Act:

> (a) The Congress declares that it is the historic policy of the United
> States to respond to the urgent needs of persons subject to persecution
> in their homelands, including, where appropriate, humanitarian
> assistance for their care and maintenance in asylum areas, efforts to
> promote opportunities for resettlement or voluntary repatriation, aid for
> necessary transportation and processing, admission to this country of
> refugees of special humanitarian concern to the United States, and
> transitional assistance to refugees in the United States . . . .
>
> (b) The objectives of this Act are to provide a permanent and systematic
> procedure for the admission to this country of refugees of special
> humanitarian concern to the United States, and to provide
> comprehensive and uniform provisions for the effective resettlement and
> absorption of those refugees who are admitted.

Pub. L. No. 96-212, § 101(b), 94 Stat. 102, § 101 (defining "Purpose" of 8 U.S.C. §

1521 (USRAP)).

By replacing these "carefully considered policy judgments" with his own

"America-First" policy to exclude refugees from the nation, the President unlawfully

nullifies and overrides USRAP with a "different and inconsistent" approach to the

same issue of refugee admissions. *See Hawaii III*, at 689; *Youngstown*, 343 U.S. at

639.

Additionally, with respect to Section 3(b) of the USRAP EO, that section

plainly exceeds Section 1182(f)'s statutory language. Through Section 1182(f),

Congress has authorized the President to "suspend . . . entry" and to "impose on the

entry of aliens any restrictions he may deem appropriate." 8 U.S.C. §1182(f). But

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 25

Add. 358

Section 3(b) of the USRAP EO directs the "Secretary of Homeland Security [to] suspend decisions on applications for refugee status," until he finds that "resum[ing]" USRAP is "in the interests of the United States." USRAP EO §§ 3(b), 4. The plain language of Section 1182(f) does not reference refugee applications, much less delegate authority to suspend agency operations directed by Congress.

On top of overriding USRAP, Plaintiffs argue that the USRAP EO conflicts with Congress's statutorily implemented FTJ program. *See* Dkt. No. 14 at 16 (citing 8 U.S.C. § 1157(c)(2)(A); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1078–79 (W.D. Wash. 2017)). Given the findings above, the Court need not reach this issue.

### 3.3.2   The USRAP EO is ultra vires because it does not "suspend" entry under Section 1182(f).

The USRAP EO exceeds the "textual limitation" imposed by Section 1182(f) requiring that suspensions on entry be temporary or conditional in nature. *See* 8 U.S.C. § 1182(f); *Hawaii III*, 585 U.S. at 687 (analyzing statute's plain-language limitations); *Doe #1*, 957 F.3d at 1065 (same). As the Supreme Court recognized in *Hawaii III*, Section 1182(f) allows the President to "suspend" entry "for [a] period"— *not to terminate entry*. The term "suspend" means "to cause to stop temporarily," *Suspend*, Merriam-Webster Dictionary (2019), or "connotes a deferral till later," suggesting a finite interruption rather than permanent cessation. *Doe #1*, 957 F.3d at 1065 (quoting *Hawaii III*, 585 U.S. at 687 (citation omitted)).

While the President need not "prescribe in advance a fixed end date" for entry restrictions—which would be impractical or impossible in some cases—there must be some temporal limitation. For example, when responding to a diplomatic dispute

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 26

or policy concern, a President may "link the duration of the suspension, implicitly or explicitly, to the resolution of the triggering condition." *Hawaii III*, 585 U.S. at 687. The proclamation in *Hawaii III* satisfied this requirement by making clear that its "conditional restrictions would remain in force only so long as necessary" to address identified "inadequacies and risks," with the aim to "relax or remove the entry restrictions as soon as possible." *Id.* at 708.

The USRAP EO lacks any such temporal limitation. Unlike the proclamation upheld in *Hawaii III*, it contains no language—implicit or explicit—suggesting that the suspension is tied to the resolution of a specific triggering condition. This deficiency mirrors the problem the Ninth Circuit identified in *Doe #1 v. Trump*, in which the court invalidated a proclamation suspending entry of immigrants based on domestic healthcare system concerns. 957 F.3d at 1065. That proclamation, like the USRAP EO, had no fixed end date and failed to tie the suspension to any resolvable, triggering event or condition. *Id.* at 1065–66.

Also like the unlawful proclamation in *Doe #1 v. Trump*, the USRAP EO cites broad, long-term policy concerns without demonstrating how these concerns will be resolved or how the suspension relates to addressing them. It notably fails to identify deficiencies in the existing refugee program that would be remedied by the suspension, and its zero-sum view that admitting refugees necessarily depletes resources for Americans creates an unresolvable justification. Without these elements, there is no way to "render the limitation feasibly temporary," as required by the Ninth Circuit in *Doe #1*. 957 F.3d at 1066.

1    Consequently, the USRAP EO does not merely "suspend" entry "for [a]

2    period" as permitted by Section 1182(f); rather, it effectively displaces the refugee

3    program entirely and indefinitely, exceeding the President's statutory authority.

### 3.3.3    The Court rejects Defendants' sweeping characterization of the President's inherent powers here.

6    Defendants argue that the USRAP EO is well within the President's

7    discretion because his "authority reigns principally in the realm of admissions of

8    aliens and foreign affairs." Dkt. No. 31 at 18–19 (citing *Fiallo v. Bell*, 430 U.S. 787,

9    792 (1977); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). Without citation,

10   they also assert that the President "has broad authority to . . . determin[e] how

11   foreign aid funds are used." *Id*. at 20. These contentions seem to be part of a larger

12   argument that the Constitution provides the President with inherent authority to

13   act as he did here. The Court finds these arguments unpersuasive for the reasons

14   below.

15   To start, Defendants' cases do not support the conclusion that the

16   Constitution gives the President inherent power to unilaterally override entire

17   immigration statutes passed by Congress. Rather, those cases highlight that the

18   Legislative Branch is constitutionally responsible for passing immigration laws. *See*

19   *e.g.*, *Fiallo*, 430 U.S. at 792, 794 (1977) (citation omitted) ("Congress has . . .

20   exceptionally broad power to determine which classes of aliens may lawfully enter

21   this country."); *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)

22   ("[N]ormally Congress supplies the conditions of the privilege of entry into the

23   United States," and "[e]xecutive officers may be entrusted with the duty of

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 28

1  specifying the procedures for carrying out the congressional intent."). The

2  Constitution expressly vests the Legislative Branch—not the Executive Branch—

3  with the power to "establish [a] uniform Rule of Naturalization" and pass all laws.

4  U.S. Const. art I, §1; *id*. art. I, § 8, cl. 4; *see also Fiallo*, 430 U.S. at 792 ("[O]ver no

5  conceivable subject is the legislative power of Congress more complete than it is

6  over the admission of aliens" (internal citations and quotation marks omitted)).

7  Indeed, the Constitution requires the President to "take Care" to ensure that

8  Congress's laws are "faithfully executed." U.S. Const. art. II, § 3.

9        Next, Defendants' argument mischaracterizes the USRAP EO as a creature

10 of foreign policy, when in fact, its "purpose" and "policy" sections primarily reference

11 domestic economic matters and the "appropriate assimilation of refugees" within

12 our country. *See* USRAP EO §§ 1, 2 ("The United States lacks the ability to absorb

13 large numbers of migrants, and in particular, refugees, into its communities in a

14 manner that does not compromise the availability of resources for Americans,

15 . . . and that ensures the appropriate assimilation of refugees" . . . "It is the policy of

16 the United States to ensure that public safety and national security are paramount

17 considerations in the administration of the USRAP, and to admit only those

18 refugees who can fully and appropriately assimilate into the United States and to

19 ensure that the United States preserves taxpayer resources for its citizens.").

20 Although the USRAP EO makes a conclusory reference to "national security," it's

21 clearly distinguishable from other national security focused executive orders,

22 including the Presidential Proclamation at issue in *Hawaii III*. *See* Proclamation

23 No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017) ("Enhancing Vetting Capabilities and

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 29

1
2
3
4
5

Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats"). Unlike the USRAP EO, that Presidential Proclamation "identif[ied] ongoing deficiencies in the information needed to assess whether nationals of particular countries present[ed] 'public-safety threats.'" *Hawaii III*, 585 U.S. at 677.

6
7
8
9
10
11

In the realm of domestic economic matters, however, "the national security and foreign affairs justifications for policy implementations disappear, and the normal policy-making channels remain the default rules of the game." *Doe #1*, 957 F.3d at 1067. Like the Ninth Circuit in *Doe #1*, this Court rejects the notion that the USRAP EO implicates the President's foreign affairs powers simply because it affects refugees.

12
13
14
15
16
17
18
19
20
21

Instead, the focus of the USRAP EO is domestic—the economic impact on American communities, tax-payer resources, and "appropriate assimilation." *See* USRAP EO § 1. This is not a use of Section 1182(f) that affords the President maximum deference. Indeed, "Congress' delegation of authority in the immigration context under Section 1182(f) does not afford the President unbridled authority to set domestic policy regarding employment of nonimmigrant foreigners." *Nat'l Ass'n of Mfrs. v. DHS*, 491 F. Supp. 3d at 563. Rather, "there must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." *Id.*

22
23

Accordingly, this Court also rejects Defendants' argument that the USRAP EO falls within the President's plenary authority to manage foreign affairs.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 30

### 3.4    Plaintiffs are likely to succeed on their APA claims against Secretary Rubio, Secretary Noem, and Secretary Kennedy.

The Court turns now to Plaintiffs' claims against the Agency Defendants. Whereas Plaintiffs' ultra vires claims against the President challenge the USRAP EO itself, their Administrative Procedure Act (APA) claims against the Agency Defendants challenge agency actions taken to halt and defund USRAP.

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin*, 505 U.S. at 796. Under the APA, persons "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court" are "entitled to judicial review thereof." 5 U.S.C. §§ 702, 704. Section 706(2) of the APA requires reviewing courts to "hold unlawful and set aside agency action . . . found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). While the precise "procedure required by law" varies by context, of relevance here are the notice-and-comment procedures set forth in Section 553, which govern agency rulemaking. *See* 5 U.S.C. § 553.

Plaintiffs offer three arguments why the Court, under Section 706(2), must hold unlawful and set aside the agency actions interpreting, implementing, and expanding the USRAP EO: first, that these actions violate statutory law; second, that these actions ignored required procedures of notice-and-comment rulemaking;

and third, that these actions are arbitrary and capricious. On all three fronts, the

Court agrees that Plaintiffs have shown a likelihood of success on the merits.

### 3.4.1    The Refugee Funding Suspension and the Agency Suspension are final agency actions reviewable under the APA.

To begin, Defendants argue that Plaintiffs fail to allege any final agency

action reviewable under the APA. They posit four arguments why this is the case.

First, they say that Plaintiffs fail to identify a discrete agency action at issue.

Second, they argue that actions implementing executive orders are not reviewable

under the APA. Third, they argue that the actions at issue are merely temporary

and therefore not "final" within the meaning of the APA. And fourth, they argue

that the claims challenging the Refugee Funding Suspension belong, if anywhere, in

the United States Court of Federal Claims. The Court addresses—and rejects—each

argument, concluding that the Agency Suspension and Refugee Funding Suspension

are both reviewable under the APA.

> *a.    Plaintiffs adequately identify discrete agency actions for APA review.*

According to Defendants, Plaintiffs identify no "discrete" agency action for

court review, instead mounting an impermissibly broad "programmatic challenge"

seeking "wholesale improvement" of agency programs. Dkt. No. 31 at 26. In support

of this argument, they cite *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000)

(finding that environmental groups' APA claims failed to specify a final agency

action). But *Sierra Club* involved a "sweeping argument that the Forest Service's

'on-the-ground' management of the Texas forests over the last twenty years

1   violate[d] the [National Forest Management Act]." *Id.* Plaintiffs, by contrast,

2   narrowly challenge discrete agency actions made over several days or weeks.

3       Concretely, Plaintiffs break down their allegations against the Agency

4   Defendants into two sets of agency actions: the "Agency Suspension" and the

5   "Refugee Funding Suspension." The "Agency Suspension" refers to the categorical

6   suspension of all USRAP-related refugee case processing, case decisions, refugee

7   admissions, and refugee travel into the United States. *See* Dkt. No. 14 at 6. The

8   Agency Defendants implemented the Agency Suspension a full week before the

9   USRAP EO called for the suspension of refugee admissions into the country.

10  *Compare* USRAP EO, §3(a) ("This suspension shall take effect at 12:01 am eastern

11  standard time on January 27, 2025.") *with* Dkt. No. 31-1 ¶ 20 (Zerbinopoulos Decl.)

12  ("PRM officials canceled all refugee travel scheduled for after 12:00 pm on January

13  20, 2025.").

14      The "Refugee Funding Suspension" refers to the suspension of federal

15  funding to USRAP nonprofit partners for their work processing refugee applications

16  abroad and providing services to refugees domestically. USRAP nonprofit partners,

17  including Plaintiff resettlement agencies, learned of the Refugee Funding

18  Suspension on January 24, when PRM issued mass "Suspension Notices" directing

19  resettlement agencies to immediately stop work, cancel obligations, and incur no

20  new costs. Dkt. No. 31-3. Plaintiffs allege that, along with these Suspension Notices,

21  the Refugee Funding Suspension also includes a *sub silentio* suspension, enacted

22  without notice, of contractual reimbursements owed to USRAP partner nonprofits

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 33

1    for work already performed under cooperative agreements. *See* Dkt. No. 15-23 ¶¶

2    46-47.

3        The Court finds that these agency actions—the Agency Suspension and the

4    Refugee Funding Suspension—are discrete enough to facilitate APA review. *See Al*

5    *Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206–07 (S.D. Cal. 2019)

6    (finding that unwritten, informal DHS policy limiting access to asylum at border

7    was APA-reviewable); *Washington v. U.S. DHS*, 614 F. Supp. 3d 863, 872–73 (W.D.

8    Wash. 2020) (same as to unwritten CBP policy of courthouse arrests of noncitizens).

9            b.    *Agency Defendants cannot evade APA review merely by*
              *claiming they are implementing executive orders.*

10       Because the "President is not an agency within the meaning of the [APA],"

11   Presidential actions, including executive orders, are immune from APA review.

12   *Franklin*, 505 U.S. at 796. Attempting to expand this rule, Defendants argue that

13   agency actions implementing executive orders are also immune from APA review.

14   Dkt. No. 31 at 26.

15       In support of this argument, Defendants cite just one authority, an out-of-

16   circuit district court case: *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d

17   85, 99–104 (D.D.C. 2016). There, the plaintiffs brought an APA challenge to DOS's

18   issuance of a "Presidential permit" for the construction of an international bridge.

19   *Id.* The court found that the permit issuance was not an APA-reviewable "agency

20   action" because DOS issued the permit at the statutorily authorized direction of the

21   President, with no agency discretion. *Id.* Defendants assert that the Refugee

22   Funding Suspension and Agency Suspension, because they merely implement the

23

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 34

USRAP EO and Foreign Aid EO, are analogous to the permit issuance in *Detroit Int'l Bridge Co.*

Not so. The Ninth Circuit has held that "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). "[F]inal agency actions, even if implementing an executive order, are subject to judicial review under the APA." *Id.* The Ninth Circuit decision in *E. Bay Sanctuary Covenant v. Trump* provides clear guidance. 932 F.3d 742, 770–71 (9th Cir. 2018). There, plaintiffs brought an APA challenge to an agency rule that purported to implement a Presidential Proclamation calling for the suspension of migrant entry on the southern border outside ports of entry. *Id.* The Ninth Circuit held that while it did "not have any authority under § 706 of the APA to review the Proclamation . . . , *we may review the substantive validity of the Rule together with the Proclamation.*" *Id.* (emphasis added).

The reason for this is clear. As another court recently noted in a case challenging agency implementation of the Foreign Aid EO, exempting agency action from APA oversight just because it purports to carry out presidential policy "would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Nos. CV 25-00400 (AHA), 25-00402 (AHA), 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025) (finding likelihood of success on merits of APA claim challenging agency implementation of Foreign Aid EO).

To make an even finer point, this case is distinguishable from *Detroit Int'l Bridge Co.* in two key respects. First, the USRAP EO itself is unlawful. *Supra* § 3.3.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 35

1    Defendants cite no authority indicating that an ultra vires Executive Order can

2    shield agency actions—even those that merely color within the lines of the Order—

3    from APA review.

4         Second, the Agency Suspension and Refugee Funding Ban do not merely color

5    within the lines. Unlike the permit issuance in *Detroit Int'l Bridge Co*, these are not

6    ministerial implementations, sans discretion, of Presidential authority. Rather,

7    they represent substantive expansions of the Executive Orders they purport to

8    carry out. A brief look at each agency action clarifies this point.

9         Defendants claim they enacted the Refugee Funding Suspension to comply

10   with the Foreign Aid EO. But the Foreign Aid EO calls only for a pause in "foreign

11   development assistance." Foreign Aid EO § 3(a). It says nothing about USRAP or

12   refugees. *See generally id*. Without explanation, the State Department construed

13   the term "foreign development assistance" to include funding for USRAP

14   programs—even including programs Congress has expressly characterized as

15   "domestic." *See* 8 U.S.C. § 1522(a)(3) ("domestic assistance" to refugees). This

16   surprising construction indicates vast agency discretion.

17        The Agency Defendants also claim they enacted the Agency Suspension in

18   compliance with the USRAP EO. But the USRAP EO, on its face, authorizes the

19   Secretaries of State and Homeland Security to "jointly determine . . . *in their*

20   *discretion*" to admit refugees on a "case-by-case basis." USRAP EO, §3(c) (emphasis

21   added). Armed with this discretion, the Agency Defendants opted not to create a

22   process to consider case-by-case admissions before implementing a total cessation of

23   refugee travel into the country—a full week before the date called for in the EO.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 36

Additionally, while the USRAP EO calls only for the suspension of refugee case decisions and admissions, the Agency Suspension also suspended all case processing, effectively shuttering USRAP operations.

That Defendants allege these extraordinary actions were taken to carry out the President's Executive Orders does not immunize them from APA review. *See, e.g.*, *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021) ("The means by which the Secretary implements the Proclamations are therefore within the discretion of the Secretary, are not dictated by the Proclamations themselves, and require the Secretary to exercise judgment."); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) ("State's action—suspending visa adjudications when the Proclamation merely directs the suspension of 'entry'—thus required the agency to exercise its judgment.").

> c. *The Agency Suspension and Refugee Funding Ban are "final agency actions" within the meaning of the APA.*

Defendants argue that because the Agency Suspension and Refugee Funding Suspension are temporary, they are not "final agency actions" subject to APA review. They point out that the Foreign Aid EO provides for a 90-day suspension of funding assistance; the USRAP EO provides for a 90-day suspension of refugee admissions; and both EOs call for a Presidential determination after 90 days of whether to lift the suspension. On this basis, Defendants assert that the agency actions implementing the temporary suspensions are not "final" within the meaning of 5 U.S.C. § 704 (authorizing review of "final agency action").

But the fact that the challenged actions are ostensibly temporary is immaterial—for, as Plaintiffs point out, "*all* agency actions are subject to future change." Dkt. No. 36 at 9. Under the well-settled standard, an agency action is final if it (1) marks the "consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Defendants do not dispute that the Agency Suspension and Refugee Funding Suspension produce "legal consequences" for USRAP nonprofit partners, refugees, and others. Nor do they dispute that the Agency Suspension and Refugee Funding Suspension each represent the consummation of an internal administrative decision-making process, even if opaque. The Court concludes that the Refugee Funding Suspension and Agency Suspension are final agency actions subject to APA review. *See Nat'l Council of Nonprofits v. OMB*, No. 25-239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (in case challenging similar "pause" to funding and disbursements, finding that "[b]y any measure, Defendants' action[s] led to legal consequences and constituted final agency action").

    d.    *Plaintiffs' APA claims challenging the Refugee Funding Suspension are not subject to the exclusive jurisdiction of the United States Court of Federal Claims.*

Defendants' final argument against APA-reviewability pertains only to the Refugee Funding Suspension. According to Defendants, Plaintiffs' challenge to the Refugee Funding Suspension is ultimately a contract claim alleging a breach of the terms of the agreements between USRAP nonprofit partners and the government—

1    and is therefore subject to the exclusive jurisdiction of the United States Court of

2    Federal Claims.

3         Defendants provide almost no briefing to support this position. But reading

4    between the lines, their argument seems to invoke the relationship among Sections

5    702 and 704 of the APA and the Tucker Act. Section 702 states that claims against

6    the federal government challenging agency actions are not barred by sovereign

7    immunity—except for "money damages" claims. 5 U.S.C. § 702. In other words,

8    claims seeking "money damages" from the government, including *contractual*

9    damages, are barred by sovereign immunity and cannot proceed under the APA.

10   Section 704 provides that only agency actions "for which there is no other adequate

11   remedy in a court" are subject to APA review. *Id.* § 704. That is, if a claim could be

12   brought, for example, in the Court of Federal Claims, it cannot proceed under the

13   APA. Finally, the Tucker Act provides that the Court of Federal Claims has

14   "jurisdiction to render judgment upon any claim against the United States founded

15   . . . upon any express or implied contract with the United States, or for liquidated or

16   unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

17   Synthesizing these provisions, the Court understands Defendants to be arguing

18   that Plaintiffs' claims challenging the Refugee Funding Suspension—because they

19   seek money damages for a breach of contract and could therefore be brought in the

20   Court of Federal Claims—satisfy neither the Section 702 waiver of sovereign

21   immunity nor the Section 704 no-other-adequate-forum requirement.

22        This argument, even when properly formulated, misses the mark. As the

23   Supreme Court clarified in *Bowen v. Massachusetts*, "[t]he fact that a judicial

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'" within the meaning of Section 702. 487 U.S. 879, 893 (1988) (holding that federal district court, not Court of Federal Claims, has jurisdiction to review federal agency action denying reimbursements owed for Medicaid expenditures). The *Bowen* Court carefully distinguished money damages, which "are given to the plaintiff to *substitute* for a suffered loss," from specific remedies, which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quotations omitted) (emphasis original); *see also Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) ("An action for specific performance is not an action for 'money damages' under APA § 702, even if the remedy may actually require a payment of money by the government."). The *Bowen* Court made crystal-clear that when a party suing the federal government "seek[s] funds to which a statute allegedly entitles it, rather than money in compensation for the losses," such a claim is not excepted from Section 702's sovereign-immunity waiver. *Bowen*, 487 U.S. at 896.

17
18
19
20
21
22

As in *Bowen*, Plaintiffs here "do not bring breach-of-contract claims for money damages." Dkt. No. 36 at 13. "Instead, they challenge agency actions suspending all USRAP processing and funding for USRAP and resettlement assistance and seek an injunction and ultimately vacatur of those unlawful actions." *Id.* Plaintiffs could not obtain these remedies in the Court of Federal Claims, which "has no power to grant equitable relief[.]" *Richardson v. Morris*, 409 U.S. 464, 465 (1973).

23

1

2

3

4

5

Because Plaintiffs could not obtain the equitable relief they seek outside federal district court—and because Plaintiffs seek specific remedies, not damages—the Court rejects Defendants' final argument about non-reviewability. The Court concludes that the Refugee Funding Suspension and Agency Suspension are final agency actions properly subject to APA review.

6

7

### 3.4.2 The Refugee Funding Suspension and Agency Suspension are contrary to law and exceeded the Agency Defendants' statutory authority.

8

9

10

11

12

13

Under the APA, reviewing courts must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law"; "contrary to constitutional right [or] power"; or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A)–(C). Plaintiffs argue that the Agency Suspension and Refugee Funding Suspension exceed the Agency Defendants' statutory authority and are not in accordance with law. *See* 5 U.S.C. § 706(2)(A), (C). The Court agrees.

14

15

16

17

18

19

20

21

22

23

To begin with, the Refugee Funding Suspension and Agency Suspension, like the USRAP EO, contradict the clear intent of Congress "to provide a permanent and systematic procedure for the admission to this country of refugees . . . and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Refugee Act of 1980, Pub. L. No. 96-212, § 101(b), 94 Stat. 102. The Court has already concluded that the President lacks authority to nullify the Refugee Act. *Supra* § 3.3. The same applies *a fortiori* to the Agency Defendants, who unlike the President, lack authority to suspend admissions under Section 1182(f). Counsel for the government conceded this point at oral

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 41

argument, distinguishing *Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017), on the grounds that the "suspension [in *Doe*] was issued by the Secretary of State, so it was not based on [Section 1182(f)] precedential authority." *See Doe*, 288 F. Supp. 3d at 1080 ("DHS Secretary [could not] simply ignore the 'permanent and systematic procedure' for refugee admission and resettlement that Congress established in the Refugee Act of 1980.").

The lawfulness of the Refugee Funding Suspension merits particular scrutiny here because the Refugee Funding Suspension claims support from the Foreign Aid EO, not the USRAP EO, and therefore exhibits statutory infirmities not already discussed in the Court's analysis of the USRAP EO, *supra* § 3.3. In particular, the Refugee Funding Suspension contradicts the clear will of Congress, codified in Section 1522 of the INA, to create a federally funded system to support domestic refugee resettlement.

Defendants argue that "[w]hile it is true that § 1522(b) . . . authorizes the Secretary of State 'to make grants to, and contracts with, . . . nonprofit agencies" for resettlement services, "nothing requires the Secretary to exercise this authority at all or to any specific degree." Dkt. No. 31 at 28. The Court disagrees. The Statute mandates the Agency Defendants to administer the domestic refugee resettlement program. *See* 8 U.S.C. §§ 1521–24. Congress appropriates funds, and the agencies are required, "to the extent of available appropriations," to ensure the provision of support services for resettled refugees—including employment training and placement, English language teaching, and direct cash support. 8 U.S.C. § 1522(a). The statutory scheme envisions that the federal agencies will meet this obligation

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 42

1    by entering contract and grant relationships with nonprofit service providers. 8

2    U.S.C. § 1522(a)–(d). "Each [such] grant or contract . . . shall require the [nonprofit]

3    agency to," among other things, "fulfill its responsibility to provide for the basic

4    needs (including food, clothing, shelter, and transportation for job interviews and

5    training) of each refugee resettled and to develop and implement a resettlement

6    plan including the early employment of each refugee resettled and to monitor the

7    implementation of such plan." 8 U.S.C. § 1522(b)(7)(D).

8         By withholding funding, the Agency Defendants likely act contrary to law not

9    only by abdicating their own obligations to fund and administer the program but

10   also by prohibiting resettlement partners from complying with their statutory

11   obligations. And given that neither the USRAP EO nor the Foreign Aid EO call for

12   the defunding of the domestic refugee resettlement program, the Court is not

13   inclined the credit the ostensibly temporary nature of those Orders as a factor

14   weighing against the illegality of the Refugee Funding Suspension.[6]

15

16

17

18

19   _____

     [6] The Court notes that the Refugee Funding Suspension also likely violates the
20   Congressional Budget and Impoundment Control Act (ICA), 2 U.S.C. § 682 *et seq.*,
     though the parties did not address this issue. The ICA restricts the Executive's
21   ability to defer spending appropriated funds through both procedural and
     substantive requirements. *See* 2 U.S.C. §§ 682(1)(A), 684(a), (b). The Refugee
22   Funding Suspension withholds congressionally appropriated USRAP funds
     indefinitely, likely constituting a "deferral of budget authority" under the ICA. *See*
23   *id*. § 682(1)(A). It appears from the record that neither the procedural nor the
     substantive requirements were met here. But as the Parties did not brief the ICA,
     the Court will not decide this motion on ICA grounds.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

### 3.4.3    The Agency Suspension did not comply with required procedures of notice-and-comment rulemaking.

Plaintiffs argue that the Court must hold unlawful and set aside the Refugee Funding Suspension and Agency Suspension because they amount to substantive, or legislative, rulemakings "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D). "Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009); *see* 5 U.S.C. § 553 (notice-and-comment rulemaking procedures). Under these required procedures, federal agencies must "publish notice of proposed rules in the Federal Register and then allow 'interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.'" *E. Bay Sanctuary Covenant*, 932 F.3d at 775 (quoting 5 U.S.C. § 553(c)). "The 'agency must consider and respond to significant comments received during the period for public comment.'" *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015)). "These procedures are 'designed to assure due deliberation' of agency regulations and 'foster the fairness and deliberation that should underlie a pronouncement of such force.'" *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001)).

Defendants do not dispute that the Agency Defendants enacted the Agency Suspension and Refugee Funding Ban without following notice-and-comment procedures. Nor do they invoke the "good cause" or "foreign affairs" exceptions to Section 553. *See* 5 U.S.C. §§ 553(a)(1), 553(b)(B). Instead, they argue that their

1   actions merely implemented the President's Orders, and thus were not subject to

2   APA procedures. Dkt. No. 31 at 29. But as discussed above, the Agency Suspension

3   and Refugee Funding Suspension are not mere ministerial implementations of

4   Executive Orders; they are discretionary—and far-reaching—final agency actions.

5   *See supra* § 3.4.1(b). Thus, Defendants' argument is unavailing.

6          The Court agrees with Plaintiffs that the agency actions at issue qualify as

7   substantive, or legislative, rules. Under the APA, a "rule" is "the whole or a part of

8   an agency statement of general or particular applicability and future effect designed

9   to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4). An action

10  need not be in writing to be a rule; otherwise, an agency could "shield its decisions

11  from judicial review simply by refusing to put those decisions in writing." *Grand*

12  *Canyon Tr. v. Pub. Serv. Co. of New Mexico*, 283 F. Supp. 2d 1249, 1252 (D.N.M.

13  2003). Rules are distinct from "adjudications" in that adjudications "resolve disputes

14  among specific individuals in specific cases, whereas rulemaking affects the rights

15  of broad classes of unspecified individuals." *Yesler Terrace Cmty. Council v.*

16  *Cisneros*, 37 F.3d 442 (9th Cir. 1994). And legislative, or substantive, rules are

17  distinct from interpretive rules in that they "create rights, impose obligations, or

18  effect a change in existing law[.]" *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087–

19  88 (9th Cir. 2003). Interpretive rules "merely explain, but do not add to, the

20  substantive law that already exists in the form of a statute or legislative rule." *Id.*

21         The Agency Suspension and Refugee Funding Suspension are substantive, or

22  legislative, rules because they effect legal changes of general applicability. They

23  terminate all USRAP case processing, decisions, admissions, and travel, and they

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 45

block all funding to USRAP partner nonprofits. The fact that they effectively nullify pre-existing regulations that were themselves codified through notice-and-comment rulemaking only bolsters this conclusion. *See* Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. § 207); Procedures for Filing a Derivative Petition (Form I–730) for a Spouse and Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3792 (Jan. 27, 1988) (to be codified at 8 C.F.R. § 207.7); *Doe*, 288 F. Supp. 3d at 1075 ("Where the original rule was adopted after a notice and comment period, courts have generally found the decision to alter those rules to be substantive, and therefore subject to APA rulemaking procedures as well." (citing cases)). The Court thus concludes that Plaintiffs are likely to succeed on their claim that the Agency Suspension violates the procedural requirements of the APA.

But the Court does not reach the same conclusion with respect to the Refugee Funding Suspension. The APA expressly excepts "matter[s] relating to . . . loans, grants, benefits, or contracts" from the procedural requirements of Section 553 notice-and-comment rulemaking. 5 U.S.C. § 553(a)(2). This "statutory exception 'cuts a wide swath through the safeguards generally imposed on agency action[.]'" *Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir. 1984) (quoting *Good Samaritan Hospital, Corvallis v. Mathews*, 609 F.2d 949, 953 (9th Cir.1979)). The parties

provided almost no briefing on this issue.[7] Nevertheless, the Court is preliminarily persuaded that the Refugee Funding Ban qualifies as a "matter relating to . . . grants, benefits, or contracts" and is therefore likely exempt from Section 553 procedural requirements. Of course, this does not exempt it from Section 706. Thus, that the Refugee Funding Suspension is arbitrary, capricious, and contrary to law is sufficient to set it aside.

### 3.4.4    The Refugee Funding Suspension and Agency Suspension are arbitrary and capricious.

Plaintiffs argue that the Agency Suspension and Refugee Funding Suspension must also be set aside under Section 706(2)(A) for the separate reason that they are arbitrary and capricious. Dkt. No. 14 at 25. The Court agrees.

"Under the arbitrary and capricious standard, our scope of review is narrow and deferential." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008). "Agency action is valid 'if a reasonable basis exists for [the agency's] decision.'" *Id.* (quoting *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir.2006)). "A reasonable basis exists where the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Id.* (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agriculture*, 415 F.3d 1078, 1093 (9th Cir.2005)). "Although we may uphold a decision of less than

---

[7] In their reply brief, Plaintiffs state that "Defendants have not asserted that any exceptions to the notice-and-comment rulemaking requirement apply, and those arguments are now forfeited." Dkt. No. 36 at 12. This is false. *See* Dkt. No. 31 at 29 (opposition brief) (stating, with no further analysis, that "any activity relating to the pause in funding necessarily involves 'loans, grants, benefits, or contracts'").

1  ideal clarity if the agency's path may reasonably be discerned, we may not infer an

2  agency's reasoning from mere silence." *Id.* (citations and quotation marks omitted).

3  Thus, an agency bears the burden to "show that there are good reasons for the new

4  policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And where an

5  agency action rescinds a prior policy, the agency must show consideration of both

6  "serious reliance interests," *id.*, as well as "alternatives . . . within the ambit of the

7  existing policy." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

8      The Court applies these review standards first to the Agency Suspension,

9  then to the Refugee Funding Suspension.

10      As discussed throughout this Order, the Agency Suspension substantively

11  expanded the USRAP EO in at least three ways. First, it terminated all refugee

12  travel into the United States a full week prior to the date called for in the USRAP

13  EO. Dkt. No. 31-1 ¶ 20. Second, it terminated not just all case decisions and

14  admissions, but also all USRAP case processing and operations—effectively

15  shuttering the program. *See* Dkt. No. 15-24 ¶ 25. And third, where the USRAP EO

16  expressly authorized the Secretaries of State and Homeland Security to "jointly

17  determine to admit aliens to the United States as refugees on a case-by-case basis,"

18  USRAP EO § 3(c), the Agency Defendants discretionarily opted not to create such a

19  system for case-by-case admissions before terminating all refugee entry into the

20  country. *See* Dkt. No. 31-1 ¶ 22 n.2.

21      The Agency Defendants provided no explanation whatsoever for these

22  substantive expansions of the USRAP EO. They did not, as is required under

23  arbitrary-and-capricious review, acknowledge, let alone meaningfully consider, the

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 48

1
2
3
4
5
6
7

reliance interests of refugees, U.S. citizens, and resettlement nonprofits harmed by

their actions. Nor did they articulate any consideration of alternative options—such

as the implementation of a case-by-case admissions system at the discretion of the

Secretaries of State and Homeland Security—that might mitigate the harms of the

Agency Suspension. Instead, they merely cite the USRAP EO as a justification for

their actions. But the USRAP EO—which is itself unlawful—cannot, on its face,

explain the Agency Defendants' discretionary expansions of the USRAP EO.[8]

8
9
10
11
12
13
14
15

The Refugee Funding Suspension likewise went far beyond the text of the

Foreign Aid EO that it purported to implement. As discussed above, the Foreign Aid

EO calls only for a pause in "foreign development assistance" and says nothing

about USRAP, refugee case processing, or refugee services. Foreign Aid EO § 3(a).

Nevertheless, the Agency Defendants, with no explanation, construed the Foreign

Aid EO as requiring the total suspension of all funding for USRAP operations—

including, contrary to reason, funding for *domestic* refugee resettlement support.

*See* Dkt. No. 31-1 ¶¶ 24–27.

16
17

As with the Agency Suspension, the Agency Defendants provided no reasoned

explanation for the Refugee Funding Suspension. Defendants' counsel states that

18
19
20
21
22
23

---

[8] Defendants advance the remarkable position that suspending refugee admissions *before* the cutoff specified in the USRAP order was somehow an act of compassion—a preemptive attempt to prevent incoming refugees from being "stranded at U.S. ports of entry[.]" Dkt. No. 31-1 ¶20. This explanation rings hollow, however, when confronted with the real-world impact on refugees like Plaintiff Pacito—who had already sold his belongings, terminated his housing lease, and prepared for imminent departure. As courts have repeatedly held, post hoc rationalizations cannot retroactively justify agency actions lacking a rational basis. *Arrington*, 516 F.3d at 1113.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 49

Secretary Rubio issued the Suspension Notices because USRAP-related funding "is appropriated under the 'Migration and Refugee Assistance' (MRA) heading of title III of the Department of State, Foreign Operations, and Related Programs Appropriations Act (SFOAA)"—which was paused in response to the Foreign Aid EO. *Id.* This is no explanation at all. Defendants effectively concede that Secretary Rubio discretionarily halted USRAP funding yet give no insight into the reasons for that decision. Nor did the Agency Defendants apparently consider reasonable alternatives. *See AIDS Vaccine*, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025) ("Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs.").

Additionally, the State Department did not acknowledge the apparent deviation from its own regulations implementing the Refugee Act. *See* 2 C.F.R. § 600.101 (incorporating by reference *id.* § 200.305(b)(6)); *see California v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 718 F. Supp. 3d 1060, 1085 (N.D. Cal. 2024) ("Some courts have concluded that an agency's failure to comply with its own regulations is 'not in accordance with law' for purposes of the APA. Other courts have held that, when an agency fails to comply with its own regulations, it has acted arbitrarily and capriciously for purposes of the APA." (citations omitted)). Those regulations expressly provide that "[p]ayments for allowable costs must not be withheld . . . unless required by Federal statute, regulations, or" if "[t]he

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 50

recipient . . . has failed to comply with the terms and conditions of the Federal award" or "is delinquent in a debt to the United States." *See* 2 C.F.R. § 200.305(b)(6). None of those conditions appear to be met here.

In sum, the Court finds that the Plaintiffs are likely to prove that the Agency Suspension and the Refugee Funding Suspension are arbitrary and capricious and must therefore be set aside under the APA.

### 3.5 Plaintiffs are likely to succeed on their claims that Defendants violate the due process rights of follow-to-join petitioners.

Plaintiffs contend that suspending USRAP violates the due process rights of follow-to-join petitioners, including Plaintiff Esther. Dkt. No. 1 ¶¶ 228–29. The Defendants counter that this "procedural due process claim" lacks merit, mainly relying on *Department of State v. Muñoz*, 602 U.S. 899, 909 (2024). Dkt. No. 31 at 25. This argument misapprehends the fundamental distinction between this case and *Muñoz*.

In *Muñoz*, the Supreme Court addressed whether a United States citizen possessed a constitutional liberty interest in having her foreign-national spouse admitted to this country. The plaintiff there asserted that the right to live with her noncitizen spouse was "implicit in the 'liberty' protected by the Fifth Amendment," and claimed that the unexplained denial of her husband's visa application violated this interest. 602 U.S. at 902–03. The Court rejected this position, finding no unenumerated constitutional right to secure a noncitizen spouse's entry into the United States. *Id.* at 903.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Here, in contrast, Esther's interest stems not from constitutional implications but from a specific statutory entitlement. Under 8 U.S.C. § 1157(c)(2)(A), spouses and children of refugees "shall be entitled to the same admission status" when following to join the principal refugee. This mandatory language establishes a substantive right, not a discretionary privilege. Other courts examining this statute have reached the same conclusion. *See Doe*, 288 F. Supp. 3d at 1078–79.

Ninth Circuit precedent recognizes that procedural due process protections attach to liberty interests grounded in "nonconstitutional law, such as a statute." *Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021). The mandatory language in § 1157(c)(2)(A) creates precisely such an interest—an entitlement for refugees' eligible family members to receive the same refugee status, which in turn gives rise to procedural protections before that entitlement can be suspended.

The fundamental requirement of due process is "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). In evaluating whether due process requirements have been satisfied, courts consider three factors: (1) the private interest affected by government action; (2) the risk of erroneous deprivation through the procedures used and the value of additional safeguards; and (3) the government's interest. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1207 (9th Cir. 2022).

Applying these principles, the Court finds that Plaintiff Esther's interest in her daughter's admission is substantial. After eight years of pursuing her petition, when her daughter was finally "on the verge of travel," Esther learned, with no

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 52

1    prior notice or opportunity to be heard, that her daughter's admission was

2    indefinitely suspended. *See* Dkt. No. 15-15.

3        And given the Court's conclusion that the Executive Order is itself likely

4    unlawful, *supra* § 3.3, the government's interests cannot justify this procedural

5    deficiency. The government has no legitimate interest in enforcing an order that

6    exceeds its statutory authority. *See State v. Trump*, No. C25-0127-JCC, 2025 WL

7    415165, at *6 (W.D. Wash. Feb. 6, 2025) ("[T]he Government has no legitimate

8    interest in enforcing an Order that is likely unconstitutional and beyond its

9    authority.").

10       Accordingly, the Court finds that Plaintiffs are likely to succeed on their due

11   process claim.

12   **3.6    Plaintiffs will face irreparable harm without immediate injunctive
        relief.**

13
14       Plaintiffs seeking a preliminary injunction must show that they are likely to

15   suffer irreparable harm without preliminary relief. *Winter*, 555 U.S. at 20. A

16   "showing of a mere possibility of irreparable harm is not sufficient under *Winter*."

17   *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). Plaintiffs have

18   easily met their burden here.

19       The individual plaintiffs submit declarations showing the USRAP EO,

20   Agency Suspension, and Refugee Funding Suspension have caused them irreparable

21   harm—plaintiffs stranded abroad face physical danger and financial hardship after

22   cancelling travel plans and selling their possessions; several plaintiffs suffer

23   ongoing separation from family members in the U.S.; and plaintiffs who have

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 53

1  recently arrived to the U.S. have been cut off from critical resettlement benefits and

2  support services needed to establish their new lives in America. These harms

3  compound daily and cannot be remedied after the fact. *See, e.g.*, *E. Bay Sanctuary*

4  *Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (economic harm is irreparable

5  "where parties cannot typically recover monetary damages flowing from their

6  injury—as is often the case in APA cases"); *Washington v. Trump*, 847 F.3d at 1169

7  ("separated families" constitute irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d

8  962, 969–70 (9th Cir. 2011) (per curiam) (recognizing that "important [irreparable

9  harm] factors include separation from family members" (cleaned up)); *Al Otro Lado,*

10  *Inc. v. McAleenan,* 423 F. Supp. 3d 848, 876–77 (S.D. Cal. 2019) (threat of physical

11  danger to refugees is irreparable harm); *Doe v. Trump,* 288 F. Supp. 3d 1045, 1082

12  (W.D. Wash. 2017) (prolonged family separation, including in context of refugee

13  suspension, constitutes irreparable harm); *cf. Leiva-Perez*, 640 F.3d at 969

14  (likelihood of physical danger if asylum-seeker is returned to his or her home

15  country is part of irreparable harm inquiry).

16      The organization plaintiffs will suffer a similar fate absent an injunction. The

17  record shows that they face devastating and irreparable harm from the Refugee

18  Funding Suspension, which has frozen over $100 million in anticipated revenue and

19  thrown them into a cash-flow crisis. This has forced them to furlough or lay off

20  hundreds of staff members, cancel obligations, and halt essential refugee services.

21  This is an existential threat to their survival, as the combination of staff reductions,

22  loss of institutional knowledge, damaged community partnerships, and declining

23  service quality threatens to permanently shut down their operations. Under

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY
INJUNCTION - 54

established legal precedents, these injuries all constitute irreparable business harm. *See, e.g.*, *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business is sufficient to establish irreparable harm[.]" (cleaned up)); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("a substantial loss of business" and prospect of "bankruptcy" constitute irreparable harm).

The Government's arguments to the contrary are, to put it charitably, unconvincing, as the Government tries to wave away concrete evidence of devastating harm to both individual and organizational plaintiffs, offering instead the tepid suggestion that these injuries amount to mere economic inconvenience. But the record shows otherwise: refugees stranded in dangerous conditions abroad, families who sold everything they owned before having travel cancelled, and organizations facing the wholesale destruction of decades-worth of refugee resettlement infrastructure are not theoretical injuries that can be remedied by a check from the Treasury.

And the Government's suggestion that Plaintiffs cannot demonstrate irreparable harm because the refugee resettlement process is already slow-moving fundamentally misunderstands both the nature of preliminary injunctive relief and the concrete evidence of harm in this case. That refugees often wait months or years for processing does not negate the immediate and irreparable nature of the injuries caused by the Government's abrupt suspension of the entire refugee program. The fact that some of the threatened harms may not occur for several months is not reason, by itself, to deny a preliminary injunction. *Privitera v. California Bd. of*

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 55

*Med. Quality Assur.*, 926 F2d 890, 897 (9th Cir. 1991) (improper to deny preliminary injunction only because license revocation hearing was three months away); *see also Joint Bd. of Control of Flathead, Mission and Jocko Irr. Dist. v. United States*, 646 F. Supp. 410, 419 (D. Mont. 1986) *rev'd on other grounds by* 832 F.2d 1127 (9th Cir. 1987) (holding "future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such injury is a legitimate end of injunctive relief"); *Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 630 (4th Cir. 1979) (same). The Government's position, taken to its logical conclusion, would mean that no refugee could ever obtain preliminary injunctive relief for a denial of entry into the country or life-sustaining resettlement services because the USRAP process is inherently long. This cannot be correct.

The evidence overwhelmingly shows that both individual and organizational plaintiffs face concrete, immediate, and irreparable harms that can be prevented only through preliminary injunctive relief. Thus, the Court finds that the second *Winter* factor—irreparable harm—is met here.

### 3.7    The balance of equities and public interest favor a preliminary injunction.

When considering a preliminary injunction motion, "district courts must 'give serious consideration to the balance of equities and the public interest"—the third and fourth *Winter* factors. *Earth Island Inst.*, 626 F.3d at 475 (quoting *Winter,* 555 U.S. at 27). In weighing the equities, courts "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Weighing the public interest, on the other

hand, "primarily addresses impact on non-parties rather than parties." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019). When the Government is a party to a case, "the balance of the equities and public interest factors merge." *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

As discussed above, the record shows concrete and severe harms to the individual and organizational plaintiffs flowing directly from the USRAP EO and its implementation. These harms are mostly irreversible and warrant immediate intervention to stop more harm from befalling Plaintiffs.

In contrast, the Government offers only an abstract assertion about harm to executive authority over immigration matters. To be sure, the President has considerable discretion in managing immigration and foreign affairs, but that authority does not extend to actions that override Congress's carefully crafted statutory schemes. The public interest is not served by maintaining executive actions that conflict with federal law, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (no legitimate government interest in violating federal law), particularly where those actions threaten to dismantle a refugee resettlement infrastructure built over decades to carry out Congress's expressed commitment to humanitarian protection, *see Doe v. Trump,* 288 F. Supp. 3d at 1084 (collecting cases).

The USRAP EO also cites concerns about national security, refugee assimilation, and preserving taxpayer resources. But Congress has already carefully addressed these precise issues through comprehensive legislation that requires

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 57

thorough security screening, provides structured support for integration through established resettlement agencies, and includes detailed provisions for efficient use of public resources. The Government has identified no deficiencies in these existing safeguards that would warrant wholesale suspension of the refugee program. *See Hawaii*, 859 F.3d at 783, *vacated on other grounds and remanded*, 583 U.S. 941 (2017) (equities tipped in plaintiffs favor when "the Government ha[d] not put forth evidence of injuries resulting from the preliminary injunction, or how the screening and vetting procedures in place before the [prior refugee ban executive] Order was enjoined were inadequate such that the Order should take immediate effect.").

Particularly striking is the position of the States whose emergency declarations the Government invokes to justify its actions. Dkt. No. 26-1. New York and Massachusetts—joined by seventeen other states that together resettle nearly half of all refugees in the United States—explain that their emergency declarations addressed distinct circumstances involving asylum seekers and other migrants at the southern border, not legally admitted refugees who arrive with work authorization and federal support for resettlement. This clarification undermines a central premise of the USRAP EO and highlights the disconnect between the Government's stated justifications and its sweeping actions.

Thus, the balance of equities and the public interest—the third and fourth *Winter* factors—tip sharply in Plaintiffs' favor. *CTIA*, 928 F.3d at 841 ("[A] preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" (quoting *Cottrell*, 632 F.3d at 1132)).

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ISSUING PRELIMINARY INJUNCTION - 58

Add. 391

### 3.8    Scope of relief.

In recent years, nationwide injunctions have sparked significant debate. *See* Amanda Frost*, In Defense of Nationwide Injunctions,* 93 N.Y.U. L. Rev. 1065, 1090 (2018). Relying on general critiques about the propriety of district courts issuing such injunctions, the Government argues that any injunctive relief here must be limited to the named Plaintiffs only. Dkt. No. 31 at 26 (citing *United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring)). The day may soon come when the Supreme Court addresses the boundaries of the lower courts' ability to issue nationwide injunctions, but until then, district courts retain the flexibility to craft remedies that effectively address the actual harms at stake—and here, that means nationwide relief.

Our legal system has long recognized that "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973). For this reason, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, complete relief for the named plaintiffs entails enjoining portions of the USRAP EO. That the benefits or protections of such an injunction would flow to other, nonparties does not render such an injunction overbroad. *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" (emphasis in original));

1     *see Hawaii v. Trump,* 859 F.3d 741, 788 (9th Cir.), vacated and remanded, 583 U.S.

2     941 (2017) ("Narrowing the injunction to apply only to Plaintiffs would not cure the

3     statutory violations identified, which in all applications would violate provisions of

4     the INA.").

5         In any event, a partial or "fragmented" approach to an injunction "would run

6     afoul of the constitutional and statutory requirement for uniform immigration law

7     and policy. *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017) (citing

8     *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015)). "Congress has

9     instructed that the immigration laws of the United States should be enforced

10     vigorously and uniformly, and the Supreme Court has described immigration policy

11     as a comprehensive and unified system." *Texas*, 809 F.3d at 187–88 (footnotes and

12     quotation marks omitted). A piecemeal approach would be impracticable, as the

13     refugee resettlement system functions as an integrated whole, with interconnected

14     processes spanning international borders and domestic agencies. Requiring the

15     government to maintain parallel systems—one operational for the named Plaintiffs

16     and one suspended for everyone else—would create an administrative nightmare.

17         Thus, any order enjoining the implementation of the USRAP EO must be

18     nationwide. *See Trump v. Hawaii*, 585 U.S. 667, 751 n.13 (2018) (Sotomayor, J.,

19     dissenting) ("[T]he imposition of a nationwide injunction was 'necessary to provide

20     complete relief to the plaintiffs.'") (quoting *Madsen v. Women's Health Ctr., Inc.*, 512

21     U.S. 753, 765 (1994)).

22

23

### 4. CONCLUSION

The Court granted Plaintiffs' Motion for a Preliminary Injunction, Dkt. No. 14, for the reasons above and ORDERS as follows:

1. Defendants, except for President Trump individually, and all Defendants' respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of this Order, are fully ENJOINED from the following:

    a. Enforcing or implementing Executive Order 14163 § 3(a), (b), and (c), and § 4 in its entirety;

    b. Suspending or implementing the suspension of refugee processing, decisions, and admissions;

    c. Suspending or implementing the suspension of USRAP funds, including implementing the Suspension Notices sent by the U.S. State Department to all refugee and resettlement partners on January 24, 2025;

    d. Withholding reimbursements to resettlement partners for USRAP-related work performed pursuant to cooperative agreements before January 20, 2025.

2. Defendants' attorneys must provide written notice of this Order to all Defendants and agencies, including President Trump, and to Defendants' employees, contractors, and grantees by March 7, 2025, at 5:00 p.m. (Pacific Standard Time). Defendants must file a copy of the notice on the docket at the same time.

3.  No security bond is required under Federal Rule of Civil Procedure 65(c).

4.  This preliminary injunction will remain in effect pending further orders

from this Court.

Dated this 28th day of February, 2025.

Jamal N. Whitehead
United States District Judge