**No. 25-1313**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

**PACITO, et al.**,

Plaintiffs-Appellees,

v.

**DONALD J. TRUMP, et al.**,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-255

———————————

## EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3
## FOR STAY PENDING APPEAL
## RELIEF REQUESTED BY MARCH 21, 2025

———————————

YAAKOV M. ROTH
*Acting Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Acting Director*
NANCY K. CANTER
*Senior Litigation Counsel*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005
JOSEPH MCCARTER
ALEXANDRA YEATTS
*Trial Attorneys*

## TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATE ...................................................................v

INTRODUCTION ......................................................................................1

BACKGROUND .......................................................................................3

ARGUMENT ...........................................................................................5

     I.     Defendants Are Likely To Succeed on Appeal....................................5

          A.     The USRAP Order is a valid exercise of the President's broad authority under 8 U.S.C. §1182(f) ....................................6

          B.     The USRAP Order does not violate the Due Process Clause.........................................................................13

          C.     The district court also erred with respect to Plaintiff's funding claims..........................................................14

     II.     The Equitable Factors Favor a Stay ..................................................18

     III.     At a Minimum, the Nationwide Aspect of the Injunction Should Be Stayed........................................................................20

CONCLUSION .......................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allende v. Shultz,*
   845 F.2d 1111 (1st Cir. 1998) ........................................................6

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) .....................................................................15

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) .....................................................................20

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ............................................... 2, 20, 21

*Dep't of State v. Muñoz,*
   602 U.S. 899 (2024) .....................................................................13

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) ..........................................................8

*Doe 1 v. Jaddou,*
   --- F. Supp. 3d ---, 2025 WL 327368 (D. Md. Jan. 29, 2025)................8

*East Bay Sanctuary Covenant v. Barr,*
   934 F.3d 1026 (9th Cir. 2019) ............................................... 2, 4, 21

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) .....................................................................12

*Gonzalez v. Cuccinelli,*
   985 F.3d 357 (4th Cir. 2021) .............................................................8

*Great-West Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002) .....................................................................15

*Hawaii v. Trump,*
   859 F.3d 741 (9th Cir.) ..................................................................21

*Hilton v. Braunskill,*
   481 U.S. 770 (1987) .......................................................................5

*Kiobel v. Royal Dutch Petroleum,*
   569 U.S. 108 (2013) .....................................................................18

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) .................................................................................21

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...........................................................................................12

*Maryland* v. *King*,
   567 U.S. 1301 (2012) .........................................................................................18

*Myers v. United States*,
   272 U.S. 52 (1926) .............................................................................................18

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................... 18, 19

*Norton v. SUWA*,
   542 U.S. 55 (2004) ...................................................................................... 6, 12

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ................................................................................. *passim*

*Trump v. New York*,
   592 U.S. 125 (2020) ...........................................................................................10

*Tucson Airport Authority v. General Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) .............................................................................14

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ...........................................................................20

**Statutes**

5 U.S.C. §553(a) ........................................................................................................12

8 U.S.C. §1157(a)(2)........................................................................................ *passim*

8 U.S.C. §1157(c)(1) ...................................................................................................19

8 U.S.C. §1157(c)(2)(A) .............................................................................................13

8 U.S.C. §1157(c)(4) ...................................................................................................19

8 U.S.C. §1159 ............................................................................................................19

8 U.S.C. §1182(f) ............................................................................................... *passim*

8 U.S.C. §1185(a) .....................................................................................................6, 7

8 U.S.C. §1201(h) ................................................................... 7-8

8 U.S.C. §1522(a)(1)(A) ...................................................... 15, 16

8 U.S.C. §1522(b)(1)(B) ............................................................15

8 U.S.C. §1522(b)(7).................................................................16


**Regulations**

2 C.F.R. §200.340 ....................................................................20

8 C.F.R. §207.9 ........................................................................19


**Other Authorities**

Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025)

   ("USRAP Order") ........................................................ *passim*

Exec. Order No. 14169, 90 Fed. Reg. 8,610 (Jan. 20, 2025)

   ("Foreign Aid Order") ................................................... *passim*

Pub. L. No. 96-212, §101(a) ................................................ 16-17

U.S. Constitution, Art. II, § 2, cl. 1 ........................................10

## CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required

by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of attorneys for the parties**

Counsel for Defendants-Appellants:

> Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
> Drew C. Ensign (drew.c.ensign@usdoj.gov)
> August E. Flentje (august.flentje@usdoj.gov)
> Joseph McCarter (joseph.a.mccarter@usdoj.gov)
> Alexandra Yeatts (alexandra.yeatts@usdoj.gov)
> Nancy K. Canter (nancy.k.canter@usdoj.gov)
> United States Department of Justice, Civil Division
> Office of Immigration Litigation
> P.O. Box 878, Ben Franklin Station
> Washington, DC 20044
> (202) 305-7234

Counsel for Plaintiffs-Appellees:

> Deepa Alagesan
> Mevlüde Akay Alp
> Linda Evarts
> Ghita Schwarz
> INTERNATIONAL REFUGEE
> ASSISTANCE PROJECT
> One Battery Park Plaza, 33rd Floor
> New York, New York 10004
> Telephone: (646) 939-9169
> Facsimile: (516) 324-2267
> dalagesan@refugeerights.org
> makayalp@refugeerights.org
> levarts@refugeerights.org
> gschwarz@refugeerights.org

v

Melissa Keaney
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
P.O. Box 2291
Fair Oaks, California 95628
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
mkeaney@refugeerights.org

Laurie Ball Cooper
Megan McLaughlin Hauptman
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
Telephone: (516) 732-7116
Facsimile: (516) 324-2267
lballcooper@refugeerights.org
mhauptman@refugeerights.org

Harry H. Schneider, Jr., WSBA No. 9404
Jonathan P. Hawley, WSBA No. 56297
Shireen Lankarani, WSBA No. 61792
Esmé L. Aston, WSBA No. 62545
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com
EAston@perkinscoie.com

John M. Devaney
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

vi

JDevaney@perkinscoie.com

Joel W. Nomkin
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
JNomkin@perkinscoie.com

Nicholas J. Surprise
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
NSurprise@perkinscoie.com

**(2) Facts showing the existence and nature of emergency**

As set forth more fully in the motion, the district court has entered a nationwide injunction enjoining an executive order issued by the President. The district court thought the issues presented were sufficiently urgent that he issued an oral nationwide injunction from the bench at a hearing on February 25, 2028, followed by a written order three days later.

The district court's injunction prevents the President from exercising his authority under 8 U.S.C. §1182(f). That provision authorizes the President to "suspend the entry of … any class of aliens" "[w]henever [he] finds that [their] entry … would be detrimental to the interests of the United States." 8 U.S.C. §1182(f). "By its terms, §1182(f) exudes deference to the President in every clause" and

provides a "comprehensive delegation" of authority. *Trump v. Hawaii*, 585 U.S. 667, 684-85 (2018).

As explained below, the injunction is inflicting irreparable harm by preventing the Executive from exercising its authority regarding refugee admissions into the United States. It will have the effect of causing individuals to be granted refugee status that is difficult or impossible to reverse, even though the President has specifically determined that their entry into the U.S. is detrimental to the national interest. These harms will be compounded the longer that injunction is in place.

**(3) When and how counsel notified**

Defendants' counsel notified counsel for Plaintiffs by email on March 7, 2025, of Defendants' intention to file this motion. On March 8, 2025, counsel for Plaintiffs' responded that they opposed Defendants' motion. Service will be effected by electronic service through the CM/ECF system.

**(4) Submissions to the district court**

Defendants requested a stay pending appeal from the district court twice. The government first requested a stay at the Preliminary Injunction hearing after the district court issued a nationwide injunction orally from the bench, which the district court described as "premature."

After the district court issued its written preliminary injunction on February 28, 2025, Defendants moved for a stay pending appeal the next business day on

Monday, March 3, 2025. In that filing, Defendants "respectfully request a ruling by the close of business on March 7, 2025," and indicated that "after that time, if relief has not been granted, Defendants intend to seek relief from the U.S. Court of Appeals for the Ninth Circuit." Dkt. 48 at 1.[1]

At a hearing on March 4, 2025, the district court indicated that it was not inclined to expedite ruling on Defendants' stay motion. Plaintiffs' response to Defendants' motion for a stay pending appeal was filed on March 7, 2025. As of the filing of this motion, there has been no ruling on Defendants' motion to stay with the district court.

**(5) Decision requested by**

A decision on the motion for a stay pending appeal is requested as soon as possible, but no later than March 21, 2025.

Counsel for Defendants-Appellants:

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Acting Director*

NANCY K. CANTER
*Senior Litigation Counsel*

---

[1] Docket citations are to No. 25-cv-255 unless otherwise noted.

ix

U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005

JOSEPH MCCARTER
ALEXANDRA YEATTS
*Trial Attorneys*

# INTRODUCTION

The district court issued a universal injunction overriding the President's invocation of his statutory authority to suspend refugee entry into the United States. That holding directly contravenes *Trump v. Hawaii*, 585 U.S. 667 (2018), the plain text of the relevant immigration statutes, and bedrock principles of Article III and equity. It also causes ongoing and irreparable harm to the United States. This Court should therefore stay the order on an emergency basis pending appeal.

Supplementing the President's inherent Article II authority, Congress has conferred on the President broad statutory authority to "suspend the entry of … any class of aliens" "[w]henever [he] finds that [their] entry … would be detrimental to the interests of the United States." 8 U.S.C. §1182(f). "By its terms, §1182(f) exudes deference to the President in every clause"; it reflects a "comprehensive delegation" of authority from Congress to the President. *Hawaii*, 585 U.S. at 684-85.

Relying on that delegation, the President determined that "the United States has been inundated with record levels of migration" in recent years, and found that continued entry of refugees would be detrimental to the interests of the United States. The President accordingly invoked §1182(f) and other authorities to temporarily suspend the entry of refugees, subject to case-by-case exceptions. Exec. Order No. 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ("USRAP Order") §§1, 3(c), 4.

1

The district court held that the suspension was unlawful, principally on the ground that it supposedly conflicts with the "purpose and policy" of the Refugee Act and "eviscerates an entire statutory scheme, replacing it with the President's unfettered discretion." Add. 357-58. But that reasoning flouts *Hawaii*, which is controlling here. It further overlooks that both the Refugee Act (8 U.S.C. §1157) and §1182(f) are parts of the same "statutory scheme" (the Immigration and Nationality Act, or INA), and that §1182(f) authorizes the President to "impose entry restrictions *in addition to* those elsewhere enumerated in the INA," *Hawaii*, 585 U.S. at 684 (emphasis added). Plus, even on its own terms, the text of the Refugee Act *confirms* the President's authority. It sets only a ceiling—not a floor—on the number of refugees to be admitted in any given year. And that ceiling is "such number as the President determines"—which could be zero. 8 U.S.C. §1157(a)(2).

Beyond its direct conflict with *Hawaii*, the district court's universal injunction transgresses the power of district courts by setting refugee policy for the entire nation. That overbroad relief ignores this Court's admonition to limit relief to "redress only the injury shown as to [Plaintiffs]." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Indeed, this Court has repeatedly applied that rule to narrow nationwide injunctions in the immigration context. *See*, *e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019).

The district court's ruling suffers from additional errors too. The court wrongly overrode the decision of the President and Secretary of State to temporarily suspend foreign aid contracts to ensure they are consistent with administration priorities. Once that money is paid out, it likely can never be recovered. Moreover, the Court enjoined §4 of the USRAP Order, barring the President from obtaining the advice of his cabinet regarding the refugee program. That is an extraordinary violation of Article II's Opinions Clause.

In short, the district court's injunction rests on numerous clear-cut errors of law and stands in open defiance of the Supreme Court's decision in *Hawaii*. Because those errors inflict irreparable harms upon the United States, this Court should grant a stay pending appeal as soon as possible.

## BACKGROUND

On January 20, 2025, the President issued the USRAP Order, suspending admission of refugees under the USRAP. The President determined that the "United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees." USRAP Order §1. As the President explained, "[o]ver the last 4 years, the United States has been inundated with record levels of migration, including through the" refugee program. *Id.* So the USRAP

3

Order suspended "decisions on applications for refugee status"—but allowed for admission of refugees on a case-by-case basis should the Secretaries of Homeland Security and State jointly determine such admission is in the national interest and would not threaten national security or welfare. *Id*. §3(c). The Order also set forth a process for resuming refugee admissions in the future after a review, to be conducted within 90 days, by the Secretaries of Homeland Security and State. *Id*. §4.

On the same day, the President also signed an order placing a 90-day pause in foreign development assistance to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with foreign policy. *See* Exec. Order No. 14169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,610 (Jan. 20, 2025) ("Foreign Aid Order") §§2, 3. The Foreign Aid Order required agency heads to review each foreign assistance program to determine "whether to continue, modify, or cease each foreign assistance program." *Id.* §3(b)-(c). The Foreign Aid Order authorizes the Secretary of State to waive the 90-day pause for specific grants and to resume programs prior to the end of the 90-day period. *Id.* §3(d)-(e). The Secretary issued an order to implement this policy, which included suspension of refugee-related cooperative agreements. *See* Add. 313-314.

Three weeks after the President issued these executive orders, three refugee service contractors and nine individuals filed suit challenging the refugee suspension and funding pause. *See* Dkt. 1.

4

The district court orally issued a nationwide preliminary injunction from the bench on February 25, Dkt. 39, followed by a written order three days later, Dkt. 45. The court order prohibited Defendants from implementing §§3(a), 3(b), 3(c), and 4 of the USRAP Order; suspending or implementing the suspension of refugee processing, decisions, and admissions; suspending or implementing the suspension of USRAP funds; and withholding reimbursements to resettlement partners for work performed prior to January 20, 2025. Add. 394.

## ARGUMENT

An immediate stay pending appeal is warranted because the government can demonstrate: (1) a strong likelihood of success; (2) irreparable harm absent a stay; (3) that Plaintiffs will not be substantially harmed by a stay; and (4) the public interest in a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

### I.  Defendants Are Likely To Succeed on Appeal

The district court's order is fundamentally flawed. Applicable law empowers the President to limit the entry of aliens into the country, and that power is *heightened* in the context of refugees. The court's failure to appreciate that point led it down a path of cascading errors, terminating in a sweeping universal injunction that purports to vest the President's powers in a single district judge. This preliminary injunction has no hope of withstanding scrutiny on appeal.

5

**A.** **The USRAP Order is a valid exercise of the President's broad authority under 8 U.S.C. §1182(f).**

1.     The USRAP Order and suspension of refugee processing are valid exercises of the broad authority Congress granted the President.

a.     Section 1182(f) provides that "[w]henever the President finds that the entry of … any class of aliens into the United States would be detrimental to the interests of the United States, he may … suspend entry of … any class of aliens … or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. §1182(f); *see also id*. §1185(a)(1). Section 1182(f) "exudes deference to the President in every clause," as it "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," and "on what conditions." *Hawaii*, 585 U.S. at 684. Section 1185(a) further prohibits aliens, including refugees, from entering the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1); *see Allende v. Shultz*, 845 F.2d 1111, 1118 & n.13 (1st Cir. 1988) (§§1182(f) and 1185(a) "grant the President vast power to exclude any individual alien or class of aliens whose entry might harm the national interest"). The "sole prerequisite" to the President's exercise of authority under this "comprehensive delegation" is the determination that entry of the covered aliens into the United States "would be detrimental to the interests of the United States." *Hawaii*, 585 U.S. at 685.

6

Here, the President lawfully exercised this authority after making just such a finding, explaining that "the United States has been inundated with record levels of migration" in recent years and "lacks the ability to absorb large numbers of migrants[.]" USRAP Order §1. Under *Hawaii*, that is the end of the judicial inquiry.

But the district court marched on and premised its injunction on a finding that the USRAP Order was inconsistent with Congress' intended statutory scheme. Add. 357-58. In the district court's view, notwithstanding the broad language of §1182(f), the President's actions conflicted with the statute, including "its purpose and policy judgments." Add. 357-59. That reasoning ignored *Hawaii*'s holding that "§1182(f) vests the President with 'ample power' to impose entry restrictions *in addition to those elsewhere enumerated in the INA*," 585 U.S. at 684 (emphasis added). Indeed, the Supreme Court there rebuked lower courts for adopting just such a "cramped" reading of the President's authority under §1182(f). *Id.* at 681. The decision below repeats the same reversible error.

In any event, the Refugee Act does not override or undermine the President's expansive authority under §1182(f), as the court suggested. Add. 357-58. Just the opposite. The Refugee Act empowers the President to set a *maximum* number of refugee admissions to the United States, but does not provide *any minimum* or otherwise require the admission of any refugees. *See* 8 U.S.C. §1157(a)(2); *see also id.* §1201(h) ("Nothing in this chapter shall be construed to entitle any alien … to be

7

admitted [to] the United States"). The Act thus does not mandate *any* refugee admissions. As a result, the President did not "override particular provisions of the INA," even "assum[ing]" such a limitation on the President's §1182(f) authority existed. *Hawaii*, 585 U.S. at 689; *see Doe 1 v. Jaddou*, --- F. Supp. 3d ---, 2025 WL 327368, at *3-4 (D. Md. Jan. 29, 2025) (holding that § 1157 confers discretionary authority to admit refugees, including "discretion over whether to implement this provision at all") (quoting *Gonzalez v. Cuccinelli*, 985 F.3d 357, 367 (4th Cir. 2021)). The refugee statute further requires the number of refugees to be "in the national interest," *id.* §1157(a), which reinforces the President's §1182(f) authority to suspend entry if it is not in the nation's interest.

In short, to sustain the district court's finding that the "USRAP EO eviscerates an entire statutory scheme, replacing it with the President's unfettered discretion," Add. 357, one must ignore both the plain language of the Refugee Act and §1182(f), both of which expressly charge the President with determining whether entry of additional aliens serves the national interest. The district court usurped that power.

b.     The district court also reasoned that the "USRAP EO lacks any… temporal limitation" and was thus unlawful. Add. 360. Once again, its reasoning is directly contrary to §1182(f) and *Hawaii*. The *Hawaii* Court made clear that when the President suspends entries under §1182(f), he "is not required to prescribe in advance a fixed end date for the entry restrictions." 585 U.S. at 687. Instead,

8

§1182(f) "authorizes the President to suspend entry 'for such period as he shall deem necessary,'" so the President "may link the duration of [entry] restrictions, implicitly or explicitly, to the resolution of the triggering condition." *Id.* Indeed, "not one of the 43 suspension orders issued prior to [the *Hawaii* order by prior Presidents] ha[d] specified a precise end date." *Id.* Nor did the Proclamation that *Hawaii* upheld have an end date; that suspension was to be reviewed every 180 days. *Id.* at 680.

Here, the President permissibly linked his decision to restrict refugee entry to the strain on American communities caused by "record levels of migration" over the past four years. USRAP Order §§1, 4. He further set a procedure and timeline for considering resumption—upon receipt of periodic reports from the Secretaries of State and Homeland Security to be submitted every 90 days (*i.e.*, *more* frequently than the 180-day period approved in *Hawaii*). *Id.* §4. Under *Hawaii*, it is clear that §1182(f) requires nothing more. *Hawaii*, 585 U.S. at 687.

c.    Finally, the district court independently erred in enjoining §§3(c) and 4 of the USRAP Order. Section 3(c) provides that "[n]otwithstanding" the rest of the Order, the agencies "may jointly determine to admit aliens to the United States as refugees on a case-by-case basis," if certain conditions are met. On its face, §3(c) is incapable of causing Plaintiffs *any* harm. Its operation (if not enjoined) could only result in *more* individuals receiving refugee status. The district court never explained how an injunction against §3(c) was necessary to prevent irreparable harm.

9

The injunction against §4 is even more problematic. That section requires the Secretary of Homeland Security to "submit a report to the President … whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States" every 90 days. USRAP Order §4. The mere submission of reports obviously cannot cause Plaintiffs any harms, so the district court plainly lacked any basis to enjoin it.

Worse still, this portion of the injunction is patently unconstitutional. The Opinions Clause of the Constitution explicitly confers authority upon the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments." U.S. Const. art. II, §2 cl.1. The district court's belief that it could strip the President of this explicit constitutional authority under its incorrect interpretation of a statute is emblematic of the court's profound misunderstanding of its appropriate role in the constitutional order. *Cf. Trump v. New York*, 592 U.S. 125, 133-34 (2020) (per curiam) (observing that district court's injunction prohibiting the Secretary of Commerce from informing the President in a report of the number of aliens without lawful status "implicat[ed] the President's authority under the Opinions Clause, U.S. Const., Art. II, § 2, cl. 1" and was impermissibly based on putative injury that plaintiffs may incur because of "action that the Secretary or President *might* take in the future").

2.    The district court further erred in finding the agencies' steps to implement the USRAP Order, such as the suspension of refugee processing, to be arbitrary and capricious.

Most importantly, the court's APA reasoning was almost entirely derivative of its statutory reasoning (which fails as explained above).  If, for example, the President has validly exercised his §1182(f) authority to suspend refugee entries, it could hardly be arbitrary and capricious to suspend processing of applications for benefits that were ultimately precluded by the entry bar. Similarly, if the President validly barred new refugee entries as of January 27, it was not arbitrary and capricious to suspend travel on January 20 to prevent individuals from being stranded.[2] (Nor could the court's broad injunction be justified as a remedy for the small number of individuals affected by that putatively early implementation.) In short, once the statutory errors are corrected, the supposed APA violations disappear.

Even setting that aside, the court's APA analysis was facially flawed on its own terms. At the outset, Plaintiffs failed to identify any discrete agency action, much less final agency action subject to judicial review. Plaintiffs instead mounted

---

[2]  The district court also faulted the agencies for not creating specific procedures for evaluating case-by-case exemptions under §3(c) of the USRAP Order. Add. 381. But there is nothing arbitrary about considering requests for case-by-case exemptions on a case-by-case basis (which necessarily requires individualized consideration).

11

a programmatic challenge to a large number of agency decisions administering the refugee program, such as working with resettlement agencies, managing refugee case processing, case decisions, admissions, travel, and provision of support services in and outside the United States. But Plaintiffs cannot seek "wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). The APA certainly does not permit such challenges, lest it "become the task of the supervising court, rather than the agency, to work out compliance with the [agency's] broad statutory mandate, injecting the judge into day-to-day agency management." *Norton v. SUWA*, 542 U.S. 55, 66-67 (2004).[3]

The district court also erroneously held that notice-and-comment rulemaking was required for the Secretary to suspend overseas refugee processing and admission. Even if the claim were justiciable, notice-and-comment rulemaking is not required because these are "foreign affairs functions" under 5 U.S.C. §553(a). Nor was the temporary suspension of overseas refugee processing a "substantive, or legislative, rule[]" subject to notice-and-comment rulemaking as the district court wrongly held. Add. 378-79.

---

[3] The USRAP Order itself is not subject to APA review either, because the President is not an agency. *See Franklin v. Massachusetts*, 505 U.S. 788, 797-801 (1992).

12

In any event, any purported APA errors would not provide a basis for the district court's injunction absent its statutory authority holding. After all, enjoining agency implementing actions under the APA would provide no meaningful relief to Plaintiffs since they still would remain subject to the entry bar of §1182(f) and thus have no path to admission as a refugee. The validity of relief under the APA (and redressability for those claims) thus necessarily turns on the district court's statutory reasoning, which as described above fails any meaningful scrutiny.

### B.    The USRAP Order does not violate the Due Process Clause.

The district court also reasoned that the refugee suspension violates the Due Process Clause with respect to certain refugees who have relatives in the United States. Add. 384-85. This too is directly contrary to Supreme Court precedent, here *Dep't of State v. Muñoz*, 602 U.S. 899 (2024). The *Muñoz* Court held that U.S. citizens do not have "procedural due process rights in the visa proceedings of others." *Id.* at 917. Nor do citizens have a fundamental liberty interest in family members being admitted to the United States. *Id.* at 909.

The district court's contrary ruling is based on a misreading of 8 U.S.C. §1157(c)(2)(A), which the court interpreted as creating a statutory entitlement to admission to the United States. *Id.* There is no such entitlement, and §1157(c)(2)(A) simply specifies that once a qualifying relative of a refugee is admitted, they will then have the same refugee status as their petitioner family member. Indeed, the

13

statute makes clear that the relative must "qualif[y] for admission" independently, *id*., and specifies that certain provisions of §1182 do not apply, but does not exclude application of §1182(f). *Id*. §1157(c)(3). In any event, like the other provisions of the INA authorizing admission, §1157(c) too is subject to a Presidential determination that entry would be detrimental to the interests of the United States. *Hawaii*, 585 U.S. at 684. The Due Process Clause cannot support this injunction.

### C.    The district court also erred with respect to Plaintiffs' funding claims.

Defendants are also likely to succeed in challenging the parts of the injunction prohibiting the suspension of USRAP funds and mandating reimbursements for work performed before January 20, 2025.

With respect to payment for past work, the district court lacked jurisdiction to enjoin Defendants from "[w]ithholding reimbursements to resettlement partners for USRAP-related work performed pursuant to cooperative agreements before January 20, 2025." Add. 394. If Plaintiffs believe that the government has failed to make timely payments for prior services under contracts, Plaintiffs *must* pursue these claims through specified administrative processes and the Court of Federal Claims, and cannot recast them as APA claims. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998) (Court of Federal Claims has "exclusive jurisdiction to award money damages, and impliedly forbids declaratory and injunctive relief and precludes a §702 waiver of sovereign immunity").

14

The district court reasoned that "when a party suing the federal government 'seeks funds to which a statute allegedly entitles it, rather than money in compensation for the losses,' such claim is not excepted from Section 702's sovereign-immunity waiver." Add. 373 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)) (alteration omitted). But Plaintiffs here cannot argue (and have not argued) that any statute "entitles" them to payment. In all events, the Supreme Court has since made clear that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).

With respect to work and agreements going forward, the court relied on §1522 of the INA, which it believed "create[s] a federally funded system to support domestic refugee resettlement." Add. 375. But §1522 merely *authorizes* a program of refugee resettlement funding, rather than *requiring* one. It provides that the "Director ... *is authorized* to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement ... of refugees in the United States," 8 U.S.C. §1522(b)(1)(A)(ii) (emphasis added)—not that he *must* do so. Indeed, no provision of the INA requires that *any* grant or contract be made by the Director. To the contrary, the President may "determine[] that the Director should not administer the program" and may assign responsibilities to other officers. *Id*. §1522(b)(1)(B).

15

The district court relied on two provisions of §1522: one that imposes various requirements on grantees in specifying what grants "shall require," §1522(b)(7), and another that imposes limits on the Director "[i]n providing assistance under this section," §1522(a)(1)(A). But neither creates any statutory mandates. Neither requires the Secretary or the Director to make any grants in the first place, or creates any right to specific assistance or grants. These provisions do not confer any rights upon refugees, much less on Plaintiffs or similar nonprofits. Instead, §1522(a)(1)(A) was designed to ensure the Director did not spend unwisely, by requiring any grants issued to prioritize rapid assimilation to avoid extended reliance on cash payments from the government. *See* §1522(a)(1)(A) (any cash payments must be made "in a manner so as not to discourage their economic self-sufficiency"). The district court misread this language to create a right to cash payments and various other benefits.

Nor were Defendants' actions pausing agency funding per the Foreign Aid Order arbitrary and capricious, even assuming arbitrary-and-capricious review were appropriate. The court insisted that the Foreign Aid Order calls only for a pause in "foreign development assistance" and therefore should not have been applied to suspend *domestic* USRAP programs. Add. 369. But the refugee program as a whole is a foreign affairs program, so it is of no moment that some of the funds go to aid foreign citizens who are living on U.S. soil as refugees. *See* Pub. L. No. 96-212, §101(a) ("Congress… encourage[s] all nations to provide assistance and

16

resettlement opportunities to refugees"). This is reflected in the way Congress appropriates funding, routing all refugee funding through the State Department. Add. 304. At minimum, the court's logic would only have supported an injunction as to domestic refugee spending; it instead forbade suspending *any* of it.

The district court also complained that the State Department "apparently did not consider reasonable alternatives" such as an individualized review of cooperative agreements. Add. 383. But the whole point of the suspension was to carry out such an individualized review. The district court's order failed to acknowledge that justification and, counterintuitively, upended that deliberative process.

In all events, Plaintiffs have since moved for additional injunctive relief in the district court on the basis that their *suspended* agreements have now been *terminated* following an individualized review; that request is currently being briefed. *See* Dkts. 57, 60. It is meritless for the reasons just discussed. But this factual development also underscores that the funding provisions of the injunction should be stayed: Any injury Plaintiffs might have suffered from a "suspension of USRAP funds" no longer exists after terminations of their contracts, and are therefore no longer redressable.

\*      \*      \*

This injunction is rife with errors, all of which build on basic misapprehension of the broad statutory delegations to the President. The end result is that a single district judge has co-opted federal refugee policy. This order cannot stand.

17

## II.    The Equitable Factors Favor a Stay

The injunction imposes irreparable harm on the government and public, whose interests merge here, *Nken v. Holder*, 556 U.S. 418, 435 (2009). Whenever a district court issues a universal injunction against the Executive Branch, the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States* 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And those concerns are heightened when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, and thereby constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

The irreparable harm here is not merely abstract. The injunction effectively requires the admission as refugees of some individuals whose admission the President has determined is *not* in the national interest, contrary to the Refugee Act itself, 8 U.S.C. §§1157(a)(2), (e). That harm is irreparable and particularly acute

18

because refugee status, once granted, is as a practical matter difficult or impossible to reverse; the sole basis for revoking refugee status is upon a determination that the alien was "not in fact a refugee … at the time of the alien's admission," 8 U.S.C. §1157(c)(4); *see* 8 C.F.R. §207.9, and refugees generally are entitled to be admitted as permanent residents after one year, *see* 8 U.S.C. §1159.

On the other side of the balance, a stay of the district court's injunction will not irreparably harm Plaintiffs. Refugee status is a purely discretionary benefit, *see* 8 U.S.C. §1157(c)(1), and being denied a benefit to which one is not entitled in the first place cannot qualify as irreparable harm. Plus, under §3(c) of the USRAP Order, the relevant officials retain discretion to grant refugee status "[n]otwithstanding the suspension," so Plaintiffs cannot claim irreparable harm on that front either.

Moreover, plaintiffs have not demonstrated a risk of sufficient harm because, with one exception, the individual Plaintiffs have been waiting for months or years for possible admission to the United States *in a third country*—not in their home countries where they claim to have faced persecution. Add. 149-214; *cf. Nken*, 556 U.S. at 435 ("Although removal is a serious burden for many aliens, it is not categorically irreparable."). The one individual who remains in his home country, Iraq, based his claim of persecution on an event that occurred 15 years ago at a time of extreme instability, but has lived there safely since that time. Add. 179-86.

19

For their part, the organizational Plaintiffs assert only monetary harms, which are not irreparable. *See, e.g., Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) ("Injunctive relief is proper only if monetary damages or other legal remedies will not compensate the plaintiffs for their injuries."). Indeed, these Plaintiffs can seek payment for outstanding services rendered in the Court of Federal Claims. They are further operating under cooperative agreements that the Secretary may terminate at any time if the awards "no longer effectuate[] the program goals or agency priorities" 2 C.F.R. §200.340—and indeed have now been terminated. *See* Dkts. 57, 58. So they also lack a legal basis for the funds they now seek.

Under these circumstances, the balance of equities strongly favors a stay.

## III.    At a Minimum, the Nationwide Aspect of the Injunction Should Be Stayed

If nothing else, a nationwide injunction was improper here and wholly unnecessary to provide relief to the plaintiffs. Nationwide or universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring); *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (reiterating the "rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *California*, 911 F.3d at 584 (courts should limit relief to "redress only the injury shown as to [Plaintiffs]").

20

In purporting to set refugee policy for the entire nation, the district court reasoned that a nationwide injunction was proper since the dispute involved immigration law. Add. 393. This is flatly contrary to this Court's precedents, which require lower courts to redress only the injury shown as to plaintiffs in immigration cases. *See E. Bay Sanctuary*, 934 F.3d at 1029 (citing *Azar* for the proposition that an injunction must be "narrowly tailored to remedy the specific harms shown"). Such overbroad relief allows "one district [to] make a binding judgment for the entire country," *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021), a role that is particularly inappropriate in the area of immigration and foreign policy, where it is the political branches that are charged with making those judgments. At most, the court should have enjoined the suspension of processing of the individual plaintiffs, and the suspension of contracts with the organizational plaintiffs.

The district court's cited bases for universal relief are particularly problematic here: (1) this Court's opinion that was *vacated* by the Supreme Court in a prior decision in *Hawaii*, and (2) the *dissent* in *Hawaii*. Add. 393 ("[T]he imposition of a nationwide injunction was 'necessary to provide complete relief to the plaintiffs.'") (quoting *Hawaii*, 585 U.S. at 751 n.13 (Sotomayor, J., dissenting) (alteration omitted)); *id.* (citing *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded*, 583 U.S. 941 (2017)). To state the obvious, neither vacated decisions nor dissenting opinions can sustain the district court's universal injunction here.

21

## CONCLUSION

The Court should grant a stay pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
*Acting Director*

*/s/ Nancy K. Canter*
NANCY K. CANTER
*Senior Litigation Counsel*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005

JOSEPH MCCARTER
ALEXANDRA YEATTS
*Trial Attorneys*

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27, I certify that foregoing motion complies with the type-volume limitation because it contains 5,072 words. This motion also complies with the typeface and type style requirements because it is proportionately spaced and has a 14-point Times New Roman typeface.


                              /s/ *Nancy K. Canter*
                              NANCY K. CANTER
Dated:  March 8, 2025         Attorney for Respondent

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2025, counsel for Respondent electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.

/s/ *Nancy K. Canter*
NANCY K. CANTER
Dated:  March 8, 2025               Attorney for Respondent