No. 25-1313

# In the United States Court of Appeals for the Ninth Circuit

PLAINTIFF PACITO et al.,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:25-cv-255-JNW

## PLAINTIFFS-APPELLEES' OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

Deepa Alagesan
Linda Evarts
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 939-9169
dalagesan@refugeerights.org
levarts@refugeerights.org

Harry H. Schneider, Jr.
Jonathan P. Hawley
Shireen Lankarani
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com

*Counsel for Plaintiffs-Appellees*

[Additional counsel on signature page]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees state that no Plaintiff-Appellee has a parent corporation and no publicly held corporation owns 10% or more of a Plaintiff-Appellee's stock.

*s/ Harry H. Schneider, Jr.*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ...................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3

ARGUMENT ............................................................................................. 6

    I.     Defendants fail to demonstrate irreparable harm. .................... 7

    II.    Defendants fail to make a strong showing on the merits. .......... 9

        A.    The President was without authority to issue the Refugee Ban EO. .............................................................................. 9

        B.    The Agency Defendants' attempts to escape judicial review fail. .........................................................................12

        C.    The Agency Defendants violated the APA. .......................14

        D.    Defendants violate the due-process rights of follow-to-join petitioners. ........................................................................16

    III.    The equitable factors do not favor a stay. .................................17

    IV.    Universal relief is proper. ......................................................... 18

CONCLUSION ........................................................................................ 20

CERTIFICATE OF COMPLIANCE ......................................................... 22

CERTIFICATE OF SERVICE ................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) .............................................................. 6–7

*Arrington v. Daniels,*
  516 F.3d 1106 (9th Cir. 2008).............................................................15

*Board of Regents v. Roth,*
  408 U.S. 564 (1972) ...................................................................17

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) ...................................................................14

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...................................................................19

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020)........................................................10, 18

*Doe v. Trump,*
  288 F. Supp. 3d 1045 (W.D. Wash. 2017) ......................................... 14, 17

*East Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021)............................................................19–20

*Hawai'i v. Trump,*
  859 F.3d 741 (9th Cir.), *vacated as moot and remanded,* 583
  U.S. 941 (2017)................................................................. 9–10, 12

*HIAS, Inc. v. Trump,*
  985 F.3d 309 (4th Cir. 2021)............................................................ 18–19

*HiQ Labs v. LinkedIn Corp.,*
  31 F.4th 1180 (9th Cir. 2022) ............................................................17–18

*Khachatryan v. Blinken,*
  4 F.4th 841 (9th Cir. 2021) ...................................................................16

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) (per curiam)..................................7

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)..............................................................13

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v.*
    *State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ..............................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................. 6

*Spears v. Stewart*,
    283 F.3d 992 (9th Cir. 2002) ..............................................10

*Trump v. Hawai'i*,
    585 U.S. 667 (2018) ..............................................2, 9–11

*Trump v. International Refugee Assistance Project*,
    582 U.S. 571 (2017) ............................................................18

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................18

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017)........................................7–8, 20

*Washington v. Trump*,
    No. 25-807, 2025 WL 553485 (9th Cir. Feb. 19, 2025), *stay*
    *application filed*, No. 24A885 (U.S. Mar. 13, 2025)......................... 1–2, 8

**STATUTES**

5 U.S.C. § 551 ..................................................................14

5 U.S.C. § 553..................................................................14

5 U.S.C. § 706 ..................................................................14

8 U.S.C. § 1157 ..........................................................passim

8 U.S.C. § 1182 .......................................................................passim

8 U.S.C. § 1185 .............................................................................12

8 U.S.C. § 1521–1524 .............................................................. 3, 11

8 U.S.C. § 1522 ..........................................................................4, 16

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ........................passim

**R**ULES

Fed. R. App. P. 8 ........................................................................ 2

**O**THER **A**UTHORITIES

Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ...............passim

U.S. Const. art. II, § 3 ...................................................................12

## INTRODUCTION

The executive order and agency actions in this case eviscerate the U.S. Refugee Admissions Program ("USRAP") by indefinitely suspending the resettlement of refugees to the United States and halting funding to organizations that have carried out the USRAP's essential functions for decades.

Gutting Congress's comprehensive system for refugee admissions and resettlement has inflicted grave and irreparable harm on Plaintiffs. As the District Court found on an extensive factual record, Defendants have left individual Plaintiffs "stranded abroad," facing "physical danger and financial hardship" and separation from family in the United States. Add. 386. Defendants have further cut off "critical resettlement benefits and support services" to refugees in the United States while creating "an existential threat" to the organizational Plaintiffs, threatening to "permanently shut down their operations." Add. 387.

In contrast, Defendants claim only amorphous harms, none of which shows that the injunction, which reestablishes the decades-long status quo, will create "a serious risk of irreparable harm within 21 days." *Washington v. Trump*, No. 25-807, 2025 WL 553485, at *2 (9th Cir. Feb. 19, 2025)

("*Washington II*") (Forrest, J., concurring), *stay application filed*, No. 24A885 (U.S. Mar. 13, 2025). This alone requires denial of the motion.

Rather than engage with the equities, Defendants interpret the President's power under section 212(f) of the Immigration and Nationality Act ("INA") to be so staggeringly broad that it would read the Refugee Act of 1980 out of existence. Neither section 212(f) nor the U.S. Supreme Court's reasoning in *Trump v. Hawai'i*, 585 U.S. 667 (2018) ("*Hawai'i II*"), gives the President such boundless power. Nor, as the District Court concluded, can Defendants violate bedrock requirements of the Administrative Procedure Act ("APA") or disregard Fifth Amendment due-process protections.

Even if their "emergency" motion were properly before the Court,[1] Defendants neither make a strong showing on the merits nor demonstrate that the injunction causes them concrete harm. The evidence of Plaintiffs' immediate, irreparable, and existential injuries is irrefutable and not seriously contested. And the District Court's injunction is no broader than necessary to prevent those injuries: it preserves the status quo by preventing the dismantling of Congress's longstanding, carefully crafted refugee-admission infrastructure and by allowing refugees, their family members,

---

[1] Defendants' motion is premature because the District Court has not yet ruled on the pending stay motion. *See* Fed. R. App. P. 8(a)(1)(A).

2

and sponsors to proceed through the exhaustive application and admissions process. Defendants' motion should therefore be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Congress amended the INA and enacted the Refugee Act of 1980 to further the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Pub. L. No. 96-212, § 101(a), 94 Stat. 102. The Refugee Act established a "permanent and systematic procedure" and "comprehensive and uniform provisions" governing the admission and effective resettlement of "refugees of special humanitarian concern." *Id.* § 101(b); *see also* 8 U.S.C. §§ 1157, 1521–1524. The Act's structure deliberately balances the specific presidential authority it delegates with congressional oversight: the President sets the annual refugee ceiling, but only after "appropriate consultation" with Congress (specifically, in-person meetings during which administration officials must justify their proposal and provide detailed information about anticipated impacts and resettlement plans). Add. 337 (citing 8 U.S.C. § 1157). Congress also authorized refugees resettled in the United States to apply for spouses and unmarried minor children to join them through the "follow-to-join" program; if not inadmissible under specific statutory grounds, those family members are entitled to admission as refugees. 8 U.S.C. § 1157(c)(2)(A).

3

The USRAP is a "highly regulated process" that effectuates these statutory mandates. Add. 338. Briefly, refugees seeking admission are referred into the USRAP after meeting certain criteria, interviewed, and subjected to intensive vetting by multiple government agencies. They must receive a "sponsorship assurance" from a resettlement agency, which means the agency commits to supporting the refugee's initial integration in the United States. Add. 338–41. Resettlement agencies provide these statutorily mandated integration services through funds committed via cooperative agreements with the government. 8 U.S.C. § 1522(b)(1)–(7). This resettlement assistance must be provided "to the extent of available appropriations." *Id*. § 1522(a)(1)(A).

Executive Order No. 14163 (the "Refugee Ban EO") upended this statutorily created structure. *See* 90 Fed. Reg. 8,459 (Jan. 20, 2025). Deceivingly citing "record levels of migration" that supposedly caused major cities to seek federal aid to manage the "burden of new arrivals" and led to emergency declarations by New York and Massachusetts "because of increased migration," *id*. § 1, the Refugee Ban EO "proclaim[ed] . . . that entry into the United States of refugees under the USRAP would be detrimental to the interests of the United States," *id*. § 3(a). It omitted that the requests for aid and emergency declarations were directed at obtaining

4

assistance for migrants who were unable to work or otherwise provide for their needs—in stark contrast to refugees who arrive with work authorization and federal support for resettlement. Add. 391.

Section 3 of the Refugee Ban EO purported to suspend "entry into the United States of refugees under the USRAP" beginning on January 27, 2025. It also directed the Secretary of Homeland Security to "suspend decisions on applications for refugee status," Refugee Ban EO § 3(b), while permitting admission of refugees on a case-by-case basis, *id.* § 3(c). Under the Refugee Ban EO, the USRAP will resume if—and *only* if—President Trump determines that resumption "is in the interests of the United States." *Id.* § 4.

Rather than wait until the Refugee Ban EO's stated effective date, the Agency Defendants implemented it immediately by cancelling previously scheduled refugee travel a week before the President's entry ban took effect and expanded the Refugee Ban EO's scope by suspending *all* refugee case processing (the "Agency Suspension"). Add. 344–45. Days later, the agencies issued notices suspending all funding to resettlement partners and ordering them to "stop all work" under their cooperative agreements to support USRAP processing abroad and provide resettlement services to refugees and Special Immigrant Visa ("SIV") recipients in the United States. Add. 340, 345–46. And, without explanation, the Agency Defendants withheld

reimbursements for work performed prior to the notices (taken together, the "Refugee Funding Suspension"). Add. 345–46.

The District Court granted Plaintiffs' motion for a preliminary injunction, enjoining Defendants ("except for President Trump individually") from "[e]nforcing or implementing Executive Order 14163 § 3(a), (b), and (c), and § 4 in its entirety" and enjoining the Agency Defendants from suspending or implementing the suspension of (1) refugee processing, decisions, and admissions, and (2) funds for USRAP-related work (including withholding reimbursements for USRAP-related work prior to January 20). Add. 394. Defendants appealed.

## ARGUMENT

A stay is "an exercise of judicial discretion," "not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427, 433 (2009) (cleaned up). Four factors apply to stay motions: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006–07 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 434).

## I.      Defendants fail to demonstrate irreparable harm.

Defendants must show that "irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Al Otro Lado*, 952 F.3d at 1007. They have not done so, and the Court need not address the other factors. *See Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) (if party fails to "ma[ke] a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the [party's] proof regarding the other stay factors").

By halting the dismantling of the USRAP, the District Court "merely returned the nation temporarily to the position it has occupied for many previous years." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) ("*Washington I*"). It is *Defendants'* actions, not the District Court's order, that altered the status quo. Refugees admitted while the preliminary injunction is in place will enter pursuant to Congress's established framework, a decades-old statutory scheme. *See* 8 U.S.C. § 1157(c).

Defendants claim that the preliminary injunction would inflict irreparable injury because refugees, once admitted, cannot have their status revoked without cause. Mot. 18. But apart from their desire to ban all refugees from coming to the United States—which is unlawful—Defendants do not explain how admitting refugees in the ordinary course, including

those who just a few days prior to the issuance of the Refugee Ban EO had travel booked, would cause any harm at all. (Indeed, USRAP applicants are subjected to extensive vetting and preparation by the government and resettlement partners before they arrive. Add. 338–41.) Nor do Defendants articulate a single irreparable harm that would result from allowing Congress's refugee-resettlement system to resume, including through the work of resettlement agencies that have for decades assisted refugees through the arduous application process and helped them secure financial and logistical support during their initial months in the United States.

Defendants' argument that universal injunctions inherently and irreparably harm the Executive Branch is wrong. *See Washington II*, 2025 WL 553485, at *1 (Forrest, J., concurring) ("[P]reliminary relief halting a policy advanced by one of the political branches does not in and of itself an emergency make."). And their suggestion that injunctions in immigration cases raise "heightened" concerns about irreparable harm, Mot. 18, has been expressly rejected by this Court; any claimed "institutional injury" based on purported "erosion of the separation of powers . . . is *not* 'irreparable'" and requires resolution on the merits, not an immediate stay. *Washington I*, 847 F.3d at 1168 (emphasis added). Regardless, this argument lacks merit because, as discussed below, Defendants acted without authority.

8

## II.     Defendants fail to make a strong showing on the merits.

### A.     The President was without authority to issue the Refugee Ban EO.

The Refugee Ban EO conflicts with the express will of Congress set out in the Refugee Act and was an unlawful exercise of the President's section 212(f) power. Defendants' reading of section 212(f) ignores its plain text and is not supported by the U.S. Supreme Court's reasoning in *Hawai'i II*.

Taking first the textual limits of section 212(f), unlike the proclamation in *Hawai'i II*—which "thoroughly describe[d] the process, agency evaluations, and recommendations underlying the President's chosen restrictions," 585 U.S. at 686, and was limited to nationals of specific countries determined through the agency's process to present national-security risks—the Refugee Ban EO indefinitely suspends all refugee admissions overnight with virtually no support. The only proffered explanation is purported "record levels of migration"—*not refugees*—and the bare conclusion that "[t]he United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities." Refugee Ban EO § 1. That assertion, based on irrelevant facts, is insufficient. *See Hawai'i v. Trump*, 859 F.3d 741, 775 (9th Cir.) ("*Hawai'i I*") (findings of earlier executive order were insufficient to suspend USRAP under section

9

212(f)), *vacated as moot and remanded*, 583 U.S. 941 (2017);[2] Add. 391 (citing amici brief of nineteen States).

The Refugee Ban EO also lacks the requisite temporal limitation. The President may not permanently suspend refugee admissions; while a "fixed end date" is not required, there must be *some* limit. *Hawai'i II*, 585 U.S. at 687; *see also* 8 U.S.C. § 1182(f) (permitting President to "suspend" admission *only* "for such period as he shall deem necessary"); Add. 359–61. In *Doe #1 v. Trump*, this Court denied the government's motion for a stay, distinguishing the proclamation at issue from the one in *Hawai'i II* because it had "no requirement that the President act on the advice" of the Secretary of State's status reports and no "limit measured by the occurrence of some future event or condition." 957 F.3d 1050, 1065 (9th Cir. 2020). Likewise, the Refugee Ban EO neither requires the President to act in response to the required reports nor imposes a conditional limitation; it creates an "unresolvable justification" for permanently banning refugees unless the President changes his mind. Add. 360; *see also* Refugee Ban EO § 4.

Beyond its textual limits, section 212(f) "does not allow the President to expressly override particular provisions of the INA" or "countermand

---

[2] "Vacated opinions remain persuasive, although not binding, authority," *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002). *Hawai'i II* did not address this Court's analysis of the refugee provisions.

Congress's considered policy judgments." *Hawai'i II*, 585 U.S. at 689. By indefinitely suspending the USRAP, the Refugee Ban EO eviscerates Congress's "permanent" and "comprehensive" scheme for refugee resettlement, which outlines narrow circumstances in which refugees are inadmissible, details a process for setting refugee admissions in a fiscal year, and specifies procedures for providing integration services to resettled refugees. Refugee Act of 1980, § 101(b); *see also* 8 U.S.C. §§ 1157, 1521–1524. And it conflicts with Congress's finding that our country's "historic policy" is to "respond to the urgent needs of persons subject to persecution in their homelands." Refugee Act of 1980, § 101(a). The Refugee Ban EO and the statutory conflict presented differ from *Hawai'i II*, where the Supreme Court found that the proclamation at issue did not conflict with—but rather *supported*—Congress's statutory purpose. 585 U.S. at 690–91; Add. 357–59.

Defendants' citation to the President's authority to set annually the cap on refugee admissions only confirms that the Refugee Ban EO impermissibly conflicts with the law. The Refugee Act delegates to the President the authority to set the ceiling prior to each fiscal year pursuant to a detailed process for intergovernmental consultation. *See* 8 U.S.C. § 1157; Add. 337. The President's invocation of section 212(f) to bar *all* refugees to the United States bypasses that process entirely. And while the Refugee Act

"contemplates that the President, after consultation with Congress, may *increase* the number of refugees admitted in the middle of the fiscal year," it "does not provide a mechanism for the President to *decrease* the number of refugees to be admitted mid-year." *Hawai'i I*, 859 F.3d at 780.[3]

The Refugee Ban EO further conflicts with 8 U.S.C. § 1157(c)(2)(A) by indefinitely suspending follow-to-join refugee processing. Under that provision, if they are statutorily admissible, "[a] spouse or child . . . of any refugee who qualifies for admission . . . *shall* . . . be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee." 8 U.S.C. § 1157(c)(2)(A) (emphasis added). Defendants have no authority to indefinitely suspend admission of follow-to-join petitioners.[4]

## B.    The Agency Defendants' attempts to escape judicial review fail.

Excepting the arguments Defendants improperly raise for the first time on appeal, the District Court has carefully and methodically rejected their threshold claims that judicial review is unavailable. Add. 365–74.

---

[3] Nor is the Refugee Ban EO justified by 8 U.S.C. § 1185(a)(1). At minimum, it would have to align with the President's authority under section 212(f), *see Hawai'i I*, 859 F.3d at 770 n.10, and it does not.

[4] Defendants wrongly claim that Plaintiffs are not harmed by section 4 of the Refugee Ban EO, Mot. 9–10, but that section imposes an unlawful, indefinite process to resume the USRAP; the District Court's order prevents the President from so exceeding his authority. *See* U.S. Const. art. II, § 3.

*First*, the District Court properly rejected the argument that Plaintiffs asserted a "programmatic challenge," finding instead that they challenge two "discrete" agency actions "made over several days or weeks"; specifically, (1) the categorical suspension of all USRAP-related refugee case processing, travel, and admissions, and (2) the suspension of funding to USRAP nonprofit partners for their work processing refugee applications abroad and providing services to refugees domestically. Add. 365–66; *cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

*Second*, the District Court concluded that the challenged agency actions are final under binding precedent, notwithstanding Defendants' characterizations of their actions as temporary. Add. 370–71.

*Third*, while the District Court struggled to comprehend Defendants' Tucker Act-based jurisdictional argument (for which they "provide[d] almost no briefing"), it correctly concluded that Plaintiffs' challenge falls within the APA's waiver of sovereign immunity because Plaintiffs do not seek "money past due" or a substitute for a suffered loss. Add. 371–72. Rather, Plaintiffs seek "specific" forward-looking remedies: an injunction, and ultimately vacatur, of the unlawful agency actions suspending all USRAP processing and USRAP-related funding. Add. 373. These remedies are unavailable outside of an Article III court. *Id.* In broadening the scope of actions

13

reviewable under the APA, Congress could not have meant to limit judicial review of important agency policies to a specialized Article I court. *See Bowen v. Massachusetts*, 487 U.S. 879, 903–08 & n.46 (1988).

*Fourth*, Defendants forfeited the arguments that the foreign-affairs exception to notice-and-comment rulemaking applies and that the Refugee Suspension is not a substantive rule. *See* Add. 377 (noting that Defendants did not "invoke the . . . 'foreign affairs' exception[] to Section 553"). At any rate, the District Court correctly determined that "[t]he Agency Suspension and Refugee Funding Suspension are substantive, or legislative, rules because they effect legal changes of general applicability"—and thus must comply with "the procedural requirements of the APA." Add. 377–80.

## C.    The Agency Defendants violated the APA.

The Agency Suspension, as a substantive rule, should have been subject to notice-and-comment rulemaking. *See Doe v. Trump*, 288 F. Supp. 3d 1045, 1076–77 (W.D. Wash. 2017) (enjoining earlier iteration of President Trump's refugee ban). No rulemaking took place, in violation of the APA. *See* Add. 377–80; 5 U.S.C. §§ 551(4), 553, 706(2)(D).

The Agency Suspension and Refugee Funding Suspension are also arbitrary and capricious—claims independent of Plaintiffs' statutory analysis. *Contra* Mot. 11. The agencies did not "merely color within the lines"

14

of the executive orders they purported to implement; their actions reflected "vast agency discretion" without explanation for their decisions. Add. 369; *see also Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (courts "may not infer an agency's reasoning from mere silence"). This is particularly true of their decision to construe *domestic* assistance to refugees in the United States as subject to the President's executive order on foreign aid. Add. 369. Defendants conflate the "foreign development assistance" referenced in that order with *all* "foreign affairs program[ming]," Mot. 16, but the order speaks for itself. Defendants' reference to a subsection of the Refugee Act related to *other countries* resettling refugees does not prove otherwise. *Id.* The agencies arbitrarily construed all State Department disbursements as subject to that order.

The Agency Suspension is similarly arbitrary and capricious. Add. 380. The agencies decided to cancel all refugee travel a week before the entry ban went into effect, without considering serious reliance interests or less disruptive alternatives. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 51 (1983). And their termination of all processing went far beyond what the Refugee Ban EO requires and ensures that, even if the order is lifted, admissions cannot resume because no refugees will be ready for travel. *See* Add. 381–82.

15

Plaintiffs also are likely to succeed on their "contrary to law" claim because the agencies have no independent authority to ban admissions under section 212(f), and their actions—above and beyond those required by the Refugee Ban EO—dismantle Congress's carefully crafted refugee-admissions process. The Refugee Funding Suspension also directly contravenes Congress's directive to ensure provision of supportive services to refugees "to the extent of available appropriations." 8 U.S.C. § 1522(a); *see also* Add. 375. Moreover, even if Defendants were correct that they are not required to enter into cooperative agreements for resettlement support, *see* Mot. 16, they've already done so—and where such agreements exist, the contracting parties are statutorily required to provide certain services to refugees. *See* 8 U.S.C. § 1522(b)(7). Defendants do not explain how they acted consistently with the Refugee Act when they affirmatively prevented resettlement agencies from meeting their statutory obligations.

### D.    Defendants violate the due-process rights of follow-to-join petitioners.

Defendants' actions also violate the due-process rights of follow-to-join petitioners like Plaintiff Esther. "[P]rocedural due process rights attach to liberty interests that are based on nonconstitutional law, such as a statute." *Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021) (cleaned up). Based on section 1157(c)(2)(A)'s mandatory language, Plaintiff Esther has a

16

"legitimate claim of entitlement" to her daughter's admission that Defendants cannot take away without due process. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Doe*, 288 F. Supp. 3d at 1078–79.

### III.   The equitable factors do not favor a stay.

Equitable factors also militate against a stay because Plaintiffs will face substantial harm in the event of a stay and a stay is not in the public interest. The individual Plaintiffs suffer irreparable harm every day they are deprived of the ability to seek safety, reunite with family, and receive critical benefits to which they are entitled. Add. 386–87. Defendants' observation that some Plaintiffs are outside their countries of origin ignores that refugees flee their homes to avoid persecution and harm—the very reason supporting their resettlement—as well as evidence Plaintiffs submitted of harms facing them in their countries of first asylum. Add. 151, 153, 159, 169, 174, 176, 181–82, 189, 191, 204–05. And courts in this circuit have repeatedly found that separation from family members constitutes irreparable harm. *See Doe*, 288 F. Supp. 3d at 1082 (collecting cases).

Meanwhile, the harm to the organizational Plaintiffs is far from just "monetary," Mot. 20—their very existences are under threat, and they suffer irreparable harm each day they are unable to perform the activities at the heart of their missions. Add. 387–88. "[T]he threat of being driven out of

business is sufficient to establish irreparable harm." *HiQ Labs v. LinkedIn Corp.*, 31 F.4d 1180, 1188 (9th Cir. 2022). Weighed against these irreparable, ongoing harms, Defendants' purported harm stemming from being required to follow Congress's decades-old resettlement scheme comes up short.

Finally, the public interest lies with Plaintiffs—not Defendants—because Plaintiffs seek relief that would enforce Congress's detailed scheme for refugee admission and resettlement. Moreover, as the amici States have explained, the public interest is best served by allowing Congress's comprehensive system for provision of post-resettlement benefits to continue to ensure successful integration and self-sufficiency of refugees. Dkt. 13.1 at 8–12. Defendants have unlawfully upended this system, and there can be no legitimate government interest in violating federal law. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

## IV.  **Universal relief is proper.**

The Court should reject Defendants' request to stay the nationwide aspect of the preliminary injunction. "[T]here is no bar" against such injunctions when "appropriate." *Doe #1*, 957 F.3d at 1069 (cleaned up); *see also, e.g.*, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579, 581 (2017) (allowing nationwide injunction of parts of executive order that exceeded presidential authority); *HIAS, Inc. v. Trump*, 985 F.3d 309, 317

18

(4th Cir. 2021) (affirming nationwide injunction for organizations that "place refugees throughout the country"). District courts properly issue universal relief when it is needed to provide complete relief, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and "have considerable discretion in crafting suitable equitable relief," making appellate review "narrow," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (cleaned up).

Here, universal relief is necessary to provide Plaintiffs with complete relief; this Court should not stay that aspect of the preliminary injunction.[5]

*First*, limiting the injunction of the suspension of refugee admissions and processing to only the named individual Plaintiffs would not provide effective relief to the organizational Plaintiffs, who operate in multiple states and are harmed by every refugee who is no longer assured to them. The organizational Plaintiffs also have third-party standing to assert their clients' rights, which courts may consider when determining an injunction's scope.

*Second*, some individual Plaintiffs' applications are processed by non-Plaintiff agencies abroad, and some individual Plaintiffs are or will be assured to non-Plaintiff resettlement agencies. In short, the individual

---

[5] A geographically limited injunction would not provide complete relief because the organizational Plaintiffs "do not limit their potential clients to refugees that enter the United States" only in certain parts of the country. *E. Bay Sanctuary Covenant*, 993 F.3d at 680 (affirming nationwide relief).

Plaintiffs cannot receive complete relief unless non-Plaintiff resettlement agencies are funded: if the resettlement agencies can no longer render services, the individual Plaintiffs will not be able to advance their applications, travel to the United States, or receive resettlement benefits upon arrival. Nor would such a limited injunction provide the organizational Plaintiffs with complete relief. Funding for USRAP processing abroad means fewer refugees processed for admission to the United States, and the organizational Plaintiffs' funding for resettlement support is directly tied to the number of refugees they serve.

*Third*, the Court has recognized that, particularly in the context of immigration, uniformity matters. *See E. Bay Sanctuary Covenant*, 993 F.3d at 681; *Washington I*, 847 F.3d at 1166–67. As the District Court correctly determined, "a partial or 'fragmented' approach to an injunction 'would run afoul of the constitutional and statutory requirement for uniform immigration law and policy.'" Add. 393 (quoting *Washington I*, 847 F.3d at 1166–67). "A piecemeal approach would be impracticable, as the refugee resettlement system functions as an integrated whole, with interconnected processes spanning international borders and domestic agencies." *Id.*

## CONCLUSION

Defendants' emergency motion should be denied.

Respectfully submitted this 14th day of March, 2025.

INTERNATIONAL REFUGEE
ASSISTANCE PROJECT

Deepa Alagesan
Linda Evarts
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 939-9169
dalagesan@refugeerights.org
levarts@refugeerights.org

Melissa Keaney
P.O. Box 2291
Fair Oaks, California 95628
(646) 939-9169
mkeaney@refugeerights.org

Laurie Ball Cooper*
650 Massachusetts Avenue NW,
Suite 600
Washington, D.C. 20001
(516) 732-7116
lballcooper@refugeerights.org

PERKINS COIE LLP

By: *s/ Harry H. Schneider, Jr.*
Harry H. Schneider, Jr.
Jonathan P. Hawley
Shireen Lankarani
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com

John M. Devaney
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
(202) 654-6200
JDevaney@perkinscoie.com

Joel W. Nomkin
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
JNomkin@perkinscoie.com

Nicholas J. Surprise
33 East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460
NSurprise@perkinscoie.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) and that the response complies with the page limit of Circuit Rule 27-1(1)(d).

<u>*s/ Harry H. Schneider, Jr.*</u>

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 14, 2025.

*s/ Harry H. Schneider, Jr.*