**Nos. 25-1313, 25-1939**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**PACITO, et al.**,
        Plaintiffs-Appellees,

v.

**DONALD J. TRUMP, et al.**,
        Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-255

**MOTION TO AMEND ORDER GRANTING A STAY,
OR, IN THE ALTERNATIVE, FOR CLARIFICATION**

**[RELIEF REQUESTED BY MAY 12, 2025]**

YAAKOV M. ROTH
    *Acting Assistant Attorney General*
DREW C. ENSIGN
    *Deputy Assistant Attorney General*
DAVID KIM
    *Senior Litigation Counsel*
    U.S. Department of Justice
    Civil Division
    Office of Immigration Litigation
JOSEPH MCCARTER
ALEXANDRA YEATTS
LINDSAY W. ZIMLIKI
JASON ZUBATA
    *Trial Attorneys*

## INTRODUCTION

The government regrets that the district court has forced the government to file yet another motion for clarification after the district court adopted an untenable reading of this Court's stay order that would defeat the purpose of the President's Executive Order and compel the admission into the United States of well over 10,000 refugees in short order. Indeed, the "compliance framework" that the district court issued yesterday—based on a submission by Plaintiffs that *preceded* this Court's clarification of its stay order on April 21, 2025—effectively places the district judge in the position of superintending every detail of U.S. refugee processing and admission, despite the fact that this Court has already twice held that the government is likely to prevail on appeal in defending the President's decision to suspend refugee admissions.

At this point, the government respectfully requests that the Court amend its earlier order and stay the district court's injunction in full. By now, it has become clear (three times over) that ongoing collateral proceedings over injunction compliance are not workable. At minimum, the Court should clarify that the government's interpretation of the panel's clarification order is correct. The government respectfully seeks relief by May 12, 2025, which is when the district court's first set of new compliance deadlines will take effect.

1

## BACKGROUND

**1.** On February 28, 2025, the district court issued a written order enjoining the government from, among other things, suspending refugee processing, decisions, and admissions under the U.S. Refugee Admissions Program ("USRAP"). Dist. Ct. Dkt. No. 45 (enjoining Exec. Order No. 14163, *Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8459 (Jan. 20, 2025) ("USRAP Order")).

The government appealed that order on March 3, 2025, and moved this Court for a stay pending appeal. Dist. Ct. Dkt. No. 46; Dkt. No. 5.2. On March 25, 2025, this Court stayed the district court's February 28, 2025 preliminary injunction order, except insofar as the government was instructed to preserve the status of individuals who were conditionally approved for refugee status before January 20, 2025 ("the carveout"). Dkt. No. 28.1. This Court instructed that the district court's injunction was stayed "[i]n all other respects." *Id.* at 2.

**2.** Despite the clear and comprehensive scope of the Court's stay, the district court interpreted this Court's order as requiring the government to process and admit what would have been over 120,000 refugee applicants based on its own definition of "conditionally approved." Dist. Ct. Dkt. No. 92 at 4–5. The district court then ordered the parties to draft comprehensive compliance frameworks consistent with its expansive reading of this Court's stay carveout. Dist. Ct. Dkt. No. 108 at 5–7.

2

In response to those burdensome orders, the government sought clarification from this Court as to the scope of its injunction, specifically the meaning of the term "conditionally approved." Dkt. No. 35.1. This Court then ruled in the government's favor. Dkt. No. 46.1. As this Court explained, the carveout of its otherwise comprehensive stay applies only to a narrow group of individuals who meet three criteria. *Id.* at 4. The third criterion, in particular, sharply restricts the number of people who could benefit from the carveout—allowing in only those individuals who on or before January 20, 2025, "had arranged and confirmable travel plans to the United States." *Id.*

That text was accompanied by the Court's admonition that the carveout should not be construed so broadly as "to swallow the entire stay order"—such as a reading that would stretch the exception so far as to apply to "tens of thousands of individuals." *Id.* at 2, 3. This Court clarified that the carveout was intended to reach only those applicants "who were conditionally approved *and in transit*," individuals like Plaintiff Pacito who would have been furthest along in the approval process and "could demonstrate a strong reliance interest" in being allowed to complete that process. *Id.* at 2–4 (emphasis added).

**3.** With that explicit narrowing in mind, the government resumed processing for refugees who were scheduled to arrive in the United States within two weeks

3

following January 20, recognizing that the stay order remained in place for the vast majority of individuals subject to the USRAP Order.

The district court, however, expressed open frustration with this Court's clarification. Dist. Dkt. No. 114 at 3 (stating that this Court's "belated precision ha[d] created unnecessary confusion in a matter of significant humanitarian concern"). The district court proceeded to consider the "compliance framework" that Plaintiffs had proposed *before* this Court's clarification of its stay. *Id.*

On May 5, 2025, the district court issued a 14-page compliance framework order. Dist. Dkt. No. 119. It found that all applicants who had any travel plans, including self-travel outside established USRAP processes, regardless of how far in the future—a number approximating 12,000—were still protected by the injunction. It also imposed an incredibly burdensome compliance schedule, requiring the government, within seven days, to take "immediate steps to facilitate travel and admissions" for that large group of people, *id.* at 8, despite all of those individuals having expired security checks and many needing to undergo a new round of mandatory medical examinations. *See* Ex. 1, Declaration of Spencer Chretien ("Chretien Decl.") at ¶ 5. The district court also ordered the government to develop, within seven days, "a comprehensive plan, including a detailed timeline, to renew the travel clearances, including security and medical authorizations," of all 12,000 individuals, ignoring that such security checks are individualized and often resource-

4

intensive, and that timelines are highly variable across such a broad population. Dist. Dkt. No. 119 at 8. To closely monitor the implementation of this stringent plan, the district court also ordered that the government submit weekly reports "detailing actions taken since the last report." *Id.* at 12.

In light of the district court's departure from this Court's clarification order, the government reluctantly determined that it must again seek amendment or, at minimum, clarification of this Court's prior orders.

## **ARGUMENT**

The district court has again badly erred by reading this Court's March 25, 2025 stay order so narrowly as to largely defeat its purpose. The government maintains that, under this Court's order, only those refugees who were sufficiently far along in the process as to have imminent travel plans are exempted from the stay—not that the injunction continues to guarantee entry into the United States of thousands of refugees who were not scheduled to arrive for weeks or even months. Several features of this Court's order drive that home.

*First*, this Court required that its carveout be limited to individuals with "confirmable" travel plans, not just "arranged" travel plans, as of January 20. Dkt. No. 46.1 at 4. "Confirmable" implies a temporal nexus: if an individual's travel plan is too far out, then the booking is not reasonably confirmable and remains speculative. Travel plans are subject to change for many reasons, such as new

5

security or medical concerns, changes to personal circumstances, or logistical challenges. Chretien Decl. at ¶¶ 5, 12. All to say, whether travel plans will in fact take place becomes highly uncertain once one looks beyond a short window of time, such as the two weeks following January 20, 2025, which the government reasonably adopted here.

*Second*, to illustrate what it meant by "confirmable," this Court pointed to Plaintiff Pacito, whose travel plans were so imminent—with travel booked for January 22, two days after the Executive Order took effect—as to render him virtually "in transit." Dkt. No. 46.1 at 2, 4. Notably, this Court did *not* mention any of the named Plaintiffs who were scheduled to arrive in February. This Court is familiar with the district court docket and would have been aware from the pleadings below that Plaintiffs Alyas and Marcos were scheduled to travel in February.[1] *See* Dist. Dkt. No. 1 ¶¶ 157, 161. This Court could have readily mentioned those Plaintiffs, along with Plaintiff Pacito, when defining individuals whose travel was imminent and to whom it intended to extend the narrow carveout. But this Court did not name those individuals, presumably because those Plaintiffs were not in the same situation as Pacito, whose travel date was far more imminent than theirs.

---

[1] Plaintiffs Ahmed and Sara, as well as the individuals to be sponsored by Plaintiff Rachel, did not have travel booked at all on or before January 20. *See* Dist. Dkt. No. 1 ¶¶ 153, 164, 172.

6

*Third*, this Court expressly stated that it did not intend for "tens of thousands of individuals" to be admitted despite the USRAP Order. Dkt. No. 46.1 at 3. Yet over 12,000 individuals had travel booked for post-January 20, with the majority booked for February and some as far out as May. *See* Chretien Decl. at ¶ 9; *see also id.* Table. Under the district court's interpretation, the carveout would apply to all of those individuals, most of whom were not virtually "in transit" like Pacito. Dist. Dkt. No. 119 at 4–5. Just like the district court's prior interpretation of this Court's stay order, this overbroad reading effectively swallows the entire stay. *See* Dkt. No. 46.1 at 2. While the district court myopically concerned itself with distinguishing the 12,000 figure from the "tens of thousands of individuals" referenced in this Court's clarification, *see* Dist. Dkt. No. 119 at 5, it overlooked the point that this Court never intended to exempt anyone other than the individuals with the most extreme reliance interests, such as Pacito, who was virtually "in transit" with confirmed travel within two days of the USRAP Order being issued.

*Fourth*, this Court in clarifying the carveout underscored the heightened reliance interests presented by people like Pacito—who "sold all of his belongings in anticipation of flying to safety in the United States." Dkt. No. 46.1 at 2–4. No other named Plaintiff had similar reliance interests, and it is unlikely the roughly 12,000 individuals with plane tickets booked in the months after January 20 had sold all of their belongings or could otherwise claim the same reliance interests as Pacito.

7

This Court thus created a carveout only for applicants who "could demonstrate a *strong* reliance interest on the government's approval process," largely based on an imminent travel date. Dkt. No. 46.1 at 4 (emphasis added).

*Fifth*, this Court focused on the irreparable harm that would befall the government if forced to admit "tens of thousands of individuals." *Id.* at 3. That is exactly what the district court's latest compliance order would induce if it were to force the government to process and admit roughly 12,000 people without any regard for the imminence of those individuals' travel dates. *See* Dist. Dkt. No. 119 at 5. And if nothing else, the district court's reading of the carveout to require the admission of thousands of individuals conflicts with this Court's conclusion that the government is likely to succeed on the merits under *Hawaii v. Trump*, 585 U.S. 667 (2018). Dkt. No. 46.1 at 3 (explaining that 8 U.S.C. § 1182(f) "exudes deference to the President in every clause" (quoting *Hawaii*, 585 U.S. at 684)); Dkt. No. 46.1 at 3.

Given this Court's focus on individuals like Pacito, who were on the very cusp of transit, and its larger concern with avoiding irreparable harm to the government by admitting "tens of thousands of individuals," the government yet again seeks clarification as to the scope of this Court's stay. Notwithstanding this Court's instruction, the district court would have the government advance the processing and admission of more than 12,000 individuals, many of whose travel plans would not

8

take place for weeks and months. That untenable injunction violates 8 U.S.C. § 1182(f), which authorizes the President to halt "*the entry* of any . . . class of aliens into the United States," not to mention this Court's stay.

Indeed, the district court is effectively requiring the government to relaunch the USRAP on a massive scale, since the number of individuals with booked travel spikes to over 5,000 in the first full week of February, and over 4,000 in the following week. Chretien Decl., Table. That drastic jump in booked travel from one week to the next is simply unprecedented, Chretien Decl. at ¶¶ 10–11, and the immediate processing of all those refugees cannot be what this Court had in mind when it explicitly held its carveout should not be read to "swallow" its otherwise far-reaching stay. Dkt. No. 46.1 at 2. Any reading of the carveout that would compel processing and admission for thousands upon thousands of applicants is inconsistent with this Court's desire to avoid irreparable harm to the government, particularly in light of its conclusion that the government is likely to ultimately prevail on the merits. *See id.* at 3.

## CONCLUSION

For all of these reasons, the government correctly construed this Court's orders, and the Court should clarify accordingly, or amend the stay order to align with the government's interpretation. This Court should also go further, however—in light of the increasingly contentious collateral proceedings over compliance in the

9

district court, this Court should simply modify its order to stay the injunction in full. A full stay would avoid the improper judicial superintendence of refugee processing that the district court has imposed, and allow the parties to focus their attention on the pending merits appeal in this Court.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DAVID KIM
*Senior Litigation Counsel*

<u>/s/ Joseph McCarter</u>
JOSEPH MCCARTER*
LINDSAY W. ZIMLIKI
ALEXANDRA YEATTS
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005
Phone: (202) 746-8537
Email: Joseph.A.McCarter@usdoj.gov

*Counsel for Defendants-Appellants*

*On May 6, 2025, undersigned counsel contacted counsel for Plaintiffs-Appellees to seek their position on the instant motion and was informed that Plaintiffs-Appellees oppose the instant motion.

10

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27, I certify that foregoing motion complies with the type-volume limitation because it contains 2,178 words. This motion also complies with the typeface and type style requirements because it is proportionately spaced and has a 14-point Times New Roman typeface.

May 6, 2025
/s/ Joseph McCarter
JOSEPH MCCARTER
Attorney for Defendants-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2025, counsel for Defendants-Appellants electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.

*/s/ Joseph McCarter*
JOSEPH MCCARTER
Attorney for Defendants-Appellants

Dated May 6, 2025