**Nos. 25-1313, 25-1939**

# In the United States Court of Appeals for the Ninth Circuit

PLAINTIFF PACITO et al.,

*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
Case No. 2:25-cv-255-JNW

**CONSOLIDATED ANSWERING BRIEF OF PLAINTIFFS-APPELLEES**

Linda Evarts
Deepa Alagesan
Mevlüde Akay Alp
Pedro Sepulveda, Jr.
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 939-9169
levarts@refugeerights.org
dalagesan@refugeerights.org
makayalp@refugeerights.org
psepulveda@refugeerights.org

Harry H. Schneider, Jr.
Jonathan P. Hawley
Shireen Lankarani
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com

*Counsel for Plaintiffs-Appellees*

[Additional counsel on signature page]

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees ("Plaintiffs") state that no Plaintiff has a parent corporation and no publicly held corporation owns 10% or more of a Plaintiff's stock.

*s/ Harry H. Schneider, Jr.*

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF AUTHORITIES .................................................. v

INTRODUCTION .................................................. 1

JURISDICTIONAL STATEMENT .................................................. 4

STATEMENT OF THE ISSUES .................................................. 5

STATUTORY ADDENDUM .................................................. 5

STATEMENT OF THE CASE .................................................. 6

I. Congress created a "permanent and systematic procedure" for refugee admissions and resettlement. ................ 6

II. Congress's framework for refugee admissions and resettlement balances executive authority with congressional oversight. .................................................. 9

III. Refugee processing and resettlement is a lengthy process requiring participation from numerous governmental and nongovernmental entities. .................................................. 12

IV. Courts repeatedly rejected the first Trump Administration's attempts to dismantle the USRAP. ................ 15

V. The second Trump Administration is again trying to undo Congress's statutory scheme by indefinitely banning refugee entry and dismantling the Act's infrastructure. ............ 17

VI. Plaintiffs filed suit to enjoin the unlawful dismantling of the USRAP. .................................................. 20

VII. Plaintiffs have suffered and are continuing to suffer irreparable injuries. .................................................. 22

SUMMARY OF THE ARGUMENT .................................................. 24

STANDARD OF REVIEW .................................................. 28

ARGUMENT .................................................. 29

I. The District Court correctly concluded that Plaintiffs are likely to succeed on the merits. .................................................. 29

A. Section 1182(f) does not give the President authority to indefinitely suspend Congress's "permanent and systematic" refugee admissions program. 29

1. Section 1182(f) does not permit an indefinite ban on entry. 30

2. The Refugee Executive Order violates the Act. 34

3. This Court's opinion in *Doe #1* confirms that the Refugee Executive Order exceeds the President's authority under section 1182(f). 41

4. The motions panel's decision on Defendants' stay motion does not require or recommend a different result. 43

5. The District Court enjoined Sections 3(c) and 4 of the Refugee Executive Order insofar as they harm Plaintiffs. 44

B. The agency Defendants exceeded their authority and violated the APA. 46

1. The District Court properly exercised jurisdiction over Plaintiffs' USRAP-funding claims. 46

2. The USRAP suspension failed to comply with APA-mandated procedures. 54

3. The USRAP suspension and elimination of USRAP funding are contrary to law and ultra vires. 56

4. The USRAP suspension and elimination of funding were arbitrary and capricious. 60

5. Defendants' other purported bars to APA review are unavailing. 63

C. The Refugee Executive Order violates the Due Process Clause. 67

II. The District Court did not err in concluding that the balance of equities, including the serious irreparable harm to Plaintiffs and the public interest, favor preliminary injunctive relief. 70

III. The scope of the District Court's preliminary injunctions was necessary and appropriate. .............................................. 75

CONCLUSION ........................................................................................ 79

STATEMENT OF RELATED CASE.......................................................... 79

CERTIFICATE OF SERVICE.................................................................... 81

# TABLE OF AUTHORITIES

**CASES**

*Abboud v. INS*,
140 F.3d 843 (9th Cir. 1998) ............................................................ 71

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
Nos. 25-00400, 25-00402, 2025 WL 1380421 (D.D.C. May 13, 2025) ............................................................ 48, 50

*All. for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............................................................ 28

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ............................................................ 71

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................ 77

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................ 64

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ............................................................ 60

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ............................................................ 46-48, 50

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ............................................................ 75

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................ 75-76, 78

*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ............................................................ 73

*Climate United Fund v. Citibank, N.A.*,
No. 25-CV-698-TSC, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ............................................................ 50, 53

*Cmty. Legal Servs. v. HHS*,
No. 25-2808, 2025 WL 1393876 (9th Cir. May 14, 2025) ...................... 74

*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991) ............................................................................ 69

*Dep't of Educ. v. California*,
145 S.Ct. 966 (2025) (per curiam)..................................................passim

*Dep't of State v. Muñoz*,
602 U.S. 899 (2024) ........................................................................27, 67

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020).........................................................passim

*Doe 1 v. Jaddou.*
No. TDC-24-1942, 2025 WL 327368 (D. Md. Jan. 29, 2025) ................ 37

*Doe v. Trump*,
288 F.Supp.3d 1045 (W.D. Wash. 2017).........................................passim

*Doe v. Trump*,
No. 17-cv-178-JLR (W.D. Wash. Feb. 10, 2020), Dkt. 205......................16

*Doe v. Trump*,
No. 18-35015, 2018 WL 1774089 (9th Cir. Mar. 29, 2018) .....................16

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021)...........................................................passim

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ............................................................. 55

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................61

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ............................................................................ 35

*Fiallo v. Bell*,
430 U.S. 787 (1977)............................................................................. 72

*Gonzalez v. Cuccinelli*,
985 F.3d 357 (4th Cir. 2021) .......................................................... 37

*Hawai'i v. Trump*,
241 F.Supp.3d 1119 (D. Haw. 2017)......................................................15

*Hawai'i v. Trump*,
859 F.3d 741 (9th Cir.) (per curiam), *vacated on other grounds*, 583 U.S. 941 (2017).................................................passim

*Hawai'i v. Trump*,
871 F.3d 646 (9th Cir. 2017) (per curiam) ..........................................19

*HIAS, Inc. v. Trump*,
415 F.Supp.3d 669 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021) ..........................................................................................17

*HiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) .......................................................... 70

*Kern Cnty. Farm Bureau v. Allen*,
450 F.3d 1072 (9th Cir. 2006)...................................................59-60

*Khachatryan v. Blinken*,
4 F.4th 841 (9th Cir. 2021) .............................................................. 67

*Kiobel v. Royal Dutch Petroleum*,
569 U.S. 108 (2013) .......................................................................... 73

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ............................................................ 70

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ...................................................... 52, 65-66, 74

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......................................................................... 52

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)........................................................................... 63

*Mach. Mining, LLC v. EEOC*,
575 U.S. 480 (2015) .......... 52

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 73

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 69

*Md. Dep't of Hum. Res. v. HHS*,
763 F.2d 1441 (D.C. Cir. 1985) .......... 50

*Me. Cmty. Health v. United States*,
590 U.S. 296 (2020) .......... 50, 53

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) .......... 51, 53

*New York v. Trump*,
No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) .......... 48

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 63

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 55

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 35

*Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
415 F.3d 1078 (9th Cir. 2005) .......... 60

*Regents of Univ. of Cal. v. DHS*,
908 F.3d 476 (9th Cir. 2018) .......... 76

*Russello v. United States*,
464 U.S. 16 (1983) .......... 68

*S.F. Unified Sch. Dist. v. Americorps*,
No. 25-CV-02425-EMC, 2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) .......... 48

*Schilling v. U.S. House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) .......... 53

*SNJ Ltd. v. Comm'r*,
28 F.4th 936 (9th Cir. 2022) .......... 26

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .......... 76

*Trump v. Hawai'i*,
585 U.S. 667 (2018) .......... passim

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571 (2017) .......... 17

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) .......... 47

*U.S. Conf. of Catholic Bishops v. Dep't of State*,
No. 1:25-cv-00485-TNM, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .......... 50

*United States v. Joelson*,
7 F.3d 174 (9th Cir. 1993) .......... 39

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 67

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) (per curiam) .......... 15

*Washington v. Trump*,
No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017) .......... 15

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
32 F.4th 852 (9th Cir. 2022) .......... 28-29, 70

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 37

**STATUTES**

5 U.S.C. § 551 .......... 54

5 U.S.C. § 553 .......... 55

5 U.S.C. § 702 .......... 52

5 U.S.C. § 706 .......... 65

8 U.S.C. § 1101 .......... 6, 40

8 U.S.C. § 1157 .......... passim

8 U.S.C. § 1182 .......... passim

8 U.S.C. § 1201 .......... 68

8 U.S.C. § 1522 .......... passim

Consolidated Appropriations Act, Pub. L. 108-199, 118 Stat. 3 (2004) .......... 40-41

Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163 .......... 35-36

National Defense Authorization Act, Pub. L. 110-181, 122 Stat. 3 (2008) .......... 41

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 .......... passim

**REGULATIONS**

2 C.F.R. § 200.305 .......... 62

8 C.F.R. § 207 et seq. .......... 55

45 C.F.R. § 400 et seq. .......... 31-32

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 96-608 (1979) ....................................................................7

**EXECUTIVE MATERIALS**

Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025) ................passim

Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025)................passim

*Policy Manual Chapter 1 - Purpose and Background*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/policy-manual/volume-7-part-l-chapter-1 (May 13, 2025) .............................. 6-7

Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 24, 2017) .....................16

**OTHER AUTHORITIES**

Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9 (1981)......................................................................7

## INTRODUCTION

Congress enacted the Refugee Act of 1980 ("Act") to establish a uniform and systematic approach to the resettlement of refugees in the United States. Responding to decades of ad hoc executive actions to address the needs of persecuted people, the Act directed that the President propose in advance a plan and target number for each year's admissions after reviewing worldwide refugee numbers. It placed guardrails on the President's exercise of that authority in the form of detailed requirements for consultation with Congress. And it codified the vital role of nonprofits with resettlement expertise, emphasizing the importance of collaboration among those entities, the federal government, and states and localities. For almost fifty years, the system carefully crafted by Congress, now known as the U.S. Refugee Admissions Program ("USRAP"), has enabled millions of refugees to relocate to safety in this country and build lives, families, and businesses.

Congress did not—and has never—granted the Executive the power to override the Act. But on January 20, 2025, President Trump ordered an indefinite bar on refugees entering the United States. *See* Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025) (the "Refugee Executive Order" or "Refugee EO"). The federal agencies charged with implementing the order went further: they stopped all refugee processing, not just entry or

admission, and abruptly suspended and then terminated hundreds of millions of dollars of congressionally appropriated funding for refugee processing and resettlement, closing the door to refugees now and in the future.

Neither the President nor federal administrative agencies have the power to undo laws passed by Congress, as the District Court correctly concluded in two separate preliminary-injunction orders. While the President has considerable discretion to "suspend" entry for a "period" under 8 U.S.C. § 1182(f), he does not have authority to indefinitely bar refugees from the United States and thereby rewrite this country's laws by fiat. Nor do the unelected federal agencies charged with implementing the USRAP have even greater authority than that claimed by the President. But those agencies halted *all* refugee processing and *all* funding for the resettlement partners charged with administering the program and supporting refugees on arrival—vastly expanding the scope of the President's orders and all but ensuring that Congress's program cannot be revived.

The results have been harrowing. Individual refugees, approved to come to the United States after years of processing, have been stranded without homes or work after their scheduled flights were abruptly cancelled. And resettlement partners have been unable to pay their employees and keep

their offices open; their local expertise and relationships accumulated over decades might be lost forever, if they manage to weather this storm.

Nine Plaintiffs—individual refugees, their sponsors, and domestic nonprofits that are pillars of the USRAP—filed this putative class action in the weeks after the Refugee Executive Order issued, arguing that Defendants' actions exceeded their lawful authority and violated both the Act and the Constitution. Plaintiffs also allege that the agencies failed to engage in rulemaking or reasoned decision-making as required under the Administrative Procedure Act ("APA"). The District Court determined that Plaintiffs were likely to succeed on many of their claims and that equitable considerations favored granting preliminary relief to restore the status quo while the case proceeded.

Thereafter, the agencies abruptly terminated USRAP-related funding agreements and argued that, in doing so, they had limited Plaintiffs' available relief to money damages for individual breach-of-contract claims before an Article I court. Plaintiffs moved for—and the District Court granted—a second preliminary injunction, concluding that Defendants' contract terminations gutted the USRAP and thereby violated their statutory obligations under the Act.

The District Court did not err or abuse its discretion when it issued the two preliminary injunctions challenged in these appeals. It recognized that Plaintiffs are likely to succeed on the merits of their claims, that they face serious—even existential—harms without restoration of the status quo, and that the balance of equities favors immediate relief. Defendants do not contest any of the District Court's factual findings. Nor do they show that the District Court erred in applying the law or abused its discretion in issuing two preliminary injunctions that were only as broad as necessary to stop irreparable harm to Plaintiffs and the putative class.

During President Trump's first term, federal courts enjoined his repeated efforts to bar refugees from entering the United States and dismantle the USRAP. While the merits appeals were never decided by the Supreme Court, that Court's binding precedent makes clear that the President and the agency Defendants have again overstepped their authority and violated the law. Defendants ignore this precedent entirely or sidestep its analysis. But the law is clear, and this Court should affirm the District Court's injunctions.

## JURISDICTIONAL STATEMENT

Plaintiffs agree with Defendants' jurisdictional statement.

## STATEMENT OF THE ISSUES

1. Whether the District Court committed legal error or abused its discretion by concluding that Plaintiffs are likely to succeed in proving that (a) the Refugee Executive Order conflicts with the Act and is ultra vires; (b) the agency Defendants' implementation of the Refugee Executive Order and elimination of funding for refugee resettlement violate the APA and are ultra vires; and (c) the Refugee Executive Order and its implementation violate the constitutional right to due process.

2. Whether the District Court committed legal error or abused its discretion by concluding that Plaintiffs satisfied the other preliminary-injunction factors where Plaintiffs submitted unrebutted evidence of grave, irreparable, and immediate injury.

3. Whether the District Court committed legal error or abused its discretion in preliminarily enjoining the Refugee Executive Order, its implementation, and the elimination of funding for refugee resettlement in their entirety where no other remedy would stop the irreparable harm to Plaintiffs.

## STATUTORY ADDENDUM

Pertinent statutes, regulations, and rules appear in the accompanying addendum.

## STATEMENT OF THE CASE

### I. Congress created a "permanent and systematic procedure" for refugee admissions and resettlement.

Congress enacted the Act in 1980 "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern," as well as "provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." Pub. L. No. 96-212, § 101(b), 94 Stat. 102; *see also* 1-ER-19, 41. Under the Act, refugees who apply for humanitarian protection from abroad can be admitted to this country and then provided with assistance in rebuilding their lives in the United States.[1]

The Act was expressly designed to replace the ad hoc federal response to refugees of the preceding decades, a response that proved increasingly inadequate as the number of refugees fleeing persecution grew. *See Policy Manual Chapter 1 - Purpose and Background*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/policy-manual/volume-7-part-l-chapter-1

[1] A "refugee" is a person fleeing their country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42); 1-ER-41. Unlike asylum seekers already in the United States or at its border—who may also be found to be refugees—decisions on refugee applications for those admitted through the USRAP are completed before individuals travel here.

(May 13, 2025). Previously, the government had admitted refugees using an assortment of laws and regulations that classified people in various statuses, including as refugees, conditional entrants, parolees, pre-parolees, escapees, evacuees, or asylum grantees. *Id.* These varied approaches left unclear the long-term status of admitted individuals. *Id.* The Act addressed these issues by providing a systematic procedure for the admission and permanent resettlement of refugees in the United States. *Id.*; *see generally* Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9 (1981) (Act designed to reassert congressional limits over Executive's exercise of discretion over admissions).

The Act codified Congress's intent to respond to the "plight of the refugees themselves, as opposed to national origins or political considerations," in determining which refugees are to be admitted. H.R. Rep. No. 96-608, at 12-14 (1979); *see also* Pub. L. No. 96-212, § 101(a) (declaring that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including by admitting refugees to United States and providing transitional assistance). The Act requires that the government identify refugees of "special humanitarian concern to the United States" among whom admissions to this

country "shall be allocated." 8 U.S.C. § 1157(a)(3). It also enshrined into law the provision of domestic-resettlement assistance to support "effective resettlement" of admitted refugees, defined to include supporting refugee employment and English-language training, *id.* § 1522(a)(1)(B)(i)-(ii); ensured appropriate state and local involvement in refugee resettlement, *id.* § 1522(a)(2)(A); and prioritized refugee family reunification, *id.* § 1522(a)(2)(C)(i); *see also, e.g.*, *id.* § 1157(c)(3).

As part of this "permanent and systematic procedure," Congress created a new subagency in the Department of Health and Human Services ("HHS"), the Office of Refugee Resettlement, that, together with the State Department and what would become the Department of Homeland Security ("DHS"), administers the USRAP. Congress also codified the existing role of "voluntary agencies" (now called resettlement agencies) and state and local governments in "refugee relief and resettlement work." 8 U.S.C § 1522(a)(1)(B)(iii), (a)(2)(A)-(C), (b)(1). The USRAP is administered by these federal agencies and through partnerships with intergovernmental entities including the United Nations High Commissioner for Refugees ("UNHCR") and the International Organization for Migration ("IOM"); nonprofit agencies, including the organizational Plaintiffs; and state and local governments. 1-ER-41-42.

## II. Congress's framework for refugee admissions and resettlement balances executive authority with congressional oversight.

The Act mandates a detailed scheme for congressional oversight in developing the refugee admissions plan each fiscal year. It directs that the President "shall report" to Congress on "the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions" to the United States during that time. 8 U.S.C. § 1157(d)(1). This allocation is called the presidential "determination" and refers to the number of refugee admissions for the upcoming fiscal year that the President "determines, before the beginning of the year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest." *Id.* § 1157(a)(1).

The Act outlines what "appropriate consultation" requires and includes in-person discussion between cabinet-level representatives of the President and members of Congress, before which the President's representatives must provide statutorily prescribed information such as "the number and allocation of the refugees to be admitted," a "description of the proposed plans for their movement and resettlement," and "the estimated cost" of those plans. *Id.* § 1157(e). The President's proposal must be published and a hearing held to review it. *Id.* § 1157(d)(2), (d)(3)(A). The Act further directs

that the President "shall provide for periodic discussions" between his representatives and members of Congress "regarding changes in the worldwide refugee situation, the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions." *Id.* § 1157(d)(1). It permits the President to *raise* the presidential determination after "appropriate consultation," *id.* § 1157(b), (d)(3)(B), (e), but provides no mechanism for *reducing* the number of refugees who may be admitted after the fiscal year has begun.

For Fiscal Year 2025 (starting October 1, 2024), President Biden's representatives detailed—in more than fifty pages of facts, analysis, and conclusions—the basis for the Executive's identification of refugees of "special humanitarian concern to the United States" from all regions of the world; the reasoning behind the presidential determination of 125,000 refugee admissions for the year and the allocation of that figure; and a comprehensive plan for achieving these targets. SER-187-252.

Before the start of each fiscal year, Congress appropriates funding for the administration of the USRAP based on that year's admissions goal. This includes funding to support the resettlement of refugees who have been admitted to the United States. The Act directs that the Executive "shall, to

the extent of available appropriations," make certain services available to newly resettled refugees. 8 U.S.C. § 1522(a)(1)(A); *see also* 1-ER-19-20.

Of the three organizational Plaintiffs in this case, HIAS, Inc. ("HIAS") and Church World Service, Inc. ("CWS") are two of the ten national resettlement agencies, while Lutheran Community Services Northwest is a local affiliate of a third. Collectively, they have more than 200 years of experience helping refugees resettle in the United States, as they did this work long before Congress codified their roles. 5-ER-1008, 1024, 1043. To provide initial resettlement services, the national resettlement agencies must participate in an annual competitive funding process administered by the State Department's Bureau of Population, Refugees, and Migration ("PRM"). At the conclusion of this process, PRM and each resettlement agency execute a "cooperative agreement," which specifies the number of refugees each agency has capacity to serve in the coming fiscal year and through which the agency is partially reimbursed on a per-capita basis for the services provided. 4-ER-796; 5-ER-1007-18, 1028-29, 1049-50.

As the District Court recognized, "[t]his structure reflects Congress's intent that refugee admission decisions involve both political branches, not unilateral executive action." 1-ER-42. This system also reflects Congress's judgment that the Act's humanitarian aims are best served by a year-long

commitment that can be *increased* while providing a predictable floor of support for refugee resettlement. This, in turn, enables Congress to determine the level of appropriations necessary to implement the Act for the coming fiscal year and allows relevant governmental and nongovernmental agencies to adequately plan for meeting annual refugee admissions goals.

## III. Refugee processing and resettlement is a lengthy process requiring participation from numerous governmental and nongovernmental entities.

The path to admission to the United States as a refugee is a "highly regulated process." 1-ER-43. At the threshold, refugees must demonstrate they are a person "of special humanitarian concern to the United States," either because they belong to certain designated groups with shared characteristics (defined by statute or by the State Department in its joint reports to Congress) or are referred by an authorized entity such as the UNHCR because they meet specified criteria. To be "conditionally approved" as a principal refugee,[2] the individual must demonstrate that they meet the refugee definition codified in the Act and are not otherwise inadmissible. SER-181. Refugees are subject to fewer grounds of inadmissibility than other

[2] "Principal refugees" are individuals who meet the refugee definition and apply for refugee resettlement on their own behalf, as compared to "derivative refugees" who obtain refugee status based on their qualifying relationships with principal refugee applicants.

immigrants; for example, the Act expressly exempts refugees from the public-charge ground that considers whether the individual is likely to use certain public funds in the future. 4-ER-924. Admission of principal refugees is "[s]ubject to the numerical limitations" of the presidential determination. 8 U.S.C. § 1157(c)(1).

The Act also prioritizes the admission of spouses and unmarried minor children of refugees already admitted to the United States—known as "follow-to-join" refugees, 1-ER-43 (citing 8 U.S.C. § 1157(c)(2)(A))—reflecting one of the Act's goals of "assur[ing] family unity," 8 U.S.C. § 1157(c)(3). These refugee family members "shall . . . be entitled" to admission so long as they are not inadmissible on the grounds that apply to refugees. 1-ER-90 (quoting 8 U.S.C. § 1157(c)(2)(A)). Their admission is charged against the presidential determination. 8 U.S.C. § 1157(c)(2)(A).

Processing refugee applications generally takes months or years: the applicant is interviewed; undergoes rigorous background, security, and medical checks; and, in the case of principal refugee applicants, attends a pre-departure cultural orientation. 1-ER-44-45. The State Department oversees most aspects of refugee processing, while DHS is responsible for adjudicating refugee applications. 8 U.S.C. § 1157(c). To facilitate refugee processing, the State Department enters into cooperative agreements with

nongovernmental resettlement support centers ("RSCs"), which help prepare cases for adjudication by U.S. Citizenship and Immigration Services and are the interface between the government and refugee applicants. 1-ER-43-45. Plaintiffs HIAS and CWS operate two of the seven RSCs worldwide. 1-ER-55. Once the U.S. government clears a refugee for admission, the RSCs coordinate final steps, including medical exams and cultural orientation, and IOM facilitates travel in conjunction with the RSCs. 1-ER-44-45.

Before approved refugee applicants are permitted to travel to the United States, they must be matched with a resettlement agency or private sponsor, which commits to providing each refugee with initial services during the first ninety days in the United States pursuant to a cooperative agreement with the State Department. 1-ER-45-46; *see also* SER-181. This includes securing initial housing and basic furnishings for the family, as well as transportation from the airport upon arrival and assistance with other immediate needs such as enrolling children in school. 4-ER-796; 5-ER-1010-12, 1029, 1049. Resettlement agencies use federal funding, private donations, and volunteer support to effectuate Congress's command that initial services facilitate effective resettlement and cultivate "economic self-sufficiency" promptly after a refugee arrives. 1-ER-46 (quoting 8 U.S.C.

§ 1522(a)(1)). Without an "assurance" of resettlement support, refugees may not travel to the United States. 1-ER-20.

## IV. Courts repeatedly rejected the first Trump Administration's attempts to dismantle the USRAP.

President Trump has tried and failed to dismantle the USRAP since his first term. One week after his first inauguration, he signed an executive order that suspended all refugee entry into the United States for 120 days, indefinitely blocked Syrian refugees from entering the United States, and suspended entry of foreign nationals from seven countries. 4-ER-798. Less than a week later, a district court issued a nationwide temporary restraining order blocking the executive order from going into effect. *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). After this Court denied a request for a stay pending appeal, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (per curiam), the administration abandoned its appeal, and President Trump signed a new executive order that again suspended the USRAP for 120 days and suspended entry of foreign nationals from 7 countries. 4-ER-799. Before this second executive order could take effect, it was also enjoined. *Hawai'i v. Trump*, 241 F.Supp.3d 1119, 1140 (D. Haw. 2017). On appeal, this Court affirmed the injunction, holding that the executive order's refugee-ban provisions likely violated immigration laws and that the President exceeded his statutory authority. *Hawai'i v.*

*Trump*, 859 F.3d 741, 755-56 (9th Cir.) (per curiam), *vacated on other grounds*, 583 U.S. 941 (2017).

With Supreme Court review pending, the first Trump Administration replaced the refugee-ban portions of the executive order with an agency memorandum that continued to suspend refugee processing and entry. 4-ER-800.[3] As with the prior suspensions, this agency memorandum was quickly enjoined. *Doe v. Trump*, 288 F.Supp.3d 1045, 1087 (W.D. Wash. 2017). After declining to pursue its appeal, *Doe v. Trump*, No. 18-35015, 2018 WL 1774089, at *1 (9th Cir. Mar. 29, 2018), the administration agreed to prioritize processing for cases impacted by the unlawful suspension, Stipulated Dismissal Ex. A, at 7-13, *Doe v. Trump*, No. 17-cv-178-JLR (W.D. Wash. Feb. 10, 2020), Dkt. 205.

Having failed to prevent refugees from reaching the United States, in 2019, President Trump took aim at the domestic refugee-resettlement infrastructure with an executive order that flipped the USRAP on its head, directing that a refugee could not be resettled *unless* the state and community receiving the refugee affirmatively consented to refugee

[3] President Trump also issued a new, standalone proclamation barring foreign nationals of certain countries. Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 24, 2017). The Supreme Court considered the legality of this executive action in *Trump v. Hawai'i*, 585 U.S. 667 (2018), *see infra* pp. 30-31.

admissions in advance. 4-ER-801. The administration implemented the ban through the funding process for resettlement agencies, requiring the agencies to obtain written consents or else lose their funding. *Id*. This order and its implementation were also enjoined. *HIAS, Inc. v. Trump*, 415 F.Supp.3d 669, 686-87 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021).[4]

## V. The second Trump Administration is again trying to undo Congress's statutory scheme by indefinitely banning refugee entry and dismantling the Act's infrastructure.

Hours into his second term, President Trump again took aim at the USRAP, signing the Refugee Executive Order—titled "Realigning the United States Refugee Admission Program"—which suspends entry of all refugees and directs the Secretary of Homeland Security to suspend decisions on all refugee applications. 1-ER-47. The order justified its sweeping suspensions with allegations that the country has been "inundated with record levels of migration," but it cited as support state and local requests for assistance for *asylum seekers*—individuals who present "distinct circumstances . . . not [presented by] legally admitted refugees who arrive with work authorization and federal support for resettlement," as the District Court later recognized.

[4] None of the refugee-related injunctions were considered on the merits by the Supreme Court, but the Court stayed (only in part) the preliminary injunction of the second entry and refugee ban, balancing the equities based on the specific factual findings in that case. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581-82 (2017).

1-ER-96 (citing nineteen-state amicus brief explaining that USRAP elimination will actually impose costs on those states). The Refugee Executive Order's suspensions are indefinite: they remain not until an identified problem is addressed, but until the President determines that USRAP's resumption is in the national interest, which is defined in part by the preservation of taxpayer resources for U.S. citizens. 1-ER-48-49. "Thus," as the District Court concluded, "the President's say-so is the only way USRAP can resume." *Id.*

The federal agencies went even further. In implementing the Refugee Executive Order, the agency Defendants vastly expanded its terms. 1-ER-74. Specifically, the agencies implemented the entry ban a full week early, resulting in the cancellation of travel for refugees slated to arrive in the United States days before the ban was to take effect. Indeed, without statutory or other authority, the State Department began implementing travel cancellations even before President Trump took office—as early as January 18, 2025. Consolidated Br. for Appellants ("Br.") 39-40. Further, the agencies did more than implement the ban on refugee entry, as specified in the Refugee Executive Order. Instead, they determined unilaterally to suspend *all* processing of refugee applications, including facilitating the interim steps that refugees must take to prepare their applications,

demonstrate that they meet the criteria for refugee status, and complete the lengthy post-approval processing. 1-ER-74-75. The agencies halted all refugee applications pending at any stage of the lengthy USRAP process, and—as described below, *infra* pp. 19-20—stopped all funding for USRAP, effectively ensuring that, even if President Trump determined to resume the USRAP in the future, no refugees will be ready to complete processing and travel to the United States.[5]

Meanwhile, the agencies interpreted a different executive order to permit them to eliminate funding for USRAP processing and resettlement benefits for refugees already in the United States. On January 20, President Trump signed Executive Order 14169 (the "Foreign Aid Executive Order"), which ordered a pause in "foreign development assistance" pending a review of whether such assistance is consistent with his "America First" foreign policy. Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025); *see also* 1-ER-51, 74. The Foreign Aid Executive Order left it to the implementing agencies to define "foreign aid" and determine the process and criteria for

[5] This is precisely what has happened. Defendants earlier this month informed the District Court that *all* injunction-protected refugees require new security checks and about half require new medical examinations. SER-17; *see also Hawai'i v. Trump*, 871 F.3d 646, 664 (9th Cir. 2017) (per curiam) (refugees "have only a narrow window of time to complete their travel, as certain security and medical checks expire and must then be re-initiated" such that "[e]ven short delays may prolong a refugee's admittance").

the funding review it directed. 1-ER-74. The State Department construed the Foreign Aid Executive Order to include all funding for the USRAP, including for programs Congress has expressly characterized as "domestic." *Id.* On January 24, the State Department sent notices to all USRAP partners indefinitely suspending funding under the cooperative agreements that governed provision of refugee-processing support and initial resettlement services. 1-ER-50-51.

## VI. Plaintiffs filed suit to enjoin the unlawful dismantling of the USRAP.

Plaintiffs, nine directly impacted individuals and three refugee-resettlement organizations, filed suit to challenge these actions in February 2025. 5-ER-1051-96. Their initial preliminary-injunction motion sought to enjoin both enforcement of the Refugee Executive Order and the suspension of USRAP funding. 4-ER-914-15. The District Court granted the motion on the record at a February hearing, providing that a written order would follow imminently. 1-ER-101.

One day later, the State Department terminated all resettlement-agency cooperative agreements to provide initial resettlement services and all but one to provide refugee-processing support abroad. 1-ER-5.

The District Court's written preliminary-injunction order followed on February 28. 1-ER-39-100. Among other things, it concluded that the

Refugee Executive Order likely exceeds the President's authority under section 1182(f) because it eviscerates Congress's statutory scheme by indefinitely suspending the USRAP; that the suspension of follow-to-join admissions likely violates the Due Process Clause; and that the agencies' implementation likely violates the Act and the APA's procedural requirements and was arbitrary and capricious. 1-ER-39-100. The District Court also explained that the State Department's suspension of USRAP-related funding contradicted the clear will of Congress "to create a federally funded system to support domestic refugee resettlement" and that its implementation of the Foreign Aid Executive Order was likely arbitrary and capricious. 1-ER-80, 85-89.

After Plaintiffs supplemented their complaint and sought a second preliminary injunction against Defendants' termination of USRAP funding, the District Court enjoined the terminations of refugee-related cooperative agreements, finding that the terminations "effectively dismantled the infrastructure necessary to fulfill the Government's statutory obligations and [were] therefore contrary to law." 1-ER-23. The Court further found the terminations to be likely arbitrary and capricious. 1-ER-26-28.

Defendants appealed both preliminary injunctions, 5-ER-1097-1100, and moved to stay the first but not the second pending appeal. A motions

panel of this Court stayed the first preliminary injunction in part, later clarifying that its order requires Defendants to resume processing, facilitation of travel, admission, and provision of resettlement benefits for conditionally approved refugees who had "arranged and confirmable travel" as of January 20, 2025, No. 25-1313, Dkt. 46.1 at 4, and that the order should be interpreted narrowly "on a case-by-case basis, to apply to individuals with a strong reliance interest arising prior to January 20, 2025," No. 25-1313, Dkt. 64.1 at 1-2.

Concurrently in the District Court, Defendants conceded that their actions had resulted in "significant deterioration of functions throughout the USRAP" and that they could not predict "how long it w[ould] take to restore the USRAP to operational status." SER-80. Weeks later, the District Court found that Defendants had still not complied with the preliminary injunctions (as narrowed by this Court). SER-40-41.

## VII. Plaintiffs have suffered and are continuing to suffer irreparable injuries.

In issuing its preliminary injunctions, the District Court relied on a detailed record demonstrating that the Refugee Executive Order, its implementation, and the USRAP funding suspension (and later termination) impose "devastating harm[s]" on Plaintiffs. 1-ER-93. As the unrebutted record evidence shows, refugees have few if any rights in the countries where

they reside; have no right to work and very limited access to healthcare, housing, or education; and often face discrimination. 4-ER-941-44, 949-52, 956-59; 5-ER-965-68, 972-76, 980-82, 986-89, 995-97, 1003. The entry suspension, which resulted in the abrupt cancellation of travel for Plaintiffs Pacito and Alyas and thousands more, has left families vulnerable to physical danger and financial hardship. 1-ER-52-53, 91 (describing how Pacito and his family were left without stable housing, basic necessities, and employment after they received only twenty-four hours' notice that their travel was cancelled); 5-ER-972-75 (detailing dangers Alyas and his family face as members of minority religious group in Iraq and impact of travel cancellation); 5-ER-965-67 (describing threats Plaintiff Sara and her son face as refugees in Jordan and preparations made in anticipation of travel). The indefinite suspension of case processing leaves many more refugees in limbo, facing similar dangers and unable to seek alternative paths to refuge. Defendants' actions also prolong Plaintiffs' separation from their family members, notwithstanding the Act's express prioritization of refugee family reunification. 1-ER-52-54, 91-92; *see also, e.g.*, 5-ER-980-82 (describing impact of indefinite family separation on Plaintiff Marcos and his family).

For refugees who have already been resettled in the United States like Plaintiff Ali, Defendants' funding termination has ended access to

congressionally mandated initial resettlement-support services, which are critical to enabling refugees' integration and ability to become self-sufficient. 1-ER-54. The organizational Plaintiffs who provide these support services via cooperative agreements with the State Department are effectively being run out of business as a result of the no-notice, indefinite loss of USRAP funding. 1-ER-55. The financial impact has been devastating, threatening the organizational Plaintiffs' core existences; undermining the decades of work spent building up infrastructures, relationships, and the associated goodwill to facilitate refugee integration in local communities; and requiring them to furlough or lay off hundreds of staff all over the United States. 1-ER-55.

## SUMMARY OF THE ARGUMENT

The District Court's preliminary injunctions should be affirmed.

*First*, the District Court did not err in concluding that Plaintiffs are likely to succeed on their ultra vires challenge to the President's invocation of his section 1182(f) power. The Supreme Court made clear in *Hawai'i v. Trump* that the President's authority to "suspend" entry of non-citizens for a "period" is broad but not unlimited. 585 U.S. 667, 687-88 (2018). By *indefinitely* banning refugee entry to this country, the President exceeded that authority: in claiming that refugees are contrary to the public interest insofar as they take U.S. taxpayer dollars away from American citizens, the

President created an "unresolvable justification" that supports the permanent exclusion of refugees. 1-ER-62-66. Defendants do not seriously dispute that indefinitely banning refugee admissions exceeds the President's authority, and their claim that the refugee entry ban is "temporary" is no response.

The Refugee Executive Order is further ultra vires because it contradicts the Act's directive that U.S. taxpayer dollars support refugee resettlement, *see* 8 U.S.C. § 1522(a)(1)(A), and the Act's permanent and systematic procedure for refugee admissions and resettlement. Defendants' challenge to this conclusion misunderstands the Act's plain language.

*Second*, the District Court did not err when it concluded that the agency Defendants' evisceration of the USRAP and elimination of congressionally appropriated funding violate the APA. As a preliminary matter, Article III courts clearly have jurisdiction over APA challenges seeking injunctive relief where the challenged agency policy impacts hundreds of thousands of people in the United States and across the globe. Decades of Supreme Court precedent supports this position, caselaw that has not been reversed by—and actually formed the basis of—the Supreme Court's recent stay order in *Department of Education v. California*, 145 S.Ct. 966 (2025) (per curiam) ("*DOE*"). Defendants' arguments to the contrary

amount to wishful thinking that they can override Congress's will outside the guardrails of the APA simply by using funding agreements to implement their policy decisions. And, as the District Court concluded, Defendants' other challenges to judicial review are easily dismissed based on binding precedent.

On the merits, the agency Defendants' actions violate the APA's requirements for reasoned decision-making in multiple ways, each a sufficient basis to affirm. Defendants do not contest that Plaintiffs are likely to succeed on their claim that the agencies' wholesale suspension of the USRAP—far in excess of the entry bar in the Refugee Executive Order—was required to go through notice-and-comment rulemaking. Nor do Defendants dispute any of the District Court's factual findings, which are grounded in the unrebutted record.[6] On the issues they do dispute, Defendants fail to meaningfully respond to the District Court's reasoning that the agency actions implementing the Refugee Executive Order, as well as the decision to terminate funding for refugee processing, admissions, and resettlement, directly contradict the Act. Defendants cannot rebut the District Court's

[6] Because Defendants' opening brief does not contest *any* of the District Court's factual findings and further ignores several of its legal conclusions, those issues are now waived, and no subsequent filing can revive them. *See SNJ Ltd. v. Comm'r*, 28 F.4th 936, 939 n.1 (9th Cir. 2022).

conclusion that these actions were also arbitrary and capricious—particularly where the agencies reversed longstanding policy without explaining their reasoning, weighing serious reliance interests, or considering reasonable alternatives.

*Third*, the District Court correctly determined that Defendants violated Plaintiff Esther's constitutional right to due process when they eliminated, overnight and without notice, the statutory entitlement to admission for minor children and spouses of refugees. Defendants' reliance on *Department of State v. Muñoz*, 602 U.S. 899 (2024), is misplaced—that case involved fundamental rights inferred from the Constitution, not a statutory mandate—and their statutory argument rests on a misreading of the Act.

*Fourth*, Plaintiffs have made a strong showing, based on hundreds of pages of unrebutted evidence, of the irreparable harms they are suffering as a result of Defendants' unlawful actions. The balance of equities thus favors preliminary relief while the merits of Plaintiffs' claims are litigated.

*Finally*, as to the scope of relief, Defendants do not contest the District Court's factual findings that nothing short of the relief ordered will stop these irreparable harms. As the District Court found, the organizational Plaintiffs have affiliates across the United States and have committed to provide resettlement assistance to thousands of refugees who are currently scattered

around the world. Similarly, the individual Plaintiffs and the putative class they seek to represent are located in different regions served by different RSCs (some non-Plaintiff) and will be resettled in various states served by different locally based resettlement agencies.

## STANDARD OF REVIEW

A preliminary injunction is appropriate where the plaintiff is (1) "likely to succeed on the merits" and (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [the plaintiff's] favor," and (4) "an injunction is in the public interest." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) ("*EBSC*") (cleaned up). When the government is a party, "the last two factors (equities and public interest) merge." *Id.* These favors are "evaluated on a sliding scale" in this circuit. *Id.* (citing *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-34 (9th Cir. 2011)).

A preliminary injunction should be set aside only if the district court "abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 857 (9th Cir. 2022) (cleaned up). The Ninth Circuit reviews "the district court's legal conclusions *de novo*, the factual findings

underlying its decision for clear error, and the injunction's scope for abuse of discretion." *Id.*

## ARGUMENT

### I. The District Court correctly concluded that Plaintiffs are likely to succeed on the merits.

#### A. Section 1182(f) does not give the President authority to indefinitely suspend Congress's "permanent and systematic" refugee admissions program.

The Refugee Executive Order indefinitely halts refugee entry into the United States and thereby exceeds the President's authority under 8 U.S.C. § 1182(f) to "suspend" entry of immigrants only for a "period," which the Supreme Court has recognized must be limited in duration.[7] Defendants ignore that the refugee entry ban is indefinite, and their attempt to recast it as merely "temporary" is belied by the plain text of the order, as the District Court concluded. 1-ER-64-66. The District Court also correctly determined that President Trump's indefinite ban on refugee entry directly conflicts with the Act, which creates a "permanent and systematic procedure" for refugee admissions and resettlement in the United States. 1-ER-59-64.[8]

---

[7] Defendants do not claim that the President has inherent authority absent section 1182(f) to indefinitely ban refugee entry. *See, e.g.*, Br. 25 (Refugee Executive Order relies on President's invocation of "his separate, standalone authority under § 1182(f)").

[8] The District Court correctly concluded that the President exceeded his section 1182(f) authority when he directed an indefinite suspension of

#### 1. Section 1182(f) does not permit an indefinite ban on entry.

Defendants do not dispute that an indefinite ban on refugee entry would exceed the President's section 1182(f) authority. Nor could they: *Trump v. Hawai'i*, the case on which Defendants' entire challenge to the first preliminary injunction rests, said as much. *See* 585 U.S. at 687 (agreeing that "the word 'suspend' often connotes a deferral till later" (cleaned up)). In upholding the presidential proclamation at issue as a valid exercise of the President's section 1182(f) authority, the *Hawai'i* Court emphasized this temporal restriction: the proclamation made clear that its "conditional restrictions" would remain in force "only so long as necessary to 'address'" the identified "inadequacies and risks" that triggered the entry ban in the first place (namely, the failure of certain countries to share sufficient information about their nationals to determine whether they presented a public safety threat to the United States). *Id.* at 677, 687. The Court emphasized that the proclamation established "an ongoing process to engage" the affected nations, thereby enabling them to address those inadequacies. *Id.* at 687-88. The proclamation also established an ongoing process to assess whether affected nations made sufficient improvements;

---

decisions on refugee cases. 1-ER-63-64. Defendants do not contest this ruling, and the issue is waived.

indeed, the Court noted that the process had already been utilized to end restrictions on one of the countries. *Id.*

In short, while the Court recognized that section 1182(f) does not require the "period" of suspension to have a fixed end date, it also made clear that the suspension must be limited in duration. *See id.* at 687 (emphasizing that all past invocations of section 1182(f) authority were sufficiently limited because they were tied to resolution of condition that "triggered" entry suspension).

In contrast, the Refugee Executive Order's ban on refugee entry is not durationally limited in any way, let alone tied to the resolution of a triggering condition. It bans entry of refugees to the United States unless and until President Trump determines that admitting refugees "is in the interests of the United States" as those interests are defined in the order. 1-ER-62 (citing Refugee EO §§ 1, 4). The Refugee Executive Order, in turn, defines the national interest to *categorically exclude refugees* on the ground that they "compromise the availability of resources for Americans" and must be kept out "to ensure that the United States preserves taxpayer resources for its citizens." Refugee EO §§ 1-2. Never mind that federal law—specifically, the Act and its implementing regulations—requires that refugees be provided federally funded resettlement support, *see* 8 U.S.C. § 1522; 45 C.F.R. § 400

et seq., such that any refugee admitted to the United States necessarily receives (and is entitled to) "taxpayer resources." The Refugee Executive Order is clear: despite statutory requirements, providing U.S. tax dollars to refugees is against the national interest and, therefore, all refugee entry is necessarily against the national interest.[9]

The District Court correctly saw the Refugee Executive Order for what it is: an indefinite ban on refugee entry. The District Court concluded that the order has no temporal limit because it creates an "unresolvable justification" for barring refugees from the United States. 1-ER-65. Specifically, it takes a "zero-sum view that admitting refugees necessarily depletes resources for Americans," *id.*, such that "President Trump could effectively suspend USRAP permanently based solely on his judgment about American interests," 1-ER-62.

Defendants repeatedly mischaracterize this analysis. They incorrectly claim the District Court required a "fixed end date," contrary to *Hawai'i*. Br. 20. Not so: the District Court expressly acknowledged that "the President need not 'prescribe in advance a fixed end date,'" but there still "must be

---

[9] The District Court correctly observed that the Refugee Executive Order "simply 'proclaim[s]' detriment without providing evidence of any investigative process or factual determinations—i.e., findings," 1-ER-60-61, but declined to decide whether the President failed to make the requisite finding to invoke section 1182(f). *See id.*

some temporal limitation" on entry restrictions made pursuant to section 1182(f), which—the Refugee Executive Order "lacks." 1-ER-64-65 (quoting *Hawai'i*, 585 U.S. at 687). Defendants further accuse the District Court of "excessive reliance" on *this* Court's *Hawai'i v. Trump* decision later overruled by the Supreme Court. Br. 25. But the District Court did not discuss that decision at all in analyzing Plaintiffs' claim that the Refugee Executive Order exceeds the President's section 1182(f) authority. And though Defendants fault the District Court for relying on Ninth Circuit precedent that "predated and was superseded by *Hawai'i*," Br. 22 (citing *Doe #1 v. Trump*, 957 F.3d 1050, 1065 (9th Cir. 2020)), that case in fact *postdated and interpreted* the Supreme Court's *Hawai'i* opinion, *see* 1-ER-62. In any event, the only "error" Defendants identify in *Doe #1's* holding is language indicating that proper exercise of section 1182(f) authority requires a temporal limitation. But the *Doe #1* Court's conclusion was predicated on and mirrored the *Hawai'i* Court's holding. *Compare Doe #1*, 957 F.3d at 1065 (quoting dictionary definition of "suspend"), *with Hawai'i*, 585 U.S. at 687 (same). The analysis in *Doe #1* remains useful in guiding the Court here. *See infra* at pp. 41-43.

Finally, Defendants appear to concede, implicitly, that an indefinite ban on refugees would be outside the President's section 1182(f) authority;

they repeatedly assert that the Refugee Executive Order's ban is merely "temporary," Br. 5, 21, 45-46, because it sets "a procedure and timeline for considering resumption—upon receipt of periodic reports from the Secretaries of State and Homeland Security to be submitted every 90 days," *id.* at 21. But Defendants' focus on the frequency of reporting misses the point: entry of refugees is inherently contrary to the order's conception of "the interests of the United States" because refugees necessarily receive taxpayer-funded resettlement benefits under the Act. *See supra* pp. 14-15, 31-32. The Refugee Executive Order fails to identify any deficiency in the USRAP connected to the concerns and policy interests it identifies, let alone any way to address them. *See* 1-ER-65. That is because "the problem" the order identifies is the USRAP itself: the admission and resettlement of refugees in the United States.

**2. The Refugee Executive Order violates the Act.**

Besides exceeding the President's section 1182(f) authority, the Refugee Executive Order's indefinite ban on refugee entry is ultra vires because it overrides and replaces the purpose, objectives, and careful statutory scheme created by Congress. *See Hawai'i*, 859 F.3d at 779-82; 1-ER-62-63.

Defendants claim that the President's section 1182(f) authority supersedes the Act because Congress "layered the President's Section 1182(f) authority on top of his authority under Section 1157(a) to set the refugee admission ceiling," implicitly referencing the "later-in-time" canon of statutory interpretation. Br. 23. But that canon provides that, when two statutes conflict, the *later*-enacted and more specific statute controls. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (explaining that "[i]t is a commonplace of statutory constructure that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions").

Here, the Act was enacted in 1980—decades after section 1182(f), enacted as part of the Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82-414, 66 Stat. 163. The Act is therefore "layered . . . on top of" the President's section 1182(f) authority, *not* the other way around. *See Hawai'i,* 859 F.3d at 780-81 ("later in time" and *generalia specialibus non derogant* canons "further explain why § 1182(f) does not give the President authority

to override the requirements of § 1157”). Relatedly, Defendants rely on *Hawai'i* for the proposition that section 1182(f) allows the President to impose entry restrictions in addition to those elsewhere outlined in the INA, Br. 23, but they ignore that the order's bar on refugee admissions is not just an "additional limitation[]" in an area where Congress was otherwise silent; it is a categorical exclusion of the population whose admission was Congress's express intent in the Act, such that "Congress has stepped into the space and solved the exact problem," 585 U.S. at 691 (cleaned up).

Defendants argue that the Act tasks the President with deciding whether admitting any refugees at all is in the national interest and allows him to ban refugee entry at any time. *See, e.g.*, Br. 3, 8, 24-25 (repeatedly asserting that presidential determination could be "zero"). This is wrong. Setting aside that the Act's fundamental concern is caring for refugees—and on explicitly humanitarian grounds, *see, e.g.*, 8 U.S.C. § 1157(d) (requiring President and Congress to monitor and discuss ongoing "changes in the worldwide refugee situation")—Defendants erroneously isolate the words "in the national interest" from their statutory context; in doing so, Defendants imply that the President may define the "national interest" however he pleases, including to the exclusion of refugees whose protection is the purpose of the Act, Br. 24. But the phrase "national interest" appears only in

tandem with the directive that the President "*shall*" consider what number of refugee admissions is "justified by humanitarian concerns" or "grave humanitarian concerns" or "is otherwise in the national interest." 8 U.S.C. § 1157(a)(1)-(2), (b), (e) (emphasis added). While the Act does not define "otherwise in the national interest," it would be contrary to basic principles of statutory interpretation to construe "vague terms or ancillary provisions" to "alter the fundamental details of a regulatory scheme." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).[10]

Even if the President were allowed to set the annual refugee determination to zero—he is not—the Act makes clear that *any* significant changes to the President's plans for refugee admissions and resettlement must go through "appropriate consultation," as that term is defined by the Act. 8 U.S.C. § 1157(a)-(b), (d)-(e). Specifically, the Act requires a detailed presentation to Congress on the nature of the worldwide "refugee situation," the number of refugees to be admitted, analysis of the conditions in the countries from which they came, the President's proposed plan for their movement and resettlement, and the estimated cost of their movement. *Id.*

[10] Defendants' out-of-circuit cases are inapposite. *See Gonzalez v. Cuccinelli*, 985 F.3d 357, 367 (4th Cir. 2021) (limited to U-visas); *Doe 1 v. Jaddou*, No. TDC-24-1942, 2025 WL 327368, at *3-4 (D. Md. Jan. 29, 2025) (mandamus action concluding no right to have refugee case adjudicated within particular timeframe).

§ 1157(e). After that presentation, the Act requires in-person discussions between cabinet-level officials and congressional committees, a congressional hearing on the President's proposal, and publication of that proposal. *Id.* § 1157(d)(2)-(3), (e). In addition to the "appropriate consultation" requirements before the start of each fiscal year, the Act requires the President to "provide for periodic discussions" with Congress during the year "about the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions among refugees." *Id.* § 1157(d). The Act specifically anticipates that midyear changes to the President's refugee admissions plan might be necessary to enable *more* refugee entries because of an "unforeseen emergency refugee situation," *id.* § 1157(b), and it mandates that such changes be subject to "appropriate consultation," *id.* § 1157(b), (d)(3)(B). But it provides no mechanism to abruptly curtail refugee admissions midyear after the President's plan has been confirmed following "appropriate consultation." Defendants' attempt to infer such authority from statutory silence, *see* Br. 25, is wholly unpersuasive, *see Hawai'i*, 859 F.3d at 780-81 (reviewing Act's "very specific" consultation requirements and concluding it "does not provide a

mechanism for the President to *decrease* the number of refugees to be admitted mid-year").[11]

Defendants also ignore that the Refugee Executive Order directly contradicts specific provisions of the Act. For example, Congress expressly exempted refugees from being determined inadmissible based on the possibility that they might rely on public funds, 8 U.S.C. § 1157(c)(3), and further required resettlement assistance at public expense, *id.* § 1522(a). The Refugee Executive Order seeks to replace these directives with the President's own "America First" policy agenda to "ensure that the United States preserves taxpayer resources for its citizens," Refugee EO § 2—*not* for refugees. Similarly, Congress's detailed plan for refugee resettlement prioritizes "effective resettlement" of refugees, defined as encouraging economic self-sufficiency and English-language skills. 8 U.S.C. § 1522(a)(1). The Act expressly exempted refugees from inadmissibility based on illiteracy, *id.* § 1157(c)(3), recognizing that the very persecution from which refugees are fleeing might have made it impossible for them to attend school.[12] But

[11] While this Court's opinion was vacated, it remains persuasive. *See, e.g.*, *United States v. Joelson*, 7 F.3d 174, 178 n.1 (9th Cir. 1993) (noting that vacated opinion had "no precedential effect" but nevertheless citing opinion for its informational and "persuasive" value).

[12] This ensures, for example, that Afghan women who are of special humanitarian concern because of their connection to the U.S. mission in

the Refugee Executive Order directs that refugee admissions be limited to "only those refugees who can fully and appropriately assimilate into the United States." Refugee EO § 2.

Finally, Defendants lambast the District Court for relying on "vague notions of 'purpose and policy judgments'" to conclude that the Refugee Executive Order conflicts with the Act. Br. 23. But there is nothing vague about Congress's intent to create a "permanent and systematic procedure" for refugee admissions and resettlement, 1-ER-41 (citing Act), to replace the prior ad hoc and situational responses of the preceding decades, *see supra* pp. 6-8. The Act clearly established mechanisms to uniformly consider individuals for resettlement in the United States, both at the individual level, *see* 8 U.S.C. § 1101(a)(42) (establishing specific definition for who is a "refugee"); *id.* § 1157(c)(1) (specifying that refugees must be of special humanitarian concern to United States, not firmly resettled in third country, and admissible to be considered for admission), and at the macro level, *see id.* § 1157 (directing annual advance planning for resettlement of refugees designated to be "of special humanitarian concern to the United States").[13]

Afghanistan are not denied admission because the Taliban prohibited them from attending school.

[13] Congress has also identified groups of special humanitarian concern, including certain members of religious minority groups in Iran and Iraqis associated with the U.S. government. *See* Consolidated Appropriations Act,

And it placed guardrails and consultation requirements on the President to ensure predictability. The Refugee Executive Order directly overrides Congress's effort to impose a uniform, systematic, and predictable approach to the admission and resettlement of refugees. It displaces the Act's careful procedures with the President's determinations based on his assessment of what is in the national interest—precisely what Congress sought to eliminate with the Act.[14]

#### 3. This Court's opinion in *Doe #1* confirms that the Refugee Executive Order exceeds the President's authority under section 1182(f).

The *Doe #1* stay decision—which Defendants agreed at oral argument remains good law, 1-ER-62 n.5—involved a challenge to a presidential proclamation barring entry of certain immigrants unless they demonstrated they would be covered by approved health insurance; without support, the proclamation attributed the "perceived problem" of uncompensated medical expenses to lawful immigrants. 957 F.3d at 1056-57. This Court held that the plaintiffs raised "serious questions" on the merits of whether the

div. E, tit. II, § 213, Pub. L. 108-199, 118 Stat. 3 (2004); National Defense Authorization Act, div. A, tit. XII, § 1243(a), Pub. L. 110-181, 122 Stat. 3 (2008). Plaintiff Alyas was scheduled to travel through the Direct Access Program for U.S.-Affiliated Iraqis. *See* 5-ER-972-76.

[14] The President has apparently determined that only the admission of white Afrikaners is in the national interest of the United States. *See* SER-52-62, 68.

proclamation exceeded the President's power because the entry ban "does not have an endpoint" and, given the lack of connection between the problem and the ban, "the perceived 'necessity'" of the proclamation "could continue in perpetuity." *Id.* at 1065-66. The Court also held that the proclamation "eviscerate[d] the statutory scheme" by making acquisition of health insurance the sole determinative factor over visa issuance. *Id.* at 1064.

Here, as in *Doe #1*, the Refugee Executive Order justifies its indefinite suspension on domestic economic concerns—specifically, requests from states and cities for federal financial assistance to provide for asylum seekers who arrived in large numbers and overwhelmed local services. *See* 4-ER-925-26. But the order conflates these asylum seekers with refugees—notwithstanding that refugees are categorically distinct because they *already receive*, upon admission, the federal assistance that states and cities were requesting for asylum seekers. *Id.* (citing SER-144-46, 148-52). Meanwhile, Defendants' actions eliminating refugee funding will, ironically, impose the very financial strains on states and localities that the President purportedly sought to avoid with the Refugee Executive Order. *See* 1-ER-96 (citing amicus brief of nineteen states and finding that this point "undermines a central premise of the [order] and highlights the disconnect between the Government's stated justifications and its sweeping actions"); SER-136-39.

Just as in *Doe #1*, the Refugee Executive Order justifies itself with broad, long-term policy concerns such that there is "no way to 'render the limitation feasibly temporary.'" 1-ER-65 (quoting *Doe #1*, 957 F.3d at 1066). Indeed, the order does not even suggest that its policy preferences—some of which are already enshrined in the Act, including state and local involvement, national security, and public safety—are not already effectuated by the USRAP, which is yet another reason why it has no limiting factor. *Id.*[15]

#### 4. The motions panel's decision on Defendants' stay motion does not require or recommend a different result.

Focusing on the Supreme Court's language in *Hawai'i* that section 1182(f) "'exudes deference' to the President," a panel of this Court granted in part and denied in part Defendants' emergency motion to stay the District Court's first injunction, Dkt. 28.1 at 2 (quoting *Hawai'i*, 585 U.S. at 684), later clarifying that the *Nken* factors favored the stay given the panel's belief that "the government is likely to succeed on the merits," Dkt. 46.1 at 3.

[15] Specifically, under the Act, the federal government "shall, consistent with [the Act's] policies and strategies and to the maximum extent possible, take into account recommendations of the State." 8 U.S.C. § 1522(a)(2)(D). And, as reported to Congress during the consultation over the Fiscal Year 2025 presidential determination, refugees are already the "most thoroughly screened and vetted" population entering the United States. 1-ER-44.

The panel's stay decision is not controlling on this Court. *See EBSC*, 993 F.3d at 656-57 (stay decision did not control merits appeal). And here, the panel did not have the benefit of full briefing and argument to analyze the Supreme Court's limitations on the President's exercise of authority under section 1182(f) and how the Refugee Executive Order conflicts with the Act. *See DOE*, 145 S.Ct. at 969 (Kagan, J., dissenting) (recognizing "[t]he risk of error increases" when courts must decide "with barebones briefing, no argument, and scarce time for reflection"). The panel's brief orders did not address the temporal limitation on the President's authority or his lack of authority to override Congress's will. Nor did the panel expressly consider the legality of the agency Defendants' actions dramatically expanding the scope of the President's ban on refugee entry, notwithstanding that the agencies have no authority under section 1182(f). These considerations compel the conclusion that the Refugee Executive Order and its implementation are unlawful and must be enjoined.

#### 5. The District Court enjoined Sections 3(c) and 4 of the Refugee Executive Order insofar as they harm Plaintiffs.

Defendants' final, new argument is a distraction. They claim that the District Court erred in enjoining section 3(c), which allows the Secretaries of State and Homeland Security to "jointly determine to admit" refugees "in

their discretion, but only so long as they determine that the entry" of refugees "is in the national interest and does not pose a threat to the security or welfare of the United States"; and section 4, which directs the Secretaries to submit reports to the President every ninety days regarding "whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States in light of the policies outline in section 2" of the Refugee Executive Order. Defendants assert that "neither [clause] could cause Plaintiffs any harm" and the President is entitled to seek his officers' written opinions. Br. 27-28. But Plaintiffs challenged sections 3(c) and 4 only insofar as they *do* cause harm—because they direct executive agencies to impose extra-statutory inadmissibility requirements that bar refugees from being considered for admission. 4-ER-924-25. The District Court consequently enjoined these provisions insofar as they harm Plaintiffs. 1-ER-59-66.[16]

[16] Plaintiffs do not challenge (and do not interpret the District Court's orders to prohibit) Defendants' authority to admit refugees without imposing additional inadmissibility requirements or the President's authority to require written reports.

### B. The agency Defendants exceeded their authority and violated the APA.

#### 1. The District Court properly exercised jurisdiction over Plaintiffs' USRAP-funding claims.

The District Court correctly concluded that it has jurisdiction over Plaintiffs' claims challenging the agency Defendants' elimination of funding for USRAP-related work.[17]

Defendants' jurisdictional argument assumes that federal agencies can insulate their actions from judicial review simply by implementing policy via suspension or termination of funding. *See* Br. 30-35; 2-ER-139-40. In Defendants' view, where challenges to agency action might result in relief requiring payment of money under suspended or terminated agreements, the only legal recourse is a Tucker Act claim brought by parties to the agreement in the Court of Federal Claims.

Defendants cite no case for this remarkable proposition. In contrast, the District Court correctly relied on *Bowen v. Massachusetts*, 487 U.S. 879

[17] Defendants seek to have it both ways by arguing that the funding *suspension* is moot if the Court rules in their favor, Br. 40, but remains a live issue if the Court rules for Plaintiffs, *id.* at 41-44. The USRAP funding suspension—which Defendants justified as a temporary pause necessary to allow for review of the underlying cooperative agreements—ended by its own terms when Defendants decided in March 2025 to terminate the agreements. 2-ER-106; *see also* 4-ER-745-49; SER-90-91. Moreover, Plaintiffs' challenge to the funding suspension is judicially reviewable and violates the APA for largely the same reasons as the funding termination. *See infra* pp. 54-63.

(1988), and its progeny to reject Defendants' attempts to avoid judicial review. *See* 1-ER-9-15, 76-79. *Bowen* specifically considered and rejected the argument that a claim that might result in payment of government funds is necessarily a claim for money damages or a "disguised breach-of-contract claim" such that the APA's waiver of sovereign immunity does not apply. 1-ER-10-15, 78. The state plaintiff sought equitable relief that would result in the payment of government funds pursuant to existing agreements. 1-ER-77-78 (citing *Bowen*, 487 U.S. at 893). In finding jurisdiction, the Supreme Court carefully distinguished between "'money damages'—which substitute for a suffered loss—and 'specific remedies' that 'attempt to give the plaintiff the very thing to which he was entitled.'" 1-ER-9-10 (quoting *Bowen*, 487 U.S. at 895). The *Bowen* Court held that even where payment of money from the government might be required, such relief does not transform a case seeking specific remedies into an action for money damages. *See Bowen*, 487 U.S. at 891-901; *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998).

Tellingly, Defendants do not address *Bowen* at all. Instead, they rely almost exclusively on the Supreme Court's recent order granting an emergency stay of a preliminary injunction pending appeal. *See* Br. 32-35 (citing *DOE*). But that stay order did not announce a new rule of law or revisit

*Bowen*; to the contrary, the order confirmed *Bowen's* continuing vitality by expressly relying on it. *See* 145 S.Ct. at 968.[18] Moreover, *DOE* turned on the uncontroversial rule that "the APA's limited waiver of sovereign immunity does not extend to orders to enforce a contractual obligation to pay money." *DOE*, 145 S.Ct. at 968 (cleaned up). That rule is not implicated here, and a comparison of the cases shows why.

In *DOE*, plaintiff states' claims arose from the terms of individual grants, requiring the reviewing court to construe the terms of the awards to adjudicate the claims. *See AIDS Vaccine Advoc. Coal. v. Dep't of State*, Nos. 25-00400, 25-00402, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025) (collecting *DOE* case documents). The district court's TRO-cum-preliminary injunction relied on the terms of the grants, enjoining the government from terminating the grants except to the extent that final agency action "is consistent with the grant terms and conditions." *DOE*, 145 S.Ct. at 972 (Jackson, J., dissenting). This reasoning is more amenable to Tucker Act analysis. In granting a stay of the TRO pending appeal, the Supreme Court

---

[18] In the past several weeks, courts have repeatedly rejected Defendants' implicit argument that *DOE* reverses decades of precedent. *See, e.g.*, *S.F. Unified Sch. Dist. v. Americorps*, No. 25-CV-02425-EMC, 2025 WL 1180729, at *2-3, *6-11 (N.D. Cal. Apr. 23, 2025) (collecting cases); *New York v. Trump*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966, at *1-3 (D.R.I. Apr. 14, 2025).

declined to find that the APA's waiver of sovereign immunity extended to "orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here," *id.* at 968—that is, orders for the government to pay money based on terms and conditions of terminated contracts.

Here, in contrast, the District Court did not order any relief that relies on the terms of cooperative agreements. Nor do Defendants point to any term that the Court must construe to adjudicate Plaintiffs' claims. As the District Court made clear, it is undisputed that Defendants have authority to terminate their cooperative agreements with resettlement partners—*so long as they comply with federal law when they do so*. *See* 1-ER-34 (quoting 2-ER-110). The sole question is whether the agency Defendants complied with the APA and the Act when they eliminated funding for the USRAP and thereby harmed Plaintiffs by terminating resettlement benefits to newly arrived refugees, blocking most refugees from travel to the United States, and eliminating case processing in whole regions of the world. 1-ER-20-21. That the funding termination implemented these changes is uncontested; that these changes caused significant and widespread harm to the resettlement

agencies and the refugees they serve is unquestionable.[19] Other courts confronting similar challenges to agency policy have likewise concluded that *DOE* is readily distinguishable. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698-TSC, 2025 WL 1131412, at *9-12 (D.D.C. Apr. 16, 2025); *AIDS Vaccine*, 2025 WL 1380421, at *3. And the Supreme Court recently declined to stay a preliminary injunction in *AIDS Vaccine* where—as here—the plaintiffs "assert[ed] APA claims to invalidate agency policy directives, regardless of any breach of agreement or the extent of their losses." *Id.* at *3 (cleaned up) (citing *DOE*).[20]

In short, Plaintiffs' claims "turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985), and the relief they seek is "'prospective, nonmonetary relief to clarify

---

[19] Defendants do not challenge any of the District Court's factual findings as clearly erroneous—nor could they, given the unrebutted evidence. And unlike Plaintiffs here, *see infra* pp. 70-71, the *DOE* respondents represented they had the "financial wherewithal to keep their programs running," 145 S.Ct. at 969.

[20] The out-of-circuit district-court case Defendants cite, Br. 34, is also readily distinguishable. In *U.S. Conference of Catholic Bishops v. Department of State*, a single resettlement agency sought an order that the government "stop withholding the money due" under its cooperative agreement but did not challenge Defendants' failure to comply with their statutory obligations. No. 1:25-cv-00485-TNM, 2025 WL 763738, at *9 (D.D.C. Mar. 11, 2025). And that nonbinding case is not persuasive, as its analysis relied on the *dissenting* opinion in *Bowen*.

future obligations,'" *Me. Cmty. Health v. United States*, 590 U.S. 296, 327 (2020). Plaintiffs thus easily satisfy the *Megapulse* test that courts apply in determining whether an APA claim is actually a disguised breach-of-contract claim. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (considering (1) the source of rights on which plaintiffs base their claims and (2) the type of relief they seek).

Defendants recognize that *Megapulse* provides the relevant test, but nevertheless argue that Plaintiffs' claims must be disguised contract claims because any obligations to fund "organizational plaintiffs and other resettlement partners in particular" stem from the agreements. Br. 33. Again, however, that Plaintiffs' claims incidentally involve cooperative agreements is not the deciding factor. Under *Megapulse*, what matters is the source of Plaintiffs' claims (statute) and the type of relief they seek (forward-looking injunctive relief). Defendants further misrepresent the District Court's analysis, which made clear that Defendants *can* terminate the agreements—so long as they can meet their statutory obligations and otherwise comply with federal law. It is ultimately Defendants' inability to meet their statutory obligations, not any term in the cooperative agreements, that formed the basis of the District Court's orders.

The implications of Defendants' jurisdictional argument are astonishing and would upend decades of black-letter law. For example, the individual Plaintiffs (and putative class members) who are harmed by the agency Defendants' decisions to eliminate initial resettlement services and most refugee processing but are *not* parties to the terminated agreements would have no recourse to challenge these actions. *But see* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."). The Supreme Court has long applied a strong presumption in favor of judicial review of administrative action because "legal lapses and violations occur, and especially so when they have no consequences." *Mach. Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015); *see also Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (recognizing presumption that agency actions are reviewable under APA); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024) ("Congress in 1946 enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." (cleaned up)). Taken to its logical conclusion, Defendants' position would allow unelected federal agencies to refuse to comply with the APA's requirements any time they discharged their duties via a funding agreement—which is to say, all the time.

Moreover, as the District Court noted, this case raises "serious questions" about whether the cooperative agreements are even enforceable under the Tucker Act, given that most cooperative agreements are not. 1-ER-9-12 (explaining that most cooperative agreements are not money-mandating and do not provide things of value to government). But even where there is an enforceable Tucker Act claim, the Supreme Court has made clear that it yields where—as here—the APA provides an avenue for relief. *See Me. Cmty. Health*, 590 U.S. at 323-24. To hold otherwise would mean "an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract." *Megapulse*, 672 F.2d at 971; *see also Climate United Fund*, 2025 WL 1131412, at *12 (agencies cannot be allowed to "creatively contract their way out of judicial reviewability of their actions," contrary to "what Congress envisioned for judicial review under the APA").

Finally, even if Plaintiffs' APA claims were impliedly barred by the Tucker Act, Defendants do not and cannot dispute that the District Court had jurisdiction over Plaintiffs' ultra vires and constitutional claims. No waiver of sovereign immunity is required for ultra vires claims because Defendants enjoy no protection for actions outside their delegated authority. *See, e.g.*, *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir.

2024). And constitutional claims, including Plaintiffs' claim that the agency Defendants violated the principle of the separation of powers when they sought to override Congress's power of the purse, also require no waiver of sovereign immunity. The District Court's uncontested jurisdiction over these claims provides another basis to affirm.[21]

### 2. The USRAP suspension failed to comply with APA-mandated procedures.

The District Court properly determined that Plaintiffs are likely to succeed on their claim that the agency Defendants' indefinite suspension of the USRAP is a substantive rule that was required to go through notice-and-comment rulemaking. 1-ER-82-84. Defendants do not contest this conclusion on appeal, which alone provides a sufficient basis to affirm the District Court's injunction of the USRAP suspension.[22]

Nor could Defendants dispute that the APA required notice-and-comment rulemaking before suspension of the USRAP. The suspension

---

[21] Section 1182(f) has no impact on the foregoing analysis because the Foreign Aid Executive Order—the ostensible basis for the agency Defendants' elimination of USRAP funding—does not invoke section 1182(f). This is unsurprising: section 1182(f) concerns immigrant entry, not federal funding, and it provides no authority to agency officials.

[22] At most, Defendants argue that the District Court's analysis of was "almost entirely derivative" of its Refugee Executive Order analysis. Not so: the agency Defendants "d[id] not merely color within the lines" of the order, but exercised substantial discretion in expanding its scope, 1-ER-74—which is unlawful, *see infra* pp. 56-63.

effects legal changes of general applicability (specifically, cancelling all USRAP processing, travel, and admissions) and thereby effects a change in existing law such that it is a "rule" as defined in 5 U.S.C. § 551(4). 1-ER-83. Such rules must be promulgated through notice-and-comment rulemaking, absent an exception. *See* 5 U.S.C. § 553. Defendants have never claimed any exception applies here. Indeed, a radical shift in longstanding agency policy that impacts hundreds of thousands of people is precisely the type of situation that requires notice and comment before the change is enacted. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment) (notice-and-comment process "guards against excesses in rulemaking"); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018) (notice-and-comment process "foster[s] the fairness and deliberation that should underlie a pronouncement of such force" (cleaned up)).

What's more, the USRAP suspension overrides and "effectively nullif[ies]" existing regulations that were themselves codified through notice-and-comment rulemaking. *See* 1-ER-84 (citing 8 C.F.R. § 207 et seq.). "Where the original rule was adopted after a notice and comment period, courts have generally found the decision to alter those rules to be substantive, and therefore subject to APA rulemaking procedures as well."

*Doe*, 288 F.Supp.3d at 1075 (citing cases). This is especially true given the Act's specific requirements relating to public notice and congressional consultation before any substantial changes are made to the plan for refugee admissions. *See* 8 U.S.C. § 1157(d) (requiring public hearing and notice of initial presidential determination and any midyear changes to it); *supra* pp. 9-10.

### 3. The USRAP suspension and elimination of USRAP funding are contrary to law and ultra vires.

The District Court did not err in concluding that Plaintiffs are likely to succeed on their claim that the agency Defendants acted contrary to law when they indefinitely suspended refugee processing, admissions, and resettlement in the United States. *See* 1-ER-79-80. The Act specifically contemplates that refugees of special humanitarian concern to the United States will be identified and considered for admission. 8 U.S.C. § 1157(a)(3), (c)(1). Simply put, agencies do not have authority to eviscerate this statutorily prescribed program, regardless of whether they believe doing so is "consistent" with the President's policy agenda. Br. 38-39. To hold otherwise would allow unelected agency officials to nullify Congress's careful and detailed scheme.

Defendants do not even attempt to argue that the agency Defendants had legal authority to indefinitely suspend all USRAP processing. Their sole argument is that the District Court's analysis was "almost entirely derivative" of its Refugee Executive Order analysis and "fails for the same reasons." Br. 35. But even if the Refugee Executive Order were a permissible exercise of the *President*'s section 1182(f) authority—and it is not, *see supra* pp. 30-34—section 1182(f) grants no authority at all to agencies. In any event, the agency Defendants' USRAP suspension went well beyond the President's suspension of refugee entry, as the District Court noted. *See* 1-ER-75. The District Court also determined that the agency Defendants' suspension of refugee-related funding gutted the USRAP, causing a "significant deterioration of functions" throughout the program. 1-ER-17. Defendants do not contest these factual findings. Because these unelected agency officials lack authority to override the will of Congress, the District Court's legal conclusions are correct as well.

The agency Defendants' termination of funding for the USRAP is contrary to law for an additional reason: it guarantees that refugee admissions and resettlement cannot happen now or in the future. *See* 1-ER-74-75, 83. Refugees are unable to be admitted under current policy because they are unable to obtain an "assurance" of resettlement support from a

domestic resettlement agency given that the agency Defendants terminated every single cooperative agreement to provide such assurances. 1-ER-20.[23] And refugee processing cannot continue in whole regions of the world because there is no resettlement partner to do the work. 1-ER-20-21 ("[E]limination of refugee processing in these regions effectively nullifies the statutory scheme for determining refugee admissions."). As for resettlement services, "domestic refugee resettlement infrastructure is functionally inoperative" and refugees in the United States like Plaintiff Ali "cannot access" resettlement benefits. 1-ER-29-30. Defendants do not contest any of these factual findings, and that is the end of the inquiry: the agency Defendants' actions directly conflict with their statutory obligations under the Act.

Defendants' argument that agencies enjoy wide discretion in how they implement the USRAP and provide resettlement support—and thus that they may terminate the cooperative agreements, Br. 35-36—misses the point. No one disputes that agencies have discretion in *how* they discharge their statutory responsibilities. *See, e.g.*, 1-ER-34 (District Court's second injunction "does not encroach upon the Government's unquestioned

[23] The Trump Administration has apparently exempted white Afrikaners from this admissions requirement. *See supra* note 14.

discretionary authority, moving forward, to enter and terminate cooperative agreements *in compliance with the law*"). The issue is that Defendants *must* discharge their duties, and they cannot terminate USRAP funding if it will prevent them from doing so.

Finally, Defendants' efforts to rewrite the Act, *see* Br. 37-38, must be rejected. The text is clear: the Executive shall, "to the extent of available appropriations," provide refugees with English-language training and employment training and placement. 1-ER-20 (quoting 8 U.S.C. § 1522(a)(1)(A)). The Act further requires that any grant or contract obligate the resettlement agency receiving it to provide for the basic needs of each refugee resettled and implement a resettlement plan, which reinforces the conclusion that "Congress intended these mechanisms to be used to fulfill the statutory mandate." 1-ER-22 (citing 8 U.S.C. § 1522(b)(7)). And the Act requires the administering federal agency to establish criteria for awarding and renewing grants and contracts, enumerating some of those criteria in the statute—and demonstrating that Congress sought an orderly process for managing these agreements. 1-ER-22-23 (citing 8 U.S.C. § 1522(b)(8)). The District Court therefore did not err in concluding that the agency Defendants likely acted contrary to law.

#### 4. The USRAP suspension and elimination of funding were arbitrary and capricious.

Nor did the District Court err in determining that the agency Defendants lacked a reasonable basis for their decision, even under the APA's narrow and deferential scope of review. 1-ER-85 (citing *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006)). A reasonable basis exists where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005)). A court may not "infer an agency's reasoning from mere silence." 1-ER-86 (quoting *Kern,* 450 F.3d at 1076). And, where an agency rescinds a prior policy, it bears the burden of showing that there are good reasons for the new policy and that it considered "serious reliance interests as well as alternatives within the ambit of the existing policy." *Id.* (cleaned up).

With respect to the Refugee Executive Order, the agency Defendants substantively expanded the order's ban on refugee entry in "at least three ways"—by (1) imposing the ban a week before its effective date; (2) terminating all USRAP case processing and operations, not just refugee admissions; and (3) "discretionarily opt[ing]" not to create the system for case-by-case exceptions to the entry ban as called for by the order. 1-ER-86.

But they provided no contemporaneous explanation for these expansions.[24] Further, they did not consider relevant statutory factors, such as the Act's objective to respond to the needs of refugees of special humanitarian concern to the United States. Notwithstanding that the agencies had recently justified their *prior* policy in more than fifty pages of facts and analysis provided to Congress, *see supra* p. 10, the agency Defendants failed to provide any "good reasons" for their about-face, failed to consider alternatives, and failed to acknowledge the reliance interests of refugees, their sponsors and families, and resettlement agencies. These omissions are fatal under the APA. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ("It would be arbitrary or capricious to ignore such matters.").

With respect to the USRAP funding suspension and termination, Defendants never explained why *domestic* funding for refugee resettlement constituted "foreign aid" such that USRAP agreements are subject to the Foreign Aid Executive Order. Defendants simply assumed that order covered all refugee funding, *see* Br. 41, which is itself arbitrary and capricious. Nor

---

[24] Defendants cannot now rely on "post hoc rationalizations" to defend earlier decisions, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988), and their belated declaration, 4-ER-888, must be disregarded. Moreover, Defendants' professed concern with leaving refugees "stranded" rings hollow when, by cancelling refugee travel a week before the Refugee Executive Order's effective date, *they* ensured that refugees like Plaintiff Pacito would be stranded. 1-ER-87 n.8.

did the agencies consider any reasonable alternatives. And the agencies failed to explain why the funding suspension did not conflict with their own regulation that "'payments for allowable costs must not be withheld unless required by Federal statute, regulations, or' if 'the recipient has failed to comply with the terms and conditions of the Federal award' or 'is delinquent in a debt to the United States.'" 1-ER-88-89 (cleaned up) (quoting 2 C.F.R. § 200.305(b)(6)).

Defendants' argument that they considered the reliance interests of resettlement partners—by reimbursing them for past work, Br. 42—crucially ignores that these partners' continued existence relies on resettling the refugees whom they were scheduled to welcome before the Refugee Executive Order and agency suspensions. Nor do Defendants account for the reliance interests of hundreds of thousands of refugees who can no longer be admitted to the United States or receive resettlement assistance after Defendants eliminated USRAP funding. Defendants insist they are permitted to terminate the cooperative agreements, *id.* at 43, and, in the abstract, no one claims otherwise. The issue, however, is that they can only do so in a manner consistent with federal law, including by complying with the APA's minimum requirements for reasonable agency decision-making. It

is the failure to comply with federal law and the APA's requirements that renders their terminations of the cooperative agreements unlawful.

#### 5. Defendants' other purported bars to APA review are unavailing.

The District Court correctly determined that there is no bar to Plaintiffs' claims in light of the APA's strong presumption of review of agency actions. *See* 1-ER-16, 70-76. Defendants argue, mistakenly, that Plaintiffs have mounted an inappropriate programmatic challenge, that the Refugee Executive Order does not constitute final agency action,[25] and that funding decisions are committed to agency discretion. Plaintiffs address each argument in turn.

**Programmatic challenge.** Plaintiffs challenged the agency Defendants' decision to wholly suspend the USRAP and eliminate nearly all related funding, and the District Court correctly concluded that these discrete agency actions, taken over the course of a few days, are subject to challenge under the APA. 1-ER-70-72. Defendants' only argument in response is that, because the USRAP is a "comprehensive, integrated process," any agency decisions concerning it cannot be challenged under the

[25] Defendants did not contest in the District Court that the USRAP funding termination was a discrete, final agency action, and such argument is waived.

APA. This is not the law; Defendants' citations either support Plaintiffs' position, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-91 & n.2 (1990) (final agency action "applying some particular measure across the board . . . can of course be challenged under the APA" where that action causes plaintiff harm), or are inapposite, *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (mandamus claim required identification of discrete agency action). Contrary to Defendants' argument, Plaintiffs are not "seeking wholesale improvement" of a program, but rather an injunction of specific challenged actions so as to restore the status quo. This is exactly what the District Court ordered.

**Final agency action.** Agency action is final if it (1) marks the "consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). The District Court found, as a factual matter, that the agency Defendants' policies had an immediate impact on Plaintiffs and that that impact satisfied the second prong of the test. 1-ER-76. The District Court further found that each decision "represent[ed] the consummation of an internal administrative decision-making process, even if opaque." 1-ER-76. Defendants' proffered evidence itself speaks to consummated decisions: how

to implement the Refugee Executive Order and the Foreign Aid Executive Order. *See* Br. 40 (citing 4-ER-893-94).

Defendants argue, in essence, that the agencies' implementation of the Refugee Executive Order is immune from APA challenge because the President may make some "ultimate" determination about whether to resume the USRAP at some point in the future, which would presumably lead the agencies to take action again. Br. 46. But regardless of whether an agency will act again in the future, people adversely affected by action the agency has already taken are entitled to review of it *now*. *See* 5 U.S.C. § 706; 1-ER-72-75 ("*[A]ll* agency actions are subject to future change.").

**Funding decisions committed to agency discretion.** Finally, the District Court correctly rejected Defendants' argument that this suit falls within the very narrow universe of cases committed to agency discretion simply because it involves lump-sum appropriations. *See* 1-ER-16; Br. 46-48.[26] The Supreme Court has expressly rejected Defendants' premise, holding that where Congress has allocated funds by lump-sum appropriations, "an agency is not free simply to disregard statutory

[26] While Defendants assert this argument as to both the funding suspension and termination, they did *not* raise it as to the funding suspension before the District Court and have therefore waived it. In any event, the analysis is incorrect for the same reasons.

responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 1-ER-16 (quoting *Lincoln*, 508 U.S. at 193).

The facts in *Lincoln* are illustrative: that case concerned whether HHS could discontinue a regional treatment program for Indian children in order to redirect resources from lump-sum appropriations to nationwide services. Crucially, "no statute or regulation even mention[ed] the Program" to be discontinued. 508 U.S. at 190. The Supreme Court reasoned there was no law to apply where "Congress merely appropriates lump-sum amounts *without statutorily restricting what can be done with those funds*," such that "a clear inference arises that it does not intend to impose legally binding restrictions." *Id.* at 192 (emphasis added). Here, in contrast, the agencies have a statutory obligation to carry out Congress's directives for refugee admissions and resettlement, which include that the Executive "shall, to the extent of available appropriations," make certain services available to newly resettled refugees. 8 U.S.C. § 1522(a)(1)(A). Unlike in *Lincoln*, the agency Defendants cannot opt out of their statutory obligations, even if they have discretion in how to satisfy them. At minimum, there is law to apply to determine whether the agency Defendants' elimination of USRAP funding—which caused a "significant deterioration of functions throughout the

USRAP," 1-ER-7—violated their statutory obligations, placing this case outside the narrow exception to APA review, *see Lincoln*, 508 U.S. at 193.

### C. The Refugee Executive Order violates the Due Process Clause.

Relying on binding Ninth Circuit precedent, the District Court explained that the statutory language in the Act requiring that spouses and children "shall be entitled to the same admission status" as a principal refugee, 8 U.S.C. § 1157(c)(2)(A), creates a substantive right that cannot be withheld absent due process, 1-ER-90 (citing *Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021)). Defendants' arguments to the contrary rely on *Muñoz*, but as the District Court explained, that case is inapposite. 1-ER-89-90. *Muñoz* considered whether the plaintiff had an unenumerated constitutional right to live with her noncitizen spouse that was "implicit in the 'liberty' protected by the Fifth Amendment." 602 U.S. at 903. Applying *Washington v. Glucksberg*, 521 U.S. 702 (1997), the *Muñoz* Court held there is no such unenumerated right, 602 U.S. at 911-12. This result is a far cry from Defendants' characterization of *Muñoz*: that a plaintiff in the United States can *never* have a property or liberty interest in the proceedings of others, even where—as here—that interest is grounded in statutory text. Br. 29-30. The *Muñoz* Court had no occasion to consider the question presented in this case.

Here, section 1157 provides that a spouse or child of any principal refugee "*shall* . . . be entitled to the same admission status" as the principal refugee if the spouse or child is admissible as an immigrant—that is, if no inadmissibility ground bars admission. 8 U.S.C. § 1157(c)(2)(A) (emphasis added). Defendants claim that the requirement that a spouse or child be admissible defeats any claim of entitlement to admission, Br. 27, but they miss the point: *if* otherwise admissible, then the spouse or child is *entitled* to admission as a refugee. 8 U.S.C. § 1157(c)(2)(A); *see also* 1-ER-89-91.[27]

Defendants attempt to rewrite the statutory text to impose additional requirements on refugee-family admissions. Specifically, they claim that a spouse or child will not be admitted if "there is no space left" in the presidential determination of how many refugees to admit in a given fiscal year. Br. 27. But section 1157 belies their argument, as it provides that "*[u]pon* the spouse's or child's admission to the United States, such admission shall be charged" against the presidential determination. 8 U.S.C. § 1157(c)(2)(A) (emphasis added). In contrast, the immediately preceding subsection applicable to principal refugees provides that they "may" be

[27] Defendants' reliance on section 1201(h), Br. 26, is misplaced, as it relates to "[i]ssuance of visas," 8 U.S.C. § 1201, and refugees are not visa holders, *see* SER-181. Moreover, section 1157 already requires an inadmissibility determination.

admitted "*[s]ubject* to the numerical limitations" of the presidential determination, among other limitations. *Id.* § 1157(c)(1) (emphasis added). It is well established under canons of statutory construction that "shall" is mandatory, and where Congress writes subsections of a statute differently, it intends a different meaning. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983).

In light of the Act's special treatment of refugee spouses and children, the District Court did not err in applying the traditional test from *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), to conclude that Plaintiff Esther was likely to succeed on the merits of her due-process claim, 1-ER-90-91.[28] The District Court correctly determined that (1) Esther had a substantial interest in her daughter's admission when her daughter was on the verge of travel after eight years of pursuing the petition, (2) the risk of erroneous deprivation was high where Esther learned without prior notice or opportunity to be heard that her daughter's admission was indefinitely

[28] Defendants argue that Esther's claim is moot because her daughter has been admitted to the United States, Br. 29, but they do not dispute that Esther had standing when the case was filed and when she moved to represent a class of similarly situated petitioning relatives, *see* SER-31-33. Plaintiffs' class-certification motion remains pending and Esther remains a party to the case; the "relation back" doctrine preserves the merits of "inherently transitory" claims for review under such circumstances. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991).

suspended, and (3) the government had no legitimate interest in enforcing an order that exceeds its statutory authority. *Id.*

## II. The District Court did not err in concluding that the balance of equities, including the serious irreparable harm to Plaintiffs and the public interest, favor preliminary injunctive relief.

Defendants have not shown that, in examining the unrebutted evidence of harms that would befall Plaintiffs in the absence of injunctive relief, the District Court applied an incorrect legal standard or made "clearly erroneous" factual findings. *Where Do We Go Berkeley*, 32 F.4th at 857 (cleaned up).

Plaintiffs submitted the only evidence in the record related to irreparable harm, and the District Court determined that evidence "overwhelmingly shows . . . concrete, immediate, and irreparable harms." 1-ER-94. Specifically, the individual Plaintiffs demonstrated harms from being stranded abroad and facing physical danger, financial hardship, and prolonged family separation, *see Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011), and from being denied critical initial resettlement benefits to which they are statutorily entitled, 1-ER-91-92. The organizational Plaintiffs demonstrated that they have been forced to furlough or lay off hundreds of staff and halt essential mission-driven refugee services; the relationships and goodwill they have built over decades have been

threatened, and their very survival is in doubt. 1-ER-92; *see also HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[T]he threat of being driven out of business is sufficient to establish irreparable harm." (cleaned up)); *EBSC*, 993 F.3d at 677 (finding legal-services organizations would suffer irreparable harm due to "a significant change in their programs and a concomitant loss of funding").

Defendants try to minimize the harm to the individual Plaintiffs by pointing to years-long delays in processing their refugee applications, Br. 48, but as the District Court correctly concluded, this callous argument, "taken to its logical conclusion, would mean that no refugee could ever obtain preliminary injunctive relief for a denial of entry into the country or life-sustaining resettlement services because the USRAP process is inherently long." 1-ER-94.[29] Defendants also offer the tautological argument that the organizational Plaintiffs cannot claim irreparable injury because the only relief supposedly available to them after their cooperative agreements were terminated is money damages, Br. 49, but this is just another species of their (incorrect) argument that agencies can evade APA review simply by

[29] Defendants' other argument—that the individual Plaintiffs cannot claim irreparable harm because refugee admission is a "purely discretionary benefit," Br. 48—ignores that a "lost opportunity" to receive an immigrant benefit "represents a concrete injury." *Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998).

implementing policy through contract terminations, *see supra* pp. 46-54. And, as the District Court held, it "relies on the unjustified presumption" that the elimination of USRAP funding was lawful. 1-ER-29-30; *but see supra* pp. 54-63. At bottom, Plaintiffs' injuries cannot be remedied by money damages—and thus they are irreparable. 1-ER-29-30, 93; *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Meanwhile, Defendants claim that the United States suffers irreparable harm whenever a court issues a "universal injunction against the Executive Branch." Br. 49-50. But this Court has repeatedly rejected Defendants' argument, which ignores the role of *Congress* in our constitutional democracy. *See, e.g.*, *Doe #1*, 957 F.3d at 1059 (rejecting Defendants' position because it would mean "no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction"). Similarly, Defendants' argument that immigration-related injunctions interfere with foreign policy and undermine "the *Executive* Branch's constitutional and statutory authority over immigration," Br. 50 (emphasis added), ignores that "over no conceivable subject is the legislative power of *Congress* more complete than it is over" the admission of noncitizens, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (emphasis added). By restoring the status quo, the District Court preserved

Congress's careful refugee admissions and resettlement scheme, including the Act's foreign policy goal to "encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible." Pub. L. No. 96-212, § 101(a).[30]

Defendants' alternative theory—that the District Court's first injunction effectively requires admission of "some" refugees where the President has determined such admission is not in the national interest, Br. 50—is wrong. The injunction merely enjoins, among other things, a policy to indefinitely suspend *all* refugee entry; the Court did not touch Defendants' discretion over whether to admit any particular refugee.[31] And Congress has determined that an enduring program of refugee admissions *is* in the national interest. *See supra* pp. 6-8. Similarly, Defendants' claimed harm from being required to reinstate USRAP funding relies on a mistaken premise: that federal funds "belong to" executive officials. Br. 51. But federal

[30] Defendants' case citations are inapposite, as they concern judicial authority to retain or restore legislative policy and do not allow the Executive to undo congressional will. *See Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 115-16 (2013); *Maryland v. King*, 567 U.S. 1301, 1302 (2012).

[31] That Congress authorizes an admitted refugee to adjust their status to legal permanent resident after one year and protects that status by limiting the grounds for termination does not change the analysis. *Cf*. Br. 50-51. Apart from Defendants' desire to ban all refugees—an action that is unlawful—they do not explain why admitting refugees (one of the most extensively vetted groups the government admits) pursuant to the Act would cause any harm at all. *See* 1-ER-95-96.

funds belong to *the public*, and this country's elected officials in Congress—*not* unelected executive agencies—are "exclusively" entrusted with the power of the purse by the Constitution. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). While the Executive has discretion to implement programs using those appropriated funds, "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes," as Congress has done here through the Act. 1-ER-16 (citing *Lincoln*, 508 U.S. at 193).[32]

There is no unlawful infringement on the Executive Branch's power or any recognized harm to the public interest from enjoining unlawful agency action. To the contrary, "the public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat." *EBSC*, 993 F.3d at 679 (cleaned up). The District Court was therefore correct in concluding that the balance of equities and the public interest plainly favor preliminary relief. 1-ER-30-31, 94-96.

[32] Nor does *DOE* compel a different conclusion; unlike in that case, Defendants here have presented no evidence of harm resulting from disbursement of funds. *See Cmty. Legal Servs. v. HHS*, No. 25-2808, 2025 WL 1393876, at *6 (9th Cir. May 14, 2025) (citing *DOE* and concluding that, absent evidence, government failed to show likely irreparable harm in recovering funds).

## III. The scope of the District Court's preliminary injunctions was necessary and appropriate.

It is well established that district courts have "considerable discretion in crafting suitable equitable relief" and that "appellate review is narrow." *EBSC*, 993 F.3d at 680 (cleaned up). As the District Court recognized, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." 1-ER-97 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Moreover, an injunction is "'not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.'" *Id.* (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)).

Defendants do not dispute that these are the correct legal standards,[33] but their core argument is that nationwide injunctions are improperly broad in *all* cases. *See, e.g.*, Br. 51-53 ("Nationwide or universal remedies exceed

[33] Defendants criticize two of the District Court's caselaw citations, Br. 53, but this Court's vacated *Hawai'i* decision remains persuasive, *see supra* note 11, and the cited portion of the dissent from the Supreme Court's *Hawai'i* opinion merely observed that the majority took no position on "the propriety of the nationwide scope of the injunction," 585 U.S. at 751 n.13 (Sotomayor, J., dissenting). Both cited cases applied the established *Califano* standard.

'the power of Article III courts[.]'" (quoting *Hawai'i*, 585 U.S. at 713 (Thomas, J., concurring))). This is not the law, as the District Court explained in rejecting these same arguments. 1-ER-97.

Defendants' remaining legal arguments are unpersuasive. Their assertions about judicial interference in foreign policy remain unavailing, as discussed above, *supra* pp. 72-73. Their claim that the District Court lacked "the complete record of contracting materials" of all resettlement partners, Br. 54, is irrelevant where Plaintiffs seek to enforce Defendants' statutory obligations—not the terms of any contract, *see supra* pp. 46-54. And the fact that the preliminary injunctions benefit nonparties, Br. 54, is not dispositive; the question is whether such breadth is necessary to give complete relief to Plaintiffs, 1-ER-97.

Defendants accuse the District Court of creating an "immigration exception" to *Califano*, Br. 52, but it did no such thing: it concluded that "complete relief for the named plaintiffs" required a nationwide injunction and observed that—similar to other cases enjoining immigration policies—"[a] piecemeal approach would be impracticable, as the refugee resettlement system functions as an integrated whole, with interconnected processes spanning international borders and domestic agencies." 1-ER-97-98 (citing *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015)). Indeed, an

"uncontroverted line of precedent" supports the District Court's concerns about the practicability of injunctions of less than nationwide scope in the immigration context. *See, e.g.*, *EBSC*, 993 F.3d at 681 (collecting cases and concluding that nationwide injunction of policy limiting eligibility for asylum claims not abuse of discretion); *Regents of Univ. of Cal. v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018) (affirming nationwide injunction of policy decision to end Deferred Action for Childhood Arrivals program, noting that "[a]llowing uneven application of nationwide immigration policy flies in the face of [uniformity] requirements"), *rev'd on other grounds*, 591 U.S. 1 (2020); *see also Arizona v. United States*, 567 U.S. 387, 401 (2012) (underscoring need for uniform immigration policy in affirming injunction that enjoined state-law attempt to regulate immigration).

Finally, Defendants fail to explain how the District Court abused its discretion when it concluded, based on the unrebutted record, that complete relief to Plaintiffs required injunctions of nationwide scope. Notably, Defendants do not and have never proposed a workable alternative that would provide complete relief to Plaintiffs, nor could they. For each individual refugee Plaintiff and the putative class, refugee processing and admission requires the participation of numerous USRAP partners, including non-Plaintiff entities, *see supra* pp. 12-15; *see also* 1-ER-43-46.

Five of the seven RSCs worldwide are operated by non-Plaintiffs and, without them, refugees from whole regions of the world cannot be processed. 1-ER-20-21. Similarly, without the network of domestic national resettlement agencies (including eight non-Plaintiffs), refugees are not permitted to travel to the United States because they cannot obtain the required "assurances" of resettlement support, 1-ER-20, and refugees in the United States—like Plaintiff Ali—cannot receive statutorily mandated initial resettlement services, 1-ER-30.

The harms to the organizational Plaintiffs similarly cannot be addressed by a narrower injunction. Through their domestic resettlement work in thirty states, they provide support to refugees from around the world; every fewer refugee resettled to them directly impacts their operations and budgets. 5-ER-1007-18, 1023-37, 1042-50 (unrebutted declarations from organizational Plaintiffs); *see also EBSC*, 993 F.3d at 680 ("One fewer asylum client . . . results in a frustration of purpose . . . and a loss of funding (by decreasing the money it receives for completed cases).").[34]

For all these reasons, the District Court did not abuse its discretion in finding that universal relief was appropriate and "no more burdensome to

[34] The organizational Plaintiffs also stand in the shoes of the refugees they have assured such that a more limited injunction would not provide complete relief. *See* 4-ER-921.

the [Defendants] than necessary to provide complete relief to the plaintiffs." 1-ER-35 (quoting *Califano*, 442 U.S. at 702).

## CONCLUSION

To stop the compounding harms to Plaintiffs and refugees worldwide and forestall future unlawful action, the District Court's preliminary injunctions should be affirmed.

## STATEMENT OF RELATED CASE

A related case pending in this Court, *Community Legal Services in East Palo Alto v. HHS*, No. 25-2808, similarly raises the issue of whether district courts have jurisdiction over APA claims challenging policy decisions implemented through contract terminations.

Respectfully submitted this 20th day of May, 2025.

INTERNATIONAL REFUGEE ASSISTANCE PROJECT

Linda Evarts
Deepa Alagesan
Mevlüde Akay Alp
Pedro Sepulveda, Jr.
One Battery Park Plaza, 33rd Floor
New York, New York 10004
(646) 939-9169
levarts@refugeerights.org
dalagesan@refugeerights.org
makayalp@refugeerights.org
psepulveda@refugeerights.org

Melissa S. Keaney
P.O. Box 2291
Fair Oaks, California 95628
(646) 939-9169
mkeaney@refugeerights.org

Megan M. Hauptman
Laurie Ball Cooper
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
(516) 732-7116
mhauptman@refugeerights.org
lballcooper@refugeerights.org

PERKINS COIE LLP

By: *s/ Harry H. Schneider, Jr.*
Harry H. Schneider, Jr.
Jonathan P. Hawley
Shireen Lankarani
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
HSchneider@perkinscoie.com
JHawley@perkinscoie.com
SLankarani@perkinscoie.com

John M. Devaney
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
(202) 654-6200
JDevaney@perkinscoie.com

Joel W. Nomkin
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
(602) 351-8000
JNomkin@perkinscoie.com

Nicholas J. Surprise
33 East Main Street, Suite 201
Madison, Wisconsin 53703
(608) 663-7460
NSurprise@perkinscoie.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 20, 2025.

*s/ Harry H. Schneider, Jr.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-1313, 25-1939

I am the attorney or self-represented party.

**This brief contains** 16,769 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Harry H. Schneider, Jr. **Date** May 20, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

# ADDENDUM

## STATUTORY PROVISIONS

5 U.S.C. § 702 .................................................. ADD-1
5 U.S.C. § 706 ..................................................ADD-2
8 U.S.C. § 1101(a)(42).......................................ADD-3
8 U.S.C. § 1157 .................................................ADD-4
8 U.S.C. § 1182(f) .............................................ADD-9
8 U.S.C. § 1522...............................................ADD-10
Pub. L. No. 96-212, § 101................................ADD-25

## EXECUTIVE ORDERS

Executive Order 14163....................................ADD-26
Executive Order 14169....................................ADD-29

## 5 U.S.C. § 702

## Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

s

## 5 U.S.C. § 706

### Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 8 U.S.C. § 1101(a)(42)

## Definitions

**(42)** The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

# 8 U.S.C. § 1157

## Annual admission of refugees and admission of emergency situation refugees

### (a) Maximum number of admissions; increases for humanitarian concerns; allocations

**(1)** Except as provided in subsection (b), the number of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e)), that admission of a specific number of refugees in excess of such number is justified by humanitarian concerns or is otherwise in the national interest.

**(2)** Except as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest.

**(3)** Admissions under this subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation.

**(4)** In the determination made under this subsection for each fiscal year (beginning with fiscal year 1992), the President shall enumerate, with the respective number of refugees so determined, the number of aliens who were granted asylum in the previous year.

### (b) Determinations by President respecting number of admissions for humanitarian concerns

If the President determines, after appropriate consultation, that (1) an unforeseen emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United States of these refugees cannot be accomplished under subsection (a), the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such

admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided under this subsection.

**(c) Admission by Attorney General of refugees; criteria; admission status of spouse or child; applicability of other statutory requirements; termination of refugee status of alien, spouse or child**

**(1)** Subject to the numerical limitations established pursuant to subsections (a) and (b), the Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this chapter.

**(2)(A)** A spouse or child (as defined in section 1101(b)(1)(A), (B), (C), (D), or (E) of this title) of any refugee who qualifies for admission under paragraph (1) shall, if not otherwise entitled to admission under paragraph (1) and if not a person described in the second sentence of section 1101(a)(42) of this title, be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this chapter. Upon the spouse's or child's admission to the United States, such admission shall be charged against the numerical limitation established in accordance with the appropriate subsection under which the refugee's admission is charged.

**(B)** An unmarried alien who seeks to accompany, or follow to join, a parent granted admission as a refugee under this subsection, and who was under 21 years of age on the date on which such parent applied for refugee status under this section, shall continue to be classified as a child for purposes of this paragraph, if the alien attained 21 years of age after such application was filed but while it was pending.

**(3)** The provisions of paragraphs (4), (5), and (7)(A) of section 1182(a) of this title shall not be applicable to any alien seeking admission to the United States under this subsection, and the Attorney General may waive any other provision of such section (other than paragraph (2)(C) or subparagraph (A), (B), (C), or (E) of paragraph (3)) with respect to such an alien for

humanitarian purposes, to assure family unity, or when it is otherwise in the public interest. Any such waiver by the Attorney General shall be in writing and shall be granted only on an individual basis following an investigation. The Attorney General shall provide for the annual reporting to Congress of the number of waivers granted under this paragraph in the previous fiscal year and a summary of the reasons for granting such waivers.

**(4)** The refugee status of any alien (and of the spouse or child of the alien) may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the alien's admission.

**(d) Oversight reporting and consultation requirements**

**(1)** Before the start of each fiscal year the President shall report to the Committees on the Judiciary of the House of Representatives and of the Senate regarding the foreseeable number of refugees who will be in need of resettlement during the fiscal year and the anticipated allocation of refugee admissions during the fiscal year. The President shall provide for periodic discussions between designated representatives of the President and members of such committees regarding changes in the worldwide refugee situation, the progress of refugee admissions, and the possible need for adjustments in the allocation of admissions among refugees.

**(2)** As soon as possible after representatives of the President initiate appropriate consultation with respect to the number of refugee admissions under subsection (a) or with respect to the admission of refugees in response to an emergency refugee situation under subsection (b), the Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of such consultation.

**(3)(A)** After the President initiates appropriate consultation prior to making a determination under subsection (a), a hearing to review the proposed determination shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

**(B)** After the President initiates appropriate consultation prior to making a determination, under subsection (b), that the number of refugee admissions should be increased because of an unforeseen emergency refugee situation,

to the extent that time and the nature of the emergency refugee situation permit, a hearing to review the proposal to increase refugee admissions shall be held unless public disclosure of the details of the proposal would jeopardize the lives or safety of individuals.

**(e) "Appropriate consultation" defined**

For purposes of this section, the term "appropriate consultation" means, with respect to the admission of refugees and allocation of refugee admissions, discussions in person by designated Cabinet-level representatives of the President with members of the Committees on the Judiciary of the Senate and of the House of Representatives to review the refugee situation or emergency refugee situation, to project the extent of possible participation of the United States therein, to discuss the reasons for believing that the proposed admission of refugees is justified by humanitarian concerns or grave humanitarian concerns or is otherwise in the national interest, and to provide such members with the following information:

**(1)** A description of the nature of the refugee situation.

**(2)** A description of the number and allocation of the refugees to be admitted and an analysis of conditions within the countries from which they came.

**(3)** A description of the proposed plans for their movement and resettlement and the estimated cost of their movement and resettlement.

**(4)** An analysis of the anticipated social, economic, and demographic impact of their admission to the United States.

**(5)** A description of the extent to which other countries will admit and assist in the resettlement of such refugees.

**(6)** An analysis of the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States.

**(7)** Such additional information as may be appropriate or requested by such members.

To the extent possible, information described in this subsection shall be provided at least two weeks in advance of discussions in person by designated representatives of the President with such members.

**(f) Training**

**(1)** The Attorney General, in consultation with the Secretary of State, shall provide all United States officials adjudicating refugee cases under this section with the same training as that provided to officers adjudicating asylum cases under section 1158 of this title.

**(2)** Such training shall include country-specific conditions, instruction on the internationally recognized right to freedom of religion, instruction on methods of religious persecution practiced in foreign countries, and applicable distinctions within a country between the nature of and treatment of various religious practices and believers.

## 8 U.S.C. § 1182(f)

## Inadmissible aliens

### (f) Suspension of entry or imposition of restrictions by President

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

# 8 U.S.C. § 1522

## Authorization for programs for domestic resettlement of and assistance to refugees

### (a) Conditions and considerations

**(1)(A)** In providing assistance under this section, the Director shall, to the extent of available appropriations, (i) make available sufficient resources for employment training and placement in order to achieve economic self-sufficiency among refugees as quickly as possible, (ii) provide refugees with the opportunity to acquire sufficient English language training to enable them to become effectively resettled as quickly as possible, (iii) insure that cash assistance is made available to refugees in such a manner as not to discourage their economic self-sufficiency, in accordance with subsection (e)(2), and (iv) insure that women have the same opportunities as men to participate in training and instruction.

**(B)** It is the intent of Congress that in providing refugee assistance under this section--

**(i)** employable refugees should be placed on jobs as soon as possible after their arrival in the United States;

**(ii)** social service funds should be focused on employment-related services, English-as-a-second-language training (in nonwork hours where possible), and case-management services; and

**(iii)** local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments.

**(2)(A)** The Director and the Federal agency administering subsection (b)(1) shall consult regularly (not less often than quarterly) with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process and the intended distribution of refugees among the States and localities before their placement in those States and localities.

**(B)** The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States.

**(C)** Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall--

**(i)** insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area,

**(ii)** provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities, and

**(iii)** take into account--

**(I)** the proportion of refugees and comparable entrants in the population in the area,

**(II)** the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area,

**(III)** the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and

**(IV)** the secondary migration of refugees to and from the area that is likely to occur.

**(D)** With respect to the location of placement of refugees within a State, the Federal agency administering subsection (b)(1) shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State.

**(3)** In the provision of domestic assistance under this section, the Director shall make a periodic assessment, based on refugee population and other relevant factors, of the relative needs of refugees for assistance and services under this subchapter and the resources available to meet such needs. The Director shall compile and maintain data on secondary migration of refugees within the United States and, by State of residence and nationality, on the

proportion of refugees receiving cash or medical assistance described in subsection (e). In allocating resources, the Director shall avoid duplication of services and provide for maximum coordination between agencies providing related services.

**(4)(A)** No grant or contract may be awarded under this section unless an appropriate proposal and application (including a description of the agency's ability to perform the services specified in the proposal) are submitted to, and approved by, the appropriate administering official. Grants and contracts under this section shall be made to those agencies which the appropriate administering official determines can best perform the services. Payments may be made for activities authorized under this subchapter in advance or by way of reimbursement. In carrying out this section, the Director, the Secretary of State, and any such other appropriate administering official are authorized--

**(i)** to make loans, and

**(ii)** to accept and use money, funds, property, and services of any kind made available by gift, devise, bequest, grant, or otherwise for the purpose of carrying out this section.

**(B)** No funds may be made available under this subchapter (other than under subsection (b)(1)) to States or political subdivisions in the form of block grants, per capita grants, or similar consolidated grants or contracts. Such funds shall be made available under separate grants or contracts--

**(i)** for medical screening and initial medical treatment under subsection (b)(5),

**(ii)** for services for refugees under subsection (c)(1),

**(iii)** for targeted assistance project grants under subsection (c)(2), and

**(iv)** for assistance for refugee children under subsection (d)(2).

**(C)** The Director may not delegate to a State or political subdivision his authority to review or approve grants or contracts under this subchapter or the terms under which such grants or contracts are made.

**(5)** Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion.

**(6)** As a condition for receiving assistance under this section, a State must--

**(A)** submit to the Director a plan which provides--

**(i)** a description of how the State intends to encourage effective refugee resettlement and to promote economic self-sufficiency as quickly as possible,

**(ii)** a description of how the State will insure that language training and employment services are made available to refugees receiving cash assistance,

**(iii)** for the designation of an individual, employed by the State, who will be responsible for insuring coordination of public and private resources in refugee resettlement,

**(iv)** for the care and supervision of and legal responsibility for unaccompanied refugee children in the State, and

**(v)** for the identification of refugees who at the time of resettlement in the State are determined to have medical conditions requiring, or medical histories indicating a need for, treatment or observation and such monitoring of such treatment or observation as may be necessary;

**(B)** meet standards, goals, and priorities, developed by the Director, which assure the effective resettlement of refugees and which promote their economic self-sufficiency as quickly as possible and the efficient provision of services; and

**(C)** submit to the Director, within a reasonable period of time after the end of each fiscal year, a report on the uses of funds provided under this subchapter which the State is responsible for administering.

**(7)** The Secretary, together with the Secretary of State with respect to assistance provided by the Secretary of State under subsection (b), shall develop a system of monitoring the assistance provided under this section. This system shall include--

**(A)** evaluations of the effectiveness of the programs funded under this section and the performance of States, grantees, and contractors;

**(B)** financial auditing and other appropriate monitoring to detect any fraud, abuse, or mismanagement in the operation of such programs; and

**(C)** data collection on the services provided and the results achieved.

**(8)** The Attorney General shall provide the Director with information supplied by refugees in conjunction with their applications to the Attorney General for adjustment of status, and the Director shall compile, summarize, and evaluate such information.

**(9)** The Secretary, the Secretary of Education, the Attorney General, and the Secretary of State may issue such regulations as each deems appropriate to carry out this subchapter.

**(10)** For purposes of this subchapter, the term "refugee" includes any alien described in section 1157(c)(2) of this title.

**(b) Program of initial resettlement**

**(1)(A)** For--

**(i)** fiscal years 1980 and 1981, the Secretary of State is authorized, and

**(ii)** fiscal year 1982 and succeeding fiscal years, the Director (except as provided in subparagraph (B)) is authorized,

to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement (including initial reception and placement with sponsors) of refugees in the United States. Grants to, or contracts with, private nonprofit voluntary agencies under this paragraph shall be made consistent with the objectives of this subchapter, taking into account the different resettlement approaches and practices of such agencies. Resettlement assistance under this paragraph shall be provided in coordination with the Director's provision of other assistance under this subchapter. Funds provided to agencies under such grants and contracts may only be obligated or expended during the fiscal year in which they are provided (or the subsequent fiscal year or such subsequent fiscal period as

the Federal contracting agency may approve) to carry out the purposes of this subsection.

**(B)** If the President determines that the Director should not administer the program under this paragraph, the authority of the Director under the first sentence of subparagraph (A) shall be exercised by such officer as the President shall from time to time specify.

**(2)** The Director is authorized to develop programs for such orientation, instruction in English, and job training for refugees, and such other education and training of refugees, as facilitates their resettlement in the United States. The Director is authorized to implement such programs, in accordance with the provisions of this section, with respect to refugees in the United States. The Secretary of State is authorized to implement such programs with respect to refugees awaiting entry into the United States.

**(3)** The Secretary is authorized to make arrangements (including cooperative arrangements with other Federal agencies) for the temporary care of refugees in the United States in emergency circumstances, including the establishment of processing centers, if necessary, without regard to such provisions of law (other than the Renegotiation Act of 1951 and section 1524(b) of this title) regulating the making, performance, amendment, or modification of contracts and the expenditure of funds of the United States Government as the Secretary may specify.

**(4)** The Secretary shall--

**(A)** assure that an adequate number of trained staff are available at the location at which the refugees enter the United States to assure that all necessary medical records are available and in proper order;

**(B)** provide for the identification of refugees who have been determined to have medical conditions affecting the public health and requiring treatment;

**(C)** assure that State or local health officials at the resettlement destination within the United States of each refugee are promptly notified of the refugee's arrival and provided with all applicable medical records; and

**(D)** provide for such monitoring of refugees identified under subparagraph (B) as will insure that they receive appropriate and timely treatment.

The Secretary shall develop and implement methods for monitoring and assessing the quality of medical screening and related health services provided to refugees awaiting resettlement in the United States.

**(5)** The Director is authorized to make grants to, and enter into contracts with, State and local health agencies for payments to meet their costs of providing medical screening and initial medical treatment to refugees.

**(6)** The Comptroller General shall directly conduct an annual financial audit of funds expended under each grant or contract made under paragraph (1) for fiscal year 1986 and for fiscal year 1987.

**(7)** Each grant or contract with an agency under paragraph (1) shall require the agency to do the following:

**(A)** To provide quarterly performance and financial status reports to the Federal agency administering paragraph (1).

**(B)(i)** To provide, directly or through its local affiliate, notice to the appropriate county or other local welfare office at the time that the agency becomes aware that a refugee is offered employment and to provide notice to the refugee that such notice has been provided, and

**(ii)** upon request of such a welfare office to which a refugee has applied for cash assistance, to furnish that office with documentation respecting any cash or other resources provided directly by the agency to the refugee under this subsection.

**(C)** To assure that refugees, known to the agency as having been identified pursuant to paragraph (4)(B) as having medical conditions affecting the public health and requiring treatment, report to the appropriate county or other health agency upon their resettlement in an area.

**(D)** To fulfill its responsibility to provide for the basic needs (including food, clothing, shelter, and transportation for job interviews and training) of each refugee resettled and to develop and implement a resettlement plan including the early employment of each refugee resettled and to monitor the implementation of such plan.

**(E)** To transmit to the Federal agency administering paragraph (1) an annual report describing the following:

**(i)** The number of refugees placed (by county of placement) and the expenditures made in the year under the grant or contract, including the proportion of such expenditures used for administrative purposes and for provision of services.

**(ii)** The proportion of refugees placed by the agency in the previous year who are receiving cash or medical assistance described in subsection (e).

**(iii)** The efforts made by the agency to monitor placement of the refugees and the activities of local affiliates of the agency.

**(iv)** The extent to which the agency has coordinated its activities with local social service providers in a manner which avoids duplication of activities and has provided notices to local welfare offices and the reporting of medical conditions of certain aliens to local health departments in accordance with subparagraphs (B)(i) and (C).

**(v)** Such other information as the agency administering paragraph (1) deems to be appropriate in monitoring the effectiveness of agencies in carrying out their functions under such grants and contracts.

The agency administering paragraph (1) shall promptly forward a copy of each annual report transmitted under subparagraph (E) to the Committees on the Judiciary of the House of Representatives and of the Senate.

**(8)** The Federal agency administering paragraph (1) shall establish criteria for the performance of agencies under grants and contracts under that paragraph, and shall include criteria relating to an agency's--

**(A)** efforts to reduce welfare dependency among refugees resettled by that agency,

**(B)** collection of travel loans made to refugees resettled by that agency for travel to the United States,

**(C)** arranging for effective local sponsorship and other nonpublic assistance for refugees resettled by that agency,

**(D)** cooperation with refugee mutual assistance associations, local social service providers, health agencies, and welfare offices,

**(E)** compliance with the guidelines established by the Director for the placement and resettlement of refugees within the United States, and

**(F)** compliance with other requirements contained in the grant or contract, including the reporting and other requirements under subsection (b)(7).

The Federal administering agency shall use the criteria in the process of awarding or renewing grants and contracts under paragraph (1).

**(c) Project grants and contracts for services for refugees**

**(1)(A)** The Director is authorized to make grants to, and enter into contracts with, public or private nonprofit agencies for projects specifically designed--

**(i)** to assist refugees in obtaining the skills which are necessary for economic self-sufficiency, including projects for job training, employment services, day care, professional refresher training, and other recertification services;

**(ii)** to provide training in English where necessary (regardless of whether the refugees are employed or receiving cash or other assistance); and

**(iii)** to provide where specific needs have been shown and recognized by the Director, health (including mental health) services, social services, educational and other services.

**(B)** The funds available for a fiscal year for grants and contracts under subparagraph (A) shall be allocated among the States based on the total number of refugees (including children and adults) who arrived in the United States not more than 36 months before the beginning of such fiscal year and who are actually residing in each State (taking into account secondary migration) as of the beginning of the fiscal year.

**(C)** Any limitation which the Director establishes on the proportion of funds allocated to a State under this paragraph that the State may use for services other than those described in subsection (a)(1)(B)(ii) shall not apply if the Director receives a plan (established by or in consultation with local governments) and determines that the plan provides for the maximum appropriate provision of employment-related services for, and the maximum placement of, employable refugees consistent with performance standards established under section 106 of the Job Training Partnership Act.

**(2)(A)** The Director is authorized to make grants to States for assistance to counties and similar areas in the States where, because of factors such as unusually large refugee populations (including secondary migration), high refugee concentrations, and high use of public assistance by refugees, there exists and can be demonstrated a specific need for supplementation of available resources for services to refugees.

**(B)** Grants shall be made available under this paragraph--

**(i)** primarily for the purpose of facilitating refugee employment and achievement of self-sufficiency,

**(ii)** in a manner that does not supplant other refugee program funds and that assures that not less than 95 percent of the amount of the grant award is made available to the county or other local entity.

**(d) Assistance for refugee children**

**(1)** The Secretary of Education is authorized to make grants, and enter into contracts, for payments for projects to provide special educational services (including English language training) to refugee children in elementary and secondary schools where a demonstrated need has been shown.

**(2)(A)** The Director is authorized to provide assistance, reimbursement to States, and grants to and contracts with public and private nonprofit agencies, for the provision of child welfare services, including foster care maintenance payments and services and health care, furnished to any refugee child (except as provided in subparagraph (B)) during the thirty-six month period beginning with the first month in which such refugee child is in the United States.

**(B)(i)** In the case of a refugee child who is unaccompanied by a parent or other close adult relative (as defined by the Director), the services described in subparagraph (A) may be furnished until the month after the child attains eighteen years of age (or such higher age as the State's child welfare services plan under part B of title IV of the Social Security Act prescribes for the availability of such services to any other child in that State).

**(ii)** The Director shall attempt to arrange for the placement under the laws of the States of such unaccompanied refugee children, who have been accepted for admission to the United States, before (or as soon as possible

after) their arrival in the United States. During any interim period while such a child is in the United States or in transit to the United States but before the child is so placed, the Director shall assume legal responsibility (including financial responsibility) for the child, if necessary, and is authorized to make necessary decisions to provide for the child's immediate care.

**(iii)** In carrying out the Director's responsibilities under clause (ii), the Director is authorized to enter into contracts with appropriate public or private nonprofit agencies under such conditions as the Director determines to be appropriate.

**(iv)** The Director shall prepare and maintain a list of (I) all such unaccompanied children who have entered the United States after April 1, 1975, (II) the names and last known residences of their parents (if living) at the time of arrival, and (III) the children's location, status, and progress.

**(e) Cash assistance and medical assistance to refugees**

**(1)** The Director is authorized to provide assistance, reimbursement to States, and grants to, and contracts with, public or private nonprofit agencies for 100 per centum of the cash assistance and medical assistance provided to any refugee during the thirty-six month period beginning with the first month in which such refugee has entered the United States and for the identifiable and reasonable administrative costs of providing this assistance.

**(2)(A)** Cash assistance provided under this subsection to an employable refugee is conditioned, except for good cause shown--

**(i)** on the refugee's registration with an appropriate agency providing employment services described in subsection (c)(1)(A)(i), or, if there is no such agency available, with an appropriate State or local employment service;

**(ii)** on the refugee's participation in any available and appropriate social service or targeted assistance program (funded under subsection (c)) providing job or language training in the area in which the refugee resides; and

**(iii)** on the refugee's acceptance of appropriate offers of employment.

**(B)** Cash assistance shall not be made available to refugees who are full-time students in institutions of higher education (as defined by the Director after consultation with the Secretary of Education).

**(C)** In the case of a refugee who--

**(i)** refuses an offer of employment which has been determined to be appropriate either by the agency responsible for the initial resettlement of the refugee under subsection (b) or by the appropriate State or local employment service,

**(ii)** refuses to go to a job interview which has been arranged through such agency or service, or

**(iii)** refuses to participate in a social service or targeted assistance program referred to in subparagraph (A)(ii) which such agency or service determines to be available and appropriate,

cash assistance to the refugee shall be terminated (after opportunity for an administrative hearing) for a period of three months (for the first such refusal) or for a period of six months (for any subsequent refusal).

**(3)** The Director shall develop plans to provide English training and other appropriate services and training to refugees receiving cash assistance.

**(4)** If a refugee is eligible for aid or assistance under a State program funded under part A of title IV or under title XIX of the Social Security Act, or for supplemental security income benefits (including State supplementary payments) under the program established under title XVI of that Act, funds authorized under this subsection shall only be used for the non-Federal share of such aid or assistance, or for such supplementary payments, with respect to cash and medical assistance provided with respect to such refugee under this paragraph.

**(5)** The Director is authorized to allow for the provision of medical assistance under paragraph (1) to any refugee, during the one-year period after entry, who does not qualify for assistance under a State plan approved under title XIX of the Social Security Act on account of any resources or income requirement of such plan, but only if the Director determines that--

**(A)** this will (i) encourage economic self-sufficiency, or (ii) avoid a significant burden on State and local governments; and

**(B)** the refugee meets such alternative financial resources and income requirements as the Director shall establish.

**(6)** As a condition for receiving assistance, reimbursement, or a contract under this subsection and notwithstanding any other provision of law, a State or agency must provide assurances that whenever a refugee applies for cash or medical assistance for which assistance or reimbursement is provided under this subsection, the State or agency must notify promptly the agency (or local affiliate) which provided for the initial resettlement of the refugee under subsection (b) of the fact that the refugee has so applied.

**(7)(A)** The Secretary shall develop and implement alternative projects for refugees who have been in the United States less than thirty-six months, under which refugees are provided interim support, medical services, support services, and case management, as needed, in a manner that encourages self-sufficiency, reduces welfare dependency, and fosters greater coordination among the resettlement agencies and service providers. The Secretary may permit alternative projects to cover specific groups of refugees who have been in the United States 36 months or longer if the Secretary determines that refugees in the group have been significantly and disproportionately dependent on welfare and need the services provided under the project in order to become self-sufficient and that their coverage under the projects would be cost-effective.

**(B)** Refugees covered under such alternative projects shall be precluded from receiving cash or medical assistance under any other paragraph of this subsection or under title XIX or part A of title IV of the Social Security Act.

**(C)** The Secretary shall report to Congress not later than October 31, 1985, on the results of these projects and on any recommendations respecting changes in the refugee assistance program under this section to take into account such results.

**(D)** To the extent that the use of such funds is consistent with the purposes of such provisions, funds appropriated under section 1524(a) of this title, part A of title IV of the Social Security Act, or title XIX of such Act, may be used for the purpose of implementing and evaluating alternative projects under this paragraph.

**(8)** In its provision of assistance to refugees, a State or political subdivision shall consider the recommendations of, and assistance provided by, agencies with grants or contracts under subsection (b)(1).

**(f) Assistance to States and counties for incarceration of certain Cuban nationals; priority for removal and return to Cuba**

**(1)** The Attorney General shall pay compensation to States and to counties for costs incurred by the States and counties to confine in prisons, during the fiscal year for which such payment is made, nationals of Cuba who--

**(A)** were paroled into the United States in 1980 by the Attorney General,

**(B)** after such parole committed any violation of State or county law for which a term of imprisonment was imposed, and

**(C)** at the time of such parole and such violation were not aliens lawfully admitted to the United States--

**(i)** for permanent residence, or

**(ii)** under the terms of an immigrant or a nonimmigrant visa issued,

under this chapter.

**(2)** For a State or county to be eligible to receive compensation under this subsection, the chief executive officer of the State or county shall submit to the Attorney General, in accordance with rules to be issued by the Attorney General, an application containing--

**(A)** the number and names of the Cuban nationals with respect to whom the State or county is entitled to such compensation, and

**(B)** such other information as the Attorney General may require.

**(3)** For a fiscal year the Attorney General shall pay the costs described in paragraph (1) to each State and county determined by the Attorney General to be eligible under paragraph (2); except that if the amounts appropriated for the fiscal year to carry out this subsection are insufficient to cover all such payments, each of such payments shall be ratably reduced so that the total of such payments equals the amounts so appropriated.

**(4)** The authority of the Attorney General to pay compensation under this subsection shall be effective for any fiscal year only to the extent and in such amounts as may be provided in advance in appropriation Acts.

**(5)** It shall be the policy of the United States Government that the President, in consultation with the Attorney General and all other appropriate Federal officials and all appropriate State and county officials referred to in paragraph (2), shall place top priority on seeking the expeditious removal from this country and the return to Cuba of Cuban nationals described in paragraph (1) by any reasonable and responsible means, and to this end the Attorney General may use the funds authorized to carry out this subsection to conduct such policy.

## Pub. L. No. 96-212, § 101

## An Act to amend the Immigration and Nationality Act to revise the procedures for the admission of refugees, to amend the Migration and Refugee Assistance Act of 1962 to establish a more uniform basis for the provision of assistance to refugees, and for other purposes.

**Sec. 101. (a)** The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas, efforts to promote opportunities for resettlement or voluntary repatriation, aid for necessary transportation and processing, admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States. The Congress further declares that it is the policy of the United States to encourage all nations to provide assistance and resettlement opportunities to refugees to the fullest extent possible.

**(b)** The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

## Executive Order 14163

## Realigning the United States Refugee Admissions Program

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1.** *Purpose*. Over the last 4 years, the United States has been inundated with record levels of migration, including through the U.S. Refugee Admissions Program (USRAP). Cities and small towns alike, from Charleroi, Pennsylvania, and Springfield, Ohio, to Whitewater, Wisconsin, have seen significant influxes of migrants. Even major urban centers such as New York City, Chicago, and Denver have sought Federal aid to manage the burden of new arrivals. Some jurisdictions, like New York and Massachusetts, have even recently declared states of emergency because of increased migration.

The United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees. This order suspends the USRAP until such time as the further entry into the United States of refugees aligns with the interests of the United States.

**Sec. 2.** *Policy*. It is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens. It is also the policy of the United States that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees.

**Sec. 3.** *Realignment of the U.S. Refugee Admissions Program*. **(a)** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that entry into the United States of refugees under the USRAP would be detrimental to the interests of the United States. I therefore direct

that entry into the United States of refugees under the USRAP be suspended—subject to the exceptions set forth in subsection (c) of this section—until a finding is made in accordance with section 4 of this order. This suspension shall take effect at 12:01 a.m. eastern standard time on January 27, 2025.

**(b)** The Secretary of Homeland Security shall suspend decisions on applications for refugee status, until a finding is made in accordance with section 4 of this order.

**(c)** Notwithstanding the suspension of the USRAP imposed pursuant to subsections (a) and (b) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit aliens to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such aliens as refugees is in the national interest and does not pose a threat to the security or welfare of the United States.

**(d)** The Secretary of Homeland Security, in consultation with the Attorney General, shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement. In all cases, the Secretary of State and the Secretary of Health and Human Services shall ensure that the State and local consultation requirements in 8 U.S.C. 1522(a)(2) are carried out with respect to all refugees admitted to the United States.

**Sec. 4.** *Resumption of the U.S. Refugee Admissions Program.* Within 90 days of this order, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit a report to the President through the Homeland Security Advisor regarding whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, in light of the policies outlined in section 2 of this order. The Secretary of Homeland Security, in consultation with the Secretary of State, shall submit further reports every 90 days thereafter until I determine that resumption of the USRAP is in the interests of the United States.

**Sec. 5.** *Revocation.* Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs To Resettle Refugees and Planning for the Impact of Climate Change on Migration), is hereby revoked.

**Sec. 6.** *Severability*. If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 7.** *General Provisions*. **(a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 20, 2025.

## Executive Order 14169

## Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose*. The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2.** *Policy*. It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3. (a)** *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy*. All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

**(b)** *Reviews of United States foreign assistance programs*. Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

**(c)** *Determinations*. The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

**(d)** *Resumption of paused development assistance funding*. New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

**(e)** *Waiver*. The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4.** *General Provisions*. **(a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 20, 2025.