No. 25-1313, 25-1939

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

PACITO, et. al.,
*Plaintiff-Appellees*

v.

DONALD J. TRUMP, et. al.,
*Defendants-Appellants.*

---

*On Appeal from the United States District Court for the Western District of
Washington District Court Case No. 2:25-cv-255*

---

**BRIEF OF *AMICI CURIAE* REFUGEES INTERNATIONAL**

MATTHEW Z. CROTTY
RIVERSIDE NW LAW GROUP,
PLLC
905 W. Riverside Ave. Ste. 208
Spokane, WA 99201
(p) (509) 850 7011
mzc@rnwlg.com

Counsel for Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Amici Curiae Refugees International is a nonprofit organization. It has no parent corporation and does not issue stock.

## FRAP 29 DISCLOSURE STATEMENT

Per FRAP 29(a)(4)(E)(1)-(3) the undersigned declares (a) no party's counsel authored this brief in whole or in part, (b) no party or party's counsel contributed money to fund the preparing or submitting of this brief, and (c) no person contributed money intended to fund the preparation or submitting of this brief.

May 26, 2025                                      /s/ *Matthew Z. Crotty*
                                                 Matthew Z. Crotty

                                                 Counsel of Amici Curaie

1

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**..................................................1

**FRAP 29 DISCLOSURE STATEMENT**.......................................................1

**TABLE OF CONTENTS** ..............................................................................2

**TABLE OF AUTHORITIES** .......................................................................3

**INTEREST OF** *AMICI CURIAE*................................................................6

**FACTUAL AND PROCEDURAL BACKGROUND**.....................................6

**SUMMARY OF THE ARGUMENT** ...........................................................7

**ARGUMENT** ..............................................................................................8

    **1.   The Historical Evolution of the Role of Refugee Resettlement**................8

    **Agencies.** ...............................................................................................8

    **2.   Codification of Resettlement Agency Role in the Refugee Act of 1980**..17

    **CONCLUSION**.......................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Statutes**

22 U.S.C. § 1934 ...........................................................................12

22 U.S.C. § 2601 ...........................................................................12

8 U.S.C. § 1521 .............................................................................17

8 U.S.C. § 1522 ...........................................................................6,19

8 U.S.C. § 136 ................................................................................8

Displaced Persons Act, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 ......................11

Displaced Persons Act, Pub. L. No. 81-555, ch. 262, 64 Stat. 219 ........................12

Pub. L. 97–363, §§3(a), 4–6, Oct. 25, 1982, 96 Stat. 1734–1736 ..........................21

The Refugee Act of 1979, House Report 96-608, 13 ........................................ 18,19

The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat.102 ....................................7

**Executive Orders**

Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025)....................................7

**Legislative History & Congresssional Testimony**

Government Accountability Office, Domestic Resettlement of Indochinese
   Refugees: Struggle for Self-Reliance. HRD-77-35; B-133001, May 10, 1977. ..14

Government Accountability Office, The Indochinese Exodus: A Humanitarian
   Dilemma, ID-79-20. Apr 24, 1979 ............................................................. 13,16

Hearing on H.R. 3195 Refugee Assistance, House Committee on the Judiciary
   Subcommittee on Immigration, Refugees, and International Law, 98th Congress,
   First Session, June 9, 1983.....................................................................21

Hearing on Refugee Policy and Procedures, Subcommittee on Immigration,
   Citizenship and International Law in the Committee of Judiciary, House of
   Representatives, 95th Congress, 2nd Session, March 1, 1978..............................16

Hearing on S. 3309 to Amend the Indochina Migration and Refugee Assistance
   Act of 1975 to Provide for Assistance to New Refugees, and for Other Purposes,
   Committee on Human Resources, U.S. Senate, 95th Congress, 2nd Session,
   August 9, 1978.................................................................................15

Hearings on H.R. 2816, Refugee Act of 1979. House Committee on the Judiciary Subcommittee on Immigration, Refugees and International Law. 96th Cong.,1st sess., May 23, 1979,............................................................................21

Hearings on H.R. 5879 Reauthorization of the Refugee Act of 1980. House Committee on the Judiciary Subcommittee on Immigration, Refugees, and International Law, 97th Congress, second session, April 22, 1982 .....................22

House Report 96-781, Conference Report to Accompany the Refugee Act of 1980, February 22, 1980 ..............................................................................18

OPE Case Processing" in David Martin, The United States Refugee Admissions Program: Reforms for a New Era of Refugee Resettlement ................................24

Opening Statement of Senator Kennedy, Hearing on the Refugee Act of 1979, S. 643, Senate Judiciary Committee, 96th Congress 1st Session, March 14, 1979,...19

Statement and Directive by the President on Immigration to the United States of Certain Displaced Persons and Refugees in Europe, December 22, 1945, *available at* https://www.presidency.ucsb.edu/documents/statement-and-directive-the-president-immigration-the-united-states-certain-displaced ............10

Testimony of Jim Purcell, Oversight Hearings on the U.S. Refugee Program. House Committee on the Judiciary Subcommittee on Immigration, Refugees, and International Law, 97th Congress, First Session, September 16, 1981 ................20

U.S Displaced Persons Commission, *Memo to America : the DP story; the final report of the U. S. Displaced Persons Commission*, Washington: U. S. Govt. Print. Off., 1952 ....................................................................................11

**Misc Authorities**

The Attitude of American Jews to Refugees from Germany in the 1930's *American Jewish Historical Quarterly* ......................................................................9

HHS Study - Refugees in U.S. Have Contributed Nearly $124B to U.S. Government Budget............................................................................16

Amy Slaughter, How NGOs Have Helped Shape Resettlement 54 *Forced Migration Review* 32-34 (2017)............................................................22

J. Bruce Nichols, *The Uneasy Alliance: Religion, Refugee Work, and US Foreign Policy* ..........................................................................................12

Mark Wischnitzer, *Visas to Freedom: A History of HIAS*......................................10

Stephen R. Porter, *Benevolent Empire: U.S. Power, Humanitarianism, and the World's Dispossessed* ............................................................................9

Kathleen Newland and Randy Capps, *Why Hide the Facts About Refugees Costs and Benefits*, September 2017, Migration Policy Institute...................................15

## INTEREST OF *AMICI CURIAE*

Dr. Yael Schacher is an historian of U.S. refugee and asylum law and policy and currently works as director for the Americas and Europe for Refugees International in which capacity she submits this brief. Refugees International is a non-governmental organization that advocates for human rights, lifesaving assistance, and legal protection for displaced people. Working with partners around the world, Refugees International investigates the challenges displaced people face and develops policy solutions, including humanitarian pathways to other countries. Refugees International is not a resettlement agency or service provider and does not accept government or UN funding. This brief is intended to explain the historical evolution of the relationship between resettlement agencies and the federal government and the critical role that resettlement agencies play in administering the U.S. Refugee Admissions Program, which was codified in the Refugee Act of 1980, especially INA, 8 U.S.C. § 1522.

## FACTUAL AND PROCEDURAL BACKGROUND

This case is about the Trump administration's attempt to illegally end the U.S. Refugee Admissions Program [USRAP] and replace Congress's definition of a refugee worthy of resettlement and guidelines for administering the program with its own standards and procedures. It has done this by ignoring the definition of refugee in U.S. law and refusing to disburse funds authorized by Congress for refugee

6

resettlement, instead asserting, in a January 20, 2025 Proclamation "Realigning the United States Refugee Admissions Program[1]," that the administration will resettle only those "who can fully and appropriately assimilate into the United States" and will "ensure that the United States preserves taxpayer resources for its citizens."[2] This brief focuses specifically on how the administration's refusal to support the work of resettlement agencies subverts Congress's mandate to effectively resettle refugees of special humanitarian concern to the United States.

## SUMMARY OF THE ARGUMENT

The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, codified the longstanding role played by resettlement agencies in identifying and preparing applications for refugees abroad eligible for admission; finding sponsors for refugees and planning their placement in local U.S. communities; and supporting initial reception as well as longer term integration of resettled refugees in the U.S. The original involvement of agencies in resettlement was through providing assurances that refugees would be supported after admission, a role that President Truman formalized in the wake of World War II. By the wake of the war in Vietnam, resettlement agencies played an increasingly central role in refugee processing abroad and programs helping refugees find employment and adjust to life in the

---

[1]  Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025)
[2]  *Id.* at § 2.

7

United States. In the Refugee Act of 1980, Congress not only codified the role played by agencies in resettlement. Congress also recognized the need for predictability in refugee admissions—an issue raised by resettlement agencies in hearings about the Refugee Act—so established a consultation between Congress and the President to determine the number of refugees to be resettled each year. Further, Congress incorporated into the law the approach of the resettlement agencies towards the promotion of refugee self-sufficiency. Congress also mandated that special humanitarian concern, rather than the ad hoc whims of the executive branch, would determine which refugees were resettled through USRAP. In amendments to the Refugee Act and subsequent hearings about USRAP, Congress recognized the crucial role played by the agencies in resettling refugees "of special humanitarian concern" to the United States and furthering the ability of resettled refugees to become valuable members of U.S. communities.

## **ARGUMENT**

### 1.     **The Historical Evolution of the Role of Refugee Resettlement Agencies.**

The relationship between non-governmental agencies and refugee admissions long preceded federal financial support for resettlement. A major barrier to the admission of refugees fleeing persecution by the Nazis – who barred emigrants from leaving with capital –was the "likely to become a public charge" provision of the Immigration and Nationality Act of 1917, 8 U.S.C. §136. In evaluating visa

8

applications, consuls considered affidavits of support from close relatives and financially responsible Americans. In the late 1930s, U.S. consuls began allowing certain social service agencies, including the Hebrew Immigrant Aid Society (the organization known today as HIAS), to provide a single blanket surety bond to vouch for a group of refugees based on the agencies' knowledge of the Americans providing the affidavits of support. As one historian put it, this effectively made the State Department and the agencies "partners."[3] It was "explicit recognition" that the agencies possessed "the expertise" – familiarity with immigration policy, experience working with immigrants, and knowledge of local U.S. communities – to support fitting sponsors and effectively resettle refugees.[4]  The agencies consulted with local communities across the country to understand their capacity for resettlement and ensured support of refugees upon arrival with such matters as "finding employment and housing, managing psychological trauma and family discord…enrolling children in school."[5]

In a December 1945 Statement and Directive, President Truman formalized the relationship between the federal government and the agencies concerned with

---

[3] Stephen R. Porter, *Benevolent Empire: U.S. Power, Humanitarianism, and the World's Dispossessed* (Philadelphia: University of Pennsylvania Press, 2017) 63.
[4] *Id.*
[5] *Id*. at 60, 64. See also, Zosa Szajkowski,  "The Attitude of American Jews to Refugees from Germany in the 1930's," *American Jewish Historical Quarterly*, December 1971 (61.2) 132-133.

refugees. President Truman's statement emphasized that the U.S. had a responsibility to address the immense problem of displacement wrought by the war and reduce the human suffering of Europe's refugees by facilitating the admission of some of them to the United States. The President therefore directed the Secretary of State to send consular personnel to refugee assembly center areas in the American zones of occupation in Europe to work with Immigration and Naturalization Service officials to make "appropriate arrangements with welfare organizations in the United States" who could submit "corporate affidavit[s]" guaranteeing support for resettled refugees.[6]  Between May 1946 and October 1948, HIAS issued corporate affidavits for 4857 Jewish refugees whose resettlement in the United States was so successful that 4662 were fully self-supporting by 1951.[7]  This "corporate affidavit" system, through which an organization is given the responsibility of placing refugees in U.S. communities and supporting their initial  resettlement, is the origin of what today are called sponsorship assurances provided by refugee resettlement agencies to refugees conditionally approved by DHS/USCIS. An agency's assurance for a refugee confirms the agency is willing and prepared to accept the case for resettlement and

---

[6] Statement and Directive by the President on Immigration to the United States of Certain Displaced Persons and Refugees in Europe, December 22, 1945, *available at* https://www.presidency.ucsb.edu/documents/statement-and-directive-the-president-immigration-the-united-states-certain-displaced (*last visited* May 21, 2025)

[7] Mark Wischnitzer, *Visas to Freedom: A History of HIAS* (New York: World Publishing Co., 1956) 209.

10

will make all necessary arrangements at the local level in the United States to receive the refugee.[8]

Between 1948 and 1952, organizations concerned with refugees (including HIAS, Church World Service, the International Rescue Committee, and the National Catholic Welfare Conference) issued assurances guaranteeing housing and employment to almost ninety percent of the over 300,000 European refugees admitted under the Displaced Persons Act, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009.[9] The official report to Congress on implementation of the Displaced Persons Act called the role played by agencies in providing assurances "indispensable" and attributed their success to devoted agency relief workers in refugee camps abroad that helped prepare refugee case files and to local affiliates in communities across the United States that supported refugee reception, integration, and "attainment of independence."[10]

The organizations providing "corporate affidavits" under Truman's directive and "blanket assurances" for displaced persons were registered with the

---

[8] See step 6 of the contemporary "resettlement process" as explained by Church World Services *available at* https://cwsglobal.org/blog/from-arrival-to-home-how-refugee-resettlement-works-in-the-united-states/#:~:text=Step%206%3A%20Matching%20with%20a,lives%20in%20the%20United%20States. (*last visited* May 21, 2025)

[9] U.S Displaced Persons Commission, *Memo to America : the DP story; the final report of the U. S. Displaced Persons Commission*, Washington: U. S. Govt. Print. Off., 1952, 268.

[10] *Id.* at 293-4.

President's War Relief Control Board and the State Department's Advisory Committee on Voluntary Foreign Aid. These organizations—referred to colloquially at "VOLAGS," short for voluntary agencies—relied primarily on private sources of funding in the 1940s and 1950s, including for their resettlement of over 30,000 paroled Hungarians in 1956 and 1957. But VOLAG work with refugees was recognized and supported by Congress. In 1950, section 14 of the amended Displaced Persons Act, Pub. L. No. 81-555, ch. 262, 64 Stat. 219, authorized funds for interest-free loans to the agencies to cover the costs of transporting within the United States refugees for whom the agencies provided assurances. Funds authorized under the Mutual Security Act of 1951, Pub. L. No. 82-165, 65 Stat. 373, supported some of the VOLAGS' work with refugees abroad. Robust federal funding for refugees in the United States began with support for Cubans from presidential contingency funds under the Mutual Security Act of 1954, 22 U.S.C. § 1934, and then the Migration and Refugee Assistance Act of 1962, 22 U.S.C. § 2601.[11] By the mid-1960s, VOLAG refugee work both abroad and in the U.S. was more evenly financed partly by public and partly by private funds.[12]

---

[11] "Review of U.S. Refugee Resettlement Programs and Policies: A Report Prepared at the Request of the Chairman of the Committee on the Judiciary of the United States Senate by the Congressional Research Service," 96th Congress, 2nd Session, August 8, 1980, 20-21.

[12] J. Bruce Nichols, *The Uneasy Alliance: Religion, Refugee Work, and US Foreign Policy* at 97 and 207-209 (New York: Oxford University Press, 1988).

12

As they did in the wake of World War II, the agencies played an essential role facilitating the resettlement of refugees in the wake of the Vietnam war. Between 1975 and 1979 thousands of people fled persecution or fear of persecution in Vietnam, Laos, and Cambodia only to suffer inhumane conditions, targeted mistreatment, and refoulement (forced return to persecution) in Thailand, Malaysia, and other countries of first asylum in Asia. Under contract with the State Department, VOLAG staff in refugee camps in these countries helped register, interview, prepare case files, and arrange a sponsor in the U.S. for refugees who met the criteria of U.S. parole programs and were approved by U.S. officials. Once the refugees were paroled into the United States, the agencies covered costs of initial resettlement needs – like food, clothing, rent, furniture—and supportive services like English language or job training and counseling. While the State Department paid VOLAGS $500 for each refugee resettled in 1975 and $300 in 1977-1978, the estimated cost to the agencies for supporting each refugee for their first nine months in the United States was $877.[13]  At an August 1978 Senate hearing on refugee assistance, Wells Klein, representing the American Council of Voluntary Agencies, testified that, despite this funding shortfall, agencies were committed to continuing to support not only the initial reception of refugees but also their longer term

---

[13] Government Accountability Office, The Indochinese Exodus: A Humanitarian Dilemma, ID-79-20. Apr 24, 1979, 75. https://www.gao.gov/assets/id-79-20.pdf

integration.  According to Klein, this broad view of resettlement by the agencies stemmed from their missions to relieve human suffering and their longstanding efforts to assist refugees achieve self-sufficiency, which Klein defined as economic independence and social adjustment allowing for full participation in American life. As such, Klein testified, the agencies "were not going to let the discussion of money inhibit our agreement to resettle refugees."[14] What the agencies meant by this agreement – which went beyond a contract—was elaborated in a report by the Government Accountability Office:

> VOLAG officials generally believe their major legal responsibility under the contract was to place refugees with sponsors. In their opinion, placement with a sponsor constituted resettlement under the contract…Although VOLAG officials believe their legal responsibility was met when this was done, they did not consider their job finished. By their definition, resettlement means more than simply placing a refugee with a sponsor. Generally, they consider a refugee resettled when he is an employed and self-supporting member of the community, even though it may take several years for some refugees to reach this position. During this time VOLAGs will stand by to assist the refugees.[15]

One of the goals of the Refugee Act of 1980 was to end ad hoc Presidential decisions that people were refugees without clear humanitarian criteria, adequate

---

[14] Hearing on S. 3309 to Amend the Indochina Migration and Refugee Assistance Act of 1975 to Provide for Assistance to New Refugees, and for Other Purposes, Committee on Human Resources, U.S. Senate, 95th Congress, 2nd Session, August 9, 1978, 48.

[15] Government Accountability Office, Domestic Resettlement of Indochinese Refugees: Struggle for Self-Reliance. HRD-77-35; B-133001, May 10, 1977, 17.

planning, or sufficient federal assistance for their resettlement in the United States. Instead, the number and particular populations of concern would be agreed upon by Congress and the Executive Branch and the State Department would assure, through "ongoing dialogue" with voluntary agencies, that the refugees had sponsors and support locally in the United States.[16] As Wells Klein testified at a House Judiciary Committee hearing on refugee policy in 1978, for voluntary agencies, an ad hoc, unpredictable approach meant, "we put on staff, we take off staff; we start [English language and vocational training] programs, we phase them out;…State [affiliate] offices are geared up to working with refugees, they gear down." *Id.* Klein testified that it would be in the national interest to adopt a more orderly approach that determined the acceptance of a certain number of refugees for resettlement to the United States. "We as the resettlement agencies could plan to handle these [refugees] both in terms of benefits to refugees; but equally important, in terms of benefits to our communities and citizen participation."[17] This is because refugees who are well supported in their resettlement contribute economically to U.S. communities[18] and

---

[16] Hearing on Refugee Policy and Procedures, Subcommittee on Immigration, Citizenship and International Law in the Committee of Judiciary, House of Representatives, 95th Congress, 2nd Session, March 1, 1978, 204.

[17] *Id.* at 202.

[18] A 2017 study commissioned by President Trump's Department of Health and Human Services found that resettled refugees contribute, over a 10-year period, $63 billion more than they consume in services and assistance. Kathleen Newland and Randy Capps, "Why Hide the Facts About Refugees Costs and Benefits," September 2017, Migration Policy Institute, *available at*

because refugee sponsorship by U.S. citizens fosters civic engagement in local and world affairs valuable to American democracy.

The unpredictability Wells Klein lamented was a product of sudden decisions by the executive branch that certain populations were eligible for parole and resettlement. As another Government Accountability Office Report noted: "The use of sporadic, ad hoc parole actions for refugee admissions resulted in uncertainties for voluntary agencies and…has made it difficult for those involved to find sponsors, funds, and staff resettlement programs, as well as to set up English and job training programs to help refugees become integrated and self-sufficient."[19] To address this, the Refugee Act of 1980 authorized 50,000 refugee admissions annually in 1980, 1981, and 1982 and thereafter a number of annual admissions determined by the President in consultation with Congress before the beginning of each fiscal year. It was clear from debates about the Refugee Act (and rejected amendments to reduce the number of admissions in 1980, 1981, and 1982) that

---

https://www.migrationpolicy.org/news/why-hide-facts-about-refugee-costs-and-benefits (*last visited* May 21, 2025). Seven years later, when the Biden administration updated the study, it found that, over a 15-year period, the net benefit of resettled refugees was $124 billion. "Refugees in U.S. Have Contributed Nearly $124B to U.S. Government Budget, New HHS Study Reveals," Administration for Children and Families, February 15, 2024, *available at* https://acf.gov/archive/blog/2024/02/refugees-us-have-contributed-nearly-124b-us-government-budget-new-hhs-study (*last visited* May 21, 2025).
[19] Government Accountability Office, The Indochinese Exodus: A Humanitarian Dilemma, ID-79-20. Apr 24, 1979, vi. https://www.gao.gov/assets/id-79-20.pdf

members of Congress expected 50,000 refugees during the first three years and the number of refugees in the annual presidential determination in the years thereafter to be planned admissions target setting the actual number of refugees that would be resettled each year. The conference report on the Refugee Act refers to this as "normal flow" refugees to be resettled annually.[20] An aim of the Refugee Act's mandated process of consultation and determination of annual refugee admissions is to bring needed predictability to USRAP to allow for effective resettlement supported by resettlement agencies. This predictability is possible only if the consulted upon number and populations of refugees are actually resettled each year and admissions do not suddenly change mid-year without consultation.

### 2. Codification of Resettlement Agency Role in the Refugee Act of 1980.

The Refugee Act of 1980's goal, as stated in section b of its first title, is "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."[21]   Resettlement agencies play a key role in

---

[20] House Report 96-781, Conference Report to Accompany the Refugee Act of 1980, February 22, 1980, 19-20.

[21]   8 U.S.C. § 1521 note, Refugee Act of 1980, *available at* https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf (*last visited* May 21, 2025).

facilitating the selection process and providing assurances for refugees abroad and then working with local affiliates to ensure successful placement and integration in the United States, especially achieving economic self-sufficiency.

In passing the Refugee Act, Congress changed the originally proposed bill language regarding which refugees would be admitted to the United States from those of "special concern" to those of "special humanitarian concern." The addition of the word "humanitarian" was to emphasize "the plight of the refugee themselves" as opposed to racial and cultural factors.[22] This change in language reflected two related considerations of members of Congress. The Refugee Act defined a refugee as a person anywhere in the world determined to have a well-founded fear of persecution based upon their race, religion, nationality, political opinion, or membership in a particular social group if returned to their home country. Congress recognized that refugee resettlement in the United States should be responsive to evolving worldwide refugee situations but also that the extent of persecution and displacement worldwide means millions of people meet the Act's refugee definition. Certain groups of people of special humanitarian concern would thus need to be prioritized for assessment for refugee status by U.S. officials working to allocate the annual admissions. Congress did not want discrimination against (and false assumptions of in-assimilability about) people coming from certain countries or

---

[22] "The Refugee Act of 1979," House Report 96-608, 13.

18

regions of the world to determine access to admission as a refugee, which would allow the executive to circumvent Congress's abolishment of the national origins system from the Immigration and Nationality Act in 1965.[23]

In hearings about the Refugee Act, members of Congress recognized the "expertise" of the resettlement agencies and discussed codification of their role in an amendment that became Section 412 of the Act, 8 USC § 1522, which was proposed by Representative Elizabeth Holtzman, chair of the immigration subcommittee of the House Judiciary Committee.[24] Section 412 (a)(4) specifies that grants and contracts for resettlement "shall be made" to agencies that "can best perform the services," including (as specified in Section 412 (a) (1) (A) and (B)) employment training and placement and English language training to foster economic self-sufficiency. This was a clear reference to the work of resettlement agencies. As Representative Holtzman noted in her report on the bill, "[t]he Committee recognizes that the efforts of these agencies are vital to successful refugee resettlement. It is anticipated that the commitment to consistent resettlement funding that is embodied in this legislation will encourage the continued cooperation of these agencies. In addition to reception and placement of the refugee (i.e. airport reception; arranging inland transportation; providing basic orientation, food,

---

[23] Id.; Opening Statement of Senator Kennedy, Hearing on the Refugee Act of 1979, S. 643, Senate Judiciary Committee, 96th Congress 1st Session, March 14, 1979, 1.
[24] "The Refugee Act of 1979," House Report 96-608, 26.

clothing and shelter; placement with the sponsor), the voluntary agencies provide a variety of follow-up services, such as counseling and referral for English language training, educational and vocational training, and advice and guidance on immigration matters."[25]

Provision 412 (b) of the Refugee Act directed the State Department to make contracts with resettlement agencies for fiscal years 1980 and 1981 but required a study of which federal agency is best able to administer the grants for future years. That the State Department, rather than the Department of Health and Human Services, remained the administrator of the grant is a testament to critical role that resettlement agencies play in administering USRAP. As Wells Klein testified to Congress in a hearing on the proposed Refugee Act in 1979, the resettlement agencies expended a significant amount of the grant fund abroad, when helping to screen refugees and identify sponsors.[26] In a 1981 oversight hearing about the Refugee Act, State Department officials described the activities under grants with resettlement agencies as "a bridge between overseas selection of refugees and their arrival in communities."[27] In hearings on the reauthorization of the Refugee Act and

---

[25] *Id.* at 22.

[26] Hearings on H.R. 2816, Refugee Act of 1979. House Committee on the Judiciary Subcommittee on Immigration, Refugees and International Law. 96th Cong.,1st sess., May 23, 1979, 255.

[27] Testimony of Jim Purcell, Oversight Hearings on the U.S. Refugee Program. House Committee on the Judiciary Subcommittee on Immigration, Refugees, and International Law, 97th Congress, First Session, September 16, 1981, 7.

amendments to its section 412 in the 1980s, State Department officials discussed the placement policies developed by voluntary agencies to ensure refugees moved to localities where there were adequate housing and jobs.[28] Officials also testified that cooperative agreements with the resettlement agencies detailed the services they were to provide during the initial resettlement period and required monitoring of local affiliates and consultation with state and local governments to ensure resources were available and effective integration.[29]  That consultation was in fact mandated by a 1982 amendment to Section 412 (Pub. L. 97–363, §§3(a), 4–6, Oct. 25, 1982, 96 Stat. 1734–1736).

Since the beginning of their relationship with the federal government on refugee admissions in the years before World War II, resettlement agencies focused on programming, such as job placement, training, and counseling, that would facilitate employment of refugees as soon as possible so as to minimize reliance on assistance. Congress approval of this approach to resettlement is apparent in amendments to the  Refugee Act in the 1980s. Amendments to Section 412 in 1984 and 1986 re-emphasized the role of resettlement agencies in providing services,

---

[28]  Hearings on H.R. 5879 Reauthorization of the Refugee Act of 1980. House Committee on the Judiciary Subcommittee on Immigration, Refugees, and International Law, 97th Congress, second session, April 22, 1982, 20.

[29]  Hearing on H.R. 3195 Refugee Assistance, House Committee on the Judiciary Subcommittee on Immigration, Refugees, and International Law, 98th Congress, First Session, June 9, 1983, 146.

especially case management, to encourage refugee self-sufficiency and reduce welfare dependency in accord with agency guidelines and provisions of the law itself (beyond what is specified in cooperative contracts).[30]

Over the last twenty five years, resettlement agencies have worked with the State Department and DHS to identify populations of "special humanitarian concern" for resettlement. In the early 2000s, the International Rescue Committee did this for Afghans in Pakistan and HIAS developed a resettlement referral and identification program in Kenya.[31] These efforts by the resettlement agencies responded to concern by Congress that refugees from certain regions where there was immense human suffering and displacement were being resettled in numbers lower than the annual admissions target set by Congress and the President.[32] This work by the resettlement agencies has little to do with their cooperative agreements. It stems from concern by the resettlement agencies with fulfilling the humanitarian

---

[30] Pub. L. 98–473, title I, §101(d), Oct. 12, 1984, 98 Stat. 1876, 1877.
Pub. L. 99–605, §§3–5(c), 6(a), (b), (d), 8, 9(a), (b), 10, 12, 13, Nov. 6, 1986, 100 Stat. 3449–3451, 3453-3455.
[31] Amy Slaughter, How NGOs Have Helped Shape Resettlement 54 *Forced Migration Review* 32-34 (2017).
[32] Annual Oversight Hearing of Refugee Programs, Policies, and Budget. House Committee on International Relations Subcommittee on International Operations and Human Rights, 105th Congress, second session, February 4, 1998; Hearing on Empty Seats in the Lifeboat: Are there Problems with the U.S. Refugee Program, Senate Committee on the Judiciary Subcommittee on Immigration, 107th Congress, Second Session, February 12, 2002.

mandates of the Refugee Act and resettling annually the number and populations of refugees Congress and the President agree it is in the national interest to admit.

On the other hand, the Trump administration's suspending of USRAP and canceling funding for the resettlement agencies stops them from preparing case files for DHS abroad and providing approved refugees with assurances so that they can be resettled—a fundamental role the agencies play in administering USRAP overseas.[33] It also leaves all the refugees recently resettled in the United States by the agencies without access to supportive services —creating the very problem for local U.S. communities the Trump administration claims its Proclamation is designed to solve.

## **CONCLUSION**

The work of the resettlement agencies is beneficial to the United States and key to carrying out the mandate of the Refugee Act of 1980. The Trump administration's disregard for the role of resettlement agencies in administering USRAP violates Congress's mandate to *effectively* resettle refugees *of special humanitarian concern* to the United States as delineated in the Refugee Act of 1980.

---

[33] "OPE Case Processing" in David Martin, The United States Refugee Admissions Program: Reforms for a New Era of Refugee Resettlement, *available at* https://2001-2009.state.gov/g/prm/refadm/rls/rpts/36061.htm (*last visited* May 21, 2025).

Respectfully submitted,                    DATE May 26, 2025


/s/MATTHEW Z. CROTTY
RIVERSIDE NW LAW GROUP,
PLLC
905 W. Riverside Ave. Ste.
208
Spokane, WA 99201
(p) (509) 850 7011
mzc@rnwlg.com

*Counsel for Amici Curiae*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g)(1).

   X__    The brief contains 4,619 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

   ___    The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   X__    The brief has been prepared in a proportionally spaced typeface using MS Word in a 14 point Times New Roman font or

   ___    The brief has been prepared in a monospaced typeface using _____in a ___ characters per inch_____ font.

Respectfully submitted,                    DATE  May 26, 2025

/ S / MATTHEW Z. CROTTY
MATTHEW Z. CROTTY

25