Docket Nos. 25-1313, 25-1939

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

PACITO, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

*Appeal from a Decision of the United States District Court for the Western District of Washington, No. 2:25-cv-00255-JNW · Honorable Jamal N. Whitehead*

## BRIEF OF BET TZEDEK LEGAL SERVICES AND FAITH-BASED ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

ATARA MILLER
VICTOR HOLLENBERG
ALEX RUPPERT
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
amiller@milbank.com
vhollenberg@milbank.com
aruppert@milbank.com

LINDA DAKIN-GRIMM
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063
ldakin-grimm@milbank.com

*Attorneys for Amici Curiae*



## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* Bet Tzedek Legal Services ("Bet Tzedek"), Access California Services ("AccessCal"), Council on American-Islamic Relations California ("CAIR California"), Jesuit Refugee Service/USA ("JRS/USA"), JustFaith Ministries, International Institute of Akron ("IIA"), International Institute of Los Angeles ("IILA"), and International Institute of New England ("IINE") state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

/s/ Linda Dakin-Grimm

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................1

SUMMARY OF THE ARGUMENT ...................................................6

ARGUMENT ..................................................................................7

I.    THE EXECUTIVE ORDER VIOLATES THE DEEPLY ROOTED,
      CONSTITUTIONALLY PROTECTED RIGHT TO FREE
      EXERCISE OF RELIGION ............................................................7

      A.    Religious Refugees Have Been Present Throughout the
            History of the United States ...................................................7

            1.    Early Examples (1620—1880) .................................8

            2.    Antecedents of the U.S. Refugee Program (1880—
                  1980) ..................................................................10

            3.    Role of Religious Organizations in Contemporary
                  Refugee Resettlement (1980—Present)....................11

      B.    America's Faith Traditions Share a Religious Commitment to
            Serving and Ministering to Refugees...................................12

            1.    Jewish Law and Teaching Command Compassion and
                  Legal Protection for the Stranger.............................13

            2.    Christianity Emphasizes Care for One's Neighbor by
                  the Life and Teachings of Jesus Christ .....................15

                  a.    The Catechism of the Catholic Church and
                        Catholic Social Teaching Establish Care for
                        Refugees as a Moral Imperative Requiring
                        Action ..........................................................17

                  b.    Protestant Denominations Embrace Christ's Call
                        to Serve Those in Need, Including Refugees ...........20

            3.    Islamic Legal and Ethical Traditions Mandate
                  Hospitality and Protection for the Oppressed............22

C.    The Balance of Equities and Public Interest Weigh Heavily in
       Plaintiffs-Appellees' Favor Because *Amici*'s Work with
       Refugees Is Constitutionally Protected Religious Exercise ................24

       1.    The Executive Order Impermissibly Burdens Religious
             Practice .......................................................................28

       2.    The Executive Order Threatens Religious Freedom and
             Civil Society ...............................................................31

CONCLUSION .............................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ................................................................25

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................................26

*Cmty. House, Inc. v. City of Boise,*
  490 F.3d 1041 (9th Cir. 2007)................................................24

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014)..................................................24

*Employment Div. v. Smith,*
  494 U.S. 872 (1990) ................................................................28

*Fifth Ave. Presbyterian Church v. City of New York,*
  293 F.3d 570 (2d Cir. 2002) ...................................................29

*Fulton v. City of Philadelphia,*
  593 U.S 522 (2021) .................................................................28

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ................................................................27

*McCreary Cnty. v. Am. Civil Liberties Union of Ky.,*
  545 U.S. 844 (2005) ................................................................25

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012).............................................24, 27

*Pacito v. Trump,*
  No. 2:25-cv-255-JNW, 2025 WL 655075 (W.D. Wash. Feb. 28,
  2025)........................................................................................29

*The Presbyterian Church (U.S.A.) v. United States,*
  870 F.2d 518 (9th Cir. 1989)..................................................27

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,*
  450 U.S. 707 (1981) ................................................................27

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ................................................................29

*W. Presbyterian Church v. Bd. of Zoning Adjustment*,
862 F. Supp. 538 (D.D.C. 1994) ..........................................26

**Statutes**

U.S. Const., amend. I .....................................................8, 24

Realigning the United States Refugee Admissions Program, Exec.
Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025) ...................*passim*

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102....................7, 11

**Other Authorities**

Amir Hussain, *Toward a Muslim Theology of Migration*, Theology of
Migration in the Abrahamic Religions (Elaine Padilla & Peter C.
Phan eds., 2014) ........................................................23

Angela C. Carmella, *Progressive Religion and Free Exercise
Exemptions*, 68 U. Kan. L. Rev. 535 (2019) ...............................25, 26

Aristide R. Zolberg, *The Roots of American Refugee Policy*, 55 Soc.
Rsch. No. 4, 649-678 (Winter 1988)........................................10

Bertrand van Ruymbeke, *The Huguenots in America*, Oxford Rsch.
Encyclopedia of Am. Hist. (2020)..........................................8

The Bible (New Int'l Version).....................................*passim*

Cardinal Roger M. Mahony, *Renewing Hope, Seeking Justice*, People
on the Move (Pontifical Council for Pastoral Care of Migrants and
Itinerant People, No. 108, 2008) ........................................ 19-20

*Catholic Social Teaching (CST)*, Catholic Legal Immigration
Network, Inc., https://www.cliniclegal.org/toolkits/community-
education/catholic-social-teaching (last visited May 27, 2025)...........18

Catechism of the Catholic Church (CCC), Libreria Editrice Vaticana,
Citta del Vaticano (1993) ...............................................18

Christine M. Venter, *Human Dignity Has No Borders: Respecting the
Rights of "People on the Move" and the Rights and Religious
Freedom of Those Who Aid Them*, 46 BYU L. Rev. 1369 (2021).............13

The Contemporary Torah.........................................14

- v -

E.P. Hutchinson, *Legislative History of American Immigration Policy* 108 (1981)..........................................................................................10

*Encyclical Letter Fratelli Tutti of the Holy Father Francis on Fraternity and Social Friendship*, Libreria Editrice Vaticana 03-10-2020 (Assisi)......................................................................................20

*Exsul Familia Nazarethana*, Apostolic Constitution 01-08-1952 (Rome) .........................................................................................19

*Fact Sheet: President Donald J. Trump Establishes the Religious Liberty Commission*, The White House (May 1, 2025) .......................29

*Golden Rule*, Scarboro Missions, https://www.scarboromissions.ca/golden-rule/understanding-the-golden-rule (last visited May 27, 2025) ...........................................16

Hamed Aleaziz & Michael Crowley, *Inside the Extraordinary Contradictions in Trump's Immigration Policies*, N.Y. Times (May 13, 2025) .......................................................................28

Hiromi Chiba, *The Role of the Protestant Church in the US Refugee Resettlement Program during the Early Cold War Era: The Methodist Case*, 43 Exchange 9-28 (2014), *available at* https://www.researchgate.net/publication/344475207_The_Role_of _the_Protestant_Church_in_the_us_Refugee_Resettlement_Progra m_during_the_Early_Cold_War_Era_The_Methodist_Case .......................21, 22

Irving Cutler, *The Jews of Chicago: From Shtetl to Suburb* (1996) ........................9

Jonathan D. Sarna, *American Judaism: A History* (2d ed. 2019) .............................8

Leslie Woodcock Tentler, *American Catholics: A History* (2020) ..........................8

Mark Granquist, *Lutherans in America*, Oxford Rsch. Encyclopedia of Am. Hist. (2016) ...........................................................................9

Martin Lings, *Muhammad: His Life Based on the Earliest Sources* (2006).......................................................................................... 23-24

Mary Brown, *The Historical Value of the Immigrant Parish:  How Long Should a Ministry Last?*, Ctr. for Migration Stud. (Apr. 13, 2023), https://cmsny.org/historical-value-immigrant-parish-brown-041323/ ...............................................................................9

*Message for the World Day of Migrants and Refugees, Migrants and Refugees: Towards a Better World (2014)*, Libreria Editrice Vaticana 05-08-2013 (Rome) ...............................................................20

Nick Bunker, *Making Haste from Babylon: The Mayflower Pilgrims and Their World* (2010) ........................................................................8

Noah Feldman, *Divided by God: America's Church-State Problem – and What We Should Do About It* (2005) ......................................9

Office of Refugee Resettlement, U.S. Dep't of Health & Hum. Servs., https://www.acf.hhs.gov/orr (last visited May 27, 2025) ...................11

*Our History*, Global Ministries, The United Methodist Church, https://umcmission.org/umcor-our-history/ (last visited May 27, 2025) ....................................................................................................21

*Pacem in Terris: Encyclical of Pope John XXIII, On Establishing Universal Peace in Truth, Justice, Charity, and Liberty*, Libreria Editrice Vaticana 11-04-1963 (Rome) ..............................................19

Pazit Ben-Nun Bloom et al., *Religious Social Identity, Religious Belief, and Anti-Immigration Sentiment*, 109 Am. Pol. Sci. Rev. 203 (2015) ...................................................................................................13

Qur'an, *translated in* Clear Quran (Talal Itani, 2024) .............................23

Rabbi Dan Moskovitz, *Save One Life, Save the Entire World (Including Yourself)*, Religious Action Ctr. of Reform Judaism (May 24, 2019), https://rac.org/blog/save-one-life-save-entire-world-including-yourself ......................................................................14

Rabbi Lord Jonathan Sacks, *To Heal a Fractured World: The Ethics of Responsibility* (2005) ...............................................................14, 15

*Rerum Novarum: Encyclical of Pope Leo XIII, On Capital and Labor*, Libreria Editrice Vaticana 15-05-1891 (Rome) ...................................14

Robert Mirak, *Torn Between Two Lands: Armenians in America 1890 to WWI* (1983) .........................................................................................10

*Seven Themes of Catholic Social Teaching*, U.S. Conf. of Catholic Bishops, https://www.usccb.org/beliefs-and-teachings/what-we-believe/catholic-social-teaching/seven-themes-of-catholic-social-teaching (last visited May 27, 2025) ................................................17

- vii -

Sunan At-Tirmidhi, https://sunnah.com/tirmidhi .................................................23

Teo Armus & Emily Wax-Thibodeaux, *White South Africans arrive at Dulles as refugees under Trump order*, Wash. Post (May 12, 2025) .................28

Terry Coonan, *There Are No Strangers Among Us: Catholic Social Teachings and U.S. Immigration Law*, 40 Cath. Law. 105 (Fall 2000).........................................................................................................18

Tsuriel Rashi, *Jewish Ethics Regarding Refugees: Ideology and Realization*, 37 J. L. & Religion 1 (2021) ...........................................15

U.S. Comm'n for Refugees and Immigrants, *Lautenberg Program Fact Sheet* (Sept. 7, 2022), https://refugees.org/wp-content/uploads/2022/09/Lautenberg-Program-Fact-Sheet-9.7.2022.pdf.................................................................................12

U.S. Dep't of State, Bureau of Population, Refugees, and Migration, Report to Congress: Proposed Refugee Admissions for Fiscal Year 2024 (Oct. 2023)............................................................. 11-12

Young-Joo Lee, *Welcoming Strangers: Protestant Churches' Involvement in Refugee Resettlement in the United States*, 63 J. for Sci. Study of Religion 388 (2024).............................................13, 26

**BRIEF OF BET TZEDEK LEGAL SERVICES AND
FAITH-BASED ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

**STATEMENT OF INTEREST OF *AMICI CURIAE*[1]**

*Amici curiae* are a diverse group of faith-based organizations, every one of which contributes in some way to welcoming and providing ongoing social services to refugees upon their arrival in the United States. *Amici* are united in that their work for refugees is, at least in part, driven by faith. And though the faiths of *amici* and their employees, members, or volunteers vary, one common thread among all the faiths *amici* represent is a commitment to welcoming refugees and ensuring they live dignified lives, free from persecution.

*Amici*'s reasons for seeking to submit the attached brief are twofold. *First*, the brief illustrates for the Court how teachings from their various faiths (and those of their employees and members) motivate their speech and conduct in caring for and engaging with refugees. *Second*, by effectively banning all refugee arrivals into the United States, Executive Order 14163 and the Trump Administration's subsequent actions more broadly limit *amici*'s free exercise of religion in violation of the First Amendment of the U.S. Constitution.

---

[1] No person or entity other than *amici* and their undersigned counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Defendants-Appellants have advised they take no position on the filing of this brief. Plaintiffs-Appellees have consented to its filing.

**Bet Tzedek Legal Services ("Bet Tzedek")** is a non-profit law firm which was founded in 1974 upon the tenet of Jewish law and tradition of "tzedek, tzedek, tirdof"—in English, "justice, justice you shall pursue"—to provide legal services to Holocaust survivors and seniors in Los Angeles, California.  Bet Tzedek today provides free legal services to low-income individuals and families across Los Angeles County, including refugees and immigrants, regardless of their race, ethnicity, or religion.  Though it welcomes employees and clients from all religious backgrounds, Bet Tzedek still adheres to the Jewish scriptural directive never to turn away a stranger from a foreign land.  The Executive Order interferes with Bet Tzedek's ability to carry out that mission.

**Access California Services ("AccessCal")** is a non-profit community-based organization founded in 1988 dedicated to providing culturally and linguistically sensitive health and human services to underserved communities, with a focus on the Arab American and Muslim American populations.  Guided by its mission to empower individuals and families through direct services, education, and advocacy, AccessCal plays a vital role in refugee resettlement by offering critical support like case management, mental health services, employment assistance, and immigration and citizenship services, housing navigation and support, transportation, youth and senior services, and educational classes.  AccessCal's work is also intertwined with

faith through partnerships with faith-based communities and a shared commitment to compassion, dignity, and service.

**Council on American-Islamic Relations California ("CAIR California")** is a 501(c)(3) non-profit whose mission is to enhance understanding of Islam, protect civil rights, promote justice, and empower American Muslims. CAIR California provides free legal services to immigrants and partners with refugee resettlement agencies to assist refugees from Afghanistan, Syria, Yemen, and many other countries. CAIR California served 3,189 immigration clients in 2024 alone. CAIR California's work is guided by the Islamic principles of serving humankind and supporting the most marginalized members of our society, as the experiences of the Prophet Muhammad and the earliest Muslims illustrate the importance of welcoming and supporting refugees, wherever they may be or be from. The Administration's actions will interfere with CAIR California's faith-inspired practice of welcoming and assisting refugees in the United States.

**Jesuit Refugee Service/USA ("JRS/USA")** is an apostolic work of the Society of Jesus missioned to accompany, serve, and advocate for vulnerable refugees and other displaced people. Rev. Pedro Arrupe, S.J., the then-Superior General of the Society of Jesus, founded JRS in 1980 to assist Vietnamese refugees fleeing the fall of Saigon. In the past year alone, JRS/USA accompanied over 1.2 million people in 57 countries with a comprehensive array of services including, but

- 3 -

not limited to, provision of emergency basic needs, education, medical and mental health care, vocational and job training, as well as services promoting community resilience, reconciliation, and peacebuilding. In Catholic teaching, the duty to care for migrants is found in Biblical texts and the writings of Church fathers on poverty and wealth. In the last century, Pope Pius XII reaffirmed the Church's commitment to caring for migrants of every kind in his apostolic constitution *Exsul Familia*. The Administration's actions have negatively impacted JRS/USA through significant reductions in funding, leading to layoffs and a reduction in services overseas that impairs JRS's mission of serving refugees and other forcibly displaced persons.

**JustFaith Ministries** is a 501(c)(3) non-profit that hosts educational programs on the intersection of the Christian faith and the responsibility of each Christian to greater society. Its community-driven programs are rooted in Catholic Social Teaching, and many are geared towards the Biblical directive to welcome the stranger. JustFaith Ministries' programming teaches the basics of assisting refugees, immigrants, and their families, regardless of their race or religion. JustFaith Ministries believes that a core tenet of their faith is an obligation and responsibility on the part of wealthier individuals from wealthier countries to provide sanctuary and welcome to those fleeing persecution abroad. The Administration's actions interfere with this faith-based practice.

**International Institute of Akron ("IIA")** was founded in 1916 by the Young Women's Christian Association ("YWCA") to serve refugee women and children in Akron and Northeast Ohio. IIA now partners with churches, synagogues, and mosques to help welcome refugees fleeing persecution to the United States. In the past two years, IIA received 40 to 50 refugees monthly, but since the Executive Order, IIA has only received two arrivals. Many of the refugees IIA works with have been separated from their families and wait in fear and uncertainty, not knowing if they will ever be reunited. The Administration's actions harm Akron's economy, given the contribution that refugees have made to its workforce for decades, and they impede IIA's faith-based practice of welcoming refugees.

**International Institute of Los Angeles ("IILA")** is a non-profit organization founded by the YWCA in 1914, which provides services to newly arrived refugees in Southern California. IILA has played a prominent role in every major refugee and immigrant wave to the United States since its founding. As part of its services, IILA helps refugees find housing, obtain employment, learn English, and enroll children in school. Though IILA is today a secular organization, its service for refugees is rooted in basic Christian principles that every refugee should be welcomed and given a life of dignity.

**International Institute of New England ("IINE")** was formed by the merger of three separate International Institutes—two of which were founded by the

YWCA—that provide services to refugees to welcome them to New England. Though IINE is now a secular organization, IINE partners with local churches whose members sponsor and support refugees and their families. In the last fiscal year, IINE served approximately 1,160 refugees. The Administration's actions have interfered with IINE's faith-based practice of welcoming refugees and will harm New England's economy, which depends on refugees and immigrants joining the workforce.

## SUMMARY OF THE ARGUMENT

Shortly after taking office, President Trump and his administration (the "Administration") unlawfully dismantled the United States Refugee Admissions Program ("USRAP") with the stroke of a pen. *See* Realigning the United States Refugee Admissions Program, Exec. Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025) (the "Executive Order"). In so doing, the Administration interfered with the centuries-long, constitutionally protected work of faith-based organizations that have served refugees coming to this country since its earliest days.

The First Amendment protects the right of individuals and organizations to freely practice their religion. As a result of the Executive Order, *amici curiae* in this case—organizations that assist refugees in the communities where they reside, whose mission is either explicitly or indirectly rooted in religious practice—have seen that right curtailed. The sincerely held religious beliefs of *amici*, and those of

- 6 -

their employees and volunteers, are an integral part of their faith. And their work is part of a broader historical and constitutional legacy at the heart of what it means to be American.

Because of the Administration's actions functionally ending USRAP, the ability of *amici* to live out the dictates of their faith is in grave danger. The Administration's dubious pretext for doing so adds insult to plain constitutional injury. The balance of equities and public interest weigh heavily in favor of Plaintiffs-Appellees, and *amici* urge the Court to affirm the District Court's injunctions.

## ARGUMENT

## I.  THE EXECUTIVE ORDER VIOLATES THE DEEPLY ROOTED, CONSTITUTIONALLY PROTECTED RIGHT TO FREE EXERCISE OF RELIGION

### A.  Religious Refugees Have Been Present Throughout the History of the United States

The history of the United States is deeply intertwined with the movement of religious refugees seeking safety and freedom. From the Pilgrims' arrival in 1620 through the enactment of the Refugee Act of 1980, America has been a haven for those fleeing religious persecution, and its citizens of every religious faith have welcomed and protected them, consistent with their various scriptural teachings. For centuries, that tradition has been reinforced by the Constitution and carried out in practice through faith-based organizations—or organizations whose roots lie in

faith—like *amici*, which are central to the nation's refugee resettlement infrastructure.

### 1.     Early Examples (1620—1880)

Among the earliest and best-known examples of religious refugee migration to American shores is the journey of the Pilgrims, who fled repression in England in the hope of obtaining the freedom to practice their faith. *See generally* Nick Bunker, *Making Haste from Babylon: The Mayflower Pilgrims and Their World* (2010). The Pilgrims' experience established America as a destination for people of faith seeking to escape persecution for their beliefs. Subsequent centuries brought waves of religious refugees, including French Huguenots, English and German Catholics, and Eastern European Jews, who shaped the evolving ethos of religious liberty and pluralism in what would become the United States. *See* Bertrand van Ruymbeke, *The Huguenots in America*, Oxford Rsch. Encyclopedia of Am. Hist. (2020); Leslie Woodcock Tentler, *American Catholics: A History* (2020); Jonathan D. Sarna, *American Judaism: A History* (2d ed. 2019).

Those values are codified in the U.S. Constitution, specifically, the First Amendment—which guarantees both the free exercise of religion and bars the establishment of any state religion. U.S. Const. amend. I. The American constitutional framework was designed to allow religion to thrive independently of government, while still empowering religious actors to contribute to civil society.

*See, e.g.*, Noah Feldman, *Divided by God: America's Church-State Problem – and What We Should Do About It* (2005).  Professor Feldman's work underscores how the separation of church and state can create fertile ground for faith-based organizations to engage in humanitarian work, including refugee resettlement.

In the century after ratification of the Constitution, religious refugee resettlement in the United States evolved from an informal, community-based response to persecution into a semi-institutionalized part of American immigration policy.  In the 19th century, Protestant churches frequently supported waves of Scandinavian and German Lutherans escaping state-imposed religious conformity, and Catholic dioceses assisted Irish and Italian Catholics who fled famine, anti-Catholic violence, and poverty.  *See* Mark Granquist, *Lutherans in America*, Oxford Rsch. Encyclopedia of Am. Hist. (2016); Mary Brown, *The Historical Value of the Immigrant Parish:  How Long Should a Ministry Last?*, Ctr. for Migration Stud. (Apr. 13, 2023), https://cmsny.org/historical-value-immigrant-parish-brown-041323/.  Jewish communities, particularly in New York and Chicago, mobilized to welcome Jewish refugees escaping antisemitic Russian pogroms in the late 1800s and early 1900s.  *See* Irving Cutler, *The Jews of Chicago: From Shtetl to Suburb* (1996).

### 2.    Antecedents of the U.S. Refugee Program (1880—1980)

By the 1880s, Congress specifically provided for the admission of those seeking "to avoid persecution or punishment on religious or political grounds." E.P. Hutchinson, *Legislative History of American Immigration Policy* 108, 141-42 (1981). The early 20th century saw a surge in Eastern Orthodox and Armenian Christians arriving from the collapsing Ottoman Empire, many of whom fled religious persecution and ethnic cleansing. *See, e.g.*, Robert Mirak, *Torn Between Two Lands: Armenians in America 1890 to WWI* (1983). Although national immigration quotas passed in the 1920s severely curtailed many of these population flows, religious organizations continued to advocate for exceptions and provide social services to those who did arrive.

After the Second World War, U.S. refugee policy became more explicitly linked to religious and ideological persecution. The Displaced Persons Act of 1948 and Refugee Relief Act of 1953 provided admission to thousands of Holocaust survivors, anti-Communist Catholics, and other victims of totalitarian regimes. *See* Aristide R. Zolberg, *The Roots of American Refugee Policy*, 55 Soc. Rsch. No. 4, 649-78 (Winter 1988). Faith-based groups often worked in tandem with the federal government to resettle those populations. This period set the stage for the formal resettlement infrastructure we know today, helmed by USRAP.

- 10 -

### 3.    Role of Religious Organizations in Contemporary Refugee Resettlement (1980—Present)

The Refugee Act of 1980 (the "Refugee Act") marked a significant evolution in U.S. refugee policy by aligning domestic law with international legal standards and establishing formal resettlement mechanisms.  Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.).  The Refugee Act created the Office of Refugee Resettlement and institutionalized public-private partnerships that lie at the heart of USRAP and the American refugee resettlement system.  *See* Office of Refugee Resettlement, U.S. Dep't of Health & Hum. Servs., https://www.acf.hhs.gov/orr (last visited May 27, 2025).  Of the nine primary voluntary agencies that have historically been tasked with refugee resettlement and integration, six are religious in nature, including Plaintiffs-Appellees HIAS and Church World Service.  These faith-based organizations, as well as *amici*, their employees, and volunteers, operate from deeply held theological commitments to welcome the stranger and shelter the oppressed.  *See* Section I.B, *infra*.  Those convictions make clear that refugee resettlement is more than a bureaucratic process—it is a moral mission undertaken by people and communities of faith.

Since 1980, the United States has resettled over three million refugees, including religious minorities from Southeast Asia, the former Soviet Union, Afghanistan, Myanmar, and the Middle East.  *See* U.S. Dep't of State, Bureau of

Population, Refugees, and Migration, Report to Congress: Proposed Refugee Admissions for Fiscal Year 2024 (Oct. 2023). Many of those refugees were resettled pursuant to the Lautenberg Amendment, which targets for special consideration in refugee processing persons from the former Soviet Union who are Jews, Evangelical Christians, or active in the Ukrainian Catholic or Orthodox Churches, as well as members of religious minority groups in Iran, including Jews, Christians, Baha'is, Sabean-Mandeans, and Zoroastrians. *See* U.S. Comm'n for Refugees and Immigrants, *Lautenberg Program Fact Sheet* (Sept. 7, 2022), https://refugees.org/wp-content/uploads/2022/09/Lautenberg-Program-Fact-Sheet-9.7.2022.pdf. Even during periods of declining federal admissions quotas, faith-based agencies have sustained operations and publicly advocated for robust refugee protections. Their work reflects the broader religious and constitutional heritage of the United States: one in which freedom of conscience and the protection of religious minorities are mutually reinforcing values.

### B. America's Faith Traditions Share a Religious Commitment to Serving and Ministering to Refugees

Despite their differences, the faiths to which *amici*, their staffs, and their volunteers adhere place service to the stranger—refugees, immigrants, neighbors—at the core of their practices and systems of belief. For centuries, faith-based organizations have helped resettle the lion's share of refugees admitted to the United States through a wide range of services like housing, health care, childhood

education, language learning, and employment training. *See* Young-Joo Lee, *Welcoming Strangers: Protestant Churches' Involvement in Refugee Resettlement in the United States*, 63 J. for Sci. Study of Religion 388, 388-89 (2024) ("*Welcoming Strangers*"). Their contributions to the United States' longstanding commitment to welcoming migrants mean that without their actions, USRAP may not have been feasible. Notably, "sponsoring refugees necessitates strong commitment and active involvement of the stakeholders, including the clergy, church staff, elders, and laity." *Id*. at 389. This section canvasses the theological traditions of the religions represented by *amici* to illustrate a universal call on their members to welcome and care for refugees. *See, e.g.*, Christine M. Venter, *Human Dignity Has No Borders: Respecting the Rights of "People on the Move" and the Rights and Religious Freedom of Those Who Aid Them*, 46 BYU L. Rev. 1369, 1391-92 (2021) ("'[R]eligious beliefs are often said to evoke compassion towards the disadvantaged, which may be expected to extend to attitudes towards immigrants.'") (quoting Pazit Ben-Nun Bloom et al., *Religious Social Identity, Religious Belief, and Anti-Immigration Sentiment*, 109 Am. Pol. Sci. Rev. 203, 204 (2015)).

## 1.     Jewish Law and Teaching Command Compassion and Legal Protection for the Stranger

Judaism's ethical and legal commitments to refugees are grounded in both scriptural mandate and historical experience. The Tanakh—or Hebrew Bible— repeatedly commands that the stranger (*ger*, meaning foreigner or alien) be treated

- 13 -

with compassion, justice, and dignity. The Torah is unambiguous on that point: "You shall not oppress a stranger, for you know the feelings of the stranger, having yourselves been strangers in the land of Egypt." *Exodus* 23:9 (The Contemporary Torah). In *Leviticus*, Jews are again instructed to reflect on their own past as refugees: "The strangers who reside with you shall be to you as your citizens; you shall love each one as yourself, for you were strangers in the land of Egypt[.]" *Leviticus* 19:34 (The Contemporary Torah); *see also Deuteronomy* 10:19 (The Contemporary Torah) ("You too must befriend the stranger, for you were strangers in the land of Egypt."). That commandment is cited over thirty times in the Torah, more than any other ethical imperative. *See* Rabbi Lord Jonathan Sacks, *To Heal a Fractured World: The Ethics of Responsibility* 58 (2005). And beyond the Torah, rabbinical tradition—as expounded in the Talmud—elaborates on the commandment ("mitzvah") of caring for the vulnerable, reinforcing that the stranger's rights must be protected socially, economically, and judicially. *See* Rabbi Dan Moskovitz, *Save One Life, Save the Entire World (Including Yourself)*, Religious Action Ctr. of Reform Judaism (May 24, 2019), https://rac.org/blog/save-one-life-save-entire-world-including-yourself ("Whoever saves a single life is considered by scripture to have saved the whole world.").

For centuries, Jewish legal and moral philosophers have reinforced the importance of providing aid to the stranger. In his *Mishneh Torah*, Maimonides

described that obligation as one that requires "every human being to reach out to his fellow man to save him in his hour of distress." *See* Tsuriel Rashi, *Jewish Ethics Regarding Refugees: Ideology and Realization*, 37 J. L. & Religion 1 (2021). More recently, Rabbi Lord Jonathan Sacks emphasized that the biblical experience of exile calls on Jews to stand in solidarity with the stranger, because "God cares about the stranger, and so must we." Sacks, *supra*, at 59. And for centuries, Jewish liturgy has incorporated references to exile and displacement; the annual Passover seder serves as both a ritual remembrance of liberation *and* an act that reminds each generation of their historical identity and obligations as former refugees. Those obligations form the cornerstone of the work that both *amicus* Bet Tzedek and Plaintiff HIAS conduct with refugees in the United States.

### 2. Christianity Emphasizes Care for One's Neighbor by the Life and Teachings of Jesus Christ

There is a long Biblical foundation for hospitality, but nowhere is it made clearer that displaced persons are special in the eyes of God than the life and teachings of Jesus Christ. Whereas Christians believe that all are made in the "image" of God (*Genesis* 1:27 (New Int'l Version)) and that each person should treat others the way they would like to be treated (*see Matthew* 7:12 (New Int'l

Version))—known familiarly as the "Golden Rule"[2]—care for one's neighbor, including the refugee, is a core tenet of the Christian faith.

When Christ was an infant, the Holy Family fled the terror of Herod into Egypt. *See Matthew* 2:14-15 (New Int'l Version). And as an adult, Christ was an itinerant preacher, "but the Son of Man ha[d] no place to lay his head." *Matthew* 8:20 (New Int'l Version). In this way, Christ's mortal presence on Earth was unmistakenly marked by the refugee experience, without a permanent home and relying on the assistance of others to survive. In his public ministry, Christ also invited his followers to welcome *and* care for strangers and the less fortunate: "I was a stranger and you invited me in, I needed clothes and you clothed me, I was sick and you looked after me, I was in prison and you came to visit me . . . . [t]ruly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me." *Matthew* 25:35-40 (New Int'l Version) (internal quotation marks omitted).

Therefore, Christianity holds that by welcoming the stranger, Christ is welcomed himself, for in the face of the refugee, migrant, and immigrant, Christians are called to see the face of Christ. *See, e.g., Luke* 24:13-15 (New Int'l Version) (while on the road to Emmaus, the disciples welcomed a stranger to stay with them,

---

[2] *See Understanding the Golden Rule*, Scarboro Missions, https://www.scarboromissions.ca/golden-rule/understanding-the-golden-rule (last visited May 27, 2025) (explaining the universality and moral authority of the "Golden Rule").

only later realizing the stranger was the resurrected Christ). This faith teaching is operationalized into concrete action through the oft-quoted Bible passage that "faith without works is dead." *James* 2:15-17 (New Int'l Version) ("Suppose a brother or a sister is without clothes and daily food. If one of you says to them, 'Go in peace; keep warm and well fed,' but does nothing about their physical needs, what good is it? *In the same way, faith by itself, if it is not accompanied by action, is dead.*") (emphasis added).

###### a. The Catechism of the Catholic Church and Catholic Social Teaching Establish Care for Refugees as a Moral Imperative Requiring Action

In addition to the foregoing scriptural support for the Christian calling to care for refugees, the Catechism of the Catholic Church ("CCC") and Catholic Social Teaching ("CST")—derived from the Gospels and the words of Christ, papal and Roman Catholic church documents, and statements and pastoral letters of bishops around the world, including the bishops of the United States—adapt the original Biblical commands from God into teachings which Catholics are called upon to apply in their daily lives. *Seven Themes of Catholic Social Teaching*, U.S. Conf. of Catholic Bishops, https://www.usccb.org/beliefs-and-teachings/what-we-believe/catholic-social-teaching/seven-themes-of-catholic-social-teaching (last visited May 27, 2025) ("The Church's social teaching is a rich treasure of wisdom about building a just society and living lives of holiness amidst the challenges of

- 17 -

modern society."); *see also* Terry Coonan, *There Are No Strangers Among Us: Catholic Social Teachings and U.S. Immigration Law*, 40 Cath. Law. 105 (Fall 2000). The resettlement of displaced persons, including refugees, is contemplated in both the CCC and CST.

The Catholic Church's position on the resettlement of refugees is unequivocal, but not without exceptions. In this way, Catholics of "[t]he more prosperous nations" are called "to welcome the foreigner in search of the security and the means of livelihood," while national governments are still permitted to "make the exercise of the right to immigrate subject to various juridical conditions." CCC, No. 2241, Libreria Editrice Vaticana, Citta del Vaticano (1993). The acknowledgement for the role that "[p]olitical authorities" undertake in administering the resettlement of refugees renders the Catholic Church's position on care of displaced persons practical, not optional. *See Catholic Social Teaching (CST)*, Catholic Legal Immigration Network, Inc., https://www.cliniclegal.org/toolkits/community-education/catholic-social-teaching (last visited May 27, 2025) ("Catholic teaching views migration not as a divisive phenomenon, but as an occasion to build the human family[.] In this context, service to newcomers constitutes an obligation to persons of faith, not an option."). Specifically, the Catholic Church calls on its followers to "alleviat[e] the miseries of refugees dispersed throughout the world, and assist[] migrants and their families." CCC, No. 1911 (internal quotation marks omitted).

- 18 -

In the recent life of the Catholic Church, various pontiffs have formally spoken about the plight of refugees and the corollary duty of Catholics to practice their faith through deeds. In the first social encyclical, Pope Leo XIII established that persons have a right to work to survive and to support their family, yet do not do so in isolation, but rather with the support of one another. *See Rerum Novarum: Encyclical of Pope Leo XIII, On Capital and Labor*, Libreria Editrice Vaticana 15-05-1891, 50 (Rome). Pope Pius XII affirmed that migrants have a right to a life with dignity, and therefore a right to migrate, describing the Holy Family as the "archetype of every refugee family." *See Exsul Familia Nazarethana*, Apostolic Constitution 01-08-1952 (Rome). Later, Pope John XXIII clearly articulated migration as a right held by all persons: "[E]very human being has the right to freedom of movement and of residence within the confines of his own State. *When there are just reasons in favor of it, he must be permitted to emigrate to other countries and take up residence there*." *Pacem in Terris: Encyclical of Pope John XXIII, On Establishing Universal Peace in Truth, Justice, Charity, and Liberty*, Libreria Editrice Vaticana 11-04-1963, 25 (Rome) (emphasis added).

More recently, Pope Benedict XVI implored Americans to resettle refugees and highlighted this country's steadfast tradition of welcoming migrants. *See* Cardinal Roger M. Mahony, *Renewing Hope, Seeking Justice*, *in* People on the Move (Pontifical Council for Pastoral Care of Migrants and Itinerant People, No. 108,

2008) (quoting Pope Benedict, saying, "[C]ontinue to welcome the immigrants who join your ranks today, to share their joys and hopes, to support them in their sorrow and trials, and to help them flourish in their new home. This, indeed, is what your fellow countrymen have done for generations. From the beginning, they have opened their doors to the tired, the poor, the huddled masses yearning to breathe free. These are the people who America has made her own.") (internal quotation marks omitted). The late Pope Francis described aid to migrants as an occasion to "build a more just society, a more perfect democracy, a more united country, a more fraternal world and a more open and evangelical Christian community." *Message for the World Day of Migrants and Refugees, Migrants and Refugees: Towards a Better World (2014)*, Libreria Editrice Vaticana 05-08-2013 (Rome); *see also Encyclical Letter Fratelli Tutti of the Holy Father Francis on Fraternity and Social Friendship*, Libreria Editrice Vaticana 03-10-2020 (Assisi) (reminding the Catholic faithful that migrants "possess the same intrinsic dignity as any person").

### b. Protestant Denominations Embrace Christ's Call to Serve Those in Need, Including Refugees

The Bible is the common sacred text which, as set out above, expounds a rich theological tradition for Protestants of all denominations to attend to the wellbeing of immigrants. Support for this tradition can be traced to the Old Testament. *See, e.g.*, *Deuteronomy* 24:14 (New Int'l Version) ("Do not take advantage of a hired worker who is poor and needy, whether that worker is a fellow Israelite or a foreigner

residing in one of your towns."). And evidence for it can also be found in the New Testament, where, for example, believers in Christ are called to love their neighbors as they love themselves. *See Luke* 10:25-37 (New Int'l Version) (telling the Parable of the Good Samaritan); *see also Micah* 6:8 (New Int'l Version); *Isaiah* 1:17 (New Int'l Version).

"Go and do likewise," said Christ, when explaining that to "inherit eternal life," one must show mercy on a stranger. That teaching has no doubt been at the core of the Protestant Church's practices with respect to the resettlement of refugees.[3] For example, in response to the Second World War's devastating effects around the world, the 1940 General Conference of the Methodist Church (U.S.A.) passed a resolution to form a relief agency, originally named the Methodist Committee for Overseas Relief ("MCOR") to alleviate human suffering worldwide. *See Our History*, Global Ministries, The United Methodist Church, https://umcmission.org/umcor-our-history/ (last visited May 27, 2025). "Perceiving

---

[3] *See* Hiromi Chiba, *The Role of the Protestant Church in the US Refugee Resettlement Program during the Early Cold War Era: The Methodist Case*, 43 Exchange 9-28 (2014), *available at* https://www.researchgate.net/publication/344475207_The_Role_of_the_Protestant _Church_in_the_us_Refugee_Resettlement_Program_during_the_Early_Cold_Wa r_Era_The_Methodist_Case (explaining that the term "Protestant Church" is used in this context since the general attitudes and policies of Protestant denominations in the United States were expressed in statements and actions of the Church World Service as well as the National Council of the Churches of Christ in America, which coordinated Protestant refugee relief efforts nationwide) ("*The Role of the Protestant Church*").

refugee relief as an area of vital importance in which the church had a special mission, MCOR called on the church to fill its place in the plan of God and the needs of men." *The Role of the Protestant Church* at 69 (citation and internal quotation marks omitted). Following its establishment, MCOR reaffirmed its partnership with the federal government to resettle refugees in accordance with the Protestant Church's teachings as a "missionary enterprise to manifest God's love by practicing good neighborliness." *Id*. at 70 (relying on a 1957 MCOR report on the Refugee Relief Act of 1953 to explain that the migration crisis of the time meant that it was unthinkable to refrain from helping refugees since MCOR's efforts were a worthy and stimulating project for the life of the Protestant Church).

### 3.  Islamic Legal and Ethical Traditions Mandate Hospitality and Protection for the Oppressed

Islamic law and teaching—grounded in the concept of *amān*, or protection— affirms the moral and legal imperative to aid refugees. The Qur'an commands Muslims to defend the rights of the oppressed and provide refuge to those facing danger: "And why would you not fight in the cause of God, and the helpless men, and women, and children, cry out, 'Our Lord, deliver us from this town whose people are oppressive, and appoint for us from Your Presence a Protector[.]'" Qur'an 4:75, *translated in* Clear Quran, 65 (Talal Itani, 2024). Moreover, the Qur'an reinforces the obligation to provide full protection, care, and safety for refugees, even if they are not Muslim. Qur'an 9:6, *translated in* Clear Quran, 139 (Talal Itani, 2024). And

- 22 -

hadith—or subsequent commentaries by contemporaries of the Prophet Muhammad—further reinforce the value that Muslims place on assisting those in need. *See* Sunan At-Tirmidhi 1306, https://sunnah.com/tirmidhi:1306 ("Whoever grants respite to an indigent or alleviates it for him, Allah will shade him on the Day of Judgment under His Throne, a Day in which there is no shade except His shade.").

Islamic history also underscores the extent to which migrants and those who give them aid serve as binding moral exemplars. *See generally* Amir Hussain, *Toward a Muslim Theology of Migration*, *in* Theology of Migration in the Abrahamic Religions 173 (Elaine Padilla & Peter C. Phan eds., 2014). When Muhammad and the first converts to Islam—the Muhajirun—emigrated to Medina after their exile from Mecca, they were taken in by the Ansar, who provided them with shelter and support. The Qur'an praises the Ansar, who "love those who emigrated to them," "find no hesitation in their hearts in helping them[,]" and "give them priority over themselves, even if they themselves are needy[,]" adding that "[w]hoever is protected from his natural greed—it is they who are the successful." Qur'an 59:9, *translated in* Clear Quran, 449 (Talal Itani, 2024). Several years prior, some of Muhammad's followers fled to Abyssinia, in modern-day Ethiopia, seeking refuge from persecution in Mecca. There, they were taken in by a Christian king and given refuge. *See* Martin Lings, *Muhammad: His Life Based on the Earliest*

*Sources* 83-86 (2006). Those experiences remain central to the Muslim ethos of charity, or *zakat*, and of brotherhood, or *ummah*.

### C. The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs-Appellees' Favor Because *Amici*'s Work with Refugees Is Constitutionally Protected Religious Exercise

The Executive Order's burden on *amici*'s constitutionally protected free exercise of religion underscores how the balance of equities and the public interest weigh strongly in favor of affirming the District Court's preliminary injunction. Where a plaintiff raises "serious First Amendment questions[,]" it "compels a finding" that "*at the very least the balance of hardships tips sharply in the plaintiff's favor.*" *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up) (emphasis added). In the past, the Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citation omitted).

Under the First Amendment, "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. Const. amend. I (emphasis added). That fundamental guarantee of religious freedom is meant to protect "[f]reedom of conscience and freedom to adhere to such religious

- 24 -

organization or form of worship as [an] individual may choose." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). "[T]he goal of the [Religion] [C]lauses is clear: to carry out the Founders' plan of preserving religious liberty to *the fullest extent possible* in a pluralistic society." *McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 882 (2005) (O'Connor, J., concurring) (emphasis added). For *amici*, the outcome of this appeal may determine whether that promise is kept.

There is a difference between "refusal claims" and "affirmative claims" with respect to the free exercise of religion. "Refusal claims arise when a law or government policy mandates a person to act in ways that are contrary to her faith, and she refuses to comply[,]" whereas "affirmative claims involve religious exercise that originates with the claimant's faith. A religious person or entity engages in conduct in accordance with faith, but the conduct is met with legal restraint—a law prohibiting or curtailing that religious exercise." Angela C. Carmella, *Progressive Religion and Free Exercise Exemptions*, 68 U. Kan. L. Rev. 535, 541 (2019) ("*Progressive Religion*"). According to Professor Carmella, the key to understanding the difference between refusal and affirmative claims is understanding "the relationship between religious traditions and the exercise of faith[.]" *Id*. at 542. When required by religion, loving one's neighbor and welcoming the stranger, while general commands, place a burden on the adherents of a faith tradition to "us[e] the hermeneutics of their texts, the ceremonies of their

- 25 -

ancestors, or examination of conscience, to decide the ways in which these commands will be manifested and expressed." *Id.*

By providing charitable, social, and humanitarian aid, *amici*, their employees, and their volunteers exercise their "freedom to act" as an affirmative claim under the First Amendment according to their sincerely held religious beliefs. *See Welcoming Strangers* at 389 ("Churches participating in refugee resettlement processes handle the logistics, which include a wide range of activities, including greeting them at the airport, helping them secure initial housing arrangements, and assisting them in finding work."). Indeed, charity—in its many forms ranging from welcoming refugees to supporting the communities and organizations to which they belong—is a "central tenet of all major religions." *W. Presbyterian Church v. Bd. of Zoning Adjustment*, 862 F. Supp. 538, 544 (D.D.C. 1994). And the Free Exercise Clause protects both belief and conduct motivated by sincerely held religious convictions. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see generally Progressive Religion* at 578 (explaining that where there is "a conflict between religious exercise and law, with law restraining service to the poor in ways that do not serve a compelling interest in a least restrictive manner[,]" courts have "agreed with the churches' arguments that their affirmative acts in service to the poor, even in wealthy neighborhoods, were as central to their faith as worship and should not be restrained").

- 26 -

The First Amendment's Free Exercise Clause protects both individual believers and institutions—including religious organizations—from laws that substantially burden their ability to practice their faith. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989). The challenged Executive Order directly interferes with the missions of faith-based organizations (and organizations whose members are driven by faith) that view the resettlement of refugees as a core tenet of their religious practice. And although general religious commands invite the adherents of those faiths to choose how they will follow those commands, the mere existence of legally permissible alternatives does not negate the fact that the religious actor, in the first instance, chooses how to exercise their faith. *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). The balance of equities in this case plainly favors an injunction. *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

- 27 -

### 1. The Executive Order Impermissibly Burdens Religious Practice

While neutral and generally applicable laws may burden religious exercise without being subject to strict scrutiny, *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990), that is not the case where—as here—the challenged action is neither neutral nor generally applicable. *See Fulton v. City of Philadelphia*, 593 U.S 522, 533 (2021). Laws lack general applicability if they restrict religious conduct while permitting secular conduct that "undermines the government's asserted interests in a similar way." *Id*. at 534. The Administration's recent decision to admit white South African refugees on dubious humanitarian grounds with little, if any vetting, demonstrates the hollowness of its security-based justifications for the Executive Order. *See* Teo Armus & Emily Wax-Thibodeaux, *White South Africans arrive at Dulles as refugees under Trump order*, Wash. Post (May 12, 2025); Hamed Aleaziz & Michael Crowley, *Inside the Extraordinary Contradictions in Trump's Immigration Policies*, N.Y. Times (May 13, 2025) ("P. Deep Gulasekaram, a professor of immigration law at the University of Colorado Law School, said the exceptions made for white Afrikaners—while other groups are kept out—'overtly advances a narrative of global persecution of whites.'"). Yet, even before May 2025, the government had utterly failed to show that the Executive Order was narrowly tailored or justified by a compelling interest, *Fulton*, 593 U.S. at 541, let alone one

that employed the least restrictive means.  *See Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 576 (2d Cir. 2002).

On the contrary, the Executive Order is grossly overbroad and fails to target specific conduct or credible threats to national security and public safety.  As the District Court found, the Executive Order functionally imposes a blanket ban on the entry of refugees into the United States and "unlawfully overrides" USRAP in its entirety, with resumption contingent solely on the President's determination that allowing refugee entries "'is in the interests of the United States.'"  *Pacito v. Trump*, No. 2:25-cv-255-JNW, 2025 WL 655075, at *10 (W.D. Wash. Feb. 28, 2025) (quoting Executive Order §§ 1, 4).  The Executive Order points to "public safety and national security" as "paramount considerations" in the administration of USRAP.  Yet it proceeds to ban refugee resettlement altogether, subject to limited "case-by-case" exceptions at the joint discretion of the Secretary of State and Secretary of Homeland Security.  Executive Order § 3(c).  The only exception that they have made so far—for the South African refugees—cannot reasonably be seen as being in the "national interest" when viewed against the backdrop of the Administration's stated goal of "Standing Up For Religious Freedom," *Fact Sheet: President Donald J. Trump Establishes the Religious Liberty Commission*, The White House (May 1, 2025), or, in the alternative, years of religious animus from the President himself.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 731 (2018) (Sotomayor, J., dissenting).

For *amici*, assisting with the resettlement of refugees in the United States is religiously mandated activity. As described *supra*, religious teachings across faiths emphasize a divine imperative to welcome and serve the stranger. For instance, in the Christian tradition, "faith without works is dead[,]" *James* 2:26 (New Int'l Version), such that freely holding one's religious beliefs requires positive action in accordance with those beliefs. *Amici* and their members adhere to their various faiths through action. Between them, *amici* sponsor and place refugee families, provide legal aid and asylum application assistance, offer English language and job training courses, provide necessities for life, and furnish spiritual and emotional support. Those activities are not just charitable services, but in many cases—for *amici* or their constituents—they are clear religious obligations as well. The tremendous burden the Executive Order places on *amici*'s shared religiously motivated practice of directly or indirectly assisting with refugee resettlement compels a finding that the balance of equities and the public interest weigh strongly in Plaintiffs-Appellees' favor.

### 2. The Executive Order Threatens Religious Freedom and Civil Society

Beyond constitutional doctrine, the Executive Order threatens the fabric of American pluralism. Faith-based organizations, like many of the *amici* here, have historically formed the backbone of civil society. *See* Section I.A, *supra*. These groups provide humanitarian and legal services with cultural competence, moral clarity, and a commitment to communities across the United States.

Penalizing that work based on theological commitments not only violates the Free Exercise Clause, but it also undermines the promise of inclusion and religious diversity embodied in the U.S. Constitution more broadly. The Administration threatens to undo refugee resettlement today, but tomorrow, it could be prison ministry, disaster relief, or medical missions. When government policy compels religious organizations to choose between pursuing their faith-based mission and complying with government regulations that absolutely impede completion of that mission, the constitutional injury is immediate and corrosive.

## CONCLUSION

Considering the centuries-long, constitutionally protected tradition of faith-based refugee resettlement in the United States, the balance of equities and the public

interest strongly weigh in favor of Plaintiffs-Appellees.  For the foregoing reasons,

*amici* respectfully submit that the District Court's injunctions should be affirmed.


Dated:  May 27, 2025


                                       /s/ Linda Dakin-Grimm
                                        Atara Miller
                                        Victor Hollenberg
                                        Alex Ruppert
                                        MILBANK LLP
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone: 212-530-5000
                                        Facsimile: 212-530-5219

                                        Linda Dakin-Grimm
                                        MILBANK LLP
                                        2029 Century Park East, 33rd Floor
                                        Los Angeles, California 90067
                                        Telephone: 424-386-4000
                                        Facsimile: 213-629-5063

                                        ATTORNEYS FOR *AMICI CURIAE*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  25-1313, 25-1939

I am the attorney or self-represented party.

**This brief contains 7,000 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[XX] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.

    [  ] a party or parties are filing a single brief in response to multiple briefs.

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

/s/ Linda Dakin-Grimm

- 33 -