**No. 25-1313, 25-1939**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACITO; ET AL.

*Plaintiffs-Appellees*,

*v.*

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Western District of Washington, Case No. 2:25-cv-255-JNW

**BRIEF FOR AMICUS CURIAE REFUGEE COUNCIL USA IN SUPPORT OF PLAINTIFFS-APPELLEES**

SUNIL R. VARGHESE
REFUGEE COUNCIL USA
1 Thomas Circle NW
Suite 700
Washington, DC 20009
(202) 573-7346
svarghese@rcusa.org

SARAH M. RICH
SOMIL B. TRIVEDI
DEMOCRACY FORWARD
P.O. Box 34553
Washington, D.C. 20043
(202) 274-7652
srich@democracyforward.org
strivedi@democracyforward.org

May 27, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus does not have a parent corporation and is not a publicly traded company.  No publicly held corporation owns 10% or more of amicus's stock.

Dated:  May 27, 2025                    Respectfully submitted,


                                        *s/ Sarah M. Rich*
                                        SARAH M. RICH
                                        *Attorney for Amicus Refugee Council USA*

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF AMICUS ................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ............................................................................... 4

I.      THE UNITED STATES HAS A LONG HISTORY AND TRADITION OF
        RESETTLING AT-RISK REFUGEES. ...................................... 4

II.     REFUGEES FACE ONGOING RISKS AND HARMS IN THEIR
        CURRENT COUNTRIES OF TEMPORARY REFUGE. ........................... 11

III.    FOR MANY REFUGEES, THE UNITED STATES IS THE ONLY
        COUNTRY WHERE THEY HAVE A REALISTIC OPPORTUNITY FOR
        RESETTLEMENT. ...................................................... 16

IV.     FOR MANY REFUGEES, THE UNITED STATES IS THE ONLY
        COUNTRY WHERE THEY CAN REUNITE WITH RELATIVES. ..................... 20

V.      IF THE EXECUTIVE ORDER IS NOT ENJOINED, MANY REFUGEES
        COULD BE REMOVED TO THEIR HOME COUNTRIES, WHERE THEY
        WOULD EXPERIENCE CONTINUED PERSECUTION AND VIOLENCE. ............... 23

CONCLUSION .......................................................................... 26

CERTIFICATE OF COMPLIANCE ......................................................... 28

CERTIFICATE OF SERVICE ............................................................. 29

# TABLE OF AUTHORITIES

Page(s)

## CASES

*HIAS, Inc. v. Trump,* 415 F. Supp. 3d 669 (D. Md. 2020), *aff'd*, 985
F.3d 309 (4th Cir. 2021)...................................................................7

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ...............................2

## STATUTES AND RULES

8 U.S.C. § 1157 ....................................................................................20

Fed. R. App. P. 29 ................................................................................1

Fed. R. App. P. 32 ................................................................................1

## EXECUTIVE AND AGENCY MATERIALS

Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025) .........................*passim*

Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) .............................3, 12

Library of Congress, *Religion and the Founding of the American
Republic*, https://www.loc.gov/exhibits/religion/rel01.html (last
visited May 25, 2025) ........................................................................5

National Park Service, *The Immigrant's Statue* (Feb. 26, 2015),
https://www.nps.gov/stli/learn/historyculture/the-immigrants-
statue.htm ........................................................................................5

Office of Refugee Resettlement, *Unaccompanied Refugee Minors
Program* (May 6, 2025),
https://acf.gov/orr/programs/refugees/urm; ..................................17

President Ronald Reagan, Statement on United States Immigration &
Refugee Policy (July 30, 1981),
https://www.presidency.ucsb.edu/documents/statement-united-
states-immigration-and-refugee-policy ..........................................7

USCIS, *Refugees and Asylum* (Nov. 12, 2015),
https://www.uscis.gov/humanitarian/refugees-asylum ................................... 5

USCIS, *Refugee Processing and Security Screening* (Mar. 14, 2024),
https://www.uscis.gov/humanitarian/refugees-and-
asylum/refugees/refugee-processing-and-security-screening ......................... 9

USCIS, *The United States Refugee Admissions Program (USRAP)
Consultation and Worldwide Processing Priorities* (Nov. 22,
2024), https://www.uscis.gov/humanitarian/refugees-and-
asylum/usrap#:~:text=Department%20of%20Homeland%20Sec
urity%20(DHS,and%20services%20to%20arriving%20refugees
(last visited May 25, 2025) ........................................................................... 9

U.S. State Dep't, *U.S. Refugee Admissions Program Access
Categories*, https://2017-2021.state.gov/refugee-admissions/u-
s-refugee-admissions-program-access-categories/ (last visited
May 27, 2025) ............................................................................................. 10

## OTHER AUTHORITIES

Beth Bailey, *Calculating the human toll of the US exit from
Afghanistan three years later*, Washington Examiner (Aug. 23,
2024), https://www.washingtonexaminer.com/magazine-
features/3129402/calculating-the-human-toll-of-the-us-exit-
from-afghanistan-three-years-later/ ............................................................ 18

Yama Bariz, *Pakistan expels tens of thousands of Afghans*, BBC (Apr.
19, 2025), https://www.bbc.com/news/articles/c74z19pl7wgo ................... 24

Carl J. Bon Tempo & Hasia R. Diner, *Immigration: An American
History* (2022) ............................................................................................. 6

Anastasia Brown & Todd Scribner, *Unfulfilled Promises, Future
Possibilities: The Refugee Resettlement System in the United
States*, 2 J. Migration & Hum. Sec. 101 (2014) .......................................... 7

Doctors Without Borders, *Echoes of violence in the Rohingya camps of Cox's Bazar* (Dec. 4, 2024), https://www.doctorswithoutborders.org/latest/echoes-violence-rohingya-camps-coxs-bazar ......................................................................11

Andrea Gillespie, *Left Behind: Refugee Ban Abandons Vulnerable Orphans*, Human Rights First (Aug. 2, 2017), https://humanrightsfirst.org/library/left-behind-refugee-ban-abandons-vulnerable-orphans/; .................................................................17

Daniel A. Gross, *The U.S. Government Turned Away Thousands of Jewish Refugees, Fearing That They Were Nazi Spies*, Smithsonian Magazine (Nov. 18, 2015), https://www.smithsonianmag.com/history/us-government-turned-away-thousands-jewish-refugees-fearing-they-were-nazi-spies-180957324/; ...............................................................6

Diaa Hadid & Juliana Kim, *Afghans who helped the U.S. are in dangerous limbo after Trump's order on refugees*, NPR (Jan. 27, 2025), https://www.npr.org/2025/01/27/nx-s1-5273521/trump-executive-order-refugee-afghanistan-veterans....................18

Migration Policy Institute, *U.S. Annual Refugee Resettlement Ceilings and Number of Refugees Admitted, 1980-Present*, https://www.migrationpolicy.org/programs/data-hub/charts/us-refugee-resettlement (last visited May 25, 2025)...........................................9

Stephanie J. Nawyn, *Faithfully Providing Refuge: The Role of Religious Organizations in Refugee Assistance and Advocacy* (Ctr. for Compar. Immigr. Stud., Working Paper No. 115, 2005) ...........................................................................7

Andrew Roth, *Trump refugee ban 'strands Afghans endangered by US withdrawal'*, The Guardian (Jan. 20, 2025), https://www.theguardian.com/us-news/2025/jan/21/donald-trump-inauguration-refugee-ban-afghanistan. ...............................................21

UNHCR, *Family Reunification*, https://www.unhcr.org/us/what-we-do/build-better-futures/solutions/complementary-pathways/family-reunification (last visited May 25, 2025)...................20, 21

UNHCR, *Global Trends: Forced Displacement in 2023* (2024),
https://www.unhcr.org/us/global-trends-report-2023 ...................................12

UNHCR, *Refugee Data Finder*, https://www.unhcr.org/refugee-
statistics/download (last visited May 27, 2025)............................................10

UNHCR, *Refugee Data Finder: Key facts for countries hosting the
world's refugees*, https://www.unhcr.org/refugee-
statistics/insights/explainers/refugee-hosting-metrics.html (last
visited May 26, 2025) ...........................................................................11, 12

UNHCR, *Refugee Resettlement: An International Handbook to Guide
Reception and Integration* 276 (2002),
https://www.unhcr.org/media/refugee-resettlement-
international-handbook-guide-reception-and-integration-
chapter-3-3 ...................................................................................................17

UNHCR, *Resettlement, Complementary Pathways, and Family
Reunification*, https://reporting.unhcr.org/global-report-
2023/outcome-areas/resettlement-complementary-pathways-
and-family-reunification (last visited May 27, 2025) .....................................8

UNHCR U.S., *Frequently Asked Questions*,
https://www.unhcr.org/us/contact-us/frequently-asked-
questions (last visited May 25, 2025) .............................................................5

UNHCR U.S., *Information on UNHCR Resettlement*,
https://www.unhcr.org/us/what-we-do/resettlement-united-
states/information-unhcr-resettlement (May 25, 2025) ...........................16, 17

U.S. Holocaust Memorial Museum, *Americans and the Holocaust:
How Many Refugees Came to the United States from 1933-
1945?*, https://exhibitions.ushmm.org/americans-and-the-
holocaust/how-many-refugees-came-to-the-united-states-from-
1933-1945 (last visited May 25, 2025) ............................................................6

U.S. Holocaust Memorial Museum, *Voyage of the St. Louis* (Jun. 18,
2024),
https://encyclopedia.ushmm.org/content/en/article/voyage-of-
the-st-louis....................................................................................................6

## STATEMENT OF INTEREST OF AMICUS

The Refugee Council USA (RCUSA) is a national coalition of refugee and asylum service and advocacy organizations, including faith-based, human rights, and immigrant groups, dedicated to the protection of forcibly displaced people in the United States. As a thought leader and convener, RCUSA advances collective learning and action to respond to displacement crises, transform humanitarian systems, and help affected communities.

RCUSA's member agencies include organizations directly involved in identifying, referring, and processing refugees overseas who are in extraordinary need of resettlement as a critical tool of protection against physical harm and as a long-term durable solution to their plight. These agencies work closely with the U.S. government, the Office of the United Nations High Commissioner for Refugees (UNHCR), other partner organizations, and refugees themselves to support and strengthen the U.S. Refugee Admissions Program (USRAP).

Based on its decades of experience with USRAP, RCUSA submits this brief to provide the Court with context and first-hand accounts regarding the serious and permanent harm that will result if this program is suspended for refugees whose cases have been submitted to or approved by the U.S. for resettlement.[1]

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), RCUSA states that no party's counsel authored this brief in whole or in part, and that no party, party's

- 1 -

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus RCUSA submits this brief to highlight the irreparable harm to refugees that Appellants' challenged actions have caused and will continue to cause if the injunctions at issue are vacated. Appellants' arguments under the equitable preliminary injunction factors assume that the named individual Appellees and the refugee class members they represent will not face "significant risk of harm" in the "third countries" where they currently reside while they await admission or consideration for admission to the United States.[2] Appellants also appear to contend that refugees who have managed to survive persecution and violence while waiting in their home countries for resettlement will continue to "safely" get by.[3]

Appellants' arguments are inconsistent with the realities experienced by RCUSA, its member organizations, and the refugees they support. As one refugee recently expressed:

> I ask that the court considers how this ban has destroyed everything we have been holding [on to] for the past ten years – our hope, our health, and our future. We just want the chance to

---

counsel, or person other than RCUSA, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] Opening Br. at 48; *see also Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (discussing the standard for irreparable harm in the preliminary injunction analysis).

[3] *Id.*

live a life without fear and suffering, and the U.S. resettlement program was our only way to do that.[4]

The refugees served by RCUSA and its member organizations face severe risks to their lives, health, and livelihoods, both in the temporary host countries where they are currently living and in the home countries from which they fled. These risks will continue unless the injunctions ordered by the District Court are kept in place and complied with. Many refugees are not qualified to resettle in countries other than the United States, including, for example, those who are unaccompanied minors and those who are refugees precisely because of their cooperation or engagement with the U.S. government. Additionally, the abrupt nature of the challenged Executive Orders[5] has separated many refugee families, with some family members resettled in the United States and others left in limbo. For refugees with family members in the United States, their only realistic opportunity for reuniting with those family members is if they also are resettled in

---

[4] Comments of Ms. P., a Congolese refugee who fled to Kenya when her family was hunted down due to their ethnicity. In preparation for submission of this amicus brief, RCUSA interviewed and solicited comments from member agencies, partners, and refugees regarding the impact of the Defendants' enjoined actions. RCUSA has included comments from these interviews throughout this brief. To protect their safety and privacy, individuals are identified by either the first initial of their last names or a pseudonym (indicated with quotation marks).

[5] Exec. Order No. 14163, 90 Fed. Reg. 8,459 (Jan. 20, 2025) (the "Refugee Executive Order"); Exec. Order No. 14169, 90 Fed. Reg. 8,619 (Jan. 20, 2025) (the "Foreign Aid Executive Order"); collectively, the "Executive Orders."

the United States. Further, if the preliminary injunctions are removed, many refugees in temporary host countries will be forced back to the home countries they fled, where they will suffer further persecution and violence. And the Executive Orders will not only harm refugees. They will also put an end to the United States' role as a country of safety and opportunity for people fleeing persecution around the world.

Amicus RCUSA urges this Court to affirm the District Court's injunctions not only because Appellees are likely to succeed on the merits, as the Answering Brief shows, but also because Appellants' actions will cause severe, long-lasting harm to hundreds of thousands of refugees across the globe.

## ARGUMENT

### I. THE UNITED STATES HAS A LONG HISTORY AND TRADITION OF RESETTLING AT-RISK REFUGEES.

As Appellees highlight in their Opening Brief, the Executive Orders at issue in this appeal relate to the U.S. Refugee Admissions Program (USRAP). This is a separate program—and separate path to citizenship—from the U.S. asylum system, which is available to noncitizens who are already present in the United States or at

its borders.[6]  Since its inception in 1980, the USRAP has resettled approximately 3.3 million refugees[7], playing a vital role both in protecting refugees fleeing war-torn or authoritarian countries and in cementing the United States' leadership in protecting vulnerable populations.

The history of America is, in significant part, a history of refugees.  The New England colonies, New Jersey, Pennsylvania, and Maryland were all created by Europeans fleeing violent religious persecution.[8]  Before the country had an official refugee program, it had Emma Lazarus' words on the Statue of Liberty—also known as the "Mother of Exiles." [9]  In the 19th and early 20th centuries, prior to the onset of immigrant quota statutes in the 1920s, many immigrants came to the United States

---

[6] *See* USCIS, *Refugees and Asylum* (Nov. 12, 2015) https://www.uscis.gov/humanitarian/refugees-asylum (last visited May 27, 2025); UNHCR U.S., *Frequently Asked Questions*,  (last visited May 25, 2025); https://www.unhcr.org/us/contact-us/frequently-asked-questions (last visited May 25, 2025);

[7] *See* SER-254–255.

[8] Library of Congress, *Religion and the Founding of the American Republic*, https://www.loc.gov/exhibits/religion/rel01.html (last visited May 25, 2025).

[9] National Park Service, *The Immigrant's Statue* (Feb. 26, 2015), https://www.nps.gov/stli/learn/historyculture/the-immigrants-statue.htm (last visited May 27, 2025).

fleeing persecution, although they were not required to provide any specific reason for immigrating under the laws that existed at that time.[10]

The global scale of suffering caused by World War II and its aftermath jump-started America's modern role in refugee resettlement. The United States accepted approximately 200,000 refugees fleeing the Nazis in the 1930s and 1940s, more than any other country in the world.[11] The U.S. government continued to provide formal resettlement opportunities in the post-War period, frequently working with faith-based groups: the INA amendments in the 1960s and 1970s allowed refugees temporary status, and the Refugee Act in 1980 created USRAP via nearly

---

[10] *See* Carl J. Bon Tempo & Hasia R. Diner, *Immigration: An American History* (2022) 124-27 (discussing various immigration streams to the U.S. in the late 1800s, including "people from the Balkans and regions within the Ottoman Empire, such as Armenians, best considered refugees," and "Eastern European Jewish" immigrants who fled "pogroms, violent outbursts against Jews").

[11] United States Holocaust Memorial Museum, *Americans and the Holocaust: How Many Refugees Came to the United States from 1933-1945?*, https://exhibitions.ushmm.org/americans-and-the-holocaust/how-many-refugees-came-to-the-united-states-from-1933-1945 (last visited May 25, 2025). Even as the United States saved many refugees from the Nazi regime, it turned back others it easily could have accepted due to overblown, antisemitic concerns over spying and the immigration quotas in place at that time. *See* Daniel A. Gross, *The U.S. Government Turned Away Thousands of Jewish Refugees, Fearing That They Were Nazi Spies*, Smithsonian Magazine (Nov. 18, 2015), https://www.smithsonianmag.com/history/us-government-turned-away-thousands-jewish-refugees-fearing-they-were-nazi-spies-180957324/; United States Holocaust Memorial Museum, *Voyage of the St. Louis* (Jun. 18, 2024), https://encyclopedia.ushmm.org/content/en/article/voyage-of-the-st-louis

unanimous, bipartisan legislation that has been repeatedly reauthorized.[12]  In these decades, Presidents of both parties supported refugee assistance, as the United States accepted hundreds of thousands of Hungarian, Cuban, Vietnamese, and other refugees fleeing wars and dictatorships in their home countries.[13]  President Reagan famously welcomed those fleeing communist persecution, saying, "[w]e shall continue America's tradition as a land that welcomes peoples from other countries. We shall also, with other countries, continue to share in the responsibility of welcoming and resettling those who flee oppression."[14]

Between 1975 and 2024, the U.S. accepted more than 3.6 million refugees for permanent resettlement, reaffirming its historical role as a leader in providing humanitarian protection and welcoming persecuted and displaced persons.[15]  As described in the most recent annual *Report to the Congress* on refugee admissions:

---

[12] *See* Anastasia Brown & Todd Scribner, *Unfulfilled Promises, Future Possibilities: The Refugee Resettlement System in the United States*, 2 J. Migration & Hum. Sec. 101, 104-05 (2014); *HIAS, Inc. v. Trump,* 415 F. Supp. 3d 669, 674-75 (D. Md. 2020), *aff'd,* 985 F.3d 309 (4th Cir. 2021); Stephanie J. Nawyn, *Faithfully Providing Refuge: The Role of Religious Organizations in Refugee Assistance and Advocacy*, (Ctr. for Compar. Immigr. Stud., Working Paper No. 115,  2005).

[13] *See* Brown & Scribner, *supra*, at 104-06.

[14] President Ronald Reagan, Statement on United States Immigration & Refugee Policy (July 30, 1981), https://www.presidency.ucsb.edu/documents/statement-united-states-immigration-and-refugee-policy.

[15] SER-254–255.

[USRAP] is a critical demonstration of the United States' efforts to extend hope and relieve suffering globally through refugee resettlement, as record numbers of people around the world have been forced to flee war, persecution, and instability. Nearly 118 million people are now forcibly displaced worldwide, more than at any other time in history. According to the United Nations High Commissioner for Refugees (UNHCR), nearly three million refugees are now in need of protection through third-country resettlement. Through resettlement, the United States provides an opportunity for some refugees to pursue a life of safety and dignity without fear of persecution. In doing so, the United States reaffirms its role as a global leader, upholds our nation's core values, and builds on the long, enduring history of American communities providing a warm welcome to those fleeing persecution."[16]

This global leadership role has inspired many other countries to join in the global refugee resettlement effort. Twenty-three other countries now participate in the resettlement program coordinated by UNHCR, thanks in large part to the example set by the United States.[17]

USRAP receives refugee referrals from a small number of defined pathways, including, most significantly, UNHCR, which accounts for most of the cases entering the program ("Priority 1" referrals).  Other pathways include referrals from a U.S. Embassy or a designated NGO (also "Priority 1"), referrals from designated groups of "special humanitarian concern" identified by the Department of State ("Priority 2"), the family reunification program ("Priority 3"), and a private

---

[16] SER-191.

[17] UNHCR, *Resettlement, Complementary Pathways, and Family Reunification*, https://reporting.unhcr.org/global-report-2023/outcome-areas/resettlement-complementary-pathways-and-family-reunification (last visited May 27, 2025).

- 8 -

sponsorship program ("Priority 4").[18]  All refugees applying to USRAP are subject to lengthy and extensive screening and security processes before they are approved for potential resettlement.[19]  And the number of approved refugees admitted to the United States in any calendar year is subject to an annual ceiling.

The United States' annual admissions of at-risk refugees have been significant and consistent to the present day.  And critically, UNHCR has relied on these consistent, predictable admissions to protect millions of at-risk refugees across the globe.  The chart below summarizes both the annual ceilings and the number of admitted refugees since the 1980 creation of USRAP.[20]

---

[18] USCIS, *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities* (Nov. 22, 2024), https://www.uscis.gov/humanitarian/refugees-and-asylum/usrap#:~:text=Department%20of%20Homeland%20Security%20(DHS,and%20services%20to%20arriving%20refugees) (last visited May 25, 2025).

[19] USCIS, *Refugee Processing and Security Screening* (Mar. 14, 2024), https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugee-processing-and-security-screening (last visited May 27, 2025).

[20] Migration Policy Institute, *U.S. Annual Refugee Resettlement Ceilings and Number of Refugees Admitted, 1980-Present*, https://www.migrationpolicy.org/programs/data-hub/charts/us-refugee-resettlement (last visited May 25, 2025).



U.S. Refugee Admissions & Refugee Resettlement Ceilings, FY 1980-2025*

Consistent with this long history and the many millions of at-risk refugees across the globe, the Presidential Determination on Refugee Admissions for Fiscal Year 2025 set the admissions ceiling at 125,000, of which the vast majority would have comprised UNHCR-referred refugees. [21]

---

[21]  *See* SER-183–184; UNHCR, *Refugee Data Finder*, https://www.unhcr.org/refugee-statistics/download (last visited May 27, 2025); U.S. State Dep't, *U.S. Refugee Admissions Program Access Categories*, https://2017-2021.state.gov/refugee-admissions/u-s-refugee-admissions-program-access-categories/ (last visited May 27, 2025).

## II.    REFUGEES FACE ONGOING RISKS AND HARMS IN THEIR CURRENT COUNTRIES OF TEMPORARY REFUGE

Appellants suggest that Appellees are not at risk of harm because all but one of the individual Appellees are currently living in "third countries."[22] This argument ignores the severe economic, health, and personal safety harms that refugees commonly suffer in the "third" host countries where they live before permanent resettlement.

Most refugees do not find immediate stability once they escape their home countries. Significantly, 69% of refugees are hosted by countries that neighbor their home countries.[23] Neighboring host countries are often themselves unstable, and can expose refugees to the same harms they were fleeing just across the border.[24] Equally problematic, approximately 71% of refugees are hosted in low- and middle-income, developing countries.[25] This means that the world's poorest countries host a disproportionate share of refugees, creating a background environment of

---

[22] Opening Br. at 48-49.

[23] UNHCR, *Refugee Data Finder: Key facts for countries hosting the world's refugees*, https://www.unhcr.org/refugee-statistics/insights/explainers/refugee-hosting-metrics.html (last visited May 26, 2025).

[24] *See, e.g.*, Doctors Without Borders, *Echoes of violence in the Rohingya camps of Cox's Bazar* (Dec. 4, 2024), https://www.doctorswithoutborders.org/latest/echoes-violence-rohingya-camps-coxs-bazar (describing dangers faced by Rohingya refugees who fled Myanmar for neighboring Bangladesh).

[25] UNHCR, *Refugee Data Finder: Key facts for countries hosting the world's refugees*, *supra*.

instability which can often make it impossible for refugees to obtain financial or personal security.[26] Further, refugees are often unable to secure legal status in these host countries, leaving them without access to housing, health, and educational opportunities that they would be eligible for if permanently resettled.[27] Many refugees' only options for housing are in cramped, temporary quarters, whether in camps or urban areas, creating a lack of privacy and serious health concerns.[28]

Consistent with this, the field staff of one of RCUSA's member organizations reported that they anticipate the consequences of the Refugee Executive Order, Foreign Aid Executive Order, and related funding termination decisions will include increased child labor, increased child recruitment by armed forces, deteriorated health status including lack of control of diabetes and HIV, and increased mental health concerns including suicide attempts by children and adults.[29] This harms not only the refugees themselves, but global stability and therefore the United States' own interests.

---

[26] *Id.*; *see also* UNHCR, *Global Trends: Forced Displacement in 2023*, at 2–3 (2024), https://www.unhcr.org/us/global-trends-report-2023.

[27] *See infra*, 15-16, 23-25.

[28] *See, e.g.*, Hanadi Syam, et al., "*With every passing day I feel like a candle, melting little by little.*" *Experiences of long-term displacement amongst Syrian refugees in Shatila, Lebanon*, 13 Conflict & Health 45 (2019).

[29] Comments of Ms. S., field office staff of RCUSA member organization located in East Africa.

Appellees' brief provides multiple examples of refugees who are not safe in their host countries for these or similar reasons, including Appellees Pacito and Sara.[30]  Amicus RCUSA and its member organizations have worked with many refugees who face similar challenges.

For example, Ms. P., an RCUSA member organization client from the Democratic Republic of the Congo (DRC), has been displaced from her home since 2016.  In the DRC, Ms. P.'s tribe was systematically "hunted down, attacked, and killed" solely for their tribal affiliation.  Ms. P.'s father worked at a school and was attacked and stabbed in the shoulder for attempting to protect young female students from violence.  Ms. P., her mother, and her father escaped to Kenya, where they have lived since 2016.  Her parents have since suffered severe health issues, including diabetes, heart failure, and depression, and the organizations that were providing them with medical care in Kenya have ceased doing so following Appellants' actions to suspend funding.  Ms. P. had to quit her job and efforts to pursue higher education to care for her parents.  Ms. P. and her parents had been approved for resettlement in the United States to live with her cousin, who had committed to support them.  But their February 5, 2025 flight was canceled after the Refugee Executive Order.  The family is now living "in constant fear and

---

[30] *See* Answering Br. at 22–24, 70–72; ER-808–09, -811–12 (Supplemental Complaint).

uncertainty," and Ms. P. reports that she is "struggling to keep everything together while feeling like I am losing everything."[31]

In another example of the irreparable harms suffered by refugees due to the Executive Orders, an RCUSA member organization worked with twenty refugees in a West African host country whose cases were submitted to the USRAP for urgent processing. The principal applicants in these cases were leaders in their refugee camp who uncovered serious instances of corruption and exploitation perpetrated by some of the camp managers in relation to the provision of basic services. As whistleblowers, these refugees and their family members were targeted by camp officials, experiencing repeated, brutal physical attacks that proved nearly lethal. The refugees have all been interviewed and approved by the United States Citizenship and Immigration Services (USCIS). As of January 20, 2025, they were merely awaiting medical checks, final processing steps, and flight bookings to the United States when the Executive Orders were issued. They remain in grave danger as they await resettlement to the United States.[32]

Another RCUSA member organization that works in Kenya had over 200 cases in the USRAP pipeline at the time of its suspension, including seventy-five

---

[31] Comments of Ms. P.

[32] Comments of Ms. B., staff member of RCUSA member organization located in Kenya.

refugees from DRC, Ethiopia, Burundi, Somalia, and Turkey who were submitted for urgent processing. Nearly all these cases were submitted under the "Woman at Risk" category, and many of the refugees had pressing medical conditions. Of these urgent cases, twenty-three refugees were "ready to travel" at the time of the USRAP suspension.[33]

Equally troubling, many refugees also face risks in their current countries *because* they have engaged with the U.S. resettlement process, a process which has now turned its back on them. The Refugee Executive Order halted admissions even for those who had acted in reliance on assurances from the U.S. government that they would be admitted.[34] Based on these assurances, refugees left jobs, sold possessions, gave up housing, and removed their children from school to prepare for the trip to the United States for a new life.

For example, "Omar," a Syrian refugee who fled to Lebanon for safety, was accepted with his family for resettlement as refugees to the United States through USRAP. They sold all their belongings after their cases were approved and processed to completion, with only travel to the United States pending. But after the

---

[33] Comments of Ms. O., staff member of RCUSA member organization located in Kenya.

[34] This Court has already recognized the potential for grievous harm to these individuals. *See* Order of May 9, 2025 (Dkt. 64) (ordering that refugees with "a strong reliance interest arising prior to January 20, 2025, comparable to Plaintiff Pacito" should be exempted from the stay of the Refugee Executive Order).

- 15 -

Executive Orders issued, they were left stranded in Lebanon, where they do not have legal permission to reside, and have lost their housing. According to Omar:

> Based on this, I sold everything I owned while I was in Lebanon as a refugee. Even my children were expelled from school because of their absence [due to] preparing for travel and the interviews conducted for us by the American government.
>
> Then came Mr. Trump's decision to suspend immigration, which had a huge negative impact on our lives and the lives of my family members, as we lost all our hope for a decent life … the moment the decision was issued. After that, we lost our housing, as I had set an approximate period for my departure from the house we were living in, according to the previously scheduled travel data and routine procedures. [35]

## III. FOR MANY REFUGEES, THE UNITED STATES IS THE ONLY COUNTRY WHERE THEY HAVE A REALISTIC OPPORTUNITY FOR RESETTLEMENT.

Many refugees submitted to or accepted by the U.S. for resettlement will not be suitable for or qualify for resettlement in another country. UNHCR carefully assesses individual case profiles and specifically matches them with appropriate resettlement countries.[36] This is a deliberative process based on a wide range of considerations, including ties to the resettlement country and potential for sponsoring individuals or communities, specialization of certain resettlement countries with particular nationalities or profiles of cases, and the special needs of

---

[35] Comments of "Omar."

[36] *See* UNHCR U.S., *Information on UNHCR Resettlement*, https://www.unhcr.org/us/what-we-do/resettlement-united-states/information-unhcr-resettlement (last visited May 25, 2025).

- 16 -

the refugees, such as medical or mental health needs best catered for in particular countries or communities.[37]  Due to the limited resettlement capacity and additional eligibility criteria applied by other countries (either explicitly or implicitly), many refugees submitted to or accepted for resettlement in the United States cannot qualify for resettlement elsewhere, leaving them without a permanent home if the USRAP remains closed.  This includes cases referred by U.S. Embassies or named by U.S.-based sponsors.

For example, the United States is the only resettlement country with a highly-developed and extraordinarily successful program for resettling Unaccompanied Refugee Minors, including well-trained and closely monitored foster families throughout the country.[38]  The minors blocked from resettling by the USRAP suspension are among those most harmed by the challenged actions, as most will be unable to resettle in another country with the foster structure to accept them.

---

[37] *Id.*

[38] *See* U.S. Office of Refugee Resettlement, *Unaccompanied Refugee Minors Program* (May 6, 2025), https://acf.gov/orr/programs/refugees/urm;  Andrea Gillespie, *Left Behind: Refugee Ban Abandons Vulnerable Orphans*, Human Rights First (Aug. 2, 2017), https://humanrightsfirst.org/library/left-behind-refugee-ban-abandons-vulnerable-orphans/; *see also* UNHCR, *Refugee Resettlement: An International Handbook to Guide Reception and Integration* 276 (2002), https://www.unhcr.org/media/refugee-resettlement-international-handbook-guide-reception-and-integration-chapter-3-3.

As another critical example, many refugees face difficulty resettling in other countries due to their work for or engagement with the U.S. government. For example, many thousands of Afghan refugees who worked with the United States military against the Taliban have been left stranded by the Refugee Executive Order.[39] More than 40,000 Afghans are actively seeking resettlement in the United States, including the families of approximately 200 active duty U.S. service members.[40] Those who remain in Afghanistan or neighboring Pakistan are not safe due to their cooperation with the U.S. government, and many now "do[] not know where else to go."[41]

Another example of harm stemming from refugees' work with the United States are the cases of approximately 100 Yemeni former employees of the U.S. Embassy in Sana'a and their families who are now stranded in Egypt. These refugees were forced to flee when the Houthis took control of Sana'a and the Embassy offices closed. Those who had worked for the United States became

---

[39] *See* Diaa Hadid & Juliana Kim, *Afghans who helped the U.S. are in dangerous limbo after Trump's order on refugees*, NPR, (Jan. 27, 2025), https://www.npr.org/2025/01/27/nx-s1-5273521/trump-executive-order-refugee-afghanistan-veterans; Beth Bailey, *Calculating the human toll of the US exit from Afghanistan three years later*, Washington Examiner (Aug. 23, 2024), https://www.washingtonexaminer.com/magazine-features/3129402/calculating-the-human-toll-of-the-us-exit-from-afghanistan-three-years-later/.

[40] Hadid & Kim, *supra.*

[41] *Id.*

targets, and several Embassy workers were arrested, threatened, or forcibly "disappeared."[42]  The Yemeni refugees worked with the U.S. Embassy to submit USRAP applications and were assured by their U.S. former colleagues that they would eventually be resettled in the United States.  Following the Embassy's advice, they left Yemen for Egypt.  Now, after the Executive Orders, they are stranded in Egypt, without stable legal status.  As one of these refugees has reported, they are "sleeping hungry, hiding like criminals, and living in constant fear that our temporary visas will expire."[43]  Additionally, their children "are without education because schools require official residency permits or fees," "some families cannot afford medicine or basic treatment," and others "have been forced to reduce their meals to once daily just to survive another day."[44] As Ali explains, "[h]ow do we explain to these innocent children that the country their parents served faithfully may have forgotten its promises? … We wonder daily: how long will we remain trapped here? We cannot return to Yemen because it means certain danger, yet we cannot endure these conditions in Egypt much longer."[45]

---

[42] Comments of "Ali," speaking on behalf of the group of Yemeni former U.S. Embassy workers.

[43] *Id.*

[44] *Id.*

[45] *Id.*

Even with the many hardships they have endured, these refugees still hope for resettlement in the United States, given their unique ties to the U.S. government and their reliance on the advice of the U.S. Embassy:

> Despite everything we are going through, we still believe in the values we served—freedom, justice, keeping promises. We await the American judicial system, which diplomats have always told us is a fortress of justice, to correct this historical injustice. Not just for our future, but to affirm the principles that have made America a beacon of hope for the persecuted in the world."[46]

## IV.  FOR MANY REFUGEES, THE UNITED STATES IS THE ONLY COUNTRY WHERE THEY CAN REUNITE WITH RELATIVES.

The United States is also a critical destination because it is the only country where many refugees can reunite with family members.  The Refugee Act of 1980 prioritizes "family unity" and, consistent with this priority, entitles the spouses and minor children of admitted refugees to "follow on" admission, as long as they are not inadmissible on other grounds.[47]  The UN similarly recognizes family unity as both a "universal right" and an important "boost" to integration.[48]  "Family members not only provide a sense of safety, especially for vulnerable groups like women, children and older people, but also contribute to economic self-reliance. Getting

---

[46] *Id.*

[47] *See* 8 U.S.C. § 1157(c)(2)(a), (c)(3).

[48] UNHCR, *Family Reunification*, https://www.unhcr.org/us/what-we-do/build-better-futures/solutions/complementary-pathways/family-reunification (last visited May 25, 2025).

back together with family also helps refugees affected by conflict-related trauma to heal."[49]

Appellants' suspension of the USRAP process has left many refugees indefinitely separated from family members in the United States. This includes, for example, thousands of Afghan refugee families that both the Biden and first Trump administrations had promised to aid. According to press reports, the Afghan refugees whose resettlement plans were canceled include family members of active-duty U.S. military personnel and over 200 minors with relatives in the United States.[50]

Refugees separated from their families cannot simply go somewhere else or stay in their temporary host countries without the significant, ongoing harm of being separated from their loved ones. RCUSA's member organizations work with many refugees placed in this plight by Appellants' actions, including refugees whose joy in seeing family members finally leave for resettlement in the United States in late 2024 or early 2025 was snatched away when their own travel plans were abruptly canceled.

---

[49] *Id.*

[50] Andrew Roth, *Trump refugee ban 'strands Afghans endangered by US withdrawal'*, The Guardian (Jan. 20, 2025), https://www.theguardian.com/us-news/2025/jan/21/donald-trump-inauguration-refugee-ban-afghanistan.

For example, a Congolese refugee family in Rwanda, clients of an RCUSA member organization, had successfully completed the U.S. resettlement process and most of its members departed to the United States in January 2025. One family member, a single woman required to be on a separate case, was scheduled to depart in February 2025. However, due to the Executive Order, her departure was halted. The RCUSA member organization reports that this woman is now left alone in Rwanda indefinitely, with minimal support, and is psychologically distressed due to the separation from her family and the uncertainty of her future.[51]

As another example, the family of "Amina," a retired decorated U.S. veteran, also faces grave repercussions in Afghanistan on account of Amina's service to the United States. The Taliban targeted her relatives after retaking control of the country, and members of Amina's family fled to safe houses, with some escaping to Pakistan. The Pentagon referred their cases to USRAP, and some were able to reunite safely with Amina in the United States. The remaining cases of Amina's family members were in the final stages, and the U.S. government flew Amina's family to the As Sayliyah U.S. Army Base in Qatar (CAS) to complete processing. Tragically, due to the Refugee Executive Order, instead of remaining at CAS for a few weeks, they have languished there for months, separated from the rest of their

---

[51] Comments of Mr. K., RCUSA member organization staff member located in Rwanda.

- 22 -

family. As Amina sees the emotional, physical, financial, and mental toll her U.S. service has taken on her family, she laments, "[t]heir only fault is that they are related to me."[52]

As another example, Ms. M., a Congolese refugee living in Zambia, is part of a family of seven. Two of her siblings were resettled to the United States in October 2024. She and her family waited eagerly to join her siblings, but the communications they were receiving related to resettlement have ceased since the Refugee Executive Order. The family is now unsure when, or if, they will ever be reunited with the two children. Ms. M. writes that her family "pray[s] to see [her siblings] soon [because] my mother cries [every day] to see her children go far away from her."[53]

## V. IF THE EXECUTIVE ORDER IS NOT ENJOINED, MANY REFUGEES COULD BE REMOVED TO THEIR HOME COUNTRIES, WHERE THEY WOULD EXPERIENCE CONTINUED PERSECUTION AND VIOLENCE.

Finally, if the injunction is vacated, many refugees will face removal from their host countries to their home countries. For example, in Pakistan, where hundreds of thousands of Afghans fled to escape the Taliban, over 19,500 Afghans were deported back to their Taliban-controlled home country in the first few weeks of April 2025 alone and approximately 700-800 families are being deported every

---

[52] Comments of "Amina."

[53] Comments of Ms. M.

day.[54]  For many, the Executive Orders have left them in legal limbo, undocumented in their current countries and vulnerable to removal back to places where they faced the threat of persecution, violence, or death.

RCUSA and its member organizations serve many refugees facing these dangers.

"Amanuel" and his two siblings were persecuted in their home country of Eritrea because of their Pentecostal Christian faith.  Amanuel and his siblings fled Eritrea and are now in Ethiopia.  They were approved for resettlement in the United States and had a willing sponsor, but their travel was canceled following the Executive Orders.  Now, Amanuel and his siblings are at risk of being deported back to Eritrea, "back to the country where [they] face imprisonment and torture."[55]  The family is "afraid to go outside because many Eritreans are being snatched from the streets…and…deported."[56]

Similarly, "Gabriela" is a Venezuelan national currently living in Columbia. Gabriela's father was jailed for not supporting the Venezuelan government.  The government then removed Gabriela from her apartment and arranged for her to be fired from her job as a teacher.  Gabriela and her son had been waiting for

---

[54]  Yama Bariz, *Pakistan expels tens of thousands of Afghans*, BBC (Apr. 19, 2025), https://www.bbc.com/news/articles/c74z19pl7wgo.

[55] Comments of "Amanuel."

[56] *Id.*

resettlement in the United States, and had a flight scheduled for the week of January 21, 2025. The Executive Orders caused her plans to be canceled, leaving her and her son undocumented, with no legal status in Colombia. She has no legal ability to work to support herself or her son. Gabriela has struggled to pay for basics and medical care. Gabriela's son has faced barriers at school due to his undocumented status. They have been left "emotionally, mentally and physically exhausted," and their lack of legal status in Colombia leaves them vulnerable.[57]

As another example, "Noor," a refugee from Afghanistan who is currently living at the As Sayliyah U.S. Army Base in Qatar, has also experienced the purgatory that can be a refugee's experience in a country of temporary asylum. Noor's husband worked directly with the U.S. military in Afghanistan before he was killed after the Taliban took over in 2021. Since the Taliban takeover, her husband's family has been trying to force her to marry her husband's brother against her will. She cannot go to the authorities because the Taliban supports such forced marriages. American friends of her husband helped her flee to Pakistan, where she was referred to USRAP and received a refugee interview:

> After my interview and exams, the US government flew me from Pakistan to their camp in Doha, on the way to America. I have been here ever since, … completely in the care of the United States government. There is nothing and no one in Afghanistan for me to return to. I abandoned everything. … I am frightened every day. I am

---

[57] Comments of "Gabriela."

- 25 -

midway between the horrors of Afghanistan, and a new home with my friends in America. The Americans at the camp are friendly and keep us physically safe, but this limbo is emotionally crushing.[58]

Due to the Executive Orders, Noor is stuck at a U.S. Army base facing the existential question of whether the Americans will resettle her safely to the United States as promised or forcibly return her to Afghanistan and into a forced marriage.

## CONCLUSION

Contrary to Appellants' arguments, the refugee class members face significant risks of harm if the District Court's injunctions are vacated. These class members face severe risks to their lives, health, and livelihoods both in the temporary host countries where they are now living and in the home countries from which they escaped. The Court should affirm the injunctions because Appellees are likely to succeed on the merits and because Appellants' challenged actions will cause severe, long-lasting harm to hundreds of thousands of refugees across the globe.

---

[58] Comments of "Noor."

Dated:  May 27, 2025

Respectfully submitted,

/s/ *Sarah M. Rich*

SARAH M. RICH
SOMIL TRIVEDI
DEMOCRACY FORWARD
P.O. Box 34553
Washington, D.C. 2004
(202) 274-7652
srich@democracyforward.org
strivedi@democracyforward.org

SUNIL R. VARGHESE
REFUGEE COUNCIL USA
1 Thomas Circle NW
Suite 700
Washington, DC 20009
(202) 573-7346
svarghese@rcusa.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Circuit Rule 32.1(a).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains <u>5,589</u> words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/  Sarah M. Rich
SARAH M. RICH


May 27, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this May 27, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ Sarah M. Rich
SARAH M. RICH