**Nos. 25-1313, 25-1939**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

**PACITO, et al.**,

Plaintiffs-Appellees,

v.

**DONALD J. TRUMP, et al.**,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-255

———————————

### REPLY IN SUPPORT OF
### CONSOLIDATED BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*
YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*
DREW C. ENSIGN
  *Deputy Assistant Attorney General*
DAVID KIM
  *Senior Litigation Counsel*
JOSEPH MCCARTER
ALEXANDRA YEATTS
LINDSAY ZIMLIKI
JASON ZUBATA
  *Trial Attorneys*
  U.S. Department of Justice
  Civil Division
  Office of Immigration Litigation
  Washington, DC 20005

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................... iii

TABLE OF CONTENTS ....................................................................... i

INTRODUCTION .............................................................................. 1

ARGUMENT ................................................................................... 2

I.      The USRAP Order Is a Lawful Exercise of the President's Authority ........................................................................ 2

     A.      The USRAP Order is a valid exercise of the President's expansive authority under 8 U.S.C. § 1182(f). ........................... 3

     B.      The Refugee Act does not displace the President's authority to restrict entry under Section 1182(f). ...................... 8

II.      The USRAP Order Does Not Violate Due Process ............................ 13

III.      The District Court Lacked Jurisdiction over Plaintiffs' Funding Claims ................................................................... 15

IV.      Plaintiffs' APA Claims Fail ................................................ 22

     A.      The agencies did not violate the APA by ceasing to process refugees who were barred from admission. ................. 23

     B.      The agencies did not violate the APA by pausing USRAP funding pursuant to the Foreign Aid Order, and later terminating cooperative agreements consistent with those agreements' terms. ................................................... 25

     C.      The agencies did not violate the APA by proceeding without notice-and-comment rulemaking. .............................. 26

     D.      Regardless, all the APA claims are barred multiple times over ...................................................................... 28

V.      The Balance of Equities Supports Reversal of the Injunctions .......... 30

VI.  The Injunctions Are, at Minimum, Impermissibly Overbroad ...........33

CONCLUSION ....................................................................................35

CERTIFICATE OF COMPLIANCE ........................................................36

CERTIFICATE OF SERVICE ...............................................................36

# TABLE OF AUTHORITIES

## CASES

*AIDS Vaccine Advocacy Coalition*,
Nos. 25-400, 25-402, 2025 WL 1380421 (D.D.C. May 13, 2025) ....................21

*Am. Ass'n of Colleges For Teacher Educ. v. McMahon*,
No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025).......................... 20, 21

*Am. Library Ass'n v. Sonderling*,
No. 25-1050, 2025 WL 1615771 (D.D.C. June 6, 2025) ...................................20

*Ancient Coin Collectors Guild v. CPB*,
801 F.Supp.2d 383 (D. Md. 2011) ......................................................................23

*Arizona All. v. Mayes*,
117 F.4th 1165 (9th Cir. 2024) ...........................................................................33

*Arizona v. United States*,
567 U.S. 387 (2012).............................................................................................30

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991)...............................................................................................22

*Belgau v. Inslee*,
975 F.3d 940 (9th Cir. 2020) ....................................................................... 13, 14

*Bennett v. Spear*,
520 U.S. 154 (1997).............................................................................................28

*Bowen v. Massachusetts*,
487 U.S. 879 (1988).............................................................................................21

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ..............................................................................33

*Climate United Fund v. Citibank, N.A.*,
No. 25-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025)....................................21

iii

*Department of Education v. California,*
 145 S.Ct. 966 (2025) ............................................................ 2, 16, 22

*Department of State v. Muñoz,*
 602 U.S. 899 (2024) ................................................................ 14, 15

*Doe #1 v. Trump,*
 957 F.3d 1050 (9th Cir. 2020) .............................................................6

*Doe #1 v. Trump,*
 984 F.3d 848 (9th Cir. 2020) ...............................................................7

*Doe v. Trump,*
 288 F.Supp.3d 1045 (W.D. Wash. 2017) .........................................28

*East Bay Sanctuary Covenant v. Barr,*
 934 F.3d 1026 (9th Cir. 2019) ...........................................................34

*East Bay Sanctuary Covenant v. Trump,*
 950 F.3d 1242 (9th Cir. 2020) ...........................................................7

*FDA v. Hippocratic Medicine,*
 602 U.S. 367 (2024) ...........................................................................33

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992) ...........................................................................27

*Gill v. Whitford,*
 585 U.S. 48 (2018) .............................................................................33

*Great-West Life & Annuity Ins. Co. v. Knudson,*
 534 U.S. 204 (2002) ..................................................................... 21, 22

*Hawaii v. Trump,*
 859 F.3d 741 (9th Cir. 2017) .............................................................11

*Ingersoll-Rand Co. v. United States,*
 780 F.2d 74 (D.C. Cir. 1985) .............................................................18

*Kidwell v. Dep't of Army*,
    56 F.3d 279 (D.C. Cir. 1995) ................................................................16

*Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ..............................................................................2

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ........................................................................ 29, 30

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ..............................................................................29

*Maryland v. King*,
    567 U.S. 1031 (2012) ...........................................................................31

*Mass. Fair Hous. Ctr. v. HUD*,
    No. 25-30041 (D. Mass Apr. 14, 2025) ...............................................20

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................... 16, 17, 18

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................7

*Sabra v. Maricopa Cnty.*,
    44 F.4th 867 (9th Cir. 2022) ...............................................................27

*Sherley v. Sebelius*,
    776 F.Supp.2d 1 (D.D.C. 2011) ..........................................................27

*Slayman v. FedEx Ground Package Sys.*,
    765 F.3d 1033 (9th Cir. 2014) .............................................................13

*Solutions in Hometown Connections v. Noem*,
    No. 25-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025)......................20

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)....................20

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..................................................................... *passim*

*U.S. Conf. of Catholic Bishops v. Dep't of State*,
  No. 25-465, 2025 WL 1261485 (Mar. 3, 2025)...................................19

*U.S. Conf. of Catholic Bishops v. Dep't of State*,
  No. 25-465, __F.Supp.3d__, 2025 WL 763738 (D.D.C. Mar. 11, 2025)19, 22, 32

*United Aeronautical Corp. v. U.S. Air Force*,
  80 F.4th 1017 (9th Cir. 2023) ...............................................16

*United States v. Keller*,
  2 F.4th 1284 (9th Cir. 2021) ........................................................7

*Yee v. Jewell*,
  228 F.Supp.3d 48 (D.D.C. 2017) ................................................ 21, 22

## STATUTES

5 U.S.C. § 702 ...........................................................................21

5 U.S.C. § 706(2) .......................................................................18

8 U.S.C. § 1157 ...........................................................................9

8 U.S.C. § 1157(a) .....................................................................34

8 U.S.C. § 1157(a)(2) ......................................................... 10, 11, 31

8 U.S.C. § 1157(a)(3) .................................................................24

8 U.S.C. § 1157(c) .....................................................................11

8 U.S.C. § 1157(c)(1) .................................................................24

8 U.S.C. § 1157(c)(2)(A) .............................................................14

vi

8 U.S.C. § 1182(f) ................................................................ *passim*

8 U.S.C. § 1522 ............................................................... 29, 30

8 U.S.C. § 1522(a) ................................................................11

8 U.S.C. § 1522(a)(1)(A) ...................................................... 25

8 U.S.C. § 1522(b)(1)(A) ......................................................25

8 U.S.C. § 1522(b)(7) ...........................................................25

8 U.S.C. § 1522(b)(8) ...........................................................25

28 U.S.C. § 1491(a)(1) ..........................................................16

## REGULATIONS

8 C.F.R. § 207.2(c) ...............................................................26

8 C.F.R. § 207.7 ....................................................................28

## INTRODUCTION

The district court's sweeping injunctions upend settled law and intrude on powers reserved to the Executive. They enjoin the President's suspension of refugee admissions under 8 U.S.C. § 1182(f)—a suspension imposed after a formal finding that further entries would be detrimental to the interests of the United States. They also bar the State Department from terminating federal contracts with resettlement partners, effectively compelling the Government to fund and operate a program the President lawfully paused. These orders cannot be squared with *Trump v. Hawaii*, 585 U.S. 667 (2018), which reaffirms that § 1182(f) delegates expansive discretion to the President to suspend entry based on his foreign affairs judgments. Nor can they be reconciled with established constraints on judicial review of Executive Branch spending decisions and foreign assistance programs. That is why this Court already stayed those injunctions pending appeal. This Court should now reverse outright.

Plaintiffs—and the district court—believe the President's reliance on § 1182(f) somehow "eviscerates" the Refugee Act and overrides other parts of the Immigration and Nationality Act. But that ignores both the statutory framework and the indisputable fact that § 1182(f) empowers the President to "suspend the entry of all aliens or any class of aliens … or impose on the entry of aliens any restrictions he may deem to be appropriate." *See Hawaii*, 585 U.S. at 684. The Refugee Act does

not mandate the admission of any particular number of refugees; instead, it prevents such admissions from *exceeding* a ceiling set by the President, reinforcing the long-standing rule that the "exclusion of aliens is a fundamental act of sovereignty … inherent in the executive power to control the foreign affairs of the nation." *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

Plaintiffs' funding claims fare no better as they fall outside the scope of judicial review under settled principles of sovereign immunity and the Administrative Procedure Act ("APA"). Indeed, the Supreme Court's recent stay in *Department of Education v. California*, 145 S.Ct. 966 (2025) ("*DOE*"), confirms the APA does not provide an end-run around the Tucker Act's exclusive channel for adjudicating claims arising from federal funding agreements.

At bottom, the injunctions substitute judicial preferences for the considered judgment of the Executive Branch in the conduct of foreign affairs and the administration of the immigration laws. They rest on legal error, exceed the bounds of equitable relief, and risk significant harm to the separation of powers. This Court should reverse.

## ARGUMENT

### I. The USRAP Order Is a Lawful Exercise of the President's Authority

Section 1182(f) authorizes the President to "suspend the entry of all aliens or any class of aliens … for such period as he shall deem necessary" if he "finds that

2

the entry" of that class of aliens "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). That broad grant of authority easily encompasses the President's USRAP Order, as the stay panel already determined. And the Refugee Act does not displace the President's power under § 1182(f). Plaintiffs' arguments mischaracterize both the statutes and the President's Order.

### A. The USRAP Order is a valid exercise of the President's expansive authority under 8 U.S.C. § 1182(f).

Plaintiffs do not dispute that, in adopting the USRAP Order, the President satisfied the "sole prerequisite" to exercising his authority under § 1182(f)—namely, finding that the entry of refugees "would be detrimental to the interests of the United States." *Hawaii*, 585 U.S. at 685 (quoting 8 U.S.C. § 1182(f)). Their sole argument with respect to § 1182(f) itself is that the USRAP Order did not genuinely "suspend" entry because it is "indefinite." Ans.Br. 30–34. That argument is belied by the Order's terms, which tie the duration of the suspension to the achievement of specified policy goals related to reasons for the Order's issuance and set forth a process for periodic re-examination. Op.Br. 21. Nothing more is required.

Specifically, the USRAP Order explains that, "[o]ver the last 4 years, the United States has been inundated with record levels of migration, including through the [USRAP]," which led cities to "s[eek] Federal aid to manage the burden of new arrivals," and even to "declare[] states of emergency because of increased migration." USRAP Order § 1. Against the backdrop of this nationwide crisis, the

3

Order "suspend[ed] the USRAP until such time as the further entry into the United States of refugees aligns with the interests of the United States." *Id*. The Order then directs the Secretary of Homeland Security to "submit a report to the President" every 90 days "regarding whether a resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, in light of" the Order's stated policies to (1) "ensure that public safety and national security are paramount considerations," (2) "admit only those refugees who can fully and appropriately assimilate into the United States," (3) ensure that the United States "preserves taxpayer resources for its citizens," and (4) ensure that "State and local jurisdictions" are given a role in refugee placement. USRAP §§ 2, 4.

That structure does exactly what *Hawaii* endorsed: It "link[s] the duration" of its restrictions … to the resolution of the triggering condition[s]," and then establishes a protocol to "assess on a continuing basis whether entry restrictions should be modified or continued." 585 U.S. at 680, 687; *see* Op.Br. 21.

Indeed, the Order is materially indistinguishable in this respect from the proclamation upheld in *Hawaii*. That proclamation invoked § 1182(f) to suspend the entry of foreign nationals from eight countries due to those nations' "deficiencies" in collecting or sharing "information needed to assess whether [their] nationals … present 'public safety threats'" to the United States. *Hawaii*, 585 U.S. at 677. Much like the entry restrictions in the USRAP Order, the restrictions in the *Hawaii*

4

proclamation were to "remain in force only so long as necessary to 'address' the identified 'inadequacies and risks' with the covered nations." *Id.* at 680. And like the USRAP Order, the *Hawaii* proclamation directed the Secretary of Homeland Security to "assess on a continuing basis whether entry restrictions should be modified or continued, and to report to the President every 180 days" (a longer period than the USRAP Order). *Id.* at 680.[1] Those features, the Supreme Court held, showed that the restriction was limited in duration and thus a genuine suspension. *See id.* at 687–88. The same result should obtain here.

Plaintiffs admit no fixed end date is required, but insist the USRAP Order is somehow different from the *Hawaii* proclamation because (they say) one of its stated grounds ("preserv[ing] taxpayer resources") is inherently incompatible with the resumption of *any* refugee admissions, given that the Refugee Act expressly contemplates federal funding for "resettlement support" for refugees. Ans.Br. 31; *see id.* at 32 (arguing the Order rests on a determination that "all refugee entry is necessarily against the national interest"). That is a distortion of the USRAP Order: It does *not* say that the commitment of U.S. taxpayer resources to refugees is categorically antithetical to the national interest; rather, it explains that the

---

[1] The USRAP Order is also indistinguishable from several of the prior proclamations under § 1182(f) that were cited approvingly in *Hawaii*. *See, e.g.*, Proclamation 6958 (Nov. 22, 1996); Proclamation 8693 (July 24, 2011).

suspension is warranted in light of the unique and severe strain on U.S. taxpayer resources "[o]ver the last 4 years," as "[c]ities and small towns" have been "inundated with record levels of migration," causing some jurisdictions to "declare[] states of emergency because of increased migration." USRAP Order § 1. The Order is, in other words, a response to a uniquely severe crisis related to mass migration occasioned by the prior Administration. And that crisis is not permanent; it is one the Administration is working tirelessly to resolve. That is why the USRAP Order builds in 90-day review periods for the Administration to assess whether progress in addressing the underlying policy interests warrants reconsideration of the suspension. *See supra* § I.A (discussing USRAP Order § 4). The Order is therefore far from an "indefinite" suspension, and certainly no more so than the proclamation upheld in *Hawaii*. 585 U.S. at 687.

For those reasons, the USRAP Order is nothing like the order at issue in *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020). *See* Ans.Br. 33, 41–43. That decision concluded that the suspension at issue was effectively permanent because it "tie[d] the putative suspension" to a problem—"uncompensated healthcare costs"—that "has no apparent resolution under the current healthcare system." *Id*. at 1065. That has no relevance here, because it is not the Administration's position that the crisis of mass migration is incapable of resolution. To the contrary, the Administration has devoted enormous attention over the last five months to that end and is firmly

committed to ending that crisis. Indeed, the Order explicitly allows for resumption of the USRAP based on the President's determination that "the further entry into the United States of refugees aligns with the interests of the United States." USRAP Order § 1.

In any event, the stay decision in *Doe #1* has little persuasive value, as the motion panel was careful to emphasize it was "not … prejudg[ing] the merits" of the issue and "not address[ing] the merits in detail." *Id*. at 1062. And when it came time for a merits panel to conduct that "detail[ed]" analysis, the Court *upheld* the suspension under § 1182(f). *See Doe #1 v. Trump*, 984 F.3d 848, 864-65 (9th Cir. 2020), *vacated as moot*, 2 F.4th 1284 (9th Cir. 2021). If the Court is going to consider the views of a stay panel, it should be the stay panel *from this case*, which repeatedly concluded the Government was likely to succeed on appeal. Dkt. Nos. 28.1, 46.1, 64.1; *see Nken v. Holder*, 556 U.S. 418, 426 (2009) (listing stay factors, which largely mirror preliminary injunction standards); *see also East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1262 (9th Cir. 2020) (noting a "later merits panel should not lightly overturn a decision made by a motions panel," a proposition carrying particular force here, where the motions panel took care to provide "opinions and explanations" on the merits at multiple points).

Accordingly, the USRAP Order falls squarely within the President's broad authority under § 1182(f).[2]

## B. The Refugee Act does not displace the President's authority to restrict entry under Section 1182(f).

Plaintiffs contend the USRAP Order is nonetheless unlawful—*even if* it is otherwise authorized by § 1182(f)—because the Order supposedly "overrides and replaces the purpose, objectives, and careful statutory scheme" of the Refugee Act. *See* Ans.Br. 34–41. In essence, Plaintiffs argue the Refugee Act displaces § 1182(f) with respect to the entire field of refugee regulation. The Supreme Court in *Hawaii* rejected exactly that kind of "cramped" view of § 1182(f)'s authority—it held § 1182(f) does not give the President a mere "residual power" that is subservient to the other provisions of the INA, but instead "vests authority in the President to impose *additional* limitations on entry beyond the grounds for exclusion set forth in the INA—including in response to circumstances that might affect the vetting system or other 'interests of the United States.'" 585 U.S. at 691 (emphasis added); *see* Op.Br. 23.

_____

[2] Defendants did not (and do not) concede that the President exceeded his authority under § 1182(f) by ordering a "suspension of decisions on refugee cases." Ans.Br. 29 n.8. As the Opening Brief argued, the President's Order is a lawful exercise of his authority. The power to suspend refugee admissions includes the authority to suspend further action on pending refugee applications that were not approved at the time the USRAP Order was issued. And it certainly was not arbitrary or capricious for agencies to cease such processing in light of the USRAP Order.

Plaintiffs acknowledge *Hawaii*'s holding but say it does not control here because the USRAP Order is not operating "where Congress was otherwise silent," but in an area where "Congress has stepped into the space and solved the exact problem" through the Refugee Act. Ans.Br. 36 (quoting *Hawaii*, 585 U.S. at 691). But § 1182(f) and the USRAP Order do not address the same "exact problem" as the Refugee Act. The Refugee Act lays out a framework for resettling refugees in the United States subject to the President's executive discretion. *See generally* 8 U.S.C. § 1157. It does not—and was not designed to—supply the President with emergency powers, or to address a crisis arising from an unprecedented wave of migration. It is § 1182(f) that confers emergency powers on the President to temporarily "suspend" the entry of aliens—including refugees—whose entry he deems to be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). And the USRAP Order is an exercise of those emergency powers in the context of the "record levels of migration" that existed "[o]ver the last 4 years."

The Refugee Act thus no more addresses the same "exact problem" as § 1182(f) than did the Visa Waiver Program discussed in *Hawaii*. 585 U.S. at 690–91. The statutes are directed at different issues and serve different goals. That dispenses with Plaintiffs' charge that recognizing the President's emergency suspension authority improperly "overrides Congress's effort to impose a uniform,

systematic, and predictable approach to the admission and resettlement of refugees." Ans.Br. 41.

Moreover, the terms of § 1182(f) and the Refugee Act belie Plaintiffs' claim that the two conflict. As the Opening Brief explained, the Refugee Act authorizes the President to set a *maximum* "number of refugees who may be admitted" each fiscal year, 8 U.S.C. § 1157(a)(2), whereas § 1182(f) authorizes only temporary *reductions* in the number of refugees (and others) within that ceiling. *See* Op.Br. 23–24 (citing 8 U.S.C. § 1157(a)(2)). And both statutes require the President to take account of the "national interest" in exercising these different statutory authorities. *Id*. The two operate in harmony, not conflict.

Plaintiffs still try to conjure up a conflict by arguing § 1182(f)'s authority to suspend *all* refugee entry contradicts a supposed requirement in the Refugee Act that the "number of refugees" the President selects for a given fiscal year must be more than zero. Ans.Br. 36–37. But no such requirement exists. The Refugee Act does not mandate any minimum number of refugees; instead, it states only that the number of refugees for a given fiscal year "shall be such number as the President determines … is justified by humanitarian concerns *or* is otherwise in the national interest." 8 U.S.C. § 1157(a)(2) (emphasis added). Zero is a number. By its terms, the Refugee Act authorizes the President to decide that "the national interest" dictates that zero refugees be admitted, and nothing about that reading "alter[s] the fundamental

10

details of a regulatory scheme." Ans.Br. 37. In any event, many refugees were already admitted for the current fiscal year.

Plaintiffs observe that the Refugee Act provides a mechanism for increasing the number of refugees midyear, but no parallel mechanism that authorizes the President to "curtail refugee admissions midyear." Ans.Br. 38. That is because the annual cap is just that—a cap. It sets the number of refugees that "may be admitted" during the year—not that "must be admitted." 8 U.S.C. § 1157(a)(2). Increasing the cap requires further action; admitting fewer refugees does not. In any event, this is all beside the point. The USRAP Order is not a reduction in the fiscal year 2024 cap for refugees under the Refugee Act. And, as explained, the President's authority under § 1182(f) to temporarily suspend admissions operates in harmony with the Refugee Act. Op.Br. 23–24.[3]

Finally, Plaintiffs assert the USRAP Order conflicts with the provisions of the Refugee Act exempting refugees from being rendered inadmissible because of their reliance on public assistance and that "encourage economic self-sufficiency and English-language skills." Ans.Br. 39 (citing §§ 1157(c) and 1522(a)). That argument

---

[3] Plaintiffs rely on the vacated decision in *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *vacated as moot*, 583 U.S. 941 (2017), to support their argument that the USRAP Order contravenes the Refugee Act. Ans.Br. 38-39. That vacated decision has no precedential value, and its reasoning is incorrect for the reasons provided here and in the Opening Brief.

ignores *Hawaii*'s holding that § 1182(f) "vests authority in the President to impose additional limitations on entry *beyond* the grounds for exclusion set forth in the INA." 585 U.S. at 691 (emphasis added). In any event, the USRAP Order's goal of "admitting only those refugees who can fully and appropriately assimilate," USRAP Order § 2, does not conflict with the Refugee Act's exemption from inadmissibility "based on illiteracy," *see* Ans.Br. 39; illiterate persons can assimilate into the United States and the USRAP Order does not suggest otherwise. Nor is the USRAP Order premised solely on a concern for preserving taxpayer resources or promoting assimilation, but also on concerns for "public safety and national security" and ensuring participation of "State and local jurisdictions" in "the placement or settlement" of refugees—and all of that, as explained, only in the unique context of an unprecedented crisis caused by record migration. USRAP Order § 2.

The USRAP Order is thus a lawful exercise of the President's expansive authority under § 1182(f), and does not conflict with the Refugee Act. The district court's contrary decision should be reversed.[4]

---

[4] The district court independently erred by "fully" enjoining Defendants from enforcing §§ 3(c) and 4 of the USRAP Order "in [their] *entirety*." ER-99 (emphasis added); Op.Br. 27–29. Plaintiffs do not dispute it would be impermissible to enjoin parts of the USRAP Order that pose no conceivable harm to them, and unconstitutional to enjoin § 4. *See* Ans.Br. 44–45. Their only response is to claim the court enjoined §§ 3(c) and 4 of the USRAP Order only "insofar as they harm Plaintiffs." Ans.Br. 45. But they do fail to identify any such harm. And the district court's order left no ambiguity that it was "fully" enjoining §§ 3(c) and 4 of the (continued . . .)

## II.    The USRAP Order Does Not Violate Due Process

The district court also erred in holding the USRAP Order violates the Due Process Clause with respect to follow-to-join individuals who have relatives in the United States. That claim is both moot (because the Plaintiffs with standing to press this issue have received the relief they sought) and meritless (because there is no entitlement to follow-to-join admission). *See* Op.Br. 29–30.

"[W]here, as here, [a named] plaintiff's claim becomes moot before the district court certifies the class," their class claim forming the basis of "the class action normally also becomes moot." *See Slayman v. FedEx Ground Package Sys*., 765 F.3d 1033, 1048 (9th Cir. 2014) (citation omitted). Plaintiffs respond that Plaintiff Esther's claims are "inherently transitory." Ans.Br. 69 n.28. Under this exception, an otherwise moot claim by a named plaintiff in a putative class action may survive the mootness doctrine if (1) "the duration of the challenged action is too short to allow full litigation before it ceases," and (2) "there is a reasonable expectation that the named plaintiffs could themselves suffer repeated harm or it is certain that other persons similarly situated will have the same complaint." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020) (cleaned up). But that exception does

---

Order "in [their] entirety." ER-99. Nothing in the portions of the record Plaintiffs cite remotely supports their view that the court limited its injunction of §§ 3(c) and 4 only "insofar as they harm Plaintiffs." *See* Ans.Br. 45 (citing ER-924–25 and ER-59–66).

not apply here. The processing of refugee applications typically takes *years*—as it did for Plaintiff Esther herself, ER-917, 950 (application filed in 2016)—in part due to circumstances beyond the Government's control. *Accord* Ans.Br. 13; *see, e.g.*, ER-950 ¶ 18 (DNA evidence required in Esther's case). That lengthy process is not "too short to allow full litigation before it ceases," *Beglau*, 975 F.3d at 949, and so Plaintiff Esther's due process claim is moot.

On the merits, Plaintiffs' due process argument rests on a misreading of 8 U.S.C. § 1157(c)(2)(A). They focus on the phrase "shall … be entitled to the same admission status [of the principal refugee]." Ans.Br. 68. But as even they concede, that so-called entitlement applies only to applicants who are ultimately deemed admissible when entering the country. *Id.* (conceding an admissibility determination *and* space under the refugee ceiling is first required). Section 1157(c)(2)(A) creates no entitlement to admission, which means the USRAP Order does not deprive anyone of a cognizable liberty interest.

The Supreme Court's decision in *Department of State v. Muñoz*, 602 U.S. 899 (2024), is thus dispositive. Although Plaintiffs try to reduce *Muñoz* to a case about unenumerated rights, it plainly holds there is no "claim to a procedural due process right in *someone else's* legal proceeding"—which would naturally include statutory processing of refugee applications. *Id.* at 916. *Muñoz* further held a U.S. citizen does not have a constitutional right to either bring an alien spouse to the United States or

reside in the United States with an alien spouse. 602 U.S. at 903, 911. Plaintiffs try to limit *Muñoz* to its facts, *see* Ans.Br. 67, but the principle articulated in *Muñoz* applies with equal force to family members other than a spouse. 602 U.S. at 916 ("the Constitution does not *require* [a] result" where "unity of the immigrant family" is "prioritize[d]," where "[o]ther issues, including national security and foreign policy, matter too"). Plaintiffs' due process claim thus necessarily fails.

## III. The District Court Lacked Jurisdiction over Plaintiffs' Funding Claims

Beyond enjoining the USRAP Order, the district court also enjoined the suspension—and later the termination—of cooperative agreements for resettlement services. Plaintiffs agree the suspension "ended by its own terms when Defendants decided in March 2025 to terminate the agreements." Ans.Br. 46 n.17. So the only live issue on appeal is whether the district court erred by purporting to enjoin the termination of those contracts.[5] The court did err, including because it lacked jurisdiction over these contractual claims in the first place.

---

[5] Plaintiffs argue that the Government tried "to have it both ways" when it discussed both the funding suspension pursuant to the Foreign Aid Order and the termination of the cooperative agreements consistent with the terms of those agreements. Ans.Br. 46 n.17. But where Plaintiffs chose to simultaneously advance claims on both fronts, the Government cannot be faulted for taking care to provide a comprehensive response to those claims. Again, Plaintiffs conceded the suspension "ended by its own terms" with the termination of the cooperative agreements, and the larger point still holds, regardless of how Plaintiffs frame their claims, that this suit fundamentally concerns an attempt to compel the resumption of refugee processing and admissions and the payment of funds they believe they are due under contract.

"[T]he Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *DOE*, 145 S.Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)). By doing so, the Tucker Act precludes review of breach-of-contract claims under the APA. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023).

For purposes of applying this jurisdictional bar, labels are not dispositive; rather, if a plaintiff sues to vindicate rights that are rooted in a contract, and seeks relief that is contractual in nature, the claim must be filed in the Court of Federal Claims under the Tucker Act. *See Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (courts must look to complaint's "substance, not merely its form"); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (relevant inquiry is whether the claim "is at its essence a contract claim"). The Supreme Court recently reaffirmed that principle in *DOE*, staying a district court's injunction against an agency's termination of federal grants. 145 S.Ct. at 968; Op.Br. 32–33.

Here, Plaintiff resettlement partners have merely "disguised" their breach-of-contract claims as APA claims, which the Tucker Act impliedly forbids. *Megapulse*, 672 F.2d at 968. Plaintiffs argue their claims are not contract claims because they (1) frame their claims as violations of statutes, namely the APA and Refugee Act, and (2) request "forward-looking injunctive relief." Ans.Br. 50–51. Neither point is persuasive.

As to the source of rights, the Plaintiff resettlement partners can only base their funding claims on the cooperative agreements, because neither the APA nor the Refugee Act itself *entitles* resettlement partners to any funding. The APA simply requires that agencies act in accordance with law and not arbitrarily or capriciously. Of course, any breach-of-contract claim could be recharacterized in those terms, which is why the governing precedent is clear that framing a breach as an APA violation does not circumvent Tucker Act jurisdiction. *See Megapulse*, 672 F.2d at 967 n.34 ("It is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA. … We refuse to believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication." (cleaned up)).

With respect to the Refugee Act, nothing in that statute requires resettlement services to be provided through outside partners (or at all)—let alone through the particular Plaintiff entities here. Indeed, despite insisting their claims arise from statute, Plaintiffs tellingly never cite anything in the Refugee Act in this section of their brief. *See* Ans.Br. 46–54. If refugees maintain the Government is failing to provide services they (incorrectly) read the statute to mandate, they could at most try to pursue a claim to "compel agency action unlawfully withheld"—even if that claim would collapse under scrutiny for many of the same reasons spelled out below,

17

*infra* § IV. *See* 5 U.S.C. § 706(2). But the Plaintiff resettlement partners have no statutory right to reinstatement of their funding instruments.

As to remedies, the Plaintiff resettlement partners do not seek simply to reinstate the funding of the USRAP, but to reinstate the funding *they receive* via cooperative agreements. That amounts to specific performance of the contracts—which is a classically contractual form of relief. And it is a form of relief that the Tucker Act forbids in federal district court. Plaintiffs cannot evade the remedial limitations of the Tucker Act by suing under the APA instead. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) (explaining remedies under the Tucker Act do "not include specific performance," and thus "[t]o prevent government contractors from avoiding this remedy restriction, we have indicated that a complaint involving a request for specific performance must be resolved by the Claims Court"); *Megapulse*, 672 F.2d at 971.

At bottom, Plaintiffs ask the Court to compel payment for services fully governed by cooperative agreements. That is contractual, placing the claim squarely within the purview of the Tucker Act.[6]

---

[6] Plaintiffs object that individual refugees are not parties to the cooperative agreements and thus cannot sue under the Tucker Act. Ans.Br. 52. True, and those individuals can sue under the APA if they believe final agency action has deprived them of status or non-contractual benefits to which they are entitled by law. But individual refugees have no standing to sue for reinstatement of the cooperative (continued . . .)

18

The district court in D.C. reached this same conclusion in an almost identical case, holding it lacked jurisdiction over a resettlement partner's APA claims challenging the pause and termination of cooperative agreements for reception and placement services because "[s]uch a request for an order that the government 'must perform' on its contract is one that must be resolved by the Claims Court." *U.S. Conf. of Catholic Bishops v. Dep't of State*, No. 25-465, __F.Supp.3d__, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir. Mar. 28, 2025); *see* Op.Br. 34. Plaintiffs' only effort to distinguish *Catholic Bishops* is that the plaintiff there "did not challenge Defendants' failure to comply with their statutory obligations." Ans.Br. 50 n.20. Contrary to Plaintiffs' assertion, the plaintiff resettlement agency in *Catholic Bishops* did allege its claims were "grounded in regulatory and statutory duties", notwithstanding the district court's ultimate conclusion that the claims were contractual. *U.S. Conf. of Catholic Bishops v. Dep't of State*, No. 25-465, 2025 WL 1261485 (Mar. 3, 2025) (plaintiff's memorandum in support of motion for preliminary injunction). In any case, as just explained, Plaintiffs here invoke no statutory entitlement either.

Plaintiffs try to distinguish *DOE* on the ground that the district court here "did not order any relief that relies on [construing] the terms of the cooperative

_____

agreements with the Plaintiff resettlement partners, and the Plaintiff resettlement partners cannot sue under the APA for breach of those contracts.

19

agreements." Ans.Br. 49. But nothing in *DOE* turned on whether the claim involved construing contractual terms. And courts around the country have followed *DOE* over the past two months without demanding any such showing. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (staying injunction based on *DOE* where grants "were awarded by federal executive agencies to specific grantees from a generalized fund"); *Am. Library Ass'n v. Sonderling*, No. 25-1050, 2025 WL 1615771, at *5 (D.D.C. June 6, 2025) (denying preliminary injunction where plaintiffs alleged grant terminations violated the APA, First Amendment, separation of powers, and *ultra vires* doctrine, and noting *DOE* "cast[] doubt on district courts' jurisdiction to hear cases involving grant terminations"); *Solutions in Hometown Connections v. Noem*, No. 25-885, 2025 WL 1103253, at *8–10 (D. Md. Apr. 14, 2025) (denying TRO motion challenging termination of certain grants in light of *DOE*, and concluding plaintiffs' APA claims were "in essence contract claims against the United States for which the … Court of Federal Claims has exclusive jurisdiction"); *Mass. Fair Hous. Ctr. v. HUD*, No. 25-30041 (D. Mass Apr. 14, 2025), ECF 42 (dissolving a TRO after acknowledging *DOE* is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr.

10, 2025) (staying district court's preliminary injunction in a case involving education-related grants in light of *DOE*).[7]

Instead, Plaintiffs rely principally on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), to argue the district court is the proper venue to bring their contract claims. Ans.Br. 46–47. But that case did not address a contractual arrangement between the government and a private party. Rather, *Bowen* concerned states' entitlement to federal funding directly under a statute—not contract—so it addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages." *See* 487 U.S. at 981–901; 5 U.S.C. § 702. Regardless of whether Plaintiffs' requested relief is best characterized as money damages, APA jurisdiction is independently barred here because the Tucker Act forbids Plaintiffs' attempt to compel continued funding *under a contract. See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (explaining jurisprudence regarding APA carveout for suits for "money damages" "has no bearing" on the ability of private parties to obtain injunctions to enforce contractual obligations against the federal government); *Yee*

---

[7] Plaintiffs argue this Court should instead follow *Climate United Fund v. Citibank, N.A.*, No. 25-698, 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025)—but they overlook that the D.C. Circuit has stayed that decision pending appeal. *See* Order, No. 25-5122 (D.C. Cir. Apr. 28, 2025) (per curiam); Ans.Br. 50. And *AIDS Vaccine Advocacy Coalition*, Nos. 25-400, 25-402, 2025 WL 1380421 (D.D.C. May 13, 2025), even if correctly decided (and it wasn't), is no help to Plaintiffs, given that the case involved "blanket directives to suspend congressionally appropriated foreign aid" antecedent to any contractual breach or termination. *Id.* at *3.

*v. Jewell*, 228 F.Supp.3d 48, 56 (D.D.C. 2017) (recognizing a demand for "monetary relief" for purposes of Tucker Act jurisdiction is a "concept distinct from 'money damages' in the sense of *Bowen*"). And the Supreme Court made clear in *DOE* that *Bowen* does not permit APA jurisdiction in cases like this one involving an "order[] 'to enforce a contractual obligation to pay money.'" 145 S.Ct. at 969 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Thus, rather than *Bowen*, the better analog for this case continues to be *Catholic Bishops*, 2025 WL 763738, at *1.

For these reasons, the district court lacked jurisdiction to enjoin not only the pause of USRAP funding but later the fundamentally contractual termination of the cooperative agreements, and this Court should reverse for lack of jurisdiction.[8]

## IV. Plaintiffs' APA Claims Fail

For the reasons explained in §§ I and II, the USRAP Order was lawful, and the district court erred in holding otherwise. The court's conclusion that the agencies

---

[8] Plaintiffs assert "Defendants cannot dispute that the district court had jurisdiction over [their] ultra vires … claim[]." Ans.Br. 53. But Plaintiffs did not bring an *ultra vires* claim in their Complaint or Supplemental Complaint. *See* ER-784, 1151. Nor could they, because an *ultra vires* claim is precluded when a statutory remedy exists—and here, the Tucker Act provides a remedy for breach of contract. *See Bd. Of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (a non-statutory *ultra vires* claim is unavailable if there is a "meaningful and adequate means of vindicating" a plaintiff's rights).

acted contrary to law by implementing the USRAP Order was based on its flawed § 1182(f) analysis, and thus fails with it. *See* Op.Br. 35.

Plaintiffs respond that § 1182(f) confers no authority on agencies, Ans.Br. 57, but that misses the point. The agencies acted pursuant to a valid executive order, which *was* based upon the President's § 1182(f) authority. The APA does not permit review of agency implementation of an authority assigned by Congress to the President. *See, e.g.*, *Ancient Coin Collectors Guild v. CPB*, 801 F.Supp.2d 383, 402, 405 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) (where an agency acts on behalf of the President, those acts remain those of the President for APA purposes and do not become reviewable as actions of an agency). Nor can an agency's compliance with facially valid executive orders be characterized as contrary to law or arbitrary and capricious under the APA.

## A. The agencies did not violate the APA by ceasing to process refugees who were barred from admission.

Plaintiffs claim the agencies went beyond the USRAP Order and violated the APA by pausing not only refugee *admissions*, but also refugee *processing*. *See* Ans.Br. 60.[9] But that is neither arbitrary and capricious, nor contrary to law. It is

---

[9] Plaintiffs also argue that the agencies exceeded the USRAP Order by suspending refugee travel prior to the USRAP Order's effective date, and by considering case-by-case exemptions to the Order on an individualized basis. Ans.Br. 60. As already addressed in Defendants' opening brief, both of those challenges are baseless too. Op.Br. 39-40, 43.

transparently reasonable not to devote scarce time and resources to processing refugee applicants who have no viable path to admission at the moment, especially given many of the processing steps (like medical examinations) must be proximate to admission or else expire. *See* Op.Br. 39–40 (citing ER-893–94), 43. Plaintiffs do not seriously argue otherwise; they only critique the agencies for providing "post hoc rationalizations." Ans.Br. 61, 61 n.24. That is inaccurate: The agency declaration on record attested to the State Department's reasoning *at the time* it implemented the USRAP and Foreign Aid Orders. ER-888–97.

Nor is a pause of refugee processing contrary to the statutory scheme—more specifically, provisions governing admissions "in accordance with a determination made by the President" and the Attorney General's discretionary authority to admit any refugee subject to the numerical limitations and other statutory requirements. Ans.Br. 56 (citing 8 U.S.C. § 1157(a)(3), (c)(1)). Neither provision imposes a requirement to process refugee applications; instead, they simply speak to the admission of refugees in the normal course—that is, absent any entry restrictions that the President may impose under his § 1182(f) authority, as he lawfully did here. *See* 8 U.S.C. §§ 1157(a)(3) (explaining how admissions are generally to "be allocated"), 1157(c)(1) (discussing the Attorney General's discretionary and regulatory authority to admit refugees). The regulations themselves are explicit in recognizing the Executive's discretionary powers in governing the entire refugee

24

admission process, and in no way can be read as curtailing the President's unquestioned authority under § 1182(f).

**B.** **The agencies did not violate the APA by pausing USRAP funding pursuant to the Foreign Aid Order, and later terminating cooperative agreements consistent with those agreements' terms.**

Turning back to the cooperative agreements, Plaintiffs have no viable funding claim under the APA (even assuming the Tucker Act permits APA review). Plaintiffs acknowledge agencies have "discretionary authority … to enter and terminate cooperative agreements." Ans.Br. 58–59. Indeed, the Refugee Act authorizes—but does not require—the Secretary of State to "make grants to, and contracts with, public or private nonprofit agencies for initial resettlement" of "refugees in the United States." 8 U.S.C. § 1522(b)(1)(A). Plaintiffs insist, however, that the Government is statutorily obligated to provide a program for initial resettlement to newly arrived refugees. Ans.Br. 57–59. But the provisions they cite merely set forth requirements and performance criteria for resettlement agencies operating under cooperative agreements. They do not require the Government to enter into such agreements in the first place. 8 U.S.C. § 1522(b)(7)–(8). And § 1522(a)(1)(A) simply identifies the objectives that should be advanced in providing domestic refugee resettlement but likewise does not require entering into cooperative agreements with resettlement agencies for an initial resettlement program.

25

Plaintiffs wrongly claim the funding terminations "guarantee[] that refugee admissions and resettlement cannot happen now or in the future," Ans.Br. 57. They assert refugee processing cannot continue without resettlement partners, and refugee applicants cannot be admitted when they are unable to obtain assurances from resettlement agencies. Ans.Br. 57–58. But the funding terminations in no way prevent the resumption of USRAP processing and domestic resettlement support once admissions resume—either through new cooperative agreements with resettlement partners, or through alternative means implemented by the Government.[10] Finally, Plaintiffs are mistaken that the agencies should have prioritized the "continued existence" of the resettlement partners. Ans.Br. 62. It is not the role of the agencies to account for the long-term financial viability of resettlement partners—let alone to prioritize their interests above complying with the President's lawful exercise of his powers over immigration.

## C. The agencies did not violate the APA by proceeding without notice-and-comment rulemaking.

Plaintiffs' procedural APA claims go nowhere as well. The agencies were not required to do notice-and-comment rulemaking before implementing the USRAP

---

[10] Insofar as Plaintiffs suggest an assurance of resettlement support from a resettlement agency is required under the law, the Refugee Act does not require assurances, and 8 C.F.R. § 207.2(c) requires only that each refugee applicant be sponsored by a responsible person or organization.

Order. Ans.Br. 54–56. The President's lawful invocation of § 1182(f) was not subject to notice-and-comment rulemaking because the President is not an agency. *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). And agencies implementing presidential orders are not "obligated to consider comments that, if adopted, would cause [them] to disobey the President and create an unlawful rule." *Sherley v. Sebelius*, 776 F.Supp.2d 1, 22 (D.D.C. 2011).

Regardless, the temporary suspension of refugee processing is not a "substantive rule" subject to notice-and-comment requirements. Plaintiffs claim the pause effectively "alter[s]" USRAP regulations. Ans.Br. 55. It does not. The suspension does not touch those regulations, which remain intact pending the resumption of the program. Indeed, the pause does not affect primary conduct of any regulated parties at all—only the agencies' own implementation efforts.[11]

Lastly, given Plaintiffs have not put forth a viable APA claim, there is no basis for them to assert the Government somehow failed to meet the APA's procedural requirements.

---

[11] Plaintiffs claim the Government waived any challenge to the district court's notice-and-comment holding. Ans.Br. 54. Not so. The Government's opening brief explained multiple independent reasons that all Plaintiffs' APA claims fail. *See* Op.Br. 30–35, 44–48; *see also See Sabra v. Maricopa Cnty.*, 44 F.4th 867, 881–82 (9th Cir. 2022) (issue not addressed in opening brief preserved when raised in reply brief).

Despite all this, the district court held the temporary suspension of overseas processing is a "substantive, or legislative, rule[]" subject to notice and comment. ER-82–84. It relied on a statement in *Doe v. Trump*, 288 F.Supp.3d 1045, 1075 (W.D. Wash. 2017), that agency actions that alter regulations promulgated through notice-and-comment rulemaking are themselves subject to rulemaking procedures. ER-84 (citing 8 C.F.R. § 207 generally and 8 C.F.R. § 207.7 specifically). But that proposition is irrelevant here, as the agency implementation of the USRAP Order merely pauses refugee application processing pending an evaluation of the program and in no way alters the rules of the application process or prevents following-to-join individuals from being granted refugee status if they are admitted to the country.

### D.    Regardless, all the APA claims are barred multiple times over.

All of the above aside, Plaintiffs have not overcome the threshold bars to APA review. Their claims independently fail on any of the following grounds.

*First*, Plaintiffs do not identify final agency action. The pause in processing refugee applications and admissions is, by nature, not a final action. It therefore does not satisfy the first prong of the *Bennett v. Spear* test, 520 U.S. 154, 177–78 (1997)—*i.e.*, consummated decisionmaking. *See* Op.Br. 45–46 (noting "[n]othing in the [USRAP Order] contemplates a permanent or final state of affairs," nor would the Order turn into an actionable "final action down the road," because whether to

28

resume processing and admitting refugees would be for the President (who is not an "agency" under the APA) to decide).

*Second*, Plaintiffs' challenge to a large number of agency decisions collectively administering the USRAP amounts to an unreviewable programmatic challenge. Plaintiffs acknowledge they challenge a series of "discrete agency actions, taken over the course of a few days," but still assert the aggregation of separate discrete actions is reviewable under *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890–91 & n.2 (1990). Ans.Br. 63–64. Not so. *Lujan* explained that an order "applying some particular measure across the board" might be challengeable so long as such order "is final and has become ripe for review." 497 U.S. at 890 n.2. That is not the case here: There is no "particular measure" that is being applied "across the board"—as just explained, pausing the USRAP is not final agency action anyway.

*Finally*, Plaintiffs may not challenge the allocation of USRAP funding because the allocation of funds from a lump-sum appropriation is committed to agency discretion. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). Plaintiffs' attempt to distinguish *Lincoln* fails, as it is premised on their erroneous belief that § 1522 requires the provision of resettlement support. Ans.Br. 66–67. As discussed, that statute merely *authorizes* the provision of certain services and directs the Government to prioritize certain goals, but does not mandate initial resettlement

support at all (let alone require cooperative agreements with Plaintiffs here). 8 U.S.C. § 1522. Because Congress has not "statutorily restrict[ed] what can be done with" the allocated Migration and Refugee Assistance lump sum, *Lincoln*, 508 U.S. at 192, the Executive agencies are permitted to spend the allocated funds as they see fit across a wide range of migration and refugee programs.

## V.     The Balance of Equities Supports Reversal of the Injunctions

Plaintiffs are unable to answer the irreparable harm the injunctions would cause the Government and public if they are not vacated, or show any irreparable injury of their own sufficient to outweigh those interests.

To start, Plaintiffs do not dispute the Government's explanation that it would be practically impossible to reverse grants of refugee status made during the pendency of litigation should the Government prevail on the merits. Op.Br. 50–51. To the contrary, Plaintiffs admit that refugees may "adjust their status to legal permanent resident after one year" and "the grounds for termination" of that status are "limit[ed]." Ans.Br. 73 n.31. That proves problematic, since a "defining characteristic of sovereignty" is "the power to exclude from the sovereign's territory people who have no right to be there." *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J., concurring in part and dissenting in part). Compelling the Government to permanently admit people whose admission the President has determined to be contrary to the interests of the United States inflicts quintessential

*sovereign* injury, which by definition is irreparable. It is no answer that prospective refugees would still be subject to inadmissibility grounds. Ans.Br. 73. The whole point of § 1182(f) is to allow the President to restrict the entry of aliens who would *not* otherwise be inadmissible.

Plaintiffs insist that, by creating a refugee program, Congress determined refugee admission advances the national interest. Ans.Br. 73. But Congress also vested the President with broad discretion to determine which individual classes of refugees may be admitted in the national interest, *see* 8 U.S.C. § 1157(a)(2), and whether the entry of any class of aliens should be suspended for being detrimental to the interests of the United States, *see id.* § 1182(f). Similarly, Plaintiffs' assertion that the continued entry of refugees causes no harm cannot be squared with the President's § 1182(f) determination that "the United States has been inundated with record levels of migration," with some jurisdictions "declar[ing] states of emergency because of increased migration." ER-47 (quoting USRAP Order § 1).

At bottom, the First Injunction prevents the President from exercising core immigration powers, which is itself an irreparable injury. *See Maryland v. King*, 567 U.S. 1031, 1303 (2012) (Roberts, C.J., in chambers).

On the funding side, too, the injunctions threaten irreparable harm. It would be nearly impossible for the Government to recover public funds disbursed to resettlement partners should it prevail on the merits—as the stay panel found it likely

31

will. Op.Br. 51. Plaintiffs do not dispute that the inability to recover these funds would constitute irreparable harm; they respond only that the Government presented no evidence of the difficulty in recovering funds. Ans.Br. 74 n.32. But Plaintiffs' admission that the resettlement partners face insolvency absent the millions of dollars in disbursements, Ans.Br. 24, 71, *see* ER-739, 751, readily evidences the scale of the monetary outflows at stake here, as well as the likely impossibility of recovering those funds even if the district court ultimately rules in the Government's favor.

On the other side of the scale, Plaintiffs recount their claimed harms but fail to explain how those are irreparable. Ans.Br. 70–71. They describe the Government's argument as to the individual Plaintiffs as "callous" in pointing out the years-long duration of the refugee application processing—but are unable to show how those individuals face significant risk of harm in third countries, or how the one Plaintiff who remains in his home country is at risk given he has lived there safely for the last 15 years. *See* Op.Br. 48. As for the resettlement partners, while Plaintiffs claim money damages will not provide adequate redress, that is no reason to grant equitable relief as a substitute. *See Catholic Bishops*, 2025 WL 763738, at *7 n.6 ("Regardless of the precise remedial powers of the Claims Court, … government contractors seeking specific performance must go there, even if the contractor will be limited to a damages remedy.").

## VI. The Injunctions Are, at Minimum, Impermissibly Overbroad

At minimum, the universal injunctions issued below flout the limitations on federal courts arising both from the Constitution and principles of equity. *See* Op.Br. 51–54. Relief must be narrowly tailored to the parties before the court and "limited to the inadequacy that produced [plaintiffs'] injury in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Here, Plaintiffs fail to show that "complete relief" could not be provided by a narrower injunction limited to any bona fide, identified plaintiffs. *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).

Plaintiffs maintain a universal injunction is necessary because the Plaintiff resettlement partners operate in multiple states and are harmed by reduced refugee admissions. *See* Ans.Br. 78. But that in no way requires or justifies relief on behalf of *non-parties*. The only appropriate relief (again, if Plaintiffs had any meritorious claims, which they do not) would be an injunction as to Plaintiff resettlement partners which would apply as to their activities, wherever these occur. The resettlement partners have no vested right to serve some minimum number of refugees, and thus have no legal basis on which they can demand the admission of refugees. *See FDA v. Hippocratic Medicine*, 602 U.S. 367, 395–96 (2024); *Arizona All. v. Mayes*, 117 F.4th 1165, 1170 (9th Cir. 2024).

Plaintiffs also contend non-party resettlement partners must be covered by a sweeping universal injunction because continuing the USRAP with only the named

resettlement partners in this suit would make resuming the USRAP impracticable. Ans.Br. 76. But continuation of the USRAP using only the Plaintiff resettlement partners would not prevent the USRAP from being reinstated in a meaningful way. At most, it may possibly reduce the number of refugees receiving assurances and being admitted under the program by the end of the year. But that is not a reason to allow the district court to dictate the exact scale on which the USRAP must operate (including the number of resettlement partners with which the agencies must contract). That would be at complete odds with the text of the Refugee Act, which does not mandate a minimum number of annual refugee admissions—the applications for which are adjudicated on a discretionary, case-by-case basis—but simply provides that such admissions must not *exceed* the ceiling set by the President. 8 U.S.C. § 1157(a); *see East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (rejecting notion that "a nationwide injunction is appropriate simply because [there is] a rule that applies nationwide").[12]

At a minimum, the district court's injunctions must be vacated on account of their excessive overreach.

---

[12] Plaintiffs wrongly claim Defendants have never proposed a workable plan for resuming the USRAP using only the Plaintiff resettlement partners, likely referring to contentious disputes over the district court's misreading of this Court's partial stay. Ans.Br. 77. Defendants, however, have proposed a plan that is consistent with this Court's largely comprehensive stay. *Pacito*, Dist.Dkt. 128.

## CONCLUSION

This Court should reverse the district court's injunctions.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DAVID KIM
*Senior Litigation Counsel*

<u>*s/ Joseph McCarter*</u>
JOSEPH MCCARTER
ALEXANDRA YEATTS
LINDSAY ZIMLIKI
JASON ZUBATA
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Washington, DC 20005

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a) and Ninth Circuit Rule 32-1(a), I certify that the text of the reply brief is double spaced, proportionately spaced 14-point Times New Roman type; and the footnotes are single spaced, proportionately spaced 14-point Times New Roman type. Defendants have pending a Rule 32-2(a) motion to exceed the 7,000-word type-volume limitation by 1,467 words.

*s/ Joseph A. McCarter*
JOSEPH A. MCCARTER
Attorney for Defendants-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Appellees' counsel is a registered CM/ECF user and will be served by the appellate CM/ECF system.

*s/ Joseph A. McCarter*
JOSEPH A. MCCARTER
Attorney for Defendants-Appellants